Heidi McIntosh, Utah Bar #6277
Thomas R. Delehanty, CO Bar #51887
*(pro hac vice forthcoming)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel: (303) 623-9466
Fax: (720) 550-5757
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

*Attorneys for Proposed Intervenor-
Defendants National Parks Conservation
Association, The Wilderness Society, Grand
Canyon Trust, Great Old Broads for
Wilderness, Western Watersheds Project,
WildEarth Guardians, Sierra Club, and
Center for Biological Diversity*

Michelle White, Utah Bar #16,985
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
michellew@suwa.org

*Attorney for Proposed Intervenor-Defendant
Southern Utah Wilderness Alliance*

Stephen H.M. Bloch, Utah Bar #7813
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
steve@suwa.org

*Attorney for Proposed Intervenor-Defendant
Southern Utah Wilderness Alliance and
Natural Resources Defense Council*

Katherine Desormeau, CA Bar #266463
*(pro hac vice forthcoming)*
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Tel.: (415) 875-6100
Fax: (415) 795-4799
kdesormeau@nrdc.org

Sharon Buccino, DC Bar #432073
*(pro hac vice forthcoming)*
Charles Corbett, DC Bar #1767101
*(pro hac vice forthcoming)*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Tel.: (202) 289-6868
Fax: (415) 795-4799
sbuccino@nrdc.org
ccorbett@nrdc.org

*Attorneys for Proposed Intervenor-
Defendant Natural Resources Defense
Council*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRIC OF UTAH
SOUTHERN REGION OF THE CENTRAL DIVISION**

| | | |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 4:22-cv-00060-DN-PK |
| | ) | |
| JOSEPH R. BIDEN, JR., *et al.*, | ) | Hon. David Nuffer |
| | ) | |
| Defendants, | ) | Magistrate Judge Paul Kohler |
| | ) | |
| and | ) | **MOTION TO INTERVENE AND** |
| | ) | **MEMORANDUM IN SUPPORT** |
| SOUTHERN UTAH WILDERNESS | ) | |
| ALLIANCE, *et al.*, | ) | |
| | ) | |
| Proposed-Intervenor- | ) | |
| Defendants. | ) | |
| | ) | |

## I.   INTRODUCTION

Plaintiffs Zebediah George Dalton, *et al.* (collectively, the Dalton Plaintiffs) seek to eliminate protections for public lands and irreplaceable cultural and archaeological sites, fossil deposits, wildlife habitat, and geologic features, by challenging President Biden's designations of Bears Ears National Monument and Grand Staircase-Escalante National Monument (collectively, the Monuments).[1] Their suit threatens the hard-won conservation achievements and interests of movants Southern Utah Wilderness Alliance, *et al*.[2] (collectively, the SUWA Intervenors), all of which have worked for years to secure and maintain monument protections for these areas.

Because the remedy the Dalton Plaintiffs seek—reversal of President Biden's decisions and diminishment of the Monuments and the protection they confer—would impair the SUWA Intervenors' interests in enjoying and preserving the Monuments, and because no other party adequately represents their interests, the SUWA Intervenors respectfully move to intervene as of right under Federal Rule of Civil Procedure 24(a). Alternatively, the SUWA Intervenors move to intervene permissively under Rule 24(b).

The SUWA Intervenors' counsel conferred with counsel for defendants Joseph R. Biden, Jr., *et al*. (collectively, Federal Defendants) and counsel for the Dalton Plaintiffs regarding this motion. Federal Defendants indicated they would reserve taking a position until the motion was filed. Counsel for the Dalton Plaintiffs states: "Plaintiffs take no position on the motion to intervene, provided that the participation of intervenors does not delay resolution of this case."

---

[1] *See* Pres. Proc. No. 10,285, Proclamation on Bears Ears National Monument, 86 Fed. Reg. 57,321 (Oct. 8, 2021); Pres. Proc. No. 10,286, Proclamation on Grand Staircase-Escalante National Monument, 86 Fed. Reg. 57,335 (Oct. 8, 2021).

[2] Movants are Southern Utah Wilderness Alliance, Center for Biological Diversity, Grand Canyon Trust, Great Old Broads for Wilderness, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, The Wilderness Society, Western Watersheds Project, and WildEarth Guardians.

1

II.   STATEMENT OF FACTS

   A.  Designation of the Monuments

The Bears Ears and Grand Staircase-Escalante National Monuments are rich in cultural significance and human history, plant and animal life, and paleontological resources. As the Hopi Tribe, Navajo Nation, Ute Mountain Ute Tribe, and Pueblo of Zuni describe, ECF No. 47, Bears Ears has been home to Native American communities "since time immemorial," and their stories are interwoven into the landscape in the form of mud brick granaries and dwellings, rock art, tools, projectile points, pottery, and other cultural sites.[3] Its sinuous canyons and towering mesas are geologic wonders, representing one of the least-developed areas in the contiguous United States. Many iconic wildlife species rely on habitat within the Monument, and the landscape contains fossils of dinosaurs, plant-eating crocodiles, and other ancient plant and animal life.[4] Because off-road vehicle use, unmanaged visitation, mining, looting of cultural sites, and other activities increasingly threatened these irreplaceable objects, five Native American tribes—supported by the SUWA Intervenors and others—urged President Obama to preserve the Monument for future generations. President Obama responded, designating the 1.35-million-acre Bears Ears National Monument pursuant to his authority under the Antiquities Act.[5]

Grand Staircase-Escalante National Monument similarly "abounds" in cultural significance and human history.[6] Grand Staircase-Escalante is "one of the world's great paleontological laboratories," with "geological treasure[s]" like "the first evidence that tyrannosaurs hunted in packs" and "marble-like iron oxide concretions found in Navajo

---

[3] 86 Fed. Reg. at 57,321, 57,326, 57,329.
[4] *Id.* at 57,324–28.
[5] Pres. Proc. No. 9558, 82 Fed. Reg. 1139, 1143 (Dec. 28, 2016).
[6] 86 Fed. Reg. at 57,337.

Sandstone that provide insight into Martian geology."[7] The Monument "contains 50 percent of Utah's rare flora and 125 species of plants that occur only in Utah or on the Colorado Plateau."[8] The Monument is imbued with historic significance. Numerous tribal nations have deep "ancestral, cultural, [and] historical ties" to the region, and the "vast and austere" landscape "teems with evidence of the efforts expended by both indigenous people and early Anglo pioneers to carve existences into an arid and unforgiving region."[9] Recognizing the historical and scientific importance of this "unspoiled natural area," President Clinton designated the Grand Staircase-Escalante National Monument in 1996.[10] Congress later added 180,000 acres to the Monument, bringing it to 1.87 million acres.[11] Several of the SUWA Intervenors advocated for the Monument's creation and intervened to defend it from a prior legal challenge.[12]

When President Trump took office, he directed Secretary of the Interior Ryan Zinke to review prior monument designations for possible modification.[13] Following that review, President Trump shrank the Bears Ears National Monument by about 85 percent, to roughly 200,000 acres.[14] He also shrank the Grand Staircase-Escalante National Monument by about 46 percent, to roughly 1 million acres.[15] The SUWA Intervenors promptly sued, asserting the president lacked authority under the Antiquities Act to revoke existing monument protections.[16]

---

[7] *Id.* at 57,337.
[8] *Id.*
[9] *Id.* at 57,336–37.
[10] Pres. Proc. No. 6920, 61 Fed. Reg. 50,223, 50,223 (Sept. 18, 1996).
[11] 86 Fed. Reg. at 57,335.
[12] *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001) [hereinafter *UAC*].
[13] Exec. Order No. 13,792, 82 Fed. Reg. 20,429 (Apr. 26, 2017).
[14] Pres. Proc. No. 9681, 82 Fed. Reg. 58,081, 58,085 (Dec. 4, 2017).
[15] Pres. Proc. No. 9682, 82 Fed. Reg. 58,089, 58,093 (Dec. 4, 2017)v.
[16] *See Nat. Res. Def. Council v. Trump*, No. 17-cv-02606 (D.D.C. filed Dec. 7, 2017), *consolidated with Hopi Tribe v. Trump*, No. 17-cv-02590 (D.D.C. filed Dec. 4, 2017); *The Wilderness Soc'y v. Trump*, No. 17-cv-02587 (D.D.C. filed Dec. 4, 2017), *consolidated with Grand Staircase Escalante Partners v. Trump*, No. 17-cv-02591 (D.D.C. filed Dec. 4, 2017).

While those cases were pending, on February 6, 2020, the U.S. Forest Service and Bureau of Land Management (BLM) released a management plan for the Bears Ears National Monument that implemented Proclamation 9681.[17] At the same time, BLM released a management plan for the lands excised from the Grand Staircase-Escalante National Monument as well as one for the remaining monument lands that implemented Proclamation 9682.[18] The SUWA Intervenors and their members participated in the Secretary of the Interior's 2017 review and in both Monuments' management plan development through public commenting processes.[19]

On January 20, 2021, President Biden directed the Secretary of the Interior to review President Trump's monument rollbacks.[20] After months of study and public outreach, Secretary Deb Haaland issued a report recommending that both Monuments be restored.[21] On October 8, 2021, President Biden issued a proclamation that "confirm[ed], restore[d], and supplement[ed] the boundaries and protections" for Bears Ears.[22] It reserved all 1.35 million acres of land included in the Monument's original designation, plus approximately 11,200 acres of land that had been added with Proclamation 9681.[23] On the same day, President Biden restored Grand Staircase-Escalante to its prior size of 1.87 million acres.[24]

On August 25, 2022, the Dalton Plaintiffs filed this suit, alleging that President Biden's

---

[17] BLM, *Record of Decision and Approved Monument Management Plans for the Indian Creek and Shash Jáa Units* (Feb. 2020).

[18] BLM, *Record of Decision and Approved Resource Management Plan for the Kanab-Escalante Planning Area* (Feb. 2020); BLM, *Record of Decision and Approved Resource Management Plan for the Grand Staircase-Escalante National Monument* (Feb. 2020).

[19] *See infra*, note 27.

[20] Exec. Order No. 13,990 § 3, 86 Fed. Reg. 7037, 7039 (Jan. 20, 2021).

[21] U.S. Dep't of the Interior, *Report on Restoring National Monuments* 15 (June 2021), https://on.doi.gov/3BA4VOT.

[22] 86 Fed. Reg. at 57,321.

[23] *Id.* at 57,330–31.

[24] 86 Fed. Reg. at 57,344–46.

proclamations restoring the Monuments violate the Antiquities Act and requesting that the Court declare the proclamations unlawful and enjoin their implementation.

### B.  The SUWA Intervenors

The SUWA Intervenors are nonprofit organizations dedicated to the conservation of federal public lands and the wildlife and ecosystems they sustain.[25] Ensuring robust protection for national monuments, and for Bears Ears and Grand Staircase-Escalante specifically, is integral to their work. The SUWA Intervenors took action in support of the Bears Ears Inter-Tribal Coalition's proposal to designate Bears Ears;[26] submitted detailed comments during the Zinke review in support of retaining the Monuments;[27] filed legal challenges to the 2017 rollbacks—litigation that is ongoing;[28] and participated in BLM and the Forest Service's subsequent management-planning processes.[29] In 2021, they advocated for the Monuments' restoration by participating in the Interior Department's virtual public stakeholder meeting, engaging in public and member education efforts, and sending letters to the administration describing the urgent need for monument protections.[30]

---

[25] *See* Ex. 1, Decl. of Ernest Atencio ¶¶ 4–5; Ex. 2, Decl. of Ray Bloxham ¶¶ 6–13; Ex. 3, Decl. of Jack Hanley ¶¶ 1–2; Ex. 4, Decl. of Wayne Hoskisson ¶ 2; Ex. 5, Decl. of Sara Husby-Good ¶¶ 4–5; Ex. 6, Decl. of Daniel Kent ¶ 2; Ex. 7, Decl. of Taylor McKinnon ¶¶ 2–3; Ex. 8, Decl. of Erik Molvar ¶¶ 3–4; Ex. 9, Decl. of Tim Peterson ¶¶ 5, 8; Ex. 10, Decl. of Katie Umekubo ¶¶ 6–7; Ex. 11, Decl. of Laura Welp ¶ 3.

[26] Atencio Decl. ¶ 6; Bloxham Decl. ¶ 16.b; Hoskisson Decl. ¶¶ 14–15; Husby-Good Decl. ¶ 9; McKinnon Decl. ¶ 4; Molvar Decl. ¶¶ 10–11; Peterson Decl. ¶ 14.c; Umekubo Decl. ¶ 9.

[27] Atencio Decl. ¶ 9; Husby-Good Decl. ¶¶ 11.a, 18.a; McKinnon Decl. ¶ 9; Molvar Decl. ¶ 12; Peterson Decl. ¶¶ 17a, 17.c, 32.a ; Umekubo Decl. ¶ 12; Welp Decl. ¶ 22.

[28] Atencio Decl. ¶ 10; Bloxham Decl. ¶¶ 15.g, 16.h; Hoskisson Decl. ¶ 15; Husby-Good Decl. ¶¶ 11.b, 18.b; McKinnon Decl. ¶ 11; Molvar Decl. ¶ 12; Peterson Decl. ¶¶ 14.h, 17.d, 32.d; Umekubo Decl. ¶ 13; Welp Decl. ¶ 25.

[29] Atencio Decl. ¶¶ 11–12, 15; Bloxham Decl. ¶¶ 15,h, 16.i; Hoskisson Decl. ¶ 10; Husby-Good Decl. ¶¶ 12, 19; Peterson Decl. ¶¶ 14.d, 15–16, 17.b, 31.g–h, 32.c; Umekubo Decl. ¶ 16; Welp Decl. ¶¶ 19–20, 23–24.

[30] Atencio Decl. ¶ 13; Hoskisson Decl. ¶¶ 12–13; McKinnon Decl. ¶¶ 12–13; Peterson Decl. ¶¶ 17.a, 32.b; Umekubo Decl. ¶ 14.

The SUWA Intervenors' members regularly visit the Monuments to appreciate and learn from the spectacular cultural, ecological, and scientific resources they hold.[31] President Biden's proclamations protect the SUWA Intervenors and their members' interests; and conversely, elimination or diminution of the Monuments and the protection they confer would impair their interests by undoing the conservation gains they worked to achieve.[32]

## III.   ARGUMENT

### A.  The SUWA Intervenors Are Entitled to Intervene as of Right.

Under Federal Rule of Civil Procedure 24(a), "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."[33] The Tenth Circuit follows "a somewhat liberal line in allowing intervention."[34] Thus, "[f]ederal courts should allow intervention where no one would be hurt and greater justice could be attained."[35] Moreover, when litigation raises an issue of significant public interest, "the requirements for intervention may be relaxed."[36]

---

[31] Atencio Decl. ¶ 19–26; Bloxham Decl. ¶¶ 19–27, 30–35; Hanley Decl. ¶¶ 4, 10, 12; Hoskisson Decl. ¶¶ 3–8; Husby-Good Decl. ¶¶ 7, 15; Kent Decl. ¶¶ 3–13, 19–27; McKinnon Decl. ¶¶ 16–18; Molvar Decl. ¶¶ 5–9; Peterson Decl. ¶¶ 7–13, 28–30; Umekubo Decl. ¶ 18; Welp Decl. ¶¶ 6–11, 13–18.

[32] Atencio Decl. ¶ 27; Bloxham Decl. ¶¶ 17–18, 28–29, 36–37; Hanley Decl. ¶ 7–9, 10.c, 11, 12.c, 13–15; Hoskisson Decl. ¶¶ 16–21; Husby-Good Decl. ¶ 20–21; Kent Decl. ¶¶ 13–18, 28–31; McKinnon Decl. ¶¶ 20–21; Molvar Decl. ¶¶ 14–16; Peterson Decl. ¶¶ 18–27, 33–38; Umekubo Decl. ¶ 17; Welp Decl. ¶¶ 26–27.

[33] Fed. R. Civ. P. 24(a)(2); *see also UAC*, 255 F.3d at 1249; *Kane Cnty. v. United States*, 928 F.3d 877, 889 (10th Cir. 2019); *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017).

[34] *Nat'l Farm Lines v. Interstate Com. Comm'n*, 564 F.2d 381, 384 (10th Cir. 1977); *see also, e.g.*, *Zinke*, 877 F.3d at 1164.

[35] *UAC*, 255 F.3d at 1250 (internal quotation marks omitted).

[36] *San Juan Cnty v. United States*, 503 F.3d 1163, 1201 (10th Cir. 2007) (en banc).

The Tenth Circuit's decision in *UAC* is squarely on point. In that case, the Tenth Circuit held that the movants, including three of the SUWA Intervenors here, were entitled to intervene as of right to defend against a challenge to President Clinton's designation of Grand Staircase-Escalante National Monument.[37] As in *UAC*, the SUWA Intervenors here meet the test for intervention as of right under Rule 24(a)(2).

First, the motion is timely. The SUWA Intervenors filed expeditiously after the Dalton Plaintiffs filed their complaint, so there can be no prejudice to the Dalton Plaintiffs.[38]

Second, the SUWA Intervenors have "an interest relating to the property or transaction that is the subject of the action"—the Monuments themselves.[39] As in *UAC*, their interest is grounded in "their desire to further their environmental and conservationist goals by preserving the undeveloped nature of the lands encompassed by the monument[s]" and through their many years of advocacy for the creation and protection of the Monuments.[40] In *UAC*, the movants' support for the Monument's creation, their goal of "vindicating their conservationist vision through its preservation, [and] their use of the monument in pursuit of that vision," demonstrated that their interest was sufficient to support intervention as of right.[41]

These same interests are present here. SUWA Intervenors and their members were vocal

---

[37] *UAC*, 255 F.3d at 1248, 1256.

[38] *See UAC*, 255 F.3d at 1250–51 (holding motion to intervene was timely given lack of prejudice to plaintiffs and "relatively early stage of the litigation").

[39] Fed. R. Civ. P. 24(a)(2); *UAC*, 255 F.3d at 1252; *see also Kane Cnty.*, 928 F.3d at 892.

[40] *UAC*, 255 F.3d at 1251.

[41] *Id*. at 1252–53; *see also Kane Cnty.*, 928 F.3d at 892 (holding "preservation and enjoyment of [affected] land" satisfied interest test); *W. Energy All.*, 877 F.3d at 1165 (holding a "record of advocacy," including work to "reduc[e] the instances and effects of oil and gas drilling on public lands," satisfied interest test); *Coal. of Ariz./N.M. Cntys. v. Dep't of Interior*, 100 F.3d 837, 841–43 (10th Cir. 1996) (holding a "persistent record of advocacy for [an endangered owl's] protection" satisfied interest test); *Wild Earth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1198, 1200 (10th Cir. 2010) (similar).

supporters of establishing and protecting the Monuments, both initially and in 2021 before President Biden's proclamation.[42] They participated in the Interior Department's 2017 review and, later, in the public process that led to the 2020 management plans,[43] all in service of their conservation goals. Finally, their members regularly use and enjoy areas in the Monuments for aesthetic, scientific, educational, and recreational purposes, and they benefit from the Monuments' restored protections.[44] These interests entitle them to intervene as of right.[45]

Third, the SUWA Intervenors satisfy Rule 24(a)'s impairment prong, which requires a showing that the litigation "may as a practical matter impair or impede the movant's interest."[46] This is a "minimal burden" and requires the movants to show "only that impairment . . . is possible if intervention is denied."[47] Here, as in *UAC*, the SUWA Intervenors' interests would be impaired if the Dalton Plaintiffs succeed in eliminating or diminishing the Monuments.[48] If the Dalton Plaintiffs obtain the relief they seek, the Monuments will lose some or all of the protections for which the SUWA Intervenors worked and advocated. The lands would once again be open to mineral extraction and a multiple-use management regime that increases the risk of native vegetation removal, harmful off-road vehicle use, and vandalism and looting of cultural sites—all of which harm the Monuments' remarkable values that the SUWA Intervenors'

---

[42] *Supra*, notes 26, 30.
[43] *Supra*, notes 27, 29.
[44] *Supra*, notes 31–32.
[45] *UAC*, 255 F.3d at 1252–53.
[46] Fed. R. Civ. P. 24(a)(2).
[47] *Nat'l Park Serv.*, 604 F.3d at 1199 (quotation marks omitted).
[48] *See UAC*, 255 F.3d at 1253.

members cherish.[49] These facts satisfy Rule 24(a)'s impairment element.[50]

Fourth, none of the existing parties adequately represents the SUWA Intervenors' specific interests in this matter.[51]  As the Tenth Circuit has repeatedly recognized, this prong is satisfied where the government's broad obligation to represent the public interest "*may* conflict" with the intervenors' "particular interest[s]"—even if they share the same ultimate litigation objective.[52] Accordingly, the Tenth Circuit in *UAC* held that the movants cleared Rule 24(a)'s "minimal burden" and were entitled to intervene as of right.[53] *UAC* is consistent with recent case law directly on point: courts have repeatedly granted motions to intervene as of right filed by stakeholders seeking to defend other presidential monument proclamations despite their being nominally aligned with the federal government.[54]

Here, the case for inadequate representation is even stronger than in *UAC* given the

---

[49] Atencio Decl. ¶ 27; Bloxham Decl. ¶¶ 21–29, 33–36; Hanley Decl. ¶¶ 9, 11; Hoskisson Decl. ¶¶ 16–20; Husby-Good Decl. ¶ 20; Kent Decl. ¶¶ 13–15, 17, 28–29; McKinnon Decl. ¶ 20; Molvar Decl. ¶ 14; Peterson Decl. ¶¶ 18–27, 33–36; Umekubo Decl. ¶ 17; Welp Decl. ¶ 26.
[50] *See UAC*, 255 F.3d at 1253–54 (finding that the Monument "provide[d] greater protection for the intervenors' interests than prior" land management plans did).
[51] *See* Fed. R. Civ. P. 24(a)(2).
[52] *UAC*, 255 F.3d at 1255–56 (emphasis added); *see also id.* at 1255 (citing cases); *Kane Cnty.*, 928 F.3d at 895–96 (inadequate representation where government's "broad-ranging" interests were not identical to intervenor's narrower interests and change of administrations risked further "divergence of interest"); *Coal. of Ariz./N.M. Cntys.*, 100 F.3d at 845 (finding inadequate representation because the government "must represent the public interest, which may differ from [the movant's] particular interest in the protection of the [endangered] [o]wl").
[53] *UAC*, 255 F.3d at 1254, 1256.
[54] *See* Order, ECF No. 105, *Hopi Tribe v. Trump*, No. 17-cv-02590-TSC (D.D.C. Jan. 11, 2019) (granting Utah's motion to intervene); Order, ECF No. 83, *The Wilderness Society v. Trump*, No. 17-cv-02587-TSC (D.D.C. Jan. 11, 2019) (granting Utah and counties' motion to intervene); *see also, e.g.*, Order, ECF No. 26, *Fehily v. Biden*, No. 22-cv-02120-GC-TJB (D.N.J. Aug. 22, 2022) (granting environmental groups' motion); Minute Order, *Conservation Law Foundation v. Trump*, 1:20-cv-01589-JEB (D.D.C. Sept. 10, 2020) (granting fishing proponent's motion); Minute Order, *Mass. Lobstermen's Ass'n v. Ross*, No. 17-cv-00406-JEB (D.D.C. Mar. 20, 2018) (granting environmental groups' motion); Order, ECF No. 12, *Murphy Co. v. Trump*, No. 17-cv-00285-CL (D. Or. Mar. 14, 2017) (granting environmental groups' motion).

federal government's ongoing adversity to the SUWA Intervenors in litigation concerning these very Monuments.[55] There, the federal government and SUWA Intervenors have taken different positions on some of the very same legal issues presented in the Dalton Plaintiffs' complaint— including the availability and scope of judicial review, the scope of the President's authority under the Antiquities Act, and the meaning of the Act's "smallest area" clause.[56] Although the Federal Defendants' current position is that they will defend the legality of President Biden's proclamations, their divergent positions in *Hopi Tribe* and *The Wilderness Society* demonstrate that their arguments and interests may differ substantially from the SUWA Intervenors' here.

In sum, the SUWA Intervenors meet each of the four Rule 24(a) requirements and, just as in *UAC*, the Court should grant their motion to intervene as of right.

### B. Alternatively, This Court Should Grant Permissive Intervention.

If the Court denies intervention as of right, the SUWA Intervenors alternatively request leave to intervene permissively.[57] The SUWA Intervenors timely seek to present a defense that shares common questions of law and fact with the case's central issue: the legality of President Biden's restoration of the Monuments. The SUWA Intervenors will not cause undue delay or prejudice because they will not raise claims or issues beyond the scope of the complaint and will coordinate with other defendants to prioritize the just and efficient resolution of this action. Thus, if the Court denies intervention of right, permissive intervention is warranted.

### IV. CONCLUSION

For the reasons above, the SUWA Intervenors respectfully request that the Court grant their motion to intervene.

---

[55] *See Hopi Tribe*, No. 17-cv-2590; *The Wilderness Soc'y*, No. 17-cv-02587.
[56] *See* Compl. (ECF No. 2) ¶¶ 25, 39–99, 124–35.
[57] Fed. R. Civ. P. 24(b).

Respectfully submitted November 22, 2022

/s/ Heidi McIntosh
Heidi McIntosh, Utah State Bar No. 6277
Thomas R. Delehanty, CO Bar #51887 *(pro hac vice forthcoming)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 623-9466
Fax: (720) 550-5757
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

*Attorneys for Proposed Intervenor-Defendants National Parks Conservation Association, The Wilderness Society, Grand Canyon Trust, Great Old Broads for Wilderness, Western Watersheds Project, WildEarth Guardians, Sierra Club, and Center for Biological Diversity*

/s/ Michelle White
Michelle White, Utah State Bar No. 16,985
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
michellew@suwa.org

*Attorney for Proposed Intervenor-Defendant Southern Utah Wilderness Alliance*

/s/ Stephen Bloch
Stephen H.M. Bloch,
Utah State Bar No. 6277
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
steve@suwa.org

*Attorney for Proposed Intervenor-Defendants Southern Utah Wilderness Alliance and Natural Resources Defense Council*

11

Katherine Desormeau, CA Bar #266463 *(pro hac vice forthcoming)*
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Tel.: (415) 875-6100
Fax: (415) 795-4799
kdesormeau@nrdc.org

Sharon Buccino, DC Bar #432073 *(pro hac vice forthcoming)*
Charles Corbett, DC Bar #1767101 *(pro hac vice forthcoming)*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Tel.: (202) 289-6868
Fax: (415) 795-4799
sbuccino@nrdc.org
ccorbett@nrdc.org

*Attorneys for Proposed Intervenor-Defendant Natural Resources Defense Council*

12

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRIC OF UTAH**
**SOUTHERN REGION OF THE CENTRAL DIVISION**

|  |  |
|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )  No. 4:22-cv-00060-DN-PK |
| | ) |
| JOSEPH R. BIDEN, JR., *et al.*, | )  Hon. David Nuffer |
| | ) |
| Defendants, | )  Magistrate Judge Paul Kohler |
| | ) |
| and | )  **DECLARATION OF ERNEST ATENCIO** |
| | ) |
| SOUTHERN UTAH WILDERNESS | ) |
| ALLIANCE, *et al.*, | ) |
| | ) |
| Proposed-Intervenor- | ) |
| Defendants. | ) |
| | ) |
| | ) |

I, Ernest Atencio, hereby state and declare as follows:

1.       I am of full age and make the following statements based on personal knowledge. If called to testify, I could and would competently do so.

2.       I am Southwest Regional Director for the National Parks Conservation Association (NPCA) and am responsible for managing staff and programs throughout Utah, Arizona, New Mexico, and Colorado. NPCA's headquarters is in Washington, DC, and I work from my home office in Arroyo Hondo, near Taos, New Mexico.

3.       I have worked at NPCA for six-and-a-half years, and I have served in my current role for three-and-a-half years. I have been a dues-paying member since March 2021.

4.       NPCA is a nonprofit membership organization with hundreds of thousands of members nationally, including thousands in Utah.

5.        NPCA's mission is to "protect and enhance America's National Park System for present and future generations." As part of that mission, NPCA also seeks to protect public lands that comprise—and/or contribute to—intact cultural and ecological landscapes that include National Park System units. This work includes safeguarding the integrity of undeveloped public lands and preventing destructive impacts of extractive industries on lands with cultural and natural heritage significance. As the Antiquities Act has been a bedrock law that led to the protection of many iconic national monuments that are now part of the National Park System, we ardently support and defend this law and the monuments it has protected for the benefit of the public—including Bears Ears and Grand Staircase-Escalante National Monuments. Pursuant to our mission, NPCA has spent years advocating for and defending protections for Bears Ears National Monument and Grand Staircase-Escalante National Monument, as well as preserving the integrity of the Antiquities Act.

6.        Beginning in the 2010s, NPCA actively and publicly supported Utah Diné Bikeyah and the Bears Ears Inter-Tribal Coalition (BEITC) in calling on President Obama to protect Bears Ears as a national monument. This was consistent with our long-standing "Canyonlands Completion" campaign to protect additional lands originally proposed for inclusion in Canyonlands National Park. We sent a letter to BEITC in 2015 explicitly expressing our support. When the President established Bears Ears as a national monument in 2016, NPCA celebrated and informed our members about the Tribes' historic accomplishment.

7.        I also have a longstanding personal interest in the protection of the lands that are now within the Bears Ears National Monument. In the early 2010s, when Bears Ears was first proposed as an area that merited enhanced conservation, I advocated with the New Mexico Congressional delegation for its protection.

2

8.      In 2017, President Trump directed the Secretary of the Interior, Ryan Zinke, to conduct a review of certain national monuments designated since 1996, including Grand Staircase-Escalante and Bears Ears, suggesting the President might revoke monument protections.

9.      During Secretary Zinke's review, NPCA submitted letters explaining that both Grand Staircase-Escalante and Bears Ears merit protection as national monuments, and that the President lacked the authority to dismantle them. NPCA also published blogs and other materials on our website, informing our members and the public about the Trump administration's review. Numerous NPCA members submitted public comments calling on the administration to retain the monuments' protections. At about this time, I had an opportunity to talk with Secretary Zinke in person when he was visiting Bears Ears National Monument as part of his review. I shared my personal experience with the multiple benefits of the Río Grande del Norte National Monument that had been protected in 2013 next door to where I live and expressed NPCA's view that the Bears Ears National Monument should be similarly protected under the Antiquities Act.

10.     In 2017, President Trump issued proclamations dismantling the Bears Ears and Grand Staircase-Escalante National Monuments. Alongside other aligned groups, NPCA joined a lawsuit in federal court challenging the legality of the President's rollback of Bears Ears National Monument. *See NRDC v. Trump*, No. 17-cv-02606-TSC (D.D.C. filed Dec. 7, 2017) (consolidated with *Hopi Tribe v. Trump*, No. 17-cv-2590-TSC (D.D.C. filed Dec. 4, 2017)).

11.     In 2019 NPCA submitted extensive comments, and ultimately filed a formal protest, on the proposed management plan for the rolled-back Bears Ears National Monument's Indian Creek and Shash Jáa Units. NPCA objected to the plan's inadequate protection of monument objects and to the separation of the two disconnected units from each other and from

3

contiguous national park units, which compromised consistent, integrated management of monument objects and resources across the entire connected landscape.

12.     NPCA also submitted extensive comments and ultimately filed a formal protest regarding the 2019 Grand Staircase-Escalante National Monument and Kanab-Escalante Planning Area (KEPA) Proposed Resource Management Plans and Final Environmental Impact Statement. The comments and protest similarly objected to separating the monument lands from the KEPA lands and adjacent national park units.

13.     In January 2021, President Biden initiated a review of the prior administration's national monument rollbacks. In April 2021, NPCA submitted a letter to the Biden Administration advocating for both monuments' restoration. We also published blogs and articles on our website informing our members of what is at stake and describing the importance of restoring protections to these special places, and we offered our members a way to submit online comments in support of monument restoration.

14.     On October 8, 2021, the President issued proclamations restoring both monuments, as we had urged. Those proclamations are the subject of the instant lawsuit.

15.     We contributed and signed on to comments prepared by a coalition of conservation organizations for the public scoping phase of the new management-planning processes for the restored Grand Staircase-Escalante and Bears Ears National Monuments, in September and October of 2022, respectively. Our sections focused on the important cultural resource and ecological connections with adjacent national park landscapes, including Canyonlands National Park (for Bears Ears), Natural Bridges National Monument (Bears Ears), and Glen Canyon National Recreation Area (Bears Ears and Grand Staircase-Escalante). In addition, NPCA and the Coalition to Protect America's National Parks separately submitted

4

stand-alone comments regarding the Grand Staircase-Escalante plan, again highlighting the important cultural resource and ecological connections with adjacent national park landscapes, including Bryce Canyon and Capitol Reef National Parks and Glen Canyon National Recreation Area.

16.     Over the years, for both monuments, NPCA has developed and published numerous articles, press releases, action alerts, blogs, podcasts, and informational factsheets informing our members and the general public about what makes these monuments special and deserving of protection. Our members express deep enthusiasm and commitment to protecting these special places.

17.     NPCA is currently and will continue to stay engaged in the resource management-planning processes for both restored monuments and has already submitted public scoping comments to the Bureau of Land Management and the U.S. Forest Service, as described above.

18.     In our advocacy and public education work, we strive to secure and defend meaningful protections on the ground for the full extent of both monuments, and to ensure that the monuments' objects of scientific and historic interest remain protected from damage by mining, vehicle use, grazing, and other activities for the benefit of the American public. Maintaining monument status for both areas is essential to that goal.

19.     NPCA's members include cultural resource and archaeology enthusiasts, hikers, mountain bikers, canyoneers, educators, bird- and wildlife-watchers, and photographers who visit both monuments to enjoy and learn from them. NPCA's work to protect and defend the monuments benefits our members' interests by protecting these areas from the disruption and damage caused by mining and other industrial activities. These protections are essential to preserving the unparalleled scientific, cultural, ecological, and scenic values of these areas.

20.     In addition to my current professional role with NPCA, I have enjoyed both of these monument landscapes for many years in various meaningful personal and professional capacities.

21.     My first visit to what is now Bears Ears National Monument was as a student on a field trip with Colorado Mountain College in 1978 where I spent time in Butler Wash, Comb Wash, on Comb Ridge, and on the Moki Dugway and Cedar Mesa. Later that year I worked as an assistant instructor for the Colorado Outward Bound School on the first of three, three-week-long wilderness backpacking trips in the greater Canyonlands area, including Lockhart Basin, Indian Creek, Newspaper Rock, and Beef Basin, which are all now within Bears Ears.

22.     Since 1978 I have made dozens of trips to and through areas that are now part of Bears Ears and Grand Staircase-Escalante with family and friends and as a professional guide, exploring many remote sites and areas backpacking, hiking, canyoneering, and camping. With an M.A. in applied cultural anthropology and years of experience as a park ranger at Mesa Verde and other national parks, I have always had a strong interest in the related cultural history of the Bears Ears area and have actively sought out remote and unique archaeological sites for my personal and professional education and enlightenment.

23.     To the best of my recollection, my explorations—backpacking, technical canyoneering, dayhiking, camping, and traveling by vehicle—in the Bears Ears area have included the North Cottonwood/Elk Ridge Road, Upper and Lower Arch Canyon Overlooks, Mule Canyon and House on Fire, Cave Towers, most of the length of Grand Gulch and tributary canyons, Fish and Owl Canyons, the Citadel, 7 Kiva Ruin, Moonhouse, Muley Point, Valley of the Gods, Lower Dark Canyon, Comb Ridge, and Butler, Comb, and Cottonwood Washes. In 2017 I published an article about an NPCA-facilitated trip I took to Bears Ears with

underprivileged inner-city youth from Salt Lake City. Later that year I led a trip to Bears Ears for *High Country News*' travel program. In March of this year, I sought solace in Bears Ears after my father passed away with a few days of camping and exploring. My most recent trip to Bears Ears was in early November of this year with NPCA and a delegation from the Pueblo of Acoma, which NPCA co-sponsored.

24.   My first trip to lands that are now within Grand Staircase-Escalante was in 1991. I have similarly explored several areas along the Hole in the Rock Road, including Hurricane Wash, Coyote Gulch, Peek-a-Boo and Spooky slot canyons, and Devil's Garden. I have hiked to lower and upper Calf Creek Falls, through Escalante Canyon, visited Grosvenor Arch, and traveled by vehicle and bicycle and camped along the Burr Trail, Cottonwood Canyon Road, and Highways 12 and 89. And I have enjoyed views and conducted public education programs about the wild and undeveloped landscape of the area from a distance while leading houseboat trips for Elderhostel on Lake Powell.

25.   In all these travels I have most appreciated the remote, wild, undeveloped nature of these landscapes; the unique, dramatic, and one-of-a-kind geologic features; the largely untrammeled wildlife habitat; and of course, the rich cultural and archaeological resources. I have particularly relished the sense of solitude and natural quiet and the dark night skies of these remote places. In our rapidly developing modern world there are few places left with these rare qualities. There is no other landscape in the southwest region—or perhaps in the entire country— that holds the same geological drama and richness of natural and cultural resources in a still largely wild and undeveloped state. I am drawn there to explore and experience it every opportunity I have.

26.     My next scheduled trip to Bears Ears is April of 2023 leading a donor trip for
NPCA. Also, as a freelance writer, I am working on an essay about the few days I spent in Bears
Ears after my father's death and will be scheduling personal time there for more field research to
complete that project. I typically have at least one personal trip a year to Bears Ears and/or Grand
Staircase-Escalante and expect that to continue as long as I am able.

27.     Removing national monument protections from Bears Ears and Grand Staircase-
Escalante would open both areas to mining, oil and gas development, insufficiently managed off-
road vehicle recreation, and other industrial and inappropriate development that would
irrevocably damage the land and alter the experience. If not protected as national monuments, the
noise and lights of industrial development would diminish the precious sense of solitude and
natural quiet and the dark night skies of these remote places. And I want my children and
grandchildren to have the opportunity to experience these special places without development.

28.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
is true and correct.

Executed this 18th day of November, 2022, in Arroyo Hondo, New Mexico.


Ernest Atencio

8

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRIC OF UTAH
SOUTHERN REGION OF THE CENTRAL DIVISION

| | | |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 4:22-cv-00060-DN-PK |
| | ) | |
| JOSEPH R. BIDEN, JR., *et al.*, | ) | Hon. David Nuffer |
| | ) | |
| Defendants, | ) | Magistrate Judge Paul Kohler |
| | ) | |
| and | ) | **DECLARATION OF RAY BLOXHAM** |
| | ) | |
| SOUTHERN UTAH WILDERNESS | ) | |
| ALLIANCE, *et al.*, | ) | |
| | ) | |
| Proposed-Intervenor- | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

I, RAY BLOXHAM, declare as follows:

1.      I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of Southern Utah Wilderness Alliance ("Alliance"), The Wilderness Society ("TWS"), Natural Resources Defense Council ("NRDC"), Sierra Club, Center for Biological Diversity ("CBD"), and The Grand Canyon Trust's ("the Trust") Motion to Intervene in the above-captioned matter.

2.      I am an active member of the Alliance, TWS, NRDC, Sierra Club, CBD, and the Trust. I live in Salt Lake City, Utah.

3.      I am the Field Director for SUWA and have served in this position since 1999. My position requires me to spend considerable time on-the-ground visiting federal public lands

throughout Utah and documenting their condition. This includes mapping and photo-documenting evidence of wilderness characteristics such as the naturalness of the area and opportunities for solitude; and damage to both natural resources, such as biological soil crusts, vegetation, riparian areas, and cultural resources that is attributable to activities such as off-road vehicles, oil and gas development, and mining.

4.      I travel the public lands throughout Utah extensively for personal recreation and have done so for many years. During my visits I enjoy sightseeing, bird watching, hiking, backpacking, camping, kayaking or rafting, scenic photography, and visiting cultural sites and unique geological features and objects. I also enjoy the clear air and expansive vistas, engage in quiet contemplation, and appreciate the solitude the federal public lands provide.

5.      I have and continue to travel extensively throughout the public lands in Utah, including the public lands that make up the Grand Staircase-Escalante National Monument and Bears Ears National Monument as established by President Biden on October 8, 2021 (together, "the Monuments").[1]

6.      The Alliance is a non-profit environmental membership organization dedicated to the sensible management of all public lands within the state of Utah, the preservation and protection of plant and animal species, the protection of air and water quality on public lands, the preservation and protection of cultural, archaeological and paleontological resources, and to the preservation of Utah's remaining wild lands. The Alliance has offices in Salt Lake City and Moab, Utah and in Washington, D.C. The Alliance has members in all fifty states and several foreign countries. The Alliance members use and enjoy public lands in and throughout Utah for a

---

[1] *See* Pres. Proc. No. 10,286, Proclamation on Grand Staircase-Escalante National Monument, 86 Fed. Reg. 57,335 (Oct. 8, 2021); Pres. Proc. No. 10,285, Proclamation on Bears Ears National Monument, 86 Fed. Reg. 57,321 (Oct. 8, 2021).

variety of purposes, including scientific study, recreation, wildlife viewing, hunting, aesthetic appreciation, and financial livelihood. Alliance members frequently visit and recreate (*e.g.*, sightsee; view and appreciate cultural sites; kayak; bird watch; enjoy clean air, expansive vistas, dark night nights, and solitude) on the federal public lands throughout the Monuments. Alliance members enjoy their ability to view and appreciate pre-historic and historic cultural sites and artifacts, as well as paleontological resources, (*e.g.*, fossils, petrified woods) and geological features (*e.g.*, Moqui marbles, the Staircase itself, and the Bears Ears Buttes) on Monument lands. Alliance members regularly visit and appreciate the lands encompassed by the Monuments as they were designated by President Biden.

7.     The Alliance is a charter member of the Utah Wilderness Coalition, a union of over 200 local and national organizations dedicated to the passage of America's Red Rock Wilderness Act, discussed below.

8.     TWS is a non-profit national membership organization founded in 1935 with over one million members and supporters who reside throughout the nation, including over 1,300 members and supporters in Utah. TWS's mission is to unite people to protect America's wild places. TWS sees a future where people and wild nature flourish together, meeting the challenges of a rapidly changing planet. Protecting wilderness quality and other sensitive lands managed by the Bureau of Land Management ("BLM") and Forest Service is vital to achieving TWS's mission, and the organization has led the effort to permanently protect 112 million acres of wilderness and ensure sound management of our shared national lands.

9.     TWS has been actively involved in land-use and travel-management planning on public lands within the lands that make up Bears Ears National Monument and has litigated to secure additional protection of these lands from motorized vehicle abuse, oil and gas

3

development and other harmful activities. TWS members visit the lands within the Monument to experience their remote wilderness quality, view wildlife, camp, hike, and enjoy the vivid natural beauty of the area. Its members are also drawn to view the numerous archaeological and paleontological sites.

10.     Prior to the designation of original Grand Staircase-Escalante National Monument by then-President Clinton, TWS had worked for years to protect BLM wilderness lands and other sensitive lands located within the Monument. TWS has initiated and intervened in numerous lawsuits to ensure the lands within the Monument are protected from roads and off-highway vehicle abuse. It has actively engaged in major actions and management decisions in the Monument since its establishment. Deceased TWS senior staff attorney and conservation director Phil Hanceford served on the Monument Advisory Committee from 2011 to 2018, providing input into all aspects of monument management. TWS members visit the lands within the Monument to experience their remote wilderness quality, view wildlife, camp, hike and enjoy the vivid natural beauty of the area. Its members are also drawn to view the numerous archaeological and paleontological sites.

11.     Plaintiff Sierra Club is a national non-profit organization with 63 chapters nationwide, including in Utah, dedicated to exploring, enjoying, and protecting the wild places of the earth; to protecting and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass the exploration, enjoyment, and protection of the lands, water, and air in Utah.

12.     CBD is a non-profit environmental organization with over 81,000 members. The Center maintains an office in Washington D.C. CBD uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive, and has advocated and continues to advocate for increased protections for species and their habitats in Utah. CBD's members support the protection of Utah's wild and ecologically unique land.

13.     The Trust is headquartered in Flagstaff, Arizona and has more than 4,000 active members and supporters from all over the United States. The Trust's mission is to safeguard the wonders of the Grand Canyon and the Colorado Plateau, while supporting the rights of its native peoples. The Trust advocates for environmentally responsible management of public lands and their associated resources, access to these lands, and permanent administrative and legislative protections to maintain their ecological integrity and wildness.

14.     For the remainder of this declaration I will refer to the Alliance, TWS, NRDC, Sierra Club, CBD, and the Trust collectively as "SUWA."

15.     SUWA and their members have, as specified below, worked for decades to protect and preserve the lands, wilderness characteristics, wildlife, and cultural resources in the Grand Staircase-Escalante National Monument. This includes, but is not limited to:

    a.     The Alliance, NRDC, Sierra Club, and the Trust have advocated for more than three decades for the passage of America's Red Rock Wilderness Act, which would designate approximately 1.66 million acres of public lands in the Grand Staircase-Escalante National Monument as Wilderness;

    a.     The Alliance has provided BLM with numerous wilderness character submissions and information from on-the-ground surveys regarding wilderness resources for lands within the Grand-Escalante National Monument including, but not limited to, the Lampstand, Brinkerhoff Flats, Pioneer Mesa, Studhorse Peaks, North Escalante Canyons, Paria-Hackberry, Paradise/Wahweap, Mud Spring Canyon, Carcass Canyon, Burning Hills, Fifty-mile Mountain, Rock Cove, Coyote Canyon, Timber Mountain, Willis Creek, Kodachrome Headlands, The Blues,

The Cockscomb, Glass Eye Canyon, Ladder Canyon, Nephi Point, Upper Kanab Creek, and Pine Hollow proposed Wildernesses;

b. The Alliance, TWS, and the Trust intervened in *Utah Association of Counties v. Bush*, 316 F. Supp. 2d 1172 (D. Utah 2004), *appeal dismissed* 455 F.3d 1094 (10th Cir. 2006), and successfully defended President Clinton's establishment of Grand Staircase-Escalante National Monument;[2]

c. The Alliance, TWS, and Sierra Club opposed a large coal mine and associated developments in the heart of Grand Staircase-Escalante National Monument and successfully challenged (before the Utah Board of Oil, Gas, and Mining) the State of Utah's decision to grant a permit to the mine operator;

d. The Alliance, TWS, Sierra Club, and the Trust participated in the public process leading to the BLM's release and adoption of the 2000 Grand Staircase-Escalante National Monument Management Plan by attending meetings, submitting comments and information for that plan.[3] The Alliance, TWS and Sierra Club also intervened in a lawsuit and successfully defended the Monument Management Plan's 2000 Monument Travel Management Plan. *See Kane Cnty. v. Salazar*, 563 F.3d 1077 (10th Cir. 2009);

e. The Alliance, TWS, Sierra Club, and the Trust have intervened in current litigation to, in part, defend road closures contained in the 2000 Monument Travel Management Plan;[4]

f. The Alliance, TWS, and the Trust have commented on, provided information, and/or brought administrative protests over numerous proposals affecting lands within the Grand Staircase-Escalante National Monument such as road surface upgrades and widening of the Burr Trail and Hole-in-the-Rock Road, construction of a titanium mine, vegetation removal projects, trailhead and facilities management projects, commercial group size amendments, special recreation permits, and a variety of other site-specific projects initiated by BLM, county governments, and other entities on lands within the Monument;

g. SUWA is litigating then-President Trump's repeal of President Clinton's Proclamation establishing the original Grand Staircase-Escalante National Monument and creation of three geographically separate and much smaller

---

[2] *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1252 (10th Cir. 2001).
[3] *See generally* Bureau of Land Mgmt., Grand Staircase-Escalante National Monument Approved Management Plan and Record of Decision (1999).
[4] *See* Amended Complaint ¶¶ 2948-72, *Kane Cnty. v. United States*, 2:11cv1031 (CW) (D. Utah) (Kane County and the State of Utah claim the Flag Point route as an RS 2477 right-of-way (K3380); this route was closed in the 2000 Monument Management Travel Plan).

monument units: the Grand Staircase, Kaiparowits, and Escalante Canyons Monument;[5]

h.   SUWA commented on and provided information to BLM on the 2020 Grand Staircase-Escalante National Monument and Kanab-Escalante Planning Area Resource Management Plans (herein referred to as the "GSENM RMP" and "KEPA RMP," respectively) (DOI-BLM-UT-0000-2018-0008-RMP-EIS).[6] Comments included detailed proposals for the creation of new Areas of Critical Environmental Concern and contained independent scientific research, and current photos and mapping created by the Alliance. The comments also strongly encouraged BLM to provide the highest level of protection for the monument objects identified by President Clinton;

i.   The Alliance, TWS, and the Trust have commented on, provided information, protested, appealed and/or challenged numerous site-specific vegetation removal projects affecting lands within the Grand Staircase-Escalante National Monument, such as the Skutumpah Terrace Sagebrush Steppe Enhancement Project (DOI-BLM-UT-0300-2017-0003-EA);[7] the Pine Hollow Fire Stabilization project (DOI-BLM-UT-P020-2020-014-EA);[8] and the Wire Pass Fire Emergency Stabilization and Rehabilitation Project (DOI-BLM-UT-P020-2020-012-EA).[9]

16.   The Alliance, TWS, NRDC, Sierra Club, CBD and their members have, as specified below, worked for decades to protect and preserve the lands, cultural resources, wilderness characteristics, and wildlife in the Bears Ears National Monument. This includes, but is not limited to:

a.   The Alliance, NRDC, and Sierra Club have advocated for more than three decades for the passage of America's Red Rock Wilderness Act, which would designate approximately 983,000 acres of proposed wilderness in the Bears Ears National Monument as Wilderness;

---

[5] *See Modifying the Grand Staircase-Escalante National Monument*, Proclamation No. 9682 (Dec. 4, 2017); 82 Fed. Reg. 58089 (Dec. 4, 2017); *See* Complaint, *The Wilderness Soc'y v. Trump*, Case No. 1:17-cv-02587 (Dec. 4, 2017) (D.D.C), ECF No. 1.

[6] *See* Bureau of Land Mgmt., GSENM and KEPA Records of Decision and Approved Resource Management Plans (February 6, 2020), https://eplanning.blm.gov/eplanning-ui/project/94706/.

[7] IBLA 2019-94 (Sept. 16, 2019) (finding in favor of the Alliance and setting aside BLM's decision and remanding).

[8] IBLA 2020-403 (Feb. 17, 2021) (finding in favor of the Alliance and setting aside BLM's decision and remanding).

[9] IBLA 2020-404 (Feb. 17, 2021) (finding in favor of the Alliance and setting aside BLM's decision and remanding).

b. The Alliance has supported the Bears Ears Inter-Tribal Coalition's proposed Bears Ears National Monument by encouraging Alliance members to: attend meetings; write letters to the Obama, Trump, and Biden Administrations; write to local, regional, and national newspapers; and meet with elected state and Federal officials to advocate for the designation of the Bears Ears National Monument;

c. The Alliance, TWS, NRDC, and Sierra Club participated in the processes leading to the BLM Moab and Monticello field offices' Record of Decisions ("ROD") and Approved Resource Management Plans ("Moab RMP" and "Monticello RMP," respectively)[10]—both of which encompass portions of the Bears Ears National Monument—by attending meetings, submitting comments, information, and protesting and litigating the approval of those plans;

d. The Alliance and TWS participated in the process leading to the BLM Moab field office's master leasing plan ("Moab MLP")[11]—which encompasses the northern portion of the Bears Ears National Monument—by attending meetings, submitting comments, and providing information and data including for numerous wilderness character submissions;

e. The Alliance, TWS, NRDC and Sierra Club participated for more than three years in the process underlying Congressmen Rob Bishop (R-UT) and Jason Chaffetz's (R-UT) Utah Public Lands Initiative Act, H.R. 5780, 114th Cong. (2016) which included the lands at issue;

f. The Alliance has provided BLM with numerous wilderness character submissions and information regarding wilderness resources for lands within the Bears Ears National Monument including, but not limited to, Lockhart Basin, Dripping Spring, Hatch Canyon, Upper Indian Creek, Arch Canyon, Allen Canyon, Cheesebox Canyon, Comb Ridge, Fish and Owl Creeks, Gravel and Long Canyons, Harts Point, Shay Mountain, The Needle, Valley of the Gods, Lime Canyon, Comb Ridge, and The Tabernacle proposed wilderness areas;

g. The Alliance has commented on, provided information, protested, appealed and/or litigated numerous site-specific proposals affecting lands and resources within the Bears Ears National Monument such as the ATV Trail in Indian Creek Area, San Juan County Utah (DOI-BLM-UT-Y020-2006-0005-EA (Dec. 2016)), *S. Utah Wilderness Alliance et al.*, IBLA No. 2017-75; San Juan ATV Safari, Environmental Assessment (DOI-BLM-UT-Y020-2014-0011 (2014)); Hole in the

---

[10] *See generally* BLM, Moab Field Office, Record of Decision and Approved Resource Management Plan (2008), https://eplanning.blm.gov/eplanning-ui/project/66098/570*;* BLM, Monticello Field Office, Record of Decision and Approved Resource Management Plan (2008), https://eplanning.blm.gov/eplanning-ui/project/68097/570.

[11] *See generally* BLM, Moab and Monticello Field Offices, Record of Decision and Moab Master Leasing Plan/Approved Resource Management Plan Amendments (2016).

Rock Trekking Special Recreation Permit (DOI-BLM-UT-Y020-2012-0001 (April 2015)), *S. Utah Wilderness Alliance*, IBLA No. 2016-85; Hite #1 Application for Permit to Drill and Associated Access Road Right-of-Way, Environmental Assessment (DOI-BLM-UT-Y020-2013-003 (April 2013)); Beef Basin/Dark Canyon Plateau Vegetation Removal, *S. Utah Wilderness Alliance*, 185 IBLA 150 (2014); Motorized use in Arch Canyon, *S. Utah Wilderness Alliance v. Sierra*, No. 2:08cv195 (D. Utah Oct. 17, 2008); Oil and gas leasing on lands now within Bears Ears National Monument border, *S. Utah Wilderness Alliance*, 163 IBLA 1 (2004); and BLM's 1999 Utah Wilderness Inventory process;[12]

    h.   SUWA is participating as a Plaintiff in a lawsuit challenging President Trump's dismantling of the original Bears Ears National Monument, as established by President Obama. *Nat. Res. Def. Council v. Trump*, No. 1:17-cv-02606 (D.D.C. Dec. 7, 2017); and

    i.   SUWA is commenting on and attending public meetings for the Bears Ears National Monument - Monument Management Plans for the Indian Creek and Shash Jaa' Units to advocate for the most environmentally protective alternative, (DOI-BLM-UT-0000-2018-0007-RMP – EIS (Feb. 2020) (together "Indian Creek and Shash Jaa' MMP").

    17.    My health, recreational, scientific, spiritual, educational, and aesthetic interests— and those of SUWA's members—will be harmed if Plaintiffs succeed in their litigation challenging President Biden's establishment of the Monuments. As the President declared, the unique objects identified in the Monuments' respective Proclamations are under threat of damage and destruction. A national monument designation is required to ensure the proper care and management of these objects and to protect them from the operation of the public land mining and mineral lease laws.

    18.    If the Court finds in favor of Plaintiffs' claims that President Biden lacks statutory authority to designate either of the Monuments (either entirely or partially) or that his decision was otherwise unlawful, my and SUWA's members' interests in the heightened protection the

---

[12] *See* U.S. Government Publishing Office, Utah Wilderness Inventory (1999), https://www.gpo.gov/fdsys/search/pagedetails.action?st=utah+wilderness+inventory&granuleId=&packageId=GPO-DOI-BLM-UTAH99 (follow hyperlink for "Entire Publication").

Monuments' designation provide to the resources and objects identified by President Biden's Proclamations will be harmed, as detailed in the following paragraphs.

**Grand Staircase-Escalante National Monument**

19.    I have personally visited the lands currently encompassed by the Grand Staircase-Escalante National Monument for decades. I typically visit every year and at times at least two to three times a year. I live about a five to six hour drive from the Monument's fantastic lands and enjoy taking weekend or full week trips to spend time in and explore the remote and wild lands within the Monument. This year alone I have visited the Monument on four separate occasions to backpack through the Paria River and Hackberry Canyon, backpack on Colt Mesa, and to examine motorized vehicle use in the Little Desert area that is open to cross-country motorized vehicle use.

20.    My visits to the lands in Grand Staircase-Escalante National Monument, as designated by President Biden, have included but are not limited to, Paria River Canyon, Red Breaks, Willis Creek, Bull Valley Gorge, Heward Creek, Sheep Creek, Yellow Creek, Jim Hollow, Horse Spring Canyon, Alvey Wash, Star Seep, Right Hand Collet, Hole-in-the-Rock Trail, Tenmile Flat, Sunset Flat, Early Week Bench, Cat Pasture, Batty Caves, many locations along Fiftymile Mountain and Fiftymile Bench, Sunset Arch, Hurricane Wash, Fortymile Ridge, Sooner Rock, Sooner Bench, Cave Point, Circle Cliffs, Lampstand, The Flats, White Canyon Flat, Studhorse Peaks, Death Hollow, Colt Mesa, Horse Pasture Mesa, Deer Point, Burr Trail, Buckskin Mountain, Coyote Valley, The Cockscomb, Buckskin Gulch, the Rimrocks, the Toadstools, Rock House Cove, Wahweep Creek, Wahweep Hoodoos, Jack Riggs Bench, Coyote Creek, Blue Cove, Nipple Creek, Nipple Bench, Middle Warm Creek Point, Tibbet Canyon, Warm Creek, Smokey Mountain, Smokey Hollow, Croton Canyon, Croton Bench, Little Valley

Canyon, Grand Bench Neck, Rock Creek, Navajo Canyon, Pete's Cove, Collet Top, Pilot Knoll, Clints Cove, The Scorpion, Ty Hatch Bench, Bull Canyon, John Wills Bench, Snow Bench, and John Henry Canyon. I love traveling to these places to hike, backpack, camp, take photographs and take scenic drives, engage in quiet contemplation, and appreciate the dark night skies.

21.     Many of these places, such as Colt Mesa, Circle Cliffs, and Forty Mile Ridge contain or are themselves objects that President Biden Proclamation specifically identified for protection and would suffer from reduced protection if Plaintiffs' lawsuit is successful. For example, these areas will be opened once again to—among other things—impacts from incompatible development activity such as hard rock mining and oil, gas, and coal leasing. Each of these activities is specifically prohibited by President Biden's Proclamation. Impacts from these activities, were they to be allowed, would include construction of new roads, drill pads, and waste pits as well as the clearing of native vegetation and soils.[13]

22.     I appreciate the solitude and love experiencing the natural beauty of these lands. The sight and sound of human development, off-highway motorized vehicle use, and activities like mining and related activities like truck traffic and light pollution, diminishes my enjoyment of these visits.

23.     I have also traveled many times to Grosvenor Arch and the hills and cliffs immediately north and south, a region I refer to as The Cockscomb. Grosvenor Arch is an amazing "double arch" and I enjoy photographing the arch itself as well as the surrounding landscape. I also enjoy hiking and exploring the hills and cliffs in The Cockscomb and experiencing the views west towards Bryce Canyon National Park and the upper Paria River corridor. I greatly appreciate viewing and exploring this part of the Monument and would like to

---

[13] *See* KEPA ROD at 3.1.1.

continue to do so. However, mining impacts from the so-called Berry Patch #4 mining claim (located after President Trump removed Monument protections from these lands within the current Grand Staircase-Escalante National Monument) will harm my enjoyment of these lands. I am aware that on May 6, 2019, Berry Patch #4 operator, Alpine Gems LLC, provided BLM with a Plan of Operations, signaling to BLM its intent to conduct substantial mining activities on the recently located mining claim. And on June 3, 2019, BLM notified Alpine Gems that it would begin reviewing the Plan. Based on my experiences recreating in wilderness areas, hard rock mining causes visual and auditory impacts that extend far beyond the mine site itself. I have also seen how mining leads to increased vehicle traffic into new and remote areas. These impacts harm my ability to partake in and enjoy quiet recreation like hiking and photography. These impacts also harm my ability to find solitude in these wild lands and escape the sights and sounds of industrial activity. I do not enjoy photographing, hiking, exploring or spending time in areas where I can see or hear mining activity.

24.     I have also traveled many times to the Colt Mesa area, including the area where claimants staked and recorded more than 30 "Mesa" mining claims (again located while this area lacked protections due to President Trump's evisceration of the original Grand Staircase-Escalante National Monument) to explore for cobalt, nickel, zinc and copper. I take great pleasure in traveling, hiking, camping, and taking scenic photos in and around the Colt Mesa area. I have hiked to the top of Colt Mesa itself and the views there expand to the entire landscape below. The Circle Cliffs are prominent with views to Navajo Mountain, Silver Falls Bench and Deer Point all providing backdrops to this wild region. I have also traveled past the Colt Mesa Mine site on multiple occasions to hike, backpack and camp to the south. I was most recently in this area in February 2022 to camp, backpack, and explore.

12

25.     I am concerned that my future, planned trips to the area will be less enjoyable because of mining related activities at the Mesa mining claims. Mining activity at this site will cause long-lasting impacts, including removal of native vegetation, increasing erosion, polluting the air and soil, and producing waste and debris. In my many years exploring the wild lands in Utah, I have seen these kinds of effects with my own eyes. The visual and auditory impacts from mining activities—dust, mechanical noise and light pollution—extend beyond the mine site itself and impact otherwise remote, quiet, and pristine areas. And I am concerned that the increased vehicle traffic that results from mining activity at the Mesa mining claims would bring significant heavy truck traffic into the narrow canyon system leading to Colt Mesa. These impacts harm my ability seek out solitude and quiet recreation. I do not enjoy spending time, photography, hiking or exploring in places that are being or have been impacted by hard rock mining.



*Looking across the Circle Cliffs near Colt Mesa and the Mesa mining claims that were located after President Trump excluded these lands from the Monument*
*Credit: Ray Bloxham*

26.     I have also visited the BLM-managed lands within the Grand Staircase-Escalante National Monument to document wilderness characteristics, which involves determining whether there is naturalness, solitude, and the opportunity for primitive or unconfined recreation. I also document the adverse impacts of off-highway vehicle use and often see the damage motorized vehicles cause to sensitive resources, including destruction of fragile biological soil crusts, damage to cultural sites, and adverse impacts to riparian areas. I monitor site-specific development proposals and have witnessed the impacts from hard rock mining, coal mining, and oil and gas development—including the construction of roads and well pads and the drilling of wells.

27.      I am planning to return to the Circle Cliffs area near Colt Mesa and to Bryce

Canyon National Park (overlooking the upper Paria River and the southern Cockscomb) and

Grosvenor Arch to hike, camp, and take photos during the spring or summer of 2023.

28.      My health, recreational, scientific, spiritual, and aesthetic interests will be harmed

if Plaintiffs' lawsuit is successful and the protections afforded to the Grand Staircase-Escalante

National Monument and the objects within by President Biden's Proclamation are lost. President

Biden's establishment of the Monument adds significant additional legal and administrative

protections and oversight to affected lands by prohibiting energy development and improving

coordination between state, federal, and Tribal governments regarding the protection of pre-

historic and cultural resources, among other things. When these lands were subject to President

Trump's repeal of the original Grand Staircase-Escalante National Monument, I observed the

result: a real, demonstrable loss of protection to the excluded lands. The excluded lands were

opened to: location of hard rock mining claims; oil, gas and coal leasing, exploration and

development. These activities are incompatible with the activities I enjoy and appreciate on lands

within the Grand Staircase-Escalante National Monument and the objects President Biden seeks

to protect.

29.      Without President Biden's Monument protections, cultural resources are subject

to destruction from mineral development and other incompatible activities. Such damaging

activities directly affect my interests by destroying wilderness characteristics, ruining

opportunities for recreation and solitude, impacting air quality and regional haze, and

diminishing (or even preventing) enjoyment and appreciation of pre-historic and historic cultural

sites as well as paleontological and geological resources.

**Bears Ears National Monument**

30.     Since 1999, I have visited, hiked, rafted, canoed, photographed, camped, and otherwise appreciated and explored the Forest Service and BLM-managed public lands throughout the Bears Ears National Monument many times, including for personal recreation. I live about a six-hour drive from many of the Monument's most stunning lands and I visit these lands, on average, twice a year and have done so since about 1999.

31.     I visited Bears Ears National Monument most recently in August 2019 when I floated the San Juan River, camped along its shores and hiked up various side canyons. Though my plans to visit the Monument in 2020 and 2021 were derailed because of the COVID-19 pandemic, I plan to return to Bears Ears National Monument in late 2022 and again early in spring of 2023.

32.     My trips to these lands have included visits to, but not are limited to, many of the objects that President Biden's Proclamation identifies by name as deserving protection under the Antiquities Act. This includes many of the Bears Ears National Monument's remarkable wilderness-caliber lands on both BLM and Forest Service-managed lands such as Lockhart Basin, White Canyon, Valley of the Gods, Beef Basin, House Park Butte, Bobby's Hole, Dark Canyon, Elk Ridge, Tuwa Canyon, Grand Gulch, Colins Spring, Johns Canyon, Jacob's Chair, Road Canyon, Comb Ridge, Texas Flat, Arch Canyon, Mule Canyon, Fish Creek Canyon, Dripping Springs Canyon, and Ruin Park. I love traveling to these places and will continue to visit regularly.

33.     In my many travels to Bears Ears National Monument, I have visited the area of the so-called Easy Peasy Mining Claim where Kimmerle Mining, LLC has been conducting mining activities for over a year now. This mining claim was located in 2019 following President

16

Trump's dismantling of the original Bears Ears National Monument. I have also been to the nearby Cheese and Raisins hills and hiked along the rims of Comb Ridge just above the proposed mine site. Those rims provide exceptional views of the Cheese and Raisins area. I also travel along the nearby Cottonwood Wash Road and have hiked to several of the rims above that wash. I enjoy exploring, hiking, and taking photographs in this area as well as taking in the beautiful scenery. I plan to return to the Cheese and Raisins area and the nearby rims of Comb Ridge in the spring of 2023. However, I am concerned that mining activities at the Easy Peasy mine site will significantly diminish my enjoyment of the area. The impacts of hard rock mining—waste generation, removal of native vegetation, erosion, generation of dust and haze, destruction of wildlife habitat and sound pollution—will harm my enjoyment of this beautiful area. I do not enjoy visiting or hiking in areas that are impacted by mining. The impacts of mining also extend beyond the mine site itself. The mining is visible and audible from the rims of Comb Ridge, the Cheese and Raisins area, and other nearby hiking areas I visit and will and negatively affect my use of that area, interfering with my quiet recreation, quest for solitude in wild lands, as well as my aesthetic appreciation of the area. Following President Biden's Proclamation, BLM may require that new mining activities at the Easy Peasy mine cease pending preparation of a validity determination.[14] Regardless, I will continue to visit other areas within Bears Ears National Monument as described in this declaration.

34.    I have also visited Tables of the Sun Buttes, Fry Canyon and the Moss Back Butte. Each of these areas are within lands that Energy Fuels Inc. and a nearby uranium processing mill lobbied the Trump Administration to remove from the original Bears Ears

---

[14] 43 C.F.R. § 3809.100(a).

National Monument,[15] and will again lose the protection of a monument designation if Plaintiffs' claims against President Biden's designation are successful.[16] The area is dominated by Wingate sandstone cliffs, including the Tables of the Sun. The stunning Moss Back Butte towers over Cedar Mesa and the upper reaches of Fry Canyon include a geological formation called The Needle. Fry Canyon also contains an array of cultural resources. It is a spectacular area that I have visited many times, most recently in August 2019, to camp, explore, hike, take photographs and appreciate cultural sites. The impacts of uranium mining in this area—including introduction of industrial sights and sounds, generation of waste and pollution, removal of native vegetation and creation of new roads—will negatively impact my use and enjoyment of this fantastic place. I intend to return to this area in spring of 2023 and am very concerned that these activities will mar the remote landscape and impede my ability to participate in quiet recreation.

35. I have also visited the BLM-managed lands in the Bears Ears National Monument to document their wilderness characteristics. This involves determining whether there is naturalness, solitude and the opportunity for primitive or unconfined recreation, and thus whether the area is eligible for Wilderness designation. I also document the adverse impacts of off-

---

[15] *See* Juliet Eilperin, *Uranium firm urged Trump officials to shrink Bears Ears National Monument*, Wash. Post (Dec. 8, 2017), https://www.washingtonpost.com/national/health-science/uranium-firm-urged-trump-officials-to-shrink-bears-ears-national-monument/2017/12/08/2eea39b6-dc31-11e7-b1a8-62589434a581_story.html; Hiroko Tabuchi, *Uranium Miners Pushed Hard for a Comeback. They Got Their Wish*, N.Y. Times (Jan. 13, 2018), https://www.nytimes.com/2018/01/13/climate/trump-uranium-bears-ears.html.

[16] Energy Fuels successfully lobbied to have the lands their claims occupy removed from monument protections during the Trump Administration. *See* Juliet Eilperin, *Uranium firm urged Trump officials to shrink Bears Ears National Monument*, Wash. Post (Dec. 8, 2017), https://www.washingtonpost.com/national/health-science/uranium-firm-urged-trump-officials-to-shrink-bears-ears-national-monument/2017/12/08/2eea39b6-dc31-11e7-b1a8-62589434a581_story.html; Hiroko Tabuchi, *Uranium Miners Pushed Hard for a Comeback. They Got Their Wish*, N.Y. Times (Jan. 13, 2018), https://www.nytimes.com/2018/01/13/climate/trump-uranium-bears-ears.html.

highway vehicle use and often see the damage off-highway vehicles cause to sensitive resources, including destruction of fragile biological soil crusts, and damage to cultural sites and riparian areas. I also monitor site-specific development proposals and have witnessed first-hand impacts from hard rock mining and oil and gas development, including the construction of roads and well pads and drilling of wells, in Bears Ears National Monument.

  36. My health, recreational, scientific, spiritual, and aesthetic interests will be harmed and impaired if the Court declares that President Biden exceeded his authority or otherwise acted unlawfully when he established Bears Ears National Monument, and/or if the Court enjoins President Biden's establishment of the Monument. The Monument Proclamation adds additional legal and administrative protections and oversight to affected lands by prohibiting energy development and improving coordination between state, federal, and tribal governments regarding the protection of pre-historic and cultural resources, among other things. The loss of monument protections would result in a real, demonstrable loss of protection to the currently designated lands. The lands would be open to location of new hard rock mining claims (and existing claims could be developed with less federal oversight), and to oil and gas leasing, exploration and development in accordance with the Moab and/or Monticello RMP and/or Moab MLP, which do not adequately protect the resources I enjoy and appreciate. Cultural resources would be exposed to destruction from mineral development, harmful off-highway vehicle use, and other incompatible recreational activities. Such damaging activities directly harm my interests by destroying wilderness characteristics, ruining opportunities for recreation and solitude, impacting air quality and regional haze, and diminishing (or even preventing) enjoyment and appreciation of pre-historic and historic cultural sites.

37.     An order by the Court declaring President Biden's October 8, 2021 Proclamations designating the Grand Staircase-Escalante and Bears Ears National Monuments was a lawful exercise of executive authority under the Antiquities Act will protect my interests described herein by ensuring that the lands, the Monuments' objects and numerous resource values in the Monuments remain protected and preserved for the current as well as future generations.

I DECLARE under penalty of perjury that the foregoing is true and correct.

DATED: November 21, 2022

_____
Ray Bloxham

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRIC OF UTAH**
**SOUTHERN REGION OF THE CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 4:22-cv-00060-DN-PK |
| | ) | |
| JOSEPH R. BIDEN, JR., *et al.*, | ) | Hon. David Nuffer |
| | ) | |
| Defendants, | ) | Magistrate Judge Paul Kohler |
| | ) | |
| and | ) | **DECLARATION OF JACK HANLEY** |
| | ) | |
| SOUTHERN UTAH WILDERNESS | ) | |
| ALLIANCE, *et al.*, | ) | |
| | ) | |
| Proposed-Intervenor- | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

I, JACK HANLEY, declare as follows:

1.      I have personal knowledge of each of the facts set forth below, and if called upon

to do so, could and would testify regarding the following. This declaration is filed in support of

Southern Utah Wilderness Alliance's ("the Alliance") Motion to Intervene in the above-

captioned matter.

2.      I am the Stewardship Coordinator for the Alliance and have worked for the

Alliance since 2019. My position requires me to spend considerable time on the ground visiting

federal public lands throughout Utah observing their condition and working with land

management agencies to preserve wilderness characteristics and natural values of these amazing

lands. I am responsible for organizing and leading (alongside staff from the Bureau of Land

Management and the Forest Service) volunteer service projects that restore and prevent damage to natural resources such as biological soil crusts, vegetation, riparian areas, wildlife habitat, and cultural resources. The damage to these resources is often attributable to activities such as off-road vehicles, oil and gas development, mining, and high volumes of recreational use.

3.      I am an active member of the Alliance and have traveled the public lands throughout Utah extensively for personal recreation. During my visits I enjoy sightseeing, bird watching, hiking, camping, climbing, canyoneering, kayaking or rafting, and visiting cultural sites, unique geological features, and objects. I also enjoy the clear air and expansive vistas, engage in quiet contemplation, and appreciate the solitude the federal public lands provide.

4.      I have and continue to travel extensively throughout the public lands in Utah, including the public lands that presently make up the Grand Staircase-Escalante National Monument and Bears Ears National Monument as established by President Biden on October 8, 2021 (together, "the Monuments").[1]

5.      The Alliance is a charter member of the Utah Wilderness Coalition, a union of over 200 local and national organizations dedicated to the passage of America's Red Rock Wilderness Act.

6.      The Alliance and its members have worked for decades to protect and preserve the federal public lands comprising the Monuments.

7.      The health, recreational, scientific, spiritual, educational, and aesthetic interests of the Alliance and its members will be harmed and impaired if Plaintiffs succeed in their litigation challenging President Biden's establishment of the Monuments. As the President declared, the

---

[1] *See* Pres. Proc. No. 10,285, Proclamation on Bears Ears National Monument, 86 Fed. Reg. 57,321 (Oct. 8, 2021); Pres. Proc. No. 10,286, Proclamation on Grand Staircase-Escalante National Monument, 86 Fed. Reg. 57,335 (Oct. 8, 2021).

unique objects identified in the Monuments' respective proclamations are under threat of damage and destruction. A national monument designation is required to ensure the proper care and management of these objects, including to withdraw them from operation of the public land mining and mineral lease laws.

8.      If the Court finds in favor of Plaintiffs' claims that President Biden lacks statutory authority to designate either of the Monuments (either entirely or partially) or that his decision was otherwise unlawful, the Alliance's members' interest in the heightened protection the Monuments' designation provide to the resources and objects identified by President Biden's Proclamations will be harmed, as detailed in the following paragraphs.

**Grand Staircase-Escalante National Monument**

9.      With respect to the Grand Staircase Escalante National Monument, if President Biden's designation is found unlawful, then BLM will no longer be required to manage the Monument lands to prioritize the proper care and management of Monument objects. Instead, the lands will be managed subject to either the Grand Staircase Escalante National Monument Resource Management Plan ("GSENM RMP") or the Kanab-Escalante Planning Area Resource Management Plan ("KEPA RMP"). Each of these plans provides significantly less protection and conservation of monument resources and objects as compared to President Biden's monument designation and put unique and pristine monument objects and landscapes at risk of irreparable harm.

a.   For example, hundreds of thousands of acres of the Monument lands and many objects identified in President Biden's Proclamation will be subject to the KEPA RMP. These lands and objects will be managed under the much less protective "multiple use standard," and exposed to—among other things—impacts from

incompatible development activity such as hard rock mining and oil, gas, and coal leasing. Each of these activities is specifically prohibited by President Biden's Proclamation. Impacts from these activities, were they to be allowed, would include construction of new roads, drill pads, and waste pits as well as the clearing of native vegetation and soils.[2]

b.  Indeed, after then-President Trump eviscerated the original Grand Staircase-Escalante National Monument and replaced it with three, much smaller, Monument units, dozens of mining claims were located in the excluded lands, including: Creamsicle 1, 2 & 3, Berry Patch 1 & 4, Raspberry 1, and Mesa 1-34. The Berry Patch 4 and Creamsicle mining claimants have submitted plans of operation to BLM, signaling their intent to increase mining operations.

c.  While the mining claims are subject to President Biden's new monument protections, BLM is required to determine if the claims are "valid" (i.e., contain a valuable mineral deposit) as a prerequisite to approving plans of operation for mines such as the Berry Patch 4 and Creamsicle. However, if monument protections are lost, then development of the mining claims may be allowed to continue even in the absence of a valid claim—subjecting the lands to adverse impacts even where no valuable minerals are actually present.

d.  Even the Trump-era GSENM RMP emphasizes the use of resources and reduced constraints on activities within lands which BLM purports to manage to protect monument objects.

---

[2] *See* KEPA ROD at 3.1.1.

e.  Both the GSENM RMP and KEPA RMP allow for nearly unlimited target

shooting, placing monument objects at higher risk for damage and vandalism.[3]

Target shooting also affects my and the Alliance's members interests by

damaging or destroying monument objects, including cultural resources, native

flora and fauna, and geologic features, and destroying wilderness characteristics.

Throughout my travels across Utah's public lands, and in particular on visits to

cultural sites now protected by President Biden's Grand Staircase-Escalante

National Monument Proclamation, I have witnessed significant adverse impacts

and the vandalism of cultural and archeological sites due to careless or intentional

target shooting. For example, near the Lampstand Butte (within the Grand

Staircase-Escalante National Monument) I have found bullet shells, target

fragments, and other trash strewn about across mounds of prehistoric artifacts like

pottery and stone tools, damaging the integrity of these irreplaceable resources. I

have also visited rock formations, and even worse, prehistoric rock art panels in

the Grand Staircase-Escalante National Monument that have been used as targets,

completely destroying both cultural and geologic features.

f.  President Biden's Proclamation requires BLM to prepare a new monument

management plan that will protect and restore the important and sensitive natural

and cultural objects the Monument was designated to protect. President Biden's

Proclamation expressly directs the Secretary of Interior to provide for "maximum

public involvement" when preparing a new management plan. Through this

process, which has already begun, the Alliance's members and I will have an

---

[3] *See* KEPA ROD at 2.18.2; GSENM ROD at 2.18.2.

opportunity to persuade BLM to adopt a management plan that provides for maximum protection of monument objects and values; for example, by prohibiting target shooting on all or most of the Monument lands. If Plaintiffs' litigation is successful, no new management planning will take place. As a result, the Alliance's members and I will lose the opportunity to participate in a new planning process and improve the protection of monument objects.

10.     I use and enjoy the public lands within the Grand Staircase-Escalante National Monument for many purposes, including those that President Trump excluded from monument protection. I have visited, hiked, explored, photographed, camped, and otherwise appreciated and explored these lands since 2019.

a.   I live about a four-hour drive from the Monument's fantastic lands and enjoy taking trips that can last several days to spend time in and explore the remote and wild lands within the Monument. Since 2019, I typically visit lands within the Monument every year and at times at least three to four times a year. I plan to continue visiting these lands every year for the foreseeable future. I visited the Monument most recently in late summer and fall of 2022. I plan on returning as often as possible.

b.   My visits to the lands in Grand Staircase-Escalante National Monument, as designated by President Biden, have included but are not limited to, the Paria-Hackberry Wilderness Study Area, the Escalante River and many of its tributaries, Death Hollow, Coyote Gulch, Big Spencer Flat, upper and lower Calf Creek, Willis Creek, Bull Valley Gorge, Devil's Garden Wilderness Study Area, Cottonwood Narrows, Grosvenor Arch, the Wahweap Wilderness Study Area, the

6

Cockscomb Wilderness Study Area, Phipps Death Hollow Wilderness Study Area, North Escalante Canyons/the Gulch Wilderness Study Area, Steep Creek Wilderness Study Area, and Scorpion Wilderness Study Area. I love traveling to these places to hike, camp, engage in quiet contemplation, and appreciate the solitude and dark night skies—qualities that are increasingly difficult to find in Utah and across the American West. Additionally, for years I have coordinated and led volunteer service projects to restore areas that were damaged by off-highway motor vehicle use and inappropriate camping activities throughout the Monument. In 2022, these service trips included restoration work on Big Spencer Flat, Calf Creek, and adjacent to Lampstand Road.

c.   President Biden's Proclamation specifically identifies for protection many of the places that I have and continue to enjoy in my personal capacity and work to protect in my professional capacity, including Coyote Gulch and Calf Creek. These places will receive less protection vis-à-vis the Trump-era management plans if Plaintiffs' lawsuit is successful.

d.   I appreciate the solitude of and love experiencing the natural beauty of these lands. The sight and sound of human development, including activities such as mining and related activities like truck traffic and light pollution, as well as things like target shooting, diminishes my enjoyment of these visits. I am planning to return to Little Death Hollow, The Gulch, and other tributaries of the Escalante River in 2023 to backpack and enjoy the solitude of these magnificent places. I also intend to return to the Cockscomb area, the Circle Cliffs and Hole in the

Rock Road to conduct more volunteer service projects to protect these areas throughout 2023.

**Bears Ears National Monument**

11.     With respect to the Bears Ears National Monument, if President Biden's designation is found unlawful, then BLM will no longer be directed to manage the Monument lands to prioritize the proper care and management of monument objects. In place of the President's directive to BLM and the Forest Service to ensure proper care and management monument objects and values, the lands will instead be managed subject to either the Monticello Resource Management Plan ("Monticello RMP"), the 1986 Manti-La Sal Land and Resource Management Plan ("Manti-La Sal LRMP"),[4] or the Trump-era Indian Creek and Shash Jaa' Monument Management Plans ("Indian Creek and Shash Jaa' MMPs"). Each of these plans provide decreased protection and conservation of monument objects and values as compared to President Biden's monument designation.

a.     For example, the objects and values subject to the Monticello RMP and Manti-La Sal LRMP would be opened to the location and exploration of hard rock mining claims and to mineral leasing and development, and will suffer from the impacts of those activities, including: the construction of new roads, drill pads, and waste pits, as well as the clearing of native vegetation and soils.

b.     Indeed, after President Trump decimated President Obama's Bears Ears National Monument (replacing it with two much smaller monument units) and

---

[4] *See* Forest Service, Manti-La Sal National Forest Forrest Plan (1986), https://www.fs.usda.gov/detail/mantilasal/ landmanagement/planning/?cid=stelprdb5383364.

reopened the excised land to mineral entry,[5] more than a dozen new hard rock mining claims were located on the lands previously protected by President Obama's monument designation. These new mining claims include: the Easy Peasy and Easy Peasy 2; Geitus 9, 10, and 12; and VAR 1, 2, 3, and 4. Use and development of some of these mining claims, including the Easy Peasy mine has already begun and that same operator has filed a plan of operations for a larger scale mine on the Geitus claims. The location and development of new mining claims will continue to occur on these lands if President Biden's new monument protections are lost.

c.  Additionally, as with the mining claims located in the Grand Staircase-Escalante National Monument, the BLM is required to determine if mining claims within Bears Ears National Monument are "valid" (i.e., contain a valuable mineral deposit) in order to approve plans of operation for the mines. However, if the monument protections are lost, then development of the mining claims may be allowed to continue even in absence of a valid claim— subjecting the lands to adverse impacts even where no valuable minerals are actually present.

d.  In addition, President Biden's Proclamation requires BLM and the Forest Service to jointly prepare a new resource management plan that will protect and restore the important and sensitive natural and cultural objects and values the Bears Ears National Monument was designated to protect. President

---

[5] *Modifying the Bears Ears National Monument*, Proclamation No. 9681, 82 FR 58081 (Dec. 4, 2017).

Biden's Proclamation expressly directs the Secretaries of Interior and Agriculture to provide for the "maximum public involvement" when creating a new management plan. If Plaintiffs' litigation is successful, no new management planning will take place. As a result, the Alliance's members and I will lose the opportunity to participate in the planning process, and to persuade the agencies to adopt plans that provide maximum resource protection.

e.  Instead, of preparing new management plans, the BLM would manage the lands presently within Bears Ears National Monument pursuant to the Indian Creek and Shash Jaa' MMPs (which emphasized continued multiple use, and placed as few protections on the resources and objects within the Shash Jaa' and Indian Creek Units as possible), the Monticello and Moab RMPs, and Manti-La Sal LRMP (which manage those planning areas subject to the principles of multiple use).[6] Consequently, the resources and objects within the monument would suffer damage and destruction from incompatible activities on public lands.

f.  For example, on lands that would revert to the Monticello RMP, objects identified in President Biden's Proclamation will be being exposed to the hard rock mining and oil and gas leasing and development I discussed above. The

---

[6] *See* BLM, Monticello Field Office, BLM ROD and Approved MMPs for the Indian Creek and Shash Jaa' Units of BENM ("BLM Monument ROD") (Feb. 2020), https://eplanning.blm.gov/eplanning-ui/project/94460/570;
U.S. Forest Service, USFS ROD and Approved Manti-La Sal National Forest Land and Resource Management Plan Amendment for the BENM Shash Jaa' Unit ("USFS Monument ROD") (Feb. 2020), https://eplanning.blm.gov/eplanning-ui/project/94460/570.

objects will also continue to be at higher risk for damage and vandalism from activates such as target shooting, which is allowed nearly everywhere within the lands subject to the Moab and Monticello RMPs and Manti-La Sal LRMP.[7] For instance, the Wolfman petroglyph panel was one of the most remarkable rock art sites in Utah and was significantly damaged and vandalized by target shooting. Preventing vandalism and theft of the objects identified in President Biden's Proclamation is a key goal of the monument designation.

g.  Also, both new and ongoing looting and vandalism of cultural sites would be more likely because BLM and the Forest Service will no longer be required to prepare a new transportation plan for motorized and non-motorized use.[8] BLM is well aware that its current motorized travel plans and route designations do not adequately protect the spectacular cultural resources in and around Bears Ears National Monument. [9] In my trips traveling throughout the Bears Ears National Monument, I have personally witnessed the destruction of cultural artifacts from illegal motorized vehicle travel. Based on my years of experience traveling throughout the Monument and across

---

[7] *See* BLM Monument ROD at 53.

[8] President Obama's Bears Ears Proclamation directed the BLM and Forest Service to "prepare a transportation plan that designates the roads and trails where motorized and non-motorized mechanized vehicle use will be allowed." That provision was incorporated by reference into President Biden's Proclamation.

[9] *See* BLM, Land Use Plan Evaluation and Report: Monticello Field Office Approved Resource Management Plan 5 (Sept. 2015) (stating that route and travel designations in the Monticello RMP fail to address cultural and paleontological needs and protection), https://eplanning.blm.gov/eplanning-ui/project/68097/570.

southern Utah, the presence of motorized vehicle trails increases the likelihood of looting and vandalism of cultural sites near or along those trails.

h.   Activities such as target shooting and off-road vehicle use affect the Alliance and its members' interests by damaging or destroying cultural resources, degrading air quality and scenic vistas, displacing wildlife and other native species, and damaging or destroying wilderness characteristics.

i.   Further, President Biden's Proclamation provides additional legal and administrative protections and oversight to affected lands by improving coordination between state, federal, and Tribal governments regarding the protection of pre-historic and cultural resources, among other things. In particular, President Biden's Proclamation re-established the Bears Ears Commission, in accordance with Proclamation 9558, to ensure that "management decisions affecting the monument reflect expertise and traditional and historic knowledge." The Bears Ears Commission "shall consist of one elected officer each from the Hopi Nation, Navajo Nation, Ute Mountain Ute Tribe, Ute Indian Tribe of the Uintah Ouray, and Zuni Tribe." The Secretaries of Interior and Agriculture are required to "meaningfully engage the Commission."

j.   This heightened Tribal input stands in stark contrast to the "Shash Jaa' Commission" formed by President Trump's Proclamation, that included a representative from the San Juan County Commission and did not apply to the Indian Creek Unit.[10]

---

[10] *See* Proclamation 9681, 82 Fed Reg 58081, 58086 (Dec. 8, 2017).

12.     I have visited the lands encompassed by President Biden's Bears Ears National Monument Proclamation since 2014. Similar to my trips to the Grand Staircase-Escalante National Monument, I have and continue to frequently visit, hike, photograph, climb, canyoneer, camp on, and otherwise appreciate and explore these lands.

a.   I live a short drive from the Bears Ears National Monument lands and enjoy taking trips that can last nearly a week to spend time in and explore the remote and wild lands within the Monument. I typically visit lands within the Bears Ears National Monument every year and at times at least six to ten times a year. I plan to continue visiting these lands every year for the foreseeable future.

b.   My visits to Bears Ears National Monument, as established by President Biden, have included, but are not limited to the following areas: Indian Creek, Arch Canyon, Butler Wash, Comb Ridge, Cottonwood Wash, Mule Canyon, White Canyon, Cheesebox Canyon, Fish Canyon, Allen Canyon, Hammond Canyon, Gravel Canyon, Dark Canyon, Woodenshoe Canyon, Milk Ranch Point, the Abajo Mountains, Fry Canyon, and Elk Ridge. I love traveling to each of these places to canyoneer, climb, hike, camp, take photographs and take scenic drives, engage in quiet contemplation, and appreciate the dark night skies. Additionally, I have coordinated and led volunteer service projects to restore areas that were damaged by off-highway motor vehicle use and worked in partnership with Forest Service archeologists to survey and document historical and cultural resources to inform travel planning and aid in archeological research to better understand human history. Most recently, in 2022, these service trips included leading a group of volunteers to assist BLM conduct an archeological survey in Allen

13

Canyon and another group to assist the Forest Service in ensuring compliance with the travel management plan on Elk Ridge.

c.   President Biden's Proclamation specifically mentions many of the places that I have and continue to use and enjoy in my personal capacity and work to protect in my professional capacity including Indian Creek, Fry Canyon, and Elk Ridge. These objects will suffer from reduced protection and increased risk of harm if Plaintiffs' lawsuit is successful.

d.   I appreciate the solitude and love experiencing the natural beauty of these lands. The sight and sound of human development, including activities like mining and related activities like truck traffic and light pollution, diminishes my enjoyment of these visits. I intend to return in 2023 to backpack through White Canyon, Dark Canyon, hike Fable Valley, explore more slot canyons, and climb the world-famous rock walls in Indian Creek. I am also planning to continue my work leading volunteer service projects to manage the impacts of off-highway vehicles on Elk Ridge and in the Grand Gulch Instant Study Area on Cedar Mesa. Finally, I plan on continuing our annual partnership with Forest Service archeologists to document and survey archeological resources.

13.   My physical health, mental health, recreational, scientific, spiritual, and aesthetic interests will be harmed and impaired if Plaintiffs' lawsuit is successful and the protections afforded to the Monuments and the objects and values they contain are damaged or lost. President Biden's establishment of the Monuments adds significant additional legal and administrative protections and oversight to affected lands by prohibiting energy development and improving coordination between state, federal, and Tribal governments regarding the protection

14

of pre-historic and cultural resources, among other things. When these lands were subject to President Trump's repeal of the original Monuments and the accompanying inadequate management plans, the result was a real, demonstrable loss of protection to the excluded lands. The excluded lands were opened to location of hard rock mining claims and oil, gas and coal leasing, exploration and development. And the lands that remained within the Monument were exposed to damage from inappropriate activities such as target shooting and vegetation removal projects. These activities are incompatible with the values, objects and activities I enjoy and appreciate on lands within the Monuments and the objects President Biden seeks to protect.

14.    Without President Biden's monument protections, cultural resources are subject to adverse effects, including destruction from mineral development and other incompatible activities. Other damaging activities directly that affect my interests include destroying wilderness characteristics, ruining opportunities for recreation and solitude, impacting air quality and regional haze, and diminishing (or even preventing) enjoyment and appreciation of pre-historic and historic cultural sites as well as paleontological and geological resources.

15.    An order by the Court declaring that President Biden's October 8, 2021 Proclamations designating the Grand Staircase-Escalante and Bears Ears National Monument was a lawful exercise of executive authority under the Antiquities Act will protect my interests described herein by ensuring that the lands, Monument objects and numerous resource values in the Monument remain protected and preserved for the current as well as future generations.

I DECLARE under penalty of perjury that the foregoing is true and correct.

DATED: November 21, 2022

/s/ Jack Hanley

_____

Jack Hanley

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRIC OF UTAH
SOUTHERN REGION OF THE CENTRAL DIVISION**

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 4:22-cv-00060-DN-PK |
| JOSEPH R. BIDEN, JR., *et al.*, | ) Hon. David Nuffer |
| Defendants, | ) Magistrate Judge Paul Kohler |
| and | ) **DECLARATION OF WAYNE** |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) **HOSKISSON** ) ) |
| Proposed-Intervenor-Defendants. | ) ) ) |

I, Wayne Y. Hoskisson, declare as follows:

1.      I have personal knowledge of each of the following facts and, if called upon to do so, could and would testify as follows.

2.      I have been a member of the Sierra Club since 1993. The Sierra Club is a national grassroots environmental organization founded in 1892 by conservationist John Muir and currently has more than 832,000 members. The Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and

resources; to educate and enlist humanity to protect and re-store the quality of the

natural and human environment; and to use all lawful means to carry out these.

3.     I currently serve as the Wilderness Chair and the Public Lands Chair

of the Utah Chapter of the Sierra Club. The Utah Chapter has about 5,700

members. From 1996 to about 2016, I was an elected member of the Utah

Chapter's Executive Committee; although I am no longer an elected member of

that Committee, I continue to participate in Chapter Executive Committee

meetings and in discussions of particular issues such as the Bears Ears National

Monument, wilderness initiatives and legislation, management planning by the

Forest Service and Bureau of Land Management and other issues.  Through this

work, and out of my personal interest, I am familiar with the lands within the

boundaries of the Bears Ears National Monument, as designated on December 28,

2016, and restored by the Biden Proclamation on October 8, 2021.

4.     I live in Moab, Utah, about 75 miles by highway from the Bears Ears

National Monument and have hiked and camped on the lands included in the

Monument more than 100 times – averaging about 3 to 4 times a year since about

1985. I have conducted multiple backpacking trips to many canyons in the

Monument, including White Canyon, Long Canyon, Gravel Canyon, McLoyd

Canyon, Grand Gulch, Bullet Canyon, Fish Creek, Owl Creek, Road Canyon, and

North Fork Road Canyon with my wife, son, daughter, or friends. I visit the

Monument lands to enjoy their natural beauty, marvel at the granaries, cliff dwellings, rock art and other artifacts left by the Indigenous people who first lived here, to view native wildlife, and to enjoy the profound natural quiet of the area. I appreciate the quietness and the solitude of the wilderness lands in the Bears Ears National Monument, including the lands that President Biden's Proclamation restored to monument status. I value my trips there, with the dark skies and countless stars visible during my overnight stays, the chance to be alone, and the chance for discovery—of knowing just a little bit more about the world around me.

5.      I attended the Bears Ears Inter-Tribal Gathering at Kigalia Point in July 2019. Unfortunately, the COVID-19 pandemic limited my plans to visit the Bears Ears National Monument in 2020. However, I did visit the Bears Ears National Monument in October 2020 to help remove some damaged or possibly vandalized fencing surrounding some riparian vegetation on the shore of Duck Lake on Elk Ridge. Elk Ridge is in the Manti-La Sal National Forest portion of the Bears Ears National Monument. In October 2021, I arranged for Ken Maryboy, a Navajo leader and member of the San Juan County Commission, to speak with a group of students visiting the Bears Ears National Monument area from the College of the Atlantic in Bar Harbor, Maine. Ken Maryboy is a Navajo Elder and one of the principal proponents of the Bears Ears National Monument. By sheer chance the students met with him on October 8, 2021, the day President Biden

restored the Bears Ears to the full boundaries established originally by President Obama.

6.      I have refrained from travel recently due to Covid concerns, but expect to visit the Bears Ears National Monument again when I am able. In the meantime, I continue to advocate for protection of the Monument as designated on October 8, 2021, as described herein.

7.      During my visits to the lands included in President Biden's proclamation, I enjoy encountering and viewing Ancestral Puebloan stone homes, granaries, and other structures. I have become increasingly aware of the fragility of these structures, which could easily be disturbed by visitors without proper care and management by federal land managers. Over time, I have found many archaeological sites where looters have removed pottery shards, fragments of stone and wood implements, corn cobs, and other artifacts. I understand that even such small pieces can help determine the age of an archaeological site. The need for visitor education to ensure that these resources are protected is immense. President Biden's 2021 proclamation directs the relevant federal public management agencies to protect the Monument's objects of scientific and historic importance and ensures preservation of these historical artifacts.

8.      Many Sierra Club members also use and enjoy public lands throughout the Bears Ears National Monument, including the lands for which

President Biden restored monument status. They engage in various activities, including ecological studies, sightseeing, viewing archaeological sites, observing native wildlife, hiking, backpacking, and enjoying the solitude of this remote area. The Sierra Club's members will continue to visit the Bears Ears area and, in particular, the areas now restored in the monument protection by President Biden's Proclamation, including places like the Citadel on Cedar Mesa and Hart's Draw.

9.     The Sierra Club's efforts to protect public lands in the Bears Ears area predate the Bears Ears National Monument designation. The Club has worked since the 1980s to advocate for protection of lands within the 2016 Bears Ears National Monument boundaries, that are now restored by President Biden's Proclamation. For example, the Club was a founding member of the Utah Wilderness Coalition, and in 1989, helped to introduce federal legislation known as America's Red Rock Wilderness Act to protect public lands in Utah, including lands designated as the Bears Ears National Monument in 2016. I personally became involved in organizing to pass this legislation in 1993.

10.     Before President Obama designated the Monument in 2016, the Sierra Club participated in the development of the Bureau of Land Management's Monticello Field Office Resource Management Plan, which governed resource development, mineral leasing, recreation, and other uses on lands that eventually were included in the Monument. I became familiar with the plan through my work

with the Club. The plan fell short of providing the lands excluded from the Monument the enhanced protection needed to preserve their cultural and natural resources. I also submitted comments to correct some inaccurate or misleading information given to the public during the planning process for the much smaller national monument that was left after President Trump shrunk the Bears Ears National Monument by over 80 percent in 2017, and I attended some of the first local meetings conducted by BLM during its planning process to advocate for Monument protection.

11.     More recently, I attended the Bears Ears National Monument Advisory Committee meeting and provided public comments urging protection of the Monument as restored in 2018.

12.     President Biden's Proclamation, which the Sierra Club actively supported and advocated for, protects the wilderness quality, the cultural, historical, and paleontological artifacts, the scientific and ecological values, and the remarkable scenery that I and other Sierra Club members value and worked to protect, as a national monument.

13.     In my capacity as the Sierra Club Utah Chapter's Wilderness and Public Lands Chair, I have actively advocated and will continue to actively advocate for the maintenance of the Bears Ears National Monument boundaries as defined in the 2021 Proclamation, and for the Monument's continued

protection under the Antiquities Act. With such protection, the lands and the resources they contain will benefit from enhanced management and conservation that will limit the looting of archeological sites, damaging off-road-vehicle use, uranium mining, oil and gas drilling and other activities that have harmed the land and its unique cultural and natural values.

14.     Since early 2015, I have attended meetings with tribes and other conservation organizations to discuss a potential national monument proposal that would protect the Bears Ears area. My role primarily was to work with and support Native American Tribes who were developing their own proposal for a Bears Ears National Monument. The Sierra Club sent national alerts and included articles in chapter newsletters to its members describing the need for national monument protection and urging them to support the monument designation.

15.     Michael Brune, the former executive director of the Club, has visited Bears Ears twice, hiked into a ruin on Cedar Mesa, and met with tribal leaders both times to express support for the Monument. I advocated for the Monument's designation directly to members of the Obama administration and raised awareness for the designation among the Club's Utah Chapter members. In 2017, Sierra Club supported and participated in litigation challenging President Trump's purported rollback of the Monument. *Hopi Tribe v. Trump*, No. 1:17-cv-02590-TSC (D.D.C. filed 2017).

16.     I am aware that mining prospectors and claimants have staked claims and begun work near the South Cottonwood Road, in an area that President Trump removed from the Monument and that President Biden restored, including the Easy Peasy uranium claims in an area known as the Cheese and Raisins Hills. This area is just west of South Cottonwood Wash and within the boundaries of the Bears Ears National Monument proclaimed by President Obama and outside of the boundaries as determined by President Trump. This kind of mining activity would once again be allowed if the Court reverses President Biden's proclamation and the withdrawal of the land from mineral exploration mining, all to the Sierra Club's detriment.

17.     Mining activities and the noise and dust that would result if the Monument designation were reversed would amount to a significant conservation loss for the Sierra Club and for me, personally. It would dramatically diminish my ability to enjoy this area for its natural beauty. I have observed the results of old mining activity near cliff dwellings—stacked stone structures tucked into the cliff and sheltered by an overhanging rock—above South Cottonwood Wash. As I ascended the slopes towards the mining claim sites, I found three large pot shards within inches of the edge of one of the mining routes. I took the following two photos, which document this evidence of pre-historic indigenous communities near the mining claims:



*Photo 1: Photo taken by Wayne Y. Hoskisson on Nov 3, 2019. This cliff dwelling is in a ledge above South Cottonwood Wash and below the Cotton-wood Wash Road. An old mining adit was nearby on the same ledge.*



*Photo 2: Taken by Wayne Y. Hoskisson Nov. 3, 2019. These pieces of pottery were along an old bulldozer track heading west and upslope from South Cottonwood Wash towards the Easy Peasy mining claims.*

18.     The pieces of pottery I photographed were lying on the edge of one of

the mining trails and could easily have been destroyed by contact with a heavy

vehicle or piece of mining machinery. Loss of the protective mandate provided by

President Biden's 2021 proclamation which comes with national monument status

would open the lands to harmful mining activities, including ground disturbance,

noise, and increased traffic on roads.

10

19.     Due to the Monument's restoration, the Sierra Club's and my health, recreational, scientific, spiritual, educational, conservation, and aesthetic interests remains protected. The restored Monument designation adds legal and administrative protections and oversight to lands within its boundaries, by prohibiting hard rock mining, by improving coordination between state, federal, and tribal governments regarding the protection of pre-historic and cultural resources, among other things, and by requiring that management decisions be consistent with the Proclamation's protective mandate.

20.     If President Biden's restoration of the Monument designation is reversed, existing protections associated with the Monument would be lost, along with the lasting integrity of sacred lands containing spiritual importance for indigenous people, landscapes, plants, wildlife, recreational opportunities such as hiking, camping, hunting and rock climbing, and other cultural resources are secure from harm. It would put irreplaceable cultural sites and artifacts, wildlife, and plants at risk from mining and looting activities.

21.     I hope that the Monument designation is upheld so that the Bears Ears National Monument remains protected and preserved for current as well as future generations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 4, 2022

_Wayne Y. Hoskisson_
Wayne Y. Hoskisson

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

|  |  |
|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 4:22-cv-00060-DN-PK |
| JOSEPH R. BIDEN, JR., *et al.*, | ) Hon. David Nuffer |
| Defendants, | ) Magistrate Judge Paul Kohler |
| and | ) **DECLARATION OF SARA HUSBY-GOOD** |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) ) |
| Proposed-Intervenor-Defendants. | ) ) ) |

1.     I am personally aware of the matters set forth below and, if called as a witness, would testify truthfully concerning those matters.

2.     I am currently the Executive Director of Great Old Broads for Wilderness ("Great Old Broads"). I have held this position since July 2022. I first became a member of Great Old Broads in 2014. In the course of my relationship with the organization, first as a member and now as the Executive Director, I have become familiar with the facts set forth below.

3.     I am a resident of Durango, Colorado.

1

***About Great Old Broads for Wilderness***

4.      Great Old Broads is a national grassroots organization, led by women, that engages and inspires activism to preserve and protect wilderness and wild public lands. With its 8,500 members and advocates, Great Old Broads works to train women as effective leaders and to amplify their voices to protect public lands (including national monuments) and the wilderness values they hold. Great Old Broads is recognized by the Internal Revenue Service as a Section 501(c)(3) public charity.

5.      Great Old Broads staff, including myself, train members as grassroots leaders of local chapters (called "Broadbands"). Staff, chapters, and members participate in land stewardship and monitoring projects in collaboration with several federal agencies. Staff and members also submit public comments and participate in appeals and objections processes to ensure that that public land management is carried out using the procedures, policies and laws established to protect land, cultural sites, prehistoric sites, water, air, wildlife, as well as the protection of recreation, opportunities for solitude, natural quiet, spiritual rejuvenation, and other human benefits of public lands.

***Great Old Broads' Interest in the Protection of Bears Ears National Monument***

6.      Great Old Broads has participated in local, state, and national activities to support the original designation of the Bears Ears National Monument

2

and the restoration of its original boundaries, which occurred in 2021. We have

worked to ensure that the lands and the monument values found there are protected

and preserved, and that all voices who share this vision are at the table equitably.

7.    Members of Great Old Broads use and enjoy Bears Ears National

Monument and the spectacular resources it contains for hiking, camping,

backpacking, boating, canyoneering, climbing, scenic drives, archaeological

exploration, stewardship projects, and more. Members travel from across the

United States to experience the scenery, wildness, canyons, rivers, and cultural

and natural resources of the Monument.

8.    Broads' advocacy for the land now within Bears Ears began before

the Monument was first designated, including the following:

(a)    Great Old Broads has supported passage of America's Red

Rock Wilderness Act, H.R. 2044, since the organization's very beginning, and

each year thereafter. The Act is designed to provide permanent protection for

undeveloped, wilderness landscapes, including those found on the lands within the

current Monument boundaries.

(b)    In 2008, the Great Old Broads joined with other environmental

groups to challenge the federal Bureau of Land Management's Monticello Field

Office's Resource Management Plan because, among other things, it utterly failed

to provide sufficient protection to BLM lands and resources that President Obama

3

eventually included in the Monument.

(c)    In 2008, Great Old Broads joined with Southern Utah Wilderness Alliance to challenge BLM's (BLM) denial of SUWA's petition to close Arch Canyon, in San Juan County, Utah, to motorized vehicle use. *Southern Utah Wilderness Alliance v. Sierra*, No. 2:08-cv-00195-TC (D. Utah Oct. 17, 2008).  Such use was harming the soils, degrading the stream, and led to looting and damage to the canyon's many cultural sites, now located within the Monument.

(d)    In 2014 Great Old Broads held a 5-day event in conjunction with the Grand Canyon Trust where we trained 24 folks to identify plants of the region and then worked in the field for three days of reading transects on the Manti-La Sal National Forest in a part of the Monument called the Abajos. That effort was part of an ongoing project to collect plant data that will be used to increase protection and restoration of native plant communities on southern Utah public lands.

(e)    Broads conducted trainings and multi-day monitoring events where members and partners used our Broads Healthy Lands Project monitoring system for recording off-road vehicle (ORV) impacts on the land. Southern Utah had become the "poster child" of the national ORV crisis. Broads Healthy Lands Project conducted multiple multi-day events with many dozens of members and

collected ORV impact data on lands within the Monument that are part of the

BLM Monticello Field Office and Manti-La Sal National Forest.

(f)     Broads was an active member of the Protect Greater

Canyonlands Coalition advocating for enhanced protections of certain landscapes,

a portion of which became part of the Bears Ears National Monument.

(g)     Broads has held a number of multi-day "Broadfloat" events on

the San Juan River to connect members to the landscape and educate them about

threats and the need for increased protections. This past year, we facilitated a trip

in the Monument with Ancient Waves, an Indigenous guiding company, and we

will take a rafting trip with them in the Monument in May of 2023.

9.     Broads also advocated for the Monument's creation in 2016, as

described below:

(a)     In April 2016, Broads' Wasatch (Salt Lake City area) chapter

hosted a six-day camping and hiking trip with 12 people to get to know the

proposed Monument, and visited many archaeological sites such as Mule Canyon,

Cave Towers, Bullseye, Monarch Cave, Valley of the Gods, and many less well-

known sites. Great Old Broads submitted comments, organized member

involvement, and participated in hearings in support of the Monument designation,

including in Secretary of the Interior Sally Jewell's listening session in July 2016

in Bluff, Utah. We advocated for a national monument designation that would

5

protect the spectacular natural, historic, and cultural resources found on lands that ultimately became the Bears Ears National Monument.

(b)     Great Old Broads has conducted "Broadwalks" (multi-day camping, educational, and stewardship events) in the Monument and has held membership gatherings in Indian Creek and at the Bears Ears themselves. These activities have helped to raise people's awareness of the environmental issues in this area.

(c)     In September 2016, before President Obama designed the Monument, 60 members, additional speakers, and guests spent five days camping below the Bears Ears buttes as part of a Broadwalk to learn about the Monument proposal and conduct stewardship projects with public land management agencies. Broads hiked in Dark Canyon, Grand Gulch, Bullet Canyon, Peavine Canyon, and Valley of the Gods and visited the archaeological sites known as Citadel, Ballroom, and Target Ruins. They learned about the history and prehistory of the area and spoke with Ute and Navajo representatives about their connection with the Bears Ears region. They also wrote letters to President Obama and recorded short video statements, all of which were submitted to the Interior Department and the White House in support of the designation of Bears Ears National Monument.

10.     Great Old Broads continued to advocate for the Monument after its original designation in 2016. For example, Broads encouraged members to provide

comments to BLM and the Forest Service, encouraging the agencies to develop, without delay, a management plan for the Monument, as directed by the 2016 Proclamation. The Broads continued to educate its members and the public on the important values within the Monument and the need to protect them.

11.     Great Old Broads opposed efforts by the Trump administration to reduce the Monument's size with the following advocacy efforts:

(a)     Broads was actively engaged in former Secretary Ryan Zinke's national monument review, which he undertook in the spring of 2017 at then-President Trump's direction. We submitted detailed comments to Secretary Zinke about the values present in the Monument and the need to protect them from mining, oil and gas drilling, off-highway use and other threats.  We also encouraged members to submit comments through email action alerts and educational forums. We also came to Blanding and the Mule Canyon Rest Area in southeastern Utah when Secretary Zinke visited Utah in May 2017 hoping there might be an opportunity to provide comment as part of the Monument review. While he met with politicians who were openly advocating for reversal of the Monument, the Secretary provided no such opportunity for Monument advocates like the Great Old Broads. Instead, we were prevented, as were all of the public, from going to the Blanding airport or going down the trail at the Mule Canyon Rest Area where Zinke held a press conference; we were provided no opportunity

7

to speak.

     (b)    Great Old Broads for Wilderness, along with other groups, sued the Trump administration for its illegal reduction of the Monument. *Nat. Res. Def. Council v. Trump*, No. 1:17-cv-02606 (D.D.C. filed Dec. 7, 2017), *consolidated with Hopi Tribe v. Trump*, No. 1:17-cv-02590-TSC (D.D.C. filed Dec. 4, 2017). That case is still pending.

12.    Great Old Broads has continued to advocate for the Monument after President Biden restored it in 2021.  For example:

     (a)    Broads participated in the September 21, 2022, virtual public scoping meeting hosted by the Bureau of Land Management and the Forest Service for Bears Ears National Monument to help shape the future of the Monument's management.

     (b)    Great Old Broads submitted public scoping comments on October 31, 2022, in favor of co-management of the Monument by both federal agencies and the Tribes with ties to the land, and to ensure the highest level of protective management practices were considered during the planning process

13.    On November 16, 2022*,* Broads hosted an online webinar open to the public discussing what Tribal co-management is, how it is beneficial to public lands and Indigenous people, and how to advocate for co-management in land planning and conservation. We used Bears Ears as an example. Speakers included:

- Regina Lopez-Whiteskunk, a member of the Ute Mountain Ute Tribe and former Ute Mountain Ute Tribal Council member.  She is also a former co-chair for the Bears Ears Intertribal Coalition.

- Angelo Baca, who is from the Navajo and Hopi nations. He served as the Cultural Resources Coordinator for Utah Diné Bikéyah.  Angelo is currently a member of the Bears Ears Monument Advisory Committee.

- Jake Palma, the Bureau of Land Management's Field Manager in Montecello, Utah—including Bears Ears National Monument.

- Charissa Miijessepe-Wilson, a member of the Prairie Band Potawatomi Tribe in Northeast, Kansas, and Co-Director of the Bears Ears Inter-Tribal Coalition—where she manages Tribal Leadership directives and daily operations, leads Strategic Planning and Visioning, and oversees the ramp up and creation of the Bears Ears Commission.

We had 147 people in attendance including members of Great Old Broads, federal agency employees, Tribal members, other nonprofits, environmental law firms, universities, and government staff from different cities, counties, and states around the country.

***Great Old Broads' Interest in the Protection of Grand Staircase-Escalante National Monument***

14.     As with Bears Ears National Monument, Great Old Broads has participated in local, state, and national activities related to the protection of the

9

Grand Staircase-Escalante National Monument and the restoration of its boundaries throughout the history of our organization.  We have worked to ensure that wilderness and wild lands within the Monument are protected and preserved, and that all voices who share this vision are at the table equitably.

15.    Members of Great Old Broads use and enjoy Grand Staircase-Escalante National Monument and the spectacular resources it contains by hiking, camping, backpacking, boating, canyoneering, climbing, exploring the many scenic drives, engaging in archaeological exploration, working on stewardship projects, and more. Members travel from across the United States to experience the scenery wildness, canyons, rivers, cultural and natural resources of the Monument. Some specific areas enjoyed by Broads include: Escalante River canyons, Coyote Gulch, Calf Creek Falls, Spooky and Peekaboo Canyons, Paria River, Mail Trail, Burr Trail, Highway 12, and so much more.

16.    Broads were started by a group of senior women who understood the need to educate the public about how older people valued and used undeveloped wild lands.  They began to organize in Escalante, Utah—at the doorstep of what would become the Grand Staircase-Escalante National Monument—after a senator from Utah claimed wrongly that wilderness discriminated against the elderly. Since then, the Broads have continually advocated for the protection of the lands

that eventually became the Grand Staircase-Escalante National Monument.

Examples of this advocacy include:

(a)     Broads founder and longtime board member, Ginger Harmon, was a designated member of the Interested Public starting about late 1970s and continuing through 1980s and 1990s. When the Monument was founded in 1996, she turned her attention to working though environmental organizations including Great Old Broads for Wilderness.

17.     Great Old Broads continued to advocate for the Monument after its original designation in 1996:

(a)     Great Old Broads successfully challenged BLM and National Park Service livestock grazing management within Glen Canyon National Recreation Area (GCNRA) and adjacent lands for failing to consider the cumulative effects of grazing and failing to protect cultural and natural resources. *Great Old Broads for Wilderness v. Kempthorne*, 452 F. Supp. 2d 71 (D.D.C. 2006). The GCNRA is relevant to the Monument because, when formulating its monument management plan, the agency must consider areas surrounding the Monument, and there are grazing allotments that cross the boundaries between the Monument and GCNRA.

(b)     Great Old Broads worked with Grand Canyon Trust and other organizations to collect field data regarding biocrusts within the Monument in

11

2013 and 2014. This resulted in a report for consideration as BLM developed alternatives for a Draft Environmental Impact Statement for a Grand Staircase-Escalante National Monument Grazing Management Plan.

(c)     From 2013 to 2016 Great Old Broads conducted annual week-long volunteer projects with Escalante River Watershed Partnership performing Russian olive removal and river restoration on the Escalante River.

(d)     Members and staff have given public comments advocating and urging the BLM to improve the impact of grazing conditions and vegetation management at Monument Advisory Committee (MAC) meetings.

(e)     Great Old Broads has participated in Rangeland Health Field Tours and provided input to BLM staff regarding livestock grazing management.

(f)     Great Old Broads conducted trainings and multi-day monitoring events where members and partners used our Broads Healthy Lands Project monitoring system for recording ORV impacts on the land. Broads Healthy Lands Project collected ORV impact data within the Monument and conducted a training event in Boulder, UT.

(g)     Great Old Broads celebrated its 20th Anniversary in 2009 with a 5-day event in Escalante with over 60 participants camping, hiking, performing stewardship projects and learning about the Monument.

18.     Great Old Broads has consistently opposed efforts to reduce the

12

Monument's size using various advocacy approaches:

(a)      Broads was actively engaged in former Secretary Ryan Zinke's national monument review, which he undertook in the spring of 2017 at then-President Trump's direction. We submitted detailed comments to Secretary Zinke about the values present in the Monument and the need to protect them from mining, oil and gas drilling, off-highway use, and other threats, and we encouraged members to submit comments through email action alerts and educational forums.

(b)      Great Old Broads for Wilderness, along with other groups, sued the Trump administration for its illegal reduction of the Monument. *The Wilderness Soc'y v. Trump*, No. 1:17-cv-02587-TSC (D.D.C. filed Dec. 4, 2017). That case is still pending.

19.      Great Old Broads has continued to advocate for the Monument after President Biden restored it in 2021, including urging it to adopt grazing reform for the monument to ensure that the Monument's values are protected.

### Conclusion

20.      The elimination or reduction of national monument status for the lands with Bears Ears and Grand Staircase-Escalante National Monuments would harm Broads' interests. Without monument-status protection, much of the land would be open for mining, oil and gas development, unmanaged off-road vehicle use, and

13

other harmful activities that impair the landscapes' cultural, scientific, and

conservation values. This would undo significant work that Broads has undertaken

over the years, and it would impair Broads members' enjoyment of these awe-

inspiring and truly irreplaceable lands.

21.     Conversely, an order by the Court affirming the legality of President

Biden's October 8, 2021, proclamations designating Bears Ears and Grand

Staircase-Escalante National Monuments would protect my interests described

herein by ensuring that the lands and numerous natural and cultural resource values

within the Monuments remain protected and preserved for current and future

generations.


I declare under penalty of perjury that the foregoing is true and correct.


Sara Husby-Good


14

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRIC OF UTAH**
**SOUTHERN REGION OF THE CENTRAL DIVISION**

| | | |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:22-cv-00060-DN-PK |
| JOSEPH R. BIDEN, JR., *et al.*, | ) ) | Hon. David Nuffer |
| Defendants, | ) ) | Magistrate Judge Paul Kohler |
| and | ) ) | **DECLARATION OF DANIEL KENT** |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) ) | |
| Proposed-Intervenor-Defendants. | ) ) ) ) | |

I, DANIEL KENT, declare as follows:

1.      I have personal knowledge of each of the following facts and, if called upon to do so, could and would testify regarding the following. This declaration is filed in support of Proposed Intervenor-Defendants Southern Utah Wilderness Alliance*, et al.*'s Motion to Intervene in the above-captioned matter.

2.      Because I am concerned about the conservation of public lands, including the Bears Ears and Grand Staircase-Escalante National Monuments, I support, and am a member of, a number of groups dedicated to ensuring that these places are protected from harmful development and other activities. These groups

1

include the Southern Utah Wilderness Alliance (SUWA), National Resources

Defense Council (NRDC), Grand Canyon Trust, the Center for Biological

Diversity, Great Old Broads for Wilderness, Sierra Club, Western Watersheds

Project, WildEarth Guardians, National Parks Conservation Association, and The

Wilderness Society.

**<u>BEARS EARS NATIONAL MONUMENT</u>**

3.      I have lived in Utah since 1983, specifically in Grand and San Juan

Counties, near the Bears Ears National Monument. About half the year I live in

Moab, Utah, about an hour's drive from the Monument. The other half of the year I

live in the field, camping in southern Utah's canyon country, largely within the

Bears Ears Monument's boundaries. Many years I spend more time in the

backcountry of the Bears Ears than in any other place, living out of a backpack and

my pickup. I have been a guide, ranch hand, carpenter, mason, park ranger,

wildlife biologist, public lands activist, outdoor educator, volunteer, and an

environmental non-profit founder/director. I have also been a federal lands wildlife

contractor since 1992. All of these jobs have centered on and depended upon the

public lands within or adjacent to the Bears Ears National Monument.

4.      I started visiting the area that was ultimately designated as Bears Ears

National Monument in 1979. It was an escape from a harried city environment to

one in which I could enjoy the original, fruitful abundance of our natural world. On

2

average, I spend approximately 150 days a year in the Monument. I have been in every canyon in the Monument at least once, most of them 8 times or more, often surveying for wildlife and raptors, particularly Mexican spotted owls. An important protected area for this rare owl overlaps a large percentage of the Monument. I deeply care about them and how they are impacted by human activity. I visit frequently to backpack, camp, hike, climb, bike, explore archeology, encounter wildlife, forage, and generally witness this marvel of nature.

5.     I spent much of 2019 and 2020 in the original Bears Ears, as designated under President Obama. I visited most of the canyons in Cedar Mesa and the White Canyon Complex four times that year.

6.     In November 2021, I visited Kings Spring Canyon, which includes Spring Canyon, a beautiful source of water in an otherwise arid desert. It is so fascinating to see how the shale and limestone clay water oozes out of the mountains to create a spring that feeds surrounding habitats. Kings Spring Canyon is the largest east-side drainage of Bears Ears and is vital for healthy wildlife habitats.

7.     In 2021 I also visited Grand Gulch and all its side canyons. I camped on Elk Ridge above Natural Bridges, at the Bear's Ears proper, and on the rims of Arch Canyon, Notch Canyon and the Dark Canyon complex, as I have nearly every year for over 30 years. Allen Canyon and South Cottonwood Canyons, loaded with

3

archeological sites and the location of the Allen Canyon/Bayes Ranch where I worked and still visit, are of particular interest, as I plan on helping to document sites. Many sites are currently not well documented or registered with State Historic Preservation Office ("SHPO").

8.      In 2021 and 2022 I spent about half my time in Grand Gulch, Arch Canyon, and other canyons in or adjacent to Bear's Ears National Monument, including Hart's Draw and its many side canyons. I also spent a week in Moki Canyon and its tributaries on Mancos Mesa, documenting extreme overgrazing and downcutting of stream banks, as well as conducting Mexican spotted owl surveys.

9.      I have trips planned for several areas within the Monument this winter, including Allen Canyon, Cottonwood Canyon, Posey's Canyon, the high peaks, John's Canyon, Step Canyon, White Canyon and Comb Ridge.

10.     One place within the Monument, Elk Ridge, is the Mother Mountain in my mythology and provides very real nurturing and meaning to my life. It is literally the center of my spiritual homeland. From the sheltering old growth ponderosa, aspen, and oak forests to the fork of the longest river in the Southwest (at the confluence of the San Juan and Colorado Rivers) this is the world's most beautiful and stunningly spectacular watershed. I always return here for solace, silence, sanity, and something ineffable, but soulfully potent, that I find in this place. This landscape speaks so strongly to me, giving me hope and energy from

its actively evolving, thriving life force. Artifacts left by the original Native

Americans who lived here are everywhere. These sites, and the rock art, granaries,

and dwellings are situated in a vast, interconnected network of thousands of

smaller sites, well-preserved in this desert environment.

11.    Another place I love to visit is Comb Wash, where the uplifted cliffs

crash and fold into the mountain, creating a passage for prehistoric and modern

people alike coming up from the San Juan River between the monolithic face of

Comb Ridge and the deep, imposing canyons of Cedar Mesa. These areas are

loaded with cultural sites: there is a rich embroidery of Native American

interactions here stemming from its geographic location as a transitional route from

the river and low desert winter home to the summer farming and hunting areas on

Milk Ranch Point and Elk Ridge.

12.    Just north of this area, in a place known as the Cheese and Raisins,

lies Whiskers Draw, where there is a spring, cottonwood gallery forest, and large

slickrock alcoves in the Navajo Sandstone, the same stratum that forms the walls

of Zion Canyon. There are magnificent cultural sites in and around this small

canyon, with many remains of small prehistoric farms, pithouses, kivas, great

houses, campfires, tools and lithic scatter, and a network of ancient travel routes

thought to connect with Chaco Canyon. This nexus of settlements, farm sites and

travel and seasonal migration routes centers at this point where Arch Canyon

comes into Comb Wash across from the Cheese and Raisins and Whiskers Draw. It is a focal point of local Ute activity to this day, where they own a section and a half of land and hold ceremonies. I enjoy pondering the rich history of Puebloan inhabitation here and the immense importance this landscape has held for eons. The need to keep protections in place for this part of the Monument is important to preserve it as the cultural and historical treasure that it is. My own observations show that vandalism and "pot hunting" accompany human activities such as mining and motorized recreation, and this contributes to my strong desire to fully document the plethora of interconnected cultural sites in this vicinity.

13.     I often, at least once a year, bring friends for a hike or backpack in the Fall, and usually car camp at least once more at the Hammond Canyon rim. When I hike into Notch Canyon, which I have done many times both for pleasure and work, I am annoyed and dismayed by old mining scars, although such signs are diminishing over time. If President Biden's restoration of the Monument is reversed, a new mine could be located here. That would be a very sad thing, and I would not want to return and see it or know what it is doing to the land, the water table, and nearby Cottonwood Creek. Mining development here would harm my enjoyment of the area, and I would choose not to backpack or camp here anymore.

14.     Fortunately, the early cultural sites and historic remains are protected by President Biden's proclamation, which requires that the Monument be managed

6

to preserve its natural and cultural values intact. As a result, the Monument will receive a heightened level of protection from poorly managed recreation (particularly motorized recreation), extractive industries, or destructive grazing projects.

15.     For example, I am aware that mining prospectors located several mining claims for uranium and other hard rock minerals on lands that had been excluded from the Monument by President Trump in 2017. Additionally, I have seen the view of Deer Point, which already has one of the most noticeable mine scars in the entire region, and which is highly visible from an extensive part of Highway 95. I know well how mining scars the land and impacts native habitats and water quality. Loss of the protective mandate provided by President Biden's 2021 proclamation would reopen the lands to harmful mining activities like these and harm my interests in ensuring that they retain their natural and undeveloped character.

16.     The Bears Ears National Monument is still natural, silent, and (mostly) unscarred, which is the main reason I play, work, live, and worship there. With its many colorful rock layers and diverse ecosystems, it is also fascinating to lovingly look at it from afar. I love travelling through the complex landscape knowing that every inch of it is part of an immensely special place that has sustained humans for generations. I appreciate the aesthetic beauty of the

7

Monument, and I love to look out over the dark contours of the Earth in the radiant

sunlight, or at night with no lights or the incessant whine of motors you always

hear near cities and highways.

17.     I would be harmed by the loss of Monument status for these lands,

which would make these lands available for mine development and the increased

traffic, noise, and artificial light it would bring, three things I specifically am trying

to get away from when I travel to Bear's Ears. The Monument has utterly amazing

archeological, geological, historical, and biological resources—all of which are

interconnected—that deserve preservation from the looting and other harms that I

have observed in numerous sites before the Monument's designation.

18.     I feel a debt to the wilds within the Bears Ears National Monument

that bring me happiness, a livelihood, and so many blessings, some as simple as

water, others as sublime as the unseen divine master's finest labyrinth.

## GRAND STAIRCASE ESCALANTE NATIONAL MONUMENT

19.     In the year the Grand Staircase Escalante National Monument was

designated, now restored by President Biden on October 8, 2021, I was living in

the heart of the Monument on the Escalante River and was working and living in

an area overlooking the Monument. Every morning, I walked along the river. My

drinking water came from a spring under a petroglyph panel. I was there working

for the Boulder Mountain Wilderness Committee to defend the headwaters of the Escalante.

20.     Over the years, I have completed numerous Mexican spotted owl surveys, documented trespass cattle, and have gone on backpacking, bicycling, canyoneering, and river trips hundreds of times within Grand Staircase-Escalante National Monument. The first time I ever saw the Escalante River was on a 2,000-mile bicycle trip that took me up the Burr Trail into Boulder. I fell so deeply in love with the landscape that I camped under a rock for months and worked at Hall's Crossing on Lake Powell so I could stay and explore Glen Canyon National Recreation Area, on lands that eventually became the Grand Staircase-Escalante National Monument.

21.     I plan to move back to Boulder when I can afford to, because this Monument includes the most idyllic landscapes imaginable, representing vast stretches of undeveloped public lands, unique geologic formations, and quiet majesty. It is a place where I can go to experience natural quiet and scenic beauty, away from the pressures and concerns that occupy daily life in more developed settings.

22.     I visit the Grand Staircase Escalante Monument frequently and extensively, at least several weeks a year. Designation and protection of the Monument has made the experience even better. For example, the Bureau of Land

9

Management (BLM), which manages the Monument, is now better managing cattle grazing to ensure that it is consistent with the protection required by the monument proclamations. The BLM has recently issued new guidance that will govern management of the Monument, and which directs the agency to ensure that management decisions are consistent with the Proclamation. The guidance will be in effect until BLM completes a new management plan for the Monument, due in March 2024.

23.    The Monument's visitors center has boosted economic activity in the area, providing local jobs, teaching science, and educating visitors, all of which have enhanced community health, built stronger relationships between people, brought money and services into the community of Escalante, and established a new, more respectful way of engaging with the land. The lives of my friends and myself have been made better in very tangible ways by the Monument's designation in 1996 and the restoration of its boundaries in 2021.

24.    My previous trips within the Monument include visits to the Paria River, Orderville Canyon, Johnson Canyon, Bull Valley Canyon, the Cockscomb and Cottonwood Narrows, Box Canyon, Mamie Creek, Death Hollow, Sand Creek, Calf Creek, Antone Bench, and most of the canyons of the Escalante. During some of these trips, my purpose was to explore the amazing plant and pollinator diversity, ancient human habitation sites and rock art, and canyons with restored

10

protections within the Monument. Most of these trips involved using the monument as an outdoor science lab for ecological education.

25.     During the first week of December 2021, I took friends to the canyons of the Escalante to experience peace, marvel at the massive geologic formations for which the Grand Staircase is named, look for fossils, and enjoy the solitude, adventure, and spiritual renewal in the wilderness. More recently I have hiked the tributaries of Steep Creek, Hot Canyon, Cottonwood Canyon, Slickrock Canyon and Deer Creek and camped multiple times on the northwestern border of the Monument and gazed over its unscarred natural beauty.

26.     This coming year I plan to hike/float the Escalante River and spend time in the incomparable and unique forest off the old Boulder Mail Trail on Antone Bench. I also have plans to visit Pollywog Bench, Coyote Gulch, Stevens Canyon, and will undoubtedly hike in Calf Creek and Deer Creek more than once. I return in no small part to inspire myself to keep fighting to protect this magnificence, as yet untrammeled and unspoiled by public lands extractionists.

27.     As with the Bears Ears National Monument, the Grand Staircase-Escalante National Monument's prehistoric, historical, and scientific features are uniquely interconnected. This interwoven lattice of places and things makes the landscape as a whole truly unique, significant, and irreplaceable. We have a rare opportunity here to maintain this continuity across nearly the entire breadth of

11

Southern Utah. I hope to hike continuously thru this landscape, both from the Grand Canyon to the Aquarius Plateau and from Zion to Moab, in remembrance of the original Escalante National Park, which would have protected all these lands as one continuous unit.

28.    I would be harmed by the loss of Monument status for these lands, which would make these lands available for mine development and the increased traffic, noise, and artificial light it would bring, three things I specifically am trying to get away from when I travel to the Monument. I am aware that prospectors have staked mining claims in an area on and near Colt Mesa, an area I have visited and where I plan to return. Losing the Monument, and the mineral withdrawal which excluded the area from mining activity, would harm my interests by introducing an industrial activity, noise, and excavation to an area that is largely natural and quiet. The Monument has utterly amazing archeological, geological, and biological resources that deserve preservation.

29.    What I appreciate about the Monument, and wish to see continue in perpetuity, are the clear dark skies, untainted by coal or hard rock mining and the lights, noise, and development that come with it; quiet lands where the natural evolution continues with minimal human interference; endless opportunities for solitude; a well-defined travel plan that limits destructive, noisy recreationists on motorized conveyances; and a rare landscape-level protected area in which larger

12

ecological processes are sustained permanently. These are the things that make life worth living and the reason I come back frequently for joy, adventure, and renewal within these Monument lands.

30.     Because of President Biden's Proclamation, I have renewed hope for the future of this magnificent place because the BLM must manage it in accordance with the protective mandates of the Proclamation. I need this wild place for inspiration and escape. If the Monument restoration is not upheld, mining and other disruptive activities will likely resume in places I once knew in their free, unfettered state, and the values and objects currently protected under the Monument designation will suffer. I would be crushed and dispirited.

31.     If the Monument designation remains in effect, my vision and hope for the irreplaceable lands within the Monument is attainable. For example, both the Biden proclamation and the original Clinton proclamation included a provision authorizing holders of grazing allotments to return them to the BLM, on a willing-seller basis. This is music to my ears because it gives the land and the water an opportunity to recover from the degradation left by livestock grazing. However, an order by the Court reversing the designation of the Grand Staircase Escalante National Monument would harm my interests, and the interests of the groups of which I am a member, in the preservation of the Monument's ecosystems, rare plant and animal species, unique geological formations, rich human history, and

cultural sites and artifacts found there. It would reverse the hard-won conservation

achievements that I and the groups of which I am a member have long fought for.

     I declare under penalty of perjury that the foregoing is true and correct to the

best of my knowledge.

     Dated: November 16, 2022

Daniel Kent

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

|  |  |  |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:22-cv-00060-DN-PK |
| JOSEPH R. BIDEN, JR., *et al.*, | ) ) | Hon. David Nuffer |
| Defendants, | ) ) | Magistrate Judge Paul Kohler |
| and | ) ) | **DECLARATION OF TAYLOR MCKINNON** |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) ) | |
| Proposed-Intervenor-Defendants. | ) ) ) ) | |

I, Taylor McKinnon, declare as follows:

1.      I have personal knowledge of each of the following facts and, if called upon to do so, could and would testify as follows:

2.      I have been a member of and have worked for the Center for Biological Diversity ("the Center") since 2007 in various capacities including as Public Lands director. Currently I am a Public Lands Campaigner, a position I have held since 2014. As Public Lands Campaigner for the Center, I work to protect public lands by, for example, advocating with land management agencies to minimize fossil fuel extraction on public lands and protect endangered species and

1

their habitats. I have worked to protect endangered species inhabiting the Bears Ears National Monument, including the Northern goshawk, Mexican spotted owl, Southwestern willow flycatcher, Yellow-Billed Cuckoo, California condor, Razorback sucker, Colorado pikeminnow, Bonytail chub, Humpback chub, and Navajo sedge.

3.      The Center is a national membership organization founded in 1989 and dedicated to the protection and recovery of endangered species and their habitats. The Center is headquartered in Tucson, Arizona and has offices across the country. It has over 89,000 dues paying members and more than 1.7 million supporters and online activists.

4.      The Center has advocated for Bears Ears National Monument's protection throughout its nearly six-year history of being designated, shrunk, and finally restored on October 8, 2021. The Center also advocated for the restoration of Grand Staircase-Escalante National Monument's protection after being shrunk. These efforts include advocating for the original and restored designations, submitting comments in several administrative processes, participating in social media outreach and action alerts to the public, and educating and providing the Center's members with a way to express their support.

5.      The Center's efforts to protect the Bears Ears area began long before its support for the Bears Ears National Monument designation. The Center has

supported the Red Rock Wilderness Act for decades. The Act, introduced into Congress every year since 1989, would protect Utah's canyon country from energy development and off-road vehicle use. This protection would extend to lands managed by the federal Bureau of Land Management within the Bears Ears National Monument, and include places such as Cedar Mesa, a scenic complex of sandstone canyons that harbor numerous species of native wildlife.

6.      The Center also supported a proposal to designate a Canyonlands National Monument in 2014 by pushing for President Obama to designate the Greater Canyonlands region as a national monument. This would have given greater protection to the area within the Canyonlands National Park as well as expanded protection to lands surrounding the park, including areas now in the Bears Ears National Monument.

7.      In addition to supporting the Red Rock Wilderness Act and the designation of the Canyonlands National Monument, the Center opposed legislation developed as part of an effort known as the Public Lands Initiative (PLI). The PLI would have encouraged mineral development across vast swaths of southern Utah in and around Bears Ears and conveyed many road segments across federal public lands to the state. The Center opposed the PLI because the proposed legislation gave too much land to the state of Utah and did not sufficiently protect wilderness areas or objects of national importance.

8.     The Center also commented on the Moab and Monticello Resource Management Plans that governed land management in areas now in the Monument and urged the BLM to protect the remarkable wildlife, habitat, and other natural features of the lands, much of which were eventually incorporated into the Bears Ears National Monument. These comments stemmed from a public lands campaign I ran to minimize fossil fuel extraction in the area. The comments incorporated information from the campaign.

9.     When former Secretary of the Interior Ryan Zinke undertook a review of national monuments in 2017, the Center and its members submitted comments supporting Bears Ears and Grand Staircase-Escalante and advocated for their continued protection and status as a national monument.

10.     When former President Donald Trump issued new proclamations shrinking both national monuments in December of 2017, the Center for Biological Diversity organized more than 40 events around the country—rallies, protests, concerts, letter-writing parties and visits to congressional offices—opposing rollbacks to Bears Ears, Grand Staircase-Escalante, and other national monuments.

11.     The Center is a plaintiff in litigation challenging President Trump's purported rollback of the Monuments. *Nat. Res. Def. Council v. Trump*, No. 1:17-cv-02606 (D.D.C. filed Dec. 7, 2017), *consolidated with Hopi Tribe v. Trump*, No. 1:17-cv-02590 (D.D.C. filed Dec. 5, 2017) (Bears Ears); *The Wilderness Soc'y v.*

4

*Trump*, No. 1:17-cv-02587 (D.D.C. filed Dec. 4, 2017) (Grand Staircase-Escalante).

12.    In December of 2020, the Center for Biological Diversity published a report describing key actions the incoming Biden administration should take to address the extinction crisis and climate change. Citing the Trump administration's reduction of protections and boundaries for both Bears Ears and Grand Staircase-Escalante National Monuments, the report urged the incoming administration to establish new national monuments. After President Biden took office in January of the next year, the Center distributed those recommendations widely among administration officials. In 2020, the Center for Biological Diversity hosted a webinar for its members discussing the need to protect the monuments, their biological diversity, and the Antiquities Act of 1906.

13.    In 2021, the Center for Biological Diversity sent a letter to the Biden administration urging the restoration of boundaries and protections for Bears Ears and Grand Staircase-Escalante National Monuments. This letter specifically cited harm that could be caused to previously protected land and monument objects from resource extraction activities, like uranium mining and oil and gas development, that had been limited or prohibited prior to the Trump administration rollbacks. In October of 2021, the Center for Biological Diversity issued a public statement

supporting the Biden administration's proclamations reestablishing protections for the Bears Ears and Grand Staircase-Escalante National Monuments.

14.     In August of 2022, the Center and allies issued a press release denouncing the State of Utah's lawsuits challenging the Biden administration's proclamations setting forth new protections for both Monuments.

15.     Between 2017 and 2022, Center for Biological Diversity members and online activists sent 32,612 letters to the Trump and Biden administrations opposing rollbacks of the Bears Ears and/or Grand Staircase-Escalante National Monuments and urging restoration of their boundaries and protections.

16.     I have used and enjoyed the lands now in the Bears Ears and Grand Staircase National Monuments for all of my adult life. My first trip to lands now protected as Bears Ears was during the mid-1990s; I spent my time boating and camping in the San Juan River corridor. I observed rock art at the Butler Wash panel and visited the River House ruins. From 2005 to 2007, I lived in Bluff, Utah and co-owned Wild River Expeditions, a rafting company that ran river trips down the San Juan in an area that is now part of Bears Ears. Guiding these tours required me to know and explain the geologic, human and natural history of the area. In addition to commercial river trips, I have taken numerous private river trips along the San Juan River and have served as an environmental interpreter for river trips of school children. I have hiked and camped extensively in many areas of the

Monument, both before and after joining the Center. I have visited the area

between Sand Island and Raplee Anticline and have camped in the River House,

Cottonwood, and Big Stick areas, among many other locations within the

Monument. My first trip to lands now protected as Grand Staircase National

Monument was also in the mid-1990s. I camped, hiked and bird-watched in Calf

Creek and hiked and bird-watched in Harris Wash and along the Escalante River.

In 2017 I hiked, photographed, and camped on Smokey Mountain and

photographed Warm Creek Canyon. In 2019 I camped and hiked at numerous

locations within the monument, including Calf Creek, Spooky Gulch, Peek-A-Boo

Canyon, Spencer Flat, and tributary canyons to Long Canyon.

17.     I have explored much of the area in both monuments by driving down

the back roads. In the Grand Staircase-Escalante National Monument, this includes

Cottonwood Road, Smokey Mountain Road, Hole in the Rock Road, Spencer Flat

Road, the Burr Trail and Highway 12. In Bears Ears National Monument, this

includes Highway 95, Highway 261, Cottonwood Wash Road, Elk Ridge Road,

John's Canyon Road, and on the open road network on Cedar Mesa and Beef

Basin. I have flown over the area to take pictures of the San Juan River Corridor

and Cedar Mesa and have hiked or driven extensively near the monument in Grand

Gulch, Slickhorn, the Red House Cliffs, and the Abajo Mountains. Since joining

the Center, I have taken at least three trips down the San Juan River and have

traversed other parts of both monuments extensively. I have for decades spent many dozens of hours of free time reading and researching about the natural and human history and paleo-history of Bears Ears National Monument, all of which is not only of personal interest to me, but also supports my work at the Center to protect the Monument.

18.     During my visits to the monuments, I almost always take photographs. I have visited and photographed dozens of Ancestral Puebloan ruins and habitation sites, including cliff dwellings, masonry structures, pit houses, granaries, and kivas. I have also visited and photographed dozens of rock art and petroglyph sites of all kinds, including Paleo-Indian, Archaic, Glen Canyon Linear, Ancestral Puebloan, Navajo, and Paiute. I have also photographed both monuments' unique landscapes, landforms, and wildlife. Here are examples:



*Photo 1: Looking northeast across Bears Ears National Monument from southeast of Beef Basin. Photo by Taylor McKinnon, 2017.*



*Photo 2: Last light on Cathedral Butte, Bears Ears National Monument.*
*Photo by Taylor McKinnon, 2017.*



*Picture 3: A view from Cedar Mesa to the San Juan River, in what is today Bears Ears National Monument. Photo by Taylor McKinnon, ca. 2006.*



*Picture 4: Ancestral Puebloan cliff dwelling, Beef Basin, Bears Ears National Monument. Photo by Taylor McKinnon, 2017.*



*Picture 5: Valley of the Gods and Cedar Mesa, Bears Ears National Monument.*
*Photo by Taylor McKinnon, 2021.*



*Picture 6: Columbian mammoth petroglyph, suggesting the coincidence of Paleo-Indians and Pleistocene megafauna, Upper Sand Island Panel, Bears Ears National Monument. Photo by Taylor McKinnon, 2021.*



*Picture 7: Summer tanager (*Piranga rubra*), breeding male north of its described breeding range, San Juan River corridor, Bears Ears National Monument. Photo by Taylor McKinnon, 2021.*

15



*Picture 8: Tributary canyon to Long Canyon, Grand Staircase-Escalante National Monument. Photo by Taylor McKinnon, 2019.*



*Picture 9: Spooky Gulch, Grand Staircase-Escalante National Monument. Photo by Taylor McKinnon, 2019.*

19.     President Biden's October 8, 2021, proclamation restored national monument protections to places that I value within the Bears Ears and Grand Staircase-Escalante National Monuments, lands that the Center urged President Biden (and administrations before him) to protect as national monuments.

20.     If President Biden's proclamations are overturned in this litigation, the Bears Ears and Grand Staircase-Escalante National Monuments, and the Center's interests in their conservation will suffer great harm. Mining companies

17

and oil and gas developers will likely seek to access pristine parts of the

Monuments as they have in the past when the lands were unprotected; off-road

vehicle users will degrade native vegetation and other ecological resources; and

more looting of prehistoric and historic cultural sites will occur. As a rafting

guide, I frequently saw the signs of looting and desecration of archaeologically

important areas. This behavior reflects disrespect for prior peoples and the places

they inhabited and harms my interests in viewing these sites in their undisturbed

state. The increased mining and oil and gas development, the proliferation of off-

road vehicle use, and the looting will all undermine the Center's conservation

goals and its successful advocacy for the Bears Ears and Grand Staircase-

Escalante National Monuments.

21.     Protection under the Antiquities Act guarantees that the innumerable

historic and cultural objects in the Bears Ears and Grand Staircase-Escalante

National Monuments remain protected and preserved for the current as well as

future generations and allow me to return to the aforementioned places to hike,

view wildlife, and take photographs on landscapes unmarred by mining and

pollution.

I declare under penalty of perjury that the foregoing is true and correct to

the best of my knowledge.

November 21, 2022

18

Taylor McKinnon

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

|  |  |
|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 4:22-cv-00060-DN-PK |
| JOSEPH R. BIDEN, JR., *et al.*, | ) Hon. David Nuffer |
| Defendants, | ) Magistrate Judge Paul Kohler ) |
| and | ) **DECLARATION OF ERIK MOLVAR** ) |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) ) |
| Proposed-Intervenor-Defendants. | ) ) ) |

I, Erik Molvar, declare as follows:

1.      I have personal knowledge of each of the following facts and, if called upon to do so, could and would testify as follows:

2.      I currently live in Laramie, Wyoming and am the Executive Director of Western Watersheds Project (WWP), where I have worked since October 2016. Under the WWP bylaws, all employees are conferred membership in the organization, and, as a result, I have also been a contributing member since 2016. WWP is headquartered

1

in Hailey, Idaho, and has over 12,000 members and supporters.  I am also a current member, and former staff, of WildEarth Guardians.

3.      Founded in 1993, WWP is a nonprofit environmental conservation group dedicated to protecting and restoring watersheds and wildlife throughout the West, including Utah, through education, public policy initiatives, and legal advocacy. It provides oversight and monitoring of public lands to ensure the functionality and resilience of native ecosystems.

4.      WWP has a strong interest in the management of the Bears Ears National Monument.  It submitted comments on the Monument management plan, commented on and appealed a number of vegetation manipulation projects in the Monument, conducted field monitoring of land health conditions on the Monument, and litigated the reduction of the Monument by President Trump.

5.      I am an author of a number of guidebooks to public lands, including national parks and monuments, wilderness areas, and BLM public lands. These include guides that cover recreation opportunities in Glacier, North Cascades, Olympic, Saguaro, Bryce Canyon, and Zion National Parks, as well as Chiricahua, Ironwood Forest, and Organ Pipe Cactus National Monuments. It is necessary to visit these areas periodically to keep my guidebooks updated, and I have visited the lands now designated as Bears Ears National Monument as part of my travels throughout

the West to revise my Zion and Bryce Canyon guidebook.

6.      I visit the lands designated as Bears Ears National Monuments nearly every year, typically during March or April. In March of 1991, while a graduate student at the University of Alaska Fairbanks, I made my first trip to the lands currently designated as Bears Ears National Monument, backpacking into Kane Gulch and Grand Gulch (then designated the Grand Gulch Primitive Area) and visiting a number of cliff dwellings. Bears Ears has been a favorite area to return to ever since. I took the picture below during a trip in April 2020, and it accurately reflects the site as I saw it on that day.



*Cliff dwelling, Grand Gulch, 2020*

3

7.      I returned to backpack Grand Gulch in 2000, and my most recent trip to Bears Ears was in March 2021. Within Bears Ears National Monument, I have visited Grand Gulch, Kane Gulch, White Canyon, the Moki Dugway, Valley of the Gods, Mule Canyon, Butler Wash, and the rims of Cedar Mesa above Valley of the Gods. I have used and enjoyed these lands for the purposes of photography (including taking the images embedded within this declaration), enjoyment of archaeological sites, geology study, hiking, backpacking, birdwatching, and camping.  I took the photo below during that trip in April 2020, and it accurately reflects an area of the Bears Ears National Monument known as Valley of the Gods.



*Looking into Valley of the Gods from the top of Cedar Mesa, 2020*

4

8.      With the exception of Mule Canyon, all of these places were without Monument protection as a result of President Trump's December 4, 2017, proclamation. Protection was only restored under President Biden's October 8, 2021, proclamation.

9.      I plan to return to Bears Ears National Monument in March 2023, as part of my annual trip across the Colorado Plateau.

10.    On behalf of WWP, I have advocated for the establishment of Bears Ears National Monument, and later for its restoration and expansion, for many years, beginning at a meeting with Deputy Undersecretary for Lands and Minerals Jim Lyons in 2015, prior to the Monument's establishment. I have also written articles documenting the need to protect the Monuments in numerous publications such as:

   a. The Hill (*Utah's public lands 'grand bargain' falls on its face*, Feb. 11, 2016, https://thehill.com/blogs/pundits-blog/energy-environment/269066-utahs-public-lands-grand-bargain-falls-on-its-face; and *Ryan Zinke was no Theodore Roosevelt*, Dec. 17, 2018, https://thehill.com/opinion/energy-environment/ 421708-ryan-zinke-was-no-theodore-roosevelt);

   b. Salt Lake Tribune (*Bears Ears is a holiday gift Utahns should embrace*, Dec. 31, 2016), https://archive.sltrib.com/article.php?id=11702036&itype=storyID;

   c. Deseret News (*What Utah and Trump can learn from Wyoming about the value*

5

*of national monuments*, May 22, 2017), https://www.deseret.
com/2017/5/22/20612757/op-ed-what-utah-and-trump-can-learn-from-
wyoming-about-the-value-of-national-monuments;

d.   Idaho State Journal (*Sage grouse and the looting of the American West*, Dec.
10, 2017), https://www.idahostatejournal.com/opinion/columns/sage-grouse-
and-the-looting-of-the-american-west/article_dd62a4bb-c537-588e-9f49-
65047dd30be1.html;

e.   Counterpunch (*Honor the tribal vision for Bears Ears National Monument*,
March 15, 2021), https://www.counterpunch.org/2021/03/15/honor-the-tribal-
vision-for-bears-ears-national-monument/; and

f.   The Wildlife News (*Of Indigenous Peoples, Environmentalism, and Atonement*,
Sept. 27, 2021), https://www.thewildlifenews.com/2021/09/27/of-indigenous-
peoples-environmentalism-and-atonement/.

11.     I also have been a spokesperson in numerous news stories urging the
designation and protection of Bears Ears National Monument, including those published
by the New York Times, Oregon Public Broadcasting, High Country News, EnviroNews,
Western Livestock Journal, and Mountain West News.

12.     In addition to safeguarding the Monument from poor management practices,

WWP and its members, including myself, have defended the Monument's original designation in 2016. During Secretary of the Interior Ryan Zinke's monuments review period in 2017, I submitted personal comments supporting the retention of the Monument's original boundaries and attended rallies in support of this cause. WWP also submitted an organizational comment letter in favor of the Monument. In 2017, WWP and other groups filed a lawsuit challenging President Trump's unlawful rollback of the Monument, which slashed the size of the Monument by 85%. *Hopi Tribe v. Trump*, No. 1:17-cv-02590-TSC (D.D.C. 2017).

13.    The October 8, 2021, proclamation restoring protections to the Monument— and in particular, closing the door to harmful mining-related activities and providing for permanent closure of livestock grazing allotments bought from willing sellers—was a result for which WWP advocated vigorously.  It protects the interests of WWP, its members, and me. The spectacular and unspoiled landscapes, natural sights and sounds and smells, dark skies, fascinating pictograph panels and cliff dwellings, and unique flora and fauna of Bears Ears National Monument provide a confluence of special features that explain why I return here year after year to enjoy the solitude, natural setting, and unique features.

14.    Loss of the protective mandate provided by President Biden's 2021 proclamation would open the lands to activities that would scar the land and harm

my and WWP's conservation interests. If stripped of monument protection, much of the land will be open for mining of minerals like uranium, or drilling for oil and gas. Additionally, off-road vehicle uses, which the BLM more carefully limits on Monument lands to preserve monument values, will expand. This will not only harm species and ecosystems, natural landscapes, and culturally important sites that WWP and I have worked hard to preserve, but will also degrade my ability to enjoy the area. Removal of protections impairs my enjoyment of public lands by introducing noise, visible human intrusions, light pollution, and by destroying archaeological sites, eliminating or degrading natural and historical features of the landscape that are irreplaceable and of utmost value to me.  Loss of the protections that now apply to the Monument would reverse conservation gains that WWP spent significant resources to achieve.

15.    Conversely, an order by the Court affirming that President Biden's October 8, 2021, Proclamation designating Bears Ears National Monument constitutes a lawful exercise of executive authority under the Antiquities Act will protect my interests described herein by ensuring that the lands and numerous natural and cultural resource values in Bears Ears National Monument remain protected and preserved for the current as well as future generations.

16.    Retention of monument status and protection of the remarkable historic and

scientific objects that are found within the Bears Ears National Monument is of great importance to WWP because it provides a clear conservation mandate to guide the decisions of federal land managers.  In the past, BLM has not consistently protected the lands within the Monument and WWP has had to advocated vigorously for BLM to exercise its authority to protect the Monument.  For example, after the unlawful Trump proclamation, BLM issued a resource management plan for the Bears Ears National Monument that failed to provide adequate protection to Monument resources. For example, the Bears Ears plan set forage utilization levels at 50%, twice the amount that is sustainable in arid western rangelands based on the best available science. It also formally sanctioned and declared open a damaging network of off-road vehicle trails, increased the number livestock watering facilities (each one of which becomes a hotspot for land and resource damage), and authorized the mechanical destruction of pinyon-juniper woodlands and even aerial spraying of herbicides. Each of these actions are like to cause major and sometimes irrevocable damage to the objects for which the Monument was designated.

17.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 4, 2022

Erik Molvar

9

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| ZEBEDIAH DALTON, *et al.*, | ) |
|  | ) |
|  Plaintiffs, | ) |
|  | ) No. 4:22-cv-00060-DN-PK |
|  v. | ) |
| JOSEPH R. BIDEN, JR., *et al.*, | ) Hon. David Nuffer |
|  | ) |
|  Defendants, | ) Magistrate Judge Paul Kohler |
|  | ) |
|  and | ) **DECLARATION OF TIM D.** |
|  | ) **PETERSON, JR.** |
| SOUTHERN UTAH WILDERNESS | ) |
| ALLIANCE, *et al.*, | ) |
|  | ) |
|  Proposed-Intervenor- | ) |
|  Defendants. | ) |
|  | ) |

I, Tim Peterson, declare as follows:

1.      I have personal knowledge of each of the following facts and, if called upon to do so, could and would testify as follows.

2.      I submit this declaration on behalf of Grand Canyon Trust ("the Trust") and WildEarth Guardians ("Guardians").

3.      I have been employed since January 2010 by the Trust, a 501(c)(3) non-profit public lands advocacy organization founded in 1985. The Trust is headquartered in Flagstaff, Arizona and has more than 4,000 active members and supporters from all over the United States. In addition to our Flagstaff

1

headquarters, our staff work from home offices in Winslow and Phoenix, Arizona;

Salt Lake City, Grover, and Bluff, Utah; Tohatchi, New Mexico; and the Denver

metro area, Basalt, and Durango, Colorado, where I am based.

4.      I currently serve as the Trust's Cultural Landscapes Director. In this

capacity, I work to achieve permanent protection of Utah's exceptional public

lands that are located on the Colorado Plateau and to increase the authority of

Native Nations and Indigenous people over the management of their ancestral

homelands.

5.      The Trust's mission is to safeguard the wonders of the Grand Canyon

and the Colorado Plateau, while supporting the rights of its native peoples. The

Trust advocates for environmentally responsible management of public lands and

their associated resources, access to these lands, and permanent administrative and

legislative protections to maintain their ecological integrity and wildness.

6.      As part of its mission to support the rights of the Colorado Plateau's

Native peoples, the Trust has worked to achieve the permanent protection of the

outstanding cultural, natural, and historic resources of the Bears Ears and Grand

Staircase-Escalante National Monuments.

7.      As part of my work for the Trust, and for my own personal enjoyment

and education, I have traveled extensively throughout the Monuments to conduct

field research trips and study the Monuments' natural and cultural resources, all of

which supports my conservation and advocacy work for the Trust. I am intimately familiar with the lands inside the Monuments.

8.      In addition to being an employee of the Trust, I am also a member of WildEarth Guardians. Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. Guardians envisions a world where wildlife and wild places are respected and valued and our world is sustainable for all beings. It believes in nature's inherent right to exist and thrive. Guardians relies on law, science, policy reform, and group organizing to advocate for greater restrictions on resource extraction on western public lands and appropriate protections for imperiled species. Guardians has focused on driving its substantial membership to take action to oppose the reduction of, and advocate for the restoration of, the Monuments. Guardians has members and supporters who recreate on federal public lands in Utah, and specifically in the Bears Ears and Grand Staircase-Escalante National Monuments, including me.

## BEARS EARS NATIONAL MONUMENT

9.      I have explored and enjoyed the land within Bears Ears National Monument for years. My trips have been on foot, in full-size vehicles, via small aircraft, and by all-terrain vehicle. I have also traveled through the region by raft and inflatable kayak, floating down the San Juan River.

10.     My personal interests in the Monument include the preservation, in its natural state, of its scenery, ecology, geology, paleontology, history, and most importantly, its Native American culture. My first extensive experience in the Bears Ears region as an adult was in October 1997, and I have made dozens of repeat visits for both work and recreation from January 2007 to the present day.

11.     I have enjoyed my visits to the Monument tremendously. I engage in activities like watching wildlife; gathering edible piñon nuts and other plants; photographing and enjoying the scenery, cultural resources, and geology; backpacking and day hiking in the canyons; running the San Juan River; and viewing and studying an incredible array of historic and cultural resources, including surface sites, granaries and cliff dwellings, rock art, pottery shards, ancient tools and material quarries, hogans, wickiups and sweat lodges, the Hole-In-The-Rock-Trail (established by Latter-Day Saint settlers), and numerous other historic and cultural resources, both evident and subtle. The landscape is alive with signs of past and present use by Native Americans, and the evidence is in situ nearly everywhere you look in the Monument. Of all my travels across the western United States, no area can match the varied and arresting scenic and cultural diversity of the Bears Ears cultural landscape.

12.     I have participated in at least eight separate photography overflights – slow and low – over the vast majority of the Bears Ears National Monument. I

made the image below on an overflight on April 5, 2017, of Mancos Mesa and

Moqui Canyon, a remote area of the Monument.



*Photo 1: Overflight of Mancos Mesa and Moqui Canyon*
*Photo by Tim Peterson, April 5, 2017*

13.   I made the following photograph after sunset on July 19, 2018. It

shows a spectacular cliff dwelling in the foreground, and the Bears Ears Buttes in

the background. The striking, unique, and fragile nature of the dwelling found here

is the epitome of objects of scientific and historic importance that the Antiquities

Act of 1906 was meant to protect. The Bears Ears cultural landscape is one of five

regions envisioned when Edgar Lee Hewett wrote early drafts of the Antiquities

Act, and it was the last to be protected some 100 years later.



*Photo 2: Cliff Dwelling After Sunset with the Bears Ears Buttes in the Background*
*Photo by Tim Peterson, July 19, 2018*

14.     The Trust has advocated for protection of the lands within the Bears

Ears National Monument for decades by engaging in the National Environmental

Policy Act (NEPA) process concerning land management planning, livestock

grazing, and travel management projects.  Some examples of the Trust's other

work advocating for protection of these lands include the following:

a.     In 2010, our advocacy to add national monument protections in

the region included our involvement in founding the campaign to protect a Greater

Canyonlands National Monument whose focus area encompassed a large portion

of the northern Bears Ears cultural landscape. We were a core partner in that effort

6

until late 2015, when efforts began to coalesce around a campaign to protect the area that would become Bears Ears National Monument.

       b.      In 2010, a local 501(c)(3) non-profit organization named Utah Diné Bikéyah ("UDB") began efforts to include in the public lands debate local Native American voices that had been historically excluded. Based on elder interviews and cultural mapping, UDB assembled a proposal for a Utah Diné Bikéyah National Monument encompassing, and exceeding in some areas, the lands eventually protected as Bears Ears National Monument in 2016. The Trust supported this effort by advising UDB staff and board members and partnering on numerous events and outreach activities.

       c.      The Bears Ears Inter-Tribal Coalition, composed of the Hopi, Navajo, Ute, Ute Mountain Ute, and Zuni Tribal governments, was formed on July 15, 2015, to work together for the protection of their sacred ancestral public lands. In my capacity as an employee of the Trust, I worked on this campaign extensively until the Monument's designation in 2016 in support of, and at the direction of, the Coalition leaders. My work included providing photography to the campaign (events and landscape work), issue and resource briefings, field tours, policy analysis, and extensive strategic, media, and communications consulting.

       d.      The Trust maintains an email list of approximately 6,758 individuals who have registered with us to receive updates supporting the

protection and defense of the Monuments. We communicate with individuals on the email list about specific developments affecting the Monuments, describe the resources that deserve protection, convey the importance of supporting Tribal interests in the preservation of the Monuments, and notify them about opportunities to engage in advocacy and other efforts, like agency planning processes that affect the Monuments. I currently lead the Trust's communications efforts on the Monuments.

e.     In my role as the Trust's Cultural Landscapes Director, I co-led a multi-day educational Bears Ears expedition for Trust members and supporters from April 22–28, 2018, on the San Juan River from Sand Island near Bluff, Utah, near what may contain the oldest rock art in North America, down the river through Comb Ridge to the Clay Hills takeout.

f.     I participated in hiking trips for Trust members and supporters in my professional capacity in 2019, 2021, and 2022–offering the lay of the land, issue and landscape history, and updates on where things stood regarding protections and ongoing land management planning processes.

g.     I have participated in and photographed several of the annual Bears Ears Summer Gatherings. The 2019 gathering was the best attended ever, as evidenced in the group photo I captured below:



*Photo 4: Fourth Annual Bears Ears Summer Gathering*
*Photo by Tim Peterson, July 20, 2019*

h.      In 2017, the Trust, along with other groups, filed a lawsuit

challenging President Trump's purported rollbacks of Bears Ears and Grand

Staircase-Escalante National Monuments. *Hopi Tribe v. Trump*, No. 1:17-cv-

02590-TSC (D.D.C. filed 2017); *The Wilderness Society v. Trump*, No. 1:17-cv-

02587-TSC (D.D.C. filed 2017). I was the Trust's declarant in the Bears Ears

lawsuit.

15.      In my capacity as a staff member at the Trust, I contributed to NEPA

comments for the Monument management plans written during the Trump

reduction period, including (but not limited to) authoring nominations for Areas of

Critical Environmental Concern and urging that they receive enhanced protection due to the remarkable features found there.

16.     In my capacity as Cultural Landscapes Director, I contributed to several sections of joint scoping comments that were submitted on October 31, 2022, for Bears Ears' new Monument Management Plan, including (but not limited to) sections on collaborative management authority and policy and the need to protect Forest Service lands with wilderness character.

17.     Like the Trust, Guardians has advocated extensively for the Monument's designation and protection. Examples include the following:

a.      Communicating with its members and supporters and urging action on behalf of Bears Ears, including (but not limited to) sending action alerts to members and supporters in 2017 encouraging then-Interior Secretary Zinke not to recommend altering the boundaries of the monument, joining FOIA requests for information regarding the former president's monuments review, and driving member action to advocate for avoiding reduction, and then urging its members and supporters to encourage President Biden to restore the Monument's original boundaries.

b.      Contributing to and signing on to joint NEPA comments on management planning for the Trump-reduced Monument units and the Biden-restored Monument.

10

c.      Guardians has also advocated for the designation and protection of Bears Ears National Monument, including by informing its members of the ongoing threats of oil and gas leasing and illegal off-road vehicle activity on public lands within the boundary of the proposed national monument, and asking them to contact then-President Obama to request that Bears Ears be protected as a national monument under the authority of the Antiquities Act. Later, it submitted comments to then-Interior Secretary Zinke opposing any revocation or reduction of Bears Ears National Monument in response to Executive Order 13792's examination of designations of certain national monuments made under the authority of the Antiquities Act.

d.      Guardians is also a plaintiff in the litigation described above challenging President Trump's purported rollbacks of Bears Ears and Grand Staircase-Escalante National Monuments.

18.     The conservation interests of the Trust and Guardians would be harmed if the Court reversed President Biden's designation. Without the protection assured by the Antiquities Act and the proclamation designating the Monument, the land will be vulnerable to damage from mining, looting of cultural sites, and OHV abuse. For example, areas that I have worked to protect, such as Sand Wash, Cedar Mesa, The Needle, Fry Canyon, Fry Mesa, Tables of the Sun, Mossback Mesa, Mossback Butte, Wingate Mesa, Red House Cliffs, Moqui Canyon, Mancos

Mesa, Valley of the Gods, Bluff Bench, Tank Mesa, Cottonwood Wash, Elk Ridge, Hammond Canyon, the Abajo Mountains, Shay Mountain, Harts Draw, and Lockhart Basin would lose protection if the Monument designation is reversed. Some examples of places and cultural resources that would be at risk are shown in the following images:








*Photo Group 5: Cultural Objects Within Bears Ears*
*Photos by Tim Peterson, May 5, 2015; April 13, 2017 (2); May 5, 2017; October 12, 2016*

19.     Without the protection that monument status confers, BLM would manage its portion of the Monument pursuant to the general "multiple use" approach of the Bureau of Land Management's 2008 Monticello Resource Management Plan (RMP). The Trust submitted comments during the development of that plan, and I have extensive knowledge of its contents and BLM's implementation of the plan. In short, the Plan fails to give these lands the protection needed to preserve their cultural and natural resources and fails to protect the wilderness quality; the cultural, historical, and paleontological resources; the scientific and ecological values; and the remarkable scenery that I and other Trust members value.

20.     Without Monument status, and the mineral withdrawal that comes with it, the lands would be open again for the staking of claims and hard rock mining, particularly for uranium in this area. The area depicted in the photograph I took below on North Elk Ridge in the Manti-La Sal National Forest within the

13

Monument is just one place where mining claims are a threat to the land's integrity and to the culturally significant sites that are found there.



*Photo 6: Hammond Uranium Land Claims in the Manti-La Sal National Forest*
*Photo by Tim Peterson, July 19, 2018*

21.     On October 13, 2019, I visited the area near the South Cottonwood Chacoan Great House and Richard Wetherill's Cave 7, where the Western archaeological term "basketmaker" was coined in recognition of the baskets found in lower strata from a time that predated Indigenous peoples' adoption of pottery making. The area is known as "Cheese and Raisins" on USGS maps, named because an early cattleman often only had cheese and raisins for lunch. During my visit, prior to President Biden's proclamation, I saw three new uranium claims filed on lands removed from the Monument by President Trump: Cottonwood, Easy

14

Peasy, and Royal Flush. What I saw, shot video of, and photographed there shocked, saddened, and dismayed me. My photograph showing the Cottonwood, Royal Flush, and Easy Peasy claims is pictured below:



*Photo 7: Cottonwood, Royal Flush, and Easy Peasy Claims*
*Photo by Tim Peterson, October 13, 2019*

22.     After startling three does that had been feeding on the Cottonwood claim, I traveled north, then west, and was shocked to discover the unsigned, active, and open shaft of the Easy Peasy mine. Though there was evidence that the area had been mined decades ago but not properly cleaned up, I also found recently excavated piles of waste rock and tailings, discarded bright orange and highly

visible plastic fencing, machinery and mining and ventilation equipment, fuel and

water tanks, a discarded hydraulic fuel container, and other trash at the site. Photos

of the Easy Peasy mine are shown here:



*Photo 8: Open Shaft of the Easy Peasy Mine*
*Photo by Tim Peterson, October 13, 2019*



*Photo 9: Waste from Mining Activity Within the Easy Peasy Mine*
*Photo by Tim Peterson, October 13, 2019*



*Photo 10: Aerial Photo of the Easy Peasy Mine*
*Photo by Tim Peterson, October 13, 2019*

23.     I visited the Easy Peasy mine again on July 24, 2020, this time with a handheld Geiger counter—a device that measures ionizing radiation. I recorded a "high" radiation reading of 203 counts per minute (CPM) near the open shaft, compared to a "normal" reading of 24 CPM nearby.



*Photo 11: "High" radiation reading at the shaft of the Easy Peasy Mine*
*Photo by Tim Peterson, July 24, 2020*



*Photo 12: "Normal" radiation reading nearby the Easy Peasy Mine*
*Photo by Tim Peterson, July 24, 2020*

24.     I visited the Easy Peasy mine for a third time on April 5, 2022, this time recording a "high" radiation measurement of 214 CPM just inside the open shaft.



*Photo 13: "High" radiation reading inside the Easy Peasy Mine*
*Photo by Tim Peterson, April 5, 2022*

25.     The filing of the Easy Peasy and other claims, and the ground-disturbing activities associated with mining, are examples of the kinds of harm that result when the Monument lands lack protection, and which will occur again if protections are lifted. I remain concerned about exposure to high levels of radiation for people, birds, and wildlife at the un-remediated and unmarked site. This kind of damage would concretely undermine the conservation gains that the Trust and Guardians have worked to achieve.

26.     Loss of monument status would also put the lands now within Bears Ears at risk of harm from off-road vehicles. While working for the Utah

Wilderness Coalition in 1997, before the widespread popularity of off-highway vehicle, or OHV use, I documented vehicle routes, including travel ways, roads, and trails, in San Juan County and in the Bears Ears region that were naturally reclaimed and revegetated, blocked by man-made and natural obstructions, and/or otherwise impassible to vehicles of any kind. When I returned to the area in 2007 and began to systematically document OHV use in the region, many of the same routes that had been impassible in 1997 had been re-developed and were being used heavily by OHVs. In the interim, a local ATV club (with the blessing of the local BLM and material support from San Juan County, Utah) had reconstructed hundreds of miles of abandoned routes to open them to OHV use without public notice or public involvement. The 2008 Monticello RMP made many of these routes "legal" on the RMP's travel management plan.

27.     President Biden's proclamation restoring Bears Ears National Monument requires BLM and the Forest Service to protect the Monument from harmful OHV use. It requires the Monument managers to prepare a comprehensive transportation plan designating routes in the Monument for motorized and non-motorized vehicles, but only if it was consistent with the protection of Monument resources. It also closed the Monument to new motorized routes, except for a few limited purposes. New transportation planning as a part of Monument management planning will allow for an inventory and assessment of roads, motorized routes,

and trails that are actively doing damage to sensitive cultural sites and allowed for their re-routing, mitigation, or closure and rehabilitation. There is an established and direct correlation between both unintentional damage and looting and Native American grave robbing when cultural sites are easily accessible by motorized vehicles.

## **GRAND STAIRCASE -ESCALANTE NATIONAL MONUMENT**

28.     I have also traveled extensively throughout the Grand Staircase-Escalante National Monument to conduct field research trips to document OHV use, to take photographs, and to study the Monument's natural and cultural resources since just after its designation in 1996 to the present day. I have done so as part of my work for the Trust and for my own personal enjoyment and education. I am intimately familiar with the lands inside the Monument.

29.     I enjoy the undisturbed natural beauty and the remarkable values of these lands as I fly over in small aircraft, hike, drive, and photograph throughout the Monument. The Trust's and my own personal interests in the Monument include the preservation, in its natural state, of its scenery, ecology, geology, paleontology, history, and most importantly, its Native American culture.

30.     The following photos of lands within the Monument showcase the landscape's features and cultural resources that the Trust and Guardians have sought to protect through national monument designation:



*Photo 14: View from Smoky Mountain in GSENM*
*Photo by Tim Peterson, April 6, 2007*



*Photo 15: An aerial view of the Escalante River corridor in GSENM*
*Photo by Tim Peterson, flown by LightHawk, September 9, 2011*



*Photo 16: Pictographs in GSENM*
*Photo by Tim Peterson, March 21, 2004*



*Photo 17: An aerial view of Big Flat Uplift in GSENM*
*Photo by Tim Peterson, flown by LightHawk, September 9, 2011*



*Photo 18: The Paria River corridor in GSENM*
*Photo by Tim Peterson, May 16, 2018*



*Photo 19: Petroglyphs and Vandalism in GSENM*
*Photo by Tim Peterson, February 20, 2020*

31.     As with Bears Ears, the Trust's advocacy for the lands within the

Grand Staircase-Escalante National Monument is decades long. Examples of this

advocacy include the following:

a.     The Trust has spent decades documenting the impacts of

livestock grazing on biological soil crusts, riparian areas, springs, seeps, and other

water sources in Grand Staircase-Escalante, all in service of our advocacy to

reduce livestock grazing pressure on Monument lands.

b.     In the 1990s, the Trust partnered with willing ranchers to retire

their grazing permits to rest the land from cattle grazing on half a million acres in

and along the Escalante River, its tributaries, and bench lands nearby. These lands

have now been free from livestock grazing (apart from occasional trespass cattle)

for more than twenty years, and the riparian systems have re-bounded from near

ecological collapse. Reversal of President Biden's monument designation threatens

to reverse the recovery of these valuable lands.

        c.     Also in the 1990s, the Trust helped ensure that oil and gas

leases on the Kaiparowits Plateau remained undeveloped.

        d.     Over twenty years ago, the Trust intervened in a challenge to

President Clinton's designation of the Monument to advocate for the Monument.

*Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246 (10th Cir. 2001). The District of

Utah eventually ruled against the plaintiffs and upheld the Monument's original

1996 designation in 2004.

        e.     Since 2007, the Trust has actively participated in the Escalante

River Watershed Partnership, an effort focused on eradicating non-native

vegetation in the Escalante River corridor and its tributaries.

        f.     My program at the Trust has a goal of expanding Indigenous

authority over shared governance of Monument lands. In service of advancing this

goal, on November 30, 2021, I guided three overflights of the southern end of

Grand Staircase-Escalante National Monument for Tribal Members and staff of the

Navajo Nation and the Hopi Tribe. These flights provided a birds' eye view of

lands that President Biden's proclamation has restored to national monument status

that had been cut by the former president. Trust staff led additional overflights and

on-the-ground tours on two occasions in 2022. In addition to orienting cultural

leaders and staff to the monument's boundaries that day in November 2021, I

gathered photographs for use in the Trust's communications around Grand

Staircase-Escalante.



*Photo 20: The Cockscomb in GSENM*
*Photo by Tim Peterson, flown by EcoFlight, November 30, 2021*



*Photo 21: Warm Creek in GSENM*
*Photo by Tim Peterson, flown by EcoFlight, November 30, 2021*



*Photo 22: Kitchen Corral Wash in GSENM*
*Photo by Tim Peterson, flown by EcoFlight, November 30, 2021*

g.      The Trust contributed to comments at every stage of the NEPA process for management plans for the Trump-reduced Monument units in 2018 and 2019.

h.      The Trust contributed extensively to scoping comments submitted on September 28, 2022, for Grand Staircase-Escalante's new Monument management plan.

32.     Guardians has also advocated extensively for protection of the lands within the Monument. Examples of this advocacy include the following:

a.      In May 2017, Guardians sent a letter to then-Interior Secretary Zinke in response to Executive Order 13792, detailing why Grand Staircase-Escalante National Monument should not be revoked or reduced by President Trump. Two months later when the secretary recommended that President Trump redraw the monument's boundary to greatly reduce its size and once again make public lands open to resource development, Guardians collected signatures from more than 10,000 supporters for a letter opposing the secretary's recommendation as a violation of the Antiquities Act.

b.      Guardians' advocacy for Grand Staircase also included joining FOIA requests for information regarding the former president's monuments review, and driving member action to advocate for avoiding reduction, and then advancing President Biden's eventual Monument restoration.

c.      Guardians contributed to and signed on to joint NEPA comments on management planning for the Trump-reduced Monument units and the Biden-restored Monument.

d.      Guardians joined the lawsuit challenging President Trump's purported rollbacks Grand Staircase-Escalante National Monument. *The Wilderness Society v. Trump*, No. 1:17-cv-02587-TSC (D.D.C. filed 2017).

33.      The Trust's, Guardians', and my own interests would be harmed by dismantling of the Grand Staircase-Escalante National Monument because it would

31

undermine decades efforts to protect these lands and to uphold their monument status. National monuments are managed to prioritize the protection of these objects above all other resource uses to keep them unimpaired by consumptive activities like mining, drilling, removal of native vegetation, and logging.

34.     Without the protection that monument status confers, BLM would manage the Monument pursuant to the general "multiple use" principle that applies generally to Bureau of Land Management lands without the heightened protection that applies to national monuments.

## CONCLUSION

35.     Eliminating monument status would subject the lands within both Monuments to more mining claims and development, activities which are either prohibited or more closely regulated in national monuments.

36.     Eliminating monument status and the heightened monument protections would also subject the Monuments' lands to increased OHV abuse that could lead to increasing user conflict and soil erosion, destruction of cultural resources and sensitive soil crusts, and increasing dust, noise, and a general reduction of the feeling of solitude and peace that I value in Bears Ears and Grand Staircase-Escalante.

37.     Eliminating monument status for Bears Ears and Grand Staircase-Escalante would also harm the mission of the Cultural Landscapes Program at the

Grand Canyon Trust, which is to restore and increase Indigenous influence over the management of ancestral public lands and ensure that those lands are protected from harm. Reversing the monument designation would put at risk historical and cultural resources and the conservation and educational benefits that would have flowed from application of the Tribes' traditional knowledge to the Monuments' management.

38.    An order by the Court reversing President Biden's October 8, 2021, Proclamations designating Bears Ears and Grand Staircase-Escalante National Monuments would harm the Trust's and Guardians' conservation interests by undermining the protection that the lands and numerous natural and cultural resource values in the Monuments currently enjoy. It would also reverse years of advocacy efforts the Trust has undertaken to ensure that the unique scientific, historic, and prehistoric values of the monuments are forever protected.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 16, 2022

Tim D. Peterson Jr.

33

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**SOUTHERN REGION OF THE CENTRAL DIVISION**

| | | |
|---|---|---|
| DALTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 4:22-cv-00060-DN |
| | ) | |
| JOSEPH R. BIDEN, JR., *et al.*, | ) | Hon. David Nuffer |
| | ) | |
| Defendants, | ) | **DECLARATION OF** |
| | ) | **KATIE UMEKUBO** |
| and | ) | |
| | ) | |
| SOUTHERN UTAH WILDERNESS | ) | |
| ALLIANCE, *et al.*, | ) | |
| | ) | |
| Proposed-Intervenor- | ) | |
| Defendants. | ) | |

I, Katie Umekubo, hereby state and declare as follows:

1.      My full legal name is Mary Katherine Umekubo. I am of full age and make the following statements on personal knowledge. If called to testify, I could and would competently do so.

2.      I am Senior Director of the Lands Division of the Natural Resources Defense Council (NRDC), 40 West 20th Street, New York, New York 10011. I work in NRDC's San Francisco office.

3.      I have worked at NRDC for 11 years, and I have served in my current role since January 2022. My duties in this role include overseeing the work of four projects, ranging from forests conservation issues to stopping fossil fuels extraction to preservation of natural lands.

While each of our projects have targeted and shifting strategies with varying degrees of local and regional engagement, our Division has a long history of working to preserve and protect Western public lands and upholding the bedrock environmental statutes that are cornerstone to that protection.

4.      I have visited Grand Staircase-Escalante National Monument, as well as the lands within Bears Ears National Monument prior to designation, for recreation, cultural and scientific appreciation, and to simply take-in the natural beauty and awe these lands command.

5.      NRDC is a nonprofit membership organization incorporated under the laws of the State of New York. I am aware that NRDC has hundreds of thousands of members, including thousands in Utah.

6.      NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. As part of that mission, NRDC seeks to protect nature in ways that advance the long-term welfare of present and future generations—including by safeguarding the integrity of undeveloped lands and preventing destructive impacts of extractive industry exploration and development on important natural heritage lands.

7.      Pursuant to our mission, NRDC has spent years advocating for and defending protections for Bears Ears National Monument and Grand Staircase-Escalante National Monument.

8.      With respect to Grand Staircase-Escalante, NRDC was actively involved in its original designation in 1996. NRDC staff worked to understand the various interests that would be affected by monument designation and to address them through monument designation. Since the monument's designation, NRDC worked to influence the monument's management in a way that would protect the natural and cultural resources that the monument was created to protect.

2

9.      With respect to Bears Ears, beginning in the 2010s, NRDC actively and publicly supported the Bears Ears Inter-Tribal Coalition in calling on President Obama to protect this area as a national monument. NRDC members submitted public comments in support of the monument's designation. NRDC staff attended the July 16, 2019, public meeting in Bluff, Utah, to advocate for the monument's designation. When the President established Bears Ears as a national monument in 2016, NRDC shared the news with our members and publicly celebrated the action.

10.     Over the years, for both monuments, NRDC has developed and published numerous blogs, articles, explainers, and informational factsheets informing our members and the general public about what makes these monuments special and deserving of protection. Our members express deep enthusiasm and commitment to protecting these special places.

11.     In 2017, President Trump directed the Secretary of the Interior, Ryan Zinke, to conduct a review of certain national monuments designated since 1996, including Grand Staircase-Escalante and Bears Ears, suggesting the President might revoke monument protections.

12.     During Secretary Zinke's review, NRDC submitted letters explaining that both Grand Staircase-Escalante and Bears Ears merit protection as national monuments, and that the President lacked the authority to dismantle them. NRDC also published blogs and other materials on our website, informing our members and the public about the Trump administration's review. Numerous NRDC members submitted public comments calling on the administration to retain the monuments' protections.

13.     In 2017, President Trump issued proclamations dismantling the monuments. Alongside other aligned groups, NRDC filed lawsuits in federal court challenging the legality of

3

the President's rollbacks. *See NRDC v. Trump*, No. 17-cv-02606-TSC (D.D.C. filed Dec. 7, 2017) (consolidated with *Hopi Tribe v. Trump*, No. 17-cv-2590-TSC (D.D.C. filed Dec. 4, 2017) (challenging Bears Ears rollback)); *The Wilderness Soc'y v. Trump*, No. 17-cv-02587-TSC (D.D.C. filed Dec. 4, 2017) (challenging Grand Staircase-Escalante rollback). Those lawsuits are still pending in the U.S. District Court for the District of Columbia.

14.     In January 2021, President Biden initiated a review of the prior administration's national monument rollbacks. In August 2021, NRDC submitted a letter (along with other aligned organizations) advocating for both monuments' restoration. We also published blogs and articles on our website informing our members of what is at stake and describing the importance of restoring protections to these special places, and we offered our members a way to submit online comments in support of monument restoration.

15.     On October 8, 2021, the President issued proclamations restoring both monuments, as we had urged. Those proclamations are the subject of the instant lawsuit.

16.     NRDC is currently engaged in the resource management-planning processes for both restored monuments. For Bears Ears, we recently submitted public scoping comments (along with other aligned organizations) to the Bureau of Land Management and the U.S. Forest Service as part of those processes.

17.     In our advocacy and public education work, we strive to secure and defend meaningful protections on the ground for the full extent of both monuments, and to ensure that the monuments' objects of scientific and historic interest remain protected from damage by mining, vehicle use, grazing, and other activities. Maintaining monument status for both areas is essential to that goal.

18.     I am aware that NRDC's members include hikers, educators, and wildlife-watchers who visit both monuments to enjoy and learn from them. NRDC's work to protect and defend the monuments benefits our members' interests by protecting these areas from the disruption and damage caused by mining and other activities. These protections are essential to preserving the health, beauty, and unequalled cultural and educational values of these areas.

19.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of November, 2022, in San Francisco, California.

_Katie Umekubo_
Katie Umekubo
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104

5

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

| | | |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:22-cv-00060-DN-PK |
| JOSEPH R. BIDEN, JR., *et al.*, | ) ) | Hon. David Nuffer |
| Defendants, | ) ) | Magistrate Judge Paul Kohler |
| and | ) ) | **DECLARATION OF LAURA WELP** |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) ) | |
| Proposed-Intervenor-Defendants. | ) ) ) | |

I, Laura Welp, declare as follows:

1.      I have personal knowledge of each of the following facts regarding the Grand Staircase-Escalante National Monument (the Monument) and my and Western Watersheds Project's (WWP) interests in the Monument's preservation. If called upon to do so, I could and would testify as follows:

2.      I have been employed by, and a member of, WWP since 2012. WWP is headquartered in Hailey, Idaho and has over 12,000 members and supporters. I am familiar with the organizational purposes and mission of WWP as well as its activities and goals in the West, including in Utah and in the Grand Staircase-

1

Escalante National Monument in particular.

3.      Founded in 1993, WWP is a nonprofit environmental conservation group dedicated to protecting and restoring watersheds and wildlife throughout the West, including Utah. We rely on education, public policy initiatives, and legal advocacy to achieve our conservation goals. We also provide oversight and monitoring of activities on federal public lands, and we advocate for measures to ensure the functionality and resilience of native ecosystems.

4.      I hold a bachelor's degree in biology from the University of Alaska - Fairbanks, and a master's degree in botany from the University of Wyoming. At WWP, I am currently the Ecosystems Specialist for Northern Arizona and Southern Utah. As part of my responsibilities, I monitor various activities and the ecological conditions of federal public lands in southern Utah, including within the Monument. My work includes visiting and assessing the conditions of areas where activities on federal public lands are proposed for approval by federal land management agencies, visiting and assessing areas where the agencies themselves undertake ground-disturbing activities, providing written technical and policy-oriented comments on proposed projects, gathering data, encouraging agencies to consider and implement science and research in land management, and collaborating with agencies and other advocacy groups. When ecosystems I survey appear to be degraded, I report my findings to WWP, and we work to fix the

problem by providing relevant studies and other information to land managers, the public, and other decision makers.

5.      From 2001 to 2005, I worked as a botanist for the Grand Staircase-Escalante National Monument. My duties included conducting rangeland health surveys throughout the Monument, summarizing the data, participating in grazing allotment evaluation discussions with range staff, and writing a draft Environmental Impact Statement for a grazing plan amendment. I received an award for my performance of this work from the BLM.

6.      I lived in Kanab, Utah for 20 years before moving to McCleary, Washington, where I live now. Despite my move, I visit the Monument at least twice every year both for work and for recreation. While at the Monument, I engage in the kinds of work described above, including surveying the ecological conditions on the ground and documenting the impacts of activities like motorized use and livestock grazing. As an employee of WWP and a citizen using the public lands, I encourage and advocate BLM to adopt science-based management of Monument resources. I do this by documenting examples of environmental or cultural degradation and providing it to other staff at WWP, or to the BLM, so BLM can act on it to improve conditions on the ground.

7.      I also recreate in the Monument. I enjoy being in an environment relatively undisturbed by development and other impacts. The potential for

restoring functioning ecosystems with native plants and animals over wide

expanses is not available in very many other places in the United States, but it is

available in the Grand Staircase, as long as protective management regimes like the

monument designation remains in place. Visiting Native American cultural sites

and discovering ancient rock art is a highlight of my visits as well. Simply

experiencing the solitude, wilderness, and natural beauty of the Monument is very

important to me. Consequently, I am keenly interested in the management and

preservation of natural resources here.

8.      The Monument is located on the Colorado Plateau physiographic

province, which has a unique and remarkably diverse flora adapted to arid climate

and sedimentary soils. It has the highest number of endemic plant species in the

intermountain West and the most taxa of any ecoregion in Utah. About 18% of the

monument flora consists of plants that only occur on the Colorado Plateau. Due to

its location at the intersection of several ecoregions, the entire Monument is

critically important botanically and ecologically. Its flora and vegetation contribute

significantly to the region's natural beauty and its importance as habitat for

wildlife, as well as humans seeking recreation, adventure, or solitude. More

importantly, the Monument's native plant species have intrinsic value, especially

for those that only occur in the Monument and/or are unprotected elsewhere. These

botanical riches were specifically protected in the Presidential proclamation of

1996, the Monument's 2000 management plan, and President Biden's 2021 proclamation.

9.     In the 20 years I lived in Kanab, I regularly visited the Monument. In that time, I spent more than 910 total days—or cumulatively, two and half years— exploring the Grand Staircase section of the Monument near Kanab. Areas in which I have camped and hiked include, but are not limited to, West Clark Bench, the Cockscomb, the Paria River, Jodey Point, Butler Valley, Round Valley, Rock Springs Bench, Bull Valley Gorge, Upper Lick Wash, Kitchen Corral Wash, Petrified Hollow, Eagle Sink, Buckskin Mountain, and numerous archaeological sites. One of my favorite rare plants, *Penstemon ammophilus*, occurs here. My husband and I took this photo of the *Penstemon ammophilus* on First Point in the Grand Staircase section of the Monument during a visit on May 18, 2014:



Photo 1: *Penstemon ammophilus*, Photo by Laura Welp, May 18, 2014.

10.     All of the places listed in the preceding paragraph were without

national monument protection as a result of President Trump's December 4, 2017,

proclamation. Protection was only restored under President Biden's October 8,

2021, proclamation.

11.     Additionally, I have spent a year exploring the Kaiparowits Plateau section of the Monument between Escalante on the north end and Big Water on the south. I have visited, for work and play, the Rimrocks, Brigham Plains, White Sands, and traveled on the Smoky Mountain Road. The area along the Cottonwood Road in the Rimrocks area contains populations of the rare and stunning Tropic goldeneye (*Heliomeris soliceps*), a Kane County endemic. This member of the sunflower family is one of the few plants that can survive on the clay shales of the Monument's Tropic and Chinle formations. Like many annual herbs it is absent in dry years, but when precipitation levels are adequate the hills are covered in gold. Other rare endemic plants associated with these soils include *Euphrobia nephradenia* and *Cymopterus higginsii*. Most recently I have seen heavy livestock use and trampling of most of the Tropic goldeneye population along Cottonwood Road. I am not aware that anyone is monitoring this species or the effects of livestock on this population. The photo on the left below is a photo I took that accurately depicts the vivid yellow flowers of the Tropic goldeneye in the Cottonwood Road area of the Monument during a visit on June 6, 2010. The photo on the right is from a visit on March 27, 2015, when livestock were present in the same area. While the lack of plants in this instance may be explained by the early date or by lack of precipitation, trampling at this level in these clay soils causes

7

long-term soil compaction and harms plant communities.



Photo 2. Tropic goldeneye
Photo by Laura Welp 6/6/2010



Photo 3. Tropic goldeneye habitat trampled by livestock
Photo by Laura Welp 3/27/2015

12.     Other rare plant species in this region include the Smokey Mountain globe mallow, which grows only on clinker—a stony residue from naturally burning coal—in the Burning Hills area. President Biden's 2021 proclamation restores much-needed protections for these unique species and habitats. For example, Petrified Hollow along the Seaman's Wash road provides habitat for a suite of endemic plant that only grow on soils in the Chinle formation: Chinle chia

8

(*Salvia columbariae* var. *argillacea*), Atwood's phacelia, (*Phacelia pulchella* var. *atwoodii*), Murdock's evening primrose (*Oenothera murdockii*), and Gumbo milkvetch (*Astragalus ampullarius*). Another endemic—Kane breadroot (*Pediomelum epipsilum)*—is found on the gypsum soils of the Moenkopi formation along the base of the Vermilion cliffs. These areas had been excised from the Monument in 2017 and deprived of NLCS protections.

13.     Further, during the 20 years I lived in Kanab, I spent about nine months exploring the Escalante Canyons region. It contains features along the Hole-in-the-Rock Road such as Sooner Rocks, Fortymile Ridge, Harris Wash, and trailheads to spectacular canyon hikes including Coyote Gulch and Early Weed Bench. By far, my favorite places, with the most outstanding and awe-inspiring scenic vistas and solitude, are the Circle Cliffs and Wolverine Loop areas, where, unfortunately, mining claims were staked on Colt Mesa after the 2017 rollback in monument protection. Situated between Capitol Reef National Park and Glen Canyon National Recreation Area, this region of the Monument is just as deserving of preservation as those stellar national park units.

14.     This region also includes populations of, and habitat for, Jones cycladenia (*Cycladenia humilis*). This listed threatened species occurs on steep and fragile Chinle slopes and is vulnerable to any kind of surface disturbance. It is a large plant with big magenta flowers and thick waxy leaves, and its remarkable

9

appearance is emphasized by the fact that it is often the only plant seen on this harsh terrain. It appears to primarily reproduce vegetatively now. Researchers speculate that the plant may require a specific pollinator that no longer exists. It is vulnerable to impacts from off-road vehicles and oil and gas exploration. Wagon Box Mesa, a refuge from grazing that can serve as the benchmark standard for natural conditions, is also located here. I have much enjoyed visiting all of these areas over the years, especially to view the unique flora there. The following photo taken by a former U.S. Fish and Wildlife Service scientist at a research site in Glen Canyon National Recreation Area accurately depicts the Jones cycladenia.



Photo 4: Jones cycladenia, Photo by Daniella Roth.

15.   I was most recently on the Grand Staircase-Escalante National

Monument on the Buckskin Mountain/House Rock Road area in October 2021. I study vegetation restoration and am interested in the post-fire recovery efforts of the Wire Pass/Pine Valley fire on BLM lands in the Monument. The following is a photo I took during my October 31, 2021, visit that accurately depicts the Wire Pass/Pine Valley fire.



Photo 5: Wire Pass/Pine Valley Burn, Photo by Laura Welp, October 31, 2021.

16.     In the spring of 2023 I plan to drive the Wolverine Loop Road to the Little Death Hollow trailhead and south to the spectacular vistas of Glen Canyon National Recreation area, where Jones cycladenia occurs. The degree of solitude

11

afforded by this remote road offers opportunities for reflection and renewal that are increasingly rare. I also plan to revisit Circle Cliffs sometime in 2023. The following is a photo that I took that shows the scenic vistas that I enjoy in the Wolverine Loop area. I took this photo of the Wolverine Loop areas of the Monument during a visit on May 9, 2002.



Photo 6: Wolverine Loop area. Photo by Laura Welp, May 9, 2002.

17.    Unfortunately, Colt Mesa, site of a proposed copper and cobalt mine, lies immediately east of the Wolverine Loop Road. My experience would be severely harmed by seeing the mine degrading the landscape and from hearing mine operations, or from encountering mining vehicles on the road and other

12

evidence of industrialization. These impacts would detract from the outstanding

primitive recreation values in this area. The Monument designation makes it harder

for operators to develop the mine and may limit development and other activities

there. For example, with the Monument designation in place, the BLM will

determine whether the mining claims contain valuable mineral deposits, which is

required before they are deemed valid; BLM does not perform such determinations

on unprotected lands. Additionally, loss of the protective mandate provided by

President Biden's 2021 proclamation would make it more likely that this kind of

mining activity would occur and undermine the conservation gains WWP helped

achieved through its advocacy for reinstatement of the Monument designation.

18.     I also plan to drive the Cottonwood Road and visit Grosvenor

Arch, a trip which reveals the very real-world harm from lost monument status.

The Berry Patch #4 alabaster mining claim occurs nearby in Butler Valley, and its

visual and/or auditory effects are noticeable from several points along the road,

which is a popular tourist site. In addition, I have been to the nearby Creamsicle

alabaster mine site. Mining activity like this is an example of the kinds of harm

that would occur from reversal of the Biden proclamation and is detrimental to the

values of ecological integrity, silence, and solitude that I seek on Monument land

and that WWP seeks to maintain. Loss of the protective mandate provided by

President Biden's 2021 proclamation that comes with the monument status would

13

open the lands to harmful mining activities to my and WWP's detriment.

19.     WWP staff, including me, have repeatedly engaged in advocacy to ensure protection of the Monument and its unique and important natural resources. We have contacted the Monument managers many times throughout the years via phone, email, and letter, regarding problematic livestock impacts to resources, including damage to soils, vegetation, and riparian areas. We also comment each year on damaging projects that the Monument managers propose. For example, in 2013, because BLM failed to follow its own procedures to improve grazing management, resulting in degradation to Monument lands, we sued the agency to obtain better protection of the Monument's natural resources.

20.     In 2015 and 2019, I gave presentations to the Utah BLM state directors about ongoing degradation due to livestock grazing and vegetation treatments (in which large swaths of native pinyon-juniper forests are "chained" and the ground scraped, to encourage forage growth). In 2020, I co-wrote a science plan for the Grand Staircase-Escalante Partners, an advocacy group that focuses on protection of the Monument's ecological, paleontological, and visitor resources. I also wrote WWP newsletter articles about the Monument and participated in a local news television broadcast about the need for special designation and protection in the Monument.

21.     In addition, I was quoted in numerous press releases on the

14

monument. On February 18, 2021, I was quoted in a press release regarding BLM's failure to consider project alternatives that would have limited post-wildfire treatments to native seeds and manual restoration methods.[1] On September 17, 2019, I was quoted in a press release regarding an overturned BLM Decision to Replace Native Forests with Exotic Livestock Forage in the Monument. [2]On August 23, 2019, I was quoted in a press release regarding the Grand Staircase-Escalante National Monument Management Plan allowance for increased mining and grazing.[3] And on November 18, 2018, I was quoted in a press release regarding BLM's plan to increase livestock in the Monument. [4]

---

[1] Western Watersheds Project, https://www.westernwatersheds.org/2021/02/interior-board-overturns-blm-decisions-to-use-non-native-livestock-forage-and-chaining-within-historic-boundaries-of-grand-staircase-escalante-national-monument/ (last visited Nov. 8, 2022).

[2] Western Watersheds Project, https://westernwatersheds.org/2019/09/interior-board-overturns-blm-decision-to-replace-native-forests-with-exotic-livestock-forage-in-grand-staircase-escalante-national-monument/ (last visited Nov. 8, 2022).

[3] Western Watersheds Project, https://www.westernwatersheds.org/2019/08/new-grand-staircase-escalante-national-monument-plan-allows-increased-mining-grazing/ (last visited Nov. 8, 2022).

[4] Western Watersheds Project, https://westernwatersheds.org/2018/11/blm-plan-would-strip-protections-from-bears-ears-national-monument-western-watersheds-project-among-numerous-conservationists-opposing-new-plan/ (last visited Nov. 8, 2022).

22.     In addition to safeguarding the Monument from harmful activities, WWP and its members, including me, have defended the Monument's designation. When Interior officials in the Trump administration took steps to roll back the Monument's designation, I submitted personal comments supporting the retention of the Monument's original boundaries and attended rallies in support of this cause, as shown in the pictures below.



Photo 7: St. George Rally, Photo by L. Welp, December 4, 2017.



Photo 8: Kanab Rally Photo by L. Welp, October 5, 2017.



Photo 9: Salt Lake City Rally, Photo by L. Welp, December 2, 2017.

23.     WWP, in conjunction with other conservation groups, also submitted detailed comment letters on Monument management plans and projects. On February 2, 2018, WWP submitted comments on the vegetation treatment projects proposed for the Grand Staircase-Escalante National Monument. On April 18, 2018 and November 30, 2018, WWP and other conservation groups submitted comments on the Monument Resource Management Plans and Environmental

Impact Statement urging BLM to adopt measures that would maximize protection for monument resources. On December 3, 2018, WWP submitted comments on the Skutumpah Terrace Sagebrush Steppe Enhancement Project Draft Environmental Assessment.

24.    I am currently pursuing an appeal of a livestock project within Grand Staircase-Escalante National Monument. The appeal challenges BLM's proposal to drill 6 wells, 4 storage tanks, 13 troughs, and 17 miles of pipeline to alleviate damage from mismanaged cattle grazing (Rangeland Wells and Pipelines Projects, DOI-BLM-UT-0300-2017-0063-EA).

25.    In 2017, WWP joined with other plaintiffs to challenge the 2017 Trump proclamation. *The Wilderness Soc'y v. Trump*, No. 1:17-cv-02587-TSC (D.D.C. filed Dec. 4, 2017).

26.    The October 8, 2021, proclamation restored protections to the Monument and reinstated the mineral withdrawal that bars new harmful mining related activities, protecting the interests of WWP, its members, and me. It is a result that we worked hard to achieve. Although I currently live in McCleary, Washington, I previously lived in Kanab for twenty years because I wanted to work in the Grand Staircase-Escalante National Monument and explore these amazing lands. I continue to visit the Monument to this day, and I plan to return to live in the area. I have aesthetic, cultural, emotional, and scientific interests in

17

visiting such a beautiful and geologically spectacular place. If President Biden's Proclamation is reversed, many of the places stripped of protection will be available for mining of coal, uranium, alabaster, and other minerals. Additionally, off-road vehicle trails, which the BLM more carefully managed on Monument lands to preserve monument values, will proliferate. This will not only destroy the various ecosystems that WWP and I have worked hard to preserve but will also affect my ability to enjoy the area. Removal of protections harms my use and enjoyment of these areas by destroying the natural wilderness, archaeological and cultural sites, tribal ancestral and historical sites, and the natural quietness of the area, characteristics that I hold dear.

27.     An order by the Court affirming the validity of President Biden's October 8, 2021, proclamation designating the Grand Staircase-Escalante National Monument under the Antiquities Act will protect my interests and WWP's interest described herein by ensuring preservation of the ecosystem, rare plant species, geological formations, cultural sites and artifacts, and minerals of the lands in the Grand Staircase-Escalante National Monument.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 08, 2022

Laura Welp

18

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRIC OF UTAH**
**SOUTHERN REGION OF THE CENTRAL DIVISION**

| | | |
|---|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:22-cv-00060-DN |
| JOSEPH R. BIDEN, JR., *et al.*, | ) ) | Hon. David Nuffer |
| Defendants, | ) ) | Magistrate Judge Paul Kohler |
| and | ) ) | **[PROPOSED] ORDER GRANTING** |
| | ) | **THE SUWA INTERVENORS'** |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) | **MOTION TO INTERVENE** |
| | ) | |
| Proposed-Intervenor-Defendants. | ) ) | |

This matter comes before the Court upon the motion to intervene filed by proposed Intervenor-Defendants Southern Utah Wilderness Alliance, Center for Biological Diversity, Grand Canyon Trust, Great Old Broads for Wilderness, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, The Wilderness Society, Western Watersheds Project, and WildEarth Guardians, (collectively, the SUWA Intervenors) in Case No. 4:22-cv-00060-DN. Having reviewed the motion and determined that intervention is warranted, the Court GRANTS the motion.

Signed this _____ day of _____, 2022.

_____
Judge David Nuffer
United State District Judge

SUWA Intervenors' Motion to Intervene

No. 4:22-cv-00060-DN

# Exhibit 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )      No. 4:22-cv-00060-DN-PK |
| | ) |
| JOSEPH R. BIDEN, JR., *et al.*, | )      Hon. David Nuffer |
| | ) |
| Defendants, | )      Magistrate Judge Paul Kohler |
| | ) |
| and | )      **[PROPOSED] ANSWER IN** |
| | )            **INTERVENTION** |
| SOUTHERN UTAH WILDERNESS | ) |
| ALLIANCE, *et al.*, | ) |
| | ) |
| Proposed-Intervenor- | ) |
| Defendants. | ) |
| | ) |

Defendant-SUWA Intervenors Southern Utah Wilderness Alliance, Center for Biological Diversity, Grand Canyon Trust, Great Old Broads for Wilderness, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, The Wilderness Society, Western Watersheds Project, and WildEarth Guardians (collectively, SUWA Intervenors), through their undersigned counsel, say as follows by way of answer to Plaintiffs' Complaint, dated August 25, 2022 (ECF No. 2):

## INTRODUCTION[1]

1.      Paragraph 1 sets forth legal conclusions to which no response is required, or it purports to characterize a statement by Chief Justice Roberts respecting the denial of certiorari in *Massachusetts Lobstermen's Association v. Raimondo*, 141 S. Ct. 979 (2021), and two subsections of the Antiquities Act, 54 U.S.C. § 320301(a), (b), which speak for themselves and are the best evidence of their contents. To the extent a response may be required, SUWA Intervenors deny.

2.      The allegations in the first sentence of Paragraph 2 are too vague to permit a response. The remainder of Paragraph 2 purports to characterize House of Representatives Report No. 59-2224 (1906), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

3.      The first, third, and fourth sentences of Paragraph 3 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny. The remainder of Paragraph 3 purports to characterize Presidential Proclamation No. 10285, Bears Ears National Monument, 86 Fed. Reg. 57,321 (Oct. 8, 2021) ("Proclamation

---

[1] For ease of reference, SUWA Intervenors reproduce the section headings as they appear in Plaintiffs' Complaint. To the extent those headings contain factual allegations to which a response is required, those allegations are denied.

10285"), and Presidential Proclamation No. 10286, Grand Staircase-Escalante National Monument, 86 Fed. Reg. 57,335 (Oct. 8, 2021) ("Proclamation 10286"), which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context.

4.      The sentences in Paragraph 4 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

5.      The second sentence in Paragraph 5 purports to characterize 54 U.S.C. § 320301(b), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. The remaining sentences in Paragraph 5 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

6.      The sentences in Paragraph 6 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

7.      The sentences in Paragraph 7 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

8.      The sentences in Paragraph 8 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

9.      The assertion in Paragraph 9 that the monuments are "unlawful" is a legal conclusion to which no response is required. To the extent a response may be required, SUWA Intervenors deny. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 and therefore deny.

10.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 and therefore deny.

11.     The sentences in Paragraph 11 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

**PARTIES**

12.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 12 and therefore deny.

13.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and therefore deny.

14.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 14 and therefore deny.

15.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 15 and therefore deny.

16.     SUWA Intervenors admit that Defendant Joseph R. Biden is the President of the United States and that he issued Proclamation 10285 and Presidential Proclamation 10286. The proclamations speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations in Paragraph 16 contrary to their plain language, meaning, and context.

17.     SUWA Intervenors admit the allegations in Paragraph 17.

18.     SUWA Intervenors admit the allegations in Paragraph 18.

19.     SUWA Intervenors admit the allegations in Paragraph 19.

20.     SUWA Intervenors admit the allegations in Paragraph 20.

21.     SUWA Intervenors admit the allegations in Paragraph 21.

22.     SUWA Intervenors admit the allegations in Paragraph 22 regarding U.S. Department of Agriculture's authority over Bears Ears National Monument, and deny the remainder of the paragraph.

23.     SUWA Intervenors admit the allegations in Paragraph 23.

24.     SUWA Intervenors admit the allegations in Paragraph 24 regarding the U.S. Forest Service's authority over Bears Ears National Monument, and deny the remainder of the paragraph.

25.     The statement in Paragraph 25 is Plaintiffs' characterization of their own complaint to which no response is required.

### JURISDICTION AND VENUE

26.     The allegation in Paragraph 26 is Plaintiffs' characterization of their own complaint and a legal conclusion to which no response is required.

27.     The allegations in Paragraph 27 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors admit that Plaintiffs' claims purport to raise "federal questions" under 28 U.S.C. § 1331, and that this Court generally has authority to issue equitable relief in appropriate cases. SUWA Intervenors deny that such relief is warranted here. The remainder of Paragraph 27 purports to characterize *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

28.     The allegations in Paragraph 28 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or

information sufficient to form a belief as to the truth of the assertions in Paragraph 28 and therefore deny.

29.     The allegations in Paragraph 29 are legal conclusions to which no response is required.

### FACTUAL ALLEGATIONS

#### *The Text of the Antiquities Act*

30.     The allegations in Paragraph 30 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors state that the Antiquities Act speaks for itself and is the best evidence of its contents; SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

31.     Paragraph 31 purports to characterize 54 U.S.C. § 320301(a), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

32.     Paragraph 32 purports to characterize 54 U.S.C. § 320301(b), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

33.     Paragraph 33 purports to characterize 18 U.S.C. § 1866(b), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

34.     The allegations in Paragraph 34 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors assert that Public Law No. 59-209, 34 Stat. 225 (1906) and the Antiquities Act as codified at 54 U.S.C. § 320301 speak for themselves and are

the best evidence of their contents, and deny any allegations contrary to their plain language, meaning, and context.

### *The Origins of the Antiquities Act*

35.     Paragraph 35 is a quotation from a statement by Chief Justice Roberts respecting the denial of certiorari in *Massachusetts Lobstermen's Association v. Raimondo*, 141 S. Ct. 979 (2021), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. To the extent that Paragraph 35 is construed as a legal conclusion regarding the meaning or purpose of the Antiquities Act, no response is required. To the extent a response may be required, SUWA Intervenors deny.

36.     The allegations in Paragraph 36 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions in Paragraph 36 and therefore deny.

37.     The statements in Paragraph 37 are too vague to permit a response, or they constitute legal conclusions to which no response is required.

38.     The allegations in Paragraph 38 are too vague to permit a response, or they constitute legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions in Paragraph 38 and therefore deny.

39.     The second sentence of Paragraph 39 is a citation to and partial quotation from the District of Utah's decision in *Utah Association of Counties v. Bush*, 316 F. Supp. 2d 1172, 1178 (D. Utah 2004). SUWA Intervenors state that the decision speaks for itself and is the best evidence of its contents, and therefore deny any allegations inconsistent with its plain language, meaning, or context. The remainder of Paragraph 39 contains Plaintiffs' legal conclusions, to

which no response is required. To the extent a response may be required, SUWA Intervenors deny.

40.     The allegations in the first and second sentences of Paragraph 40 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny. The second and third sentences of Paragraph 40 contain a partial quotation from House of Representatives Report No. 58-3704 (1905), a citation to a law review article, and legal argument to which no response is required. SUWA Intervenors state that the House Report speaks for itself and is the best evidence of its contents; SUWA Intervenors therefore deny any allegations contrary to the report's plain language, meaning, and context.

41.     The assertions in Paragraph 41 and footnotes 1 and 2 are legal argument and conclusions to which no response is required, or they are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny. To the extent that Paragraph 41 and footnotes 1 and 2 purport to characterize House of Representatives Report No. 8066 (1900), House of Representatives Report No. 10451 (1900), House of Representatives Report No. 13349 (1904), and Senate Report No. 4127 (1904), SUWA Intervenors assert that the reports speak for themselves and are the best evidence of their contents, and deny any allegations contrary to their plain language, meaning and context.

42.     The allegations in the first two sentences of Paragraph 42 (not counting citations) are too vague to permit a response. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions and therefore deny. To the extent that the first sentence of Paragraph 42 purports to characterize House of Representatives Report No. 11021 (1900), SUWA Intervenors assert that the report speaks for itself and is the best evidence of its contents, and deny any allegations contrary to its

plain language, meaning and context. The remaining allegations in Paragraph 42 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

43.    The allegations in the first three sentences (not counting citations) in Paragraph 43 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions and therefore deny. The remainder of Paragraph 43 purports to characterize House Report No. 58-3704 (1905), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

44.    The allegations in Paragraph 44 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors admit that the Antiquities Act was enacted in 1906, and deny the remaining allegations.

45.    The allegations in the first sentence of Paragraph 45 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny. The remainder of Paragraph 45 is Plaintiffs' legal argument and conclusions, to which no response is required. To the extent a response may be required, SUWA Intervenors deny. To the extent Plaintiffs purport to characterize House of Representatives Report No. 59-2224 (1906), Senate Report No. 59-3797 (1906), and Congressional Record, Volume 40, page 7888 (1906), SUWA Intervenors state that those sources speak for themselves and are the best evidence of their contents, and therefore deny any allegations contrary to their plain language, meaning, and context.

46.    The allegations in Paragraph 46 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

*The History of the Grand Staircase-Escalante and Bears Ears Monuments*

47.     The allegations in Paragraph 47 are too vague to permit a response, or are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

48.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 48 and therefore deny. The remaining allegations in Paragraph 48 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny.

49.     The first and third sentences of Paragraph 49 (not counting citations) are too vague to permit a response, or are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny. The second sentence of Paragraph 49 purports to characterize Proclamation 10285 and Proclamation 10286, which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context.

## The Grand Staircase-Escalante National Monument

50.     The allegations in Paragraph 50 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny.

51.     The allegations in Paragraph 51 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions and therefore deny.

52.     The allegations in Paragraph 52 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions and therefore deny.

53. The assertions in Paragraph 53 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions and therefore deny.

54. The allegations in Paragraph 54 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertions and therefore deny.

55. SUWA Intervenors admit that Presidential Proclamation No. 6920, 61 Fed. Reg. 50,223 (Sept. 18, 1996) established Grand Staircase-Escalante National Monument. The proclamation speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the assertion in the second sentence of Paragraph 55, and therefore deny it.

56. Paragraph 56 purports to characterize Presidential Proclamation No. 9682, 82 Fed. Reg. 58089 (Dec. 4, 2017) ("Proclamation 9682"), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. SUWA Intervenors further lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' assertion about "extensive discussions" and therefore deny.

57. Paragraph 57 purports to characterize Proclamation 9682, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

58.     Paragraph 58 purports to characterize Proclamation 10286, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

59.     The first sentence of Paragraph 59 purports to characterize Proclamation 10286, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. The remaining assertions in Paragraph 59 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

60.     Paragraph 60 purports to characterize Proclamation 10286, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

61.     Paragraph 61 purports to characterize Memorandum from Director, Bureau of Land Management to Utah State Director, Bureau of Land Management, Interim Management of the Grand Staircase-Escalante National Monument (Dec. 16, 2021) ("the Grand Staircase-Escalante Interim Guidance"), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

## The Bears Ears National Monument

62.     The allegations in Paragraph 62 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny.

63.     The allegations in Paragraph 63 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny.

64.     Paragraph 64 purports to characterize Presidential Proclamation No. 9558, Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1139 (Dec. 28, 2016)

("Proclamation 9558"), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

65.     The allegations in Paragraph 65 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny.

66.     Paragraph 66 purports to characterize Presidential Proclamation No. 9681, <u>82 Fed. Reg. 58,081</u> (Dec. 4, 2017) ("Proclamation 9681"), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

67.     Paragraph 67 purports to characterize Proclamation 10285, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

68.     Paragraph 68 purports to characterize Proclamation 10285, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. The second and third sentences of Paragraph 68 (not counting citations) contain legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

69.     Paragraph 69 purports to characterize Proclamation 10285, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

70.     Paragraph 70 purports to characterize Memorandum from Director, Bureau of Land Management to Utah State Director, Bureau of Land Management, Interim Management of the Bears Ears National Monument (Dec. 16, 2021) ("the Bears Ears Interim Guidance"), which

speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

### The Consequences of the Monuments

71.     The allegations in Paragraph 71 are too vague to permit a response, and constitute legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

72.     The allegations in Paragraph 72 are too vague to permit a response, or they constitute legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' assertions and therefore deny.

73.     The allegations in the first two sentences in Paragraph 73 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73 and therefore deny.

### The BlueRibbon Coalition

74.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 and therefore deny.

75.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 and therefore deny.

76.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76 and therefore deny.

77.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 and therefore deny.

78.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78 and therefore deny.

79.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79 and therefore deny.

80.     The allegations in Paragraph 80 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80 and therefore deny.

81.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 and therefore deny.

82.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82 and therefore deny.

83.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83 and therefore deny.

84.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 and therefore deny.

85.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85 and therefore deny.

86.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86 and therefore deny.

87.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and therefore deny.

88.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 and therefore deny.

89.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 and therefore deny.

90.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 and therefore deny.

91.     The first sentence in Paragraph 91 purports to characterize Proclamation 9681 and Proclamation 9682, which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegation in Paragraph 91 and therefore deny.

92.     The second sentence of Paragraph 92 purports to characterize Proclamation 10285 and Proclamation 10286, which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92 and therefore deny.

93.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence in Paragraph 93 and therefore deny. The remainder of Paragraph 93 purports to characterize Proclamation 10285, Proclamation 10286, the Bears Ears Interim Guidance, and the Grand Staircase-Escalante Interim Guidance. The proclamations and guidance memoranda speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context.

94.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and therefore deny.

95.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 and therefore deny.

96.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 and therefore deny.

97.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and therefore deny.

98.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and therefore deny.

99.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 and therefore deny.

100.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and therefore deny.

101.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and therefore deny.

102.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102 and therefore deny.

103.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 and therefore deny.

104.    The second sentence in Paragraph 104 purports to characterize the Grand Staircase-Escalante Interim Guidance, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104 and therefore deny.

105.     The first sentence in Paragraph 105 is a legal conclusion to which no response is required. To the extent a response may be required, SUWA Intervenors deny. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105 and therefore deny.

106.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 and therefore deny.

107.     The sentences in Paragraph 107 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the sentences in Paragraph 107 and therefore deny.

## Kyle Kimmerle

108.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 and therefore deny.

109.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 and therefore deny.

110.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110 and therefore deny.

111.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 and therefore deny.

112.     The allegations in Paragraph 112 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny.

113.     The allegations in Paragraph 113 are too vague to permit a response, or they are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

114.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 and therefore deny.

115.     The first sentence in Paragraph 115 is a legal conclusion to which no response is required. To the extent a response may be required, SUWA Intervenors deny. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 115 and therefore deny.

116.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 and therefore deny.

117.     SUWA Intervenors admit that Kimmerle LLC submitted a plan of operation to the Bureau of Land Management regarding Geitus Mine. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 117 and therefore deny.

118.     SUWA Intervenors admit that the Bureau of Land Management notified Kimmerle LLC that a validity exam would be needed before the Bureau could continue processing the plan of operations for Geitus Mine. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 118, and therefore deny.

119.     The allegations in the first sentence of Paragraph 119 are too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny. The remainder of Paragraph 119 purports to characterize the Bears Ears Interim Guidance, which speaks for itself

and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

120.   SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120 and therefore deny.

121.   SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 and therefore deny.

122.   SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 and therefore deny.

123.   SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and therefore deny.

124.   SUWA Intervenors admit that Kimmerle LLC purports to hold other mining claims within Bears Ears National Monument other than those claims associated with Geitus Mine. The second sentence in Paragraph 124 (not counting citations) purports to characterize Proclamation 10285, which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 124 and therefore deny.

125.   SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 and therefore deny.

126.   SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 and therefore deny.

**<u>Zeb Dalton</u>**

127.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127 and therefore deny.

128.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128 and therefore deny.

129.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129 and therefore deny.

130.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and therefore deny.

131.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131 and therefore deny.

132.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132 and therefore deny.

133.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133 and therefore deny.

134.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134 and therefore deny.

135.    SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135 and therefore deny.

136.    The first sentence in Paragraph 136 is a legal conclusion to which no response is required. To the extent a response may be required, SUWA Intervenors deny. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 136 and therefore deny.

137.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137 and therefore deny.

138.     The allegation in the first sentence of Paragraph 138 is too vague to permit a response. To the extent a response may be required, SUWA Intervenors deny. The remainder of Paragraph 138 purports to characterize the Bears Ears Interim Guidance and Proclamation 10285, which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context.

139.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and fourth sentences in Paragraph 139 (not counting citations) and therefore deny. The remainder of Paragraph 139 purports to characterize the Bears Ears Interim Guidance and Bureau of Land Management, BLM Manual 6220, National Monuments, National Conservation Areas, and Similar Designations (2012), which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context.

140.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140 and therefore deny.

141.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 and therefore deny.

**Suzette Morris**

142.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142 and therefore deny.

143.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143 and therefore deny.

144.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144 and therefore deny.

145.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145 and therefore deny.

146.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 and therefore deny.

147.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147 and therefore deny.

148.     The allegations in the first sentence of Paragraph 148 are too vague to permit a response. The remainder of Paragraph 148 purports to characterize Proclamation 9558 and Proclamation 10285, which speak for themselves and are the best evidence of their contents. SUWA Intervenors deny any allegations contrary to their plain language, meaning, and context.

149.     The allegations in the second and third sentences of Paragraph 149 are legal conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny. SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 149 and therefore deny.

150.     SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 150 and therefore deny.

**CLAIM FOR RELIEF**

151.     Paragraph 151 is a statement incorporating Plaintiffs' allegations in the preceding paragraphs, to which no response is required. To the extent a response may be required, SUWA Intervenors incorporate their preceding responses.

152.    The assertions in the first sentence of Paragraph 152 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny. The remainder of Paragraph 152 purports to characterize 54 U.S.C. § 320301(a), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

153.    The assertions in Paragraph 153 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

154.    The assertions in Paragraph 154 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

155.    The assertions in the first, third, and fourth sentences in Paragraph 155 (not counting citations) are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny. The remainder of Paragraph 155 purports to characterize 54 U.S.C. § 320301(b), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

156.    The assertions in the first, fourth, and fifth sentences in Paragraph 156 (not counting citations) are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny. The second sentence in Paragraph 156 (not counting citations) purports to characterize 54 U.S.C. § 320301(b), which speaks for itself and is the best evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context. The third sentence in Paragraph 156 (not counting citations) purports to characterize Proclamation 10286, which speaks for itself and is the best

evidence of its contents. SUWA Intervenors deny any allegations contrary to its plain language, meaning, and context.

157.     The assertions in Paragraph 157 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

158.     The assertions in Paragraph 158 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

159.     The assertions in Paragraph 159 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159 and therefore deny.

160.     The assertions in Paragraph 160 are legal argument and conclusions to which no response is required. To the extent a response may be required, SUWA Intervenors deny.

**PRAYER FOR RELIEF**

The remaining paragraphs in Plaintiffs' Complaint constitute Plaintiffs' prayer for relief to which no response is required. To the extent a response may be required, SUWA Intervenors deny the allegations in Plaintiffs' prayer for relief, and further deny that Plaintiffs are entitled to any relief in this case.

**SUWA INTERVENORS' GENERAL DENIAL**

SUWA Intervenors deny any allegations of the Complaint, whether express or implied, that are not expressly admitted in this Answer.

## SUWA INTERVENORS' AFFIRMATIVE DEFENSE
## AND REQUESTED RELIEF

SUWA Intervenors state the following affirmative defense. In support of the following affirmative defense, SUWA Intervenors incorporate their answers to the Complaint's allegations as set forth above.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs fail to state a claim upon which relief can be granted.

SUWA Intervenors reserve the right prior to, at, or after trial to amend their answer or add any additional defenses or objections to Plaintiffs' claims that may become known and available as this action proceeds.

WHEREFORE, SUWA Intervenors respectfully request that the Court:

(A)      Dismiss the Complaint with prejudice;

(B)      Enter judgment in favor of Defendants and SUWA Intervenors;

(C)      Decline to grant any relief to Plaintiffs; and

(D)      Grant such further relief as the Court deems just and proper.


Respectfully submitted November 22, 2022

*/s/ Heidi McIntosh*
Heidi McIntosh, Utah State Bar No. 6277
Thomas R. Delehanty, CO Bar #51887 *(pro hac vice forthcoming)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 623-9466
Fax: (720) 550-5757
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

*Attorneys for Proposed Intervenor-Defendants National Parks Conservation Association, The Wilderness Society,*

*Grand Canyon Trust, Great Old Broads for Wilderness,*
*Western Watersheds Project, WildEarth Guardians, Sierra*
*Club, and Center for Biological Diversity*

*/s/ Michelle White*
Michelle White, Utah State Bar No. 16,985
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
michellew@suwa.org

*Attorney for Proposed Intervenor-Defendant*
*Southern Utah Wilderness Alliance*

*/s/ Stephen Bloch*
Stephen H.M. Bloch,
Utah State Bar No. 6277
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
steve@suwa.org

*Attorney for Proposed Intervenor-Defendants Southern*
*Utah Wilderness Alliance and Natural Resources Defense*
*Council*

Katherine Desormeau, CA Bar #266463 *(pro hac vice*
*forthcoming)*
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Tel.: (415) 875-6100
Fax: (415) 795-4799
kdesormeau@nrdc.org

Sharon Buccino, DC Bar #432073 *(pro hac vice*
*forthcoming)*
Charles Corbett, DC Bar #1767101 *(pro hac vice*
*forthcoming)*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005

Tel.: (202) 289-6868
Fax: (415) 795-4799
sbuccino@nrdc.org
ccorbett@nrdc.org

*Attorneys for Proposed Intervenor-Defendant Natural
Resources Defense Council*