Gary S. Guzy (*pro hac vice* forthcoming)
John Mizerak (*pro hac vice* forthcoming)
Shruti Barker (*pro hac vice* forthcoming)
Scott Shelton (*pro hac vice* forthcoming)
Tyler Smith (*pro hac vice* forthcoming)
Eric Chung (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-5978
gguzy@cov.com
jmizerak@cov.com
sbarker@cov.com
sshelton@cov.com
tsmith@cov.com
echung@cov.com

Raymond Scott Berry (0311)
P.O. Box 9491 Salt Lake City, UT 84109
801-556-8515
rsberryslc@gmail.com

*Counsel for Proposed Intervenors Grand
Staircase Escalante Partners, Society of
Vertebrate Paleontology, and Conservation
Lands Foundation*

# THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE, <br><br> *Defendants*. | Civil Action No. 4:22-cv-0060-DN-PK <br><br> Judge David Nuffer <br><br><br> **RULE 24 MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS** |

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

MOTION TO INTERVENE .............................................................................. 1

MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE ...................... 2

INTRODUCTION ............................................................................................ 2

ARGUMENT ................................................................................................... 3

I.      Proposed Intervenors Are Entitled to Intervene as of Right. ......................... 3

      *A.      Proposed Intervenors 'Motion is Timely*.............................................. 4

      *B.      Proposed Intervenors have substantial protected interests at stake.*.... 4

      *C.      If Successful, Plaintiffs' Action Would Impair Proposed Intervenors '*
      *Interests.* ............................................................................................. 8

      *D.      The Existing Parties May Not Adequately Represent Proposed*
      *Intervenors 'Interests.* ......................................................................... 9

II.     Proposed Intervenors Qualify for Permissive Intervention.......................... 10

CONCLUSION ................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Diamond v. Charles,
476 U.S. 54 (1986).................................................................................................4

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.,
407 F.3d 1091 (10th Cir. 2005) .............................................................................3

Trbovich v. United Mine Workers,
404 U.S. 528 (1972).................................................................................................9

GSEP v. Biden,
No. 17-2587 (D.D.C.) .............................................................................................2

Kane Cty. Utah v. United States,
928 F.3d 877 (10th Cir. 2019) ................................................................................9

Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n,
578 F.2d 1341 (10th Cir. 1978) ..............................................................................9

TWS v. Biden,
No. 17-2591 (D.D.C.) .............................................................................................2

Utah Ass'n of Ctys. v. Clinton,
255 F.3d 1246 (10th Cir. 2001) .................................................................... passim

Utah ex rel. Utah State Dep't of Health v. Kennecott Corp.,
232 F.R.D. 392 (D. Utah 2005) ............................................................................10

W. Energy Alliance v. Zinke,
877 F.3d 1157 (10th Cir. 2017) ..............................................................................9

Wal-Mart Stores, Inc. v. Texas Alco. Bev.,
834 F.3d 562 (5th Cir. 2016) ..................................................................................4

WildEarth Guardians v. Nat'l Park Serv.,
604 F.3d 1192 (10th Cir. 2010) ..............................................................................6

**Other Authorities**

7C Fed. Prac. & Proc. Civ. § 1916 § 1916 (3d ed.) ....................................................4

Fed. R. Civ. P. 24(a) ............................................................................................ passim

Fed. R. Civ. P. 24(b) ......................................................................................1, 4, 10, 11

86 Fed. Reg. 57335 (Oct. 15, 2021)................................................................................................2

## MOTION TO INTERVENE

Pursuant to <u>Federal Rule of Civil Procedure 24</u>, Grand Staircase Escalante Partners ("Partners"), Society of Vertebrate Paleontology ("SVP"), and Conservation Lands Foundation ("CLF," altogether, "Proposed Intervenors")[1] respectfully move for leave to intervene as defendants as a matter of right, or in the alternative, permissively, in the above-captioned case.

Proposed Intervenors are three organizations whose founding purposes are to protect and preserve the sensitive resources contained within Grand Staircase Escalante National Monument. Therefore, Proposed Intervenors have a substantial interest in this litigation, which threatens the existence of the Monument and the resources within it. Those substantial interests are not adequately represented by the existing parties and would be severely impaired should Plaintiffs prevail.

Not only do Proposed Intervenors have substantial interests at stake in this litigation, they also have a deep understanding of the facts on the ground within the Monument as well as the legal issues at the heart of this case, which will aid the Court's resolution of these important issues. Proposed Intervenors will not cause undue delay or prejudice and will coordinate with other defendants to ensure streamlined proceedings and avoid duplicative filings.

The undersigned counsel has conferred with counsel for the existing parties. Plaintiffs' Counsel states: "Plaintiffs take no position on the motion to intervene, provided that the participation of intervenors does not delay resolution of this case." Defendants indicated that they would reserve taking a position after seeing this motion.

---

[1] SVP and CLF have joined another motion to intervene brought on behalf of a coalition of organizations with significant interests in the Bears Ears National Monument. This motion concerns the substantial interests of Partners, SVP, and CLF in the protection of Grand Staircase National Monument, only.

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

### INTRODUCTION

This case concerns, in part, President Biden's October 8, 2021 Proclamation[2] designating new boundaries for the Grand Staircase-Escalante National Monument (the "Monument" or "Grand Staircase") as necessary for the effective care and protection of the Monument's geological, archaeological, cultural, historical, biological, and paleontological resources.

Proposed Intervenors are three organizations whose founding purposes are to protect sensitive resources of the type contained within Grand Staircase, and, in the case of Partners and CLF, to protect the existence of the Monument itself. Indeed, Proposed Intervenors have spent the past five years challenging President Trump's 2017 proclamation purporting to reduce Monument boundaries and protections.[3]  Proposed Intervenors' members work, conduct scientific research, recreate, and find aesthetic and spiritual fulfillment within the Monument.  Plaintiffs' suits, which seek a legal ruling that would invalidate the Biden Proclamation and erase federal protections for important resources such as unearthed fossils, geologic formations, and indigenous flora and fauna, are a substantial threat to Proposed Intervenors' interests, and in the case of Partners, an existential one.  Proposed Intervenors' interests are not adequately protected by the existing parties, and the motion to intervene, filed in the initial stages of the litigation before any responsive pleadings, is timely.  Proposed Intervenors accordingly satisfy the test for intervention as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure.

---

[2] Proclamation 10286 of Oct. 8, 2021, Grand Staircase-Escalante Nat'l Monument, 86 Fed. Reg. 57335 (Oct. 15, 2021) (hereinafter "Biden Proclamation").

[3] *See GSEP v. Biden*, No. 17-2587 (D.D.C.) *TWS v. Biden*, No. 17-2591 (D.D.C.)

The Tenth Circuit has permitted similarly situated conservation organizations with substantially similar interests to intervene *in prior litigation about the boundaries of this very same Monument*. [4] The Court concluded that an action, like the one here, seeking to invalidate the Monument could impair those interests, which were not adequately represented by the Government. The same reasoning controls here.

But even if this Court for some reason finds that the Proposed Intervenors do not meet the standard for intervention as of right, they satisfy the requirements for permissive intervention. This motion is timely, and Defendants will not unduly delay these proceedings. Moreover, Plaintiffs pose detailed factual questions about the "smallest area compatible" for protection of Monument resources, which depends on the value, location, and need for protection of objects within Grand Staircase. Proposed Intervenors have extensive experience with these questions, have developed an extensive record addressing them in prior litigation, and would lend this important background and perspectives to aid in the resolution of the matters presented in this case.

## ARGUMENT

### I.      Proposed Intervenors Are Entitled to Intervene as of Right.

"The Tenth Circuit generally follows a liberal view in allowing intervention under Rule 24(a)."[5] A court "must permit" a party to intervene as of right where the party: (i) "claims an interest relating to the property or transaction that is the subject of the action," (ii) where resolution of the lawsuit may "as a practical matter impair or impede the movant's ability to

---

[4] *See Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246 (10th Cir. 2001).

[5] *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005).

protect its interest," and (iii) where the party's interests are not "adequately represent[ed]" by the existing parties.[6]  Proposed Intervenors meet this standard.

    A.     <u>*Proposed Intervenors 'Motion is Timely*</u>

A motion to intervene is timely if the motion is filed when "the case is far from ready for final disposition."[7]  This case has just begun. Plaintiffs filed their Complaint in this action less than three months ago, on August 24, 2022. The United States has not yet filed a responsive pleading, nor has the Court issued any substantive orders. Under these circumstances, this Motion is timely under Rule 24(a).[8]

    B.     <u>*Proposed Intervenors have substantial protected interests at stake.*</u>

Rule 24(a)(2) requires an applicant for intervention to possess an interest relating to the property or transaction that is the subject matter of the litigation.[9]  This requirement is not rigid. Rather, "[t]he 'interest' test is primarily . . . a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."[10] An interest is sufficient for purposes of Rule 24 if it is "legally protectable"—that is,

---

[6] Fed. R. Civ. P. 24(a)(2).

[7] *Utah Ass'n of Ctys.*, 255 F.3d at 1250-51.

[8] "[A]n application made before the existing parties have joined issue in the pleadings has been regarded as clearly timely"§ 1916 Timeliness of Motion, 7C Fed. Prac. & Proc. Civ. § 1916 (3d ed.); *cf. Utah Ass'n of Ctys.*, 255 F.3d at 1251 (finding motion to intervene timely even where "document discovery, discovery disputes, and motions by defendant[] seeking dismissal on jurisdiction[] grounds" had already occurred).

[9] Fed. R. Civ. P. 24(a)(2).

[10] *Wal-Mart Stores, Inc. v. Texas Alco. Bev.*, 834 F.3d 562, 566 n.2 (5th Cir. 2016) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)).

"if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim."[11]

Proposed Intervenors have legally protectable interests at issue in this litigation. All three have brought litigation concerning Proclamation 9682, which purported to reduce the size of Grand Staircase by nearly 50%. [12]  Proposed Intervenors challenged that Proclamation alleging that it violated the Antiquities Act and the Constitution.  For the past five years, they have, through that litigation, sought to restore the Monument boundaries established by President Clinton in 1996 and adjusted and affirmed by Congress in subsequent legislation.

And long before President Trump issued his 2017 proclamation purporting to remove critical protections for Monument objects, Proposed Intervenors worked to preserve and protect Monument objects.

Partners, which in 2004 was established as the official "friends" organization of the Monument, provides extensive educational and supportive programming, such as assisting the Bureau of Land Management by administering a project to remove invasive Russian olive trees growing along a 100-mile riparian corridor of the Escalante River within the original Monument boundaries (this was and remains one of the largest backcountry restoration projects in the country); developing an extensive science and monitoring plan for the Monument; and supporting the restoration of damaged historic, scientific, and cultural sites.[13] In 2021, Partners'

---

[11] *Id.* at 566 (quoting *Texas v. United States*, 805 F.3d 653, 659 (5th Cir. 2015)); *see also Diamond v. Charles*, 476 U.S. 54, 75 (1986).

[12] *See* Compl. for Declaratory & Injunctive Relief, *Grand Staircase Escalante Partners et al. v. Trump (*D.C.D. 2017), No. 1:17-cv-02591.

[13] *See* Ex. 1, Bauman Decl. at ¶ 4–6; 10; *see also* Ex. 2, Holland Decl. at ¶ 4–6.

staff, volunteers, and hosted-workers contributed nearly 21,000 hours to supporting and restoring the Monument's precious resources and educating the public about the Monument.[14]

Partners has been supported in its efforts by CLF, a national nonprofit committed to promoting conservation throughout the United States.[15] CLF assists the National Landscape Conservation System in working to protect Grand Staircase, the largest and among the best known units of the National Conservation Lands.[16] CLF has joined with Partners to assist in the protection of Monument objects,[17] including through multi-year organizational capacity building training as well as tailored trainings to increase Partners' ability to raise money, recruit and manage volunteers, communicate with their members, and engage local communities around the Monument in educational activities.[18] Partners was the first group to receive a grant from CLF and since 2008 has received 21 grants totaling $675,000 since then.[19]

Finally, in recognition of the substantial paleontological resources within the Monument's borders, SVP and its members have conducted extensive paleontological field work within Grand Staircase, and its members have been active in documenting the Monument's fossil resources since before the Monument was designated in 1996.[20] SVP members were among the original advocates for the creation of the Monument in 1996, and research conducted by SVP members within the Monument is specifically mentioned in both President Clinton's and President Biden's

---

[14] Bauman Decl. at ¶ 15–19.

[15] Ex. 3, Murray Decl. ¶ 6.

[16] *Id*. at ¶ 7–8.

[17] *Id.* at ¶8–14.

[18] *Id.* at 8–10.

[19] *Id.* at ¶ 10.

[20] Ex. 4, Polly Decl. ¶ 8–20.

Proclamations related to the Monument.[21]  32 SVP members have active paleontological research sites within the Monument and others are actively planning research there in the near future.[22]

Environmental and conservation interests such as these "indisputabl[y]" qualify as the kind of interests necessary to justify intervention as of right under Rule 24(a).[23] Indeed, the Tenth Circuit has permitted environmental groups to intervene as defendants in prior litigation about this same Monument. In *Utah Association of Counties v. Clinton*,Plaintiffs brought suit seeking "to have declared illegal the Presidential Proclamation [originally] Establishing the Grand Staircase Escalante National Monument."[24] Intervening conservation groups "claim[ed] an interest relating to the monument … by virtue of their support of its creation, their goal of vindicating their conservationist vision through its preservation, their use of the monument in pursuit of that vision, and their economic stake in its continued existence."[25] The Tenth Circuit concluded that these interests were "sufficiently related" to the question of the existence of the Monument and its boundaries "to support intervention as of right."[26]  That reasoning applies with equal force here.

---

[21] *Id.* at ¶ 12.

[22] *Id.* at ¶ 14.

[23] *WildEarth Guardians v. Nat'l Park Serv*., 604 F.3d 1192, 1198 (10th Cir. 2010) (holding that a hunting and conservation group had a substantial interest, and could therefore intervene as of right, in a lawsuit challenging the National Park Service's plan to reduce the native elk population in Rocky Mountain National Park).

[24] *Utah Ass'n of Ctys.*, 255 F.3d at 1248.

[25] *Id.* at 1251.

[26] *Id.*

C.      *If Successful, Plaintiffs' Action Would Impair Proposed Intervenors 'Interests.*

Under Rule 24(a), intervenors must also demonstrate that "the disposition of this action may as a practical matter impair or impede their ability to protect their interest."[27] This burden "is minimal," and a would-be intervenor "must show only that impairment of its substantial legal interest is possible."[28] The Tenth Circuit in *Utah Ass'n of Ctys.*, found that similarly situated environmental groups met this requirement, reasoning that is was "not speculative to conclude that the protection accorded the intervenors' interest in preserving the wilderness nature of the monument land would be diminished if the land were to lose its designation as a national monument."[29]

The same reasoning controls here. The Complaint pursues a strikingly narrow theory of the Antiquities Act that is at odds with the breadth of the Act's language and 116 years of practice. Plaintiffs baldly assert that the "court cannot salvage the proclamations" at all.[30]  Failing that all-out attack, they contend that even assuming there were protectable objects within Grand Staircase, a reservation of no more than 2,400 acres (less than 1% of the total area reserved by President Biden) is all that would be needed to protect those objects.[31] They argue further that the President does not have authority under the Act to protect major categories of objects, including all non-biological objects, non-unique objects, and objects not somehow fixed to the land.[32]Plaintiffs' cabined and ahistorical interpretation would strip the exceptional natural features of Grand

---

[27] *Utah Ass'n of Ctys.*, 255 F.3d at 1253.

[28] *Id.*

[29] *Id.* at 1254.

[30] Compl. ¶ 157.

[31] *Id.* ¶ 158.

[32] *See, e.g.,* i*d.* at 154.

Staircase of important legal protections and would subject the Monument to the kinds of harms that motivated Congress to pass the Act in the first place,[33] including harms resulting from mining operations within Monument borders.[34] This would impair Proposed Intervenors' long-established interest in the protection of the Monument and the objects of historic and scientific interest that it has been created to protect.

> D. *The Existing Parties May Not Adequately Represent Proposed Intervenors'*
> *Interests.*

Would-be intervenors need only show that their interests may not be adequately represented by the existing parties.[35] This burden is "minimal,"[36] and "the possibility of divergence of interest[s] need not be great."[37] As the Tenth Circuit has recognized, when the existing defendant is the government, this showing is "easily made,"[38] because "the public interest the government is obligated to represent may differ from the would-be intervenor's particular interest."[39] Here, the Federal Defendants do not adequately represent Proposed Intervenors' interests, which are more focused than the government's general obligation to the public.

In prior litigation involving this Monument, the Tenth Circuit concluded that the interests of nonprofit conservation organizations and the government were not identical even though both sought to defend the legality of the government's action designating the boundaries of Grand

---

[33] *See* Bauman Decl. ¶ 19–25; Murray Decl. ¶ 15; Holland Decl. ¶ 6–7.

[34] *See* Polly Decl. ¶25–28; Holland Decl. ¶ 7.

[35] *See, e .g., Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1346 (10th Cir. 1978).

[36] *Trbovich*, 404 U.S. at 538.

[37] *W. Energy Alliance v. Zinke*, 877 F.3d 1157, 1168 (10th Cir. 2017).

[38] *Utah Ass'n of Ctys.*, 255 F.3d at 1254.

[39] *Kane Cty. Utah v. United States*, 928 F.3d 877, 892 (10th Cir. 2019).

Staircase.[40] Emphasizing that the government's broad public interest could conflict with the narrower interests of the nonprofit, the Tenth Circuit granted the group's motion to intervene as of right.[41]

Here, too, the government cannot adequately represent Proposed Intervenors' particularized interest in the protection of the Monument's resources for posterity; indeed, from 2017 until 2020, the Trump Administration attempted to reduce the size of the Monument, a decision which was defended in Court and implemented by BLM through a revised management plan. This recent history confirms the Tenth Circuit's observation nearly two decades ago that "it is not realistic to assume that the [government's] programs will remain static or unaffected by unanticipated policy shifts."[42] Proposed Intervenors provide a backstop to changing government priorities, which further justifies their intervention in this case.

Accordingly, because Proposed Intervenors satisfy all requirements of Rule 24(a) and have Article III standing, this Motion to Intervene should be granted.

## II.      Proposed Intervenors Qualify for Permissive Intervention.

In the event this Court does not grant intervention as of right, Proposed Intervenors should be permitted to intervene pursuant to <u>Federal Rule of Civil Procedure 24(b)</u>, which provides that

---

[40] *Utah Ass'n of Ctys.*, <u>255 F.3d at 1256</u>.

[41] *See id*. at 1255-56.

[42] *Id.* at 1256 (internal quotation marks and citation omitted).

"[o]n timely motion, the court may permit anyone who … has a claim or defense that shares with the main action a common question of law or fact."

In exercising its discretion, a court considers "whether the intervention will unduly delay or prejudice the adjudication of the  original parties' rights,"[43] and "whether the interveners will significantly contribute to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented."[44] Proposed Intervenors satisfy each of these factors.

*First*, the defenses asserted by Proposed Intervenors in their proposed Answer share common questions of both law and fact with the main action regarding the legality of President Biden's Proclamation and the distribution and nature of objects of historic and scientific importance within the Monument.

*Second*, intervention would not unduly delay or prejudice the rights of the original parties. This Motion comes in the earliest phase of litigation, before the original Defendants have filed any responsive pleadings.

*Third*, Proposed Intervenors have familiarity with the relevant facts as well as the legal questions at the heart of this case, and will aid the Court's resolution of the issues. Proposed Intervenors bring two unique perspectives to the litigation. First, they have significant  knowledge of the Monument and its resources. The legal dispute in this case will turn, in part, on what constitutes the "smallest area compatible" with the proper care and management of the objects within Grand Staircase, which, in turn, depends on the value, location, and needs for protection of those objects. Proposed Intervenors have extensive knowledge about these issues..  Second, as

---

[43] Fed. R. Civ. P. 24(b)(3).

[44] *Utah ex rel. Utah State Dep't of Health v. Kennecott Corp*., 232 F.R.D. 392, 398 (D. Utah 2005).

demonstrated by their prior extensive litigation, Proposed Intervenors have expertise about the legal issues and history and scope of the Antiquities Act implicated by Plaintiffs 'complaint, and would meaningfully contribute to the development of those issues as well.

Accordingly, even if this Court finds that Proposed Intervenors do not satisfy the standard for intervention as of right, the Motion to Intervene is proper under Rule 24(b).

## CONCLUSION

For the foregoing reasons, this Motion to Intervene should be granted.

November 23, 2022                                    Respectfully submitted,

/s/ *Raymond Scott Berry*
Raymond Scott Berry (0311)
P.O. Box 9491
Salt Lake City, UT 84109
801-556-8515
rsberryslc@gmail.com

Gary S. Guzy (*pro hac vice* forthcoming)
John Mizerak (*pro hac vice* forthcoming)
Shruti Barker (*pro hac vice* forthcoming)
Scott Shelton (*pro hac vice* forthcoming)
Tyler Smith (*pro hac vice* forthcoming)
Eric Chung (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-5978
gguzy@cov.com
jmizerak@cov.com
sbarker@cov.com
sshelton@cov.com
tsmith@cov.com
echung@cov.com

*Counsel for Proposed Intervenors Grand*
*Staircase Escalante Partners, Society of*
*Vertebrate Paleontology, and Conservation*
*Lands Foundation*

12

## CERTIFICATE OF COMPLIANCE

This Motion complies with the type-volume limitations of D.U.Civ.R. 7–1(3)(C) because

it contains 3,050 words, exclusive of the parts of the motion exempted by that Rule. This Motion

complies with the typeface requirements of D.U.Civ.R. 10–1(b) because it has been prepared in a

proportionally spaced typeface using Microsoft Word 2010 in 12 point, Times New Roman font.

November 23, 2022

/s/ *Raymond Scott Berry*
Raymond Scott Berry (0311)
P.O. Box 9491
Salt Lake City, UT 84109
801-556-8515
rsberryslc@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2022, I caused the foregoing document to be filed with the Clerk of the Court using the Court's CM/ECF system, and service was thereby effected electronically to all counsel of record.

November 23, 2022

/s/ *Raymond Scott Berry*
Raymond Scott Berry (0311)
P.O. Box 9491
Salt Lake City, UT 84109
801-556-8515
rsberryslc@gmail.com

# EXHIBIT 1

*DECLARATION OF SARAH BAUMAN*
*IN SUPPORT OF MOTION OF GRAND STAIRCASE*
*ESCALANTE PARTNERS, SOCIETY*
*OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION*
*LANDS FOUNDATION TO INTERVENE AS DEFENDANTS*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS.<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; and UNITED STATES FOREST SERVICE,<br><br>*Defendants*, | Civil Action No. 4:22-cv-0060-DN<br><br>Judge David Nuffer<br><br>**DECLARATION OF SARAH BAUMAN IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS** |

## DECLARATION OF SARAH BAUMAN

I, Sarah Bauman, declare as follows:

1.      I am over the age of eighteen and am competent to testify. This Declaration is based on my personal knowledge and belief.

2.      I have been a resident of the state of Utah for over 20 years, and I have been visiting the Grand Staircase-Escalante National Monument ("GSENM," or the "Monument") since 2000.

3.      I am currently the Executive Director of Grand Staircase Escalante Partners ("Partners").

4.      Partners is a non-profit 501(c)(3) corporation organized under the laws of the state of Utah. The organization's foundational purpose, as reflected in its bylaws, is to support, protect, maintain, and advance Grand Staircase-Escalante National Monument as established in Presidential Proclamation 6920 of September 18, 1996, and the Monument Management Plan approved on November 15, 1999.

5.      Partners' membership is composed of geologists, paleontologists, archaeologists, ecologists, biologists, historians, and other scientists; residents and business leaders from gateway towns; community leaders; recreationalists; and other individuals who seek the ongoing preservation of Grand Staircase. These members are drawn from 45 states, Washington D.C., Belgium, Canada, Great Britain, and Switzerland.

6.      Since its founding, Partners has been inextricably intertwined with the Monument, and its programmatic activity has grown as the organization has grown. Incorporation was a result of meetings in 2002 between citizens in Kanab who supported the establishment of Grand Staircase and the Monument Manager, who asked these individuals to form a "Friends" organization. And in 2004, Partners, through a Memorandum of Understanding ("MOU") entered into with the Bureau of Land Management ("BLM"), became the official "Friends" organization of the Monument with the goal of enhancing public knowledge of and appreciation for its lands and resources.

7.      In the years since, Partners has steadily grown its initiatives—often at BLM's request—to promote and safeguard the Monument. These initiatives include assisting BLM with "Walks and Talks," an educational initiative for visitors and local residents; funding and supporting BLM's Science Program; promoting outdoor education in all of the schools surrounding the Monument and at special events; taking a leadership role in the Escalante River Watershed Partnership at BLM's request; staffing the Cultural Site Steward program and Paleontology program; funding cultural resource inventories; and, most recently, partnering with the BLM to establish the Stewardship and Sustainable Visitation program, which works to prevent, mitigate, and remediate visitor impacts, such as graffiti, vandalism, and human and other waste disposal.

8.      I would like to highlight three important aspects of Partners' work: the Stewardship and Sustainable Visitation program, the Conservation program, and Tribal engagement.

9.  <u>Stewardship and Sustainable Visitation Program</u>. Since its launch in 2021, the Stewardship and Sustainable Visitation program, led by Partners, has engaged 157 volunteers who have donated 1,330 hours to protect and restore Grand Staircase-Escalante National Monument. Partners staff and volunteers have provided vital education related to "Leave No Trace" and "Visit with Respect" principles, and work closely with the BLM to conduct the following activities throughout GSENM: graffiti remediation, dispersed campsite cleanups, trail work, vehicle trespass remediation, trash removal, and native fisheries protection. Partners has minimized the unnecessary spread of dispersed camping into sensitive soil crust communities, hauled an estimated 1,500 pounds of trash (including improperly disposed human waste) and charcoal off of the Monument, and helped restore the scenic beauty of many of Escalante's slot canyons.

10. <u>Conservation Program</u>.

    a.  Since its formation in 2009, Partners has served as a lead organization and fiscal sponsor for the Escalante River Watershed Partnership (ERWP). ERWP is a coalition of scientists, nonprofit organizations, and government agencies that work to address the needs of the Escalante River Watershed through strategic and collaborative conservation strategies. Led by Partners' staff and volunteers, ERWP successfully removed the woody invasive Russian olive trees growing rapidly along the Escalante River. Russian olive was planted in local southern Utah communities in the early 1950s by the Soil Conservation Service, a project that was intended to stabilize soil following the 1930s drought and dust storms. Over approximately 60 years, the Russian olive spread throughout the Escalante River Basin on both public and private lands. In 2009, a coalition of scientists, federal and state agencies, and organizations decided to remove the Russian olive. Due to the aggressive, invasive nature of the species, the Russian olive drastically changed the ecology and hydrodynamic function of the river and riparian zone, forcing out several native species of trees and shrubs. Grand Staircase Escalante Partners worked with several other organizations and agencies, including BLM, the National Park Service ("NPS"), the United States Forest Service ("USFS"), and multiple Utah state agencies, to remove the invasive Russian olive in order to remediate the land and return it to its natural state. Partners has been involved in the project since 2011.

    b.  The project has been a success. In total, 1,454 acres of Russian olive and 17 acres of tamarisk have been removed from the watershed. While some isolated patches remain, the majority of the watershed is now in the "retreatment" phase. Large-scale removal efforts are no longer necessary.

c. Since 2011, $10,839,530 has been spent on this project, with Partners raising and managing the bulk of the project funds. The Walton Family Foundation ("WFF"), which provided $5,323,359 directly to Partners and $158,000 to the Utah Nature Conservancy Chapter, was the largest single grantor. Six different Conservation Corps completed most of the removal efforts, with quality control and safety managed by GSEP staff. The Conservation Corps crews are usually made up of four to twelve young individuals who camp out for 80 hours on each shift. The Conservation Corps that have participated are Ancestral Lands Conservation Corps, Southwest Conservation Corps, Utah Conservation Corps, and Native Conservation Corps.

d. After the current five-year maintenance and monitoring program expires, Partners intends to continue to fundraise to sustain the monitoring effort and treat areas of need throughout the Escalante watershed. The staff will be looking for new woody invasive vegetation species, monitoring the health of the native species, and treating new invasive sprouts.

11. <u>Tribal Engagement</u>. Partners collaborates with Tribal leaders and representatives to foster opportunities to integrate Tribal perspectives into the conservation and management of GSENM. In August of 2021, Partners launched its virtual "Tribal Listening" sessions, inviting the Tribes with enduring relationships to the Grand Staircase-Escalante region (Paiute, Hopi, Zuni, Navajo, Ute, and Pueblo Tribal Nations) to come together and share perspectives on cultural and natural resources, cultural site stewardship, access for cultural ceremonies and traditions, and future land management models for collaborative management and co-management. Tribal Listening sessions play an important role in helping us understand how Tribal voices can be incorporated into Monument stewardship and management. In 2022, we conducted six Tribal Listening sessions. Individuals from the following Tribes attended one or more sessions: Dine, Hopi, Kaibab Paiute, Paiute Indian Tribe of Utah, Ute Mountain Ute Tribe, and All Pueblo Council of Governors. In addition to Partners staff, we have seen representation from the Bureau of Land Management's Deputy Director of Policy and Programs, a Senior Counselor for the Department of the Interior, the Paria River District Manager, and the GSENM Monument Manager and Archaeologist. Parties in attendance discussed cultural resource inventories, the protection of cultural sites, interpretive exhibits, resource management decision-making, the use of derogatory names, and scheduling in-person visits to the Monument, among other topics. Through these sessions, we are helping to create direct lines of communication between Tribal representatives and BLM land management officials to increase opportunities for the Tribes to advocate for meaningful and authentic Tribal inclusion and consultation.

12. In addition to these programs, Grand Staircase Escalante Partners has a history of collaboration with BLM, businesses, and local residents on various scientific and educational programs, including: the Master Naturalist Training in collaboration with Utah State University, which used Grand Staircase as an outdoor classroom and recruited and trained community members to become Utah State University-certified Master Naturalists; the Grand Staircase-Escalante Science Symposium; the Ways of Understanding Land and Water Resources in the Grand Staircase-Escalante Symposium; the Boulder Heritage Festival; the Escalante Canyon Arts Festival; the Bryce Canyon Geology Festival; the Big Water Dino Festival; Earth Day events in schools and communities surrounding GSENM; river restoration presentations at Escalante High School; the restoration of the Historic Rock Springs Corral and Henrieville Creek; Public Lands Day activities; Kanab's Amazing Earthfest; the Kanab Balloon Festival; Grand Staircase-Escalante Community Lecture Series; "Ask an Expert" virtual webinars with scientists and BLM staff working on the Monument; the virtual Native Perspectives Series in partnership with Grand Canyon Trust; the Bees of Grand Staircase film production and launch; the premier of the 2022 Escalante Film Festival; and more.[1]

13. In fiscal year 2021, Partners staff (14,794), volunteers (1,330 Stewardship, 2,041 board of directors), and hosted workers (2,080 Utah Conservation and other conservation crews) contributed an estimated 20,245 hours to supporting and restoring the Monument's biological, cultural, historical, and paleontological resources, as well as to educating the public about the Monument and the landscape. We anticipate contributing approximately the same number of hours in fiscal year 2022.

14. Partners is also actively involved in the planning process for the land use management plan that will govern the Monument. On September 27, 2022, Partners submitted comments to the Bureau of Land Management along with a coalition of conservation organizations, which, among other things, encourage the Bureau to: prioritize the protection of rare and uncommon plants within the Monument; prevent damage and degradation of soils and biological crusts; control noxious and invasive non-native plants; restore native vegetation; protect wildlife corridors; maintain, protect, and enhance populations of threatened or endangered animal and fish species; manage ground and surface water to promote the protection of Monument objects and support native flora and fauna of the region; implement adaptive management strategies; create a climate change adaptation plan; manage

---

[1] More information about Partners' various and substantial programming efforts is available here: Programs, Grand Staircase Escalante Partners, *available at* https://gsenm.org/programs/.

recreational activities and uses in a way that ensures monument objects and values are protected; and encourage a sense of stewardship and conservation of the landscape during visits to the Monument.

15. Members of Partners also visit or otherwise actively use and enjoy Grand Staircase's lands and resources for recreation, aesthetic and spiritual enjoyment, wildlife viewing, dark sky viewing, photography, and artistic inspiration. Members experience and appreciate the quiet and solitude created by the serene and peaceful nature of a landscape that stretches undisturbed by human activity as far as the eye can see. The members' use and enjoyment of these areas are inextricably intertwined with the Monument's sensitive resources and are affected by the condition of the area and the status of the Monument's resource protections. Members plan to continue to visit the Monument for recreational, aesthetic and recreational purposes in the future.

16. Members rely on Grand Staircase's designation as a national monument in their professional scientific and research work and in their businesses, livelihoods, and educational endeavors, and have continuing plans to do so. Partners and its members derive significant value from the national monument designation and the protections it affords. They rely on Grand Staircase's national monument designation to secure funding for their businesses, increase the value of their investments, attract customers, and increase their revenue.

17. As a further reflection of its substantial and long-running organizational interests in protecting and preserving Grand Staircase, Partners has undertaken significant independent advocacy and public engagement efforts to protect Grand Staircase, in addition to its on-the-ground conservation, stewardship, and educational efforts.

18. For example, I am serving a three-year term as the representative for the "Conservation Community" on the Grand Staircase-Escalante National Monument Advisory Committee, which "provide[s] information and advice to the Secretary of the Interior on science issues and the achievement of Management Plan objectives,"[2] including the protection of monument resources. Scott Berry, a member of the Partners Board, also serves on the

---

[2] U.S. Dep't of the Interior, Bureau of Land Management, Grand Staircase-Escalante National Monument Advisory Committee Charter, *available at* https://www.blm.gov/sites/blm.gov/files/docs/2022-06/2022%20Final%20Charter_Grand%20Staircase%20MAC%20%282022-06-01%29-Signed%20and%20Filed.pdf (last visited Oct. 22, 2022).

Monument Advisory Committee as a representative of "dispersed recreation."[3]

19. Partners has consistently opposed recent efforts to reduce the boundaries of Grand Staircase. It filed suit alleging that President Trump's December 4, 2017 Proclamation purporting to reduce the size of the Grand Staircase-Escalante National Monument was unconstitutional and *ultra vires*, litigation which continues to this day.

20. Nicole Croft, the former Executive Director of Partners, testified before the House Natural Resource Committee on March 13, 2019, regarding Former President Trump's proclamation purporting to reduce Monument boundaries. Ms. Croft explained the "negative impacts to the health of the landscape [and] the loss of scientific research" caused by that Proclamation.[4]

21. If successful, Plaintiffs' theories—which seek an even more drastic reduction in the size of and protections afforded to Grand Staircase than the 2017 Proclamation—will undermine Partners' organizational activities and the multitude of programs that Partners offers and participates in. This is demonstrated by the aftermath of President Trump's 2017 Proclamation purporting to reduce the size of the Monument. The 2017 Proclamation caused Partners to lose previously reliable infrastructure and funding from a number of sources. Following the Proclamation, BLM terminated all of its financial arrangements with Partners, requested that all donation boxes intended to raise funds for Partners be removed from BLM visitor centers, and refused to accept funds raised by Partners for essential programs, such as the Paleontology Lab. This, in turn, impacted programs aimed at supporting the Monument's ecological and cultural resources, as it reduced the amount of funds and staffing dedicated to their operation.

22. The elimination of Grand Staircase's protections would threaten current and future uses of the Monument by Partners' members, and it would hasten the degradation of sensitive natural, biological, and cultural resources currently protected by the monument designation. Among other issues, a loss of monument protections would open the lands to mineral and geothermal leasing, which would allow prospectors to enter federal land to search for mineral deposits without prior approval.

---

[3] *Id.*

[4] Ms. Croft's full remarks are available here: Statement for the Record, Nicole Croft, House Natural Resources Committee *available at* https://naturalresources.house.gov/imo/media/doc/Croft,%20Nicole%20-%20Testimony.pdf (last visited Oct. 22, 2022).

23.   If successful, Plaintiffs' theories would also increase the risk of artifact removal, illegal digging, ATV use across sensitive areas, artifact and fossil theft, and vandalism to sensitive cultural sites that are vital to Indigenous and pioneer cultures, which is what occurred while Grand Staircase was managed pursuant to the Trump Proclamation. The national monument designation is critical for keeping such destructive activities in check. Its removal will substantially and immediately weaken the protections preventing their occurrence.

24.   More generally, the claims in this case that speak to the Executive Branch's broader authority to protect and conserve landmarks, historic and prehistoric structures, and other objects of historic and scientific interest are of grave concern to Partners and its members.

25.   Should Plaintiffs' challenge to President Biden's proclamation prevail, it would have harmful effects on Partners' goals, missions, and projects, including the imperilment of the significant restoration efforts Partners has undertaken in the Escalante River Watershed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of November, 2022.



_____

Sarah Bauman

# EXHIBIT 2

*DECLARATION OF JOHN C. HOLLAND IN SUPPORT OF
MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS,
SOCIETY OF VERTEBRATE PALEONTOLOGY, AND
CONSERVATION LANDS FOUNDATION TO INTERVENE
AS DEFENDANTS*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS. <br><br> *Plaintiffs,* <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; and UNITED STATES FOREST SERVICE, <br><br> *Defendants,* | Civil Action No. 4:22-cv-0060-DN <br><br> Judge David Nuffer <br><br><br> **DECLARATION OF JOHN C. HOLLAND IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS** |

## DECLARATION OF JOHN C. HOLLAND

I, John C. Holland, declare as follows:

1. I am 67 years of age and competent to testify. This Declaration is based on my personal knowledge and belief.

2. I am a resident of the State of Utah. I was raised in Salt Lake County and I am currently a resident of Tropic, Garfield County, Utah. I have been a taxpayer in Garfield County since 1999 and have owned a residence in Tropic since 2001. I have co-owned and started two tourism-related businesses in Garfield County.

3. My home in Tropic is located approximately half a mile from the boundary of Grand Staircase Escalante-National Monument (the "Monument") and from the boundary of Bryce Canyon National Park.

4. Grand Staircase Escalante Partners (GSEP) is a non-profit 501(c)(3) corporation organized under the laws of the state of Utah. The organization is dedicated to supporting, protecting, maintaining, and advancing Grand Staircase Escalante-National Monument. The organization's primary purpose is to assist Grand Staircase in its mission by raising public awareness, funding, and support for conservation, science, education, and restoration projects involving Grand Staircase.

5. I joined GSEP as a donating member in 2016 and joined the board of directors in December 2017. I was elected to be Board President in November 2019 and will serve in this role until December 31, 2022.

6. I have had a life-long personal interest in the educational and recreational experience available within the Monument. Indeed, protecting these interests is part of the reason why I joined and became an active member in GSEP.

   a. I have lived in Utah since 1957 and began exploring the lands included in the Grand Staircase-Escalante National Monument in the 1970s. I have spent a minimum of several hundred days exploring the canyons and plateaus located within the Monument. I was also a hiking guide in Grand Staircase-Escalante National Monument from 2012 until 2020.

   b. I currently visit the lands of Grand Staircase-Escalante National Monument nearly every day beginning with my morning walk. Most of my visits are to the Monument areas in the vicinity of Tropic and Cannonville, with occasional visits to other areas. A recent example is a trip I took last May, driving the Hole-in-the-Rock Road to 50-Mile Bench and hiking to Navajo Point above Lake Powell.

   c. As an individual who has explored Grand Staircase both pre- and post-monument designation, I can say that my experience and appreciation of the land has significantly increased as a result of the Monument's designation. It was only after the Monument's designation that scientific paleontological discoveries enhanced my understanding of the Monument's natural history. Restorative ecological projects initiated after the designation enhanced my understanding of the diverse nature of native species and their vital importance to the health of the landscape. For example, the Escalante River Watershed Partnership's work removing the Russian olive from the banks of the Escalante River, efforts which GSEP led, has protected habitat and supported native wildlife along the

canyon. The increase in various bird populations has been particularly spectacular.

d. I have frequently explored and hiked in the Monument and plan to do so in the future. Granting Plaintiffs' proposed relief would diminish my personal recreational and aesthetic interests in the Monument, as it would affect the natural beauty of the landscape, particularly due to the high likelihood of increased resource extraction on the land if the Biden Proclamation is overturned.

7. Reducing Grand Staircase's boundaries would open the land excised from the Monument to mining operations and other resource extraction processes, which would substantially diminish my aesthetic and recreational enjoyment of the Monument.

a. Granting Plaintiffs' requested relief would result in significant harm to geologic and archeological points of interest, which contribute substantial value to my life.

b. I witnessed the effects of reducing the Monument's boundaries firsthand during a visit to the Monument after President Trump's 2017 Proclamation purportedly excluded lands from the Monument and opened them to "location, entry, and patent under the mining laws."[1] I visited the Monument on October 24, 2019 and was disappointed to see that mining had already begun on the lands excluded by the 2017 Proclamation.

c. During that trip, I observed equipment tracks and new road construction within an area subject to a recently-approved mining claim. The tracks were quite sharp and fresh, despite recent wind events in the area, suggesting that the activities resulting in the described impacts were quite recent. The ground disturbance I saw appeared to be consistent with the use of the machinery the mining company planned on employing.

d. The mine area was approximately a half mile from the main road, and it was visible from higher elevation lookout points where the Round Valley road climbs Slickrock Bench. Hikers and visitors gazing southeast from those viewpoints looked down on the equipment staging area and the heavy machinery it contained. The small and secluded box canyon hikers and visitors hoped to see was spoiled by the mine; it was a blemish on the viewshed and the wilderness experience.

---

[1] *See* <u>82 Fed. Reg. 58,089</u>, 58,093 (Dec. 4, 2017).

e.  The ongoing mining at the site was an eyesore that degraded my aesthetic experience and tarnished the remote nature of this pristine landscape.

f.  The disturbances accompanying such mining operations added another layer of impact and injury to the visitor experience, as the machinery used to engage in mining produces noises, emissions, and surface disturbances that are noticeable and unnatural and detrimental to the experience of anyone seeking to enjoy the natural beauty of the Monument, including me. The owner of this mining claim filed a renewed "plan of operations" in 2022, claiming that his right to mine in this area was grandfathered into the Biden Proclamation. Granting Plaintiffs' requested relief would dramatically increase the likelihood that he would receive permission to begin mining again and would result in similar harms throughout lands excised from the Monument.

g.  Mining operations also require the construction of equipment and loading staging areas and an increase in road traffic, each of which further harms my ability to enjoy the Monument's remote landscapes.

Executed this 23rd day of November, 2022.

_____

John Holland

# EXHIBIT 3

***DECLARATION OF DANIELLE MURRAY IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS***

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS.<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; and UNITED STATES FOREST SERVICE,<br><br>*Defendants,* | Civil Action No. 4:22-cv-0060-DN<br><br>Judge David Nuffer<br><br>**DECLARATION OF DANIELLE MURRAY IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS** |

## DECLARATION OF DANIELLE MURRAY

I, Danielle Murray, declare as follows:

1.    I am over the age of eighteen and am competent to testify. This Declaration is based on my personal knowledge and belief.

2.    I have been a resident of Durango, CO for 14 years.

3.    I am a Senior Legal and Policy Director at Conservation Lands Foundation ("CLF"). I started at CLF in 2008.

4.   I have a Juris Doctorate and Master of Studies in Environmental Law from Vermont Law School.

5.   I have an Undergraduate Degree in Wildlife Conservation with a Minor in Biology from the University of Delaware.

6.   CLF's mission and organizational purpose is to protect, restore, and expand the National Conservation Lands System (from which the organization gets its name) through education, advocacy, and partnerships. The National Conservation Lands are part of a federal government land designation system established by Congress in 2000 that encompasses 35 million acres and 2,400 river miles of National Monuments, National Conservation Areas, Wilderness and Wilderness Study Areas, Wild and Scenic Rivers, National Scenic and Historic Trails, and other special designations. CLF is the only non-profit in the country specifically dedicated to establishing and safeguarding the National Conservation Lands.

7.   Grand Staircase-Escalante National Monument (the "Monument") is the largest and among the best-known units in the National Conservation Lands System.

8.   For over 20 years, the Grand Staircase-Escalante National Monument has been a flagship unit managed by BLM and a "crown jewel" of the National Conservation Lands system. Protecting the Monument was one of the main catalysts for establishing our organization. Our founders, former Secretary of the Interior Bruce Babbitt, former Counselor to the Secretary Molly McUsic, and former Chief of Staff to the Secretary Anne Shields, were instrumental in the creation and designation of Grand Staircase. Their commitment to the protection of this area led them to help establish CLF as a not-for-profit organization dedicated to ensuring the long-term conservation of Grand Staircase and other monuments within the National Conservation Lands System.

9.   A primary component of CLF's operations is providing support to local organizations to steward and protect National Conservation Lands. CLF created the Friends Grassroots Network, which is comprised of over 70 organizations located in 12 states, including Grand Staircase Escalante Partners ("Partners"), to support the National Conservation Lands. Member organizations conduct and organize a wide range of conservation-related activities, including clean-up projects, trail maintenance and rebuilding, riverbank and stream restoration, removal of invasive species, closure of illegal roads, water quality monitoring, enhancement of wildlife habitat, and improvement of recreational access. Every year, Friends Grassroots Network members dedicate tens of thousands of hours to these sorts of activities. CLF provides services and organizational support to the Friends Grassroots

Network organizations, including training related to organizational capacity building, volunteer recruitment and management, and fundraising.

10. CLF has provided Partners significant organizational support, including grants for multi-year organizational capacity building training as well as tailored trainings to increase their ability to raise money, recruit and manage volunteers, communicate with their members, and engage local communities around the Monument in educational activities. Partners was the first group to receive a grant after CLF's founding in 2008 and has received 21 grants totaling $675,000 since. Grand Staircase Escalante Partners has also been awarded the "Friends Group of the Year" recognition for the staff, board, and volunteers' deep commitment to protecting and stewarding the Monument.

11. CLF has consistently opposed recent efforts to reduce Grand Staircase's boundaries. Specifically, it opposed the monument review process that began in April 2017, which culminated in President Trump's December 4, 2017 Proclamation purporting to reduce the size of the Grand Staircase-Escalante National Monument.[1] CLF's comments expressed strong support for the Monument and its boundaries as they existed prior to President Trump's action, i.e., the borders restored by President Biden's 2021 Proclamation. CLF has also submitted comments to BLM as part of the land management planning process stemming from the 2017 Proclamation and registered a protest to BLM's proposed management plans and the Final Environmental Impact Statement.

12. Additionally, CLF has also written formal letters in opposition to proposed legislation and management decisions that could damage the Monument and its resources. Since 2010, CLF has met annually with Monument and Assistant Monument Managers in Escalante, Utah and BLM staff in Washington, D.C. to provide input on management issues related to grazing, maintenance of roads, and collaboration with Partners. For example, in 2012, the Foundation met with BLM staff and sent a formal letter to express opposition to a proposal from Garfield County to pave Hole-in-the-Rock Road, a decision that would have violated the 1999 Plan. In 2013, the Foundation sent a letter to then-BLM Director Neil Kornze that highlighted the effects the government shutdown had on the National Conservation Lands. In 2013, the Foundation worked closely with the BLM and Partners on the Utah State Plan for the National Conservation Lands, which included an official comment letter that outlined suggestions for how to increase conservation protections for Grand Staircase-Escalante National Monument. On May 21, 2015, the Foundation submitted a letter to the Senate Subcommittee on

---

[1] *See* TWS CLF Comments Grand Staircase EO 13792 (filed May 26, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-112216 (follow Attachment "PDF" hyperlink at bottom of page).

Public Lands, Forests and Mining, expressing concern over a proposed bill that would have undermined conservation protections in Grand Staircase. On February 9, 2016, Foundation staff traveled to Washington, D.C., to meet with BLM's National Partnerships Program Lead Trevor Needham to request that BLM strengthen a public-private partnership with Partners, so that Partners could continue providing volunteer education and stewardship services at the Monument. In February 2017, Foundation staff and board members met with Acting BLM Director Mike Nedd to express support for continuing the Escalante River restoration work at the Monument. On December 12, 2017, the Foundation sent a letter to Representative Chris Stewart and members of the House Committee on Natural Resources opposing Representative Stewart's legislation, the "Grand Staircase Escalante Enhancement Act" (H.R. 4558-115), which would have codified President Donald J. Trump's Antiquities Act proclamation, which purported to reduce the size of the Monument and divide it into separate units.

13. Additional examples of CLF's stewardship and outreach efforts on behalf of the Monument include the following:

   a. In early February 2020, CLF worked with Partners to create a communications response plan to the BLM's ROD for GSENM and craft a CLF and Partners press statement.

   b. In the summer of 2020, CLF provided communications and promotions support to Partners in advance of the final production and public screenings of an independent film titled Bees of Grand Staircase.

   c. In August of 2020, CLF arranged for Partners' director to take part in a forum hosted by Representative Raúl Grijalva to highlight grassroots conservation voices who could speak to the impact of William Perry Pendley's leadership of BLM and the decisions made regarding landscapes and communities across the West during his tenure. This arrangement provided Partners an opportunity to speak about the threats to GSENM after President Trump's illegal monument proclamation. CLF staff provided guidance around messaging and coaching for presentation.

   d. In early 2021, CLF staff wrote a letter in support of Partners' application to the Sorenson Legacy Foundation for funding to expand their "Native Perspectives" and "Teach-In" series.

   e. In April 2021, CLF staff coordinated with Partners to attend an in-person meeting with Interior Secretary Deb Haaland and the Utah Congressional Delegation, held in Kanab, UT on April 9. CLF provided talking points and funding for transportation and lodging and engaged Paleontologist and Kevin Madalena from Jemez Pueblo to attend and speak to the

Secretary. Charlotte Overby, CLF's Senior Field Director, attended and spoke at the meeting. This was among the first in-person meetings the Secretary held during the pandemic and the first in-person meeting of this type for CLF staff in more than a year. The logistics were expensive and complicated, but CLF knew it was important to speak directly with the Secretary to share our experiences and perspectives on the impacts of the Trump administration's actions.

14.   As a further reflection of its substantial and long-running organizational interests in protecting Grand Staircase, CLF expended substantial time and financial resources to develop, deploy, and operate a smartphone application ("App") called the "TerraTruth App," which allowed users to act as citizen monitors to report instances of illegal use on and damage to protected lands and sensitive resources. The App officially launched on January 24, 2018, and in fewer than two years, users reported 272 instances of illegal use and damage to resources in Grand Staircase, primarily within lands purportedly excluded from monument protection by former President Trump's 2017 proclamation. Particularly egregious instances of damage included several instances of illegal, off-highway vehicle use in the Paria Wash, damage to an ancient Native American fire pit, and vandalism of irreplaceable archeological art panels. Should the Court grant the relief Plaintiffs request, CLF is gravely concerned that such illegal and damaging uses will resume and worsen in lands excluded from monument protection.

15.   CLF's organizational interests in protecting and conserving Grand Staircase and other areas of the National Conservation Lands System are jeopardized by Plaintiffs' positions, which, if successful, would strip millions of acres of National Conservation Lands status. Those lands would no longer be subject to the robust protections afforded by monument status. Should that happen, there would be immediate impacts to formerly-protected, sensitive resources.

16.   As the activities described above indicate, CLF has a keen interest in preserving President Biden's proclamation re-establishing the boundaries of the Monument.

17.   Moreover, Plaintiffs' claims concerning the power of the Executive Branch to protect and conserve landmarks, historic and prehistoric structures, and other objects of historic and scientific interest are of grave concern to CLF. Indeed, Plaintiffs' requested remedy would negatively affect other National Conservation Lands, too.

18.   As a result of the foregoing, my interests, along with the interests of CLF and its donors, would be seriously harmed if this Court ruled in Plaintiffs' favor.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of November, 2022.

_____
Danielle Murray

# EXHIBIT 4

*DECLARATION OF P. DAVID POLLY IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS.<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; and UNITED STATES FOREST SERVICE,<br><br>*Defendants,* | Civil Action No. 4:22-cv-0060-DN<br><br>Judge David Nuffer<br><br><br>**DECLARATION OF P. DAVID POLLY IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS** |

## DECLARATION OF P. DAVID POLLY

I, P. David Polly, declare as follows:

1.     My name is P. David Polly. I am a member of the Society of Vertebrate Paleontology (the "Society" or "SVP"). I submit this Declaration on behalf of SVP in support of intervention in the above-captioned matter.

2.     I am a citizen of the United States and a resident of Indiana, where

I have lived for approximately 16 years.

3.      I am currently employed at Indiana University as a Professor in the Department of Earth and Atmospheric Sciences and have worked in this capacity since 2006. My job duties include research in paleontology and related fields, teaching, and service to the university.

4.      Prior to working at Indiana University, I worked at Queen Mary, University of London from 1997 to 2006; at the Natural History Museum in London from 1996 to 1997; at the University of Michigan-Ann Arbor from 1994 to 1996; at Genentech, Inc. in 1994; and at the University of California-Berkeley from 1988 to 1994.

5.      I received my Bachelor of Arts (Plan II Honors Program) from the University of Texas-Austin in 1987 and my PhD (Paleontology/Integrative Biology) from the University of California-Berkeley in 1993.

6.      I am a member of SVP and currently sit on the Government Affairs Committee. I became a member in 1987. I was a Board Member from 2014 to 2020 and served as Vice President from 2014 to 2016, President from 2016 to 2018, and Past President from 2018 to 2020 (and I served a separate term on the Board from 2005 to 2008).

7.      I am over the age of eighteen and am competent to testify. This Declaration is based on my personal knowledge and belief.

8.      SVP is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of California, and headquartered in McLean, Virginia. SVP has approximately 2,400 members as of September

2

2022. Members include both professional and avocational paleontologists.

9.      As set out in SVP's constitution, SVP's purpose is to advance the science of vertebrate paleontology and facilitate the cooperation of those concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds in which they are found. The Society also supports the discovery, conservation, and protection of vertebrate fossils and fossil sites.

10.      SVP has been advocating for decades to conserve public lands as a means of ensuring access to, and the protection of, paleontological resources. Beginning in 1991, SVP successfully argued against bills in the United States Senate that would have permitted the commercial collection of paleontological resources on public lands, and SVP continued to work with Congressional agencies to increase protections for vertebrate fossils. In 2009, SVP was instrumental in passing the Omnibus Public Land Management Act of 2009 and, in particular, the Paleontological Resources Preservation Act section of that bill.

11.      To advance vertebrate paleontology, the Society: organizes an annual international scientific conference for its members; periodically sponsors symposia at other scientific conferences; distributes merit-based grants, fellowships, and awards for paleontological research, artwork, and educational outreach; establishes professional standards for the collection and curation of fossils, for the management of paleontological data, and for the documentation of paleontological research; works with policymakers, lawmakers, and regulators in the United

3

States and around the world to establish regulatory and legal protection of scientifically-valuable fossil resources; publishes the Journal of Vertebrate Paleontology; and raises funds to support the aforementioned activities.

### The Grand Staircase-Escalante National Monument

12.     Consistent with its constitutional mission, SVP has long been involved in the protection of paleontological resources on the land constituting the Grand Staircase-Escalante National Monument ("Grand Staircase Monument"). In fact, members of SVP were among the original advocates for the creation of the Grand Staircase Monument in 1996. SVP and its members conduct extensive paleontological field work within Grand Staircase, and its members have been active in documenting the Grand Staircase Monument's fossil resources since before President Clinton designated the Monument in a 1996 proclamation. Indeed, the research conducted by SVP members is specifically mentioned in both President Clinton's and President Biden's Proclamations related to the Grand Staircase Monument.

13.     The lands included within Grand Staircase have a wealth of unique and valuable paleontological resources, including a Permian-through-Triassic sequence in the Grand Staircase area, a Late Cretaceous sequence on the Kaiparowits Plateau, and another Triassic and Jurassic sequence in the Circle Cliffs and Escalante Canyons areas. And a high proportion of the lands within Grand Staircase Monument also show high or very high potential fossil yield.

14.     The Society and its members have a scientific interest in Grand Staircase and actively work to enhance the scientific value and public

appreciation of the paleontological resources at Grand Staircase Monument. Approximately 10% of SVP's members, including me—and over 100 in total—have either actively engaged in long-term research at Grand Staircase Monument or have made short-term research visits for field trips or site visits. As of November 1, 2022, thirty-two SVP members had active paleontological research sites within the boundaries of the Monument, and other members are actively planning to conduct research there in the near future.

15.    Members of the Society visit and regularly conduct paleontological field research within Grand Staircase and rely on its designation to protect the paleontological and geological resources upon which their professional scientific and research work, educational endeavors, and careers depend. Furthermore, members choose the Grand Staircase Monument as a place for research because of its scientifically-important vertebrate fossils and because its national monument status provides for the permanent protection of the field sites, which in turn guarantees future access for purposes of verifying previous data and conclusions.

16.    Additionally, SVP members train students in paleontological field techniques, conduct educational field trips, and contribute to public educational exhibits at the Grand Staircase Monument. SVP featured paleontology from the Grand Staircase Monument at its 2016 Annual Meeting, where it also organized field trips for 40 members on the stratigraphy and paleontology of the Kaiparowits Plateau.

17.    The Society's members have been active in documenting the exceptional fossil resources at Grand Staircase Monument since 1996. Of the 56

authors of papers in a 2013 book about the paleontology of Grand Staircase Monument, 28 are SVP members or were members through large parts of their careers.[1] Similarly, 11 out of the 19 scientific papers about the paleontology of Grand Staircase Monument that were published in the last 12 months were authored by SVP members.

18.    On March 13, 2019, I testified before Congress regarding the Grand Staircase Monument's "profound impact on science," including the registration of over 2,000 vertebrate fossil specimens and the discovery of new fossil dinosaurs like the Lythronax, as well as fossil mammals, birds, lizards, snakes, plesiosaurs, fish, plants, and insects.[2] I also described how work at Grand Staircase Monument has informed our understanding of "how the Earth recovered from its largest extinction" and how Earth's "ecosystems became 'modern' because of the rise of flowering plants."

19.    In 2022, I wrote a paper for a journal called *Geological Curator* that explains the paleontological importance of the Grand Staircase Monument (as well as the Bears Ears Monument, as discussed below), the roles of SVP members in its scientific development, and the impacts of the Trump Proclamation's purported reduction of its boundaries. The paper will be published in December 2022.

---

[1] *See* AT THE TOP OF THE GRAND STAIRCASE: THE LATE CRETACEOUS OF SOUTHERN UTAH (Alan L. Titus and Mark A. Loewen, eds., Indiana University Press, 2013).

[2] Statement of P. David Polly, U.S. House Committee on Natural Resources (March 13, 2019), *available at* *https://naturalresources.house.gov/imo/media/doc/Polly,%20David%20-%20UPDATED%20Statement%20for%20the%20Record.pdf.*

20.     Serious vertebrate paleontological research on the lands that now make up the Grand Staircase Monument, as delineated in 1996, began with the work of Society members Jeff Eaton and Rich Ciffelli, who studied the Late Cretaceous microvertebrate faunas of the Kaiparowits Plateau starting in the early 1980s. The fossils they and their colleagues collected are curated at the University of Colorado, Oklahoma University, the Museum of Northern Arizona, and the Natural History Museum of Utah ("NHMU"), where they continue to be studied by Society members and, more broadly, by the international scientific community and interested members of the public. The next phase of research after the Grand Staircase Monument was established was surveying the entire property for vertebrate paleontological resources. SVP member Scott Sampson from the NHMU has conducted field research since around 2001 and member Joe Sertich from the Denver Museum has conducted field research for almost ten years. Other SVP members, such as Jacques Gautier and Marilyn Fox of Yale University, have also conducted research in the Triassic units, which led to the discovery of the most complete Poposaurus skeleton known to date (material that sheds light on the origin of dinosaurs).

21.     SVP has consistently opposed recent efforts to reduce the boundaries of Grand Staircase. Specifically, it opposed the monument review process that began in April 2017 and culminated in President Trump's December 4, 2017 Proclamation purporting to reduce the size of the Grand Staircase Monument by

approximately half.[3] SVP then filed suit against the President challenging the Proclamation, litigation which continues to this day. While this lawsuit was ongoing, SVP submitted comments opposing the new resource management plan which flowed from and sought to implement the reduction in protections engendered by the Trump Proclamation.

### SVP's Injury As To The Grand Staircase Monument

22.     The Plaintiffs' theories in this case threaten the unique paleontological resources found within Grand Staircase, as well as the interests of SVP and its members in discovering, researching, and educating the public about those resources.

23.     According to the Bureau of Land Management's ("BLM's") own count, over 1,400 scientifically important fossil sites were excluded by former President Trump's 2017 Proclamation. Plaintiffs seek an even more significant reduction of the Grand Staircase Monument's boundaries, which could result in more than 2,700 fossil sites being excluded if the entire Monument were rescinded.[4]

24.     Following the Trump Proclamation, I observed the difficulties SVP members encountered when conducting paleontological research on the lands purportedly excluded by the Proclamation. Projects on active research sites that had previously been within Grand Staircase Monument's boundaries were suspended because of increased risks to the integrity and quality of the projects

---

[3] *See* Comments from Society of Vertebrate Paleontology, DOI-2017-0002-100908 (filed May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-100908 (follow Attachment "PDF" hyperlink at bottom of page) (last visited Nov. 7, 2019).

[4] *See* Exhibit E.

posed by increased ATV and vehicle use and other ground-disturbing activities. Granting the relief Plaintiffs request would likewise hamper the Society's research efforts, although likely to a greater degree.

25.     Moreover, if Plaintiffs are successful, SVP is gravely concerned about an increase in private mining activities on excluded lands. Should Grand Staircase's monument status be revoked, private individuals and corporations could, without prior notice or authorization, enter open public lands and use hand tools or portable suction dredges to collect rock, soil, and mineral species. These activities may permanently damage or destroy the unique paleontological resources that are now protected by President Biden's proclamation.

26.     Indeed, following the Trump Proclamation, the lands purportedly excluded from the Grand Staircase Monument were opened to mining and other resource extraction activities, as well as other ground disturbing activities. In just the period between February 2018 and November 2019, 16 mining claims were filed on purportedly excluded lands.

27.     For instance, mining operations began at a claim called "Creamsicle" during this period, as a local mining company called Penney's Gemstones sought to quarry the area for alabaster. BLM's own data show that the areas Penney's Gemstones mined have either "moderate" or "high" potential to contain paleontological resources that may be adversely affected by surface-disturbing activities.[5]

---

[5] *See* Bureau of Land Mgmt., Potential Fossil Yield Classification System 3 (July 8, 2016), *available at* https://www.blm.gov/sites/blm.gov/files/uploads/IM2016-124_att1.pdf.

28.     As a scientist and leader of SVP, I am concerned that, if Plaintiffs are successful, similar mining and other ground-disturbing activities will ensue and irreplaceable paleontological resources will be lost as a result.

29.     Changes in the boundaries or management of the Grand Staircase Monument also risk loss of funding to SVP members' research projects. Funding is currently available to SVP members and their collaborators through BLM's National Conservation Lands Scientific Studies ("NCLS") support program and other BLM funding sources. These funds support inventory surveys and other scientific research at the Grand Staircase Monument. Funds from the NCLS program are therefore available to support the costs of preparation, curation, and storage at approved research repositories. The proposed boundary changes will make valuable fossil sites ineligible for these and other funds, which will in turn impact the ability of SVP's members to conduct research.

30.     SVP members also risk loss of funding from sources other than BLM. The priority BLM currently places on the conservation and protection of paleontological resources, particularly on the Kaiparowits Plateau, allows SVP members to apply for grants for long-term projects that require assurances that paleontological sites will continue to be preserved and monitored. Any change to the Grand Staircase Monument that risks harm to its paleontological resources will diminish Grand Staircase's status as land dedicated to important scientific discovery and will impede SVP members from obtaining grant funding.

31.     Paleontological research at the Grand Staircase Monument is ongoing, and there is abundant evidence to indicate that it will continue to yield

scientifically-important results well into the future. To this day, researchers are making new discoveries at rates that indicate that the full inventory of the fossil taxa preserved at the Grand Staircase Monument has not yet been recovered. In scientific terms, this is referred to as the "steep side of the collection curve."  A "collection curve" is a statistical way of looking at the number of taxa sampled relative to the amount of effort expended to recover them in the field. When researchers first study a new area, the number of new discoveries is large relative to the amount of time expended. As research continues, however, new discoveries become more rare. At Grand Staircase, researchers are still in the first phase of this "curve," which means that important scientific work should continue for decades or centuries in those areas, assuming the existence of the protective regime that Grand Staircase Monument affords. Such work is jeopardized in those areas without this protective regime.

32.     Continued monument status is also critical to the Society because it allows researchers to apply new methods and technologies old, well-studied sites. Monument status affords protections that preserve sensitive sites over long periods of time, and the policy governing scientific work at the Grand Staircase Monument has played an essential role in advancing research. For example, Daigo Yamamura of the University of Arkansas recently studied the paleoenvironment and paleoclimate of the Late Cretaceous era using new stable isotope analytic techniques. His research was based on earlier collections housed at the NHMU, which he then verified by sampling sediments from the original sites at the Grand Staircase Monument. He was able to carry out this research

because of the precise locality information available for the previously-collected specimens, which is mandated by the Grand Staircase Monument's scientific work policy, and because he was able to revisit the same sites, which remained intact. Similarly, SVP member Eric Roberts has been able to develop a refined chronology for the geological units at the Grand Staircase Monument by applying new uranium-lead dating techniques at the sites where the original stratigraphic framework was developed. Elimination of extensive areas of Grand Staircase's protections will irreparably harm the ability of Society members to perform paleontological research in the area.

33.     Because the exceptional paleontological resources were objects specifically protected under the Clinton Proclamation, preservation of those resources is prioritized over many other potentially conflicting uses of the land. Members of the Society rely on the fact of permanent protection to secure financial resources necessary to conduct research, as grant distributors are unwilling to support projects whose resources may be compromised, or whose sites may be altered or rendered inaccessible over time. The special status of paleontological resources also justifies employing professional paleontological staff at the Grand Staircase Monument who coordinate activities among research groups and organize protection efforts. Finally, national monument status ensures broad access by the scientific community and the interested public to Grand Staircase's fossils and their associated data.

34.     All of these features enhance the quality of research Society members conduct. Society members' current and future use and enjoyment of

these areas are therefore integrally intertwined with the Grand Staircase Monument's sensitive resources, and its fossil resources in particular, and are affected by the condition of the areas and the delineation and effectiveness of its resource protections. Furthermore, the Society's broader educational mission to inculcate an appreciation for paleontology among amateur scientists and the general public would be harmed if the Plaintiffs are successful in removing monument protections from the lands that constitute Grand Staircase.

35.    SVP has a keen interest in protecting the President's powers under the Antiquities Act and in preserving President Biden's 2021 proclamation reestablishing the boundaries of Grand Staircase Monument.

36.    My interests, along with the interests of SVP and its other members around the country, would therefore be seriously harmed if this Court ruled in Plaintiffs' favor.

**The Bears Ears National Monument**

37.    SVP and its members, including myself, have also devoted substantial time and resources to protect paleontological resources within the Bears Ears National Monument ("Bears Ears Monument") . SVP has focused its advocacy efforts on recognizing paleontology as a value to be protected by the Bears Ears Monument's designation. Through our experiences with the designation of Grand Staircase Monument, SVP learned that recognition prompts federal agencies to prioritize paleontological research over other uses of the land, and enhances funding opportunities for our members to conduct research through the BLM's National Landscape Conservation System.

13

38.     On November 16, 2016 in my capacity as President of SVP, I submitted a letter on behalf of SVP to the President of the United States, the Secretary of the Interior, the Director of the BLM and the Secretary of Agriculture urging them to establish the Bears Ears Monument in order to protect paleontological resources.[6]  Language from our letter appeared in President Obama's 2016 proclamation establishing the Bears Ears Monument.

39.     More recently, I submitted comment letters, dated May 25[7] and July 9[8] of 2017, urging that the original boundaries of the Bears Ears Monument be expanded and highlighting the importance of the protections provided by the Bears Ears Monument status. And on November 14, 2018, I submitted comments on behalf of SVP to the BLM and the U.S. Forest Service regarding the draft Bears Ears Monument Management Plan and Environmental Impact Statement for the Shash Jáa and Indian Creek units of the Bears Ears Monument. And on October 31, 2022 I submitted comments on behalf of SVP to the BLM on scoping for a revised Bears Ears Monument Management Plan and Environmental Impact Statement for the restored Bears Ears Monument, including nomination of a new Area of Critical Environmental Concern in Johns Canyon in the southern part of the monument that had been excluded by the Trump administration to

---

[6] A true and correct copy of this letter is attached as Exhibit A.

[7] A true and correct copy of this letter is available at https://www.regulations.gov/document?D=DOI-2017-0002-100908 (follow Attachment "PDF" hyperlink at bottom of page).

[8] A true and correct copy of this letter is available at https://www.regulations.gov/document?D=DOI-2017-0002-655559 (follow Attachment "PDF" hyperlink at bottom of page).

conserve newly discovered Paleozoic sites.

40.     Since December 2017, when President Trump issued a Proclamation dramatically reducing the size of Bears Ears Monument, SVP has devoted additional time and resources to organizing public events related to educating the public and public officials on the effects of the Trump Proclamation on paleontological science. For instance, on March 13, 2019, I testified before the U.S. House Committee on Natural Resources to highlight the paleontological effects of improper alteration of national monuments, including the Bears Ears Monument.

41.     In December 2017, following the announcement of the Trump Proclamation dramatically reducing the size of Bears Ears Monument, SVP joined Utah Diné Bikéyah, Friends of Cedar Mesa, Archaeology Southwest, Conservation Lands Foundation, Inc., Patagonia Works, The Access Fund, and the National Trust for Historic Preservation as plaintiffs in a lawsuit filed in the United States District Court for the District of Columbia challenging the Trump Proclamation. That lawsuit alleged that the Trump Proclamation exceeded the President's authority under the Antiquities Act, and sought a declaration that the Trump Proclamation was unlawful. SVP, along with its partner organizations, has been part of that litigation for nearly four years. That litigation is still pending in the District of Columbia.

42.     Since November 2018, I have made presentations on behalf of SVP in Bloomington, Indiana; Indianapolis, Indiana; Belfast, Maine; Riverside, California; Austin, Texas; Brisbane, Australia; Storrs, Connecticut; and New

15

Haven, Connecticut and have talked to reporters from *Nature*, *Science*, the BBC, Associated Press, *Sierra Sun Times*, *Salt Lake Tribune*, and *Washington Post* to educate the public on the numerous effects of funding cuts to paleontological science.

43.     In collaboration with the BLM, SVP members have also participated in educational outreach activities regarding the quality of paleontological research at Bears Ears Monument before and after its designation. Several highly fossiliferous areas, each with many individual sites, including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods, were originally within the boundaries of the Bears Ears Monument as designated by President Obama and President Biden, but were stripped of monument protection by the Trump Proclamation. SVP members, including myself, have undertaken educational outreach efforts to highlight the harms to paleontological research stemming from the removal of monument protections from the land.

44.     SVP members also regularly visit Bears Ears Monument to conduct research on paleontological resources within the boundaries set forth in the Biden Proclamation. SVP members have also published extensively on paleontological research within that area. As of November, 2022 there are 21 SVP members with active projects in Bears Ears Monument and another 5 who are planning projects in the near future. I use paleontological and geological data from the Bears Ears Monument regularly in my research and teaching, especially from the Valley of the Gods and Grand Gulch areas.

16

45.     There are a number of fascinating and paleontologically important sites in the Bears Ears area, but four recent discoveries stand out in my mind as the most important and emblematic of this area's great potential. The first is the aptly named "Hills Have Teeth," where SVP members have discovered hundreds of fossils of reptile teeth so far. The site is the most productive and diverse Triassic microvertebrate site in the state of Utah—and very likely one of the top ten most productive and diverse sites nationwide from this time period. Another major finding from the region is a collection of some the oldest footprints ever discovered in the southwestern part of the country. These footprints represent some of the northernmost occurrences we have seen of the phytosaur trace *Apatopus*, and the aetosaur trace *Brachycheirotherium* in the United States. Third, in 2017, by White Canyon, at the far western edge of the Bears Ears Monument boundary as designated by the Biden Proclamation, we discovered a site containing several large, unidentified, enigmatic bones. As discussed below, this site was discovered as the result of research being conducted with funding from a federal grant under the BLM's NCLS program, which SVP members were able to apply to this area while it was contained in the boundaries of the Bears Ears Monument. We cannot yet tell what kind of animal the bones belonged to because it has not been fully excavated, but this is a prime area for further exploration and research. Finally, in the 2016 field season, we discovered what is likely the most important Triassic fossil site in the state of Utah, known as P2N. This site is nearly sixty-three meters square—one of the largest in the world from this age—and incredibly dense with rare paleontological resources. The site was looted several years before the Bears

17

Ears Monument was declared, and the looters removed the skull of an animal known as a phytosaur. This type of phytosaur, *Pravusuchus*, was only first described in 2010 and has only been previously reported from several skull fragments in Arizona. This location represents the only known complete skeletons from this animal. Only recently was this missing piece rediscovered and reunited with the rest of the animal, now housed at the NHMU. This site represents the opportunity for completely new scientific discoveries—things which we may never see again unless the site is adequately protected. There are decades of research to do before this site has been fully explored.

46.    Equally important as the fossils themselves is the geological context in which they sit. The rocks and other formations that surround a given fossil allow paleontologists to understand the world in which the creature once lived—its rainfall, temperature, and climate. Further, one of the most important ways to understand the biological, climatological, and environmental context of large vertebrate-paleontological sites is through the existence of invertebrate and plant fossils found at the site. Thus, without protection for the geological context and invertebrate and plant fossils throughout the Bears Ears region, we will miss out on so much we could learn from the rich and unique paleontological resources on site.

## SVP's Injury As To Bears Ears

47.    The Trump Proclamation harmed the paleontological research conducted by SVP's members in the Bears Ears Monument. As noted, the Trump Proclamation

18

stripped the Bears Ears Monument protection from several areas with large quantities of fossils, including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods. The White Canyon site and P2N also fell outside of the boundaries of the Bears Ears Monument as designated by President Trump.

48.   The removal of monument protections from these lands posed a direct threat to the research SVP's members conducted. Casual collection of paleontological objects was prohibited in these areas when they were part of Bears Ears Monument, but was no longer prohibited following the Trump Proclamation because casual collection is permitted on non-monument lands. Such collection frequently destroys the geological context of the surrounding area and harms paleontological research and resources. As noted, plant and invertebrate fossils provide important contextual information because they allow paleontologists to understand the world—the time period, the climate, the environment, and the biological context—in which the creature once lived. Casual collection activities often results in the removal of these plants and fossils from the land, and thereby decreases the amount of information that can be gathered from a particular fossil site. Casual collection can be incredibly damaging if it is allowed to persist. Over time, if uninterrupted, casual collection could lead to the depletion of the paleontological resources found within the Bears Ears Monument as individuals remove such items from the Bears Ears Monument. In the past, for example, casual collection has led to the depletion of resources at some of the richest paleontological

sites in the country.[9]  I fear that, if casual collection is allowed to continue, the resources that make Bears Ears so noteworthy may similarly be threatened.

49.   Several sites continue to be at high risk. The Butler Wash track site was literally cut in half by the boundary line of Trump's reduced monument, with half of the trackways remaining inside the monument and the other half outside. This site is well known to hikers and tourists and is easily accessible from the road from Blanding. Damage is frequent, sometimes caused with innocent intention by passers-by who wish to make plaster casts of footprints, so an information sign has been erected to educate visitors about responsible stewardship, as well as about the tracks themselves. A trackway at Shay Canyon, which is also easily accessible from the road and widely advertised on outdoor sites, has been heavily damaged and perhaps entirely destroyed since President Trump enacted his changes in management. The entirety of Bears Ears contains similarly valuable paleontological resources, many of which are probably suffering similar damage that is as yet undetected because of the lack of systematic surveying and monitoring that should have been put into place after the Bears Ears Monument was established in 2016.

50.   President Trump's actions also directly and negatively affected both SVP as an organization and SVP's members, including myself. As a result of President Trump's actions, SVP diverted the time and resources of its leadership and members to participate in educational outreach efforts about the effects of the Bears

---

[9] *See* Vincent Santucci & Cassi Knight, *Fossil Cycad National Monument*, Nat'l Park Service, https://www.nps.gov/articles/fossil-cycad-national-monument.htm (last visited Nov. 9, 2021).

Ears Monument reduction to paleontological research. At a minimum, I have spent 975.5 hours addressing issues related to the Bears Ears and Grand Staircase Monuments since the Trump Proclamation, and at least three others in the organization have devoted at least 200 hours each to those issues. If not for the Trump Proclamation, the time spent on these issues would have been dedicated to other efforts.

51.   President Trump's actions also impaired SVP's ability to educate the public about paleontological resources by reducing the ability of SVP members to design, obtain funding for, receive support during, and publish on research conducted in the areas excised from the Bears Ears Monument by the Trump Proclamation. Indeed, the Trump Proclamation hindered the ability of SVP members to obtain funding and other support to continue their research and discovery of scientifically important objects within the areas excluded by the Trump Proclamation.

52.   Most notably, SVP's members were no longer able to take advantage of funding from the NCLS program in the areas excluded from the Bears Ears Monument by the Trump Proclamation. This funding is only available for work on lands in the National Landscape Conservation System. The areas excluded from the Bears Ears Monument by the Trump Proclamation, however, were also excluded from the National Landscape Conservation System. As discussed above, NCLS funding is often critical to SVP members' ability to perform their research, and the inability to acquire this funding directly harmed the ability of SVP's members to continue their paleontological work in the excised areas.

21

53.   Not only did the Trump Proclamation make it more difficult to conduct research on site in the future, but it also eliminated critical funding streams important to research by SVP members that was already underway at the time the Trump Proclamation entered into effect.

54.   By revoking the Bears Ears Monument, President Trump made the White Canyon and P2N sites, as well as many of the richest and most important sites in the area, ineligible for additional NCLS funds.

55.   For example, in 2017, a member of SVP, Robert Gay, applied for an NCLS grant through the Museum of Western Colorado to conduct work within the area protected by the Obama Proclamation. The Museum of Western Colorado received a May 2, 2017 letter from the Department of the Interior indicating that the grant had been awarded and the application accepted based upon Mr. Gay's submitted terms. The award was made to the Museum of Western Colorado, which served as the fiscal agent for the grant.[10]  The grant became effective on April 24, 2017, and could be used for work performed through April 30, 2022, as detailed in the grant and cooperative agreement. The terms of the grant reward expressly limited Gay's field work to the boundaries of the Bears Ears Monument.[11]  Mr. Gay worked under this grant beginning in the summer of 2017. An October 3, 2018 federal financial support submitted by Erik Vlick of the Museum of Western Colorado indicated that the grant was an NCLS grant.[12]  Mr. Gay had planned to

---

[10] A true and correct copy of this award letter is attached as Exhibit B.

[11] A true and correct copy of this agreement is attached as Exhibit C.

[12] A true and correct copy of this report is attached as Exhibit D.

use the grant and matching funds to continue excavations in White Canyon and P2N during 2018.

56.   Following the Trump Proclamation, however, Mr. Gay did not conduct any additional research or excavation at the White Canyon site and instead focused his work on different areas included within the new monument units designated by President Trump. Further, NCLS funding had been, by a significant margin, his most important source of funding for several years prior to the Trump Proclamation. Mr. Gay's grant money was exhausted by the end of 2018, and he was not able to apply for additional NCLS funding to further his research at P2N and the White Canyon site, which he previously had concrete intentions of doing.

57.   Mr. Gay was not alone. At least 22 SVP members had ongoing research interests in the areas that were excluded from the Bears Ears Monument by the Trump Proclamation. Approximately forty percent of the currently known paleontological sites of scientific importance at Bears Ears were removed from the Bears Ears Monument by the Trump Proclamation. These SVP members were no longer eligible for research funding from National Landscape Conservation System for work at these or other sites that were excluded from the Bears Ears Monument. Indeed, while the Trump Proclamation remained in effect, the reduction of funding available to them for research in the Bears Ears Monument areas meant that the research could not ramp up in the way SVP members intended. As a result, this research was less fruitful and yielded less scientific value than it would have been had these lands continued to be part of the Bears Ears Monument. The combined effects of these changes made it more difficult for many SVP members, including

23

Mr. Gay, to design new research, obtain grant funding for that research, and to complete the research by archiving fossil specimens and publishing papers.

58.   Other researchers abandoned their focus on Bears Ears altogether due to the Trump Proclamation. For example, one SVP member conducted research in the Bears Ears area as part of her PhD program, and planned to continue her work as the paleontological manager for the Bears Ears Monument once a scientific management plan was in place. Due to the Trump Proclamation, however, no such scientific management plan was developed, and this researcher has been forced to focus her research elsewhere even though she would like to return her focus to Bears Ears. Other paleology researchers have either left the field entirely or shifted their attention away from Bears Ears land management issues, at least in part due to the Trump Proclamation and the challenges it posed for protecting the Monument.

59.   President Trump's actions also affected SVP members' ability to obtain funding from non-BLM sources. Private foundations and institutional grantors are more willing to fund research in lands that have been granted national monument status. This is due at least in part to the protections national monument status provides. Without a guarantee that the paleontological resources for which funding has been made available will be protected and preserved throughout the project, funders are less willing to invest in our research.

60.   President Trump's actions affected Mr. Gay's ability to obtain funding for proposed projects from non-BLM sources. In November of 2017, in the lead up to

the Trump Proclamation, Mr. Gay was denied a funding grant from Canyonlands Natural History Association to draft a visitor's guide to paleontological resources within the Bears Ears Monument. The idea behind the project was to produce an accessible public-audience book about the paleontology of the Bears Ears area to help promote education and preservation. The Association informed Mr. Gay that while the project sounded interesting, they did not want to fund it at that time due to the controversy surrounding the Bears Ears Monument.

61.   Ultimately, President Trump's action revoking monument status for many of the areas where Mr. Gay and other SVP-members focus their research diminished the number and size of grants provided by non-profit and scientific institutions, which in turn affected the number of researchers they can support. And as described above, the Trump Proclamation made many of the areas in which SVP conducts research ineligible for additional NCLS funding. Without funding from either private sources or the BLM, SVP's work had to stop at some of the country's greatest paleontological sites, whose resources went undiscovered and unappreciated.

62.   Moreover, in light of the Trump Proclamation, the specialized management structures that had been placed across the entire Bears Ears Monument under the original Obama Proclamation were limited to the Shash Jáa and Indian Creek units. Monument managers often provide crucial information regarding recent activity in a monument area, and they also have scientific expertise. SVP-members' research in the areas excised from the Bears Ears Monument by the Trump Proclamation suffered because SVP members could not

take advantage of these resources in those areas.

63.    If Plaintiffs prevail in their lawsuit challenging the Biden Proclamation, SVP would experience many of the same harms it suffered after the Trump Proclamation dramatically reduced the size of the Bears Ears Monument. Should Plaintiffs win their lawsuit, the protections conferred by the Biden Proclamation would likely disappear, exposing SVP to the same harms to its interests that it experienced following the Trump Proclamation. Indeed, because Plaintiffs appear to argue that even the Trump Proclamation was unlawful, SVP would suffer even more substantial harm if Plaintiffs' succeeded that it suffered following the Trump Proclamation.

64.    Specifically, if Plaintiffs prevail, highly fossiliferous areas—including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods—may once again lose monument protection. Important paleontological sites such as White Canyon and P2N would also lose monument protection. As a result, casual collection of paleontological objects in these areas would no longer be prohibited. That threatens the paleontological research of SVP's members, as such collection often destroys the geological context of the surrounding areas and thereby harms paleontological research and resources.

65.    Plaintiffs' lawsuit and the Trump Proclamation asserted that these sites are adequately protected by the Paleontological Resources Preservation Act of 2009, but that statute merely makes collecting vertebrate fossils illegal without a scientific permit, it does not prioritize paleontological resources over competing uses, it does not make them eligible for National Conservation Lands funding, and

26

it permits the casual collection of plant and invertebrate fossils which risks destroying the context of scientifically important vertebrate sites like those in Bears Ears.

66.   Plaintiffs' lawsuit, if successful, would also force SVP to divert the time and resources of its leadership and members to participate in educational outreach efforts regarding the effects of monument reduction on paleontological research, much as SVP did following the Trump Proclamation. And it would once again impair SVP's ability to educate the public about the rich paleontological resources in the region by reducing the ability of SVP members to design, obtain funding for, and public research in the areas that are now protected by the Biden Proclamation but that were not protected under the Trump Proclamation.

67.   If Plaintiffs prevail in their lawsuit challenging the Biden Proclamation, SVP's members would no longer be able to take advantage of funding from the NCLS in the areas that are no longer part of the Bears Ears Monument, directly harming the ability of SVP's members to continue their paleontological work in lands that would no longer be protected by the Biden Proclamation.

68.   Indeed, because BLM's NCLS grant program is an important source of funding for studying paleontological resources on public lands that have received monument protection, that study enhances the value of these resource for the American public. Almost all of the paleontologists working in the Bears Ears area are SVP members. Teams from Utah are planning research in the northern Lockhart Basin part of the monument, teams from Colorado in the western White Canyon area, and teams from California in the southern Valley of the Gods regions.

Therefore, Plaintiffs' lawsuit threatens the ability of SVP's members to conduct their research, and it erodes the value of the unique paleontological resources that are currently protected by the Biden Proclamation but that were not protected under the Trump Proclamation. Much as was true while the Trump Proclamation was in effect, the scale of research by SVP members and the coordination of their research efforts would again be affected in the areas that lose monument protection in the event that Plaintiffs' lawsuit is successful.

69.   If Plaintiffs prevail, that will also affect the ability of SVP's members to obtain funding from non-BLM sources, such as private foundations and institutional grantors. As SVP members found following the Trump Proclamation, these non-BLM sources are more willing to fund research in lands that have national monument status, and less willing to fund research when there is controversy or uncertainty surrounding the monument's status. Thus, Plaintiffs' lawsuit, if successful, would likely reduce the availability of funding from these sources.

70.   Plaintiffs' lawsuit, if successful, would also deprive SVP's members of the benefit of specialist BLM monument managers who can proactively survey for scientifically important paleontological resources, recruit researchers to study those resources, and coordinate the synthesis and interpretation of the findings made by all of the researchers who work there. Those resources are available only on monument lands. If Plaintiffs prevail, the research of SVP members would suffer in the areas that are no longer protected by the Biden Proclamation, as SVP members could no longer take advantage of these BLM resources in those areas.

28

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd of November, 2022.

P. David Polly

**EXHIBIT A**



**Society of Vertebrate Paleontology**

9650 Rockville Pike • Bethesda, MD
20814-3998 Phone: (301) 634-7814 •
Fax: (301) 634-7455
Email: svp@vertpaleo.org • Web:
www.vertpaleo.org FEIN: 06-0906643

16 November 2016

**Subject: Protect paleontological resources at Bears Ears and Indian Creek**

To the President of the United States of America, the Secretary of the Interior, Director
of the Bureau of Land Management, the Secretary of Agriculture, and Chief of the Forest
Service:

We are writing as the Executive Officers of the Society of Vertebrate Paleontology
(SVP), a nonprofit scientific organization with over 2,000 professionals, amateurs, and
students worldwide (http://www.vertpaleo.org ), about the Bears Ears and Indian Creek
areas in of Utah, which have been proposed to be designated as either a National
Monument designated by the U.S. President (http://www.bearsearscoalition.org/ ) or
two National Conservation Areas through a proposed congressional bill (Utah Public
Lands Initiative: http://www.utahpli.com/ ).

Our Society welcomes either solution because both would help protect another important
national heritage resource that is not yet mentioned in the proposals: the world-class
fossils and fossil sites (= paleontological resources) in the Bears Ears and Indian Creek
areas. These public lands contain scientifically important fossil resources that are only
now beginning to be studied, some of which are in danger of being lost to the nation and
to the science through piecemeal sale of state and private land. We hope that the entire
area can be brought under the Paleontological Resources Preservation Act (PRPA),
which is part of the Omnibus Public Land Management Act of 2009 (Public Law 111-011.
P.L. 111-011, Title VI, Subtitle D on Paleontological Resources Preservation; 123 Stat.
1172; 16 U.S.C. 470aaa).

We are especially concerned that the importance of paleontological resources be
mentioned in the acts that establish protective status for Bears Ears and Indian Creek.
Like cultural and archaeological heritage, paleontological resources from the Bears
Ears and Indian Creek areas are exceptionally important and must be carefully
managed for both the protection of the fossil sites and legal study and collection by
qualified scientists for research, preservation, and education. Many vertebrate fossil

discoveries already made in the area are the only examples of their kind in the country or the world, including new species of extinct fish, amphibians, mammal-relatives, and reptiles. Researchers from the Smithsonian Institution have also uncovered important plant fossils from the same areas. Collectively these data provide critical information about the history of North America that are not available anywhere but Bears Ears and Indian Creek.

Much of the area is already on Department of Interior or USDA Forest Service land, and therefore will be covered by the protections provided for paleontological resources in PRPA. However, paleontological research at Bears Ears and Indian Creek has already demonstrated the scientific importance of the fossil resources there, and we are concerned that its absence in the proposals might place paleontological research in low priority relative to other uses. We therefore urge you to add paleontological resources to the language of any founding act that might be adopted as an important reason why these areas are being protected.

The nearby Grand Staircase-Escalante National Monument serves as a model for how such language has positively affected fossil resources. The Monument has produced many world class fossils, which are now in public trust for preservation, research, and education purposes, in large part because the importance of the paleontological resources was emphasized in the founding Presidential executive order. We request that a similar set of provisions to protect paleontological resources of the Bear Ears and Indian Creek areas must be included regardless of the type of national designation.

Appended to this letter is a paragraph about the paleontological resources of Bears Ears and Indian Creek that could be inserted into an act of preservation. If needed, SVP would be happy to provide any additional information pertaining this matter.

Sincerely yours,

P. David Polly
President, The Society of
Vertebrate Paleontology

Emily J. Rayfield
Vice President, The Society of
Vertebrate Paleontology

John A. Long
Past President, The Society of
Vertebrate Paleontology

*Suggested wording for act of preservation*

The [*National Monument/National Conservation Area*] includes world-class paleontological resources. The Valley of the Gods area includes some of the earliest vertebrates to walk on land in America, as well as exquisitely preserved leaf fossils and petrified wood. Cedar Mesa exposes strange burrows from early mammal relatives that are still poorly understood. Fossil evidence exposed along the Honaker Trail provides evidence that this arid landscape was once part of a thriving coral reef during the Pennsylvanian Period. Red Canyon, Elk Ridge, the Bears Ears, Comb Ridge, and Indian Creek preserve one of the most extensive records of the Triassic Period, the beginning of the "Age of Dinosaurs." Fossils from the Moenkopi Formation at Indian Creek provides evidence for the ecology of the large carnivorous amphibians called mastodontosaouroids, and the geologically younger Chinle Formation has produced fossil plants, crayfish and their burrows, and a variety of extinct amphibians and reptiles, such as metoposaurs, phytosaurs, crocodylomorphs, and dinosaurs. The Wingate, Kayenta, and Navajo Formations contain one of the best records of the Triassic-Jurassic transition anywhere in the world, providing crucial information for paleontologists seeking to understand how dinosaurs came to dominate terrestrial ecosystems during the Mesozoic Era.

**EXHIBIT B**



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Utah State Office



May 2, 2017

(ii)      **In Reply Refer To:**

1511 (UT-952)

Museum of Western Colorado Attn:
Peter Booth
462 UTE
Grand Junction, CO 81501-2516

Subject:              BLM-UT, Survey of Paleontological Resource of the Bears Ears National
Monument Financial Assistance Funding Opportunity No. L17AS00001

Dear Mr. Booth,

Congratulations! Enclosed is a copy of Cooperative Agreement No. L17AC00057 awarded in
response to your application for Federal Financial Assistance under the subject opportunity.
Acceptance of a financial assistance award from the Bureau of Land Management (BLM)
carries with it the responsibility to be aware of and comply with the terms and conditions of
award.
Acceptance is defined as the start of work, drawing down of funds, or accepting the award
via electronic means. Awards are based on the application submitted to, and as approved by
the BLM and are subject to the terms and conditions incorporated therein either directly or
by reference.

Please carefully read the entire agreement and take special note of the performance goals and
measures, the period of performance, the payment process, the reporting requirements and
due dates, and any Special Terms & Conditions. Periodic submission of Financial Reports (SF-
425), Performance Reports, and Youth Employment Reports are required under the Terms
and Conditions of this agreement. Please contact your BLM Program Officer (PO) with any
questions (contact information is listed on the award cover sheet).

Sincerely,

Melanie Beckstead
Grants Management Officer

Enclosures:              Cooperative Agreement

cc:              BLM Program Officer (PO)

**EXHIBIT C**

| **Grant and Cooperative Agreement** | | | | CHOOSE ONE: ☐ X ☐ COOPERATIVE AGREEMENT GRANT |
|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | |

| CHOOSE ONE: | EDUCATION | FACILITIES | RESEARCH | SDCR | TRAINING |
|---|---|---|---|---|---|

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER L17AC00057 | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE 04/24/2017 | 4. COMPLETION DATE |
|---|---|---|---|

| 5. ISSUED TO NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip) MUSEUM OF WESTERN COLORADO Attn: ATTN GOVERNMENT POC<br><br>462 UTE<br>GRAND JUNCTION CO 81501-2516 | 6. ISSUED BY     BLM UT-STATE OFC ADM SVCS BR(UT952)<br>**Mailing Address:** 440 WEST 200 SOUTH, SUITE 500 SALT LAKE CITY UT 84101 |
|---|---|
| **7. TAXPAYER IDENTIFICATION NO. (TIN)** | 9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*)<br>Peter Booth, 970-242-0971 |
| 8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO. 3L7F9 | pbooth@westcomuseum.org |

10. RESEARCH, PROJECT OR PROGRAM TITLE
BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

11. PURPOSE
See Schedule

12. PERIOD OF PERFORMANCE (*Approximately*)
04/24/2017 through 04/30/2022

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $24,871.00 | THIS ACTION | $24,871.00 |
| CASH SHARE | $0.00 | **TOTAL** | $24,871.00 |
| NON-CASH SHARE | $0.00 | | |
| RECIPIENT SHARE | $142,912.00 | ☐ | ☐ |
| ☐   **TOTAL** | $24,871.00 | ☐ | |

14. ACCOUNTING AND APPROPRIATION DATA
01

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| 0020123237 | | | |

## 15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | ReBecca Hunt Foster | | 435-259-2179 | rhuntfoster@blm.gov |
| NEGOTIATOR | | | | |
| ADMINISTRATOR | Melanie Beckstead | | (801) 539-4169 | mbeckstead@blm.gov |
| PAYMENTS | | | | |

## 16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :

Federal Land Policy and Management Act of 1976 (FLPMA), 43 USC 1737, PL 94-579, as amended. Section

| 17. APPLICABLE STATEMENT(S), IF CHECKED: | 18. APPLICABLE ENCLOSURE(S), IF CHECKED: |
|---|---|
| NO CHANGE IS MADE TO EXISTING PROVISIONS | PROVISIONS        SPECIAL CONDITIONS |
| FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT | REQUIRED PUBLICATIONS AND REPORTS |

| **UNITED STATES OF AMERICA** | **COOPERATIVE AGREEMENT RECIPIENT** | |
|---|---|---|
| CONTRACTING/GRANT OFFICER        DATE | AUTHORIZED REPRESENTATIVE | DATE |
| Melanie Beckstead | | |

| **Grant and Cooperative Agreement** | | | | | |
|---|---|---|---|---|---|
| | | | | ESTIMATED COST | |
| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |

CFDA Number:        15.224

DUNS Number:        086342235

Funding Opportunity Number:

L17AS00001 Required Cost

Sharing/Matching: None Indirect Cost

Rate: 8.8%

Required Periodic Status Reporting

Performance Reports: Annual

SF425 Financial Reports: Quarterly

E-mail Reports To:

BLM_UT_Financial_Assistance@blm.gov

Refer to Attachment No. 1 for Award Terms and

Conditions

11. PURPOSE:

This cooperative agreement is made and entered
into by the Department of the Interior, Bureau of
Land Management, the Utah State Office (BLM),
and Museums of Western Colorado, the recipient,
for the purpose of the BLM Utah Survey of
Paleontological Resources of the Bears Ears
National Monument project, transferring
something of value to the recipient to carry out a
public purpose of support or stimulation
authorized by a law of the United States.
Acceptance of a Federal Financial Assistance
award from the Department of the Interior (DOI)
carries with it the responsibility to be aware of
and comply with the terms and conditions of
award.  Acceptance is defined as the start of
work, drawing down funds, or accepting the
award via electronic means.

BLM substantial involvement by the BLM

Program Officer (PO) will be collaborate with the

| Recipient to manage all stages of project development, implementation, and evaluation. Responsibility for project management, control, Continued ... | | | | | |
|---|---|---|---|---|---|

| | **Grant and Cooperative Agreement** | | | | |
|---|---|---|---|---|---|
| | | | | ESTIMATED COST | |
| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |

| 00010 | and direction will be shared by the recipient and the BLM, however the BLM will have the right to intervene by modifying the project management plan if the project is not staying on schedule and/or technical issues arise.<br>Legacy Doc #: BLM<br>Delivery Location Code:<br>0004276660 BLM-UT MOAB<br>FIELD OFFICE*<br>82 EAST<br>DOGWOOD<br>MOAB UT<br>84532 US<br><br>Account Assignm: K G/L Account: 6100.411C0<br>Business Area: L000 Commitment Item: 411C00<br>Cost Center: LLUTY02000 Functional Area:<br>L18300000.XM0000 Fund: 16XL1109AF Fund<br>Center: LLUTY02000 Project/WBS:<br>LX.SS.J0610000 PR Acct<br>Assign: 01<br>Period of Performance: 04/24/2017 to 04/30/2022<br><br><br>Museums of Western Colorado<br>Obligated Amount: $24,871.00<br><br><br><br>The total amount of award: $24,871.00.<br>The obligation for this award is<br>$24,871.00. | | | | 24,871.00 |

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

## 1.  COOPERATIVE AGREEMENT OBJECTIVES:

### A.  Objective(s):

The objective of this agreement is to form a partnership between BLM Utah and the Museums of Western Colorado to conduct a preliminary, systematic inventory of the available rock outcrops from the Triassic/Jurassic transition. This inventory will provide an understanding of the fossil resources present within the Bears Ears National Monument. This inventory will also provide information on how best to protect those resources and will study their significance to the prehistoric history of Utah and America in general.

### B.  Public Benefit(s)

This inventory will provide significant value to the public because the fossils discovered by it are the foundation for internationally-recognized scientific research. Additionally, these fossils will reach tens of thousands of people in the state of Colorado, nationwide, and internationally through our museum exhibits, public programs, school programs, and the resultant popular media exposure.

### C.  Federal Award Performance Goals

*Spring 2017:* Background research, planning, and coordination with BLM field offices and interim management of BENM.
*Summer 2017:* Fieldwork in BENM to inventory fossil resources. Tasks include systematic prospecting to identify new fossil sites, evaluation of these sites, and excavation of those sites under risk. This work will be undertaken by crews of trained staff and volunteers from the MWC and Utah Friends of Paleontology.
*Fall 2017:* Preparation and curation of collected specimens at the MWC.
*Winter 2016-2017:* Final preparation and submission of interim report to BLM.
*Spring/Summer 2018*: Second season of fieldwork to inventory complete inventory work as laid out in this proposal.
*Fall 2018:* Preparation and curation of collected specimens at the MWC.
*Winter 2018:* Final preparation and submission of final report to BLM

## 2.  PROPOSED WORK

A.  The Recipient's Project Proposal entitled A Critical Evaluation of the Paleontological Resources of the Triassic/Jurassic Transition for Purposes of Protection, Inventory, and Salvage Within the Bears Earns National Monument, is accepted by the BLM and made a part of this agreement in order to serve as the agreement's work plan. Other documents incorporated by reference include the recipient's Standard Form (SF) 424 Application for Federal Assistance, dated 02/02/2017, SF424A, Budget Information - Non-Construction Programs, SF424B, Assurances - Non-Construction Programs, Budget Detail, and signed Certification Regarding Lobbying - Certification for Contracts, Grants, Loans and Cooperative Agreements.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

B.  In addition, the BLM will:

Make site visits as warranted by program needs.

**BLM Agreement No.  L17AC00057**                                              **Attachment No. 1**
Recipient Name: Museums of Western Colorado                                    (Pg.  PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

C.  In addition, the recipient will also be responsible for significant developments, i.e., events which may occur between the scheduled performance reporting dates that have significant impact upon the supported activity. In such cases, the recipient must inform the BLM or pass- through entity as soon as the following types of conditions become known:

1.  Problems, delays, or adverse conditions which will materially impair the ability to meet the objective of the Federal award. This disclosure must include a statement of the action taken, or contemplated, and any assistance needed to resolve the situation.

2.  Favorable developments which enable meeting time schedules and objectives sooner or at less cost than anticipated or producing more or different beneficial results than originally planned.

## 3.  TERM OF AGREEMENT

A.  The term, or period of performance, of this agreement shall become effective as of the date shown on the signed award cover page and may remain in effect for a maximum of five (5) years. The BLM will consider continued support of the project upon; (a) the recipient showing progress satisfactory to the BLM toward program goals and the determination by the BLM that continuation of the program would be in the best interests of the Government, and/or (b) the availability of funds.

B.  Budget and Program Revisions

1.  Recipients must submit in writing to the BLM's Program Officer (PO) any request for budget or program revision in accordance with 2 CFR 200.308.

2.  All modifications to the agreement shall be in writing and signed by the GMO. No oral statements or any written statements made by any person other than the GMO, shall in any manner modify or otherwise affect the terms of the agreement.

C.  Termination. This agreement may be terminated in accordance with the provisions of 2 CFR, Subpart D, Section 200.339 Termination.

## 4.  FINANCIAL SUPPORT AND PAYMENT METHOD

A.  Funding. This agreement may be funded each fiscal year (FY) based on the availability of BLM funding. Funds obligated but not expended by the recipient in a FY may be carried forward and expended in subsequent years.

B.  Maximum Obligations. The total obligations, including modifications, represent the amount for which the BLM will be responsible under the terms of this agreement. The BLM shall not be responsible to pay for, nor shall the

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

recipient be responsible to perform, any effort that will require the expenditure of Federal funds above the current obligated amount.

   C.  Reimbursable Costs and Limitations. The recipient shall not incur costs or obligate funds for any purpose pertaining to operation of the program or activities beyond the expiration date stated in the agreement. The only costs which are authorized for a period of up to 90 days

**BLM Agreement No. L17AC00057**                                          **Attachment No. 1**
Recipient Name: Museums of Western Colorado                              (Pg. PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

following the award expiration date are those strictly associated with closeout activities for preparation of the final report. The BLM's financial participation is limited. The BLM will only fund up to its share of those amounts requested in the project proposal and as are subsequently approved and funded in the agreement. The recipient shall not be obligated to continue performance under the agreement or to incur costs in excess of the costs set forth in the proposal and subsequent agreement. However, if the Recipient chooses to expend funds in excess of the approved project budget, the Recipient will be responsible to fund the excess without funding participation by the Bureau.

    D.  Cost Sharing and Matching

Cost sharing for this agreement shall be in accordance with 2 CFR, Subpart D, Section 200.306, Cost sharing or matching.

    1.  There is no cost share or match legislatively required for this award.

    E.  Program Income

Program income generated under this award shall be in accordance with 2 CFR, Subpart D, Section 200.307(e)(1) Deduction - Program income must be deducted from total allowable costs to determine the net allowable costs, and be used for current costs unless the Federal awarding agency authorizes otherwise. Program income that the non-Federal entity did not anticipate at the time of the Federal award must be used to reduce the Federal award and non- Federal entity contributions rather than to increase the funds committed to the project. Program income generated through the performance of this project must be reported on Standard Form (SF) 425, Federal Financial Report (see section 6. PERFORMANCE, FINANCIAL, AND OTHER REPORTING).

    F.  Indirect Costs

    1.  The Recipient has never had a federally approved negotiated indirect rate, and as the BLM is the cognizant agency, the Recipient has requested and received approval from the BLM for reimbursement under this agreement at the de minimis rate shown on the award cover sheet under "Indirect Cost Rate." This rate is to be applied to the agreement's base modified total direct costs (MTDC). MTDC consist of all salaries and wages, fringe benefits, materials and supplies, services, travel, and subgrants and subcontracts up to the first $25,000 of each subgrant or subcontract (regardless of the period covered by the subgrant or subcontract). Equipment, capital expenditures, charges for patient care, rental costs and the portion of subgrants or subcontracts in excess of $25,000 shall be excluded from TDC. Participant support costs shall generally be excluded from MTDC.

    G.  Payment by Reimbursement

    1.  Payment will be made by draw-down reimbursement through the Department of the Treasury, Automated Standard Application for Payment (ASAP) System. See following website: http://www.fms.treas.gov/asap Treasury Circular 1075 (31 CFR 205) requires that draw-downs to a recipient organization

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

shall be limited to the minimum amounts needed and shall be timed to be in accordance with the actual, immediate cash requirements of the recipient organization in carrying out the purposes of the approved program or project. The timing and

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

amount of cash advances shall be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program or project costs and the proportionate share of any allowable indirect costs

      2.  Funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds, must be disbursed before requesting additional cash payments.

    H.  Payment Review

If a recipient has a history of poor performance, financial instability, uses a management system not meeting standards prescribed by the Uniform Administrative Requirements, has not conformed to the terms and conditions of the award, and/or is not otherwise responsible in safeguarding Federal funds, they may be determined to be "high risk" and be placed on Agency Review. Agency Review limits a recipient's access to funds by requiring that all draw-down requests reviewed and approved prior to their being released. Recipients on agency review must submit a completed Standard Form (SF) 270 Request for Advance Payment or Reimbursement for each payment requested along with a detailed explanation of how the costs correspond to the approved budget categories as listed on their Application for Federal Assistance SF-424A Budget Information and their Detailed Budget Breakdown or Challenge Cost Share Program Commitment Document, whichever is applicable. Being put on Agency Review does not relieve the recipient of required financial or performance reporting requirements.

    I.  System for Award Management (SAM, [www.SAM.gov](www.SAM.gov))

Recipients of Federal financial assistance must maintain current registration with the System for Award Management (SAM, [www.SAM.gov](www.SAM.gov)). Failure to maintain registration can impact access to funds and future obligations under this agreement and any other financial assistance or procurement award the recipient may have with the Federal government.

## 5.  PERFORMANCE & FINANCIAL MONITORING

    A.  In accordance with 2 CFR 200.327 Financial Reporting and 200.328 Monitoring and Reporting Program Performance, the recipient is responsible for oversight, monitoring, and reporting of its activities under Federal awards to assure compliance with applicable Federal requirements and that performance expectations are being achieved. The BLM's monitoring of the recipient's activities may include review of the award file including discussions with the recipient regarding reporting, award activities, and project status (desk reviews), analysis of financial and performance reports, and discussions of specific issues related to project implementation, observation of project activity, and review of planned versus actual progress (site visits). The BLM has the right to inspect and evaluate the work performed or being performed under this agreement, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work. If the BLM performs inspection or evaluation on the premises of the recipient or a sub-recipient, the recipient shall

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

furnish and shall require sub-recipients to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

**BLM Agreement No.  L17AC00057**                                      **Attachment No. 1**
Recipient Name: Museums of Western Colorado                              (Pg. PAGE **10** of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

1.  BLM programmatic monitoring addresses the content and substance of the program. It is a qualitative review to determine performance, innovation, and contributions to the field. The BLM may make site visits as warranted by program needs. In addition, the BLM has the right of timely and unrestricted access to any books, documents, papers, or other records of the recipient's that are pertinent to the award, in order to make audits, examinations, excerpts, transcripts, and copies of such documents. This right also includes timely and reasonable access to recipient personnel for the purpose of interviews and discussions related to such documents.

2.  BLM financial monitoring ensures compliance with financial guidelines and general accounting practices. On-site or internal financial reviews are conducted to determine if: (1) award recipients are properly accounting for the receipt and expenditures of federal funds; (2) expenditures are in compliance with federal requirements and award special conditions; and (3) proper documentation on financial monitoring activities is prepared, maintained, and distributed as appropriate.

## 6.  PERFORMANCE, FINANCIAL, AND OTHER REPORTING

Periodic financial, performance, and (if applicable) youth employment status reporting is a condition of this financial assistance award. Submission of reports is required whether or not any work has been attempted and/or any funds have been drawn down or expended. Failure to comply with the reporting requirements included in this agreement may be considered a material non-compliance with the terms and conditions of the award. Non-compliance may result in withholding of future payments, suspension or termination of the agreement, recovery of funds paid under the agreement, and withholding of future awards. The periodic status reporting required under this agreement is as follows.

A.  Quarterly Federal Financial Reports

1.  Recipients of Federal financial assistance are required to submit periodic financial reports which document the financial status of their awards. The Federal Financial Report (FFR) or Standard Form (SF) 425 and SF425A - Attachment, is the Office of Management and Budget (OMB) standard form used to report financial status. Expenditures and/or income may be reported either on a cash or accrual basis, whichever method is normally used by the recipient. Submitted SF425 reports must be signed by an authorized official of the recipient certifying that the information complete, accurate, consistent with the recipient's accounting system, and that all expenditures and obligations are for the purposes set forth in the agreement. The SF425 represents a claim to the Federal government, filing a false claim may result in civil or criminal penalties. Blank SF425 forms with instructions are available on the Grants.gov web site, URL: http://www.grants.gov/web/grants/forms.html.

2.  Quarterly Reporting. Financial status reports under this agreement must be submitted on a quarterly (every three Months) basis. Reporting periods and report due dates under this agreement shall be as follows:

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

| *Reporting Period Dates* | *Submit Report By* |
|---|---|
| Award Start Date *through* September 30, 2016* | October 31, 2016* |
| October 1, 2016 *through* December 31, 2016* | January 31, 2017* |
| January 1, 2017 *through* March 31, 2017* | April 30, 2017* |

**BLM Agreement No. L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

April 1, 2016 *through* June 30, 2017*      July 31, 2017*

*And each 3-Month period thereafter for the life of the agreement.

  3. Quarterly financial reports are due by 30 Calendar days after the end of the reporting period. E-mail financial status reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

  4. At the end of the agreement, final SF425 financial reports are due by 90 Calendar days after the expiration, termination, and/or project completion, whichever comes first. E-mail final financial status reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

 B. Annual Performance Reports

  1. Recipients of Federal financial assistance are required to submit periodic performance reports prepared in accordance with 2 CFR, Subpart D, Section 200.328 Monitoring and Reporting Program Performance. There is no standard form, however performance reports should always relate to the performance goals and objectives identified in Section 1. of this agreement. Performance reports must be submitted in a narrative summary to include, but not limited to, the following:

  a. Completed established goals, work in progress, future work, the percentage of work completed (based on Section 1 and 2 of this document).

  b. The reasons why established goals and objectives were not met or problems which may impact the ability to complete work on time with recommendations on their resolution, if appropriate.

  c. Prediction of future activities and how they will be accomplished.

  d. Where the accomplishments of the Federal award can be quantified, a computation of the cost (for example, related to units of accomplishment) may be required if that information will be useful.

  e. Where performance trend data and analysis would be informative to the BLM program the Federal awarding agency should include this as a performance reporting requirement.

  f. Additional pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

  2. Annual Reporting. Performance status reports under this agreement must be submitted on an annual basis. Reporting periods and report due dates under this agreement shall be as follows:

***Reporting Period Dates***       ***Submit Reports By***

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

Award Start Date *through* June 30, 2017*                    September 30, 2017*

*And each 12 Months thereafter for the life of the agreement.

    3.  Annual performance reports are due by 90 Calendar days after the end of the reporting period. E-mail performance reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

    4.  At the end of the agreement, final performance reports are due by 90 Calendar days after the expiration, termination, and/or project completion, whichever comes first. E-mail final performance reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

## 7.  LIABILITY, INSURANCE, AND INDEMNIFICATION

    A.  Liability. The BLM assumes no liability for any actions or activities conducted under this agreement except to the extent that recourse or remedies are provided by Congress under the Federal Tort Claims Act, 28 USC 2671.

    B.  Indemnification. The recipient hereby agrees:

    1.  To indemnify the federal government, Bureau of Land Management (BLM), from any act or omission of the recipient, its officers, employees, or (members, participants, agents, representatives, agents as appropriate) (1) against third party claims for damages arising from one or more activities carried out in connection with this financial assistance agreement and (2) for damage or loss to government property resulting from such an activity, to the extent the laws of the State where the recipient is located permit. This obligation shall survive the termination of this agreement.

    2.  To pay the United States the full value for all damage to the lands or other property of the United States caused by the recipient, its officers, employees, or (members, participants, agents, representatives, agents as appropriate).

    3.  To provide workers' compensation protection to the recipient's officers, employees, and representatives.

    4.  To cooperate with the BLM in the investigation and defense of any claims that may be filed with the BLM arising out of the activities of the recipient, its agents, and employees.

    5.  In the event of damage to or destruction of the buildings and facilities assigned for the use of the recipient in whole or in part by any cause whatsoever, nothing herein contained shall be deemed to require the BLM to replace or repair the buildings or facilities. If the BLM determines in writing, after consultation with the recipient that damage to the buildings or portions thereof renders such buildings unsuitable for continued use by the recipient, the BLM shall assume sole control over such buildings or portions thereof. If the buildings or facilities rendered

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

unsuitable for use are essential for conducting operations authorized under this agreement, then failure to substitute and assign other facilities acceptable to the recipient will constitute termination of this agreement by the BLM.

**BLM Agreement No. L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

C.  Flow-down. For the purposes of this clause, "recipient" includes such subrecipients, contractors, or subcontractors as, in the judgment of the recipient and subject to the Government's determination of sufficiency, have sufficient resources and/or maintain adequate and appropriate insurance to achieve the purposes of this clause.

D.  Identified Activities. All activities carried out in connection with this financial assistance agreement.

## 8.  BLM PROPERTY STANDARDS

A.  Government-furnished property (GFP), such as tools and equipment, furnished by the BLM to the recipient shall be used for official purposes only and shall be subject to the terms of the agreement. Tools and equipment shall be returned in the same condition received except for normal wear and tear in project use. Any BLM property used or other property acquired under this agreement, including intangible property such as copyrights and patents, shall be governed by the property management provisions of 2 CFR, Subpart D, Sections 200.310 to 200.316, Property Standards.

B.  Intangible Property.

1.  Title to intangible property (see § 200.59 Intangible property) acquired under a Federal award vests upon acquisition in the non-Federal entity. The non-Federal entity must use that property for the originally-authorized purpose, and must not encumber the property without approval of the Federal awarding agency. When no longer needed for the originally authorized purpose, disposition of the intangible property must occur in accordance with the provisions in § 200.313 Equipment paragraph (e).

2.  The non-Federal entity may copyright any work that is subject to copyright and was developed, or for which ownership was acquired, under a Federal award. The Federal awarding agency reserves a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use the work for Federal purposes, and to authorize others to do so.

3.  The non-Federal entity is subject to applicable regulations governing patents and inventions, including Governmentwide regulations issued by the Department of Commerce at 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Awards, Contracts and Cooperative Agreements."

4.  The Federal government has the right to: (a) Obtain, reproduce, publish, or otherwise use the data produced under a Federal award; and (b) Authorize others to receive, reproduce, publish, or otherwise use such data for Federal purposes.

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

C.  Recipient staff will be required to complete a BLM-approved Defensive Driving Course if driving a Government-owned vehicle (GOV).

D.  Recipient staff will be required to complete a BLM-approved Four-wheel ATV safety and training program if using Government-furnished ATVs.

**BLM Agreement No.  L17AC00057**                                    **Attachment No. 1**
Recipient Name: Museums of Western Colorado                           (Pg. PAGE **10** of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

E.  Recipient staff will be required to complete a BLM-approved safety and training program if using Government-furnished power equipment, such as chainsaws, wood chippers, etc. The recipient will be responsible for meeting all protective equipment requirements if using Government-furnished equipment.

## 9.  KEY OFFICIALS

The key officials on this agreement are listed on the award cover page(s) and are considered to be essential to ensure maximum coordination and communication between the parties and the work being performed. Upon written notice, either party may designate an alternate to act in the place of their designated key official.

## 10. GENERAL TERMS AND CONDITIONS

The U.S. Department of the Interior agencies, including the Bureau of Land Management implemented the new regulations on December 26, 2014 in the 2 CFR, Part 200—UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS

A.  Administrative and National Policy Requirements

1.  By accepting Federal funding, your organization agrees to abide by the new Uniform Guidance for Grants in the expenditure of Federal funds and performance under this financial assistance award, which was implemented by Office of Management and Budget (OMB). Final Guidance has been issued and has superseded requirements from OMB Circulars, which have been replaced by the 2 Code of Federal Regulations (CFR) Grants and Agreements, Part 200.

2 CFR, Part 200 is available at the following website: http://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&tpl=/ecfrbrowse/Title02/2cfr200_main_02.tpl

B.  Administrative Requirements

1.  2 CFR Part 200 Subparts A through E - UNIFORM ADMINISTRATIVE REQUIREMENTS, AND COST PRINCIPLES.

2.  2 CFR, Subpart B, 200.112 - CONFLICT OF INTEREST – *Refer to Section 13, item 1. of this document for full text term and condition.*

3.  2 CFR, Subpart B, 200.317 – 316 - Procurement Standards.

a. §200.326 Contract Provisions: The non-Federal entity's contracts must contain the applicable provisions described in Appendix II to Part, 200 – Contract Provisions for non- Federal Entity Contracts Under Federal Awards. *Refer to Section 13, item 2. of this document for full text term and condition.*

4.  2 CFR, Subpart C, Part 200.412 - 419 – Direct and Indirect (F & A) Cost

a.  2 CFR, Appendix III to Part 200 - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs)

b.  Appendix IV to Part 200 - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Nonprofit Organizations

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

   c.   Appendix V to Part 200 - State/Local Government-wide Central Service Cost Allocation Plans

BLM Agreement No.  L17AC00057                                    **Attachment No. 1**
Recipient Name: Museums of Western Colorado                              (Pg. PAGE **10** of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

5. [2 CFR Part 200 Subpart F - AUDIT REQUIREMENTS](#). Non-Federal entities that expend $750,000.00, or more, in federal awards in a single year shall have a single or program-specific audit conducted for that year in accordance with the Single Audit Act Amendments of 1996 (31 U.S.C. 7501-7507) and revised OMB Circular A-133, available at: [http://www.whitehouse.gov/omb/circulars_default](#).

    a.   This and any other federal financial assistance award should be reported under its appropriate Catalog of Federal Domestic Assistance (CFDA) number, refer to header for appropriate CFDA to report.

6. [Appendix XII to Part 200—Award Term and Condition for Recipient Integrity and Performance Matters](#). (Refer to Section 13. 3. below for full text.)

C.   Program Legislation and/or Regulations:

1.   Scientific integrity is vital to Department of the Interior (DOI) activities under which scientific research, data, summaries, syntheses, interpretations, presentations, and/or publications are developed and used. Failure to uphold the highest degree of scientific integrity will result not only in potentially flawed scientific results, interpretations, and applications but will damage DOI's reputation and ability to uphold the public's trust. All work performed must comply with the DOI Scientific Integrity Policy posted to [http://www.doi.gov](#), or its equivalent as provided by their organization or State law. For more information go to URL: [https://www.doi.gov/scientificintegrity](#).

D.   Standard Award Terms and Conditions

1.   Code of Federal Regulations/Regulatory Requirements, as applicable:

    a.   [2 CFR Part 25](#), *Universal Identifier and System of Award Management*

    b.   [2 CFR Part 170, Appendix A Award Term](#) - *Reporting Subawards and Executive Compensation*

    c.   [2 CFR Part 175](#), *Award Term for Trafficking in Persons*

    d.   [2 CFR Part 180](#) & [2 CFR Part 1400](#), *Government-wide Debarment and Suspension (Non-procurement)*

    e.   [2 CFR Part 182](#) & [2 CFR Part 1401](#), *Requirements for Drug-Free Workplace (Financial Assistance)*

    f.   [43 CFR 18](#), *New Restrictions on Lobbying*: Submission of an application also represents the applicant's certification of the statements in [43 CFR Part 18, Appendix A](#), *Certification Regarding Lobbying*.

    g.   [41 USC §4712,](#) *Enhancement of Recipient and Sub-recipient Employee Whistleblower Protection.*

        (a) This award and related subawards and contracts over the simplified acquisition threshold and all employees working on this award and related subawards and contracts over the simplified acquisition threshold are subject to the whistleblower rights and remedies in the pilot program on award recipient employee whistleblower protections established at 41 U.S.C. 4712 by section 828 of the *National Defense Authorization Act for Fiscal Year 2013* (P.L.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

112-239).

      (b) Recipients, and their subrecipients and contractors awarded contracts over the simplified acquisition threshold related to this award, shall inform their employees in writing,

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

in the predominant language of the workforce, of the employee whistleblower rights and protections under 41 U.S.C. 4712.

(c) The award recipient shall insert the substance of this clause, including this paragraph (c), in all subawards or subcontracts over the simplified acquisition threshold, 42 CFR §52.203-17 (as referenced in 42 CFR §3.908-9).

h.   41 USC §6306, *Prohibition on Members of Congress Making Contracts with Federal Government*: No member of or delegate to the United States Congress or Resident Commissioner shall be admitted to any share or part of this award, or to any benefit that may arise therefrom; this provision shall not be construed to extend to an award made to a corporation for the public's general benefit.

i.   Executive Order 13513, *Federal Leadership on Reducing Text Messaging while Driving*: Recipients are encouraged to adopt and enforce policies that ban text messaging while driving, including conducting initiatives of the type described in section 3(a) of the order.

j.   Executive Order 13043 , *Increase Seat Belt Use in the United States* Recipients of grants/cooperative agreements and/or sub-awards are encouraged to adopt and enforce on-the-job seat belt use policies and programs for their employees when operating company-owned, rented, or personally owned vehicles. These measures include, but are not limited to, conducting education, awareness, and other appropriate programs for their employees about the importance of wearing seat belts and the consequences of not wearing them.

k.   Executive Order 13658, Minimum Wage for Contractors, seeks to increase the efficiency and cost savings in the work performed by parties who contract with the Federal Government by increasing the hourly minimum wage paid by those contractors and any subcontractors. (see 79 CFR 9851). Refer to Section 13, item 4. of this document for full text term and condition.

l.   Opposition to Any Legislation. In accordance with the Department of the Interior, Environment, and Related Agencies Act, 2006, Title IV, Section 402, no part of any appropriation contained in this Act shall be available for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which Congressional action is not complete other than to communicate to Members of Congress as described in 18 U.S.C. 1913.

m.   Endorsements.

(1) Recipient shall not publicize or otherwise circulate, promotional material (such as advertisements, sales brochures, press releases, speeches, still and motion pictures, articles, manuscripts or other publications) which states or implies governmental, Departmental, bureau, or government employee endorsement of a product, service, or position which the recipient represents. No release of information relating to this award may state or imply that the Government approves of the recipient's work products, or considers the recipient's work product to be superior to other products or services.

**BLM Agreement No.  L17AC00057**                                    **Attachment No. 1**
Recipient Name: Museums of Western Colorado                          (Pg. PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

    (2) All information submitted for publication or other public releases of information regarding this project shall carry the following disclaimer:

***The views and conclusions contained in this document are those of the authors and should not be interpreted as representing the opinions or policies of the U.S. Government. Mention of trade names or commercial products does not constitute their endorsement by the U.S. Government.***

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE **10** of 23)

(3) Recipient must obtain prior Government approval for any public information releases concerning this award which refer to the Department of the Interior or any bureau or employee (by name or title). The specific text, layout photographs, etc. of the proposed release must be submitted with the request for approval.

(4) A recipient further agrees to include this provision in a subaward to and subrecipient, except for a subaward to a State government, a local government, or to a federally recognized Indian tribal government.

n.   Publications of Results of Studies. No party will unilaterally publish a joint publication without consulting the other party. This restriction does not apply to popular publications of previously published technical matter. Publications pursuant to this Agreement may be produced independently or in collaboration with others; however, in all cases proper credit will be given to the efforts of those parties contribution to the publication. In the event no agreement is reached concerning the manner of publication or interpretation of results, either party may publish data after due notice and submission of the proposed manuscripts to the other. In such instances, the party publishing the data will give due credit to the cooperation but assume full responsibility for any statements on which there is a difference of opinion.

o.   Retention and Access Requirements for Records.

(1) All recipient financial and programmatic records, supporting documents, statistical records, and other grants-related records shall be maintained and available for access in accordance with 2 CFR, Subpart D, Sections 200.333 through 200.337, Record Retention and Access.

(2) Inspector General's (IG's) Office Access to Records - Recipients shall provide additional access for the IG's office to examine recipient's records and to interview officers/employees of recipient.

p.   Prohibition on Issuing Financial Assistance Awards to Entities that Require Certain Internal Confidentiality Agreements.

Section 743 of Division E, Title VII of the Consolidated and Further Continuing Resolution Appropriations Act of 2015 (Pub. L. 113-235) prohibits the use of funds appropriated or otherwise made available under that or any other Act for grants or cooperative agreements to an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

Recipients must not require their employees or contractors seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

Recipients must notify their employees or contractors that existing internal confidentiality agreements covered by this condition are no longer in effect.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE **10** of 23)

2.   Order of Precedence. Any inconsistency in this agreement shall be resolved by giving precedence in the following order: (a) Any national policy requirements and administrative management standards; (b) 2 CFR. Part 200; (c) requirements of the applicable

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg.  PAGE 10 of 23)

OMB Circulars and Treasury regulations; (d) special terms and conditions; (e) all agreement sections, documents, exhibits, and attachments; and (f) the recipient's project proposal.

## 11. SPECIAL TERMS AND CONDITIONS

A. Deposit of Publications. In addition to any requirements listed in the Project Management Plan, two (2) copies of each applicable publication produced under this agreement shall be sent to the Natural Resources Library with a transmittal that identifies the sender and the publication, and states that the publication is intended for deposit in the Natural Resources Library. Publications shall be sent to the following address:

U.S. Department of the Interior Natural
Resources Library Interior Service Center
Gifts and Exchanges Section 1849 C Street,
N.W. Washington, D.C. 20240

## 12. DEFINITIONS & ACRONYMS

Agency Review: If a recipient has a history of poor performance, financial instability, has a management system not meeting standards prescribed by the Uniform Administrative Requirements, has not conformed to the terms and conditions of the award, and/or is not otherwise responsible in safeguarding federal funds, they may be placed on Agency Review. Agency Review limits a recipient's access to funds by requiring that all payments must be requested, reviewed, and approved prior to their being released.

Award Recipient: The Award Recipient is the recipient's individual who is authorized to act for the applicant and to assume the obligations imposed by the Federal laws, regulations, requirements, and conditions that apply to grant applications or grant awards.

BLM: Bureau of Land Management may, also be referred to as Bureau. CFR:

Code of Federal Regulations.

DOI: Department of the Interior.

FFR: Federal Financial Report or Standard Form (SF) 425.

Financial Assistance Agreement: This grant or cooperative agreement. The term grant is defined as all Federal financial assistance that provides support or stimulation to accomplish a public purpose. Use of the term "grant" includes grants and/or cooperative agreements awarded by the Federal Government to eligible recipients.

FY: Federal Fiscal Year which runs from October 1 through September 30 each year.

GMO: Grants Management Officer, the only individual in the BLM who is authorized to obligate funds, award, modify, and/or terminate assistance agreements.

GMS: Grants Management Specialist, the administrative individual authorized to prepare assistance agreement awards and modifications, but who cannot obligate funds, award, modify, and/or terminate the agreement.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

NTE: Not-to-exceed amount, the maximum Federal funding amount available for reimbursement to the recipient.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE **10** of 23)

OMB: The Office of Management and Budget. OMB leads development of government- wide policy to assure that grants are managed properly and that Federal dollars are spent in accordance with applicable laws and regulations. OMB Circulars that apply to this agreement may be found on the OMB Website, URL: http://www.whitehouse.gov/omb/circulars_default/.

PI: The BLM Project Inspector, the technical advisor assisting the BLM Program Officer in administering and monitoring the technical aspects of the agreement. The Project Inspector is not authorized to modify this agreement or obligate the Government in any way.

PO: The BLM Program Officer, appointed for the purposes of monitoring the technical aspects of the agreement. The PO will work closely with the RPM and is authorized to clarify technical requirements, and review and approve work which is clearly within the objectives specified in this agreement. The PO will review financial, performance, and youth employment reports, and review and recommend approval of payments to the GMO if a recipient is on Agency Review. The PO is not authorized to modify this agreement or obligate the Government in any way.

Recipient: The organization and/or individual named in Box 5. of the "Grant and Cooperative Agreement" cover sheet.

RPM: The recipient's Project or Program Manager, designated to direct the project or activity being supported by the agreement. The RPM is responsible and accountable to the recipient and BLM for the proper implementation of the project or activity.

## 13. FULL TEXT TERMS AND CONDITIONS

### 1.  Department of Interior Conflict of Interest Term and Condition:

a.  The Recipient must establish safeguards to prohibit its employees and Subrecipients from using their positions for purposes that constitute or present the appearance of a personal or organizational conflict of interest. The Recipient is responsible for notifying the Grants Officer in writing of any actual or potential conflicts of interest that may arise during the life of this award. Conflicts of interest include any relationship or matter which might place the Recipient or its employees in a position of conflict, real or apparent, between their responsibilities under the agreement and any other outside interests. Conflicts of interest may also include, but are not limited to, direct or indirect financial interests, close personal relationships, positions of trust in outside organizations, consideration of future employment arrangements with a different organization, or decision-making affecting the award that would cause a reasonable person with knowledge of the relevant facts to question the impartiality of the Recipient and/or Recipient's employees and Sub-recipients in the matter.

b.  The Grants Officer and the servicing Ethics Counselor will determine if a conflict of interest exists. If a conflict of interest exists, the Grants Officer will determine whether a mitigation plan is feasible. Mitigation plans must be approved by the Grants Officer in writing. Failure to resolve conflicts of interest in a manner that satisfies the government may be cause for termination of the award.

c.  Failure to make required disclosures may result in any of the remedies described in 2 CFR § 200.338, Remedies for Noncompliance, including suspension

**BLM Agreement No. L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

or debarment (see also 2 CFR Part 180).

    d.  Definitions:

BLM Agreement No.  L17AC00057                                        **Attachment No. 1**
Recipient Name: Museums of Western Colorado                          (Pg. PAGE **10** of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

(1) Conflict of Interest is defined as any relationship or matter which might place the Recipient, its employees, and/or its Subrecipients in a position of conflict, real or apparent, between their responsibilities under the agreement and any other outside interests. Conflicts of interest may also include, but are not limited to, direct or indirect financial interests, close personal relationships, positions of trust in outside organizations, consideration of future employment arrangements with a different organization, or decision-making affecting the award that would cause a reasonable person with knowledge of the relevant facts to question the impartiality of the Recipient and/or Recipient's employees and Subrecipients in the matter.

(2) Close Personal Relationship means a Federal award program employee's childhood or other friend, sibling, or other family relations that may compromise or impair the fairness and impartiality of the Proposal Evaluator and Advisor and Grants Officer in the review, selection, award, and management of a financial assistance award.

(3) Discretionary Federal Financial Assistance means Federal awards including grants and agreements that are awarded at the discretion of the agency.

(4) Employment means:

(a) In any capacity, even if otherwise permissible, by any applicant or potential applicant for a Federal financial assistance award;

(b) Employment within the last 12 months with a different organization applying for some portion of the award's approved project activities and funding to complete them OR expected to apply for and to receive some portion of the award; and/or

(c) Employment with a different organization of any member of the organization employee's household or a relative with whom the organization's employee has a close personal relationship who is applying for some portion of the award's approved project activities and funding to complete them OR expected to apply for and to receive some portion of the award.

(d) Non-Federal entity means a State, local government, Indian tribe, institution of higher education, or nonprofit organization that carries out a Federal award as a Recipient or Subrecipient.

(e) Recipient means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term Recipient does not include Subrecipients.

(f) Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program, but does not include an individual who is a beneficiary of such program. A Subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency.

## 2.  Appendix II to Part 200—Contract Provisions for Non-Federal Entity Contracts Under Federal Awards

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

In addition to other provisions required by the Federal agency or non-Federal entity, all contracts made by the non-Federal entity under the Federal award must contain provisions covering the following, as applicable.

      (A)   Contracts for more than the simplified acquisition threshold currently set at $150,000, which is the inflation adjusted amount determined by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) as authorized by 41 U.S.C.

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg.  PAGE **10** of 23)

1908, must address administrative, contractual, or legal remedies in instances where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate.

(B)  All contracts in excess of $10,000 must address termination for cause and for convenience by the non-Federal entity including the manner by which it will be effected and the basis for settlement.

(C)  Equal Employment Opportunity. Except as otherwise provided under 41 CFR Part 60, all contracts that meet the definition of "federally assisted construction contract" in 41 CFR Part 60-1.3 must include the equal opportunity clause provided under 41 CFR 60-1.4(b), in accordance with Executive Order 11246, "Equal Employment Opportunity" (30 FR 12319, 12935, 3 CFR Part, 1964-1965 Comp., p. 339), as amended by Executive Order 11375, "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and implementing regulations at 41 CFR part 60, "Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor."

(D)  Davis-Bacon Act, as amended (40 U.S.C. 3141-3148). When required by Federal program legislation, all prime construction contracts in excess of $2,000 awarded by non-Federal entities must include a provision for compliance with the Davis-Bacon Act (40 U.S.C. 3141- 3144, and 3146-3148) as supplemented by Department of Labor regulations (29 CFR Part 5, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction"). In accordance with the statute, contractors must be required to pay wages to laborers and mechanics at a rate not less than the prevailing wages specified in a wage determination made by the Secretary of Labor. In addition, contractors must be required to pay wages not less than once a week. The non-Federal entity must place a copy of the current prevailing wage determination issued by the Department of Labor in each solicitation. The decision to award a contract or subcontract must be conditioned upon the acceptance of the wage determination. The non-Federal entity must report all suspected or reported violations to the Federal awarding agency. The contracts must also include a provision for compliance with the Copeland "Anti-Kickback" Act (40 U.S.C. 3145), as supplemented by Department of Labor regulations (29 CFR Part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"). The Act provides that each contractor or subrecipient must be prohibited from inducing, by any means, any person employed in the construction, completion, or repair of public work, to give up any part of the compensation to which he or she is otherwise entitled. The non-Federal entity must report all suspected or reported violations to the Federal awarding agency.

(E)  Contract Work Hours and Safety Standards Act (40 U.S.C. 3701-3708). Where applicable, all contracts awarded by the non-Federal entity in excess of $100,000 that involve the employment of mechanics or laborers must include a provision for compliance with 40 U.S.C. 3702 and 3704, as supplemented by Department of Labor regulations (29 CFR Part 5). Under 40

U.S.C. 3702 of the Act, each contractor must be required to compute the wages of every mechanic and laborer on the basis of a standard work week of 40 hours. Work in excess of the standard work week is permissible provided that the worker is compensated at a rate of not

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE **10** of 23)

less than one and a half times the basic rate of pay for all hours worked in excess of 40 hours in the work week. The requirements of 40 U.S.C. 3704 are applicable to construction work and provide that no laborer or mechanic must be required to work in surroundings or under working conditions which are unsanitary, hazardous or dangerous. These requirements do not apply to the purchases of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

(F) Rights to Inventions Made Under a Contract or Agreement. If the Federal award meets the definition of "funding agreement" under 37 CFR §401.2 (a) and the recipient or subrecipient wishes to enter into a contract with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the recipient or subrecipient must comply with the requirements of 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any implementing regulations issued by the awarding agency.

(G) Clean Air Act (42 U.S.C. 7401-7671q.) and the Federal Water Pollution Control Act (33 U.S.C. 1251-1387), as amended—Contracts and subgrants of amounts in excess of

$150,000 must contain a provision that requires the non-Federal award to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401-7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. 1251-1387). Violations must be reported to the Federal awarding agency and the Regional Office of the Environmental Protection Agency (EPA).

(H) Debarment and Suspension (Executive Orders 12549 and 12689)—A contract award (see 2 CFR 180.220) must not be made to parties listed on the Governmentwide exclusions in the System for Award Management (SAM), in accordance with the OMB guidelines at 2 CFR 180 that implement Executive Orders 12549 (3 CFR part 1986 Comp., p. 189) and 12689 (3 CFR part 1989 Comp., p. 235), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549.

(I) Byrd Anti-Lobbying Amendment (31 U.S.C. 1352)—Contractors that apply or bid for an award exceeding $100,000 must file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any Federal contract, grant or any other award covered by 31

U.S.C. 1352. Each tier must also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non-Federal award.

(J) See §200.322 Procurement of recovered materials.

### 3.  Appendix XII to Part 200—Award Term and Condition for Recipient Integrity and Performance Matters

A. Reporting of Matters Related to Recipient Integrity and Performance

1.  General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended

**BLM Agreement No.  L17AC00057**                                        **Attachment No. 1**
Recipient Name: Museums of Western Colorado                              (Pg. PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

(41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

### 2.   Proceedings About Which You Must Report

Submit the information required about each proceeding that:

       a.   Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

       b.   Reached its final disposition during the most recent five year period; and

       c.   Is one of the following:

          (1) A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

          (2) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

          (3) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

          (4) Any other criminal, civil, or administrative proceeding if:

             (i)   It could have led to an outcome described in paragraph 2.c.(1), (2), or (3) of this award term and condition;

             (ii)  It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

             (iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

### 3.   Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

### 4.   Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

### 5.  Definitions

For purposes of this award term and condition:

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

a.   Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

b.   Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

c.   Total value of currently active grants, cooperative agreements, and procurement contracts includes—

(1) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

(2) The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## 4.   MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 (January 2015)

(a) Definitions. As used in this clause—

"United States" means the 50 states and the District of Columbia. "Worker"—

(1) Means any person engaged in performing work on, or in connection with, a contract covered by Executive Order 13658, and

(i)   Whose wages under such contract are governed by the Fair Labor Standards Act (29 U.S.C. chapter 8), the Service Contract Labor Standards statute (41 U.S.C. chapter 67), or the Wage Rate Requirements (Construction) statute (40 U.S.C. chapter 31, subchapter IV),

(ii)  Other than individuals employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 CFR part 541,

(iii) Regardless of the contractual relationship alleged to exist between the individual and the employer.

(2) Includes workers performing on, or in connection with, the contract whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c).

(3) Also includes any person working on, or in connection with, the contract and individually registered in a bona fide apprenticeship or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship.

(b) Executive Order Minimum Wage rate.

(1) The Contractor shall pay to workers, while performing in the United States, and performing on, or in connection with, this contract, a minimum hourly

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE **10** of 23)

wage rate of $10.10 per hour beginning January 1, 2015.

   (2) The Contractor shall adjust the minimum wage paid, if necessary, beginning January 1, 2016 and annually thereafter, to meet the Secretary of Labor's annual E.O. minimum wage. The Administrator of the Department of Labor's Wage and Hour Division (the

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1

(Pg. PAGE **10** of 23)

Administrator) will publish annual determinations in the Federal Register no later than 90 days before the effective date of the new E.O. minimum wage rate. The Administrator will also publish the applicable E.O. minimum wage on www.wdol.gov (or any successor Web site) and on all wage determinations issued under the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute. The applicable published E.O. minimum wage is incorporated by reference into this contract.

(3) (i)   The Contractor may request a price adjustment only after the effective date of the new annual E.O. minimum wage determination. Prices will be adjusted only if labor costs increase as a result of an increase in the annual E.O. minimum wage, and for associated labor costs and relevant subcontract costs. Associated labor costs shall include increases or decreases that result from changes in social security and unemployment taxes and workers' compensation insurance, but will not otherwise include any amount for general and administrative costs, overhead, or profit.

(iii) Subcontractors may be entitled to adjustments due to the new minimum wage, pursuant to paragraph (b)(2). Contractors shall consider any subcontractor requests for such price adjustment.

(iv) The Contracting Officer will not adjust the contract price under this clause for any costs other than those identified in paragraph (b)(3)(i) of this clause, and will not provide duplicate price adjustments with any price adjustment under clauses implementing the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute.

(4) The Contractor warrants that the prices in this contract do not include allowance for any contingency to cover increased costs for which adjustment is provided under this clause.

(5) A pay period under this clause may not be longer than semi-monthly, but may be shorter to comply with any applicable law or other requirement under this contract establishing a shorter pay period. Workers shall be paid no later than one pay period following the end of the regular pay period in which such wages were earned or accrued.

(6) The Contractor shall pay, unconditionally to each worker, all wages due free and clear without subsequent rebate or kickback. The Contractor may make deductions that reduce a worker's wages below the E.O. minimum wage rate only if done in accordance with 29 CFR 10.23, Deductions.

(7) The Contractor shall not discharge any part of its minimum wage obligation under this clause by furnishing fringe benefits or, with respect to workers whose wages are governed by the Service Contract Labor Standards statute, the cash equivalent thereof.

(8) Nothing in this clause shall excuse the Contractor from compliance with any applicable Federal or State prevailing wage law or any applicable law or municipal ordinance establishing a minimum wage higher than the E.O. minimum wage. However, wage increases under such other laws or municipal ordinances are not subject to price adjustment under this subpart.

(9) The Contractor shall pay the E.O. minimum wage rate whenever it is

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

higher than any applicable collective bargaining agreement(s) wage rate.

(10)The Contractor shall follow the policies and procedures in 29 CFR 10.24(b) and 10.28 for treatment of workers engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips.

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

(c) (1) This clause applies to workers as defined in paragraph (a). As provided in that definition—

(i)   Workers are covered regardless of the contractual relationship alleged to exist between the contractor or subcontractor and the worker;

(ii)  Workers with disabilities whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c) are covered; and

(iii) Workers who are registered in a bona fide apprenticeship program or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship, are covered.

(2) This clause does not apply to—

(i)   Fair Labor Standards Act (FLSA)-covered individuals performing in connection with contracts covered by the E.O., i.e. those individuals who perform duties necessary to the performance of the contract, but who are not directly engaged in performing the specific work called for by the contract, and who spend less than 20 percent of their hours worked in a particular workweek performing in connection with such contracts;

(ii)  Individuals exempted from the minimum wage requirements of the FLSA under 29 U.S.C. 213(a) and 214(a) and (b), unless otherwise covered by the Service Contract Labor Standards statute, or the Wage Rate Requirements (Construction) statute. These individuals include but are not limited to—

(a) Learners, apprentices, or messengers whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(a).

(b) Students whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(b).

(c) Those employed in a bona fide executive, administrative, or professional capacity (29 U.S.C. 213(a)(1) and 29 CFR part 541).

(d) Notice. The Contractor shall notify all workers performing work on, or in connection with, this contract of the applicable E.O. minimum wage rate under this clause. With respect to workers covered by the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, the Contractor may meet this requirement by posting, in a prominent and accessible place at the worksite, the applicable wage determination under those statutes. With respect to workers whose wages are governed by the FLSA, the Contractor shall post notice, utilizing the poster provided by the Administrator, which can be obtained at www.dol.gov/whd/govcontracts, in a prominent and accessible place at the worksite. Contractors that customarily post notices to workers electronically may post the notice electronically provided the electronic posting is displayed prominently on any Web site that is maintained by the contractor, whether external or internal, and customarily used for notices to workers about terms and conditions of employment.

(e) Payroll Records.

(1) The Contractor shall make and maintain records, for three years

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

after completion of the work, containing the following information for each worker:

(i)   Name, address, and social security number;

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

(ii)   The worker's occupation(s) or classification(s);

(iii)  The rate or rates of wages paid;

(iv)  The number of daily and weekly hours worked by each worker;

(v)   Any deductions made; and

(vi)  Total wages paid.

(2) The Contractor shall make records pursuant to paragraph (e)(1) of this clause available for inspection and transcription by authorized representatives of the Administrator. The Contractor shall also make such records available upon request of the Contracting Officer.

(3) The Contractor shall make a copy of the contract available, as applicable, for inspection or transcription by authorized representatives of the Administrator.

(4) Failure to comply with this paragraph (e) shall be a violation of 29 CFR 10.26 and this contract. Upon direction of the Administrator or upon the Contracting Officer's own action, payment shall be withheld until such time as the noncompliance is corrected.

(5) Nothing in this clause limits or otherwise modifies the Contractor's payroll and recordkeeping obligations, if any, under the Service Contract Labor Standards statute, the Wage Rate Requirements (Construction) statute, the Fair Labor Standards Act, or any other applicable law.

(f)   Access. The Contractor shall permit authorized representatives of the Administrator to conduct investigations, including interviewing workers at the worksite during normal working hours.

(g)  Withholding. The Contracting Officer, upon his or her own action or upon written request of the Administrator, will withhold funds or cause funds to be withheld, from the Contractor under this or any other Federal contract with the same Contractor, sufficient to pay workers the full amount of wages required by this clause.

(h)  Disputes. Department of Labor has set forth in 29 CFR 10.51, Disputes concerning contractor compliance, the procedures for resolving disputes concerning a contractor's compliance with Department of Labor regulations at 29 CFR part 10. Such disputes shall be resolved in accordance with those procedures and not the Disputes clause of this contract. These disputes include disputes between the Contractor (or any of its subcontractors) and the contracting agency, the Department of Labor, or the workers or their representatives.

(i)   Anti-retaliation. The Contractor shall not discharge or in any other manner discriminate against any worker because such worker has filed any complaint or instituted or caused to be instituted any proceeding under or related to compliance with the E.O. or this clause, or has testified or is about to testify in any such proceeding.

(j)   Subcontractor compliance. The Contractor is responsible for subcontractor compliance with the requirements of this clause and may be held liable for unpaid wages due subcontractor workers.

**BLM Agreement No. L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

(k) Subcontracts. The Contractor shall include the substance of this clause, including this paragraph (k) in all subcontracts, regardless of dollar value, that are subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and are to be performed in whole or in part in the United States.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

### *END OF AGREEMENT*

Rev. 06/22/2016

**EXHIBIT D**

## FEDERAL FINANCIAL REPORT
(Follow form instructions)

| 1. Federal Agency and Organizational Element to Which Report is Submitted<br>Department of the Interior, Bureau of Land Management | | 2. Federal Grant or Other Identifying Number Assigned by Federal Agency<br>(To report multiple grants, use FFR Attachment)<br>National Conservation Lands Science Support Grant | | | | Page<br>1 | | of<br>1 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | pages |

| 3. Recipient Organization (Name and complete address including Zip code) |
|---|
| Museums of Western Colorado, 462 Ute. Ave., Grand Junction, CO 81501 |

| 4a. DUNS Number | 4b. EIN<br>84-0588068 | 5. Recipient Account Number or Identifying Number<br>(To report multiple grants, use FFR Attachment)<br>L17AC00057 | 6. Report Type<br>☒ Quarterly<br>☐ Semi-Annual<br>☐ Annual<br>☐ Final | 7. Basis of Accounting<br><br><br>☒ Cash ☐ Accrual |
|---|---|---|---|---|

| 8. Project/Grant Period<br>From: (Month, Day, Year)<br>4/24/2017 | To: (Month, Day, Year)<br>9/30/2018 | 9. Reporting Period End Date<br>(Month, Day, Year)<br>9/30/2018 |
|---|---|---|

| 10. Transactions | | Cumulative |
|---|---|---|
| *(Use lines a-c for single or multiple grant reporting)* | | |
| **Federal Cash (To report multiple grants, also use FFR Attachment):** | | |
| a. Cash Receipts | | $18,444.29 |
| b. Cash Disbursements | | $18,444.29 |
| c. Cash on Hand (line a minus b) | | $0.00 |
| *(Use lines d-o for single grant reporting)* | | |
| **Federal Expenditures and Unobligated Balance:** | | |
| d. Total Federal funds authorized | | $24,871.00 |
| e. Federal share of expenditures | | $18,761.29 |
| f. Federal share of unliquidated obligations | | $0 |
| g. Total Federal share (sum of lines e and f) | | $18,761.29 |
| h. Unobligated balance of Federal funds (line d minus g) | | $6,109.71 |
| **Recipient Share:** | | |
| i. Total recipient share required | | $0 |
| j. Recipient share of expenditures | | $0 |
| k. Remaining recipient share to be provided (line i minus j) | | $0 |
| **Program Income:** | | |
| l. Total Federal program income earned | | $0 |
| m. Program income expended in accordance with the deduction alternative | | $0 |
| n. Program income expended in accordance with the addition alternative | | $0 |
| o. Unexpended program income (line l minus line m or line n) | | $0 |

| 11. Indirect Expense | a. Type | b. Rate | c. Period From | Period To | d. Base | e. Amount Charged | f. Federal Share |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | g. Totals: | | | |

12. *Remarks: Attach any explanations deemed necessary or information required by Federal sponsoring agency in compliance with governing legislation:*

13. Certification: By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and intent set forth in the award documents. I am aware that any false, fictitious, or fraudulent information may subject me to criminal, civil, or administrative penalties. *(U.S. Code, Title 18, Section 1001)*

| a. Typed or Printed Name and Title of Authorized Certifying Official<br><br>Erik Vlick, Business Manager | c. Telephone (Area code, number and extension)<br>970-242-0101 |
|---|---|
| | d. Email address<br>evlek@westcomuseum.org |
| b. Signature of Authorized Certifying Official | e. Date Report Submitted (Month, Day, Year)<br>10/3/2018 |
| | 14. Agency use only: |

Standard Form 425 - Revised 6/28/2010
OMB Approval Number: 0348-0061
Expiration Date: 10/31/2011

**Paperwork Burden Statement**
According to the Paperwork Reduction Act, as amended, no persons are required to respond to a collection of information unless it displays a valid OMB Control Number. The valid OMB control number for this information collection is 0348-0051. Public reporting burden for this collection of information is estimated to average 1.5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0061), Washington, DC 20503.

**EXHIBIT E**



# EXHIBIT 5

***PROPOSED ORDER GRANTING RULE 24 MOTION OF
GRAND STAIRCASE ESCALANTE PARTNERS,
SOCIETY OF VERTEBRATE PALEONTOLOGY, AND
CONSERVATION LANDS FOUNDATION TO
INTERVENE AS DEFENDANTS***

# THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 4:22-cv-0060-DN-PK |
| | **[PROPOSED] ORDER GRANTING MOTION TO INTERVENE** |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE, | |
| *Defendants*. | |

This matter comes before the Court upon the motion to intervene filed by proposed Intervenor-Defendants Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation. Having reviewed the motion and determined that intervention is warranted, the Court GRANTS the motion.

BY THE COURT:

_____

David Nuffer
United States District Judge

Dated: _____

# EXHIBIT 6

***PROPOSED ANSWER OF INTERVENOR DEFENDANTS GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, CONSERVATION LANDS FOUNDATION, UTAH DINÉ BIKÉYAH, FRIENDS OF CEDAR MESA, ARCHAEOLOGY SOUTHWEST, PATAGONIA WORKS, THE ACCESS FUND, AND THE NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES' ANSWER TO PLAINTIFFS' COMPLAINT***

Gary S. Guzy (*pro hac vice* forthcoming)
John Mizerak (*pro hac vice* forthcoming)
Shruti Barker (*pro hac vice* forthcoming)
Scott Shelton (*pro hac vice* forthcoming)
Tyler Smith (*pro hac vice* forthcoming)
Eric Chung (*pro hac vice* forthcoming)
Covington & Burling LLP
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-5978
gguzy@cov.com
jmizerak@cov.com
sbarker@cov.com
sshelton@cov.com
tsmith@cov.com
echung@cov.com

Raymond Scott Berry (0311)
P.O. Box 9491 Salt Lake City, UT 84109
801-556-8515
rsberryslc@gmail.com

*Counsel* For Proposed Intervenors
Grand Staircase Escalante Partners,
Society of Vertebrate
Paleontology, and Conservation Lands
Foundation

Brent V. Manning (Utah State Bar No.
2075)
Michael Harmond (Utah State Bar No.
17230)
MANNING CURTIS BRADSHAW &
BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
(801) 363-5678
bmanning@mc2b.com
mharmond@mc2b.com

Jim T. Banks (*pro hac vice*
forthcoming)
Adam M. Kushner (*pro hac vice*
forthcoming)
William E. Havemann (*pro hac vice*
forthcoming)
Michael J. West (*pro hac vice*
forthcoming)
Sarah Ruckriegle (*pro hac vice*
forthcoming)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
james.banks@hoganlovells.com
adam.kushner@hoganlovells.com
michael.west@hoganlovells.com
will.havemann@hoganlovells.com
sarah.ruckriegle@hoganlovells.com

*Counsel for Proposed Intervenors Utah
Diné Bikéyah, Friends of Cedar Mesa,
the Society of Vertebrate Paleontology,
Archaeology Southwest, Conservation
Lands Foundation, Inc., Patagonia
Works, The Access Fund, and the
National Trust for Historic
Preservation in the United States*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS. | |
| *Plaintiffs,* | Civil Action No. 4:22-cv-0060-DN |
| v. | Judge David Nuffer |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; and UNITED STATES FOREST SERVICE, | **INTERVENOR DEFENDANTS GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, CONSERVATION LANDS FOUNDATION, UTAH DINÉ BIKÉYAH, FRIENDS OF CEDAR MESA, ARCHAEOLOGY SOUTHWEST, PATAGONIA WORKS, THE ACCESS FUND, AND THE NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES' ANSWER TO PLAINTIFFS' COMPLAINT** |
| *Defendants,* | |

Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, Conservation Lands Foundation, Utah Diné Bikéyah, Friends of Cedar Mesa, Archaeology Southwest, Patagonia Works, The Access Fund, and the National Trust for Historic Preservation in the United States ("Intervenor Defendants"), by and through their undersigned attorneys, hereby respond as follows to the allegations in the Complaint filed in this action by Zebediah George Dalton, BlueRibbon Coalition, Kyle Kimmerle, and Suzette Ranea Morris.

## PRELIMINARY STATEMENT

The following matters are incorporated into responses to each Paragraph of the Complaint:

A.     Except as otherwise expressly stated herein, Intervenor Defendants deny each and every allegation in the Complaint—including any allegations in the preamble, unnumbered Paragraphs, subparagraphs, prayer for relief, titles, headings, subheadings, table of contents, footnotes, tables, graphs, and illustrations of the Complaint. To the extent not expressly denied, all allegations for which Intervenor Defendants deny possessing knowledge or information sufficient to form a belief are denied.

B.     The Complaint contains purported references to documents and third-party publications and statements that have often been excerpted, paraphrased, characterized, and otherwise taken out of context. These documents and third-party publications and statements should be considered, if at all, in context and in unmodified form, and Defendants respectfully refer the Court to the respective materials for their complete contents.

C.     Intervenor Defendants reserve the right to seek to amend and supplement their Answer as may be appropriate or necessary.

## **INTRODUCTION**

1.     This paragraph represents Plaintiffs' characterization of documents and legal conclusions, and therefore requires no response. To the extent any response is required, Intervenor Defendants admit only that the quoted language appears in the cited material.

2.     This paragraph represents Plaintiffs' characterization of documents and legal conclusions, and therefore requires no response. To the extent any response is required, Intervenor Defendants admit only that the quoted language appears in the cited material.

3.     Intervenor Defendants admit that President Biden designated 1.87 million acres as within the Grand Staircase Escalante National Monument ("GSENM") and 1.36 million acres as within the Bears Ears National Monument. Intervenor Defendants otherwise deny the allegations in this paragraph, including Plaintiffs' characterization of President Biden's Proclamations of GSENM and Bears Ears National Monument, which speak for themselves.

4.     Intervenor Defendants aver that the allegations in Paragraph 4 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny the allegations in Paragraph 4.

5.     Intervenor Defendants admit that the Antiquities Act, 54 U.S.C. § 320301(b), contains the quoted language. Intervenor Defendants otherwise deny the allegations in Paragraph 5, including Plaintiffs' characterization of the Act, on

the grounds that the allegations state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

6–8.   Intervenor Defendants aver that the allegations in Paragraphs 6 to 8 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny the allegations in Paragraphs 6 to 8.

9–10.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 9 and 10 and, on that basis, deny those allegations.

11.   Intervenor Defendants aver that the allegations in Paragraph 11 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

**<u>PARTIES</u>**

12–15.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 12 to 15.

16–25.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 16 to 25 to the extent that they attempt to characterize relevant federal agencies' authority and, on that basis, Intervenor Defendants deny those allegations. Intervenor Defendants admit the remaining allegations in Paragraphs 16 to 25.

<u>JURISDICTION AND VENUE</u>

26−29.  Intervenor Defendants aver that the allegations in Paragraphs 26 to 29 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

<u>ANSWERING THE FACTUAL ALLEGATIONS</u>

**The Text of the Antiquities Act**

30−34.  Intervenor Defendants state that the Antiquities Act speaks for itself and otherwise deny the allegations in Paragraphs 30 to 34 on that basis.

**The Origins of the Antiquities Act**

35.  Intervenor Defendants admit that the *Massachusetts Lobstermen's* case contains the quoted language. Intervenor Defendants aver that the remaining allegations in Paragraph 35 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

36.  Intervenor Defendants state that the sources cited in Paragraph 36 speak for themselves and otherwise deny the allegations in this paragraph on that basis.

37.  Intervenor Defendants aver that the allegations in Paragraph 37 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

38.  Intervenor Defendants aver that the sources cited in Paragraph 38 speak for themselves. Intervenor Defendants are without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38 and, on that basis, deny those allegations.

39.     Intervenor Defendants aver that the *Utah Association of Counties v. Bush* decision speaks for itself. Intervenor Defendants are otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, on that basis, deny those allegations.

40.     Intervenor Defendants admit that the House Report cited in Paragraph 40 contains the quoted language. Intervenor Defendants aver that the allegations in Paragraph 40 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

41.     Intervenor Defendants state that the language quoted in footnotes 1 and 2 speaks for itself. Intervenor Defendants deny the remaining allegations in Paragraph 41 and affiliated footnotes.

42.     Intervenor Defendants admit that the quoted language in Paragraph 42 appears in its respective sources and state that those sources speak for themselves and that no response is required. Intervenor Defendants otherwise deny the allegations in this paragraph.

43.     Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and deny those allegations on that basis.

44.     Intervenor Defendants admit that Dr. Edgar Lee Hewett drafted the bill that was introduced in Congress and was ultimately passed as the final version of the Antiquities Act and state that the source cited in Paragraph 44 speaks for itself. Intervenor Defendants deny the remaining allegations in Paragraph 44.

45−46.  Intervenor Defendants admit that the quoted language in Paragraphs 45 and 46 appears in its respective sources. Intervenor Defendants otherwise aver that the remaining allegations in Paragraphs 45 and 46 state legal conclusions to which no response is required and deny those allegations on that basis.

**The History of the Grand Staircase-Escalante and Bears Ears Monuments**

47.     Intervenor Defendants aver that the allegations in the quoted language in Paragraph 47 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants admit that the quoted language in Paragraph 47 is an accurate reflection of its sources but otherwise deny the allegations in this paragraph.

48.     Intervenor Defendants state that the allegations in the first sentence of Paragraph 48 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations. Intervenor Defendants state that the cited sources speak for themselves. Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second, third, and fourth sentences of Paragraph 48 and, on that basis, deny the allegations. Intervenor Defendants deny the remaining allegations in Paragraph 48.

49.     Intervenor Defendants state that the Proclamations establishing GSENM and the Bears Ears National Monument speak for themselves and that the *Massachusetts Lobstermen's* decision contains the quoted language. Intervenor Defendants deny the remaining allegations in Paragraph 49.

## The Grand Staircase-Escalante National Monument

50.     Intervenor Defendants admit only that President Clinton announced the GSENM proclamation while in Arizona and deny the remaining allegations in Paragraph 50.

51–52.  Intervenor Defendants state that the *Utah Association of Counties* case speaks for itself. Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraphs 51 and 52 and deny those allegations on that basis.

53.     Intervenor Defendants admit that the quoted language accurately reflects its source and state that the *Utah Association of Counties v. Bush* case speaks for itself but otherwise deny the allegations in Paragraph 53.

54.     Intervenor Defendants admit that the quoted language in Paragraph 54 is an accurate reflection of its respective sources. Intervenor Defendants aver that the remaining allegations in Paragraph 54 state legal conclusions to which no response is required and deny those allegations on that basis.

55.     Intervenor Defendants admit the allegations in the first sentence of Paragraph 55. Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 55 and, on that basis, deny those allegations.

56.    Intervenor Defendants state that the December 2017 proclamation speaks for itself and otherwise deny the allegations in Paragraph 56.

57.    Intervenor Defendants admit that the quoted language in Paragraph 57 is an accurate reflection of its source but aver that the remaining allegations in the Paragraph state legal conclusions to which no response is required and deny those allegations on that basis.

58.    Intervenor Defendants admit that President Biden issued a proclamation restoring the boundaries of the Grand Staircase-Escalante National Monument in 2021. Intervenor Defendants state that the quoted language speaks for itself and deny the remaining allegations in Paragraph 58.

59.    Intervenor Defendants state that the Biden Proclamation speaks for itself and deny the remaining allegations in this paragraph, including that various objects are not "consistent with the text of the Antiquities Act."

60.    Intervenor Defendants state that the Biden Proclamation speaks for itself. To the extent a further response is required, Intervenor Defendants deny the remaining allegations in Paragraph 60.

61.    Intervenor Defendants state that the Grand Staircase interim guidance speaks for itself and deny the remaining allegations in Paragraph 61.

**The Bears Ears National Monument**

62.    Intervenor Defendants admit that the quoted language accurately reflects its source and otherwise deny the allegations in Paragraph 62.

64.     Intervenor Defendants admit that President Obama issued a proclamation establishing the Bears Ears National Monument on December 28, 2016. Intervenor Defendants deny the remaining allegations in Paragraph 64.

65.     Paragraph 65 represents Plaintiffs' characterization of documents and therefore requires no response. To the extent any response is required, Intervenor Defendants admit only that the quoted language appears in the cited material.

66.     Intervenor Defendants aver that the allegations in the quoted language in Paragraph 66 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants admit that the quoted language in Paragraph 66 is an accurate reflection of its source but otherwise deny the allegations in Paragraph 66.

67.     Intervenor Defendants admit that President Biden issued a proclamation restoring the boundaries of the Bears Ears National Monument in 2021. Intervenor Defendants state that the quoted language speaks for itself and deny the remaining allegations in Paragraph 67.

68.     Intervenor Defendants state that the Biden Proclamation speaks for itself and deny the remaining allegations in this paragraph, including that various objects are not "consistent with the Antiquities Act."

69.     Intervenor Defendants admit that the Bears Ears National Monument totals 1.36 million acres. Intervenor Defendants state that the quoted language speaks for itself and deny the remaining allegations in Paragraph 69.

10

70.     Intervenor Defendants state that the Bears Ears National Monument interim guidance speaks for itself and deny the remaining allegations in this paragraph.

## The Consequences of the Monuments

71.     Intervenor Defendants state that the sources cited in Paragraph 71 speak for themselves and otherwise deny the allegations in Paragraph 71.

72.     Intervenor Defendants deny the allegations in Paragraph 72.

73.     Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations that "Plaintiffs have roots in those communities that date to Utah's founding and long before," that "[t]heir families have endured a great deal in settling, developing, and cultivating the lands that are now part of the Monuments," and that "[t]hey have invested their lives in making this part of Utah what it is today." On that basis, Intervenor Defendants deny those allegations. Intervenor Defendants deny the remaining allegations in Paragraph 73.

## The BlueRibbon Coalition

74–79.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 74 to 79 and deny those allegations on that basis.

80.     Intervenor Defendants deny the allegations in Paragraph 80.

81.     Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 and deny those allegations on that basis.

82−87.   Intervenor Defendants deny the allegations in these paragraphs insofar as they suggest that the Grand Staircase Monument designation caused the consequences listed therein. Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and deny those allegations on that basis.

88−89.   Intervenor Defendants admit that the quoted language in Paragraphs 88 and 89 is an accurate reflection of its source but deny the allegations in those paragraphs insofar as they suggest that the Bears Ears National Monument designation caused the consequences listed therein. Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and deny those allegations on that basis.

90.   Intervenor Defendants deny the allegations in Paragraph 90.

91.   Intervenor Defendants admit that President Trump reduced the size of both monuments in 2017 and deny the remaining allegations in Paragraph 91.

92.   Intervenor Defendants admit that President Biden issued proclamations regarding GSENM and Bears Ears National Monument and state that the proclamations speak for themselves. Intervenor Defendants deny the remaining allegations in Paragraph 92.

93.   Intervenor Defendants state that the monument proclamations and interim guidance speak for themselves. Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 and deny those allegations on that basis.

12

94.     Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and deny those allegations on that basis.

95.     Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation that "day-to-day life is already changing for BlueRibbon and its members" as a result of President Biden's proclamations and deny those allegations on that basis. Intervenor Defendants deny the remaining allegations in Paragraph 95.

96−104.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 96 to 104 and deny those allegations on that basis.

105−106.  Intervenor Defendants aver that the allegations in Paragraphs 105 to 106 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 105 and 106 and deny those allegations on that basis.

107.     Intervenor Defendants deny the allegations in Paragraph 107.

### Kyle Kimmerle

108−126.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 108 to 126 and deny those allegations on that basis.

**Zeb Dalton**

127−141.  Intervenor Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 127 to 141 and deny those allegations on that basis.

**Suzette Morris**

142−150.  Intervenor Defendants state that President Biden's and President Obama's proclamations of Bears Ears as a national monument speak for themselves. Intervenor Defendants otherwise are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 142 to 150 and deny those allegations on that basis.

### CLAIM FOR RELIEF

151.   Intervenor Defendants incorporate and reallege each and every response contained in the foregoing paragraphs of this Answer, as though fully set forth herein.

152−158.  Intervenor Defendants aver that the allegations in Paragraphs 152 to 158 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny the allegations in Paragraphs 152 to 158.

159.   Intervenor Defendants deny the allegations in Paragraph 159.

160.   Intervenor Defendants aver that the allegations in Paragraph 160 state legal conclusions to which no response is required. To the extent that a response is required, Intervenor Defendants deny those allegations.

14

<u>**PRAYER FOR RELIEF**</u>

Intervenor Defendants deny that Plaintiffs are entitled to relief.

<u>**AFFIRMATIVE DEFENSES**</u>

Intervenor Defendants raise the following affirmative defenses to the
Complaint. By designating the following defenses as affirmative defenses,
Intervenor Defendants do not admit or acknowledge that they bear the burden of
proof and/or burden of persuasion with respect to any such defense. Intervenor
Defendants also give notice that they intend to rely upon such other and further
affirmative defenses of which they become aware during discovery in this action and
reserve the right to amend their Answer to assert any such defenses.

<u>**FIRST**</u>.  The Complaint and each claim contained therein fails to state a
claim upon which relief can be granted, fails to state facts sufficient to constitute a
cause of action, and fails to plead a cognizable injury.

<u>**SECOND**</u>.  This Court lacks subject matter jurisdiction over the claims in the
Complaint.

<u>**THIRD**</u>.  Plaintiffs' claims are barred or limited for lack of standing.

<u>**FOURTH**</u>.  Plaintiffs' claims are barred or limited for lack of ripeness.

<u>**FIFTH.**</u>  Plaintiffs' claims are barred by claim and issue preclusion.

<u>**DEFENSES RESERVED**</u>

Intervenor Defendants hereby give notice that they reserve the right to rely
upon any other applicable defenses set forth in any Answer of any other Defendant
in this action, reserve the right to rely upon any other defenses that may become

apparent during discovery in this matter, and reserve their right to amend their

Answer and to assert any such defenses.

Dated: November 23, 2022    Respectfully submitted,

/s/ Brent V. Manning

Brent V. Manning (Utah State Bar No. 2075)
Michael Harmond (Utah State Bar No. 17230)
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
(801) 363-5678
bmanning@mc2b.com
mharmond@mc2b.com

Jim T. Banks (*pro hac vice* forthcoming)
Adam M. Kushner (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
Michael J. West (*pro hac vice* forthcoming)
Sarah Ruckriegle (*pro hac vice* forthcoming)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
james.banks@hoganlovells.com
adam.kushner@hoganlovells.com
michael.west@hoganlovells.com
will.havemann@hoganlovells.com
sarah.ruckriegle@hoganlovells.com

*Counsel for Proposed Intervenors Utah Diné Bikéyah, Friends of Cedar Mesa, the Society of Vertebrate Paleontology, Archaeology Southwest, Conservation*

/s/ R. Scott Berry

Raymond Scott Berry (0311)
P.O. Box 9491 Salt Lake City, UT 84109
801-556-8515
rsberryslc@gmail.com

Gary S. Guzy (*pro hac vice* forthcoming)
John Mizerak ((*pro hac vice* forthcoming)
Shruti Barker (*pro hac vice* forthcoming)
Scott Shelton (*pro hac vice* forthcoming)
Tyler Smith (*pro hac vice* forthcoming)
Eric Chung (*pro hac vice* forthcoming)
Covington & Burling LLP
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-5978
gguzy@cov.com
jmizerak@cov.com
sbarker@cov.com
sshelton@cov.com
tsmith@cov.com
echung@cov.com

*Counsel for Proposed Intervenors Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation*

*Lands Foundation, Inc., Patagonia*
*Works, The Access Fund, and the*
*National Trust for Historic Preservation*
*in the United States*