TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
MICHAEL S. SAWYER
Senior Attorney, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:     (202) 514-5273
Email:          michael.sawyer@usdoj.gov

*Counsel for Defendants*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; and THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES; | |
| Plaintiffs, | **DEFENDANTS' MOTION TO DISMISS** |
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS; | Case No. 4:22-cv-00059-DN-PK (lead case) Case No. 4:22-cv-00060-DN-PK |
| Consolidated Plas, | District Judge David Nuffer Magistrate Judge Paul Kohler |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al.; | |
| Defendants, | |
| HOPI TRIBE, NAVAJO NATION, PUEBLO OF ZUNI, and UTE MOUNTAIN UTE TRIBE; | |
| Intervenor-Dfts. | |

**TABLE OF CONTENTS**

MOTION.................................................................................................................. 1

MEMORANDUM IN SUPPORT.............................................................................. 1

    I.      Introduction................................................................................................. 1

    II.    Factual Background ..................................................................................... 2

          A.    Four Presidents have established or modified the challenged
               monuments. ................................................................................... 2

          B.    President Biden's Proclamations designate numerous objects of
               historic or scientific interest for protection under the Antiquities Act. ...... 4

          C.    The Proclamations are subject to valid existing rights, while
               directing agencies to involve the public when preparing new
               monument management plans.................................................................. 8

    III.   Procedural Background................................................................................ 9

LEGAL STANDARD................................................................................................ 10

ARGUMENT ............................................................................................................ 11

    I.      Congress Has Not Provided For Judicial Review Of Plaintiffs' Claims. ............ 11

          A.    Plaintiffs lack an applicable waiver of sovereign immunity.................... 11

          B.    The President's exercise of discretion in issuing the challenged
               Proclamations is not judicially reviewable because Congress has not
               created such a cause of action................................................................. 14

    II.    The Challenges To Grand Staircase-Escalante National Monument And All
          But One Plaintiff Should Be Dismissed For Lack Of Standing.......................... 19

          A.    The *Garfield* Plaintiffs do not allege a cognizable injury, caused by
               the Proclamations, that would be redressed by a favorable decision........ 21

               1.    The State and the Counties cannot demonstrate standing
                      based on allegations of harm arising from increased
                       visitation to southern Utah. ........................................................ 21

                2.    The State and Counties cannot demonstrate standing based
                      on alleged injuries to resources in which they do not allege a
                       legally protectable interest. ........................................................ 26

i

         3.      The *Garfield* Plaintiffs' remaining allegations fail to establish standing. ........................................................................ 30

   B.     The *Dalton* Plaintiffs fail to adequately allege standing to challenge the Grand Staircase-Escalante Proclamation. ............................................ 32

         1.      All the individual plaintiffs fail to establish standing to challenge Proclamation 10,286. ................................................... 33

         2.      The Complaint fails to adequately allege standing for Plaintiffs Dalton and Morris. .......................................... 33

         3.      BlueRibbon Coalition does not adequately allege standing. ........ 35

III.    Plaintiffs' Claims Should Be Dismissed For Failing To Identify Improperly Designated Lands With Sufficient Particularity. .................................... 40

IV.    Plaintiffs Have Failed To State A Claim For Violation Of The Antiquities Act Because Their Claims Fail As A Matter Of Law. .......................................... 44

   A.     The President's Antiquities Act authority is not confined to protecting archaeological objects. ................................................. 44

   B.     Species and their habitats can be "objects of historic or scientific interest. ................................................................................. 45

   C.     The Bears Ears and Grand Staircase-Escalante landscapes qualify as "objects of historic or scientific interest. .................................... 47

   D.     Plaintiffs have failed to demonstrate that the Proclamations protect "generic" objects ..................................................................... 49

   E.     The Proclamations do not designate "experiences" as "objects of historic or scientific interest. ................................................... 50

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

## Cases

*Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*,
  771 F.3d 697 (10th Cir. 2014) ........................................................................................... 11

*Anderson v. Suiters*,
  499 F.3d 1228 (10th Cir. 2007) .......................................................................................... 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................... 10, 20

*Atkinson v. O'Neill*,
  867 F.2d 589 (10th Cir. 1989) ........................................................................................... 11

*Bear Lodge Multiple Use Ass'n. v. Babbitt*,
  175 F.3d 814 (10th Cir. 1999) ........................................................................................... 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................... 10, 11

*Burns Ranches, Inc. v. U.S. Dep't of the Interior*,
  851 F. Supp. 2d 1267 (D. Or. 2011) ................................................................................. 12

*Cappaert v. United States*,
  426 U.S. 128 (1976)................................................................................................... 14, 45

*Cameron v. United States*,
  252 U.S. 450 (1920)................................................................................................... 14, 45

*Catron Cnty. Bd. of Com'rs, New Mexico v. U.S. Fish & Wildlife Serv.*,
  75 F.3d 1429 (10th Cir. 1996) ........................................................................................... 29

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp*,
  333 U.S. 103 (1948)............................................................................................................ 17

*Clapper v. Amnesty Intern. USA*,
  568 U.S. 398 (2013)................................................................................................... 31, 38

*Colo. Outfitters Ass'n v. Hickenlooper*,
  823 F.3d 537 (10th Cir. 2016) ........................................................................................... 33

*Colo. Taxpayers Union, Inc. v. Romer*,
  963 F.2d 1394 (10th Cir. 1992) .............................................................................. 36, 38, 40

*Colorado v. EPA*,
  989 F.3d 874 (10th Cir. 2021) ........................................................................................... 23

*Dakota Central Telephone Co. v. State of South Dakota ex rel. Payne*,
  250 U.S. 163 (1919)................................................................................................... 16, 19

*Dalton v. Specter*,
  511 U.S. 462 (1994)........................................................................................... 14, 16, 19

*Dunn v. Black, P.S. v. United States*,
   492 F.3d 1084 (9th Cir. 2007) ............................................. 12

*Equal Means Equal v. Ferriero*,
   478 F. Supp. 3d 105 (D. Mass. 2020) ................................. 39

*FDIC v. Meyer*,
   510 U.S. 471 (1994)............................................................ 11

*Franklin vs. Massachusetts*,
   505 U.S. 788 (1992)........................................... 14, 15, 16, 18, 43

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)......................................................... 20, 35, 36

*Fund v. Kelly*,
   434 F. Supp. 3d 974 (D. Kan. 2020) .................................. 39

*Garling v. EPA*,
   849 F.3d 1289 (10th Cir. 2017) ......................................... 22

*Habecker v. Town of Estes Park, Colo.*,
   518 F.3d 1217 (10th Cir. 2008) ........................... 22, 23, 24, 36

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)......................................................... 38, 39

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
   971 F.3d 1222 (10th Cir. 2020) ......................................... 34

*Kane Cnty. Utah v. Salazar*,
   562 F.3d 1077 (10th Cir. 2009) ......................................... 27

*Larson v. Domestic and Foreign Commerce Corp.*,
   337 U.S. 682 (1949)........................................................... 13

*Lonsdale v. United States*,
   919 F.2d 1440 (10th Cir. 1990) ......................................... 12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................... 26, 33, 37

*Mocek v. City of Albuquerque*,
   813 F.3d 912 (10th Cir. 2015) ........................................... 12

*Mount Evans Co. v. Madigan*,
   14 F.3d 1444 (10th Cir. 1994) .......................................... 20, 30

*Mountain States Legal Found. v. Bush*,
   306 F.3d 1132 (D.C. Cir. 2002).......................................... 43

*Muscogee Nation v. Okla. Tax Comm'n*,
   611 F.3d 1222 (10th Cir. 2010) ......................................... 11, 20

*Nat'l Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) ............................................................................ 27

*New Mexico v. Regan*,
    745 F.2d 1318 (10th Cir. 1984) ......................................................................... 13

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)...................................................................................... 17, 18

*Nova Health Sys. v. Gandy*,
    416 F.3d 1149 (10th Cir.2005) ......................................................................... 23

*Olson v. Carmack*,
    641 F. App'x 822 (10th Cir. 2016) .................................................................... 11

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ....................................................................... 6, 8

*Papasan v. Allain*,
    478 U.S. 265 (1986)........................................................................................... 11

*Producers of Renewables United for Integrity Truth & Transparency v. EPA*,
    19-9532, 2022 WL 538185 (10th Cir. Feb. 23, 2022) ..................................... 25

*Red Hawk, L.L.C. v. Schneider*,
    493 F.3d 1174 (10th Cir. 2007) ........................................................................ 11

*Rosson v. United States*,
    127 F. App'x 398 (10th Cir. 2005) ................................................................... 12

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) ........................................................................ 31

*Schaffer v. Clinton*,
    240 F.3d 878 (10th Cir. 2001) ..................................................................... 26, 33

*Simon v. E. Kentucky Welfare Rts. Org.*,
    426 U.S. 26 (1976)...................................................................................... 31, 45

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................................... 20, 35

*State ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) .......................................................................... 30

*State of Wyoming v. Franke*,
    58 F. Supp. 890 (D. Wyo. 1945)................................................................. 18, 19

*Stewart v. Norton*,
    2:06 CV 209, 2006 WL 3305409 (D. Utah Sept. 29, 2006) ............................ 30

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..................................................................................... 30, 37

*Techs., Inc. v. Guagliardo,*
    210 F. Supp. 2d 1138 (C.D. Cal. 2001) ................................................................. 32

*Thiebaut v. Colo. Springs Utilities,*
    455 F. App'x 795 (10th Cir. 2011) ....................................................................... 20

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ........................................................................................ 33

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ........................................................................................ 14

*Tulare County v. Bush,*
    306 F.3d 1138 (D.C. Cir. 2002) ........................................................... 40, 41, 43, 46

*Turlock Irrigation Dist. v. FERC,*
    786 F.3d 18 (D.C. Cir. 2015) ................................................................................ 39

*United States v. Bd. of Cnty. Cmm'rs of Cnty. of Otero,*
    843 F.3d 1208 (10th Cir. 2016) ........................................................................... 27

*United States v. George S. Bush & Co.,*
    310 U.S. 371 (1940) ................................................................................ 16, 17, 19

*United States v. Hays,*
    515 U.S. 737 (1995) ........................................................................................... 26

*United States v. Mitchell,*
    445 U.S. 535 (1980) ........................................................................................... 11

*United States v. Mottaz,*
    476 U.S. 834 (1986) ........................................................................................... 12

*United States v. Rodriguez-Aguirre,*
    264 F.3d 1195 (10th Cir. 2001) ........................................................................... 11

*United States v. Testan,*
    424 U.S. 392 (1976) ........................................................................................... 12

*United Tribe of Shawnee Indians v. United States,*
    253 F.3d 543 (10th Cir. 2001) ............................................................................. 13

*Utah Association of Counties v. Bush,*
    316 F. Supp. 2d 1172 (D. Utah 2004) ............................................................. 18, 43

*W. Shoshone Nat. Council v. United States,*
    408 F. Supp. 2d 1040 (D. Nev. 2005) .................................................................. 12

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................................... 25

*Wasatch Equality v. Alta Ski Lifts Co.,*
    820 F.3d 381 (10th Cir. 2016) ............................................................................. 11

*Wyoming v. U.S. Dep't of,*
   *Int.*, 674 F.3d 1220 (10th Cir. 2012) ........................................................ 30

*Wyoming v. United States,*
   279 F.3d 1214 (10th Cir. 2002) ........................................................ 11, 12

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ........................................................ 43

**Statutes**

16 U.S.C. § 470hh(a) ........................................................ 5

28 U.S.C. § 2401(a) ........................................................ 36

28 U.S.C. § 1331 ........................................................ 12

28 U.S.C. § 1361 ........................................................ 12

28 U.S.C. § 2201 ........................................................ 12

28 U.S.C. § 2202 ........................................................ 12

43 U.S.C. § 1712(c)(9) ........................................................ 27, 28

54 U.S.C. § 320301 ........................................................ 15, 19

54 U.S.C. § 320302 ........................................................ 5

Utah Schools & Lands Exchange Act of 1998, Pub. L. No. 105–335, 112 Stat. 3139 ....... 3, 32, 34

Automobile National Heritage Area Act, Pub. L. No. 105–355, 112 Stat. 3247 (1998) ............... 3

Omnibus Public Land Management Act of 2009, Pub. L. No. 111–11, 123 Stat. 991, 1120 ......... 3

**Rules**

Fed. R. Civ. P. 12 ........................................................ 1, 50

Fed. R. Civ. P. 12(b)(1) ........................................................ 11

Fed. R. Civ. P. 12(b)(6) ........................................................ 10, 11, 20, 40

**Proclamations**

Establishment of the Grand Staircase-Escalante National Monument,
   61 Fed. Reg. 50,223 (Sept. 24, 1996). ........................................................ 3

Establishment of the Bears Ears National Monument,
   82 Fed. Reg. 1,139 (Jan. 5, 2017) ........................................................ 3, 9, 35

Modifying the Bears Ears National Monument,
   82 Fed. Reg. 57,322 (Dec. 8, 2017) ........................................................ 4

Modifying the Grand Staircase-Escalante National Monument,
   82 Fed. Reg. 58,089 (Dec. 8, 2017) ........................................................ 4

Bears Ears National Monument,
   86 Fed. Reg. 57,321 (Oct. 15, 2021)..................................................................*passim*

Grand Staircase-Escalante National Monument,
   86 Fed. Reg. 57,335 (Oct. 15, 2021)..................................................................*passim*

## MOTION

Defendants respectfully move the Court to dismiss these consolidated cases pursuant to Federal Rule of Civil Procedure 12(b).

## MEMORANDUM IN SUPPORT

### I.      Introduction

The Grand Staircase-Escalante and Bears Ears National Monuments guard world-renowned antiquities in southern Utah, protecting a dense array of archaeological, paleontological, geologic, historic, and other scientific objects.  Established in 1996 and 2016, respectively, the monuments shield these invaluable resources from damage and destruction.  After the previous President reduced the size of those monuments in 2017, President Biden restored the prior monument boundaries—and thus the protections previously afforded—in October 2021.  Through their Complaints in these consolidated actions, Plaintiffs seek to strip monument protections from nearly two million acres of federal land, and the numerous designated objects located thereon, while failing to articulate any cognizable interest in nearly all of that land.

This Court should reject Plaintiffs' unprecedented request to invalidate these Presidential Proclamations for four independent reasons.  *First*, Congress has not provided for judicial review of Presidential actions establishing national monuments under the Antiquities Act.  In light of that choice, no court has ever invalidated a President's designation of a national monument for violating the Antiquities Act.  The Court should thus dismiss Plaintiffs' claims for lack of jurisdiction, as Congress has neither waived the United States' sovereign immunity to, nor created a cause of action for, Antiquities Act challenges.

*Second*, the Court should dismiss all Plaintiffs' challenges to the Grand Staircase proclamation and all but one of Plaintiffs' challenges to the Bears Ears proclamation for lack of standing.  Nearly all Plaintiffs have failed to allege relevant injuries caused by President Biden's

1

actions.  Instead, their Complaints focus either on harms attributed to the original creation of these National Monuments years ago or speculative fears about what might happen should Congress approve a land exchange between Utah and the federal government or the Secretaries of the Interior or Agriculture ultimately adopt and subsequently implement monument management plans with provisions that Plaintiffs oppose.

*Third*, to the extent that any claims can survive these threshold jurisdictional deficiencies, they must be dismissed for failure to state a claim upon which relief can be granted.  The Antiquities Act explicitly authorizes the President to reserve parcels of land for the proper care and management of designated objects of historic or scientific interest.  Thus, where a plaintiff contends that the reservation is too expansive or otherwise improper, the plaintiff must at least allege with particularity which parcels of reserved land exceed the smallest area compatible with such care and management.  Because no Plaintiff has done so, the Court should dismiss Plaintiffs' claims for failure to state a claim for relief.

*Finally*, Plaintiffs' claims should be dismissed for failing as a matter of law in interpreting the Antiquities Act.  Plaintiffs ask the Court to ignore the plain language of the Antiquities Act, and several binding Supreme Court decisions, which vest broad discretion in the President to reserve lands under the Act.  The Court should not do so.

## II.    Factual Background

### A.    Four Presidents have established or modified the challenged monuments.

President Clinton established the Grand Staircase-Escalante National Monument ("GSENM") to protect, *inter alia*, "the last place in the continental United States to be mapped" as it provided "exemplary opportunities for geologists, paleontologists, archeologists, historians,

and biologists."[1]  Prominent features in the GSENM include "a vast geologic stairway, named the Grand Staircase by pioneering geologist Clarence Dutton, which rises 5,500 feet to the rim of Bryce Canyon in an unbroken sequence of great cliffs and plateaus," and "world class paleontological sites" that provide "one of the best and most continuous records of Late Cretaceous terrestrial life in the world."[2]  Although that monument originally consisted of approximately 1.7 million acres, Congress adjusted the monument boundaries on three occasions, ultimately increasing the Federal lands reserved for the monument by more than 180,000 acres.[3]

President Obama established the Bears Ears National Monument ("BENM") to protect the Bears Ears buttes and the historic and scientific objects that surround them, including "[a]bundant rock art, ancient cliff dwellings, ceremonial sites, and countless other artifacts [that] provide an extraordinary archaeological and cultural record."[4]  The area provides evidence of human history from as early as 13,000 years ago, when early people hunted now-extinct megafauna; to 2,500 years ago, when early farmers occupied the land; to the late 19th century, when Mormon settlers arrived in the area.[5]  That monument reserved approximately 1.35 million acres of Federal lands and interests.[6]

---

[1] Establishment of the Grand Staircase-Escalante National Monument, 61 Fed. Reg. 50,223, 50,223 (Sept. 24, 1996).
[2] *Id.* at 50,223–24.
[3] Grand Staircase-Escalante National Monument, 86 Fed. Reg. 57,335, 57,344 (Oct. 15, 2021) (citing Utah Schools and Lands Exchange Act of 1998, Pub. L. No. 105–335, 112 Stat. 3139; Automobile National Heritage Area Act, Pub. L. No. 105–355, tit. II, 112 Stat. 3247, 3252 (1998); and the Omnibus Public Land Management Act of 2009, Pub. L. No. 111–11, § 2604, 123 Stat. 991, 1120).
[4] Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1,139, 1,139 (Jan. 5, 2017).
[5] *Id.* at 1,139–40.
[6] *Id.* at 1,143.

In 2017, President Trump altered the boundaries of these monuments. He excluded approximately 860,000 acres of land from GSENM.[7] And he modified BENM to exclude over 1.1 million acres of Federal lands, while adding 11,200 new acres of Federal land.[8]

In October 2021, President Biden issued Presidential Proclamations 10,285 and 10,286 (hereinafter the "BENM Proclamation" and "GSENM Proclamation," respectively).[9] President Biden restored boundaries that existed in both monuments before President Trump's proclamations, while retaining approximately 11,200 acres added to BENM by President Trump. In total, President Biden restored monument status to about two million acres of federal lands.

### B. President Biden's Proclamations designate numerous objects of historic or scientific interest for protection under the Antiquities Act.

In restoring monument status to those lands, President Biden's Proclamations found that numerous "historic and scientific resources" in these monuments are "objects of historic or scientific interest in need of protection" under the Antiquities Act.[10] Those objects include geologic features (*e.g.*, Grand Staircase, Bears Ears Buttes), paleontological resources (*e.g.*, world-class paleontological sites amidst the fossil-rich formations in Kaiparowits Plateau), archaeological resources (*e.g.*, a "village with structures and pottery from multiple Ancestral Pueblo periods"),[11] and biological resources (*e.g.*, the Valley of the Gods, which "provides habitat for *Eucosma navajoensis*, an endemic moth that lives nowhere else").[12] The Proclamations also determined that both monuments contain "innumerable objects of historic or scientific interest,"

---

[7] Modifying the Grand Staircase-Escalante National Monument, 82 Fed. Reg. 58,089, 58,093 (Dec. 8, 2017).

[8] Modifying the Bears Ears National Monument, 82 Fed. Reg. 58,081, 58,085 (Dec. 8, 2017).

[9] Bears Ears National Monument, 86 Fed. Reg. 57,321 (Oct. 15, 2021) ("BENM Procl."); Grand Staircase-Escalante National Monument, 86 Fed. Reg. 57,335 (Oct. 15, 2021) ("GSENM Procl.").

[10] GSENM Procl., 86 Fed. Reg. at 57,344.

[11] BENM Procl., 86 Fed. Reg. at 57,326.

[12] BENM Procl., 86 Fed. Reg. at 57,328.

some so "rare" or "vulnerable to vandalism and theft" that "revealing their specific names and locations could pose a danger to the objects." [13]   Consistent with statutory confidentiality obligations, [14] the Proclamations do not disclose the locations of all designated objects.

As the maps below illustrate, the objects designated in the Proclamations are distributed at a high density throughout the lands that the Proclamations reserved for their proper care and management.  Beginning with GSENM, the map shows numerous geologic formations (*e.g.*, Grand Staircase, Escalante Natural Bridge), paleontological sites (*e.g.*, *Nasutoceratops, Kosmoceratops*) and archaeological sites (*e.g.*, Fiftymile Mountain area) distributed throughout the monument:

### Grand Staircase-Escalante National Monument
Depiction of certain objects of historic or scientific interest designated by Proclamation 10286



---

[13] BENM Procl., 86 Fed. Reg. at 57,322; GSENM Procl., 86 Fed. Reg. at 57,336.
[14] *See* 16 U.S.C. § 470hh(a); *see also* 54 U.S.C. § 320302 (granting agencies authority to authorize permits for examining, excavating, or gathering objects).

Similarly, the BENM map shows numerous geologic formations (*e.g.*, Bears Ears Buttes, Grand Gulch), archaeological sites (*e.g.*, House on Fire, Doll House), and habitats (*e.g.*, Valley of the Gods):



---

[15] The Court may take judicial notice of geographic locations. *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013).  Full size versions of these maps are in Exhibits G and H.

Importantly, even these maps depict only a fraction of the numerous objects of historic and scientific importance designated in the Proclamations, and the actual density of objects is much higher than depicted.

In addition to the foregoing objects, the Proclamations identify certain "areas" as objects of historic or scientific interest.  For example, the Kaiparowits Plateau area of GSENM contains "roughly 1,600 square miles of sedimentary rock that towers over the surrounding area."[16]  The "stratified geology" of this area provides, *inter alia*, "the only evidence in our hemisphere of mammals from the Cenomanian through Santonian ages and one of the world's best and most continuous records of Late Cretaceous terrestrial life."[17]  "To date, many thousands of fossil sites have been documented on the plateau, including evidence of at least 15 previously unknown species of dinosaur."[18]  The GSENM Proclamation describes the different geologic formations found on the Kaiparowits Plateau area, and explains the contribution of each formation to important paleontological discoveries.[19]  The Proclamation then details the significant historical or scientific features of each region of the Kaiparowits Plateau ranging from the Smoky Mountain area with "naturally occurring underground coal fires that have been smoldering for hundreds, if not thousands, of years" providing a "home to a number of rare and endemic plant species," to the "Fiftymile Mountain area" with "a high density of archaeological sites, including masonry structures" suggesting a convergence of the Ancestral Pueblo and Fremont cultures.[20]

The Proclamations also designate certain "landscapes" themselves as objects of historic and scientific interest.  For example, the BENM Proclamation explains how the Bears Ears

---

[16] GSENM Procl., 86 Fed. Reg. at 57,339.
[17] *Id.* at 57,340.
[18] *Id.*
[19] *Id.*
[20] *Id.*

landscape provides "one of the most extraordinary cultural landscapes in the United States" due to its "unique density of significant cultural, historical, and archaeological artifacts."[21] "[O]wing to the area's arid environment and overall remoteness, as well as the building techniques that its inhabitants employed," this landscape "retains remarkable" evidence of human use and habitation "from the Paleoindian Period, through the time of the Basketmakers and Ancestral Pueblos, to the more recent Navajo and Ute period," to a "series of passages and hideouts used by men like Butch Cassidy, the Sundance Kid, and other members of the Wild Bunch," to archaeological evidence demonstrating "the settlement of Latter-day Saint communities."[22] "Despite millennia of human habitation," the Bears Ears landscape also contains unique paleontological resources and habitat for rare and endemic species.[23] Given "the unique nature of the Bears Ears landscape, and the collection of objects and resources therein," President Biden determined, in his discretion, that "the entire landscape within the boundaries reserved by this proclamation" constitutes "an object of historic and scientific interest in need of protection."[24]

### C.  The Proclamations are subject to valid existing rights, while directing agencies to involve the public when preparing new monument management plans.

Although the Biden Proclamations reserve federal lands within the monument boundaries from new disposition under public land laws, mining laws, and mineral and geothermal leasing laws, the Proclamations are "subject to valid existing rights," such as existing valid mining claims. Nor do they displace "livestock grazing as authorized under existing permits or leases."[25]

---

[21] BENM Procl., 86 Fed. Reg. at 57,321.
[22] *Id.* at 57,322–33.
[23] *Id.*
[24] BENM Procl., 86 Fed. Reg. at 57,330–31; GSENM Procl., 86 Fed. Reg. at 57,345.
[25] BENM Procl., 86 Fed. Reg. at 57,332; GSENM Procl., 86 Fed. Reg. at 57,346.

Contrary to claims in Plaintiffs' Complaints,[26] there are many things that the challenged Proclamations do not prohibit.  They neither prohibit the use of motorized vehicles nor close roads.[27]  The Proclamations make no mention of active management, analyses under the National Environmental Policy Act ("NEPA"), installing new water facilities, or removing invasive species.[28]  Nor do they reduce the ability of Tribal members to engage in "collection of medicines, berries and other vegetation, forest products, and firewood for personal noncommercial use."[29]

The Proclamations direct the Secretaries of the Interior and Agriculture (collectively, the Secretaries) to prepare management plans for the monuments.[30]  "The Secretaries shall provide for maximum public involvement in the development of [those plans], including consultation with federally recognized Tribes and State and local governments."[31]

## III.   Procedural Background

Ten months after President Biden issued the GSENM and BENM Proclamations, two lawsuits were filed in this Court challenging those Proclamations.  On August 24, 2022, Garfield County, Kane County, and the State of Utah (collectively, the "*Garfield* Plaintiffs") filed suit, alleging that President Biden's Proclamations exceed the President's authority under the Antiquities Act of 1906.[32]  On August 25, 2022, three individuals (Zebediah Dalton, Kyle

---

[26] *See infra* p.21 & n.101.

[27] *See generally* BENM Proclamation & GSENM Proclamation (not mentioning "motor" or "vehicle").

[28] *See generally* BENM Proclamation & GSENM Proclamation (not mentioning "active management," "National Environmental Policy Act," "water facilities," or "invasive species").

[29] Establishment of BENM, 82 Fed. Reg. at 1,145; BENM Procl., 86 Fed. Reg. at 57,332 (incorporating the "the terms, conditions, and management direction" from Proclamation 9,558 into Proclamation 10,285); GSENM Procl., 86 Fed. Reg. at 57,346.

[30] GSENM Procl., 86 Fed. Reg. at 57,345 (directing the Secretary of the Interior to "prepare and maintain a new management plan" for GSENM); BENM Procl., 86 Fed. Reg. at 57,332 (directing the Secretaries of the Interior and Agriculture to "jointly prepare and maintain a new management plan for" BENM).

[31] BENM Procl., 86 Fed. Reg. at 57,332.

[32] Complaint, Docket no. 2, filed August 24, 2022 ("*Garfield* Complaint").

Kimmerle, and Suzette Morris) and an organization (BlueRibbon Coalition) (collectively, the "*Dalton* Plaintiffs") filed a similar suit.[33]  Both suits allege that the challenged Proclamations designate ineligible objects as monuments[34] and reserve more land than is necessary to care for the eligible objects.[35]  And both suits seek declaratory and injunctive relief against both President Biden and the Secretaries.[36]

Although the Complaints mention in passing various agency documents,[37] neither Complaint brings any claims under the Administrative Procedure Act ("APA").  Nor does either Complaint present any other sort of challenge to any agency action.  Instead, both Complaints squarely challenge President Biden's GSENM and BENM Proclamations.

## LEGAL STANDARD

To survive a motion under Rule 12(b)(6), a complaint must contain factual allegations sufficient to state a claim that is plausible on its face.[38]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[39]  "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering

---

[33] Complaint, Docket no. 2, *Dalton v. Biden*, Case No. 4:22-cv-60-DN, filed August 25, 2022 ("*Dalton* Compl.").

[34] *E.g.*, *Garfield* Complaint ¶¶ 246–52 (alleging that landscapes and animals are ineligible); *Dalton* Compl. ¶ 3 (same).

[35] *E.g.*, *Garfield* Compl. ¶¶ 272–309 (alleging that too much land has been reserved to protect qualifying objects); *Dalton* Compl. ¶ 158 (relying on similar allegations).

[36] *Garfield* Compl. p.80; *Dalton* Compl. p.52.

[37] *E.g.*, *Dalton* Compl. ¶ 28 (discussing "interim guidance" from the Bureau of Land Management).

[38] *Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560–63 (2007)).

[39] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

factual support for *these* claims."[40]  Plaintiffs bear the burden of demonstrating that the complaint

meets this threshold.[41]  The Court accepts the allegations of the complaint as true and draws all

reasonable inferences in the plaintiff's favor.[42]  However, the Court is "not bound to accept as true

a legal conclusion couched as a factual allegation."[43]  The Court may also use Rule 12(b)(6) to

dispose of a claim that "fails as a matter of law."[44]

Rule 12(b)(1) permits dismissal of a case for "lack of subject-matter jurisdiction."[45]  On a

facial attack under this rule, the court applies the same standards applicable to a Rule 12(b)(6)

motion and accepts the allegations in the complaint as true.[46]  "In addressing a factual attack, the

court does not presume the truthfulness of the complaint's factual allegations, but has wide

discretion . . . to resolve disputed jurisdictional facts."[47]

## ARGUMENT

**I.    Congress Has Not Provided For Judicial Review Of Plaintiffs' Claims**.

**A.    Plaintiffs lack an applicable waiver of sovereign immunity**.

"It is well settled that the United States . . . [is] immune from suit, unless sovereign

immunity has been waived."[48]  Because "the defense of sovereign immunity is jurisdictional in

nature,"[49] a party asserting a claim against the United States bears "the burden of establishing that

---

[40] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[41] *Olson v. Carmack*, 641 F. App'x 822, 826–27 (10th Cir. 2016) (citing *Twombly*, 550 U.S. at 556).

[42] *Wasatch Equality v. Alta Ski Lifts Co.*, 820 F.3d 381, 385–86 (10th Cir. 2016).

[43] *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

[44] *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 704 (10th Cir. 2014).

[45] Fed. R. Civ. P. 12(b)(1).

[46] *Muscogee Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 & n.1 (10th Cir. 2010).

[47] *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) (cleaned up).

[48] *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989) (per curiam); *FDIC v. Meyer*, 510 U.S. 471 (1994); *United States v. Mitchell*, 445 U.S. 535, 538 (1980).

[49] *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002).

its action falls within an unequivocally expressed waiver of sovereign immunity by Congress."[50]
Any such waivers "must be unequivocal and are to be strictly construed."[51]

Neither Complaint identifies an applicable waiver of sovereign immunity. Although
Plaintiffs identify several general jurisdictional provisions,[52] "[s]overeign immunity is not waived
by general jurisdictional statutes such as 28 U.S.C. § 1331 (federal question jurisdiction), . . . and
28 U.S.C. § 1361 (action to compel a government officer to perform his duty)."[53] "Nor does the
declaratory judgment statute, 28 U.S.C. § 2201, itself confer jurisdiction on a federal court where
none otherwise exists." [54] Instead, Plaintiffs "must find an explicit waiver of sovereign
immunity."[55] Because "a complaint must state the jurisdictional basis for all of the claims alleged
therein," Plaintiffs' failure to identify an explicit statutory waiver of sovereign immunity requires
dismissal of their Complaints.[56]

Plaintiffs, moreover, cannot rely on the nonstatutory *ultra vires* doctrine to circumvent the
United States' sovereign immunity. As the Tenth Circuit has explained, "the question of whether
a government official acted *ultra vires* is quite different from the question of whether that same
official acted erroneously or incorrectly as a matter of law."[57] As "the ultra vires doctrine is

---

[50] *Dunn v. Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007); *accord Lonsdale v. United States*, 919 F.2d 1440, 1444 (10th Cir. 1990).

[51] *Rosson v. United States*, 127 F. App'x 398, 400 (10th Cir. 2005); *see United States v. Mottaz*, 476 U.S. 834, 841 (1986); *United States v. Testan*, 424 U.S. 392, 399 (1976).

[52] *E.g.*, *Garfield* Compl. ¶ 25 (citing 28 U.S.C. §§ 1331, 1361, 2201, 2202).

[53] *Lonsdale*, 919 F.2d at 1444; *Burns Ranches, Inc. v. U.S. Dep't of the Interior*, 851 F. Supp. 2d 1267, 1270–71 (D. Or. 2011) (recognizing that 28 U.S.C. § 2201 does not waive sovereign immunity, and collecting cases); *W. Shoshone Nat. Council v. United States*, 408 F. Supp. 2d 1040, 1047–48 (D. Nev. 2005) ("[T]he Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, does not constitute the United States' consent to be sued, it 'merely grants an additional remedy in cases where jurisdiction already exists in the court.'") (citation omitted).

[54] *Wyoming*, 279 F.3d at 1225.

[55] *Lonsdale*, 919 F.2d at 1444.

[56] *Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015) (affirming dismissal based on failure to allege federal waiver of sovereign immunity).

[57] *Wyoming*, 279 F.3d at 1230.

grounded on 'the officer's *lack* of delegated power,'" a "claim of error in the *exercise* of that power is therefore not sufficient."[58] "The mere allegation that the official acted wrongfully 'does not establish that the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign.'"[59] Thus, where a plaintiff does not question an official's "*power* to determine" a certain issue, but instead asserts that the official's "decision was *incorrect* as a matter of law," courts have "rejected such arguments asserted in the attempt to avoid the shield of sovereign immunity."[60]

These cases confirm that Plaintiffs' claims fall outside of the narrow *ultra vires* exception to sovereign immunity. Plaintiffs do not dispute that the President has power to designate national monuments in the affected areas.[61] Instead, they disagree with how the President declared these specific monuments: by allegedly reverse engineering the monuments from their boundaries; insufficiently describing the significance of designated objects; designating ineligible objects of historic or scientific interest; reserving too much land to protect the qualifying objects; insufficiently justifying the amount of land reserved; and not making separate reservations for each of the designated objects.[62] None of these arguments assert that the President lacked the "power to determine" the existence of objects of interest or reserve land to protect those objects; instead, they represent disagreement with the choices the President has made (or processes he allegedly used) in exercising his authority under the Antiquities Act. This Court should therefore reject Plaintiffs' "attempt to avoid the shield of sovereign immunity."[63]

---

[58] *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 548–49 (10th Cir. 2001) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690 (1949)).
[59] *Id.* (quoting *Larson*, 337 U.S. at 693).
[60] *New Mexico v. Regan*, 745 F.2d 1318, 1320 n.1 (10th Cir. 1984).
[61] *E.g.*, *Garfield* Compl. ¶¶ 293–295; *Dalton* Compl. ¶ 158.
[62] *E.g.*, *Garfield* Compl. ¶ 270; *id.* ¶¶ 250–67; *id.* ¶ 247; *Dalton* Compl. ¶ 5; *id.* ¶ 8; *id.* ¶ 6.
[63] *Regan*, 745 F.2d at 1320 n.1.

Dismissal on sovereign immunity grounds is consistent with Supreme Court precedent affirming Presidential designations under the Antiquities Act. In both *Cappaert v. United States*[64] and *Cameron v. United States*,[65] the United States sought judicial relief to enforce reservations of land under the Antiquities Act. Thus, the United States' sovereign immunity was not at issue in those cases. Here, by contrast, Plaintiffs have invoked the Court's jurisdiction against the President, thus requiring them to establish a waiver of sovereign immunity. Because Plaintiffs have failed to do so, the Court should dismiss their claims on sovereign immunity grounds.

**B.     The President's exercise of discretion in issuing the challenged Proclamations is not judicially reviewable because Congress has not created such a cause of action**.

Just as Congress has not waived sovereign immunity for Plaintiffs' claims, it has also not created a cause of action to review the challenged Presidential Proclamations. In a pair of landmark decisions, the Supreme Court described the strict limits on judicial review of Presidential actions. In *Dalton v. Specter*, the Supreme Court, relying on its earlier decision in *Franklin v. Massachusetts*, concluded that Presidential actions were not reviewable under the APA because the President is not an "agency" within the meaning of that Act.[66] The Supreme Court then "assume[d] for the sake of argument" that some claims that the President violated a statutory mandate may nevertheless be judicially reviewable outside the framework of the APA, before concluding that such "review is not available when the statute in question commits the decision to the discretion of the President."[67] Instead, the Supreme Court "require[s] an express statement by

---

[64] 426 U.S. 128, 141–42 (1976).
[65] 252 U.S. 450, 455–56 (1920).
[66] 511 U.S. 462, 468–70 (1994) (citing *Franklin*, 505 U.S. 788, 798–99 (1992)).
[67] *Dalton*, 511 U.S. at 474; *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018).

Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."[68]

In the present case, Plaintiffs claim that President Biden exceeded his authority under the Antiquities Act by designating items that do not qualify as "objects of historic or scientific interest," and by failing to reserve only "the smallest area compatible with the proper care and management of" the identified objects.[69]   Plaintiffs do not allege that the President lacked the authority to create monuments in southern Utah.  Nor have Plaintiffs presented any constitutional challenges to the Antiquities Act or the President's exercise of authority under that Act.  Rather, Plaintiffs contend that the President improperly exercised the discretionary authority conferred on him pursuant to the Antiquities Act.

As in *Dalton*, however, judicial review of these statutory claims is not available because, through the Antiquities Act, Congress has conferred the authority to designate national monuments upon the President and committed that decision to his discretion.  Congress vested the ultimate decision for declaring a national monument in the President as head of the Executive branch.[70] The Act expressly authorizes the President "in [his] discretion" to declare objects of historic or scientific interest to be national monuments.[71]  Further, the President "may reserve" as a part thereof, parcels of land which shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.[72]  Although the Act contains standards which guide the exercise of the President's discretion, the President is the sole and exclusive judge as to the existence of facts satisfying those standards because Congress has not provided an "express

---

[68] *Franklin*, 505 U.S. at 801.
[69] 54 U.S.C. § 320301.
[70] *Id.*
[71] *Id.* § 320301(a).
[72] *Id.* § 320301(b).

statement" authorizing review of the President's discretionary determinations.[73]  Thus, while the Act requires the President to determine that there are objects of historic or scientific interest to be protected by the designation and that the land reserved is the smallest area compatible with the proper care and management of those objects, it is the President's judgment on those facts which is determinative of whether a national monument should be proclaimed.  Consequently, the President's judgment on these facts is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment.  "How the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review," because "no question of law is raised when the exercise of the President's discretion is challenged."[74]

This principle is firmly established by *Dalton* and a long line of Supreme Court decisions beginning with *Dakota Central Telephone Co. v. State of South Dakota ex rel. Payne*.[75]  Plaintiff there sought to enjoin implementation of an intrastate rate schedule prepared by the Postmaster General, who had assumed control of the telephone companies under presidential proclamation.  In rejecting plaintiff's claim that the President had exceeded the power given him by Congress, the Supreme Court explained that claims asserting an excess or abuse of discretion by the President are not judicially reviewable:

> But as the contention at best concerns not a want of [presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power.  This must be since, as this court has often pointed out, *the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.*[76]

---

[73] *See Franklin*, 505 U.S. at 801; *see also United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940).
[74] *Dalton*, 511 U.S. at 476 (cleaned up).
[75] 250 U.S. 163 (1919).
[76] *Id.* at 184 (emphasis added).

Similarly, in *United States v. George S. Bush & Co.*,[77] the Supreme Court reversed a determination by the Court of Customs and Patent Appeals which invalidated a presidential proclamation issued pursuant to the Tariff Act of 1930.  It is "the judgment of the President on those facts which is determinative of whether or not the recommended rates [of duty] will be promulgated" and "the judgment of the President . . . is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment."[78]

Finally, in *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp*,[79] the Supreme Court concluded that the President's decision to approve or disapprove orders of the Civil Aeronautics Board was not reviewable because "the final orders embody Presidential discretion as to political matters beyond the competence of the courts."[80]  And the Court reached this conclusion despite recognizing that the consequence of its decision was to foreclose judicial review altogether:

> The dilemma faced by those who demand judicial review of the Board's order is that, before Presidential approval, it is not a final determination . . . and after Presidential approval, the whole order, both in what is approved without change, as well as in amendments which he directs, derives its vitality from *the exercise of unreviewable Presidential discretion*.[81]

The President's unique status under the Constitution distinguishes him from other executive officials.[82]  He is entrusted under the Constitution "with supervisory and policy responsibilities of utmost discretion and sensitivity," including the responsibility to "take Care that the Laws be faithfully executed."[83]  Accordingly, the Supreme Court's refusal to subject

---

[77] 310 U.S. 371 (1940).

[78] *Id.* at 379–80.

[79] 333 U.S. 103 (1948).

[80] *Id.* at 112–14.

[81] *Id.* at 113 (emphasis added).

[82] *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982).

[83] *Id.* at 750 (quoting U.S. Const. art. II, § 3).

presidential action to judicial review is supported by the separation of powers doctrine and the President's unique position in that constitutional scheme.[84]

Two decisions from sister courts in this Circuit confirm that the Court cannot second-guess the President's discretionary judgments in establishing national monuments.  In *Utah Association of Counties v. Bush*, plaintiffs sought judicial review of their claims that President Clinton had improperly designated objects of scientific or historic interest and reserved too much land in establishing the Grand Staircase-Escalante National Monument.[85]  Judge Benson held that he lacked authority to undertake the requested review, as a "grant of discretion to the President to make particular judgments forecloses judicial review of the substance of those judgments altogether."[86]  Instead, Judge Benson concluded that his review was limited to "inquir[ing] into whether the President, when designating this Monument, acted pursuant to the Antiquities Act."[87] Similarly, in *State of Wyoming v. Franke*, this general principle of non-reviewability was applied to a similar challenge to presidential action under the Antiquities Act.[88]  In denying plaintiffs' request for a judicial declaration voiding the Presidential Proclamation which created the Jackson Hole National Monument, the Court stated:

> It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review . . . . Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those

---

[84] *See Franklin*, 505 U.S. at 800–01 ("Out of respect for the separation of powers and the unique constitutional position of the President . . . textual silence is not enough to subject" the President's decisions to judicial review under the APA); *Nixon*, 457 U.S. at 749 (absolute immunity from private damage suits is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers").

[85] 316 F. Supp. 2d 1172, 1185 (D. Utah 2004).

[86] *Id.*

[87] *Id.* at 1186 (finding this narrow review standard easily met).

[88] 58 F. Supp. 890, 892 (D. Wyo. 1945)

facts.  For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains.[89]

The court then concluded as follows: "In short, this seems to be a controversy between the Legislative and Executive Branches of the Government in which, under the evidence presented here, the Court cannot interfere."[90]

The Antiquities Act undeniably confers authority upon the President to create national monuments, and it is beyond dispute that President Biden invoked that authority in issuing the Proclamations.  Rather than dispute this authority, Plaintiffs contend that the President acted in excess of or abused his authority under the Act when he restored the challenged monuments.  Such claims are beyond the reach of judicial power.[91]  Should Plaintiffs disagree with the President's discretionary judgments, they can petition Congress to change the President's determinations.[92]

## II.    The Challenges To Grand Staircase-Escalante National Monument And All But One Plaintiff Should Be Dismissed For Lack Of Standing.

The Court should dismiss all Plaintiffs but Kyle Kimmerle for failing to adequately allege standing, and even Mr. Kimmerle lacks standing to challenge the GSENM Proclamation.[93]  The Court should therefore dismiss all challenges except for Mr. Kimmerle's challenge to the BENM

---

[89] *Id.* at 896 (internal quotation marks omitted) (quoting *George S. Bush & Co.*, 310 U.S. at 380).
[90] *Id.*
[91] *See Dalton*, 511 U.S. at 476 ("How the President chooses to exercise the discretion Congress has granted him is not a matter for our review"); *George S. Bush & Co.*, 310 U.S. at 380 ("No question of law is raised when the exercise of [the President's] discretion is challenged"); *Dakota Cent. Tel. Co.*, 250 U.S. at 184 (claim of "mere excess or abuse of discretion in exerting a power given . . . involves considerations which are beyond the reach of judicial power").
[92] For example, Congress enacted restrictions on new national monuments following unsuccessful litigation over a national monument in Wyoming.  *See* 54 U.S.C. § 320301(d) ("No extension or establishment of national monuments in Wyoming may be undertaken except by express authorization of Congress.").
[93] Defendants do not concede that Mr. Kimmerle has standing to bring suit, but do not presently seek dismissal on that ground.

Proclamation for lack of standing.[94]  Doing so will assist the Parties in focusing any factual development that may be appropriate, such as whether the parcels of reserved land allegedly causing Mr. Kimmerle's injury have historic or scientific value,[95] on Plaintiffs who can survive the pleading stage.

Consistent with Article III's case-or-controversy requirement, Plaintiffs must establish standing to sue.  To do so, a plaintiff must establish: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[96]  At the pleading stage, a plaintiff must "clearly . . . allege facts demonstrating" each standing element.[97]  And those facts must establish a plausible basis for the plaintiff's standing.[98]

Plaintiffs' challenges focus not on actual concrete injuries, but on their disagreement with the President's policy decision to protect the relevant lands and resources.  But "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy."[99]  Their Complaints recite numerous concerns with federal management of the public lands, when those

---

[94] *See Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1451–53 (10th Cir. 1994) (analyzing individual plaintiffs' standing separately and dismissing some plaintiffs for lack of standing even though other plaintiffs had standing); *Thiebaut v. Colo. Springs Utilities*, 455 F. App'x 795, 802 (10th Cir. 2011) ("courts retain discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing").

[95] *See infra* pp.40–43.

[96] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

[97] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration in original) (citation omitted).

[98] *See Ashcroft*, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss," including a motion to dismiss under Rule 12(b)(1)); *see also Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) ("we apply the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action.").

[99] *Bear Lodge Multiple Use Ass'n. v. Babbitt*, 175 F.3d 814, 822 (10th Cir. 1999) (citation omitted).

management decisions occurred long before President Biden issued the challenged Proclamations.[100]   When it comes to describing the challenged Proclamations, however, the Complaints provide conclusory assertions that the Proclamations prohibit various activities—*e.g.*, motorized vehicle use, road use, NEPA analyses, installation of water facilities[101]—that are not even mentioned in the challenged Proclamations.[102]   Elsewhere, Plaintiffs tacitly concede that their alleged injuries have not yet materialized.[103]

Here, the allegations of both Plaintiffs' complaints, even liberally construed, cannot meet Article III's requirements because, with one potential exception going only to a small portion of one of the two Proclamations, Plaintiffs have not met their burden to establish standing.

A.   **The *Garfield* Plaintiffs do not allege a cognizable injury, caused by the Proclamations, that would be redressed by a favorable decision**.

The *Garfield* Plaintiffs challenge the Biden Proclamations, asserting three basic theories of standing: harms from increased visitation to southern Utah, harms to alleged State interests in the management of federal lands, and decreased revenue from mineral sharing.   As discussed below, none of these standing theories meets Article III requirements.

1.   The State and the Counties cannot demonstrate standing based on allegations of harm arising from increased visitation to southern Utah.

Permeating their complaint is the *Garfield* Plaintiffs' contention that, in contradiction to the judgment of Congress, the creation of monuments under the Antiquities Act in fact "endanger what they purport to protect" by causing increased visitation to the relevant regions in southern

---

[100] *E.g.*, *Dalton* Compl. ¶¶ 79, 82, 112, 130–31.

[101] *E.g.*, *id.* ¶¶ 93–99; *Garfield* Compl. ¶¶ 153–54, 159.

[102] *See* BENM Procl., 86 Fed. Reg. at 57,321–34; GSENM Procl., 86 Fed. Reg. at 57,335–47.

[103] *E.g.*, *Dalton* Compl. ¶ 77 ("the Monuments portend a future [of] closed trails and roads; restricted campgrounds; limits on motorized access; and caps on group sizes that will block family or religious gatherings").

Utah.[104]  They further allege that this increase in visitors causes numerous and various harms ranging from increased search-and-rescue and road maintenance costs to harm to local wildlife populations and archeological and paleontological resources to the increased need for law enforcement.[105]

As an initial matter, the *Garfield* Plaintiffs' allegations that they are injured by—and would prefer to avoid—increased tourism to the area is neither plausible on its face nor consistent with Plaintiffs' own statements and efforts.[106]  To the contrary, all three *Garfield* Plaintiffs manage public websites designed to attract more visitors to southern Utah by advertising these very monuments, thereby causing their own "injury."[107]  Thus,  even assuming that they have plausibly alleged injury due to increased visitation, the *Garfield* Plaintiffs do not allege facts plausibly showing that that the Biden Proclamations caused the increased visitation, or that any resulting injuries would be redressed if the Court grants them relief.[108]

---

[104] *Garfield* Compl. ¶ 17 ("[The reservations] draw visitors from all over the world who trample on flora, traumatize fauna, and leave trails and roads overrun with trash and human waste"); *id.* ¶ 145 ("The reservations inherently draw increased visitation to the reserved lands due to their public notoriety").

[105] *Id.* ¶¶ 21–23, 147, 154, 156, 161, 180, 188, 195, 198, 199.

[106] *See, e.g.,* Ex. A, Utah Office of Tourism Website, Grand Staircase-Escalante 2 ("Grand Staircase–Escalante National Monument is phenomenal."); Ex. B, Utah Office of Tourism Website, Bears Ears National Monument 2 ("A pair of towering buttes stand against beautiful scenery."); Ex. C, Kane County Travel Council Website 1 ("Have you ever hoped to find the perfect vacation destination, far from the crowds, and surrounded by amazing scenic splendor? Well Now You Have!  Kane County, in Southern Utah, offers easier access to more National Parks and Monuments than any other place on earth [including] the Grand Staircase-Escalante National Monument."); Ex. D, Garfield County Tourism Website 1 (stating Garfield County "works diligently to attract visitors to [its] world-class destinations" and directing visitors to Bryce Canyon Country website); Ex. E, Bryce Canyon Country Website 2 ("When visiting Grand Staircase-Escalante, you'll find numerous things to do and places to see that will make your experience unique and memorable."). The Court may take judicial notice of these websites. *Garling v. EPA*, 849 F.3d 1289, 1297 n.4 (10th Cir. 2017).

[107] *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021).

[108] *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008).

To establish causation, a plaintiff must establish "a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."[109] If "'speculative inferences are necessary to connect [the] injury to the challenged action,' this burden has not been met."[110] And "self-inflicted injuries cannot satisfy the requirements for Article III standing because they break the causal chain linking the defendant's conduct to the asserted injury."[111]

Here, not even speculative inferences could connect the *Garfield* Plaintiffs' alleged injuries to the Biden Proclamations. Ultimately, the *Garfield* Plaintiffs' position is that the existence of the two monuments brings unwanted visitors to southern Utah.[112] But both monuments were established *years* prior to President Biden's 2021 Proclamations.[113] Further, Plaintiffs expressly allege that it was these initial "reservations"—reservations that they do not challenge in this litigation—that resulted in the increased visitation and alleged resultant harms.[114] Other allegations corroborate this point. For instance, they describe the alleged harm from increased search and rescue costs as commencing in "1996, when the Grand Staircase-Escalante reservation went into effect . . . ."[115]

As a result, Plaintiffs cannot plausibly allege facts establishing a "substantial likelihood" that any increased visitation was caused by the Biden Proclamations, as opposed to the earlier,

---

[109] *Id.* (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005)).

[110] *Id.* (quoting *Nova Health Sys.,* 416 F.3d at 1157).

[111] *Colorado*, 989 F.3d at 888 (internal citation omitted).

[112] *Garfield* Compl. ¶¶ 17, 145.

[113] *Id.* ¶ 105 (GSENM established by Proclamation 6,920 in 1996); ¶ 108 (BENM established by Proclamation 9,558 in 2016).

[114] *Id.* ¶ 113 ("The reservations [by Presidents Clinton and Obama] also attracted visitation and attention from all over the world, straining local infrastructure and increasing litter and waste, damage to the land, harm to animals, and desecration of archaeological sites").

[115] *Id.* ¶ 197 (alleging "over 750 search-and-rescue missions within San Juan, Garfield, and Kane counties," since 1996, "over 85% of them involving visitors"); *see also id.* ¶ 150 (alleging that since "President Obama created the Bears Ears reservation, vandalism and other harms to archeological resources within it have increased"); *id.* ¶ 193 (Utah launched "Pledge to Protect the Past" to address archeological vandalism in 2020 before the challenged Proclamations).

unchallenged proclamations—or to other factors, such as Plaintiffs' own tourism initiatives.  In fact, their own complaint proves the opposite.  It relies on a July 2022 Salt Lake Tribune ("SLT") article for the proposition that in 2021, "the year when President Biden issued his proclamations," Kane County experienced a "massive influx of visitors."[116]  The article, however, emphasizes that increased visitation to the region resulted from "pandemic tourism," rather than, for instance, the 2021 Proclamations.[117]  Furthermore, while the article references a substantial increase in tourist visits to Kane County between 2020 and 2021—the Biden Proclamations issued in *October* 2021—late in the year and months after the conclusion of the summer tourism season.[118]  This article, therefore, demonstrates that increased visitation was occurring immediately *before* the Biden Proclamations issued, at a time when the monument boundaries were significantly contracted under President Trump's Proclamations.  Similarly unavailing is their reliance on agency documents that discuss visitation increasing by 2020, when monument boundaries were contracted.[119]  Accordingly, the *Garfield* Plaintiffs' own allegations undermine their assertion of a link between increased tourism and the restoration of monument boundaries.

For similar reasons, the *Garfield* Plaintiffs do not adequately allege redressability for their alleged injuries arising from increased visitation.[120]  To adequately plead a redressable injury, a

---

[116] *Id.* ¶ 145 (citing Eddington, *As Kanab reels from pandemic tourism, officials hope kindness campaign can curb vandalism and trash*, Salt Lake Trib. (July 16, 2022)).

[117] Ex. F, Eddington 1–2, *supra* n.116 (noting that "during the pandemic . . . people from coronavirus-infested cities and suburbs have sought sanctuary in Kane County's wide open spaces and nearby national monuments and parks").

[118] *Garfield* Compl. ¶ 124.

[119] *Id.* ¶ 150 (citing a 2020 document from the Bureau of Land Management ("BLM") and a Forest Service document discussing how visitor use increased by 2020); *see also* Cultural Site Visitor Management for Doll House, Lewis Lodge, Dry Wash and Twin Kivas Cultural Sites, Draft Environmental Assessment, Finding of No Significant Impact 2 (June 2022), available at https://usfs-public.app.box.com/v/PinyonPublic/file/965122654218 (last visited Jan. 5, 2023) (stating that visitor use increased from 2016 to 2020).

[120] *See Habecker*, 518 F.3d at 1224 ("it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").

plaintiff "must allege facts from which it reasonably could be inferred that . . . if the court affords the relief requested, the [injury] will be removed."[121]  Here, the *Garfield* Plaintiffs seek (1) judicial declarations that the Biden Proclamations are unlawful; and (2) an injunction preventing Federal Defendants from implementing the Proclamations.[122]  They do not allege that this relief will stop people from visiting the regions where the monuments are located—nor would such an allegation be plausible.  Indeed, their alleged theory—that tourists visit the monuments "due to their public notoriety"[123]—suggests that further litigation about the monuments would only increase visitation.

Moreover, even Plaintiffs' requested remedy would not eliminate either of the two monuments.  The two monuments are each the subject of prior proclamations—those originally creating the monuments; and those in 2017 modifying their boundaries.[124]  Although there may be some question as to which proclamations would control the monuments' boundaries, were the Biden Proclamations to be vacated, there are *no* circumstances under which the monuments— encompassing, at a minimum, 1.11 million acres—would simply cease to exist.[125]  As such, even accepting Plaintiffs' unsupported allegations that the monuments are responsible for the increased visitation to the regions in which they are located—the monuments will continue to exist, regardless of whether Plaintiffs prevail.  Even if the monuments themselves somehow ceased to exist, the public would still be aware of the existence of resources within the relevant lands from the *Garfield* Plaintiffs' own websites and the prior monument proclamations.  Because Plaintiffs

---

[121] *Producers of Renewables United for Integrity Truth & Transparency v. EPA*, No. 19-9532, 2022 WL 538185, at \*9 (10th Cir. Feb. 23, 2022) (alterations in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)).
[122] *Garfield* Compl. at p.80.
[123] *Id.* ¶ 145.
[124] *Id.* ¶¶ 105, 107, 119.
[125] *See id.* ¶¶ 119–20, 122, and map at p.26.  The two 2017 Trump proclamations modifying the monuments' boundaries are subject to challenges in still-pending litigation in the U.S. District Court for the District of Columbia.  *The Wilderness Soc. v. Biden*, Case No. 17-cv-2587 (D.D.C.); *Hopi Tribe et al. v. Biden*, Case No. 17-cv-2590 (D.D.C.).

cannot plausibly allege that vacating the Biden Proclamations would eliminate public knowledge of the monument resources, they cannot plausibly allege redressability for their tourism-related injuries.

In sum, the *Garfield* Plaintiffs have failed to establish that their alleged injuries flowing from increased visitation are either caused by the Biden Proclamations or redressable by an order from this Court.  Accordingly, these theories of injury do not support standing.

> 2.    The State and Counties cannot demonstrate standing based on alleged injuries to resources in which they do not allege a legally protectable interest.

The *Garfield* Plaintiffs also allege that the Biden Proclamations cause them injury because they "pre-empt [Utah's] laws and policies"; "impede its ability to work on the land"; "impose administrative burdens on [Utah's] workers"; and cause unidentified "impositions" to the Counties' administrative planning, land management, facilities maintenance; etc.[126]  However, these alleged injuries are not cognizable injuries for purposes of Article III standing.  A plaintiff must demonstrate "an 'injury in fact'"—which must, among other things, comprise "an invasion of a legally protected interest."[127]  And, the legally protected interest must be particularized to the plaintiffs—they must clearly "allege facts demonstrating that [they are] a proper party to invoke judicial resolution of the dispute."[128]

Here, the *Garfield* Plaintiffs allege harms related to a variety of items for which they lack a legally protected interest, because the reservations apply only to federal land.  The *Garfield* Plaintiffs have identified no legal basis for having their policy preferences implemented on federal lands.  Plaintiff Utah, for instance, asserts injury due to alleged inconsistencies between how it

---

[126] *Garfield* Compl. ¶¶ 21–24.
[127] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotations and citations omitted).
[128] *Schaffer v. Clinton*, 240 F.3d 878, 883 (10th Cir. 2001) (quoting *United States v. Hays*, 515 U.S. 737, 743 (1995)).

believes the Monuments will be managed by the United States, and how it believes the relevant federal lands should be managed.[129]  But these allegations fail to identify a cognizable injury as a matter of law—states and counties do not have a legal right to impose their management preferences on federal lands within their boundaries.[130]  Their management interests in federal lands are instead governed by, *inter alia*, the Federal Land Policy and Management Act ("FLPMA"),[131] which exists in harmony with the Antiquities Act, by affording a consultation role and limited other rights to states and counties while recognizing the supremacy of Federal law and management interests.  Courts have made it clear that FLPMA imposes no obligation on the federal government to yield to State or local government preferences.[132]

Consistent with this federal statutory foundation for the State's and County's management interests, the *Garfield* Plaintiffs allege that the Monuments "deprive the State of its federal statutory procedural rights"—namely those afforded under FLPMA, 43 U.S.C. § 1712(c)(9).[133]

---

[129] *Garfield* Compl. ¶ 21 (alleging that "the reservations preempt [Utah's] law and policies"); ¶ 202 (alleging that "the reservations also preempt the State's policies" such as the "State of Utah Resource Management Plan for Federal Lands"); ¶ 204 (alleging that monuments are "antithetical" to States' goals with respect to "Utah Grazing Agricultural Commodity Zones").

[130] *See United States v. Bd. of Cnty. Cmm'rs of Cnty. of Otero*, 843 F.3d 1208, 1215 (10th Cir. 2016) (noting state law and county resolution "must yield to federal law regarding conduct on federal land").

[131] 43 U.S.C. § 1712(c)(9).

[132] *Kane Cnty. Utah v. Salazar*, 562 F.3d 1077, 1088 (10th Cir. 2009) (Section 1712(c)(9) "gives the Secretary of the Interior discretion to determine the extent to which the agency's land use plans are consistent with State and local plans"); *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 877 (9th Cir. 2017) (FLPMA requires, at most, that "Interior fully acknowledge[] and consider[] the Counties' concerns").  With respect to the Counties, the *Garfield* Plaintiffs allege that the Proclamations "force local governments . . . to review, modify, and coordinate management plans in response to the reservations."  *Garfield* Compl. ¶ 192.  This allegation is too vague to assert a cognizable injury—but in any case, it is not plausibly alleged that such activity is related to the Proclamations particularly, as opposed to any federal land use planning or decision-making with respect to federal lands.

[133] *Garfield* Compl. ¶ 194.

But that section provides only that, in the development and revision of land use plans, the Secretary of the Interior shall:

> to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located.[134]

Nothing in the Biden Proclamations is inconsistent with this requirement, which remains in force. Both Proclamations expressly reinforce the requirement by instructing that, in preparing a management plan for their respective monuments, the Secretaries of the Interior and Agriculture "shall provide for maximum public involvement in the development of that plan, including consultation with federally recognized Tribes and *State and local governments*."[135]   And any harms based on Plaintiffs' anticipated outcomes of that cooperative planning process are speculative, as that planning process has not yet concluded.

The *Garfield* Plaintiffs also allege that the Biden Proclamations will prevent them from "engaging in active land management," including to "maintain healthy soils, safeguard against fire, protect native vegetation, and preserve wildlife habitats."[136]   But they cannot allege that the Biden Proclamations prevent them from undertaking whatever management they deem appropriate on their *own* lands.   Rather, the lands impacted by the Proclamations are *federal* lands, managed by the federal land agencies.[137]   The *Garfield* Plaintiffs fail to allege any past instances when they were allowed to "active[ly] manage" relevant federal land, let alone how they could have a legally

---

[134] 43 U.S.C. § 1712(c)(9).
[135] BENM Procl., 86 Fed. Reg. at 57,332 (emphasis added).
[136] *Garfield* Compl. ¶ 187.
[137] The Complaint alleges that the monuments increase risk of damage to state and local property because they "prevent State and local efforts to clear brush and other fire fuels."  *Garfield* Compl. ¶ 205.  But as noted above, nothing in the Proclamations can be deemed as having any impact on management of non-federal land.

protectable interest in being allowed to do so.  To the extent they are alleging that federal agencies will not undertake "active management" that the Plaintiffs desire, those speculative allegations involve unripe APA claims, as they have not identified any such specific agency action or inaction.

Further, while the *Garfield* Plaintiffs allege that certain resources are, in fact, harmed by the Biden Proclamations, they lack a protectable interest in those resources.  For instance, their Complaint alleges, counterintuitively, that the Biden Proclamations harm paleontological and archeological resources.[138]  These allegations largely rely on Plaintiffs' contentions regarding increased visitation which, as discussed above, are defective as to causation and redressability. But even if that were not the case, these allegations fail to show injury in fact because Plaintiffs allege no ownership of—or any other legally-protectable interest in—archaeological and paleontological resources located on federal land.[139]  To the contrary, such resources are on federal land, and the Complaint expressly recognizes the pervasive *federal* oversight over the management of such resources.[140]

In a similar vein, the *Garfield* Plaintiffs allege a variety of harms, which would accrue not to themselves, but to their citizens and residents.[141]  But a plaintiff's complaint must establish that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant *his*

---

[138] *Garfield* Compl. ¶¶ 144–49.

[139] *Cf. Catron Cnty. Bd. of Com'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (allegations that federal designation of critical habitat would "prevent the diversion and impoundment of water *by the County*, thereby causing flood damage to county-owned property" alleged actual injury).

[140] *Garfield* Compl. ¶ 80.  Arguably, the State can assert a protectable interest with respect to wildlife.  However, its alleged harm in the Complaint is the inability to undertake management activities, such as installing water facilities or preparing NEPA analyses, *id.* ¶ 154, that the Proclamations do not prohibit, *see supra* pp.9, 20–21.

[141] *See Garfield* Compl. ¶¶ 175–180 (grazers); 181–85 ("local workers"); 209–13 (Native American interests").

invocation of federal-court jurisdiction," not that of a third party.[142]  And it is well-established that entities such as the *Garfield* Plaintiffs cannot bring an action against the federal government on behalf of their citizens.[143]

In summary, the *Garfield* Plaintiffs' effort to establish standing relies in large part on activities and resources for which they lack a legally protected interest, which is fatal to their effort.

3.    The *Garfield* Plaintiffs' remaining allegations fail to establish standing.

The *Garfield* Plaintiffs also allege that the Proclamations "deprive [the State] of revenue."[144]  While these allegations at least identify a potentially cognizable injury,[145] they ultimately fail due to their speculative nature.

First, the State alleges that it will lose revenue because it receives "fees . . . tied to the number of grazing allotments in the State," and President Biden's "reservations facilitate, if not directly invite, the permanent retirement of grazing allotments."[146]  But as the State implicitly admits, the Proclamations do not themselves reduce the number of grazing allotments.  Rather, they only provide that, should "grazing permits or leases be voluntarily relinquished by existing

---

[142] *See Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (emphasis added).

[143] *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1232 (10th Cir. 2012) (petitioners "cannot bring a suit on behalf of local business owners, i.e., their citizens, but must instead sue to protect their own sovereign interest"); *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992) ("we agree that the State does not have standing as a parens patriae to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens"); *Stewart v. Norton*, 2:06 CV 209, 2006 WL 3305409, at *4 (D. Utah Sept. 29, 2006), *aff'd sub nom. Stewart v. Kempthorne*, 554 F.3d 1245 (10th Cir. 2009) (grazing allotment) ("The Counties concede that their claimed injury cannot flow from a parens patriae interest in the outcome of the litigation")

[144] *Garfield* Compl. ¶ 21.

[145] *See Mt. Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994).

[146] Utah also alleges that "it provides grants, loans and aid to ranchers to support grazing" but that "restrictions that accompany the reservations impede some of those State-funded projects." *Garfield* Compl. ¶ 206.  It is entirely unclear what this means—but in any case, the alleged injury would appear to be that of the grazing beneficiaries, not the State.

holders," the associated lands will be retired from grazing.[147]  The State's speculation about possible future injury from other entities' voluntary relinquishment of a permit or lease is inadequate to demonstrate a certainly impending injury at the time filed their Complaint.[148]

Similarly, the State alleges that it will lose revenue from "rare-earth mineral and other mining."[149]  But, as an initial matter, the Proclamations do not bar all future mineral development within the monument boundaries.[150]  Furthermore, the State's specific allegations of potential lost royalties tie directly to the 1996 Clinton Proclamation—which they do not challenge—and not to the Biden Proclamation.[151]  In contrast, the State has *not* clearly alleged any facts that the Biden Proclamations, by restoring the lands reserved for the two monuments, have (or imminently will) result in lost revenue to the State.  More specifically, the State has not made any factual allegations that the Biden Proclamations have prevented any planned mineral development projects on any of those lands brought back within either of the monuments by the Biden Proclamations.  As such, the State fails to demonstrate any current, or "certainly impending," loss of royalties caused by either of the Proclamations.[152]

Finally, the State's allegation that it is harmed by being "forced to give up its own school trust lands within the reservations' boundaries" fails as a matter of law.  The State voluntarily

---

[147] GSENM Procl., 86 Fed. Reg. at 57,346.
[148] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient") (cleaned up); *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 44–45 (1976) ("indirectness of injury . . . may make it substantially more difficult to meet the minimum requirement of Art. III") (cleaned up).
[149] *Garfield* Compl. ¶ 207.
[150] *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1149 (10th Cir. 2013) (noting that under prior Proclamation, "new mineral leasing within the monument is prohibited, although mineral development is permitted under existing leases").
[151] *Garfield* Compl. ¶ 207 (alleging that State was projected to receive substantial direct and indirect revenues from the "high-grade coal" in GSENM, as reported in a 1998 House of Representatives report).
[152] *Clapper*, 568 U.S. at 409.

exchanged its school trust lands within the boundaries of GSENM in 1998,[153] and the BENM Proclamation provides only that "the Secretary of the Interior shall explore entering into a memorandum of understanding with the State of Utah that would set forth terms, pursuant to applicable laws and regulations, for an exchange of land owned by the State of Utah . . . within the boundary of the monument."[154]   The Court may therefore disregard the allegation that the Proclamation "forces" Utah to enter into a land exchange agreement.[155]

> **B.    The *Dalton* Plaintiffs fail to adequately allege standing to challenge the Grand Staircase-Escalante Proclamation**.

The *Dalton* Plaintiffs bring largely identical challenges to the two Biden Proclamations. *Dalton* is brought by the following four plaintiffs:  (1) Zebediah George Dalton, owner of TY Cattle Company, with operations in southwestern Utah; (2) the BlueRibbon Coalition ("BRC"), a non-profit focused on protecting public recreation access to public lands; (3) Kyle Kimmerle, managing member of Kimmerle Mining LLC, with mining interests in southeastern Utah; and (4) Suzette Ranea Morris, a member of the Ute Mountain Ute, who resides in the vicinity of BENM.[156]   As explained below, none of these Plaintiffs have standing to challenge the GSENM Proclamation, and three of them lack standing altogether.

---

[153] *See* Utah Schools and Land Exchange Act of 1998, Pub. L. No. 105-335, 112 Stat. at 3140 (explaining that "the State of Utah and the United States have reached an agreement under which the State would exchange all its State school trust lands within [GSENM] . . . for various Federal lands and interests in lands located outside the Monument").
[154] BENM Procl., 86 Fed. Reg. at 57,332.
[155] *See, e.g., eCash Techs., Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1144 n.7 (C.D. Cal. 2001) ("the Court may disregard allegations . . . if they are contradicted by facts established by reference to documents" relied on in the pleading and "the Court need not accept as true allegations that contradict facts which may be judicially noticed by the Court").
[156] *Dalton* Compl. ¶¶ 12–15, 112, 127, 142.

1.    All the individual plaintiffs fail to establish standing to challenge
Proclamation 10,286.

Mr. Dalton, Ms. Morris, and Mr. Kimmerle (together the "individual Plaintiffs")—should

be dismissed as plaintiffs with respect to the challenge to the GSENM Proclamation, because they

allege no injury related to GSENM.  As noted above, a plaintiff must establish standing for each

claim asserted.[157]  But, despite challenging the GSENM Proclamation,[158] the individual Plaintiffs

allege no injury related to GSENM.   Plaintiff Kimmerle alleges harm only relating to alleged

mining interests in or near BENM.[159]  As discussed below, Dalton's and Morris' allegations of

harm relate solely to activities at or in the vicinity of BENM.  None of these plaintiffs even mention

GSENM or Proclamation 10,286—let alone any facts that that could demonstrate that they have

standing to challenge the Proclamation.  Accordingly, at very least, the individual Plaintiffs should

be dismissed as plaintiffs with respect to the challenge to Proclamation 10,286.

2.    The Complaint fails to adequately allege standing for Plaintiffs Dalton and
Morris.

The *Dalton* Complaint fails to clearly allege facts establishing any standing for plaintiffs

Dalton and Morris.[160]  Both of these plaintiffs assert injury relating to their activities at or in the

vicinity of the BENM—but both fail to clearly allege facts establishing their standing.

Mr. Dalton alleges that "three-quarters of [his] ranch is now within Bears Ears."[161]  His

primary concern arises from his perception of the overly burdensome nature of federal regulation

of his operations.[162]  But this allegedly pervasive "federal regulation" of Mr. Dalton's activities

---

[157] *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016).
[158] *See Dalton* Compl. ¶¶ 50–61, 152–59.
[159] *Id.* ¶¶ 115–26.
[160] *Lujan*, 504 U.S. at 560; *Schaffer*, 240 F.3d at 883.
[161] *Dalton* Compl. ¶ 127.
[162] *Id.* ¶¶ 130–31.

predate the BENM Proclamation, as demonstrated by Mr. Dalton's specific examples.[163]  Further,

while Mr. Dalton vaguely alleges that he believes federal oversight will become even more onerous

under the BENM Proclamation, he provides no factual allegations demonstrating an actual or

imminent injury from the issuance of that Proclamation.  Indeed, his primary concern appears to

be that state lands (e.g., lands managed by the Utah School and Institutional Trust Lands

Administration ("SITLA")) that his cattle graze on may be transferred as part of a land exchange

agreement to the United States—and he prefers SITLA's management to that of BLM.[164]  But the

BENM Proclamation does not (and could not) mandate a land exchange.[165]  Rather, any land

exchange would, assuming that it was successfully negotiated between the United States and Utah,

have to be approved through future action, such as an Act of Congress.[166]  Because he has provided

no allegations that such action is imminent, these allegations cannot establish a a "certainly

impending" injury.[167]  Mr. Dalton should therefore be dismissed as a plaintiff.

The *Dalton* Complaint similarly fails to clearly allege facts demonstrating an actual injury

to Ms. Morris.  Ms. Morris, a member of the Ute Mountain Ute tribe, alleges that she and her

community "depend on ready access" to lands (presumably, although not specifically alleged to

be, those reserved under the BENM Proclamation).[168]  But nothing in either Proclamation prevents

---

[163] *See id*. ¶ 135 (noting that "[*f*]*or years,* [Mr. Dalton] has tried to obtain permission . . .*"*)
(emphasis added); ¶ 139 (alleging that it took 20 years for BLM approval of a fence); *see also*
Declaration of Zebediah George Dalton ¶ 11, ECF No. 2-7 ("Dalton Decl.") (asserting that he is
awaiting approval of 2016 application of 6 wells from BLM and 2018 application for 19 wells
from Forest Service).

[164] *Id.* ¶¶ 132–34.

[165] *See generally* BENM Procl., 86 Fed. Reg. at 57,321–34.

[166] *See, e.g.,* Utah Schools & Lands Exchange Act of 1998, Pub. L. No. 105-335, 112 Stat. 3139
(approving prior land exchange between the United States and Utah).

[167] *See Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1234 (10th Cir. 2020)
(allegations relating to an "analysis that has yet to take place," the outcome of which is unknown,
"cannot show a certainly impending injury").

[168] *Dalton* Compl. ¶ 147.

Ms. Morris from visiting the federal lands comprising BENM or GSENM.  Furthermore, Ms. Morris alleges concerns that the BENM Proclamation may prohibit gathering of firewood, cedar posts for the Bear Dance, "choke cherries, wild onions, sage, willows, sweet grass, yucca, medicinal herbs and the like."[169]  But she recognizes that such restrictions were not imposed under President Obama's earlier Proclamation 9,558—which "protected Native American access for 'traditional cultural and customary uses.'"[170]  This recognition negates Ms. Morris' alleged injury, because the provision from Proclamation 9,558 protecting cultural and customary uses by individuals such as Ms. Morris is incorporated by reference in the BENM Proclamation.[171]  As such, the Complaint fails to "clearly allege facts" supporting an actual injury to Ms. Morris as well.[172]

### 3.    BlueRibbon Coalition does not adequately allege standing.

Plaintiff BRC is an organization that "work[s] to protect public recreation access to public lands."[173]  An organization such as BRC can assert standing in two ways:  First, it may have standing to bring suit on behalf of its members ("associational standing") "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[174]  Alternatively, an organization may assert

---

[169] *Id.*

[170] *Id.*; *see also* Establishment of BENM, 82 Fed. Reg. at 1145  (requiring the Secretaries of the Interior and Agriculture, "to the maximum extent permitted by law and in consultation with Indian tribes . . . provide access by members of Indian tribes for traditional cultural and customary uses . . . including collection of medicines, berries and other vegetation, forest products, and firewood for personal noncommercial use")*.*

[171] *See* BENM Procl., 86 Fed. Reg. at 57,332  (providing that Secretaries shall manage the monument under its terms and "unless otherwise specifically provided herein, those provided by Proclamation 9558, the latter of which are incorporated herein by reference").

[172] *Spokeo*, 578 U.S. at 338 (cleaned up).

[173] *Dalton* Compl. ¶ 13.

[174] *Friends of the Earth, Inc*, 528 U.S. at 181.

standing on its own behalf ("organizational standing"), if it meets the standing requirements that apply to individuals.[175]

BRC cannot establish associational standing because the Complaint's allegations do not establish that its members have standing.  For instance, the Complaint alleges that the two monuments "gutted many local economies," causing harm to BRC's members—but it also describes these impacts as arising under the *original* creation of the two monuments.[176]  Plaintiffs cannot therefore establish a "substantial likelihood" that the Biden Proclamations caused the alleged harm, which—by Plaintiffs' own admissions—commenced years before October 2021.[177] And it necessarily follows that vacating the Biden Proclamations and enjoining Defendants will not re-establish allegedly harmed local economies, creating significant redressability problems.[178] In addition, these alleged injuries relate to the BRC members' economic prospects, not to BRC's purpose of "protect[ing] public recreation access to public lands."[179]  Injuries not germane to BRC's purposes cannot support BRC's standing.[180]  For the same reason, allegations regarding the impact of BENM on BRC member Shane Shumeway's ranching, construction, and mining interests cannot support BRC's alleged standing, and the same is true of Ms. Griffith's allegations about impacts of the "monument-induced seasonal economy."[181]

---

[175] *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397 (10th Cir. 1992).
[176] *See Dalton* Compl. ¶¶ 79–87 (describing ways in which President Clinton's Proclamation "gutted many local economies" and resulted in changes to local communities based on people leaving or having to find jobs related to seasonal tourist industry); *id.* ¶ 89 (alleging harm cause by President Obama's Proclamation, including causing "a massive influx of visitors").  Any challenges to Proclamations that issued over six years ago are barred by 28 U.S.C. § 2401(a).
[177] *See Habecker*, 518 F.3d at 1225.
[178] *See id.* (complaint must allege facts establishing that it would be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").
[179] *Dalton* Compl. ¶ 13.
[180] *See Friends of the Earth, Inc*, 528 U.S. at 181.
[181] *Dalton* Compl. ¶¶ 7, 85, 101.

Other allegations regarding injury to BRC members are also defective.  For instance, the Complaint alleges that BRC member Trail Hero runs a business, the "biggest function" of which is running an "annual off-roading event in Southern Utah."[182]  Plaintiffs allege that "but for the regulatory climate that the President's proclamation has unleashed," Trail Hero "would be expanding into some of the towns and areas at issue."[183]  But Plaintiffs do not allege that the Trail Hero annual event has ever occurred on federal lands (regardless of Monument status), nor do they allege that any application to hold such an event on *either* of the Monuments has ever been made— let alone denied.  Plaintiffs' vague statements of allegedly thwarted, potential future plans are therefore insufficient to describe an actual, imminent injury.[184]

The Complaint also alleges that other members, such as Brent Johansen and Simone Griffith are harmed due to closures of roads or areas within BENM and GSENM respectively.[185] However, the *Dalton* Complaint does not actually allege that any of these named individuals has previously used a specific road or campsite that is now closed as a result of the Biden Proclamations—and as a result these allegations are inadequate.[186]  Indeed, by their terms, neither of the Biden Proclamations closes any roads, and Plaintiffs are merely speculating about what the "future" may "portend" when the agencies adopt monument management plans.[187]  And, to the extent the *Dalton* Complaint identifies specific roads or off-roading areas as being closed, those

---

[182] *See Dalton* Compl. ¶¶ 96–97; Declaration of Richard Klein ¶ 4, ECF No. 2-3 ("Klein Decl.").
[183] *Dalton* Compl. ¶ 97.
[184] *See Lujan*, 504 U.S. at 564 ("such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require").
[185] *Dalton* Compl. ¶¶ 94, 99, 104; *see also* Declaration of Brent Johansen ¶ 5, ECF No. 2-4 ("Johansen Decl.") (alleging that unidentified "[r]oad and trails are being closed, denying access. Favorite camping spots are being closed").
[186] *See Summers*, 555 U.S. at 499 ("plaintiffs must show that they 'use the area affected by the challenged activity and not an area roughly in the vicinity of' a project site") (quoting *Lujan*, 504 U.S. at 566).
[187] *Dalton* Compl. ¶ 77.

roads and areas either remain open (as in the case of the Little Desert OHV area, the Kitchen Corral

road, and Inchworm Arch road)[188]; or are unaffected by the Biden Proclamations (as in the case of

Park Wash and Deer Springs Wash roads).[189]  To be sure, Plaintiffs' allegations may reasonably

be construed as asserting that BRC and its members fear that new road or other closures may occur

in the future given the Proclamations' preservation focus—but any such injuries have not

occurred—and are not "certainly impending."[190]  In sum, because the Complaint does not allege

any actual and imminent injury facing BRC's members, it fails to establish that BRC has

associational standing.

      BRC's attempt to allege organizational standing also fails.  As noted above, an

"organization has standing on its own behalf if it meets the standing requirements that apply to

individual."[191]  In doing so, it must show more than "simply a setback to the organization's abstract

social interests."[192]  Rather, it must show a "concrete and demonstrable injury to the organization's

activities."[193]  This showing can be supported by a "consequent drain on the organization's

---

[188] Declaration of Harry Barber ¶¶ 7–9, 11 ("Barber Decl.").  For example, Simone Griffin, who
is the BRC's Policy Director, asserts that "as a result of President Biden's proclamation, the
Little Desert OHV area has been closed to off-roading and motorized vehicles."  Declaration of
Simone Griffin ¶ 13, ECF No. 2-2 ("Griffin Decl.").  Nothing in the Proclamation so states—and
in fact, this assertion is inaccurate.  Barber Decl. ¶¶ 7–9.  Ms. Griffin's inconsistencies are not
limited to that statement.  For instance, she makes the contradictory assertions that during the
winter months, "it is near impossible for us to find enough help to keep the store going," and "in
the winter, we will often have more employees than we need."  Griffin Decl. ¶¶ 7–8.
[189] Barber Decl. ¶ 10.
[190] *See Clapper*, 568 U.S. at 409 (noting that "allegations of *possible* future injury are not
sufficient") (interal quotations omitted).
[191] *Romer*, 963 F.2d at 1396.
[192] *Id*. at 1397 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).
[193] *Id.*

resources."[194]  However, the mere "expenditure of resources on advocacy is not a cognizable Article III injury."[195]

BRC fails to establish organizational standing under these principles.  It alleges that the Biden Proclamations forced it to divert resources to "new efforts designed to educate members and other stakeholders about the consequences and regulations of the two national monuments at issue here."[196]  This allegation lacks plausibility on its face: the monuments are not newly-formed. GSENM has existed since 1996, and BENM has existed since 2016.[197]  Further, although from a period from late 2017 to 2021 the boundaries of both monuments were reduced, they still collectively encompassed approximately 1.11 million acres and have existed, albeit in a reduced state, since their respective establishments.[198]  Even setting this factual implausibility aside, however, Plaintiffs' alleged diversion of time and resources are the type of advocacy expenditures and self-inflicted budgetary choices that courts have refused to recognize as "cognizable Article III injury."[199]

BRC's allegations that the "monuments have also directly interfered with [its] initiatives" are equally unavailing.  Plaintiffs allege only that BRC has recently started "the Dispersed Camping Access Alliance" to "advocate for the interests of dispersed camping users."[200]  The

---

[194] *Id.*

[195] *See Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 23–24 (D.C. Cir. 2015); *see also Animal Leg. Def. Fund v. Kelly*, 434 F. Supp. 3d 974, 996 (D. Kan. 2020) (finding that plaintiff organization's decision to channel money from certain programs into others, in response to the Act, is a "self-inflicted budgetary choice.") (internal citation omitted); *Equal Means Equal v. Ferriero,* 478 F. Supp. 105, 123 (D. Mass. 2020) (holding that alleged "policy and advocacy based injuries" based on the expenditure of "significant resources educating, advocating and communicating with the public around the country to counteract Defendant's unlawful actions" were insufficient to establish the plaintiff organizations' injury) (internal quotations omitted).

[196] *Dalton* Compl. ¶ 105.

[197] *Id.* ¶¶ 55 & 64.

[198] *See id.* ¶¶ 119–20, 122, and map at p.26.

[199] *See Turlock Irrigation Dist.*, 786 F.3d at 23; *Animal Leg. Def. Fund*, 434 F. Supp. 3d at 996.

[200] *Dalton* Compl. ¶ 106.

nature of this endeavor is unclear at best—but the Complaint certainly contains no facts demonstrating that BRC is somehow no longer able to continue "advocating" with respect to dispersed camping. Instead, BRC's claimed injury appears to be that BRC believes that future management of the monuments may be inconsistent with its policy preferences. However, such a concern—of a potential future "setback to the organization's abstract social interests"—is neither sufficiently imminent nor concrete to describe an actual injury for Article III.[201] Accordingly, the Complaint also fails to clearly allege facts that could establish organizational injury to BRC.

## III. Plaintiffs' Claims Should Be Dismissed For Failing To Identify Improperly Designated Lands With Sufficient Particularity.

Even if the Court could review the President's discretionary judgments under the Antiquities Act and Plaintiffs established standing to bring such claims, their claims must still be dismissed for failure to state a claim upon which relief can be granted. As the D.C. Circuit explained in *Tulare County v. Bush*,[202] a plaintiff lodging an Antiquities Act challenge must, at a minimum, direct the court with specificity to the lands that are allegedly designated without statutory authority in order to withstand challenge under Rule 12(b)(6). In that case, for example, the plaintiffs alleged that President Clinton had violated the Antiquities Act by reserving too much land when creating the Grand Sequoia National Monument. But the D.C. Circuit upheld the dismissal of their complaint for "fail[ing] to identify the improperly designated lands with sufficient particularity to state a claim."[203] The court explained that their claim "depend[ed] on the proposition that parts of the Monument lack scientific or historical value," an issue that required specific factual allegations identifying the allegedly improperly reserved land.[204]

---

[201] *See Romer*, 963 F.2d at 1396.
[202] 306 F.3d 1138, 1142 (D.C. Cir. 2002).
[203] *Id.*
[204] *Id.*

Here, Plaintiffs have made no allegations identifying specific parcels of land that lack scientific or historical value, let alone connected such parcels to an alleged injury.  For example, Plaintiff Kyle Kimmerle alleges that he is injured from the heightened procedures applicable to his mining claims.[205]  But he never alleges that the locations of his mining claims lack objects of historic or scientific value.[206]  And given the "unique density of significant cultural, historical, and archaeological artifacts" in BENM, the absence of such an allegation is telling.[207]  The remaining *Dalton* Plaintiffs likewise provide no allegations identifying specific parcels of relevant land that allegedly lack historic or scientific value.

Similarly, the *Garfield* Plaintiffs fail to make nonconclusory allegations that there are areas of either monument that lack historic or scientific value.  Although they include two maps that they claim demonstrate that "vast expanses of terrain are not justified by any likely qualifying items or by their proper care and management,"[208] these maps omit numerous undisputed objects of historic or scientific interest.  For example, their Bears Ears map omits the Grand Gulch, a canyon "replete with thousands of cliff dwellings and rock writing sites."[209]  Similarly, their Grand Staircase-Escalante map omits numerous fossil sites for "taxa that are entirely new to science, including a vast array of horned dinosaurs, such as the *Nasutoceratops*, *Kosmoceratops*, and *Utahceratops*, a new species of *Gryposaurus* possessing a more robust skull, a new raptor, and the tyrannosaurid *Teratophoneus*."[210]  Nowhere in their Complaint do the *Garfield* Plaintiffs deny that either these fossil sites or the Grand Gulch are qualifying objects of historic or scientific interest.

---

[205] *Dalton* Compl. ¶¶ 108–26.
[206] *See id.*
[207] BENM Procl., 86 Fed. Reg. at 57,321.
[208] *Garfield* Compl. ¶ 299.
[209] BENM Procl., 86 Fed. Reg. at 57,329.
[210] GSENM Procl., 86 Fed. Reg. at 57,340.

Rather than meet these straightforward pleading standards by identifying specific parcels of reserved land that allegedly cause their injury and lack historic or scientific value, Plaintiffs instead suggest that they can state a claim merely by identifying a single designated "object of historic or scientific interest" that does not qualify for protection under the Antiquities Act, because the Proclamations do not contain explicit smallest area determinations for each of the designated objects.[211]   But, as an initial matter, Plaintiffs' proposed approach overlooks that "[i]f any provision of this proclamation, including its application to a particular parcel of land, is held to be invalid, the remainder of this proclamation and its application to other parcels of land shall not be affected."[212]   Thus, for example, even were Plaintiffs to prevail on their argument that landscapes cannot be objects of historic or scientific interest, the monument status of the remaining objects of interest—such as archaeological and paleontological sites—would not be disturbed.   And given both the distribution[213] and density[214] of these remaining objects, Plaintiffs have failed to state a claim upon which relief can be granted even were the Court to determine that the Grand Staircase-Escalante and Bears Ears landscapes cannot themselves qualify as objects of historic or scientific interest.   Even if so, Plaintiffs have provided no plausible allegation that the reservation of land would change.

Moreover, even setting aside severability, no court has ever sanctioned such a sweeping approach to judicial review of Presidential actions under the Antiquities Act, under which even a single invalid object designation would invalidate an entire proclamation.   This Court should

---

[211] *E.g.*, *Dalton* Compl. ¶ 6.

[212] *E.g.*, BENM Procl., 86 Fed. Reg. at 57,333.

[213] *See supra* pp.5–6.

[214] *E.g.*, BENM Procl., 86 Fed. Reg. at 57,321 (describing "the landscape's unique density of significant cultural, historical, and archaeological artifacts spanning thousands of years"); GSENM Procl., 86 Fed. Reg. at 57,336 ("Scientists have utilized every corner of the monument in their efforts to better understand our environment, our history, our planet's past, and our place in the universe.").

decline to do so because, even without separate smallest area determinations for each designated object, the challenged Proclamations reflect Presidential intent to, at a minimum, reserve parcels of land containing any of the designated objects of interest pursuant to the Antiquities Act.[215] Such Presidential actions "pursuant to an Act of Congress [are] supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack" them.[216] Given the strong presumption in favor of Presidential actions pursuant to express Congressional authorization, the Court should hold Plaintiffs to the threshold pleading requirement to specifically identify reserved parcels of land lacking historic or scientific value that cause their injury.[217] Plaintiffs' requested approach, on the other hand, "would produce needless head-on confrontations between district judges and the Chief Executive."[218] If all it takes to challenge a Presidential Proclamation under the Antiquities Act is disagreement with a single object designation coupled with an interest somewhere in the reserved lands, district courts would confront numerous challenges asking them to review Presidential judgments about which objects are sufficiently interesting from a historic or scientific standpoint to merit monument protections.[219] Because the Court should be most reluctant to "substitute its judgment for that of the President, . . . in an arena in which the congressional intent most clearly manifest is . . . to delegate decision-making to the sound discretion of the President,"[220] the Court should be especially "sensitive to pleading requirements."[221]

---

[215] *See* BENM Procl., 86 Fed. Reg. at 57,333.
[216] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).
[217] *See Tulare Cty.*, 306 F.3d at 1142.
[218] *Franklin*, 505 U.S. at 828 (Scalia, J., concurring).
[219] *See, e.g., Garfield* Compl. ¶¶ 225, 235, 256–67 (asking the Court to determine which objects are "socially momentous or had an assured place in history").
[220] *Utah Ass'n of Counties*, 316 F. Supp. 2d at 1186.
[221] *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002).

**IV.    Plaintiffs Have Failed To State A Claim For Violation Of The Antiquities Act Because Their Claims Fail As A Matter Of Law**.

Given Plaintiffs' failure to identify any specific portions of either Monument that allegedly lack archaeological artifacts and the density of archaeological artifacts described in both Proclamations, the Court need not reach the merits of Plaintiffs' claims and consider whether other types of "objects" qualify.   Should the Court do so, however, those claims fail on merits, as explained below.   No court has ever invalidated a Presidential designation of a monument for violating the Antiquities Act, and this Court should decline to be the first.   The Court should dismiss Plaintiffs' arguments for contradicting the plain text of the Antiquities Act, overlooking on-point Supreme Court precedent, and mischaracterizing the challenged Proclamations.

**A.    The President's Antiquities Act authority is not confined to protecting archaeological objects**.

Plaintiffs first assert that the President's delegated authority to designate "objects of historic or scientific interest" should be limited to archaeological antiquities.[222]   The Court should reject this argument for contradicting the plain text of the Antiquities Act and Supreme Court precedent.

Plaintiffs concede that the plain language of the Antiquities Act delegates "broad" authority to the President to designate "objects of historic or scientific interest."[223]   But they ask the Court to cabin this "broad" language to cover only "relics or monuments of ancient times," such as "a coin, a statue," "building[s], pillar[s], stone[s], or the like."[224]   Nothing in the text of the Antiquities Act suggests such a limitation—indeed, many "objects of . . . scientific interest" come from the natural world and not from human creations of "ancient times."   And, in any event, the Supreme

---

[222] *E.g.*, *Garfield* Compl. ¶¶ 44–47, 235.
[223] *Garfield* Compl. ¶ 235.
[224] *Garfield* Compl. ¶¶ 240–41.

Court already rejected the parallel argument that, under the Antiquities Act, "the President may reserve federal lands only to protect archeologic sites."[225]  Instead, the *Cameron* Court held that the Grand Canyon qualified as "an object of unusual scientific interest,"[226] and the *Cappaert* Court held that both a rare species and its habitat "are 'objects of historic or scientific interest,'" under the Antiquities Act.[227]  Plaintiffs provide no reasoned basis to disregard the Supreme Court's holdings on this topic.

**B.     Species and their habitats can be "objects of historic or scientific interest**."

The Court should also reject Plaintiffs' argument that the challenged habitats or species cannot constitute "objects of historic or scientific interest."[228]  Like Plaintiffs' prior argument, this claim defies Supreme Court precedent: In *Cappaert*, the Court stated that rare "fish" were "features of scientific interest," and upheld Presidential action finding that "the natural habitat of the species" should also "be preserved."[229]  Similar to the species and habitat at issue in *Cappaert*, the challenged Proclamations protect rare or endemic species and habitat found almost nowhere else.[230]  The Proclamations describe the relationships between these rare species and unique

---

[225] *Cappaert*, 426 U.S. at 141–42.
[226] *Cameron*, 252 U.S. at 455–56.
[227] *Cappaert*, 426 U.S. at 141–42.
[228] *E.g.*, *Garfield* Compl. ¶¶ 250–52; *Dalton* Compl. ¶ 5
[229] *Cappaert*, 426 U.S. at 141.
[230] *E.g.*, BENM Procl., 86 Fed. Reg. at 57,328 (the Valley of the Gods "provides habitat for *Eucosma navajoensis*, an endemic moth that lives nowhere else"); GSENM Procl., 86 Fed. Reg. at 57,337 (describing the "high number of endemic species" in " the Grand Staircase-Escalante landscape, which contains 50 percent of Utah's rare flora and 125 species of plants that occur only in Utah or on the Colorado Plateau"); *id.* at 57,341 (the Smoky Mountain area is "home to a number of rare and endemic plant species, including Atwood evening primrose and Smoky Mountain globemallow"); *id.* at 57,342 ("Cottonwood Canyon and the nearby Rimrocks area are home to a number of rare plants, such as the Tropic goldeneye and Atwood's pretty phacelia. . . . and is home to a number of rare bee species as well as a number of hot desert endemic species of bees"); *id.* at 57,343 (the Grand Staircase area contains "rare and endemic plant species, such as the Higgins spring parsley and Kane breadroot").

characteristics of the reserved land, explaining how the habitat has affected the species, similar to

how the underground pool affected the desert pup fish in *Cappaert*:

> An abundance of unique, isolated plant communities can be found, such as hanging gardens, tinajas, and rock crevice, canyon bottom, and dunal pocket communities.  Large expanses of various exposed geologic strata, each with unique physical and chemical characteristics, have resulted in a spectacular array of unusual and diverse soils, including desert pavement and biological soil crusts, which support a wide range of vegetative communities, such as relict plant communities that have existed since the Pleistocene, and a multitude of endemic plants and pollinators.  For example, lands within the Grand Staircase-Escalante landscape contain an astounding biodiversity of bees due, in large part, to the substantial elevational gradient, diversity of habitats, and abundance of flowering plants.  The area is home to hundreds of bee species, including dozens of species that are believed to be unique to this landscape.  Many of the species found in the Grand Staircase-Escalante region are highly localized, with small populations occurring in only a few locations or near certain flowering plants.[231]

Despite the *Cappaert* precedent, Plaintiffs contend that species cannot be considered

"objects . . . that are situated on land."[232]  Despite providing many definitions of statutory terms,

Plaintiffs omit the definition of "situated," as "[h]aving a site, situation, or location; being in a

relative position; permanently fixed; located"[233] and "residing."[234]  At a minimum, species such

as the "*Eucosma navajoensis*, an endemic moth that lives nowhere else" plainly are "reside" or are

"located" in that unique habitat.  Accordingly, the Court should dismiss Plaintiffs' challenge to the

inclusion of species, habitat, and ecosystems in the challenged Proclamations.[235]

---

[231] GSENM Procl., 86 Fed. Reg. at 57,337.

[232] *Dalton* Compl. ¶ 154; *Garfield* Compl. ¶ 250.

[233] Webster's New International Dictionary of the English Language 1965 (G. & C. Webster, 1917).

[234] Webster's Practical Dictionary 388 (1906).

[235] *See Tulare Cty.*, 306 F.3d at 1141–42 (dismissing challenge to Proclamation including ecosystems).

### C.    The Bears Ears and Grand Staircase-Escalante landscapes qualify as "objects of historic or scientific interest."

The Court should dismiss Plaintiffs' challenge to the designation of the GSENM and BENM landscapes as objects of historic or scientific interest.  President Biden appropriately designated the BENM landscape as an object of interest, given the "the landscape's unique density of significant cultural, historical, and archaeological artifacts spanning thousands of years, including remains of single family homes, ancient cliff dwellings, large villages, granaries, kivas, towers, ceremonial sites, prehistoric steps cut into cliff faces, and a prehistoric road system that connected the people of Bears Ears to each other and possibly beyond."[236]  Indeed, the BENM landscape was instrumental to the passage of the Antiquities Act, as the legislative history specifically notes the importance of protecting the "very numerous" ruins along "Cottonwood Creek, Butler Wash, Comb Wash, and Grand Gulch," even though "[c]omparatively little" was known about these ruins at this time.[237]  Rather than protect these numerous ruins individually, the legislative history demonstrates that Congress considered protecting them by "principal groups or district of ruins of each great culture area," such as that along the "great basin" of the San Juan river.[238]

Similarly, President Biden appropriately designated the GSENM landscape as an object of interest because "in the 25 years since its [initial] designation [in 1996], Grand Staircase-Escalante has fulfilled the vision of an outdoor laboratory with great potential for diverse and significant scientific discoveries.  During this period, hundreds of scientific studies and projects have been conducted within the monument, including":

> investigating how the monument's geology provides insight into the hydrology of Mars; discovering many previously unknown species of dinosaurs, some of which

---

[236] BENM Procl., 86 Fed. Reg. at 57,321.

[237] H.R. Rep. No. 59-2224, at 5.

[238] *Id.* at 3.

> have become household names; unearthing some of the oldest marsupial fossils ever identified; conducting extensive inventories of invertebrates, including the identification of more than 600 species of bees, some of which likely exist nowhere else on Earth; performing hydrologic research in the Escalante River and Deer Creek; studying and restoring habitat for amphibians, mammals, and bird species, including the reintroduction of bighorn sheep and pronghorn to their native range; completing rangeland science assessments, including a complete Level III soils survey; carrying out widespread archaeological surveys that have documented important sites and rock writings; and implementing social science projects related to visitor experiences and impacts. New scientific discoveries are likely just around the corner; for example, scientists have collected thousands of specimens of invertebrates from the monument that await further study and are expected to yield new species that are endemic to the monument.[239]

As the GSENM Proclamation explains, "[s]cientists have utilized every corner of the monument in their efforts to better understand our environment, our history, our planet's past, and our place in the universe."[240]  Given the extensive use of GSENM as an outdoor laboratory, protection of the landscape for that purpose is appropriate.

Plaintiffs nonetheless focus on the size of the landscapes, suggesting that a sizeable landscape cannot be an object protected by the Antiquities Act.[241]  To begin, nothing in the statutory text supports that assertion: On the contrary, the Antiquities Act provides that a President may designate a monument containing any object of significance, regardless of its size.

Even assuming that a size of a monument bore on the legality of the President's Antiquities Act designation, there is nothing remarkable about the size of the two monuments challenged here. National monuments "vary widely in size . . . . from less than 1 acre to about 283 million acres."[242]  At roughly 1.35 million and 1.87 million acres, respectively, BENM and GSENM fall comfortably within this range.  They are only slightly larger than the 0.8-million-acre Grand Canyon National

---

[239] GSENM Procl., 86 Fed. Reg. at 57,335–36.
[240] *Id.*
[241] *E.g.*, *Garfield* Compl. ¶ 288 (comparing smaller national monuments).
[242] Congressional Research Service, National Monuments and the Antiquities Act 4 (Nov. 28, 2022).

Monument approved by the Supreme Court in *Cameron*.  And even before President Biden's proclamations, these monuments collectively reserved 1.11 million acres of land.

Most importantly, Congress responded to the original GSENM boundary of approximately 1.7 million acres by *expanding* the monument to include 180,000 additional acres.[243]  Thus, even assuming size were a relevant factor, Congress has spoken to indicate that at least GSENM is appropriately sized at 1.87 million acres.

**D.    Plaintiffs have failed to demonstrate that the Proclamations protect "generic" objects.**

The Court should dismiss Plaintiffs' claim that the challenged Proclamations designate allegedly "generic" objects of interest.[244]  This claim fails at the outset: Neither Proclamation uses the term "generic," and there is no basis in either Proclamation to conclude that the President sought to protect so-called "generic" objects.[245]  The *Garfield* Complaint demonstrates that Plaintiffs are taking proclamation statements out of context to manufacture "generic" objects.  For example, the *Garfield* Plaintiffs complain that the BENM Proclamation, in designating a "world-renowned canyon," simply describes a "generic geological item[] . . . with no indication of [its] past significance."[246]  But the BENM Proclamation both particularly describes this allegedly "generic" canyon and explains its characteristics and significance:

> In the northern part of the Bears Ears landscape lies Indian Creek, the home of a world-renowned canyon characterized by sheer red cliffs and spires of exposed and eroded layers of Navajo, Kayenta, Wingate, and Cedar Mesa Sandstone, including the iconic North and South Six-Shooter Peaks.  The canyon includes famous vertical cracks striating its sandstone walls and the area provides important habitat for a multitude of plant and animal species.[247]

---

[243] *See supra* p.3 & n.3.
[244] *E.g.*, *Garfield* Compl. ¶ 256.
[245] *See supra* pp.4–8.
[246] *Garfield* Compl. ¶¶ 256–57.
[247] BENM Procl., 86 Fed. Reg. at 57,324.

Even had Plaintiffs successfully identified contextually "generic" items in the Proclamations—such as "ancient cliff dwellings; ceremonial sites; countless other artifacts; baskets; pottery; weapons; remains of single family dwellings"[248]—those items would still be protectable under the Antiquities Act, as Congress explained: "Every cliff dwelling, every prehistoric tower, communal house shrine, and burial mound is an object which can contribute something to the advancement of knowledge and hence is worthy of preservation."[249]

### E.     The Proclamations do not designate "experiences" as "objects of historic or scientific interest."

Plaintiffs mischaracterize the Proclamations as designating "experiences" as "objects of historic or scientific interest."[250]  For example, the *Garfield* Plaintiffs incorrectly claim that the BENM Proclamation designates "world class outdoor recreation opportunities" as objects under the Antiquities Act.[251]  To the contrary, the Proclamation explicitly states that "world class outdoor recreation opportunities" are "not objects of historic and scientific interest designated for protection."[252]  Because neither Proclamation designates "experiences" as monuments, the Court should dismiss this portion of Plaintiffs' challenge.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Complaints pursuant to Federal Rule of Civil Procedure 12.

---

[248] *Garfield* Compl. ¶ 263.  Some of Plaintiffs' recited phrases (*e.g.*, "countless other artifacts") appear in neither Proclamation.
[249] H.R. Rep. No. 59-2224, at 2 (1906).
[250] *Garfield* Compl. ¶¶ 253–55.
[251] *Garfield* Compl. ¶ 254.
[252] BENM Procl., 86 Fed. Reg. at 57,322.

Dated: January 5, 2023                       Respectfully submitted,

                                             TODD KIM
                                             Assistant Attorney General
                                             Environment & Natural Resources Division
                                             U.S. Department of Justice

                                             /s/ Michael S. Sawyer
                                             MICHAEL S. SAWYER
                                             Senior Attorney, Natural Resources Section
                                             Ben Franklin Station, P.O. Box 7611
                                             Washington, D.C. 20044-7611
                                             Telephone:     (202) 514-5273
                                             Fax:           (202) 305-0506
                                             Email:         michael.sawyer@usdoj.gov

                                             Counsel for Defendants