# EXHIBIT A

Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
BRAMMER RANCK, LLP
1955 W. Grove Parkway, Suite 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
bbrammer@spauldinglaw.com
mpiccolo@spauldinglaw.com

James M. Burnham (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; and THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES, <br> *Plaintiffs,* <br><br> ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS, <br> *Consolidated Plaintiffs,* <br><br> *v.* <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE, <br> *Defendants,* <br><br> HOPI TRIBE; NAVAJO NATION; PUEBLO OF ZUNI; and UTE MOUNTAIN UTE TRIBE, <br> *Intervenor Defendants.* | **SUPPLEMENTAL DECLARATION OF BEN BURR IN SUPPORT OF PLAINTIFFS' AMENDED COMPLAINT** <br><br><br><br> Lead Case No. 4:22cv00059 DN-PK <br> Member Case No. 4:22cv00060 DN <br><br> District Judge David Nuffer <br> Magistrate Judge Paul Kohler |

I, Ben Burr, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this declaration.  This declaration is based on my personal knowledge.

2.      I declare under penalty of perjury under the laws of the United States that the information in both this declaration and my prior declaration (attached hereto) is true and correct.

3.      The injuries described in my prior declaration have continued to endure, and will only compound so long as President Biden's monument designations are allowed to stand.

4.      As noted in my original declaration, roads and trails previously open to our members have been either closed or limited as a result of the Proclamations.  *E.g.*, Burr Decl. ¶ 30.

5.      The Little Desert OHV Area is one example among many.  Following President Trump's Proclamation, the entire Little Desert OHV Area was available for open-access and open-travel.  Now, the Area is surrounded by signs telling people to stay on existing routes, lest they harm the resources identified by President Biden's Proclamation.   These signs are indistinguishable from those that mark off enforceable closures in other parts of federal land.

6.      As I also identified in my original declaration, formal closures and restrictions only provide part of the picture.  *Id.* ¶ 29.  Federal agencies and officers regulate and supervise virtually all aspects of life within monument lands—including, for instance, whether our member groups are able to receive special recreation permits for off-road vehicle events on monument lands.  Accordingly, it is imperative for our members to have good relationships with BLM and other federal agencies.  And for that reason, among others, when BLM tells our members to refrain from riding on certain areas—such as large swaths of the Little Desert OHV Area—our members listen.

7.      President Biden's Proclamations—as well as the interim guidance that has been issued to implement them—have made clear that off-road vehicle use is not a protected activity,

and in fact have singled out off-road vehicle use as an activity that may be inconsistent with the Proclamations.  *Id.* ¶ 28 (collecting cites).  These regulatory changes make it significantly harder (if not impossible) for our members to access monument lands in the same way they did before the Proclamations.  *See, e.g.*, Memorandum from Director, Bureau of Land Management to Utah State Director, Bureau of Land Management, *Interim Management of the Grand Staircase-Escalante National Monument* 5 (Dec. 16, 2021) (noting "recreation" is not protected activity and flagging "special recreation permits" as area where BLM must ensure "conformance and consistency with the proclamation" even if "an event or activity has been permitted in the past").

8.      For instance, our members have been denied special recreation permits to host rides that they had been permitted to do before President Biden's Proclamations took effect.  As one example, Inchworm Arch Road has been practically closed off for certain of our members who want to host large group rides.  *See id.* at 4 (identifying "Inchworm Arch Road" as place where existing activities "should be reviewed for consistency with the terms of the Proclamation"); *see also, e.g.*, Burr Decl. ¶ 30.  Likewise, through less formal processes, many of our members—such as those who run guided commercial tours in Grand Staircase-Escalante and Bears Ears—regularly check in with BLM or other federal contacts to ask where they can and cannot ride or host events.  Following President Biden's Proclamations, this best practice has become increasingly important.  And following President Biden's Proclamations, our members have been told an increasing number of roads and trails that had previously been open to off-road vehicle use are now closed.

9.      A good example of this on-the-ground reality is in the area around Paria River.  As touched on in my prior declaration, *see, e.g.*, Burr Decl. ¶ 19, there is a road that extends northwest from the Paria Townsite and Paria Movie Set (what many of us call the "Paria Canyon Road") that goes along the Paria Wash.  This Road is remarkably popular among OHV riders.  But it was shut

off from public motorized access by President Clinton, when he included it within the original bounds of the Grand Staircase-Escalante Monument.  After President Trump's Proclamation, however, the Road was finally removed from monument bounds. And after President Trump's Proclamation, members of the public found themselves able to ride again along the Road by way of a 90-foot corridor that was designated as a right-of-way.  OHV riders across Utah were ecstatic about this development, and many took advantage of that corridor during the Trump years.  But following President Biden's Proclamation—and its decision to reinclude Paria Canyon Road within the Monument—our members have been told by BLM they cannot ride along this Road.  If the Paria Canyon Road became open again to OHV riders, our members would use it immediately.

10.     Similarly, even where areas remain nominally open after the Proclamations, our members have been deterred from riding outside of existing routes—as they were able to do before, and has they have done before in the lands now within Grand Staircase-Escalante and Bears Ears—because of a fear of incurring legal liability.  Indeed, both Proclamations declare each landscape—along with a collection of areas, ecosystems, and habitats within them—to be protected "objects," and both include a "[w]arning" that people may not "appropriate, injure, destroy, or remove any feature of the monument."  86 Fed. Reg. 57335, 57346 (Oct. 8, 2021) (Grand Staircase-Escalante); 86 Fed. Reg. 57321, 57333 (Oct. 8, 2021) (Bears Ears); *see also* 18 U.S.C. § 1866(b) (providing that anyone who "injures" or "destroys" part of a "monument" may face 90 days imprisonment, a fine, or both).  It is virtually impossible to ride a vehicle over a stretch of land without altering that land in some way, however small.  Accordingly, in light of the Proclamations and their potential legal consequences, many members have refrained entirely from riding on much monument land.

11.     President Biden's Proclamations also continue to hurt BlueRibbon Coalition itself. For example, as explained in my original declaration, BlueRibbon has dedicated time and money

to initiatives like the Dispersed Camping Access Alliance, which organizes, promotes, and advocates in favor of dispersed camping. *See, e.g.*, Burr Decl. ¶ 30.  The DCAA originated in response to a concerted and corporate effort to retire free, open-camping on public lands, and shift it to fee-based, limited recreation sites. *See generally* Matt Stoller, *Why Is Booz Allen Renting Us Back Our Own National Parks?* (Nov. 29, 2022).[1]  Our work on the DCAA has a number of facets, including educating the public on how to effectively and enjoyably disperse camp on public land.

12.     President Biden's Proclamations have undermined the DCAA and, in so doing, have injured BlueRibbon.  For both Monuments, the Proclamations have created a highly uncertain regulatory environment that jeopardizes dispersed camping, and leaves dispersed campers at sea as to what is allowed on monument lands.  After all, the Proclamations declare each landscape— along with a collection of areas, ecosystems, and habitats within them—to be protected "objects," and both include a "warning" that people may not "appropriate, injure, destroy, or remove any feature of the monument."  As a result of this regulatory environment, DCAA has been forced to divert resources from promoting dispersed camping and organizing support for greater access, and has had to shift those resources to tracking the Monuments and helping campers navigate their opaque regulations.  Also, because of the Proclamations, we have seen fewer people use monument lands for dispersed camping, which is hurting our ability to have more campers and more members.

13.     As also explained in my original declaration, BlueRibbon has been forced to spend tens of thousands of dollars on staff time, technological tools, and outreach in response to President Biden's Proclamations. *See, e.g.*, Burr Decl. ¶ 31.  This is because Grand Staircase-Escalante and Bears Ears are both much larger under President Biden's Proclamations than they were under President Trump's, and also because President Biden's Proclamations come with significantly

---

[1] Available at: https://mattstoller.substack.com/p/why-is-booz-allen-renting-us-back.

more regulations than President Trump's.  At the expense of our broader mission, we have thus had to divert resources in order to, among other things, assist and educate members about how to safely and legally comply with the Proclamations' new regulatory environment.

14.     Our members not only regularly ride on federal lands, but have regularly ridden on *these* federal lands—at least until the Proclamations.  Be it through formal closures (such as with Little Desert OHV) or *de facto* ones (such as by withholding special recreation permits), President Biden's Proclamations have prevented our members from engaging in their pastimes, practicing their hobbies, and carrying on rides they find deeply significant.  In so doing, the Proclamations have irreparably harmed our members and their personal, recreational, and spiritual interests.

Dated: 1/17/2023

Ben Burr

Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
SPAULDING LAW, LLP
1955 W. Grove Parkway, Suite 250
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
Facsimile: (801) 877-4318
bbrammer@spauldinglaw.com
mpiccolo@spauldinglaw.com

James M. Burnham (*pro hac vice* forthcoming)
Harry S. Graver (*pro hac vice* forthcoming)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS,<br><br>          *Plaintiffs*,<br><br>     *v.*<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE,<br><br>          *Defendants*. | Civil Action No. 4:22-cv-00060-DN<br><br>**DECLARATION OF BEN BURR** |

I, Ben Burr, declare as follows:

1.      My name is Ben Burr.  I am the Executive Director of the BlueRibbon Coalition ("BlueRibbon").  This declaration is based on my personal knowledge.  I am over 18 years old.

***Background***

2.      I currently live in New Harmony, Utah with my wife and four children.  My family has roots in Utah, though, dating back to the 1800s.  My ancestors traveled to Utah from Northern California as part of a group of Mormon pioneers, eventually settling the town of Burrville in 1876.

3.      My family's history runs directly through the Grand Staircase-Escalante and Bears Ears landscapes.  Those in Burrville regularly trailed cattle into the Burr Desert by way of a path that soon became the Burr Trail—the same trail that is today popular for its steep switchbacks, and its gateway into the canyon country that is made up of the Grand Staircase-Escalante Monument (along with Capitol Reef and Glen Canyon National Recreation Area).  As for Bears Ears, my sixth generation great-grandfather—John Atlantic Burr, who was one of the first settlers to arrive in Yerba Buena (now San Francisco) after the Mexican-American War—settled the area that is now Monticello, Utah, which presently serves as a gateway community to the Bears Ears National Monument.  Many Burr descendants, including John Atlantic, are buried at Monticello Cemetery.

4.      I grew up on the Wasatch Front, and I have a strong and deep connection to the lands that now include the Grand Staircase-Escalante and Bears Ears National Monuments.  My family heritage includes cattle ranching, mining, logging, and recreational exploration in these lands.  Moreover, as Mormon pioneers, my ancestors settled these areas for reasons that were deeply religious.  They were called to settle and build a life in these rugged landscapes by the prophet and leader of their church, Brigham Young.  Many features of these landscapes are named after my ancestors, and visiting these areas connects me to my religious and spiritual heritage.

5.    I have vivid memories of traveling these lands on multi-day family reunions where we traced the paths my ancestors followed to make a life in this harsh but beautiful country.  I also remember visiting and working on these lands with my father—a man who operated a helicopter company benefiting Southern Utah until his tragic death in 2017.  For instance, I recall spending a summer trying to salvage from pine beetles the conifer forests in Brian Head, an area which used to have a robust timber industry until the Grand Staircase-Escalante Monument was first created.

6.    After my father died, I returned to Utah from a stint in Washington, D.C., to come back to where my family has its roots.  Before coming to BlueRibbon, I worked as a public land consultant with a retired Forest Supervisor for the US Forest Service ("USFS") to help ranchers, miners, and property owners navigate working with the Bureau of Land Management ("BLM"), USFS, and the National Park Service ("NPS").  In so doing, I saw firsthand the costs of federal management on local lands:  from federal regulations that put local businesses out of work, to national monument designations that destroyed small communities.  One thing, in particular, that I witnessed was how the devastating economic effects of a national monument designation often stretch far beyond the borders of the monument itself.  Monuments typically create a chilling effect in the surrounding area, causing local businesses to stop work out of fear that they will be investing in areas that will soon become monument land—all to the further detriment of local communities.

7.    After two years working independently as a public land consultant, I was recruited to be the policy director of BlueRibbon.  In July 2021, I was promoted to be the Executive Director.

### *The BlueRibbon Coalition*

8.    The BlueRibbon Coalition is a 501(c)(3) non-profit that has worked to protect public recreation access to public lands through litigation, advocacy, and stewardship since 1987.

9.      BlueRibbon is a membership-based organization.   We have thousands of members—both individuals and businesses—who maintain annual memberships.  We also have hundreds of organized clubs that have their own members.  We work on behalf of our members, our club members, and their members as an umbrella organization.  Collectively, we represent hundreds of thousands of outdoor recreation enthusiasts, and we have members in all 50 States. In Utah, we have a little over 450 individual members and near 30 business/organization members. Those members both recreate and work in the Grand Staircase-Escalante and Bears Ears borders.

10.     Our member organizations include local ATV, 4x4, and motorcycle clubs.  These organizations often serve as volunteers to maintain and build trails and recreation amenities on public land.  They also often plan organized riding events that serve critical educational purposes.



(BlueRibbon Members at the "Big Ride" event)

11.     Our business members tend to be those that benefit from the motorized outdoor recreation industry.  They include retailers of parts and gear, and dealers of off-highway vehicles. They also include outfitters and guided tour operators.

12.     Our individual members come from all walks of life—people who are united by an appreciation for the benefits of outdoor recreation.  Increasingly, our members communicate to us that physical disabilities make motorized recreation their preferred form of recreation.  Just about every time we attend a ride organized for motorized recreation, there is someone who suffers from a physical disability who relies on motorized recreation in order to access public lands.  Given that reality, BlueRibbon has several partner organizations who work directly with wounded veterans to help ensure that these individuals have access to the public health benefits of outdoor recreation.

13.     BlueRibbon's mission is to champion responsible use of public lands and waters for the benefit of all recreationists by educating and empowering its members to:  secure, protect, and expand shared outdoor recreation access and use; work collaboratively with natural resource managers and other recreationists; support recreation on, and promote respect for, private property; promote equitable, responsible, and sustainable natural resource management; educate the general public, media, elected officials, and other decision makers on recreation and access issues; affect the political and administrative process; and encourage appropriate enforcement of the law.

14.     A primary focus of our work is to monitor issues related to access to public land across all federal land management agencies and state management agencies.  As one of the largest outdoor-recreation-focused organizations in the country, we regularly work on issues related to off-road recreation, snowmobiling, motorized watercraft, dispersed camping, biking, e-bikes, motorcycles, backcountry aviation, search and rescue, rockhounding, and more.  We regularly participate in administrative planning processes at the federal, state, and local level.  And through

this advocacy work we have been greatly successful in keeping recreation access open for the public.  Some of our time is also spent lobbying with regards to both federal and state legislation.

15.     Another prime focus of BlueRibbon is the important but difficult job of educating our members about new federal or state regulations, the byzantine procedures that often come with administrative initiatives, and operating under other regulatory regimes.  These education efforts are essential to our members' ability to continue functioning, and also help teach them how to be better advocates and allies in our collective work.  Relatedly, we also support a number of outreach and education campaigns that encourage users of public land to recreate responsibly and lawfully.

16.     BlueRibbon currently has five full-time staff members.  We also work with a network of dozens of enthusiast volunteers across the country.  Our annual budget is roughly $500,000, which we typically allocate to staff salary, our legal fund, and basic operating expenses.

### The Grand Staircase-Escalante and Bears Ears Monuments

17.     The Grand Staircase-Escalante and Bears Ears Monuments have been nothing short of devastating to our members and the local communities in Southern Utah that they help support.

18.     Before President Clinton established the Grand Staircase-Escalante Monument, our members extensively used the designated lands.  Many made a living off the land through hunting, through mining, and through livestock and timber production.  Others recreated throughout the lands, making use of the lands' iconic roads and trails.  By and large, these lands were visited and used primarily by local communities.  And our members were able to utilize these local areas responsibly because the lands were designated for "multiple use" under the Federal Land Policy and Management Act.

19.     President Clinton's proclamation upended all of this.  The monument designation closed many of the iconic roads and trails that our members had long used responsibly—most

notably, shutting off access to the Paria Canyon Road within the Paria Canyon.  As a result, our members were cut off from their treasured recreation experiences, their cultural and familial heritage, and their livelihoods.  Citizens petitioned the Federal Government to reopen these important areas—gathering over 1,500 signatures—but those cries fell on deaf ears in Washington. Our members were able to access the Paria Canyon Road for a short while under President Trump—when the Road fell outside the revised monument boundaries—but that relief was short-lived.  President Biden has since reincorporated Paria Canyon Road into the expanded Monument.

20. The Grand Staircase-Escalante Monument has also harmed our members because it has gutted many local economies.  Local governments have struggled to provide basic services because the shallow tourism economy the Monument brought in could not replace the stable rural economy—made up of ranching, timber, mining, and other industries—the Monument destroyed.

21. Ironically, the Monument was one of the worst things to happen to conservation in the region.  Before, these lands were mainly visited and used by local communities—communities that took care that these lands were maintained and stewarded such that future generations could continue to benefit from them.  But the Monument designation brought with it a surge of tourism and new visitors to this area.  And the Federal Government has proven ill-equipped at handling that influx.  To give just one example, the Monument has brought nearly 100,000 people a year to the Hole in the Rock trail, which has steadily degraded this once pristine and religiously significant area.  Notably, BLM has failed to construct any public restrooms to accommodate this surge in visitors.  Rather, when discussing this issues with a BLM recreation specialist in September 2018, I learned that because of federal regulations and Monument restrictions, they had been studying the issue for seven years, with zero path forward at the time to get them constructed.

22.     Worse, given that Monument wrested control from local governments and local communities, our members were not allowed to try to offset these harms—such as by maintaining and building trails or recreation amenities, as they had done before—in light of federal regulations.

23.     The story of Bears Ears is the same.  Before President Obama established the Bears Ears National Monument, our members explored its extensive canyons, mountains, and forests. Recreating on these lands was common.  As with Grand Staircase-Escalante, our members regularly organized rides and performed trail maintenance work in the area.  Likewise, locals, which included members of the local tribes, relied on the area for firewood, hunting, and family and religious gatherings.  Local communities were able to steward and responsibly rely on these lands because they were managed as multiple-use lands by the Bureau of Land Management, the US Forest Service, as well as the Utah School and Institutional Trust Lands Administration.

24.     President Obama's decision to create the Bears Ears Monument uprooted this balance at the expense of our members and our local communities.  Among other things, the broad public relations campaign that was launched to justify the monument took an obscure and lightly visited area and put it on the map.  A massive influx of visitors have surged into the area with no correlating increase in infrastructure or management capacity.  Accordingly, again, the monument has had the ironic consequence of setting back conservation.  As our members have seen firsthand, the remote backcountry experience that the monument was allegedly designated to protect is being destroyed by the designation.  Again, to just give one example, the Doll House Ruin has been itself largely ruined by the effects of the Monument.  The parking area and trail have been user created; vehicle count is up to almost unsustainable numbers; there are footprints all over the roof of the ruin; rocks on the back wall of the ruin have been disturbed; and the user-created trail has led to erosion that has contributed to flash flooding.  As the Doll House Ruin shows, the Monument itself

turned a rarely visited cultural site that was visited by recreation users seeking a highly valued, remote backcountry experience and turned it into a bucket list site for industrial-strength tourism.

25.     President Trump's decision to reduce the size of the Grand Staircase-Escalante and Bears Ears Monuments brought a much-needed reprieve to our members and our communities. Our members were both relieved and ecstatic to see the Monuments reduced.  Many of them made the five hour trip to Salt Lake City to celebrate the announcement of their reductions.  But this initial relief was short lived as those decisions were soon challenged in federal court.  The never-ending controversy surrounding the Antiquities Act has independently harmed our members because they cannot confidently plan for the future against this uncertain backdrop.  And those problems will not be addressed until there are clear limits as to what the Antiquities Act permits.

### *President Biden's Proclamations*

26.     President Biden's Grand Staircase-Escalante and Bears Ears proclamations have already seriously harmed—and will continue to seriously harm—BlueRibbon and its membership.

27.     President Biden's proclamations incorporated by reference President Clinton and President Obama's original proclamations, respectively.  In December 2021, BLM issued interim guidance for managing both Monuments until a revised monument management plan is complete.

28.     President Biden's proclamations, coupled with BLM's interim guidance, impose meaningful regulations on BlueRibbon and its members—regulations that will likely only become more severe once final monument management plans are finished.  *See, e.g.*, Memorandum from Director, Bureau of Land Management to Utah State Director, Bureau of Land Management, *Interim Management of the Grand Staircase-Escalante National Monumen*t 5 (Dec. 16, 2021) (Because "outdoor recreation … activities do not fall into the category of objects for which the monument was designated … the agency must ensure that any proposed recreation use or activity

is evaluated for resource management plan conformance and consistency with the proclamation prior to being authorized.") [hereinafter, "Grand Staircase-Escalante Interim Guidance"]; *id.* at 4 (incorporating 2020 resource management plan); *id.* at 4 ("Existing plan- and implementation-level decisions for off-road vehicle use … [is] a prominent example[] of [an] activit[y] that should be reviewed for consistency with the terms of the Proclamation."); Memorandum from Director, Bureau of Land Management to BLM Utah State Director, *Interim Management of the Bears Ears National Monument* 5 (Dec. 16, 2021) (explaining that outdoor recreation activities "are not themselves objects" under the proclamation and thus "the agency must ensure that any proposed recreation use or activity is evaluated for monument management plan or resource management plan conformance and consistency with the proclamation prior to being authorized") [hereinafter, "Bears Ears Interim Guidance"]; *id.* at 4 (incorporating 2020 monument management plan); Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1139, 1145 (Dec. 28, 2016) ("Except for emergency or authorized administrative purposes, motorized and non-motorized mechanized vehicle use shall be allowed only on roads and trails designated for such use, consistent with the care and management of such objects.  Any additional roads or trails designated for motorized vehicle use must be for the purposes of public safety or protection of such objects.").[1]

29.     These formal regulations only provide part of the picture.  Federal agencies and officers regulate and supervise virtually all aspects of life within Monument lands.  The October 2020 MAC meeting notes provide a useful window into this.  There, the Committee discussed the problems that had cropped up as a result of the influx of tourists into these lands.  To counteract

---

[1] The full Grand Staircase-Escalante memorandum can be found here:  https://www.blm.gov/sites/blm.gov/files/docs/2021-12/GSENM_Interim_Guidance_12-16-21_Final508_0.pdf.

The full Bears Ears memorandum can be found here:  https://www.blm.gov/sites/blm.gov/files/docs/2021-12/BENM%20Interim%20Guidance%2012-16-21_Final508.pdf.

these problems, federal regulators have floated a range of restrictions, all of which would have a marked impact on the daily lives of our members:  fencing restricting certain areas; closing campgrounds; requiring user education programs; and similar measures.  Similarly, regulators are hardening primitive sites—adding pavement, parking lots, signs, and other tourist-induced fortifications—that are stripping these areas of their historical character and integrity.

30.     These sorts of limitations, which are already picking back up in full measure with both Grand Staircase-Escalante and Bears Ears, hurt our members and impede our organization's ability to function.  For instance, BlueRibbon has recently started the Dispersed Camping Access Alliance as a special project within our organization to advocate for the interests of dispersed camping users (that is, campers who camp outside of a designated campground).  That project is being steadily undermined by the restrictions already imposed by the Monument, and the restrictions that are upcoming—trail closures, land-use rules, off-roading limitations, and hardened primitive sites.  Our members' ability to experience dispersed camping is in jeopardy.  Likewise, certain trails and roads have been either closed or meaningfully restricted, harming our members.  As I've learned from members, Kitchen Corral and Inchworm Arch Road, for instance, can no longer be used for commercial, organized rides—something that was allowed during the Trump Administration.  Popular trails like Park Wash and Deer Springs Wash are also now closed.

31.     In short, President Biden's proclamations have already harmed—and will continue to harm—BlueRibbon as an organization.  The proclamations have impaired our ability to perform our core mission and to operate our existing programs.  In particular, the proclamations have caused BlueRibbon to divert time and resources from some of its core programs—such as working toward securing, protecting, and expanding shared outdoor recreation access, and encouraging individual environmental stewardship on public lands—to new efforts designed to educate

members and other stakeholders about the consequences and regulations of the two national monuments at issue here.  Indeed, once President Biden announced his intent to expand the two Monuments, we spent several weeks and dozens of hours of staff time working toward assessing the impact of the Monuments on our organization and our members.  We also invested in technological tools as part of starting an advocacy campaign on behalf of our members.  All told, BlueRibbon was forced to spend tens of thousands of dollars on staff time, technological tools, and outreach in order to prepare for and adapt to the Monuments at issue.  Those important resources would have gone elsewhere but for the disastrous risks posed by the Monuments.

32.     If past practice is any guide, these injuries will only grow more severe as the interim guidance is built out and the management plans are finalized.  Our members will see restrictions in organized and commercial recreation opportunities.  Family and religious gatherings will be limited.  Trails and roads will be obliterated.  Open, free dispersed camping will be restricted and converted into paid, reservation-based camping.  Many of our members who suffer from mobility impairment disabilities and require motorized access will be prevented from accessing areas that have previously been sacred destinations of refuge and healing.  And these harms will be borne in a disproportionate manner by marginalized populations.  Indeed, recent studies show that limited-entry, reservation systems in National Parks have led to inequitable access for lower income Americans and minority populations.  That is the future these Monuments hold if allowed to stand.

Dated: 7/15/2022

Ben Burr