# EXHIBIT G

Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
BRAMMER RANCK, LLP
1955 W. Grove Parkway, Suite 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
bbrammer@spauldinglaw.com
mpiccolo@spauldinglaw.com

James M. Burnham (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; and THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES,<br>    *Plaintiffs*,<br><br>ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS,<br>    *Consolidated Plaintiffs*,<br>    v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE,<br>    *Defendants*,<br><br>HOPI TRIBE; NAVAJO NATION; PUEBLO OF ZUNI; and UTE MOUNTAIN UTE TRIBE,<br>    *Intervenor Defendants*. | **SUPPLEMENTAL DECLARATION OF KYLE KIMMERLE IN SUPPORT OF PLAINTIFFS' AMENDED COMPLAINT**<br><br><br>Lead Case No. 4:22cv00059 DN-PK<br>Member Case No. 4:22cv00060 DN<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

I, Kyle Kimmerle, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge.

2. I declare under penalty of perjury under the laws of the United States that the information in both this declaration and my prior declaration (attached hereto) is true and correct.

3. The injuries described in my prior declaration have continued to endure, and will only compound so long as President Biden's monument designations are allowed to stand.

4. Indeed, things have only gotten worse since I submitted my original declaration. In recent months, Kimmerle Mining LLC has explored selling some of its non-Geitus claims within the Bears Ears National Monument. But there is zero interest for any claim within the Monument. Recently, around the country, the going rate for claims has been over $5 per pound of uranium in the ground. But multiple companies have refused to engage with the idea of buying our claims, even at a discounted rate of fifty cents per pound (or even lower). That includes companies who had earlier expressed interest in our claims before the Proclamation. In short, because of President Biden's Proclamation, the values of our Bears Ears claims have been cut down to virtually nothing.

5. To the best of my knowledge, the lands within my Bears Ears mining claims do not include any "objects" of historic or scientific interest, as understood under the Antiquities Act.

Dated: Jan 17, 2023

_____
Kyle Kimmerle

3

Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
SPAULDING LAW, LLP
1955 W. Grove Parkway, Suite 250
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
Facsimile: (801) 877-4318
bbrammer@spauldinglaw.com
mpiccolo@spauldinglaw.com

James M. Burnham (*pro hac vice* forthcoming)
Harry S. Graver (*pro hac vice* forthcoming)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS,<br><br>         *Plaintiffs*,<br><br>         v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE,<br><br>         *Defendants*. | Civil Action No. 4:22-cv-00060-DN<br><br>**DECLARATION OF KYLE KIMMERLE** |

I, Kyle Kimmerle, declare as follows:

1.  My name is Kyle Kimmerle. I am the managing member of Kimmerle Mining LLC in Moab, Utah. This declaration is based on my personal knowledge. I am over 18 years old.

### *Background*

2.  I live in Moab, Utah, where I have lived for the last twenty plus years with my wife and five children. I was born in Honolulu because my father was then serving in the military. We moved here around the time that I was three, and I've lived in Utah ever since, for over forty years.

3.  I come from a family with a long history of mining in Utah. My great-grandfather moved to Blanding, Utah, in the 1930s, where he got his start in milling and vanadium mining. Mining has remained in my family ever since, from generation to generation. Some of my earliest memories are going out to the mines to work with my father and grandfather. I was probably four years old when I first went underground with them. I remember turning eight while my family was living in a camp trailer at a mine my dad was working (a mine we still own and one that is currently located within the Bears Ears Monument). And today, my father and I still own some of the same mines that my great-grandfather and grandfather opened up and worked on decades ago.

4.  Mining in the United States has a long history, and modern mining perhaps has its roots in the General Mining Law of 1872. The original law essentially functioned as an economic stimulus bill, incentivizing prospectors to discover and produce valuable minerals from public lands. To simplify a bit, the Mining Law sketched out a process whereby prospectors who made discoveries of valuable minerals on public lands could "stake a claim" to those lands so long as they paid certain fees to the Federal Government and also performed a minimum amount of annual work on the land to develop the claim. If the prospector failed to sufficiently develop his claim, or use the land productively, it would fall to any person willing to make the required investment.

2



*Above: Howard Kimmerle standing by the pump (center of photo). Man in foreground is probably John Kimmerle, who looks like he is tamping the dirt around the form.*



Warren Cliburn - Gene Blickenstaff - Howard Kimmerle "Moki" - Sonny Kimmerle - (Son of Bill and Gertrude Kimmerle)

5. Mining has grown more and more regulated over the years. At this point, every aspect of mining is regulated by an overlapping cadre of federal agencies. The Environmental Protection Agency regulates mines with an eye toward air and water quality, supervising all things from what engines are installed in the mobile equipment, to the diesel particulate matter that comes from a mine, to the quantities of radon emitted from underground workings, to the various sources of electricity used in operations. The Bureau of Land Management regulates everything from how mines affect endangered species, to how much dust they emit, to how mines affect surrounding plant life (including weeds). And the Mine Safety and Health Administration oversees the health and safety of those who perform the work. All of this regulation is done at a hyper-specific level. To give just one example, if a mine worker has a water bottle in his lunch box that is not properly labeled as "water," a mine operator may be issued a citation and forced to then pay a federal fine.

3

6. It should not be surprising, then, that staking and maintaining a claim today involves a very onerous process. Among other things—including finding an area of interest and filing a "notice of location" with BLM—a miner needs to pay the Federal Government an initial payment of $256 per claim. A miner needs to then pay annual maintenance fees to BLM of $165 per claim. Most importantly, before *any* actual work is done to develop a mine, a "plan of operation" must be filed with federal regulators. Having to file these plans is remarkably burdensome. Each year, plans of operation need to be more detailed, more thorough, and, in turn, more costly. What's more, plans of operation typically take many months or years to be reviewed and approved (if they are approved at all). And if a plan of operation is approved, miners must post reclamation bonds that ensure that upon finishing the project (whether successful or not), the miner will restore the surface of the land to its overall pre-mining condition.

### *Kimmerle Mining*

7. Kimmerle Mining LLC was officially formed in 2005 as a partnership between me and my dad, David Kimmerle. But as noted, we had been working in mining our whole lives. My dad had a partnership with his father, Howard Kimmerle Jr. And my grandfather had a partnership with his father, Howard Kimmerle Sr. We have been mining these lands for nearly a century.

8. We started Kimmerle Mining in 2005 because that was the first year in a very long time that the price of uranium began to rise to levels that would justify new production. For some context, the domestic uranium market has been in a constant cycle of boom and bust since around the late 1960s. People thus work the mines in this region sporadically—sometimes for months, sometimes for years, depending on the market. Given that the uranium market had been relatively depressed for a long time by 2005, we found that many of the mining corporations around here had gone under and had left a lot of valuable deposits in the region unclaimed. We got busy, and

staked several hundred claims in the area. We were able to locate claims covering a cluster of mines near Green River, Lasal, Monticello, Lisbon Valley, and a number of spots west of Blanding. Since then, we've modified our holdings in light of market factors. We have pared back some of our claims, but we have also selectively added others as some corporations abandoned the region.

9. As of 2022, we currently own over 300 claims. These claims are scattered all over Southeastern Utah and Southwestern Colorado. They cover about 20 different known deposits, as well as many areas that probably have additional deposits that require more work to prove up. Since we started Kimmerle Mining, we have paid the Federal Government roughly $665,000 in claim fees. This year, we will pay an annual maintenance fee payment that should exceed $50,000.

### The Bears Ears National Monument

10. In early 2021, Kimmerle Mining owned 135 claims in what would soon become the Bears Ears National Monument. After being sworn in, one of the first things President Biden did was to order a committee to study restoring the Bears Ears Monument to the original size designated by President Obama. In anticipation of President Biden's eventual proclamation re-expanding the Monument, we did two things at Kimmerle Mining. *First*, in April 2021, we submitted a plan of operation to open and operate a mine on a group of claims we owned called Geitus. The Geitus Mine is located at the edge of Deer Flat in Southeastern Utah. The Geitus is probably our best property: This group of claims cover a deposit containing at least 450,000 pounds of uranium, and 1,500,000 pounds of copper (and potentially three times that amount). *Second*, in September 2021, we abandoned most of our claims—100 in total—within the area where President Biden was planning to re-expand the Bears Ears Monument. We kept our best 35 claims in the area—including, most importantly, the group of claims that cover the Geitus deposit.

11. Filing the plan of operation to open the Geitus Mine was a very time-consuming and resource-intensive process. We spent about two full months gathering the necessary data, writing up the document, and submitting it to BLM. The document we ultimately submitted was over 80 pages long. We had hoped that the plan would be approved before President Biden re-expanded the Monument. At minimum, we had hoped that even if the plan was not approved, our rights to mine the deposit would nonetheless be grandfathered in given that we submitted the plan.

12. Those hopes did not bear out. BLM did not approve our plan of operation before President Biden's Bears Ears proclamation. And the Geitus claims did fall within the borders of the expanded Monument. On December 1, 2021, BLM informed us that since the Geitus claims were now inside a National Monument, we would also be required to perform (and pay for) a "Claim Validity Exam" before we could proceed any more with respect to developing those claims.

13. The interim guidance issued by BLM on December 16, 2021, gives further detail as to what this Claim Validity Exam would entail. *See* Memorandum from Director, Bureau of Land Management to BLM Utah State Director, *Interim Management of the Bears Ears National Monument* (Dec. 16, 2021).[1] Most notably, the guidance states: "Before approving a plan of operations within the monument on claims located before the lands were withdrawn" BLM must first "prepare a mineral examination report to determine whether the mining claim was valid *before* the withdrawal, and to determine whether the mining claim remains valid." *Id.* at 2. Importantly, the mining operator "will be responsible for the costs of the mineral examination." *Id.* at 3. And all significant mining activities are halted while this review takes place. *Id.* In other words, in order for a mining company to start work on an *existing* mining claim that pre-dates the Monument,

---

[1] The full memorandum can be found here: https://www.blm.gov/sites/blm.gov/files/docs/2021-12/BENM%20Interim%20Guidance%2012-16-21_Final508.pdf.

6

it must first pay for an exam that tests the validity of the claim itself. Worse, if BLM determines that the mining claim is actually *invalid*, it must then "promptly initiate contest proceedings." *Id.*

14. When we first communicated with BLM, the agency estimated that each validity exam would cost between $90,000 and $110,000. Given that the Geitus project consists of 30 claims, that would mean that the validity exams would cost us somewhere around $3 million. We have since had a number of follow-up discussions with BLM. BLM has made plain, consistent with its interim guidance, that a validity exam is required for each claim. The agency has revised its cost estimates downward, and has since told us that the exams should cost around $300,000 in total—a figure that would still be a tremendous expense for our business. Most important, though, in talking with the person who would be conducting the validity exams, it was clear that if we chose to move forward, BLM would take the opportunity to declare a number of our claims invalid.

15. We are trapped in a horrible position. Every year, we are forced to pay maintenance fees on our claims or lose them. But at the same time, the Government is stopping us from mining those claims. Moreover, in order to move forward on certain claims—namely, those making up the Geitus project—we would need to undergo an incredibly costly set of validity exams that come with the steep risk that BLM will declare our existing claims to be invalid. And even if our claims survive the validity exam process, we still need to have BLM approve our plan of operation—something that now involves ever more hurdles given that Geitus is part of a National Monument.

16. To put a finer point on it, we are pausing operations on the Geitus project because of the Monument and its requirement that we put our claims through a costly and risky validity exam process. But for that exam process, we would continue to work with BLM to get the plan of operation we already submitted approved. The Bears Ears Monument has thus already harmed our business, and it will continue to irreparably harm our business so long as it stands. As noted,

uranium markets are notably volatile; windows of profitability are fluid and fleeting, and we need the ability to capitalize on high uranium prices when they are available. Because of the Monument, and its accompanying regulations, we are missing out on these critical opportunities. We estimate that our inability to develop Geitus will cost us between $2–3 million in lost profits that we will never be able to recover.

17. Not developing the Geitus Mine has costs that extend far beyond Kimmerle Mining. If the mine was approved, we would be mining a deposit with an in-ground valuation of over $22 million. To operate the mine, we would hire about 8-10 miners who would each be earning $40 to $50 per hour. And the economic benefits of the mine would ripple through our broader community. The ore would be sent to a nearby mill in Blanding for refining—a mill that would then hire dozens of people to help process the ore and refine it into a finished saleable product. To operate the mine, we also would rely on a number of ancillary services: truck drivers to haul the ore to the mill, drillers to find more ore, fuel suppliers, equipment dealers, explosives makers, and the like. This money would circulate through our local economy to the benefit of our communities.

18. The Bears Ears Monument has also harmed us outside of the Geitus Mine. For one thing, President Biden's proclamation bars any new mining claims on federal lands within the monument bounds. 86 Fed. Reg. 57321, 57331 (Oct. 8, 2021). For another, we own four similar deposits within Bears Ears that we would like to start to develop, and would but for the Monument.

19. Lastly, what is also critical to understand is that the regulatory costs and burdens of the Monument extend far beyond the letter of the proclamation and the federal regulations. We have seen firsthand how mine operators—as well as other businesses—are reluctant to start new initiatives even *proximate* to the Monument because of a fear that the Monument will expand and an uncertainty about what the Monument's accompanying regulations will cover. Also, the

Monument has created a chilling effect in the area where businesses are concerned about working with those who have operations nearby or within the Monument because of political heat. To give one example, one of our other claims is called the Easy Peasy, which is located about half a mile within the Monument and contains a valuable vanadium deposit. We wanted to move forward on mining that claim, but we could not find a local mill to refine the ore. That was so because the local mill owners felt they would face serious political blowback if they worked with any mine that was operating within Bears Ears borders. We therefore missed out on a lucrative opportunity.

20. In light of its impact on mining, I believe the Monument will also harm our country. Uranium mining is an essential piece of domestic energy independence. A safe and responsible domestic mining industry is also critical to fighting climate change and protecting the environment. If uranium is not mined here, it will be mined in places like Australia, Canada, and Kazakhstan where the environmental regulations are far less rigorous than what they are in the United States.

21. In so many words, President Biden's designation of the Bears Ears Monument has already damaged our business and our community. If allowed to stand in its current form, I fear that the Monument will soon fundamentally destroy our region and its traditional way of life. I have seen firsthand how families like mine—families who have long histories working these lands in mining, timber, ranching, or related industries—are seeing their livelihoods threatened by the Monument and its regulations. I have also seen how our way of life is being ripped from under us by the influx of tourists that have flocked to this area because of the Monument, overwhelming our towns and, ironically, degrading the very public lands the Monument is supposed to conserve.

Dated: July 11, 2022

_____
Kyle Kimmerle