# EXHIBIT H

Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
BRAMMER RANCK, LLP
1955 W. Grove Parkway, Suite 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
bbrammer@spauldinglaw.com
mpiccolo@spauldinglaw.com

James M. Burnham (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; and THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES,<br>　　　*Plaintiffs*,<br><br>ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS,<br>　　　*Consolidated Plaintiffs*,<br>　　　v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE,<br>　　　*Defendants*,<br><br>HOPI TRIBE; NAVAJO NATION; PUEBLO OF ZUNI; and UTE MOUNTAIN UTE TRIBE,<br>　　　*Intervenor Defendants*. | **SUPPLEMENTAL DECLARATION OF ZEBEDIAH GEORGE DALTON IN SUPPORT OF PLAINTIFFS' AMENDED COMPLAINT**<br><br><br>Lead Case No. 4:22cv00059 DN-PK<br>Member Case No. 4:22cv00060 DN<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

I, Zebediah George Dalton, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge.

2.  I declare under penalty of perjury under the laws of the United States that the information in both this declaration and my prior declaration (attached hereto) is true and correct.

3.  The injuries described in my prior declaration have continued to endure, and will only compound so long as President Biden's monument designations are allowed to stand.

4.  As noted in my original declaration, I cannot build a new range improvement (or fix certain existing ones) on the parts of my ranch that sit on federal land without approval from a federal regulator, most often the BLM Rangeland Management Specialist who is assigned to my permits. *See, e.g.*, Dalton Decl. ¶¶ 16–18. Seeking such federal approval has always been burdensome, costly, and time-intensive. But those tolls are greatly increased by President Biden's Proclamation, because, now, all regulatory approvals concerning grazing activities on Bears Ears monument land must be made to "ensure [the] protection of monument objects." Memorandum from Director, Bureau of Land Management to BLM Utah State Director, *Interim Management of the Bears Ears National Monument* 5 (Dec. 16, 2021). In other words, this higher standard has caused—and will cause—me to spend more time and resources to comply with federal regulations, because approvals for range improvements are now contingent on a showing that any such activity is consistent with the Proclamation. This higher standard also makes it less likely that my pending applications for new range improvements will be approved. *See, e.g.*, Dalton Decl. ¶ 11.

5.  As I also explained before, the practical reality is that federal approvals will be few and far between—and quite likely, nonexistent. *See, e.g.*, *id.* ¶¶ 16–17. Consistent with the Proclamation's stated goal of phasing out grazing within monument lands, the BLM has taken no

action on our pending requests for new wells or other range improvements. And we have been told not to expect approvals any time soon, if at all, because of the Monument and its accompanying regulations. In parallel, I have been approached by federal regulators out here about whether I would be open to relinquishing some of my federal grazing permits. I refused.

6. I have also endured increased regulatory burdens in connection with activities *outside* the Monument that supposedly have an incidental effect on protected "objects" within the Monument. For instance, I have had to dedicate time and resources responding to a recent BLM inquiry about two of my off-Monument wells, and their hydrologic impact on the overall area. Similarly, I have now been told by BLM that I need to apply for a formal right-of-way to get to two of my wells on SITLA land (not those on Mancos Mesa). This is new; before President Biden's Proclamation, I had been able to get to these wells by way of an administrative access.

7. I have been involved with the Bears Ears Monument Advisory Committee, and my understanding is that this is all bound to get only worse. As the most recent "Scoping Report" makes plain, the bulk of comments and stakeholders have pressed plans "reducing or eliminating livestock grazing in BENM" in many circumstances. BLM & USFS, *Bears Ears National Monument: Resource Management Plan and Environmental Impact Statement* 31 (Dec. 2022).[1] There is every indication the Biden Administration will continue course to accomplish that end.

8. To the best of my knowledge, none of my ranch that sits within the Monument has any "objects" of historic or scientific interest, as understood under the Antiquities Act.

---

[1] Available at: https://eplanning.blm.gov/public_projects/2020347/200531796/20071327/250077509/Final%20BENM%20Scoping%20Report%2020221213_508.pdf.

Dated: 1/12/23

*[signature]*

Zebediah George Dalton

Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
SPAULDING LAW, LLP
1955 W. Grove Parkway, Suite 250
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
Facsimile: (801) 877-4318
bbrammer@spauldinglaw.com
mpiccolo@spauldinglaw.com

James M. Burnham (*pro hac vice* forthcoming)
Harry S. Graver (*pro hac vice* forthcoming)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the United States Forest Service; and UNITED STATES FOREST SERVICE,<br><br>   *Defendants*. | Civil Action No. 4:22-cv-00060-DN<br><br>**DECLARATION OF ZEBEDIAH GEORGE DALTON** |

I, Zebediah George Dalton, declare as follows:

1. My name is Zebediah George Dalton. I am the owner and operator of TY Cattle Company LLC. This declaration is based on my personal knowledge. I am over 18 years old.

*Background*

2. I was born and raised in Monticello, Utah. I now live in Blanding, Utah, with my wife and children. I come from a ranching family that has worked these lands since Utah's founding. My great-great-great grandad came to Salt Lake City, Utah, with the Mormon pioneers in the 1840s, and soon after settled in Anabelle, Utah. In the 1890s my great granddad moved to San Juan Country, where he homesteaded and started to run cattle in Montezuma Creek, Utah.

3. We currently own the T Y Ranch in Utah. My family has owned this ranch for 44 years, and my family has been ranching in San Juan County for a little over 130 years.

4. The T Y Ranch has a long and colorful history in Utah, starting with Plat Lyman. Plat was part of the group of Mormon pioneers who came across this area through the Hole-in-the-Rock Trail. On their journey, and in a rush to get to their destination so that they could begin farming before the growing season was over, the pioneers decided to leave a number of cattle behind in these parts. Several months later, Plat and a few others decided to come back to see if they could find any of the cows. To their surprise, not only did they find the cattle, but the cows were thriving. And because the cows were doing so well on their own, Plat decided to just keep them here and open up T Y Ranch. Plat owned and operated the ranch for a number of years, and then later sold it to some Texas cowboys. But the Texans didn't last long here, eventually going broke and abandoning the ranch (and taking a few cows with them). After that, the ranch went through a handful of owners until my family bought it in 1978. It has been in our family since.

2

5. Our ranch is roughly 730,000 acres. Almost all of that land—over 600,000 acres—is managed either by the Bureau of Land Management or the U.S. Forest Service. About three-quarters of the ranch is now within the borders of the Bears Ears Monument. During the Trump Administration, less than 1% of the ranch was within monument bounds.

6. I have been working this ranch all my life. I follow in the footsteps of my dad and grandad, who were role models to me and instilled in me the value of hard work and a solid work ethic. As they told me: If the sun is up before you, then you are burning daylight. To operate the T Y Ranch, I am usually up and out by 3:30 in the morning, and back home around 7 or 8 at night. Most days on the ranch are 12 to 16 hours long. An 8 hour day is considered a half day of work.



(Pictured: Zeb working on the ranch.)

### *Ranching and Regulation*

7. There are a few key parts to running T Y Ranch. The first is feed and water, without which you cannot run cattle. Keeping steady sources of water and feed has always been a challenge in the dry desert landscape of Southeastern Utah. But finding enough regular water for our cattle has proven especially difficult in recent years. To combat this, about ten years ago, I bought a drill rig for drilling water wells around the ranch. With the increasingly dry climate, we have found that water wells are far more reliable than ponds, and have become a necessity for us to be able to effectively rotate grazing on the ranch. To date, I have drilled around 30 wells. And I have plans to drill many more. Drilling has become a second full time job—something I'm often out doing at all hours of the day.

8. Second, it is also important to match our cows to our range. T Y Ranch is very large and very diverse. The summer range is approximately 9000 feet elevation, where the lowest point on our winter range is 3700 feet elevation. We have spent years matching the genetics of our cattle to best meet with the range. We don't want a cow that is too big or too small. A big cow requires too much energy to maintain; they simply don't get enough energy in the desert landscape to perform well, let alone raise a healthy calf. A cow that is too small is too inefficient, and, in the fall, their undersized calves are not desirable to the cattle buyers. We have found that the Brangus cross-bred cattle have done the best on our ranch. The cows are generally between 1000 to 1100 pounds. They travel well, tolerate the heat, and will venture out to feed and water.

9. Third, it is critical to maintain the infrastructure of the ranch. Overseeing the ranch requires a lot of miles on horseback every day, not only to move the cattle back and forth, but also to make sure that our structures are in good condition. Our ranch has miles of fences to repair, ponds to manage, troughs and springs to maintain, and grazing improvements to work on and build.

4

10. Because much of our ranch is located on federal land, we are generally regulated by an overlapping regime of federal and state regulations. Both BLM and the USFS manage our cattle range land, and our ranch is subject to regulations implemented by BLM, USFS, and the National Park Service. Some of our ranch—around 100,000 acres—is located on state land managed by the Utah School and Institutional Trust Lands Administration. Importantly, the bulk of our grazing improvement plans have been carried out on the sections of our ranch managed by SITLA. That is so because working with SITLA is far easier than working with any other governmental agency, especially with respect to projects involving water development (like wells).

11. Even before the Bears Ears National Monument was created, our ranch was (and still is) subject to an onerous collection of federal regulations. Indeed, the local BLM regulations alone measure about a foot tall on my desk once all printed out. And dealing with these regulations has been a consistent and burdensome challenge that has only grown more difficult over the years. At the moment, we have multiple improvements awaiting regulatory approval—19 wells that we requested from the Forest Service in 2018, and 6 wells that we requested from BLM in 2016—that are necessary to the ranch but are stuck in regulatory limbo. These delays are incredibly damaging.

12. As one example, it took us nearly *twenty years* to get BLM approval for us to build a single fence on our land. In 1998, we applied with BLM for permission to build a fence on one part of the ranch, which would divide a large pasture into two so that we could rest one side during the growing season every year for the sake of range health and recovery. Due to a combination of agency inaction, unresponsiveness, and inefficiency, it took two decades to get the environmental impact statement through BLM so that we were allowed to build this ordinary range improvement.



(Pictured: the twenty-year fence along the horizon, highlighted for visibility.)

13.     As bad, it is almost impossible to comply with certain federal regulations because compliance depends on approvals from *other* bureaucrats that are often delayed or otherwise hard to secure.  For instance, a USFS regulation holds that we must improve and maintain two water sources and one fence each year.  Four years ago, to comply with this obligation, I told USFS that I wanted to clean two reservoirs on the ranch.  To do so, I needed to use certain heavy equipment to improve the sources.  USFS agreed this would satisfy the regulation, but told me that I needed to first obtain an "archeological clearance" before we could proceed with the work.  It has been four years since that conversation, and I still haven't received this clearance.  As a result, I cannot

6

perform the maintenance on the reservoirs that I am required to do.  And this inaction puts us at risk of having the original reservoir improvements declared abandoned under *another* regulation.

### *The Bears Ears National Monument*

14. Around three-quarters of T Y Ranch—almost 550,000 acres—is within the current boundaries of the Bears Ears Monument.  The Monument and its accompanying regulations pose a direct threat to our ranch and our community.  When President Obama first established the Bears Ears Monument, people in this area were distraught.  They feared the increased federal control of these lands, and the inevitable restrictions on access to public lands that had been a part of our county's history and survival.  Most people in the community felt like this was a huge robbery of our freedoms, all for something that had little to nothing to actually do with preserving Bears Ears.

15. President Trump's decision to reduce the size of Bears Ears Monument was a much-needed course correction.  The majority of our community wanted the entire designation rescinded, and for these lands to ultimately be returned to Utah.  But we viewed President Trump's reduction as a merciful correction to a overstep in executive power.  Both ranchers and residents felt happy that President Trump listened to us, and we felt a relief from another layer of government control.

16. President Biden's proclamation expanding the Bears Ears Monument poses a direct threat to our ranch, our business, and our way of life.  Indeed, President Biden's proclamation has already started to adversely affect our ranch.  As noted, it is essential for the survival of our ranch to keep steady sources of water throughout the range.  We currently have a large portion of our ranch on Mancos Mesa that is in desperate need for better and more reliable sources of water.  Before the Monument, I had applied with BLM for right of way access to cross BLM-managed lands with my drill rig to access the state sections on Mancos Mesa so that I could drill water wells.  BLM stalled on that decision for the last number of years.  And now, under the current Monument,

we expect the situation to only get worse. That is so because, as part of carrying out President Biden's proclamation, SITLA and BLM are in the process of finalizing a land exchange agreement that will transfer the state lands within Bears Ears (including those on Mancos Mesa) to the Federal Government. As a result, even putting aside the right of way issue, the question of whether we can drill wells on Mancos Mesa lands will now be up to BLM rather than SITLA. That is not good for our ranch. SITLA's regulatory regime is easier and more efficient than BLM's. By contrast, obtaining approval for improvements from BLM is far more costly, onerous, and time-consuming.

17.  Our inability to drill wells on Mancos Mesa has harmed T Y Ranch, and we will continue to suffer irreparable harm so long as the requisite regulatory approvals are either delayed or withheld as a result of the Monument. Last fall, because I was not able to drill these wells, I had to sell down 200 head of cows since there was not enough usable feed on the rest of the range due to a drought. Being forced to sell those cows—as well as not being able to keep our replacement heifers—has cost me an estimated $750,000. That is money I will not be able to recover. Also, so long as the well project on Mancos Mesa is stalled, I am missing out on other opportunities and lost profits that I similarly will not be able to recover. Drilling wells on Mancos Mesa could have opened up a section of my ranch that rarely sees grazing. That would not only benefit our ranch, but it would also benefit the broader ecosystem here. Water wells help every species. And bringing more water into the area allows the riparian areas to rest and recover.

18.  If allowed to stand, the Monument and its accompanying regulations pose an existential threat to our ranch and our livelihood. Once SITLA lands are transferred to the Federal Government, federal regulators will have total control over whether we can build and maintain grazing improvements on our ranch. I fear that might spell the beginning of our end. As noted, the bulk of our grazing improvements have been on SITLA lands because it is virtually impossible

to get timely regulatory approvals from federal agencies. And everything we know about the Monument suggests that this will grow even worse in the coming years. The interim guidance issued by BLM makes plain that grazing is not a protected activity under the Bears Ears proclamation, and that all regulatory approvals concerning grazing activities on Bears Ears land must be made to "ensure the protection of the monument objects." *See* Memorandum from Director, Bureau of Land Management to BLM Utah State Director, *Interim Management of the Bears Ears National Monument* 5 (Dec. 16, 2021).[1] The proclamation also takes the novel step of declaring that if a grazing permit is voluntarily relinquished by an existing holder, then that land shall be "retire[d] from livestock grazing." 86 Fed. Reg. 57321, 57332 (Oct. 8, 2021). That policy reflects an initiative to steadily retire grazing on monument lands. And federal regulators could easily further that end by withholding approval of improvement projects like water sources.

---

[1] The full memorandum can be found here: https://www.blm.gov/sites/blm.gov/files/docs/2021-12/BENM%20Interim%20Guidance%2012-16-21_Final508.pdf.



(Pictured: cattle grazing on part of T Y Ranch.)

19. I have worked all my life to improve and make conditions better on the ranch so that I could pass it on to my children. I hoped to be able to pass on a ranch that was in better conditions than when I got it. I have a sinking feeling in my heart that we are going to lose the ranch and the ability to raise cattle on it. I fear the federal agencies will eventually stop us from maintaining our range improvements—especially water sources. And without water availability, it is impossible to raise cattle. It takes a great deal of work to run a ranch as large and diverse as T Y. We are at our limits, and this additional layer of federal regulation may ultimately break us.

20. I care deeply about the preservation of these lands. And in my view, as both a lifelong resident of this area and also as a member of President Trump's Monument Advisory Committee, the decision to expand Bears Ears was woefully misguided. Further, the costs of President Biden's proclamation extend far beyond ranching. The proclamation also limits logging.

10

But without logging—as we have seen firsthand—our area will be at a heightened risk of sprawling wildfires. Logging also provides good local jobs, timber products, and additional lumber for homes and improvements. The proclamation further limits mining and energy production. But some of the cleanest energy sources in the world are found right here. Mining uranium and other rare earths could help solve our nation's energy crisis. And taking these well-paying jobs from San Juan County is making it harder for our kids to stay close to home and make a living. Lastly, as local industries are suffering under the Monument, a new tourist economy is cropping up to replace it and, in turn, hollow out our community. Simply put, I do not think that our community, and our traditional way of life, will be able to survive the Bears Ears Monument in its current form.

Dated: 7/20/22

_____
Zebediah George Dalton

11