MELISSA HOLYOAK (Utah Bar No. 9832)
  Utah Solicitor General
ANTHONY L. RAMPTON (Utah Bar No. 2681)
  Assistant Utah Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov
*Attorneys for Plaintiff State of Utah*

TYLER R. GREEN (Utah Bar No. 10660)
  CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiffs Garfield County, Utah; Kane County, Utah; State of Utah*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

|  |  |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES;<br><br>*Plaintiffs,*<br><br>ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS;<br><br>*Consolidated Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; TOM VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; FOREST SERVICE, | **AMENDED COMPLAINT OF GARFIELD COUNTY, KANE COUNTY, AND THE STATE OF UTAH**<br><br>Lead Case No. 4:22cv00059 DN-PK<br><br>Member Case No. 4:22cv00060 DN<br><br>Judge David Nuffer<br><br>Magistrate Judge Paul Kohler |

*Defendants,*

HOPI TRIBE; NAVAJO NATION; PUEBLO OF ZUNI; and UTE MOUNTAIN UTE TRIBE;

*Intervenor-Defendants.*

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................................ 1

JURISDICTION AND VENUE .................................................................................................... 5

PARTIES ....................................................................................................................................... 5

BACKGROUND ........................................................................................................................... 7

I.  The Antiquities Act of 1906 limits national monument declarations to three specific categories of objects and restricts accompanying land reservations to the smallest area compatible with the proper care and management of those objects. ....................................... 7

    A.  The Act's text and legislative history confirm its limited scope. .................................... 7

    B.  Federal public lands law before and after 1906 confirms the Act's limited scope. ..... 11

    C.  Presidents have repeatedly ignored the Act's strict limits, thereby harming the very objects they purport to protect and hampering local residents' ways of life and livelihoods. ............................................................................................................... 20

II.  President Biden's proclamations cap a history of Antiquities Act abuse in Utah. .............. 23

    A.  President Clinton and President Obama abused their Antiquities Act authority with monument declarations and reservations in Utah in 1996 and 2016. .......................... 23

    B.  Responding to local concerns, President Trump reduced the size of both reservations in 2017. ..................................................................................................... 24

    C.  President Biden rescinds President Trump's proclamations and enlarges the boundaries of Grand Staircase-Escalante and Bears Ears National Monuments. ...... 26

III.  President Biden's unlawful proclamations and agency actions pursuant to those unlawful proclamations have caused, and will continue to cause, a host of adverse impacts to the land, to State and local interests, and to the items that they purport to protect. ................... 30

    A.  The proclamations increase the risk of harm to archaeological and paleontological resources. ................................................................................................................... 31

    B.  The proclamations harm the State's interests in its wildlife. ..................................... 34

    C.  The proclamations harm search-and-rescue efforts and increase search-and-rescue costs for the State and Counties. ................................................................................ 35

    D.  The proclamations harm ecosystems and preclude the State's proactive land management. .............................................................................................................. 38

E.      The proclamations harm livestock grazers in ways that materially and concretely harm Plaintiffs. ........................................................................................................ 44

F.      The proclamations harm local economies in ways that substantially affect Plaintiffs. .................................................................................................................. 47

G.     The proclamations burden infrastructure at Plaintiffs' expense and create new maintenance costs. ...................................................................................... 52

H.     The proclamations create new administrative and regulatory burdens, deprive the State of certain statutory rights, preempt state law, and otherwise deprive Plaintiffs of use of the land. ............................................................................. 54

I.       The proclamations harm Native American interests. ...................................... 58

J.      These harms are real and occurring now as a result of President Biden's proclamations and their delegations to federal agencies. ................................ 59

IV.  President Biden lacks any authority for the proclamations. ..................................... 61

A.     President Biden's proclamations declare as monuments things that are not qualifying landmarks, structures, or objects under the Act. .............................. 61

B.     President Biden proclamations exceed his authority by reserving more land than is necessary to the proper care and management of any qualifying landmarks, structures, or objects. ...................................................................... 77

C.     Other legal considerations undermine President Biden's view that the Act provides unlimited power to designate monuments and reserve land. ......................... 87

CLAIMS FOR RELIEF ....................................................................................................... 90

PRAYER FOR RELIEF ....................................................................................................... 95

## AMENDED COMPLAINT

1.      The State of Utah, Kane County, and Garfield County bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows.

## NATURE OF THE ACTION

2.      This case challenges one of the latest in "a trend of ever-expanding antiquities" reserved by Presidents under an implausible and unlawful interpretation of the Antiquities Act of 1906. *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (statement of Roberts, C.J.). Specifically, it involves President Biden's reservation in 2021 of two national monuments in southern Utah—the Grand Staircase-Escalante National Monument and the Bears Ears National Monument— that together comprise more than 3.23 million acres. That's more than twice the number of total acres in the President's home state of Delaware (1.53 million acres), more than four times the number of total acres in Rhode Island (787,840 acres), and just smaller than Connecticut (3.55 million acres).

3.      The Bears Ears and Grand Staircase-Escalante reservations are unlawful and *ultra vires*. A straightforward reading of the Antiquities Act's text reveals that the Act never contemplates "monuments" double the size of Delaware.

4.      In the Act, Congress made things in only three specific, limited categories eligible for declaration as national monuments: (1) "historic landmarks," (2) "historic" or "prehistoric structures," or (3) "other objects of historic or scientific interest." 54 U.S.C. §320301(a).

5.      If a President declares a qualifying landmark, structure, or object as a national monument, the Act allows him to "reserve parcels of land as a part of the national monument[]." *Id.* §320301(b). But Congress strictly limited the amount of land the President can reserve. Under the Act's plain text, the President's power is limited to reserving only the "smallest area compatible with the proper care and management" of the qualifying landmark, structure, or object. *Id.*

6.   Consistent with that plain text, the Act was originally understood to authorize the President to make "small reservations" that would include "only so much land as may be absolutely necessary for the preservation of those interesting relics of prehistoric times." H.R. Rep. No. 2224, 59th Cong., 1st Sess. 1 (1906).

7.   The Act does not authorize the President to declare entire landscapes as national monuments.

8.   The Act does not authorize the President to declare generic and ubiquitous items or plants and animals as national monuments.

9.   The Act does not authorize the President to draw boundaries around an enormous land area and then stitch together hundreds of items and features within those boundaries to try to reverse engineer a national monument.

10.   And the Act does not authorize the President to reserve vast quantities of land untethered to the "proper care and management" of any particular landmark, structure, or object.

11.   But President Biden, like too many of his predecessors over the past hundred years, has ignored those limits, thereby transforming the Act "into a power without any discernible limit to set aside vast and amorphous expanses of terrain." *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (statement of Roberts, C.J.).

12.   In his proclamations creating the Bears Ears and Grand Staircase-Escalante reservations, President Biden tried to justify them by declaring that entire landscapes—as vast as the State of Connecticut—were *themselves* national monuments because they were "object[s] of historic and scientific interest." Proclamation 10285 of Oct. 8, 2021, *Bears Ears Nat'l Monument*, 86 Fed. Reg. 57321 (Oct. 15, 2021); Proclamation 10286 of Oct. 8, 2021, *Grand Staircase-Escalante Nat'l Monument*, 86 Fed. Reg. 57335 (Oct. 15, 2021).

13.     In the alternative, President Biden tried to justify the reservations by declaring that long lists of generic and ubiquitous items—such as "petrified wood," "bold plateaus," and "fences"—and long lists of plants and animals—such as "potato[es]" and "beavers"—were qualifying "objects of historic or scientific interest" under the Act.

14.     President Biden made no attempt to explain how 3.23 million acres constituted the "smallest area compatible with the proper care and management" of any qualifying objects within these reservations. 54 U.S.C. §320301(b).

15.     President Biden's disrespect for the Act's limitations matters. "The creation of a national monument is of no small consequence." *Mass. Lobstermen's Ass'n,* 141 S. Ct. at 980 (statement of Roberts, C.J.). A reservation under the Act carries with it restrictions that suffocate local traditional and essential activities. For example, President Biden's reservations inhibit Native Americans from engaging in traditional cultural practices, prevent ranchers with federally recognized grazing preference rights from taking care of their cattle, and even impede Plaintiffs' search-and-rescue personnel while they are trying to save lives. They preclude Plaintiffs from managing the land as they otherwise do on other federal lands, keeping it fertile for grazing, maintaining and restoring a habitat for wildlife, and keeping it safe from wildfires. The reservations also stifle local economic activity, impact local culture and tradition, lock up potentially critical minerals, destroy jobs, and impose exasperating and costly burdens on local and state governments.

16.     In contrast to those demonstrable burdens, President Biden's reservations provide no benefits consistent with the Act's text, for they do not actually protect the things that might qualify as monuments within them. A series of federal laws passed after the Antiquities Act provide more targeted and effective protection for historic, prehistoric, and scientific resources on all federal land, including with many provisions that dwarf the minor protections included in the Act. Nor do the reservations protect the natural beauty of the land that they encompass. Other existing laws already

do that too—and on more sensible terms that permit Plaintiffs to do their part in managing the lands to ensure that natural beauty for generations to come. Simply put, the President's reservations bring in an influx of visitors while impeding the very stewards of the land who have protected it for more than a century.

17.    In this way, the reservations endanger what they purport to protect. They draw new attention to artifacts, features, and fossils on the land—causing a wave of vandalism, defacement, and desecration. They draw visitors from all over the world who trample on flora, traumatize fauna, and leave trails and roads overrun with trash and human waste. And they devastate the livelihoods of the Native Americans and locals who love and care most for the land.

18.    The reservations prevent traditional State and local stewards of the land and other rightsholders from protecting against invasive species, turning over soils, and clearing brush to prevent wildfires.

19.    The Antiquities Act does not greenlight President Biden's attempt to unilaterally transform vast regions of Utah.

20.    If President Biden's reservations of Bears Ears and Grand Staircase-Escalante National Monuments are upheld, the Antiquities Act's limits are no limits at all.

21.    The State of Utah is injured by the reservations in several ways. The reservations preempt its laws and policies, impose new administrative burdens on its workers, injure its wildlife, deprive it of revenue, impede its ability to work on the land, increase its expenditures on search-and-rescue operations and road maintenance, and give it little choice but to give up its own school trust lands within the reservations' boundaries.

22.    Kane County, Utah is injured by the reservations several ways. Kane County includes hundreds of thousands of acres subject to the Grand Staircase-Escalante reservation. The reservation of so much land within Kane County imposes countless burdens on the County, including costs and

impositions related to search-and-rescue, road maintenance, administrative planning, land management, facilities maintenance, and law enforcement.

23.     Garfield County, Utah is injured by the reservations several ways. Garfield County includes hundreds of thousands of acres subject to the Grand Staircase-Escalante reservation. The reservation of so much land within Garfield County imposes countless burdens on the County, including costs and impositions related to search-and-rescue, road maintenance, administrative planning, land management, facilities maintenance, and law enforcement.

24.     Utah, Kane County, and Garfield County are entitled to a declaratory judgment that President Biden's reservations are unlawful and that acts taken by Defendants to effectuate President Biden's proclamations are unlawful, as well as an injunction preventing Defendants from enforcing and implementing them.

## JURISDICTION AND VENUE

25.     This action arises under the Antiquities Act of 1906, 54 U.S.C. §320301, and the Administrative Procedure Act, 5 U.S.C. §701 *et seq.*

26.     This Court has subject-matter jurisdiction over this action based on 28 U.S.C. §1331, 28 U.S.C. §§2201, 2202. This Court is authorized to grant the requested relief based on 28 U.S.C. §1361, 28 U.S.C. §§2201, 2202, 5 U.S.C. §706, and its general legal and equitable powers.

27.     Venue is proper only in this judicial district under 28 U.S.C. §§1402(a)(1) and 1391(e)(1) because Defendants are United States agencies or officers sued in their official capacities, the State of Utah, Kane County, and Garfield County are residents of this judicial district, and the property that is the subject of this action is situated within this judicial district.

## PARTIES

28.     Plaintiff State of Utah is a sovereign State of the United States of America. Plaintiff Spencer J. Cox is the Governor of the State of Utah. Plaintiff Sean D. Reyes is the Attorney General

of the State of Utah. They are authorized by Utah law to sue on the State's behalf. Their offices are located at 350 North State Street, Salt Lake City, Utah 84114.

29.     Kane County is a political subdivision in the State of Utah, duly authorized to maintain this action. *See* Utah Code §17-50-302(2).

30.     Garfield County is a political subdivision in the State of Utah, duly authorized to maintain this action. *See* Utah Code §17-50-302(2).

31.     Defendant Joseph R. Biden, Jr. is the President of the United States and is sued in his official capacity. President Biden issued the proclamations establishing the Grand Staircase-Escalante and Bears Ears National Monuments and reserving the land at issue.

32.     Defendant Deb Haaland is the Secretary of the Department of the Interior. She is sued in her official capacity.

33.     Defendant U.S. Department of the Interior is a federal cabinet agency and a Department of the Executive Branch (*see* 5 U.S.C. §101) responsible for enforcing, implementing, or administering a subset of statutes, regulations, or other executive-branch actions relating to the Bears Ears National Monument and the Grand Staircase-Escalante National Monument proclamations.

34.     Defendant Tracy Stone-Manning is the Director of the Bureau of Land Management. She is sued in her official capacity.

35.     Defendant Bureau of Land Management is an agency within the U.S. Department of the Interior responsible for enforcing, implementing, or administering a subset of statutes, regulations, or other executive-branch actions relating to the Bears Ears National Monument and the Grand Staircase-Escalante National Monument proclamations.

36.     Defendant Tom Vilsack is the Secretary of the Department of Agriculture. He is sued in his official capacity.

37.     Defendant U.S. Department of Agriculture is a federal cabinet agency and a Department of the Executive Branch (*see* 5 U.S.C. §101) responsible for enforcing, implementing, or administering a subset of statutes, regulations, or other executive-branch actions relating to the Bears Ears National Monument and the Grand Staircase-Escalante National Monument proclamations.

38.     Defendant Randy Moore is the Chief of the U.S. Forest Service. He is sued in his official capacity.

39.     Defendant U.S. Forest Service is an agency within the U.S. Department of Agriculture responsible for enforcing, implementing, or administering a subset of statutes, regulations, or other executive-branch actions relating to the Bears Ears National Monument and the Grand Staircase-Escalante National Monument proclamations.

40.     If Defendants were to raise a sovereign immunity defense, any such defense is inapplicable. Plaintiffs' claims do not implicate sovereign immunity, and, in all events, federal law indicates that Congress generally waived sovereign immunity for such actions. *See, e.g.*, 5 U.S.C. §702.

## BACKGROUND

**I.     The Antiquities Act of 1906 limits national monument declarations to three specific categories of objects and restricts accompanying land reservations to the smallest area compatible with the proper care and management of those objects.**

### A. The Act's text and legislative history confirm its limited scope.

41.     The Antiquities Act authorizes the President to declare a national monument. But the Act does not confer unfettered discretion to do so. The Act sharply limits that authority by making only three categories of things on public land eligible for monument declaration:

> The President may, in the President's discretion, declare by public proclamation ***historic landmarks***, ***historic and prehistoric structures***, and ***other objects of historic or scientific interest*** that are situated on land owned or controlled by the Federal Government to be national monuments.

54 U.S.C. §320301(a) (emphasis added) (the "Declaration Provision").

42.     The Act further limits the President's authority by constraining the permissible size of accompanying land reservations. The Act anticipates reserving "parcels" of land to enclose the designated objects. The President may reserve only the smallest parcel necessary for the monument's care and management:

> The President may reserve parcels of land as a part of the national monuments. The **limits** of the parcels **shall be confined to the smallest area compatible with the proper care and management of the objects to be protected**.

54 U.S.C. §320301(b) (emphasis added) (the "Reservation Provision").

43.     Federal law, anticipating that such monuments will be physical objects, also establishes punishment for anyone who removes, damages, or defaces monuments or antiquities from federal land:

> A person that appropriates, excavates, injures, or destroys any historic or prehistoric ruin or monument or any other object of antiquity that is situated on land owned or controlled by the Federal Government without the permission of the head of the Federal agency having jurisdiction over the land on which the object is situated, shall be imprisoned not more than 90 days, fined under this title, or both.

18 U.S.C. §1866(b) (the "Punishment Provision").

44.     When Congress passed the Act, it had the effect of allowing the President to prevent antiquities from being freely raided and to prevent private persons from taking outright ownership of land containing those antiquities—*if* the delimiting statutory conditions were met. In other words, the Act prevented private expropriation, but only in very small areas.

45.     Statements contemporaneous with the Act's passage reflected this understanding of the Act's limited scope.

46.     "Most commentators who have considered the Act and its legislative history have concluded that it was designed to protect only very small tracts of land around archaeological sites." Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 477 (2003).

47.     They conclude, for instance, that "the Antiquities Act, as initially enacted, was intended to allow the President to make only small withdrawals of public lands in order to protect prehistoric ruins and Indian artifacts." Rasband, *Utah's Grand Staircase: The Right Path to Wilderness Preservation?*, 70 U. Colo. L. Rev. 483, 501 (1999).

48.     Environmentalist scholars have conceded that "Congress did *not* have in mind authorizing withdrawals of vast areas for designation as national monuments when it passed the Antiquities Act." Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Resources J. 279, 301-02 (1982) (emphasis added).

49.     Instead, "[t]he purpose was to set aside *minimal areas* to protect ruins of archaeological interest[.]'" *Id.* at 302 (emphasis added).

50.     Congressional statements confirm as much. When the Act was introduced, its congressional report reassured that "[t]he bill proposes to create *small reservations* reserving *only so much land as may be absolutely necessary* for the preservation of those interesting relics of prehistoric times." H.R. Rep. No. 2224, 59th Cong., 1st Sess. 1 (1905) (emphasis added).

51.     One representative asked the Act's sponsor point blank, "How much land will be taken off the market in the Western States by the passage of the bill?" 40 Cong. Rec. 7888 (Jun. 5, 1906) (Rep. Stephens).

52.     The bill's sponsor replied: "Not very much." *Id.* (Rep. Lacey).

53.     As proof, the sponsor pointed to the smallest-area-compatible limitation. *See id.*

54.     The first representative then asked if the Act would turn out to be "anything like" an earlier bill "by which seventy or eighty million acres of land" had become "tied up" through a series of reservations of forest lands. *Id.* (Rep. Stephens).

55.     The sponsor replied, "Certainly not." *Id.* (Rep. Lacey).

56.     Instead, the Act was to simply protect a small number of qualifying landmarks, structures, and objects, as well as the small parcels containing them.

57.     The Act was written specifically to avoid the inference that it could be used to declare broader things such as "natural or scenic areas" as national monuments. Norris, *The Antiquities Act and the Acreage Debate*, 23 George Wright Forum 6, 8 (2006).

58.     In fact, before passing the Act, Congress rejected legislation that would have authorized Presidents to declare and reserve a wider array of things. Under an earlier proposal, Presidents would have been able to declare "any natural formation of scientific or scenic value or interest, or natural wonder or curiosity," as a national monument. Squillace, *The Monumental Legacy of the Antiquities Act of 1906,* 37 Ga. L. Rev. 473, 478-79 (quoting H.R. Rep. 8066, 56th Cong. (1900)).

59.     After refusing to grant the President power to declare anything of "scenic value" or any "natural wonder or curiosity," Congress instead authorized the President to declare as a monument only three narrow categories of things: "historic landmarks," "historic and prehistoric structures," or "other objects of historic or scientific interest." 54 U.S.C. §320301(a).

60.     A few years after the Act was enacted, the Chief Clerk of the General Land Office—the precursor to the Bureau of Land Management—rejected any notion that the Act could justify declarations of things for their scenic value or similar broad considerations. He explained that "[t]he terms of the monument act do not specify scenery, nor remotely refer to scenery, as a possible raison d'etre for a public reservation." Lee, *The Antiquities Act of 1906*, at 109 (1970) (citing Bond, *The Administration of National Monuments, Proceedings of the National Park Service Conference held at Yellowstone National Park, September 11 and 12, 1911*, at 80-81 (1912)). Around the same time, the General Land Office explained that the Act "does not provide for the reservation of public land for the protection of scenery." *Hal Rothman, America's National Monuments: The Politics of Preservation*, ch. 5 (1989),

bit.ly/3QK0atm (citing GLO Commissioner Fred Dennett to Congressman Carl Hayden, 28 Apr. 1913, NA, RG 79, Series 6, Proposed National Parks, Papago Saguaro, file O-32).

61.     Instead, the Act merely authorized the President to (1) declare a qualifying landmark, structure, or object as a monument, and (2) reserve the smallest parcel of land around it necessary for the care and management of that landmark, structure, or object.

62.     A helpful illustration comes from December 1906, when President Theodore Roosevelt declared as a national monument "Montezuma's Castle." Montezuma's Castle qualified for declaration under the Act because it was a one-of-a-kind ancient structure—a towering dwelling, with five stories and twenty rooms, on federal land in Arizona. For the "proper care and management" of the Castle, President Roosevelt reserved a parcel of land of 160 acres—one quarter of a square mile.

**B. Federal public lands law before and after 1906 confirms the Act's limited scope.**

63.     Today, Utah is approximately two-thirds federal land. A complex mosaic of federal, state, and local laws governs those federal lands. Consistent with those laws, Utah and its subdivisions have long had shared responsibility for the stewardship of those federal lands. And for as long as Utah has been a State, Utah and Utahns have continuously used, managed, explored resources on, expended resources on, and otherwise benefited from these federal public lands.

64.     The Antiquities Act is one piece in that complex mosaic of federal laws governing Utah's federal public lands. Viewing the Act in that context, a conclusion emerges: the Bears Ears and Grand Staircase-Escalante proclamations go well beyond what Congress permitted under the Act.

65.     First consider federal land law before the Act. With few limits, before 1906, federal land was open for settlers to homestead, purchase, extract resources from, or graze livestock on.

66.     Unlike today, federally owned land existed primarily to be disposed of, not to be retained or conserved.

67.     In fact, "[p]ublic land law" during that era meant no more than "legislation providing for *disposal* of the public domain." Getches, *supra*, at 282 (emphasis added).

68.     Many federal laws guaranteed that nineteenth-century Americans could acquire federal land by homesteading or through outright purchases—at buyer-friendly prices. *See, e.g.*, *An Act providing for the Sale of the Lands of the United States*, 1 Stat. 464 (1796); *An Act making further provision for the sale of the public lands*, 3 Stat. 566 (1820); *An Act to Graduate and Reduce the Price of the Public Lands to actual Settlers and Cultivators*, 10 Stat. 574 (1854); *An Act to secure Homesteads to actual Settlers on the Public Domain*, 12 Stat. 392 (1862); *An act to provide for the sale of desert lands in certain States and Territories*, 19 Stat. 377 (1877); *An Act to amend the homestead laws as to certain unappropriated and unreserved lands in Nebraska*, 33 Stat. 547 (1904).

69.     Any unpurchased federal land remained open for anyone to use for free and for maximum commercial advantage, without regard to other interests or values. Under nineteenth-century mining laws, for instance, anyone could mine resources on public land at no cost, as long as they were the first users of those resources. *See, e.g.*, *An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes*, 14 Stat. 251 (1866); *An Act to amend 'An Act granting the Right of Way to Ditch and Canal Owners over the public Lands, and for other Purposes,'* 16 Stat. 217 (1870).

70.     As a result of those laws, by the end of the nineteenth century, 67 percent of original public lands outside of Alaska had been transferred to private ownership. Getches, *supra*, at 283. Much of the land remaining public had been mined for resources by first users.

71.     The same first-user principle governed the extraction of historic structures or relics found on public land that were valuable to collectors. "There was no system of protection and no permit was needed to dig" for valuable antiquities on public lands. Lee, *supra*, at 29. An "eager seeker for artifacts" therefore had only "one chief worry—that someone else would reach a ruin rich in valuable objects before he did." *Id.*

72.     The discovery of archaeological sites on federal land, and the resulting demand from collectors, drew public attention to this extraction tolerance. Private collectors, exhibitors, and museum curators from the East started collecting large ancient ruins from public lands in the West. Lee, *supra*, at 29-38.

73.     For example, a group mainly from Boston and New York excavated and transported east 198 rooms and kivas from a three-acre superstructure in Chaco Canyon, New Mexico. *Id.* at 36-37.

74.     The federal government had practically no tools at its disposal to respond to those acts. It could *temporarily* withdraw tracts of land from sale or entry, but it could not prosecute the extractors for any civil or criminal offense. And it often could not even keep them from taking outright ownership of the parcel of land containing the ruins. Lee, *supra*, at 29-39.

75.     Locals in New Mexico asked Congress to protect "at least some of these extinct cities or pueblos … from public sale." Lee, *supra*, at 40. Their pleas eventually helped to inspire the Act.

76.     Viewed against that history, the Antiquities Act is anachronistic today. Congress enacted it in response to the then-overriding policy of free appropriation. But even then, it allowed only small and rare exceptions where the demanding statutory conditions were met.

77.     Next consider changes to federal land law since Congress passed the Antiquities Act. Those succeeding laws establish that Congress provided new and different statutes to do much of the sweeping work that President Biden now erroneously ascribes to the Act.

78.     These more recent federal laws transformed the legal status and treatment of federal land. They ended the era of appropriation and plunder from public lands. They brought forth a new era of retaining public lands and managing them for multiple uses—balancing conservation and preservation with prior existing, well-established uses such as mining and mineral exploration. And

they provided greatly enhanced protections for archaeological, paleontological, and environmental resources on all federal lands.

79.     Today, *all* federal land, regardless of its monument-declaration status, is protected from the threats of appropriation and plunder that originally motivated the Antiquities Act.

80.     These changes show that, today, the Act is hardly the only means available for achieving the conservationist goals that inspired it.

81.     Soon after the Act, the federal government began to transition away from its disposition-based approach to public lands with other legislation, not the Antiquities Act.

82.     First, it took steps to limit use and appropriation of public lands:

- In 1908, Congress significantly limited entry onto and assignment of public lands, reversing its prior policy of freely allowing anyone to use, homestead, or purchase those lands. *An Act Limiting and restricting the right of entry and assignment under the desert-land law and authorizing an extension of time within which to make final proof*, 35 Stat. 52 (1908); *see also* Paul W. Gates, *History of Public Law Land Development* 491-92 (1968). At the same time, the Government Land Office made it more difficult to homestead public lands. *Id.* at 492.

- In 1915, the Supreme Court articulated a doctrine that authorized Presidents to withdraw lands from entry or assignment for the public interest without statutory authorization. *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915). The *Midwest Oil* doctrine—which stood for over half a century but is no longer in effect—conferred on the President a parallel (but practically unrestricted) judicially-created power to withdraw lands from settlement or entry. This power resembled the one statutorily conferred under the Antiquities Act, but was not restricted to lands with qualifying landmarks, structures, or objects. *Id.* at 483.

- In 1934, the Taylor Grazing Act allowed the Secretary of Interior to further limit entry upon public lands. *An Act to stop injury to the public grazing lands*, 48 Stat. 1269 (1934); *An Act to Amend the Act entitled 'An Act to stop injury to the public grazing lands,'* 49 Stat. 1976 (1936).

- In 1934, President Roosevelt temporarily withdrew from "settlement, location, sale or entry" *all* federal land in 12 western states. Exec. Order No. 6,910, *Withdrawal of Public Lands to be Used for Conservation and Development of Natural Resources* (Nov. 26, 1934).

- In 1976, the Federal Land Policy and Management Act officially ended the policy of disposition and repealed virtually all the remaining laws that allowed public lands to be converted into private lands. 43 U.S.C. §§1701 et seq. FLPMA formalized the federal government's policy that "the public lands be *retained* in Federal ownership"— a 180-degree turn from the pre-1906 era. *Id.* §1701(a)(1) (emphasis added).

83.     Second, the federal government took steps to prevent damage to and plunder of archaeological objects, Native American cultural items, and a wide range of additional collectibles on all public land with other legislation, not the Antiquities Act:

- Multiple federal criminal laws were enacted to prevent theft of or depredation against any valuable items from all public land. For instance, 18 U.S.C. §1361 made it a crime to "injure[] or commit[] any depredation against any property of the United States."

- And 18 U.S.C. §641 made it a crime to "embezzle[], steal[], purloin[], or knowingly convert[] to his use or the use of another," or to "sell[], convey[] or dispose[]" of any "thing of value of the United States," thereby protecting objects on all public land.

- Those laws authorized punishing violators with criminal and civil penalties—including up to ten years in prison.

- Several federal laws provided for targeted and detailed protection of historic, archaeological, paleontological, and cultural items on federal land. In 1966, the National Historic Preservation Act subjected all federal agency actions—including all actions receiving federal assistance or subject to any federal "license, permit, or other approval," 54 U.S.C. §306105—to a series of limitations and procedures to ensure that those actions would avoid, minimize, or mitigate adverse effects to historic properties, *id.* §306108; 36 C.F.R. §§800 et seq; *see also* 54 U.S.C. §§306101-306107, 306109-306114.

- In 1977, the Surface Mining Control and Reclamation Act required that all surface mining be "conducted as to protect the environment." 30 U.S.C. §1202(d); *id.* §§1201 et seq.

- In 1979, the Archaeological Resources Protection Act made it unlawful—on all federal land—to collect, remove, deface, alter, sell, purchase, exchange, or receive any archaeological resources without authorization. 16 U.S.C. §470ee(a). It defined "archaeological resources" broadly to include pottery, tools, structures, rock art, and any portions or pieces thereof. *Id.* §470bb(1). That legislation authorized punishing violators with criminal and civil penalties—including up to a $20,000 fine and two years in prison for a first offense, and up to a $100,000 fine and five years in prison for a second offense. *Id.* §470ee(d).

- In 1990, the Native American Graves Protection and Repatriation Act provided that Native American cultural items on federal land belong to Native descendants and tribes. 25 U.S.C. §3002(a). It also required that if anyone "in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture," discovered any Native American cultural items, they stop their activity and not resume

without protective measures and government permission. *Id.* §3002(d)(1). That legislation authorized punishing violators with criminal and civil penalties—including up to one year in prison, or up to five years in prison for a second offense. 18 U.S.C. §1170. It supplemented the earlier American Indian Religious Freedom Act, which made it "the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian … including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. §1996.

- In 1988, the Federal Cave Resources Protection Act made it unlawful—on all federal land—to damage, destroy, or remove any of a variety of resources found in caves. That legislation authorized punishing violators with criminal and civil penalties—including fines and up to one year in prison, or up to three years in prison for a second offense. 16 U.S.C. §§4306,4307.

- In 2009, the Paleontological Resources Preservation Act made it unlawful—on all federal land—to "excavate, remove, damage, or otherwise alter or deface or attempt to excavate, remove, damage, or otherwise alter or deface any paleontological resources located on Federal land" without the government's permission, *id.* §470aaa–3(a)(1), §470aaa–5(a)(1); to "exchange, transport, export, [or] receive … any paleontological resource" unlawfully removed from federal land, *id.* §470aaa–5(a)(2); or to "sell or purchase or offer to sell or purchase any paleontological resource" from federal land. *Id.* §470aaa–5(a)(3). It defined "paleontological resources" broadly to include "any fossilized remains, traces, or imprints of organisms, preserved in or on the earth's crust, that are of paleontological interest and that provide

17

information about the history of life on earth." *Id.* §470aaa(4). That legislation authorized punishing violators with criminal and civil penalties—including up to five years imprisonment. *Id.* §470aaa–5(c).

84.    Third, the federal government took steps to ensure that uses of federal land would accommodate environmental and ecological interests:

- In 1960, the Multiple Use and Sustained Yield Act solidified the presumption in favor of sustained yields of multiple uses, including conservation, recreation, grazing, timber, watershed, and wildlife and fish habitat. 16 U.S.C. §§528 et seq.

- In 1969, the National Environmental Policy Act mandated that federal agencies adopt all practicable measures to prevent environmental harm, including submission to a complex and demanding series of procedures, when engaging in major federal actions. 42 U.S.C. §§4321 et seq.; 42 U.S.C. §4332(2). It defined "major federal action" broadly to include any project involving work permitted by any federal agency. 40 C.F.R. §1508.1.

- In 1973, the Endangered Species Act required land management agencies to consider and accommodate threatened or endangered species in their land management plans, timber sales, energy or mineral leasing plans, and all other relevant aspects of their activities that might affect those species. 16 U.S.C. §§1531 et seq.

- In 1976, the Federal Land Policy and Management Act provided for the preservation of environmental values when they conflicted with resource development. *E.g.*, 43 U.S.C. §§1701(a)(8), 1702(c), 1732. FLPMA also authorized anyone to nominate an area to be designated as an area of critical environmental concern and authorized the Secretary to designate areas with "significant historic, cultural, or scenic value" as wildlife resources to further restrict activities on them. 43 C.F.R. §1601.0-7–2; 43

U.S.C. §1712(c)(3) (1976), 43 C.F.R. §1601.0-5(a). And it provided that public land would be managed to protect "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. §1701(a)(8).

85.     The upshot of these more recent federal laws? They do much of the work that President Biden's proclamations ascribe to the Antiquities Act. But, unlike the Antiquities Act, they do not stop Plaintiffs from continuing to be stewards of the land, to manage the land, to protect its wildlife and wildlife habitat, or to benefit from the land's multiple uses. Nor do they otherwise impose the burdens inherent in a monument reservation.

86.     The consequences that the Antiquities Act was designed to protect against have been addressed by these federal laws enacted in the intervening 100 years. Today, declaring a monument and reserving a parcel of land is no longer necessary to prevent any theft of or vandalism to a qualifying landmark, object, or structure or to prevent sale of the land containing such an object. Intervening legislation dwarfs the Act in both scope and severity. And none requires the President to declare a national monument or reserve accompanying land before they apply.

87.     In fact, the declaration of a monument today can be at cross purposes with preservation and warding off plunder.

88.     So when the President tells the public, for instance, that a national monument proclamation "will conserve a multitude of sites ... paleontological objects, landscape features, historic objects, and plant and animal species," *Fact Sheet: President Biden Restores Protections for Three National Monuments and Renews American Leadership to Steward Lands, Waters, and Cultural Resources*, The White House (Oct. 7, 2021), bit.ly/3dm75Ku, that is misleading. Those conservationist goals, most of which are beyond the scope of the Act in any event, are achieved under preexisting law. *See, e.g.*, Rusnak, *The Straw that Broke the Camel's Back? Grand Staircase-Escalante National Monument Antiquates the Antiquities Act*, 64 Ohio St. L. J. 669, 715-16 (2003) ("No longer does this country have a lawless, uninhabited

West, subject to vandals and homesteaders. … What possible purpose could an Antiquities Act serve today? The answer is none. The Antiquities Act has become completely antiquated.").

89.     The remaining effect of a national monument proclamation is to undermine those conservationist goals. The monument proclamations draw attention to these federal lands and increase visitation. They simultaneously stifle Plaintiffs from doing their part in managing and conserving and using the land, as they have done for nearly a century consistent with the mosaic of other conservationist statutes.

**C.  Presidents have repeatedly ignored the Act's strict limits, thereby harming the very objects they purport to protect and hampering local residents' ways of life and livelihoods.**

90.     With intervening federal land laws making the Antiquities Act's original justifications mostly obsolete, the Act has been repurposed into an instrument of abuse. Presidents now deploy the Act to shut down harmless local activity or appease particular political constituencies by appearing to protect things that they are actually making more vulnerable.

91.     Presidents have deployed the Act in ways that defy the Act's plain text and give them virtually unlimited power over federal lands.

92.     Presidents have used the Act to proclaim a total of 19 so-called "monuments" each over one million acres.

93.     Presidents have declared as "monuments" things such as landscapes, habitats, views, night skies, fossil potential, and ocean floors.

94.     When the Antiquities Act was originally passed, its sponsor assured Congress that the number of acres covered by reservations under the Act number would "certainly not" approach 70 or 80 million acres. 40 Cong. Rec. 7888 (Jun. 5, 1906) (Rep. Lacey).

95.     Today, combined reservations under the Act span about 777 million acres.

96.     In short, Presidents have used the Act to declare as "monuments" things that fall outside the three statutory categories of qualifying landmarks, structures, or objects, and to reserve amounts of accompanying land that bear no resemblance to the statutory size limitations.

97.     Those presidential abuses of the Act have become so notable that last year Chief Justice Roberts wrote a separate opinion identifying and condemning them. *See Mass. Lobstermen's Ass'n*, 141 S. Ct. 979 (statement of Roberts, C.J.).

98.     Chief Justice Roberts wrote that expansive presidential reservations would not strike "a speaker of ordinary English" as lawful under the statutory text. *Id.* at 980.

99.     He criticized the "trend of ever-expanding antiquities." *Id.* As he read the statutory text, the Reservation Provision's smallest-area-compatible limit imposed a "unique constraint" that, due to unnaturally broad constructions of the Act, "has been transformed into a power without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea." *Id.* at 980-81.

100.    He invited attention to the question of "how a monument of these proportions … can be justified under the Antiquities Act." *Id.* at 981.

101.    Chief Justice Roberts was particularly concerned with two issues: (1) "[t]he scope of the objects that can be designated under the Act" and (2) "how to measure the area necessary for their proper care and management." *Id.*

102.    These critical questions matter because, as Chief Justice Roberts wrote, "[t]he creation of a national monument is of no small consequence." *Id.* at 980. Although a proclamation of a national monument does little to serve conservationist goals in light of the complex mosaic of other federal and local laws protecting federal public lands, it has enormous adverse effects for the antiquities themselves and for the communities that have historically lived or worked on or near those same public lands.

103.    A national-monument reservation makes it difficult or impossible to conduct traditional and essential activities in the area. It imposes land-use restrictions that impede the activities of locals, state officials, cattle grazers, and others from engaging in traditional activities on the land. It prevents them from mending fences, collecting firewood, providing water, clearing brush, and saving lives. In other words, it obstructs the very people who had long preserved and protected and loved that land from doing the things that are compatible with and beneficial to it—and that have kept and preserved the land and its resident archaeological and cultural features as they are today.

104.    A reservation also brings visitors from all over the world to the area because it transforms a previously unknown (or little-known) area into a formal, presidentially proclaimed attraction. Increased visitation brings litter and waste to the land that local residents would never produce or countenance. It results in increased damage, desecration, and defacement to the land and to antiquities. The increase in visitors also drives away animals and interferes with Native American cultural traditions and life-sustaining practices, such as wood-gathering. And it burdens roads, public safety, and local resources. Because a reservation comes with limited additional funding or staff, local and state governments bear those burdens.

105.    All these consequences of presidential abuse of the Act help to explain why Chief Justice Roberts said that the Court should, in the appropriate case, carefully consider the Act's text limiting the *kinds* of landmarks, structures, and objects that Presidents can declare as national monuments and the *scope* of land that Presidents can reserve as necessary to properly care for those landmarks, structures, and objects. *See id.* at 981.

106.    This is that appropriate case. It squarely presents those issues because President Biden's proclamations are the culmination of an ill-conceived legacy of presidential Antiquities Act abuse over lands in Utah dating back to President Clinton.

## II.   President Biden's proclamations cap a history of Antiquities Act abuse in Utah.

### A.   President Clinton and President Obama abused their Antiquities Act authority with monument declarations and reservations in Utah in 1996 and 2016.

107.   In 1996, just weeks before the presidential election, President Clinton made the initial reservation of a "Grand Staircase-Escalante National Monument."

108.   President Clinton's proclamation declared the "vast and austere landscape" as a monument under the Act. Proclamation 6920 of Sept. 18, 1996, *Grand Staircase-Escalante National Monument*, 61 Fed. Reg. 50223 (Sept. 24, 1996). He declared scores of additional supposedly qualifying "objects" in the region as monuments, including "sedimentary rock layers," several "occupation sites," "five life zones," and a strip of burning coal that emits carbon dioxide into the atmosphere.

109.   President Clinton's initial Grand Staircase-Escalante land reservation was approximately 1.7 million acres.

110.   In the waning days of his second term, President Obama made the initial reservation of a "Bears Ears National Monument."

111.   President Obama's proclamation declared the "ruggedly beautiful landscape" as a monument under the Act. Proclamation 9558 of Oct. 8, 2016, *Establishment of the Bears Ears National Monument*, 82 Fed. Reg. 1139 (Jan. 5, 2017). He declared several additional supposedly qualifying "objects" in the region as monuments, including the "diversity of the soils," a "milieu of the accessible and observable together with the inaccessible and hidden," and the "quality of deafening silence."

112.   President Obama's proclamation directed the Forest Service and BLM to implement its provisions. It directed these agencies to regulate the reservation to protect the identified objects within it. It prohibited "motorized and non-motorized mechanized vehicle use" within the reservation, except on "roads and trails designated for such use, consistent with the care and management of such objects." It conferred on the agencies the authority to determine which roads would be allowed to

remain open. It withdrew the covered lands from "location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral and geothermal leasing." And it directed the agencies to issue and administer grazing permits within the reservation in such a way as to "ensure the ongoing consistency with the care and management of the objects identified above."

113.     President Obama's Bears Ears land reservation was approximately 1.35 million acres.

## B. Responding to local concerns, President Trump reduced the size of both reservations in 2017.

114.     Local opposition to President Clinton's proclamation grew over time. Local opposition to President Obama's proclamation was immediate and intense.

115.     The vast presidential reservations had the primary effect of making the land less well preserved, more difficult to protect, more susceptible to damage and antiquity desecration, impossible to work on, and more difficult to coexist with.

116.     The reservations shut down local jobs, impeded local emergency workers, made grazing difficult or impossible, and prevented State and local governments from protecting the land. The reservations also attracted visitation and attention from all over the world, straining local infrastructure and increasing litter and waste, damage to the land, harm to animals, and desecration of archaeological sites.

117.     Utah state legislators passed two resolutions in 2017 to reflect their constituents' frustration with the reservations. H.C.R. 11, *Concurrent Resolution Urging the President to Rescind the Bears Ears National Monument Designation* (Utah 2017); H.C.R. 12, *Concurrent Resolution Urging Federal Legislation to Reduce or Modify the Boundaries of the Grand Staircase-Escalante National Monument* (Utah 2017).

118.     They detailed how the reservations "had a negative impact on the prosperity, development, economy, custom, culture, heritage, educational opportunities, health, and well-being of local communities." H.C.R. 12, *supra.* The Grand Staircase-Escalante reservation, for example, had

"resulted in a 44% reduction in Escalante High School enrollment," and "in loss of business opportunity and out-migration of families, workers, and jobs." *Id.*

119.     They explained that "the power granted to the President to designate national monuments under the Antiquities Act has been exploited and abused." H.C.R. 11, *supra.*

120.     And they "strongly urge[d] the President of the United States to rescind the Bears Ears National Monument designation" in full and "to reduce or modify boundaries of" the Grand Staircase Escalante National Monument. *Id.*; H.C.R. 12, *supra.*

121.     Based on those growing concerns, President Trump instructed his Secretary of the Interior to review the propriety of President Clinton's and President Obama's proclamations.

122.     After the Secretary finished that review, President Trump reduced the two reservations in 2017 to allow for more targeted protection of certain sites and to revive the multiple-use approach in the remaining areas. Proclamation 9681 of Dec. 4, 2017*, Modifying the Bears Ears National Monument*, 82 Fed. Reg. 58081 (Dec. 8, 2017); Proclamation 9682 of Dec. 4, 2017*, Modifying the Grand Staircase-Escalante National Monument*, 82 Fed. Reg. 58089 (Dec. 8, 2017).

123.     President Trump's reduction proclamations explained that many of the things declared to be monuments in the original proclamations "are not unique to the monument, and some of the particular examples of these objects within the monument are not of significant scientific or historic interest." 82 Fed. Reg. at 58081.

124.     The reduction proclamations also explained that the original enormous boundaries were *not* the "smallest area compatible" with the proper care and management of any qualifying landmarks, structures, or objects. *Id.* at 58,082.

125.     The reduced reservations were a combined 1.11 million acres. Although the reservations remained extremely large, the reductions freed up some 1.96 million acres—well beyond

the size of Delaware—to be managed according to the multiple-use principle much to the benefit of local communities.

126.    Of course, other federal laws listed above would ensure that any activities on this remaining territory would not disrupt any archaeological sites or similar objects outside of the reduced reservations.

**C. President Biden rescinds President Trump's proclamations and enlarges the boundaries of Grand Staircase-Escalante and Bears Ears National Monuments.**

127.    In October 2021, President Biden issued two proclamations for the Grand Staircase-Escalante and Bears Ears National Monuments. *See* Proclamation 10285 of Oct. 8, 2021, *Bears Ears Nat'l Monument*, 86 Fed. Reg. 57321 (Oct. 15, 2021); Proclamation 10286 of Oct. 8, 2021, *Grand Staircase-Escalante Nat'l Monument*, 86 Fed. Reg. 57335 (Oct. 15, 2021).

128.    The scope of the land at issue in these proclamations is almost incomprehensible to persons like President Biden who have not actually visited the monuments. The land included in President Biden's "Bears Ears National Monument" is 1.36 million acres and the land included in President Biden's "Grand Staircase-Escalante National Monument" is 1.87 million acres, for a combined total of 3.23 million acres in southern Utah. As the map below shows, the two regions covered by those reservations sit about 25 miles apart and together take up much of southeastern and south-central Utah:



Source: Department of Interior

THE WASHINGTON POST

*Purple areas represent the original reservations. Orange areas represent the 2017 reservations.*
*President Biden's reservations encompass everything orange or purple.*

129.     Combined, the 3.23 million acres of land encompassed by the reservations is twice as large as Delaware, four times larger than Rhode Island, and just shy of the size of Connecticut.

130.     It is more than 150 times the size of Manhattan.

131.     It is larger than 20 percent of all the nations in the world.

132.     It is orders of magnitude larger than the other four national monuments in southern Utah combined:

- Hovenweep National Monument (President Harding) = 784 acres

- Cedar Breaks National Monument (President Roosevelt) = 6,155 acres

- Natural Bridges National Monument (President Roosevelt) = 7,636 acres

- Rainbow Bridge National Monument (President Taft) = 160 acres

133.     The amount of reserved land in Bears Ears and Grand Staircase-Escalante National Monuments is so massive that even the federal government does not know what it contains. Only about 10 percent of the land encompassed by President Biden's enlarged reservations has been subject to archaeological surveying. In other words, no one in the federal government—including President Biden—knows whether qualifying historic structures, historic or prehistoric landmarks, or other objects of historic or scientific interest exist on 90 percent of the enlarged reservations, or on about 2,907,000 acres.

134.     President Biden's proclamations reflect an erroneous view of presidential power that the Antiquities Act does not actually confer. Notwithstanding the three narrow categories of qualifying landmarks, structures, or objects listed in 54 U.S.C. §320301(a), President Biden claims that practically everything that exists within the enlarged borders qualifies for protection under the Act.

135.     First, his proclamations state that the "the entire landscape within the boundaries reserved by this proclamation" is "an object of historic and scientific interest." 86 Fed. Reg. at 57,344. They therefore declare the entire landscapes as "monuments" under the Act.

136.    Second, in apparent anticipation of that argument failing, they reason that dozens of generic and ubiquitous items, along with many different kinds of plants and animals, are also "objects of historic and scientific interest." *Id.* These supposed monuments include "parsley," "shrubs," "bighorn sheep," "minnow[s]," dozens of "areas," certain "views," "forested slopes," many unidentified "dwellings," "potential fossil yield," "wheel ruts," and "unimpeded views of the night sky." The proclamations declare all of these things as "monuments" under the Act. 86 Fed. Reg. at 57,321-57,347.

137.    And third, the proclamations reason that the double-Delaware-sized reservations constitute the "smallest area compatible" with the proper care or management of any qualifying objects because the qualifying objects are "distribut[ed]." *Id.* at 57331, 57345. They do not explain what care or management was required to protect those things, or why.

138.    The proclamations offer no definitions of the decisive terms of the statutory text and no explanation of why the things that they declare to be "monuments" or the land that they reserve satisfy the statutory standards.

139.    The combined 3.23 million acres in the enlarged reservations include additional parcels of land that were not included in the initial reservations.

140.    President Biden's proclamations include directions for shutting down local activity. They direct that all federal lands within the enlarged reservation be "withdrawn from all forms of entry, location, selection, sale, or other disposition," and from "location, entry, and patent under the mining laws," and from "disposition under all laws relating to mineral and geothermal leasing." *Id.*

141.    The proclamations aim to make grazing extinct. They direct that should "grazing permits or leases be voluntarily relinquished by existing holders, the Secretaries [of Interior and Agriculture] shall retire from livestock grazing the lands covered by such permits or leases." *Id.* at 57332.

142.     The proclamations prohibit persons from taking any action that would "appropriate, injure, destroy, or remove any feature" listed in the proclamations. *Id.*

143.     Those "feature[s]," as listed in the proclamations, would include every blade of "ricegrass'"; every inch of "soil"; and every "bee," "sunflower," and "beetle" within the millions of reserved acres. *See generally* 86 Fed. Reg. 57321-57347. Taking the proclamations at their word, they prohibit anyone—including Plaintiffs—from engaging in a wide range of activities on the land, including active management, grazing improvements, invasive-species removal, managing and conserving, and improving wildlife habitat.

144.     Although President Obama's proclamation provided that a few activities—like firewood collection and access to utilities—should continue to be allowed, *see* 82 Fed. Reg. at 1145, President Biden's proclamations made no such allowances.

145.     President Biden's proclamations did not provide for sufficient additional funding or staff to protect any of the things that he claimed to be protecting.

**III.     President Biden's unlawful proclamations and agency actions pursuant to those unlawful proclamations have caused, and will continue to cause, a host of adverse impacts to the land, to State and local interests, and to the items that they purport to protect.**

146.     President Biden's reservations are causing and will continue to cause enormous harm to the State, the Counties, and their citizens.

147.     As with any Antiquities Act reservation, the proclamations designate "monuments" on federal land. But federal land does not mean land on which the State, Counties, or their citizens lack privileges, rights, or responsibilities. To the contrary, the State, Counties, and their citizens engage in a wide range of activities on federal land, have official duties on federal land, enact laws and policies with respect to federal land and items on federal land, and regularly use federal land. Utah is about 63% federal land—the second-highest proportion in the country. Living in Utah is inextricably intertwined with using federal public lands, and sharing the responsibilities that come with that use.

148.     Activities on federal land are critical to the State, the Counties, and their citizens. Although federal land is owned by the federal government, the State and Counties take responsibility for maintaining and improving federal lands within their territory. The State and Counties engage in a wide range of official duties on federal public lands, have rights in state-owned and managed wildlife on federal lands, have law-enforcement and first-responder responsibilities on federal lands, and have enacted policies, laws, and management plans with respect to federal lands. State and federal laws ensure that non-federal actors may use, manage, explore resources on, and otherwise benefit from federal land.

149.     That is because, absent a monument designation, federal law permits Plaintiffs to use federal public lands consistent with its multiple uses. The Multiple Use and Sustained Yield Act solidifies the land-management presumption in favor of sustained yields of multiple uses, including conservation, recreation, grazing, timber, watershed, and wildlife and fish habitat. This multiple-use mandate allows for a wide range of activities on federal land. Those activities can also include exploration of minerals or other natural resources.

150.     The proclamations—by forbidding a wide range of these activities on millions of acres of federal land—change all of that. Once federal public lands are proclaimed as a national monument, the land must be managed to further the primary purpose of the proclamation, not for multiple uses.

**A.     The proclamations increase the risk of harm to archaeological and paleontological resources.**

151.     The reservations harm the archaeological and paleontological resources that they purport to protect.

152.     The reservations inherently increase visitation to the reserved lands due to their presidential-proclaimed notoriety. Increased visitation is the single most significant threat to archaeological and paleontological resources.

153.     Since they were originally proclaimed, the reservations have drawn an influx of visitors. President Biden's well-publicized plans to enlarge the reservations, *see* Maffly & Podmore, *President Joe Biden's Order to Review Utah Monuments Leaves Options Open, but Expansion All but Certain*, Salt. Lake Trib. (Jan. 25, 2021), bit.ly/3QZycLh, caused a larger additional influx of visitors. And President Biden's proclamations themselves drew even more visitors.

154.     These two "national monuments" have now made southeastern Utah "a magnet for new-to-nature visitors." Eddington, *As Kanab reels from pandemic tourism, officials hope kindness campaign can curb vandalism and trash*, Salt Lake Trib. (July 16, 2022), bit.ly/3IM7UrR. In 2021, the year when President Biden publicized his plans to enlarge the reservations and then issued his proclamations, Kane County—which includes over half of the enlarged Grand Staircase-Escalante reservation— experienced "a massive influx of visitors." *Id.*

155.     These new visitors often mistreat or do not know how to treat the archaeological and paleontological resources that they encounter. When visitors come upon previously unknown or inconspicuous areas, it often results in either intentional or unintentional harm to archaeological resources. *See, e.g.*, *Utah Petroglyph Defaced Near Moab in Latest Vandalism*, Assoc. Press (Aug. 26, 2021), bit.ly/3yiaRfY; *Climbing bolts found on 1,000-year-old petroglyphs in Utah*, Assoc. Press (Apr. 16, 2021), abcn.ws/3u2EO1j. Visitation has long been recognized as a primary driver of damage to archaeological sites. Lavris, *A Perfect Pothunting Day* (2007), bit.ly/3HRFbkU.

156.     The reservation-generated visitation has caused a dramatic increase in the occurrence of corrosion, defacement, theft, vandalism, and desecration of archaeological and paleontological resources within the reservations. Visitors to the two reservations touch rock art panels, unintentionally transferring dirt and oils that can degrade figures etched into or drawn upon the stone. Some visitors intentionally remove (or attempt to remove) rock art panels with chisels and saws, causing immediate and irreparable damage. Others collect complete or fragmentary pieces of ceramic

vessels or stone tools through unauthorized surface collection or excavation, or unknowingly trample these items underfoot while walking across an archaeological site. Many behave inappropriately, leaving litter or human biological waste all across the land, including in places considered sacred by Native Americans.

157.    As BLM itself recently acknowledged, visitors to the reservations "do not have much experience in the outdoors" and "don't understand the negative impact that seemingly small actions like writing their name on the rocks, littering or burning trash can have." Eddington, *supra*.

158.    The frequency of harm corresponds directly to the formal recognition conferred by the presidential proclamations. For example, in 2015, the land that would become the Bears Ears reservation—but was not yet subject to any presidential proclamation—experienced five cases of vandalism per year. Governor Gary R. Herbert, *Testimony before the U.S. Senate Committee on Energy and Natural Resources Oversight Hearing on 'Potential Impacts of Large-Scale Monument Designations'* 4 (Jul. 27, 2016), bit.ly/3OoU1le. That same year, the land that was already encompassed by the Grand Staircase-Escalante reservation experienced 1,400 reported cases of vandalism. *Id.* It is widely agreed that the Bears Ears region contains more archaeological resources, but it experienced less than 1 percent of the vandalism because it was not yet made a recognized attraction to visitors.

159.    Since President Obama created the Bears Ears reservation, vandalism and other harms to the archaeological resources within it have increased. The problem has gotten so bad that BLM recently proposed to use more aggressive preservation measures to curtail further visitation-related impacts on one regularly visited archaeological site. *House on Fire Trailhead Improvements*, DOI-BLM_UT-Y020-2020-0023-EA, bit.ly/3RHX8H2. Similarly, eight months after President Biden's enlargements, the Forest Service acknowledged that "[a]s visitor use increases in the [Bears Ears] area, the potential to impact sensitive cultural sites also increases." *Cultural Site Visitor Management for Doll House, Lewis Lodge, Dry Wash and Twin Kivas Cultural Sites, Draft Environmental Assessment, Finding of No*

*Significant Impact* 2 (June 2022), bit.ly/3dKcjjJ. The Forest Service also proposed a project to mitigate adverse effects caused by visitation at four archaeological sites. *Id.*

160.    Similar vulnerabilities also exist with respect to paleontological sites. The federal government has recognized that fossils are regularly stolen from federal lands, and "will continue to be stolen from federal lands"—regardless of efforts like the reservations—"unless agencies can place more trained personnel in the field." *Report of the Secretary of the Interior: Fossils on Federal & Indian Lands* 9 (May 2000), on.doi.gov/3T0cYO9. Instead of protecting paleontological resources, the reservations draw new attention and visitation to them and result in increased defacement, corrosion, and theft of those resources. Paleontological artifacts that survived tens of thousands of years have now been destroyed as a result of a President's unilateral act.

161.    As a result, the reservations have necessitated additional work by state archaeologists. To account for increased tourism and vandalism with additional efforts to spread awareness about proper treatment of sites on the land. In 2020, for instance, Utah launched the "Pledge to Protect the Past" campaign to curb archaeological vandalism. *Utah launches "Pledge to Protect the Past" campaign to stop archaeological vandalism,* Salt Lake Trib.(Mar. 20, 2022), bit.ly/3QULzeH.

**B.    The proclamations harm the State's interests in its wildlife.**

162.    The State has the sovereign and quasi-sovereign authority to protect and manage all wildlife within its borders, including on federal land. *See Kleppe v. New Mexico,* 426 U.S 529, 545 (1976). It holds title to all wildlife within its borders not held privately or otherwise legally acquired by another entity. Utah Code §§23-13-1, et. seq., 23-14-1. Utah law requires the state's wildlife agency to "protect, propagate, manage, conserve, and distribute protected wildlife" throughout the State. Utah Code §23-14-1(2)(a).

163.    A wide range of wildlife lives within the reservations. But harsh, arid conditions make it difficult for wildlife to survive, particularly during periods of drought. Many steps can be taken to

protect, conserve, and manage the wildlife. These steps generally require access, and often require vehicles and other equipment. But the reservations restrict access, prohibit the use of vehicles and equipment, and declare for protection the vegetation that needs to be cleared or restored to preserve wildlife habitat. The reservations make doing this difficult or impossible and, therefore, injure the resident wildlife entrusted to the State.

164.    The State's wildlife is injured by the reservations in several ways. First, the reservations prevent the State from engaging in habitat restoration by prohibiting the prerequisite NEPA analyses. Second, the reservations prohibit the installation of new water facilities needed to protect and propagate wildlife during periods of drought. Third, the reservations prohibit the removal of encroaching invasive plant species such as pinyon-juniper that destroy native wildlife habitat for species such as sage grouse. Fourth, the reservations increase human traffic into the wildlife's natural habitat. That makes it difficult or impossible for the wildlife to continue to live there. Fifth, the reservations make it difficult or impossible for the State to clear corridors for wildlife migration. And sixth, because the reservations impede active land management, the land's ability to support wildlife populations will decrease, which will lead to corresponding decreases in the number of hunting tags the Utah Division of Wildlife Resources is able to sell annually.

**C.    The proclamations harm search-and-rescue efforts and increase search-and-rescue costs for the State and Counties.**

165.    Search-and-rescue efforts on the reservations are left almost entirely to local governments because the federal managing agencies cannot provide those services if adequate search-and-rescue services are available from local government. The federal government does not provide its own funding for search-and-rescue operations except "in cases of emergency" and upon finding that certain narrow conditions are met. 43 U.S.C. §1742. In practice, the federal government

leaves it to Plaintiffs and other local government subdivisions to provide those search-and-rescue operations.

166.    Increased visitation prompted by the reservations increases the burden on local search-and-rescue teams. That increased burden means real costs for the State and Counties, including Kane County and Garfield County. Increased visitation naturally increases search-and-rescue demands because it draws many visitors and tourists to the reservations. Tourists typically come on a transitory basis with no connection to or knowledge of the land. They get lost, get stuck, get stranded without water, or suffer injuries on roads or trails. Although they mean well, they often are unaware of how to recreate responsibly on the land and how to safely navigate it. And they can spend days on the reservations without encountering a single ranger, educational staff, or law enforcement officer to help them stay safe. Visitors thus often end up injured, lost, or in peril. Making matters worse, much of the area within the enlarged reservations lacks cell phone service, so even when tourists are safe, families of visitors often call law enforcement to search for the visitors after they don't respond to phone calls. As a result, search-and-rescue crews and resources are dispatched throughout the reservations day and night to find these visitors and bring them back from danger or verify their safety. It is not uncommon for two or even three search-and-rescue operations to be happening at one time during peak visitation, often a hundred miles apart from one another.

167.    Community resources such as fire trucks, ambulances, rescue ropes, gasoline or diesel fuel, disposable rescue equipment, and county vehicles get used more often to search for and rescue unprepared and uneducated visitors who get lost or injured. This increases the costs for local communities to run that equipment and requires replacing it more frequently. These search-and-rescue costs fall on the State and Counties.

168.    State and local governments, including Kane County and Garfield County, are responsible for funding and staffing search-and-rescue operations within the reservations. As a result

of the reservations, they have had to spend more money, time, and resources on search-and-rescue efforts. The State of Utah reimburses local search-and-rescue efforts and often funds them directly by providing basic search-and-rescue supplies. It has had to divert increased search-and-rescue expenditures as a result of the enlarged reservations. The State has also purchased an additional search-and-rescue helicopter and additional rescue sleds as a result of increased visitation and related emergencies in southern Utah, in part due to the increased visitation effects of the reservations.

169.    Beyond that, in rural Utah, almost all firefighters and search-and-rescue personnel are volunteers. In fact, in Kane, Garfield, and San Juan Counties, there are no paid firefighters or search-and-rescue personnel. This means that the increase in search-and-rescue calls also results in rescuers taking more frequent leave from their daily jobs, hampering their ability to perform their paid work and the ability of their employers to provide goods or services to their customers.

170.    Worse, the reservations often impede search-and-rescue efforts themselves. Search-and-rescue operations require vehicles, personnel, and equipment, even helicopters. They often require going off-trail and interacting with items enumerated in the proclamations. But the reservations restrict such activities.

171.    Because of the reservations, federal agents have sought to prevent search-and-rescue personnel from entering closed roads, going off trails, and even from landing medical helicopters during search-and-rescue missions. These agents demand that alternative measures be used regardless of the urgency of a patient's needs, all in the name of protecting proclamation items. Sooner or later, someone will die because President Biden decided that an "unimpeded view[] of the night sky" was more important than human life.

172.    The reservations increase the burden on search-and-rescue crews. Available data illustrates the effects of reservations on search-and-rescue crews: Since 1996, when the original Grand Staircase-Escalante reservation went into effect, there have been over 750 search-and-rescue missions

within San Juan, Garfield, and Kane counties, over 85% of them involving visitors rather than residents of the counties. These missions have generated over 45,000 personnel hours reported to the State. The State has paid hundreds of thousands of dollars in reimbursable expenses to counties as a result of these additional search-and-rescue burdens. These numbers reflect only a fraction of the total search-and-rescue burden because many more search-and-rescue missions were covered exclusively by the Counties and no reimbursement was sought from the State. A similar pattern of increased reimbursement demands on the State has begun as a result of the Bears Ears reservation and is likely to continue. These figures also do not include the costs of the additional helicopter and rescue sleds. The 2021 enlarged reservations exacerbate these burdens and declaring them unlawful or reducing their size would reduce these burdens.

173.    More broadly, the reservations also increase burdens on local law enforcement, including in Kane County and Garfield County. The reservations draw an influx of visitors who strain local law-enforcement resources because some engage in unlawful activities in and around the reservations. Law enforcement has experienced an increase in crime as a result of the reservations.

**D. The proclamations harm ecosystems and preclude the State's proactive land management.**

174.    The reservations harm their ecosystems by drawing increased visitation and preventing traditional stewards of the land from taking steps to protect and nurture it.

175.    Because the proclamations do not themselves provide for funding, let alone sufficient funding, to accommodate the new status of the land covered by the reservations, they are almost completely without trash receptacles or bathrooms. Visitors in the reservation may be hours away from the nearest restroom at any given time. Not prepared for these conditions, visitors bring food and drinks and disposable products onto the land and, finding no trash cans, they leave them on the ground. The same visitors have no place to go to the bathroom, so they go anywhere and everywhere.

BLM has acknowledged that visitors to these lands leave "feces, toilet paper, and other litter" that has left county, state, and federal workers scrambling for a way to address the problem. Eddington, *supra.* Locals who were told that this land was being protected are dismayed to see it trashed and desecrated like never before. What was once a pristine natural landscape has become trash-strewn and an outhouse. And this problem will only continue if the reservations are left in effect; because they are so massive, it is impossible to provide an adequate and appropriate number of restroom facilities for visitors.

176.   The reservations also prevent traditional stewards of the land from managing it so as to preserve its health and beauty. The land encompassed by the enlarged reservations requires active management in many ways. It requires active management to maintain healthy soils, safeguard against fire, protect native vegetation, and preserve wildlife habitats. But because of the new restrictions imposed by the reservations, these salutary measures have become difficult or impossible. The reservations, in other words, fate the ecosystems to deteriorating health.

177.   Active management would protect the ecosystem in many ways. First, active management would keep the land's soils fertile. Soils, especially in arid southeastern Utah, evolve with regular disturbance. "Healthy soils are complex collections of interdependent life forms, and as a synergistic system soil activity may become seriously impaired when any of its elements are compromised or destroyed, as currently occurs worldwide with chemical agriculture, mismanagement of grazing animals, and over-rest." *Restoring the Climate Through Capture and Storage of Soil Carbon Through Holistic Planned Grazing,* Savory Institute 15 (2013), bit.ly/3clGJYL. Native Americans who cultivated crops in the region used soil disturbance to promote plant health and animal welfare. If traditional land-management stewards are prevented from proper management, the soils will gradually turn into lifeless dirt.

178.    But properly managing soils requires equipment, personnel, and vehicles. It can also involve the reduction of current vegetation to facilitate healthier growth in the future. Proper land management will disturb the soil and plants and other features enumerated in the proclamations— features that the proclamations says are now untouchable. The reservations therefore prevent soil treatment from taking place by prohibiting these activities and preventing any treatment to current vegetation.

179.    The effects of reservations on the soils are already easily observable. Someone driving along portions of the Skutumpah Road in the Grand Staircase-Escalante reservation will see federal land on both sides of that road. One side is federal public lands, where the State's active management of the lands may continue; the other side is part of the monument reservation. On the non-reservation side, the soils are healthy and there is high biodiversity. On the reservation side, where the State's active management is forbidden, the soil is barren and remaining vegetation is stressed, decadent, and dying. The Biden proclamations promise the same sad fate for all of the additional land now reserved in southern Utah.

180.    To remediate some of that deterioration, the State would like to engage in active vegetation management, including treatment for Pinyon-Juniper and decadent sagebrush encroachment. But for the monument designation, the State would be actively engaged in such vegetation management around the Skutumpah Terrace and elsewhere within the reservation boundaries. But the monument designation impedes the State's ability to initiate such proactive projects.

181.    Second, active management would protect the ecosystem from the growing prospect of an uncontrolled and devastating wildfire. The land in the reservations presents a high risk of fire. The dry and heavy brush and dead vegetation make the area one lightning strike or unwatched campfire away from a large-scale fire. Such a fire might kill thousands of animals and destroy the

ancient and modern human structures in the region. Indeed, fuel loads for potential wildfires now threaten many of the items that the proclamations purport to protect. It is a constant concern for those who live in the area and the locals who wish to preserve it.

182.   These hazards must be mitigated, and Utahns have the means to mitigate them. Utah's wildfire reduction plan, for example, recognizes proactive fuel management—the practice of modifying vegetation to reduce wildfire hazards—as one of its top goals to implement in vulnerable areas throughout the State. State of Utah, *State of Utah Resource Management Plan* (2022), bit.ly/3AXy5tC. But many fuel management methods involve personnel, equipment, controlled burns, and potential short-term reductions to vegetation in certain areas. "The State promotes fuel breaks, thinning, chaining, prescribed fire and the selection of fire-resistant vegetation in green-stripping and burned areas." *Id.*

183.   The reservations restrict access to personnel, forbid the use of vehicles and equipment, and identify for protection the very brush and vegetation that must be cleared to manage decadent growth and promote a healthy ecosystem. The reservations therefore prevent mitigation steps and increase the chance of a devastating wildfire.

184.   For example, located on the northwestern fringe of Grand Staircase-Escalante is the community of Deer Springs Ranch in Kane County. Multiple landowners have summer homes, and increasingly year-round homes, in this area bordering Grand Staircase-Escalante. The State and the County would like to be proactive about wildfire fuels management in this area by engaging in active vegetation treatment to reduce the risk of catastrophic wildfire in this wildland-urban interface. Due to the monument designation, however, the State and County are impeded from initiating such proactive projects. But for the monument designation, the State and County would be promoting active fire fuels management to prepare for and prevent future wildfires.

41

185.    Third, active management would protect native plants that need safeguards, nourishment, and nutrients. The land encompassed by the enlarged reservations is home to non-native invasive species such as cheat grass and tamarisk. Pinyon-juniper encroachment also displaces vulnerable native species. As is often the case with invasive species, they will overrun and ruin the ecosystem if active management is prohibited. And even native species not threatened by invasive species often need support to survive.

186.    The State and local subdivisions, as traditional stewards of the land, would ordinarily deploy a wide range of active management approaches to limit invasive species encroachment and promote native species on federal public lands. For example, they use patch-burn grazing to "maintain native herbaceous plant communities" by "reducing woody plant encroachment, stimulating above- and below-ground biomass of native perennial grasses, enhancing nutrient cycling and optimizing plant diversity." Scasta et al., *Patch-burn grazing (PBG) as a livestock management alternative for fire-prone ecosystems of North America*, 31 Renewable Agriculture 550-567 (2016). This method of active management "creates a habitat mosaic critical for many trophic levels of wildlife, particularly grassland birds," and "is a viable management approach to improve productivity and biodiversity in fire-regulated grassland ecosystems in a manner supported by both fire and grazing disturbances." *Id.*

187.    But these approaches require equipment, personnel, and vehicles. They involve disturbing or reducing current vegetation or invasive species, making room for healthier and diverse growth in the future. By their own terms, the proclamations impede that. Proclaiming these lands as "monuments," the proclamations restrict access, forbid the use of vehicles and equipment, and prohibit disturbing the vegetation that must be disturbed for active land management. The reservations therefore ensure that invasive species will continue to wreak havoc on the ecosystems.

188.    An illustration of how the reservations impede active management arose recently. The Skutumpah Terrace Sagebrush Steppe Enhancement Project proposed to use active management to

reduce fuels, restore and enhance the sagebrush-steppe ecosystem, increase plant species diversity, improve watershed conditions and water quality, improve woodland and grassland health, increase vegetation diversity, enhance wildlife habitat, decrease pinyon-juniper encroachment, and protect relict plant communities. *Skutumpah Terrace Sagebrush Steppe Enhancement Project,* DOI/Bureau of Land Management, bit.ly/3zNknrg (2018). Although the local BLM office approved the Project, the Interior Board of Land Appeals prevented it from going forward based in part on its noncompliance with the reservations' restrictions. *IBLA 2019-94*, Interior Board of Land Appeals (2019), bit.ly/3SiK6QN.

189.     The federal government acknowledges that the ecosystems need active management everywhere except reservation land. For instance, BLM recently detailed the need for active management in a materially similar and nearby ecosystem in Iron County. *Bear Valley Habitat Restoration and Hazardous Fuels Treatment, Environmental Assessment DOI-BLM-UT-C010-2021-0010-EA,* Bureau of Land Management (Apr. 2022), bit.ly/3P6B5rr. It explained that 2,894 acres of BLM-administered land needed to be managed through several mechanical, hand-thinning, and seeding methods, which would remove pinyon pine-juniper woodlands—which are detrimental to the local habitat and increase the risk of wildfire—and reseed the land with native grasses. BLM explained that this active management would "maintain or improve soil site stability, hydrologic function, riparian habitat condition, biological integrity and ecosystem resiliency"; "limit the expansion or dominance of juniper and invasive species"; "reduce fuel loading"; and "improve, protect, and expand habitat for greater sage-grouse." *Id.* Taking the proclamations at their word, that can't be done on the Bears Ears or Grand Staircase reservations.

190.     All of these acknowledged benefits are denied to any area covered by President Biden's reservations.

191.     But for the reservations, the State and local governments, including Kane County and Garfield County, would engage in active land management. Most of the traditional stewards who

would engage in the active management practices described here work on behalf of State and local governments. The State of Utah prioritizes active management of lands within its boundaries. *See* Management Makes the Difference, Utah.gov, bit.ly/3IOUNpS. It engages in active management on federal and state land to maintain healthy soils, safeguard against fire, protect native vegetation, and preserve wildlife habitats. *Id.* It would do so on the lands encompassed by the enlarged reservations if not for the restrictions imposed by the reservations themselves. The reservations therefore impede the State and the Counties from their planned activities on federal land. The State and Counties would resume these activities if the reservations were declared unlawful.

### E.  The proclamations harm livestock grazers in ways that materially and concretely harm Plaintiffs.

192.    The reservations also prevent livestock grazers from protecting their cattle, sheep, or goats and maintaining their livelihoods.

193.    There's a rich history of cattle grazing in southern Utah, including on the land encompassed by the reservations. Local families going back seven or more generations graze cattle on these lands; it is their heritage. Managing grazing is hard work. To start, grazers must privately purchase preference rights to a grazing allotment and pay the federal government a monthly fee to use that allotment. Then, they must move their cattle from summer to winter ranges, build and maintain fences to protect their cattle, construct water wells and ponds throughout their allotment to sustain their cattle, and build and maintain corrals to manage their cattle. They are constantly tending to their land and to their cattle to keep the operation going.

194.    Cattle grazing has many benefits for the land and the community. Cattle grazing is the best method short of active management to turn over soil and minimize flammable underbrush. It maintains the health of the ecosystem because cattle "break the soil cap with their hooves, fertilize it with urine and dung rich in gut bacteria, and trample plant matter into the soil surface, including

dead grasses which when left standing and oxidizing interfere with new growth." *Restoring the Climate Through Capture and Storage of Soil Carbon Through Holistic Planned Grazing,* Savory Institute 10 (2013), bit.ly/3clGJYL (citing Weber & Gokhale, *Effect of Grazing on Soil-Water Content in Semiarid Rangelands of Southeast Idaho,* 75 J. of Arid Env'ts 464-470 (2011)). Cattle grazing therefore "stimulates biotic activity by facilitating circulation of oxygen, carbon dioxide and other gases, by providing nutrients, by allowing penetration of water, and by providing land cover to minimize or eliminate bare ground." *Id.* (internal citations omitted). In addition to its ecological benefits, cattle grazing, of course, also feeds local communities and employs local workers.

195. Cattle ranchers are a critical component of Utah's livestock grazing industry, which plays a vital role in Utah's economy. Utah's plentiful rangelands support more than 6,000 cattle ranching families, making livestock production the foundation of Utah's agricultural industry. Utah Economic Council, *Economic Report to the Governor* 83 (2022), bit.ly/3Oy7iYc. Over three-quarters of Utah's agricultural income is generated by livestock and livestock products, with beef cattle and milk leading the way. *Id.* In 2020, cattle and calf sales produced $456 million. *Id.* But ranching operations "require a combination of private and public lands to be sustainable and economically viable," and "[r]anchers face significant uncertainty with 63% of Utah lands under federal control." *Id.* at 84.

196. Reservations double the size of Delaware compound this uncertainty, making it difficult for grazers to stay in business. Because of the reservations, ranchers must clear high and sometimes impossible procedural hurdles to work on their fences, wells, ponds, and corrals to keep their cattle safe and alive. Proposed and urgent projects may take seven to ten years to be approved, if they are approved at all. More often, the projects are denied because they conflict with the proclamations' restrictions. Based on those restrictions, federal agencies limit or deny grazers' ability to use vehicles and equipment on the land, and prevent them from accessing or developing new

sources of water to keep their cattle alive. As a result, grazing on the reservations has become more costly, burdensome, and inefficient.

197.    As a result of the reservations, grazing permit holders have been denied authorization to build fences on reservation lands, maintain earthen ponds on reservation lands, and access state trust parcels across reservation lands for the purposes of developing range improvements.

198.    Meanwhile, the new visitors stress already vulnerable cattle and damage the fences and watering holes built by ranchers. Visitors often do not understand how their actions affect cattle. Visitors routinely park around water wells, ponds, and corrals along the road because these are natural resting spots. Often, cattle need access to these places to survive. But cattle tend to avoid humans, so they stay far away, watching and waiting for them to leave. Sometimes, the constant flow of visitors prevents the cattle from ever approaching, and they suffer from malnutrition or thirst. Visitors also break fences, litter in watering holes, and damage corrals, jeopardizing cattle and forcing ranchers to constantly attend to the damage. Before the reservations, so few humans visited these grazing areas that problems like these seldom occurred. Now they are commonplace.

199.    The proclamations have caused a decline in grazing levels. The decline in grazing levels has been accompanied by declines in rangeland condition due to encroachment of pinyon, juniper, creosote, decadent sagebrush, and other woody species; the spread of non-native species such as cheatgrass and red brome; and the deterioration of water features, fencing, and other range improvements. These changes have altered the quality of the rangeland ecosystem, harming wildlife dependent on rangeland habitat while reducing the reservations' livestock carrying capacity.

200.    The State engages in water development well projects in the area. The State intended to but was impeded in its attempt to complete water development well projects on state trust lands in the Mancos Mesa and in the Grand Gulch areas because of restrictions created by the reservations. These projects were to be funded through Utah's Grazing Improvement Program. They would have

supported increased cattle grazing, in turn increasing economic development and tax revenue for State and local communities.

201.    Worse, the proclamations require the retirement of grazing allotments. As permits are relinquished by existing grazing allotment holders, grazing will end. Fewer allotments will reduce cattle grazing and ultimately diminish grazing activities on the land. Wrabley, Jr., *Managing the Monument: Cows and Conservation in Grand Staircase-Escalante National Monument*, 29 J. Land, Resources, & Env'l L. 253 (2009). That destroys a celebrated custom, culture, and tradition of livestock grazing in southern Utah and all the benefits to the land and financial benefits that come from it.

202.    The retirement of grazing allotments does concrete harm to the State, which loses revenue it would otherwise earn from grazing permits. The State receives revenue from federal grazing fees under a formula established by the Public Rangelands Improvement Act of 1978. *See* Cong. Research Serv., *Grazing Fees: Overview and Issues* 1 (Mar. 4, 2019), bit.ly/3b9lbyj. These fees are tied to the number of grazing allotments in the State. Because the proclamations require the retirement of grazing allotments and impose restrictions on the use of those allotments, the proclamations will produce a corresponding drop in fees the State can collect. *See also* Wrabley, Jr., *supra*, at 253.

203.    The reservations' restrictions on access to nearby State lands also harms the State by decreasing the value of that State land and decreasing revenues from the use of that land.

204.    The reservations also cause the State to lose the benefits of investments in grazing. The State provides grants, loans, and aid to ranchers to support grazing. But the restrictions that accompany the reservations impede some of those State-funded projects.

**F.  The proclamations harm local economies in ways that substantially affect Plaintiffs.**

205.    The reservations stifle other aspects of local economic activity. The land encompassed by and surrounding the enlarged reservations is home to many communities inhabited by people

who work to make a living and to feed their families. Many jobs in the area interact with and depend upon the land, including the reservations.

206.   The land encompassed by the enlarged reservations is home to rare-earth and critical minerals and other valuable natural resources, which have long been mined in areas now designated as monument reservations. There are hundreds of historic and contemporary mines within reservation boundaries. These include well known mines such as the Betty Mine, Glade Pit, Cottonwood, Hideout, Jacob's Chair, and the Sandy Mine. Mining in these areas provided the infusion of economic activity, tax revenue, and jobs that built the communities of Blanding and Monticello as we know them today.

207.   Mining activities continue today in southern Utah. *See* Maffly, *Entrepreneur Says He Holds the Secret to Utah's Uranium Renaissance*, Salt Lake Trib. (Jan. 25, 2023), bit.ly/3HAy6H4. And while the presence of rare-earth and critical minerals doesn't stop at the reservation boundaries, any new mining of those rare-earth and critical minerals is now prohibited within the reservation boundaries.

208.   The reservations deprive Utah residents of the opportunity to continue this tradition. And they cost Plaintiffs lost royalties, revenue, and economic activity, *infra.*

209.   Some of these minerals, including uranium, are essential to national security. Others, such as vanadium, are key to the production of modern electronics. And others provide valuable energy that would bolster the region's economy. The land encompassed by the enlarged Grand Staircase-Escalante reservation, for instance, includes over $1 trillion in energy resources that will languish and go undeveloped as a result of that reservation. *See Establishment of the Grand Staircase-Escalante National Monument by President Clinton on September 18, 1996: Oversight Hearing Before the Subcomm. On Nat'l Parks, Forests, and Lands of the House Comm. on Res.*, 105th Cong. 11, 13 (1997) (statement of Sen. Hatch on April 29, 1997). Some of those resources could be used in technologies

such as coal liquefaction (which results in a synthetic natural gas) or coal gasification (coal to hydrocarbon liquid for chemicals or synthetic diesel) that are actively being pursued in coal-rich, oil-poor countries such as South Africa. Other critical minerals may well exist within the reservations and could provide additional benefits to the local and national economy.

210. These minerals are generally in the most desolate areas of the land, where humans have rarely been and visitors today rarely see. And modern extraction methods ensure that negative impacts to the surface, habitat, or the environment are drastically reduced if not eliminated. *See, e.g.,* Petersen et al., *Response of greater sage-grouse to surface coal mining and habitat conservation in association with the mine,* 10 Human–Wildlife Interactions 205, 205 (2016) ("surface coal mining had no negative effect" on the population cycles of nearby vulnerable species, when coupled with other standard active management tools).

211. But the reservations ban all mining of natural resources outright—no matter how remote the mining area in the three-plus million acres of "monument" lands, no matter essential to American national security, no matter how compatible with responsible environmental management, and no matter how beneficial to State and local economies and communities.

212. The reservations thereby crush the ability of locals to responsibly use the land to productive ends. These harms encourage out-migration of working-class people who are the backbone of Utah's rural communities.

213. Banning mining of these natural resources has substantial effects on Plaintiffs too. The proclamations' bans cause the State to lose revenue that it could otherwise earn from rare-earth-mineral mining, critical-mineral mining, and other mining.

214. Utah law imposes a natural resources property tax, including for minerals on federal lands. Utah Code Ann. §§59-2-102(32)(b), 59-2-201, 59-2-101 *et seq.* Taxable minerals include uranium, vanadium, copper, and others—plentiful resources on southern Utah land now reserved as

"monuments." The State also receives a severance tax equal to 2.6% of the taxable value of all metals or metalliferous minerals, such as uranium and vanadium, sold or otherwise disposed. *Id.* §59-5-202(1). Other laws provide revenue for Plaintiffs based on royalties from the mining of those minerals. *E.g.*, *id.* §59-21-1 *et seq.*; 30 U.S.C. §181 *et seq.* The State also collects other taxes and fees in connection with these natural resources.

215.     The State's share of revenues realized from minerals on federal public lands, absent a monument designation, is substantial. Outside of the reservation boundaries, mining industries pay millions of dollars in direct production taxes, mineral royalties, and property taxes. For fiscal year 2022, the State of Utah assessed $112.4 million in natural resources property tax, collected by the counties. *See* Utah Tax Comm'n FY2022 Annual Report 24, perma.cc/P2XS-TMNS. That same year, the State received $75.6 million in revenues from federal mineral leases. *See* State of Utah 2022 Comprehensive Annual Financial Report 44, bit.ly/3cXJQTs. Those revenues are directed by statute to support counties and other political subdivisions, the State Board of Education, the Utah Geological Survey, and the Wildland Fire Suppression Fund, among others. Utah Code §§59-21-1, 35A-8-303, 59-21-2. But for the reservation boundaries, mining activities could continue and grow with the corresponding financial benefits to the State, Counties, and other beneficiaries.

216.     But within the reservation boundaries, those revenues cannot be realized. For instance, the State was projected to receive over $3 million annually in direct revenues—including sales and use tax, mineral lease royalties, and trust-land payments—and over $2 million annually as a result of indirect revenues from mining of the high-grade coal in the area encompassed by the Grand Staircase-Escalante reservation. *See, e.g.*, H.R. Rep. 105-824, *Monumental Abuse: The Clinton Administration's Campaign of Misinformation in The Establishment of the Grand Staircase-Escalante National Monument* (Oct. 16, 1998), bit.ly/3OI6j8B. Plaintiffs are denied those revenues and revenues like them as a result of the reservations.

217.    Plaintiffs would also receive revenues from other mining on the covered land if not for the monument reservations. But planned mineral mining that has been abandoned as a result of the proclamations. The State will no longer receive those revenues.

218.    For instance, Plaintiffs will lose significant tax revenue generated from the Avalanche Mine which was previously mined in upper South Cottonwood. Past drilling has found available hundreds of thousands of pounds of uranium. This mining claim is still held by a family unable to mine it due to the reservation. Similarly, the Spring Water mine on the eastern bank of South Cottonwood has been staked and claimed by a historically active mining family. Modern technology and techniques, unavailable historically, create great potential for the area as fluctuations of markets make the minerals more valuable. It is estimated that the Spring Water mine holds over one million pounds of uranium and up to millions of pounds of high-grade vanadium. In all, untold quantities and values of minerals are within monument reservation boundaries—and are now out of reach.

219.    Additionally, the State has established the Permanent Community Impact Fund Board, a program that provides loans or grants to state agencies and state subdivisions, including Kane County and Garfield County, that are or may be socially or economically affected, directly or indirectly, by mineral resource development on federal lands. The source of the Board's funding is the mineral lease royalties returned to the State by the federal government. The Board's goal is to maximize the long-term benefit of funds derived from those lease revenues and bonus payments by fostering funding mechanisms that will, consistent with sound financial practices, result in the greatest use of financial resources for the greatest number of citizens of Utah, with priority given to those communities designated as impacted by the development of natural resources covered by the Mineral Leasing Act. In fiscal year 2021, the Board distributed over $117 million in loans and grants for projects in impacted communities. *See* Legislative Report of the Permanent Community Impact Fund: Fiscal Year 2021, at §3 (Utah 2021), bit.ly/3J9ms58. The reservations expressly prevent further mineral

resource development on the reservations, thereby decreasing the amount of royalties that the federal government will return to the State and thus that the State will have available to fund projects through the Board.

### G. The proclamations burden infrastructure at Plaintiffs' expense and create new maintenance costs.

220.    In addition to all of the above ways in which the reservations harm the State and local governments, the reservations harm the State and local governments in additional ways by burdening infrastructure, with all of the associated costs for Plaintiffs.

221.    The enlarged reservations burden the State and local governments, including Kane County and Garfield County, with difficult and expensive road maintenance obligations. The reservations draw droves of tourists from all over the world who bring their cars, trucks, motorhomes, ATVs, and trailers by the thousands onto rural Utah's small, dirt back roads. The heavy traffic causes washboards, rutting, potholes, and sandpits. As these problems mount, vehicles drive off the road to avoid them, which widens the roads and encroaches on vegetation. Constant grading is necessary to keep the roads passable, but grading itself drives the road deeper into the earth's surface and becomes more difficult over time. Locals, meanwhile, need these roads to be passable for their own needs.

222.    Although the roads within the reservations are on federal land and the increased usage and increased costs of maintenance are attributable to the federal government, the federal government does not pay for them to be maintained. State and local governments pay for many of the increased road expenditures generated by the reservations. Making matters worse, the reservations' restrictions impede State and local efforts to remedy the road damage.

223.    As a result of the reservations, the Counties are impeded from adequately maintaining and repairing roads within the reservations. The reservations limit the area along the roadway that workers can use and the availability of material to place on the roads, making it more costly to maintain

the roads. For example, Kane County maintains a total of 35 roads on the reservation, mostly on its perimeter. Before the reservations, Kane County would access material from beside and near its roads within and on the perimeter of the reservation to repair washouts created by flooding and other natural events throughout the County. As a result of the reservations, this material is off-limits and can no longer be used, thereby increasing the cost of maintenance and sometimes altogether preventing the County from engaging in its intended maintenance.

224.   For another example, most large storms cause the House Rock Valley Road in Kane County to wash out in multiple locations. Kane County has attempted to get approval to put culverts in a few locations which would prevent the washouts, but does not receive approval because of the reservations.

225.   For another example, maintenance of Hole in the Rock Road is funded exclusively through funds provided by the State. Garfield County recently sought to improve the surface of Hole in the Rock Road in the Grand Staircase-Escalante so that it could safely withstand the increased traffic generated by the proclamation. The County's road-improvement proposal would have left the road entirely within its current right-of-way, and would not have resulted in any new disturbance or changed the alignment of any segment of the road. It was a minimal project that would have taken four days to complete and would not have resulted in any road closures even during those four days. But, due in part to President Biden's proclamation, BLM prohibited it from going forward.

226.   Similarly, in Kane County, the Cottonwood Canyon Road runs north to south as the only road that connects the northeastern parts of the County to the southeastern. The road parallels a significant portion of the Paria River and frequently is damaged by heavy flooding events. It takes sometimes up to a year for Kane County to perform simple maintenance fixes on the road because of the proclamation's restrictions.

227.     The reservations increase other maintenance costs on local governments. For example, as a result of the increased visitation and minimal restroom facilities, one of the few trailheads with pit toilets in the area now requires additional service. BLM, unable to adequately service the toilets itself, has requested funding from Kane County to service the toilets. Kane County currently provides approximately $26,000 each year in funding to service this location.

**H. The proclamations create new administrative and regulatory burdens, deprive the State of certain statutory rights, preempt state law, and otherwise deprive Plaintiffs of use of the land.**

228.     More broadly, the reservations also generate administrative and regulatory burdens and compliance costs on the State and on local governments. They force the State to submit to additional procedural hurdles for any necessary projects within the reservations. Projects that were previously expeditiously processed and approved are now subject to additional analysis and delay. They are often never completed or are rejected.

229.     The reservations also create conflicts with County policies and burdens on County personnel. For example, they create conflicts with Kane County's policies favoring range improvements, coordination and consistency involvement, mineral extraction, open roads, and development of grazing resources. *See, e.g.*, *Kane County Resource Management Plan*; *Kane County Land Use Ordinance*, Title 9 Chapter 27.

230.     The reservations also deprive the State of its federal statutory procedural rights. Under FLPMA, the State is guaranteed a right to participate in the development of policies and priorities on federal land, including land encompassed by the reservations. *See* 42 U.S.C. §1712(c)(9); *see also* 43 C.F.R. §1610.3-2; 43 C.F.R. §1601.0-5. That guarantee ensures the State's involvement in deliberations that control and affect the use of federal lands. But as a result of the reservations, that procedural right is effectively eliminated. No matter what the State says, the reservation land will be managed exclusively for conservation and protection.

54

231.    Similarly, the reservations also deprive Kane County and Garfield County of their federal statutory procedural rights to coordinate in the development of management plans under FLPMA.

232.    The reservations also cause the State to lose its ability to realize the full economic value of its lands, both in and around the designations.

233.    For example, as a result of the reservations, the State's access to and use of its own school trust (or SITLA) lands has been impeded. Recognizing this, the proclamations directed Defendant Secretary of the Interior Haaland to arrange with the State of Utah "an exchange of land owned by the State of Utah and administered by the Utah School and Institutional Trust Lands Administration"—which are lands dedicated to the support of Utah's public schools—"within the boundary of the monument for land of approximately equal value managed by the BLM outside the boundary of the monument." 86 Fed. Reg. 57332. The State has had to agree to land transfers in which the federal government has taken school trust lands within and near the reservations in exchange for land in other parts of the State.

234.    The value that the State could otherwise extract from such SITLA lands has diminished. For example, described above, the State proposed well projects on those lands that, if approved, would have supported increased cattle grazing. Defendants denied them because of the monument proclamations. The reservations have reduced the potential for mineral development viability from the SITLA lands near the reservations.

235.    The reservations also prevent local governments, including Kane County, from holding and funding events. These governments can and do hold and fund events on federal land not within the reservations and would hold them on the land encompassed by the reservations, but the reservations' restrictions prevent them from doing so.

236.    The reservations also preempt the State's policies. For example, the reservations preempt the State of Utah Resource Management Plan for Federal Lands. *See* Utah Code §63J-8-101. The State's land use planning and management program expresses the State's position that BLM and Forest Service land-use plans should, "to the maximum extent consistent with federal law and FLPMA's purposes," "incorporat[e] the state's land use planning and management program" for federal lands so as to:

- "support valid existing transportation, mineral, and grazing privileges" on federal land "at the highest reasonably sustainable levels," *id.* §63J-8-104(1)(a)(ii);

- "produce and maintain the desired vegetation for watersheds, timber, food, fiber, livestock forage, wildlife storage, and minerals that are necessary to meet present needs and future economic growth," *id.* §63J-8-104(1)(a)(iii);

- "meet the needs of wildlife," *id.* §63J-8-104(1)(a)(v);

- "achieve and maintain at the highest reasonably sustainable levels a continuing yield of energy, hard rock, and nuclear resources," *id.* §63J-8-104(1)(d);

- "achieve and maintain livestock grazing in the subject lands at the highest reasonably sustainable levels," *id.* §63J-8-104(1)(e);

- "manage the watershed in the subject lands to achieve and maintain water resources at the highest reasonably sustainable levels," *id.* §63J-8-104(1)(f);

- "keep open to motorized travel, any road in the subject lands that is part of the respective counties' duly adopted transportation plan," *id.* §63J-8-104(1)(h);

- "manage the subject lands so as to not interfere with the property rights of private landowners," *id.* §63J-8-104(1)(j);

- and "manage the subject lands in a manner that supports the fiduciary agreement made between the state and the federal government concerning the school and institutional trust lands," *id.* §63J-8-104(1)(k).

237.    Adhering to these statutory directives has become difficult or impossible due to the enlarged reservations, which prohibit the extraction of resources, undermine livestock grazing, impede efforts to manage the watershed, harm and threaten to shut down roads, restrict maintenance, interfere with rights of private landowners, and cause the State to exchange its school and institutional trust lands. Similarly, the reservations preempt the resource-management plans of local governments, including Kane County and Garfield County.

238.    Beyond that, Utah has established Utah Grazing Agricultural Commodity Zones in Garfield, Kane, and San Juan Counties—counties encumbered by the reservations. *See* Utah Code §63J-8-105.8(1). Utah established those zones "for the purpose of: (a) preserving and protecting the agricultural livestock industry from ongoing threats; (b) preserving and protecting the history, culture, custom, and economic value of the agricultural livestock industry from ongoing threats; and (c) maximizing efficient and responsible restoration, reclamation, preservation, enhancement, and development of forage and watering resources for grazing and wildlife practices and affected natural, historical, and cultural activities." *Id.* §63J-8-105.8(1)(a)-(c). The reservations are antithetical to each of those goals and will actively hinder the State's ability to achieve them.

239.    The reservations also increase the risk of damage to State and local property. For instance, they prevent State and local efforts to clear brush and other fire fuels, thereby increasing the risk of severe wildfires that strip the lands of vegetation, leading to flash floods that erode the landscape. These effects pollute water sources and destroy State-owned and State-managed wildlife.

## I.   The proclamations harm Native American interests.

240.    Support for the reservations among Native Americans is mixed. Hammond, *Some Indigenous groups worry a larger Bears Ears National Monument would limit access to ritual space*, Salt Lake Trib. (Sept. 21, 2021). "There is nothing sacred," said Ute tribe member Suzette Morris, "about putting a big X on the map for millions of people to visit and intentionally or unintentionally vandalize sacred sites." *Id.* As other Native Americans have explained, the land was already "being protected" before the reservations. *Id.* But the reservations impose restrictions that "break the connection we have to the area." *Id.*

241.    It's easy to see why not all Native Americans support the reservations. In addition to drawing an "influx of tourists" who endanger sacred sites, *id.*, the reservations prevent Native Americans themselves from engaging in traditional cultural and life-sustaining practices. Many Native Americans who live near the reservations have long relied on doing things that are jeopardized by the new reservation restrictions.

242.    For example, local Native Americans use many of the herbs naturally occurring within the reservations in their ceremonies and for medicinal purposes. And many Native Americans heat their homes with area firewood, including wood gathered from within the reservation boundaries. *See* Hammond, *supra* ("Many of the Navajos who live in the area … rely on collected deadwood, as they have for centuries, to stay warm through the Utah winter."). They use existing roads and drive motorized or mechanized vehicles on reservation land to access and transport this firewood.

243.    But wood, herbs, and traditional plant resources are listed in the proclamations as supposed "monuments." The proclamations also prohibit the creation of additional roads or trails designated for motorized vehicle use unless for public safety purposes or for protecting itemized objects, and prohibit the use of motorized and mechanized vehicle use except on designated trails.

Therefore, the reservations limit and perhaps altogether ban the Native Americans' traditional use of these resources.

244.    President Obama's 2016 Bears Ears proclamation, recognizing this conflict, specially allowed that the agencies would "provide access by members of Indian tribes for traditional cultural and customary uses … including collection of medicines, berries and other vegetation, forest products, and firewood for personal noncommercial use." 82 Fed. Reg. at 1145. President Biden's proclamations made no such allowances.

**J.    These harms are real and occurring now as a result of President Biden's proclamations and their delegations to federal agencies.**

245.    Each of these injuries is caused by President Biden's proclamations and reservations, and an order from this Court declaring those actions to be *ultra vires* would remedy those harms.

246.    The proclamations' delegation of power to federal agencies to effectuate the reservations through management plans, including interim management plans that presently govern the reservations, cause harms. An order from this Court declaring those actions to be contrary to law and in excess of agency authority would remedy those harms.

247.    In particular, the proclamations assign management of the land encompassed by the reservations to Defendants Secretary of Agriculture Vilsack and Secretary of the Interior Haaland, through Defendants U.S. Forest Service and Bureau of Land Management. They direct those agencies to prepare new management plans and regulations for the management of the land—management plans that the agencies otherwise would have no authority to promulgate. *E.g.*, 86 Fed. Reg. 57332.

248.    The federal agencies and agency officials have picked up the torch. They have effectuated the proclamations through interim management plans, which themselves expressly and immediately prohibit and impede activities on the reservations by Plaintiffs and others.

249.    BLM, in conjunction with other Agency Defendants, issued the Interim Management Plan for the Bears Ears reservation on December 16, 2021. *Interim Management of the Bears Ears National Monument*, Dep't of Int. (Dec. 16, 2021), perma.cc/8WU9-MMH9. The management plan determines rights and privileges and declares prohibitions, effective immediately.

250.    For example, with respect to mining and mineral leasing activity, the Bears Ears December 2021 management plan states definitively and finally that, in light of the proclamation, "no new mining claims may be located, and no new mineral leases may be issued, on lands within the monument." *Id.* at 2.

251.    For example, with respect to grazing permits, including renewals of such permits, the Bears Ears management plan states that the agency must ensure that any such permit or renewal must "ensure protection of the monument objects," *id.* at 5, separate from the inquiry of whether that grazing permit is consistent with any past management plans.

252.    BLM, in conjunction with other Defendants, also issued the Interim Management Plan for the Grand Staircase-Escalante reservation on December 16, 2021. *Interim Management of the Grand Staircase-Escalante National Monument*, Dep't of Int. (Dec. 16, 2021), perma.cc/8J37-ELHR. The management plan determines rights and privileges and declares prohibitions, effective immediately.

253.    For example, with respect to mining and mineral leasing activity, the Grand Staircase December 2021 management plan states definitively and finally that, in light of the proclamation, "no new mining claims may be located, and no new mineral leases may be issued, on lands within the monument." *Id.* at 2.

254.    For example, with respect to grazing permits, including renewals of such permits, the Grand Staircase management plan states that the agency must ensure that any such permit or renewal must "ensure protection of the monument objects," *id.* at 5, separate from the inquiry of whether that grazing permit is consistent with any past management plans.

255.    By their own terms, these December 2021 management plans prohibit or impede planned activity on the reserved lands *right now*, including Plaintiffs' activities, if inconsistent with the protection of any "object" designated for protection in the proclamations. For example, the State's and Counties' typical planned active management would entail disturbing "soil" or "ricegrass." But on the monument reservations, the federal agencies' management plans impede that active management because "soil" and "ricegrass" are protected objects under the proclamations.

256.    Cited in the management plans, the Bureau of Land Management has also issued a manual with additional policies further restricting activities on the reserved lands as part of their implementation of the proclamations. *E.g.*, *BLM Manual 6220 - National Monuments, National Conservation Areas, and Similar Designations*, Dep't of Int. (Jan. 1, 2017), perma.cc/LEY3-QTX8. The proclamations are the source of the Bureau of Land Management's continued authority for effectuating the restrictions in this manual.

257.    Based on the proclamations and plans, Defendants have also made other *ad hoc*, final decisions prohibiting requested uses of land on or near the monument reservations by Plaintiffs and other Utahns.

## IV.    President Biden lacks any authority for the proclamations.

258.    The Antiquities Act offers no basis for the President's reservation of more than 3 million acres for the Bears Ears National Monument and Grand Staircase-Escalante Monument.

### A. President Biden's proclamations declare as monuments things that are not qualifying landmarks, structures, or objects under the Act.

259.    The Antiquities Act sets forth strict limitations for the declaration of a national monument. President Biden's proclamations bear no relation to those limitations.

1.   **The Act imposes strict limitations for the declaration of a national monument.**

260.   Congress specified that the only things a President may declare to be national monuments are: (1) "historic landmarks," (2) "historic and prehistoric structures," and (3) "other objects of historic or scientific interest."

261.   Congress designed these three narrow categories to apply in rare circumstances.

262.   First, consider the category "historic landmarks." A "landmark" means "[a]n object in the landscape, which, by its conspicuousness, serves as a guide in the direction of one's course," or "an object set up to mark a boundary line" of a "country, estate, etc." *Landmark*, Oxford English Dictionary Vol. VI (L-M) 53 (1913); *see also Landmark*, Webster's Dictionary (1913) (a "conspicuous object on land that serves as a guide"); *Landmark*, Webster's New International Dictionary 1210 (1913) ("a mark to designate the boundary of land; any mark or fixed object (as a monument of any sort, a marked tree, a stone, a ditch) by which the limits of a farm, a town, or other portion of territory may be known and preserved" or "[a]ny conspicuous object on land that marks a locality or serves as a guide, esp. as a guide to navigation at sea").

263.   In other words, to qualify as a "landmark," something must be specific, conspicuous, and used by humans in a surveying or navigational capacity. A "landmark" cannot be generic, nondescript, or unknown by humans. Nobody would ever mark a boundary line by, for instance, the location of "potential fossil yield." 86 Fed. Reg. at 57325. And a "landmark" cannot be something animate, except in the rarest circumstances, such as an old, large, and distinctive tree in the middle of a field. At the least, if it is animate, it must be fixed to the land.

264.   The Act does not authorize declaring a monument on the basis of just any "landmarks." Instead, it authorizes monument status for only "historic" landmarks. This is a critical adjective, and its meaning has been lost on or ignored by most people to consider the Act. "Historic" should not be confused with the more common adjective "historical." "Historic" is much narrower.

"*Historic* means 'historically significant,'" as in "the Alamo is a historic building." *Historical; Historic*, Garner's Dictionary of Legal Usage 410 (3d ed. 2011). "Momentous happenings or developments are *historic*." *Id.* By contrast, "merely documented happenings or developments are *historical*." *Id.* Congress chose the narrow adjective "historic," thereby ensuring that the Act would not be used to authorize declarations of landmarks with no momentous human significance.

265.    Contemporaneous dictionaries reflected this distinction. They explained that "the prevailing current sense" of "historic" was "[f]orming an important part or item of history; noted or celebrated in history; having an interest or importance due to conne[ct]ion with historical events." *Historic*, Oxford English Dictionary Vol. V (H-K) 304 (1913). The definition of "historical" was left more broadly at "[o]f or pertaining to history; of the nature or character of history, constituting history; following or in accordance with history." *Historical*, Oxford English Dictionary Vol. V (H-K) 304 (1913); *see also Historical*, Webster's New International Dictionary (1913) ("historical" is "the more usual form" for "[o]f, pertaining to, or of the nature of, history," whereas "historic" is "the more usual form" for "associated with, or famous in, history; as a historic spot; a historic event").

266.    Usage guides likewise explained that "historic" had a far more narrow meaning. "The ordinary adjective of *history* is *historical*." Fowler, A Dictionary of Modern English Usage 247 (1922). By contrast, "*historic* means memorable, or assured of a place in history." *Id. Id.* And "the use of one in a sense now generally expressed by the other is a definite backsliding." *Id.*

267.    If Congress had wished to authorize the declaration as national monuments of all landmarks that were part of documented past events as national monuments, it could have used the more common adjective "historical." Instead, it authorized the declaration as national monuments of only those landmarks that were "historic"—that is, landmarks that are momentous or had an assured place in history. Something with no known major influence on a society is not historic.

268.    An example of a "historic landmark" qualifying for protection under the Act is Pompeys Pillar, a 150-foot tall sandstone pillar east of Billings, Montana that stands alone and is immediately striking to anyone within view of it. Pompeys Pillar, after being used as a guidepost by travelers for thousands of years, played a central role in (and got its name from) Lewis and Clark's expedition to the Pacific. *See* Proc. 7396 of Jan. 17, 2001, *Establishment of the Pompeys Pillar National Monument*, 66 Fed. Reg. 7351 (Jan. 17, 2001) (reserving 51 acres under the Act). It is therefore likely both a landmark and historic.

269.    But as discussed in more detail below, few or none of the things listed in President Biden's proclamations are "historic landmarks."

270.    Next, consider the category "historic or prehistoric structures." A "structure" means "[a] building or edifice of any kind," especially one "of some considerable size and imposing appearance." *Structure*, Oxford English Dictionary Vol. X (Sole-Sz) 1165 (1913); *see also Structure*, Webster's Dictionary (1913) ("a building; esp., a building of some size or magnificence").

271.    To qualify as a "structure," something must be specific, big, and man-made. A "structure" cannot be generic, too small, or unassembled. Nobody would call a "yucca fiber sandal," 86 Fed. Reg. at 57328, or "sedimentary rock layers," *id.* at 57337, for instance, a building or edifice. And a "structure" cannot be something animate. Buildings are inanimate and fixed to the land. Nobody would call "relict plant communities," *id.*, for instance, a structure.

272.    And again, the Act does not cover all "structures." It makes only "historic" or "prehistoric" structures eligible for monument status. As discussed above, a structure is "historic" only if it was socially momentous or had an assured place in history. A structure is "prehistoric," meanwhile, if it is "of, belonging to, or existing in the period antecedent to history, or to the first historical accounts of a people." *Prehistoric*, Oxford English Dictionary Vol. VIII (Poy-ry) 1273 (1913).

A structure is not prehistoric if it comes from a time when there were historical accounts of a people. For instance, pioneer "cabins," 86 Fed. Reg. at 57327, are not prehistoric.

273.    An example of a "historic or prehistoric structure" qualifying for protection under the Act is Fort Wood, the eleven-pointed early American fort that was then repurposed into the base for the Statue of Liberty. *See* Proclamation 1713 of Oct. 15, 1924 (reserving 2.5 acres under the Act). The fort is a man-made building that played an important role in American military history. It is therefore likely both a structure and historic.

274.    But as discussed in more detail below, few of the things listed in President Biden's proclamations are "historic or prehistoric structures."

275.    Finally, consider the category "other objects of historic or scientific interest."

276.    In context, the category is not as broad as it might seem. An "object" is "[s]omething placed before the eyes, or presented to the sight or other senses; an individual thing seen or perceived." *Object*, Oxford English Dictionary Vol. VII (N-Poy) 14 (1913). An "object" is of "historic" interest if it has generated interest because it was socially momentous or had an assured place in history. An object is of "scientific" interest if it has generated interest because it is "[o]f or pertaining to science or the sciences." *Scientific*, Oxford English Dictionary Vol. IX (S-Soldo) 222 (1913). "Science," in turn, means "those branches of study that relate to the phenomena of the material universe and their laws," *Science* Oxford English Dictionary Vol. IX (S-Soldo) 222 (1913).

277.    But at least three considerations show that the Act's phrase "other objects of historic or scientific interest" cannot fairly be read in this broad sense.

278.    First, the phrase "other objects of historic or scientific interest" must be interpreted narrowly to refer to only those "objects of historic or scientific interest" that fall within the same general kind or class as "historic landmarks" and "historic and prehistoric structures." "Where general words follow an enumeration of two or more things, they apply only to persons or things of the same

general kind or class specifically mentioned." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). For example, when the similar phrase "tangible object" follows the words "record" and "document," it refers to "only objects one can use to record or preserve information, not all objects in the physical world." *Yates v. United States*, 574 U.S. 528, 536 (2015); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 115 (2001) (holding that final clause in statute concerning "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" referred to only other workers involved in transportation).

279. Second, the phrase "other objects of historic or scientific interest" must be interpreted narrowly so as to be similar to "historic landmarks" and "historic and prehistoric structures"—the "other" preceding categories to which this one refers. "When several [words] are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Scalia & Garner, *supra*, at 195.

280. Here, these first two considerations mean that the phrase "other objects of historic or scientific interest" cannot be extended to things that are generic, nondescript, nebulous, or inconspicuous. They also mean that the phrase "objects of historic or scientific interest" cannot be extended to animate things or things not fixed to the land, to things that are of no past specific significance to humans, or things that are either much too small or much too large to be reasonably commensurate with the "landmarks" and "structures" covered by the Act. Any such extension would make the final phrase far afield from and unlike the original two categories.

281. And third, the phrase "objects of historic or scientific interest" must be understood in reference to the statutory title. *See* Scalia & Garner, *supra*, at 221 ("The title and headings are permissible indicators of meaning."). Titles guide interpretation "when they shed light on some ambiguous word or phrase." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528-29 (1947).

282.     Here, the "antiquities" referred to in the "Antiquities Act" refer to "relic[s] or monument[s] of ancient times; as, a coin, a statue, etc." *Antiquity*, Webster's Dictionary (1913).

283.     Chief Justice Roberts put special emphasis on the title definitions in his statement concerning unnaturally broad interpretations of the Act. *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 980 (statement of Roberts, C.J.) ("Which of the following is not like the others: (a) a monument, (b) an antiquity (defined as a 'relic or monument of ancient times') or (c) 5,000 square miles of land beneath the ocean? If you answered (c), you are not only correct but also a speaker of ordinary English.") (internal citations omitted). Any remaining doubt about whether the phrase "objects of historic or scientific interest" can be extended to things that are generic, nondescript, nebulous, animate, not fixed to the land, inconspicuous, or of no past specific significance to humans should be eliminated by the title.

284.     The otherwise-qualifying items also must be "situated" on the land. To be "situated," something must "hav[e] a site, situation, or location" or be "permanently fixed; placed; located." *Situate; Situated*, Webster's Dictionary (1913).

285.     Finally, the Act's three conditions for declaration of a national monument require the identification of discrete, specific items. A proclamation describing generic *categories* of things within the reservations, without identifying their location or number, per se fails to satisfy the Act. So while an individual "archaeological remain" in a specific location, for instance, might qualify for protection under the Act, a President cannot justify a reservation by simply insisting that there are some unknown number of "archaeological remains" at various unspecified locations within the land.

286.     In other words, a President may not enact a reservation on the conclusory assertion that it contains qualifying items only to promise to find out later which *specific* qualifying items are in it. *Cf.* Roff, *Pelosi: Pass Health Reform so You Can Find Out What's in It*, U.S. News (Mar. 9, 2010),

bit.ly/3S8PFRJ (quoting House Speaker Nancy Pelosi's statement that Congress had "to pass the [Affordable Care Act] so you can find out what's in it, away from the fog of controversy").

287.    After all, under the Act's plain text, the monument designation (for a *specific* qualifying item) comes first; only then can an accompanying reservation of land follow. If no specific qualifying object were identified, then how could a President determine the smallest area compatible for its proper care and management?

## 2. President Biden's proclamations exceed those limitations.

288.    A great number of the items that the Biden proclamations rely on do not fall within any of the three statutory categories and thus cannot be used as the justification for a national monument.

289.    As to President Biden's primary theory, the "landscape" itself is not a qualifying landmark, structure, or object under the Act. The two massive tracts of a combined 3.23 million acres were of no specific significance before the reservations. They reflect arbitrary boundaries that enclose large areas of land never before formally associated. And if they are objects at all, they are much too large and nebulous to be the sort of "objects" that are of the same kind as and similar to qualifying landmarks and structures.

290.    A "landscape" therefore may not be declared a national monument consistent with the plain text Congress used in the Act.

291.    The problem with designating millions of acres of "landscape" has come to life in Utah, where the President has used that theory as a basis for stitching together countless features of southern Utah, spanning millions of acres, that would otherwise not qualify as monuments and that are not meaningfully related to each other.

292.     As to President Biden's alternative, item-based justifications, the long lists of individual items relied on in the proclamations are almost entirely not qualifying landmarks, structures, or objects under the Act.

293.     First, plants and animals relied on in the proclamation are not qualifying landmarks, structures, or objects under the Act because they are generic and animate or not fixed to the land. Many are also nondescript, inconspicuous, or were listed with no indication of their past specific significance.

294.     In the Bears Ears Proclamation, plants and animals relied on but ineligible for declaration as monuments include:

> Townsend's big-eared bats; beavers; ringtail cats; lush green foliage; dense fir and aspen forests; hanging gardens, springs, and riparian areas; Four Corners potato, goosefoot, wolfberry, and sumac; pockets of ancient Engelmann spruce; rare stands of old-growth ponderosa pine, aspen, and subalpine fir; stands of ponderosa pine, oak, and pinyon and juniper; forests of pinyon, juniper, and Gambel oak; stands of ponderosa pine and mixed conifers; pinyon-juniper forests; aspen grove; Native perennial grasses, shrubs, and some cacti; rare and important plant and animal species; eyries for peregrine falcons; potential nesting sites for bald and golden eagles; winter grounds for big-game species; potential habitat for endangered fish and threatened plant species; habitat for Mexican spotted owls, peregrine falcons, golden eagles, and spotted bats; habitat for a wide range of wildlife, including known populations of Mexican spotted owl; foraging habitat for golden eagles and peregrine falcons; a genetically distinct population of Kachina daisy; habitat for the threatened yellow-billed cuckoo and the endangered southwestern willow flycatcher; the largest minnow in North America; razorback sucker; mule deer; elk; bighorn sheep; desert cottontail; black-tailed jackrabbit; prairie dog; Botta's pocket gopher; white-tailed antelope squirrel; chipmunk; canyon mouse; deer mouse; pinyon mouse; desert woodrat; tassel-eared squirrels; rare shrews; badger; coyote; striped skunk; ringtail gray fox; bobcat; mountain lion; porcupines; black bears; tiger salamander; red-spotted toad; Woodhouse's toad; canyon tree frog; Great Basin spadefoot; northern leopard frog; night lizard; sagebrush lizard; eastern fence lizard; tree lizard; side-blotched lizard; plateau striped whiptail; western rattlesnake; night snake; striped whipsnake; gopher snake; golden eagle; peregrine falcon; bald eagle; northern harrier; northern goshawk; red-tailed hawk; American kestrel; flammulated owl; great horned owl; Mexican spotted owl; Merriam's turkey; Williamson's sapsucker; common nighthawk; white-throated swift; ash-throated flycatcher; violet-green swallow; cliff swallow; mourning dove; pinyon jay; sagebrush sparrow; canyon towhee; rock wren; sage thrasher; southwestern willow flycatcher; 15 species of bats, including the big free-tailed bat, pallid bat, Townsend's big-eared bat, spotted bat, and silver-haired bat; pothole beetles; freshwater shrimp; an endemic moth; ancient Engelmann spruce; ponderosa

pine; subalpine fir; pinyon-juniper woodlands; big sagebrush; low sage; blackbrush; rabbitbrush; bitterbrush; four-wing saltbush; shadscale; winterfat; Utah serviceberry; western chokecherry; hackberry; barberry; cliff rose; greasewood; yucca; cacti such as prickly pear, claret cup, and Whipple's fishhook; mountain mahogany; ponderosa pine; alder; sagebrush; birch; dogwood; Gambel's oak; aspen; bluegrass; bluestem; giant ryegrass; ricegrass; needle and thread; yarrow; common mallow; balsamroot; low larkspur; horsetail; peppergrass; pinnate spring parsley; habitat for sensitive fish species and for the threatened Navajo sedge; Navajo penstemon; Canyonlands lomatium; Abajo daisy; Fremont cottonwood; western sandbar willow; yellow willow; box elder; hanging gardens; moisture-loving plants; relict species such as Douglas fir; relict plant communities; Kachina daisy; alcove columbine; cave primrose; beardtongue; evening primrose; aster; Indian paintbrush; yellow and purple beeflower; straight bladderpod; Durango tumble mustard; scarlet gilia; globe mallow; sand verbena; sego lily; cliffrose; sacred datura; monkey flower; sunflower; prince's plume; hedgehog cactus; columbine; important potential habitat for the Mexican spotted owl; intrepid beavers; and a herd of desert bighorn sheep.

295.    In the Grand Staircase-Escalante Proclamation, plants and animals relied on but ineligible for declaration as monuments include:

an astounding biodiversity of bees; hundreds of bee species; mountain lion; bear; pronghorn and desert bighorn sheep; hundreds of species of birds; winter habitat for elk; chuckwalla; a population of desert night lizard; herd of desert bighorn sheep; nesting areas for a high density of raptors; habitat for many raptor species; pinyon and juniper woodlands, ponderosa pine forests, and aspen groves; winter range for the renowned Paunsaugunt mule deer herd; hanging gardens; tinajas; rock crevice, canyon bottom, and dunal pocket communities; desert pavement; biological soil crusts; relict plant communities; Atwood evening primrose; Smoky Mountain globemallow; relict plant communities; Higgins spring parsley; Kane breadroot; remarkable specimens of petrified wood; riparian vegetation; rich riparian area; habitat for the endangered southwestern willow flycatcher; and petrified wood.

296.    Second, qualities and experiences relied on in the proclamation are not qualifying landmarks, structures, or objects under the Act because they are generic, nebulous, and not fixed to the land. Many are also nondescript, inconspicuous, or were listed with no indication of their past specific significance.

297.    In the Bears Ears Proclamation, qualities and experiences relied on but ineligible for declaration as monuments include:

unbroken views of the entire region; a sense of solitude and isolation; the striking landscape; a long history of livestock grazing; star-filled nights; natural quiet; deafening silence; diversity

of the soils; unbroken views of the entire region; and prime mule deer, elk, and black bear hunting grounds.

298.     In the Grand Staircase-Escalante Proclamation, qualities and experiences relied on but ineligible for declaration as monuments include:

starlight, airglow, aurora, and zodiacal light; views of the cosmos; route that offers unparalleled views of Lake Powell and the Kaiparowits Plateau; sweeping views to the south; Upper Escalante Canyons landscape; natural soundscape; diverse soils; and unspoiled and unimpeded views of the night sky.

299.     Third, the proclamations purport to declare geological items as monuments to justify the reservations. Geological items could be declared monuments if they were qualifying landmarks, structures, or objects under the Act, but only if identified specifically. But President Biden's proclamations are replete with generically identified geological items. These items are listed as categories, such as "broad desert mesas," rather than as specific objects, such as "Dance Hall Rock." The generic geological items relied on in the proclamation are not qualifying landmarks, structures, or objects under the Act for the simple reason that they are only listed generically or categorically. A generic description does not impart sufficient information from which to discern the area to be reserved or the smallest area compatible with the item's protection. Some generic geological items are also nondescript, inconspicuous, were listed with no indication of their past specific significance, or are too large and nebulous to be the sort of "object" that is of the same kind as and similar to qualifying landmarks and structures.

300.     In the Bears Ears Proclamation, generic geological items relied on but ineligible for declaration as monuments include:

deep sandstone canyons; broad desert mesas; towering monoliths; forested mountaintops dotted with lush meadows; unique landforms; sandstone spires; serpentine canyons; awe-inspiring natural bridges and arches; exposed geologic formations; sandstone canyons; several small waterfalls; expansive stretches of slickrock; prominent sandstone escarpments; rock walls; steep and narrow canyons; red sandstone walls; white pinnacles; large sandstone towers; hoodoos; towering cliffs; and geologic formations rich with fossils.

71

301.     In the Grand Staircase-Escalante Proclamation, generic geological items relied on but ineligible for declaration as monuments include:

> cliffs of the Grand Staircase; fossil-rich formations in the Kaiparowits Plateau; badlands of the Burning Hills; complex system of canyons in the Escalante region; bold plateaus; multihued cliffs; slot canyons; sedimentary rock layers; lithic scatters; hoodoos; exposed geologic strata; sandstone anticline; narrow, serpentine canyons; petrified dunes; rock striations; natural bridges and arches; pools of numbingly cold water; cool pools; black basalt boulders; expanses of iron concretion sheets; canyons; escarpments; towers; arches; a series of benches; and dramatic red sandstone cliffs.

302.     Fourth, specific geological items relied on in the proclamation are not qualifying landmarks, structures, or objects under the Act because they are nondescript, inconspicuous, were listed with no indication of their past specific significance, or are too large and nebulous to be the sort of "object" that is of the same kind as and similar to qualifying historic or prehistoric landmarks and structures.

303.     In the Bears Ears Proclamation, specific geological items relied on but ineligible for declaration as monuments include but are not limited to:

> South Cottonwood Canyon region; Cliff Dwellers Pasture Research Natural Area; Dark Canyon, Dry Mesa complex; White Canyon region; San Juan River; Chinle Formation; North and South Six-Shooter Peaks; Wingate Formation; Kayenta Formation; Navajo Formation; Indian Creek; North Six-Shooter Peak; South Six-Shooter Peak; Lockhart Basin area; Donnelly Canyon; Bridger Jack Mesa; Lavender Mesa; Dry, Arch, and Owl Canyons; Triassic Period Chinle Formation; Moenkopi Formation; Jurassic Period Glen Canyon Group Kayenta Formation; Upper Triassic formations; Hideout Canyon; Permian Period Cedar Mesa Sandstone; Comb Ridge; the San Juan River; Cedar Mesa; Hideout Canyon; Arch Canyon; Chinle Formation; Wingate, Kayenta, and Navajo Formations; a series of alcoves; Milk Ranch Point; Shay Canyon; Harts Point; Beef Basin; Fable Valley; westernmost edge of the Abajo Mountains (aka Blue Mountains); Tuerto Canyon; Trough Canyon; Ruin Canyon; North Cottonwood Canyon; Black Hole; Fry Canyon; Cheesebox Canyon; Elk Ridge; the Notch; Duck Lake; Hammond Canyon; Upper Arch Canyon; Texas Canyon; Notch Canyon; Hole-in-the-Rock Trail; a world-renowned canyon; a perennial creek; perennial stream; Chippean Rocks; Peavine, Woodenshoe, and other minor tributaries; Arch Canyon; Cathedral Arch; Angel Arch; Keystone Arch; Mule Canyon; Comb Ridge monocline; Whiskers Draw; Milk Ranch Point; Comb Wash; Butler Wash; South Cottonwood Wash; Valley of the Gods; Mexican Hat; Cedar Mesa; John's Canyon; Slickhorn Canyon; Fish Canyon; Road Canyon; Nevills Arch; Kane Gulch; Bullet Canyon; Clay Hills, Red House Cliffs, and Mike's Canyon; Mancos Mesa; and Moqui Canyon.

304.    In the Grand Staircase-Escalante Proclamation, specific geological items relied on but ineligible for declaration as monuments include but are not limited to:

Colt Mesa; Wingate Sandstone cliff; Circle Cliffs area; Studhorse Peaks; Deer Point; Kaiparowits Formation; Wahweap Formation; Dakota Formation; Tropic Shale Formation; Morrison Formation; Fiftymile Mountain; Window Wind Arch; Skutumpah Terrace; East and West Clark Benches; Burr Trail; Fiftymile Bench; Powell Point; Smoky Hollow Member of the Straight Cliffs Formation found near the upper reaches of Wiggler Wash; Round Valley Draw; Sooner Rocks; Grand Bench; Woolsey Arch; Smoky Mountain; Burning Hills; naturally occurring underground coal fires that have been smoldering for hundreds, if not thousands, of years; natural chimneys that release hot smoke and sulfuric gasses from the coal fires below; Maverick Natural Bridge and Phipps Arch; Escalante Natural Bridge; Bowington Arch; Dry Fork of Coyote Gulch; Brimstone Canyon; Peek-a-boo Canyon; Spooky Gulch; Paria River; Willis Creek; Zebra and Tunnel Slot Canyons; Egypt Slots; Hole-in-the-Rock Road; Rainbows and Unicorns site; Wolverine Petrified Wood Area; Calf Creek canyon; Death Hollow; Devil's Garden; Metate Arch; Little Jumbo Arch; Sunrise and Sunset arches; Chimney Rock; Kaiparowits Plateau; perennial stream; two waterfalls; Straight Cliffs; White Rocks; Cockscomb; John Henry Bench; Tibbet Bench; Nipple Bench; Jack Riggs Bench; Cretaceous Wahweap Formation; Wahweap Hoodoos; Alvey Wash; arches and portions of the Smoky Mountain Road State Scenic Backway; Blues; Butler Valley area; Hackberry Canyon area; Yellow Rock; Sam Pollock Arch; Upper Paria River complex; Carmel Formation; Entrada Formation; Lick Wash; Bull Valley Gorge; Cottonwood Canyon; Rimrocks; West Clark Bench; Toadstool Hoodoos; Grand Staircase; Grey Cliffs; White Cliffs; Timber Mountain; No Man's Mesa; Little No Man's Mesa; Vermilion Cliffs; Buckskin Mountain area; Eagle Sink; and Buckskin Gulch.

305.    These geological features are largely canyons and formations of Utah's red rock sandstone. They define southern Utah. A traveler will find such features not just within the reservations' borders but also beyond those borders. These ubiquitous features of southern Utah's landscape cannot be reserved for the same reason that all the beaches of Florida, the bayous of Louisiana, the prairies of Kansas, or the forests of Vermont could not be either if all those were on federal land. All those features are admittedly beautiful, unique to those States, a habitat for wildlife, and a place for exploration. But none of them qualify in one broad swath as "monuments."

306.    Fifth, the proclamations purport to declare archaeological, historical, and paleontological items as monuments to justify the reservations. Some archaeological, historical, and paleontological items could be declared monuments if they were qualifying landmarks, structures, or

objects under the Act, but only if identified specifically. But President Biden's proclamations are replete with generically identified archaeological, historical, and paleontological items.

307.    In the Bears Ears Proclamation, generic archaeological, historical, and paleontological items relied on but ineligible for declaration as monuments include:

> fossilized trackways of early tetrapods; fossilized traces of marine and aquatic creatures; very high potential for Permian and Triassic fossils; potential fossil yield; track sites in the Triassic Moenkopi Formation; assemblage of invertebrate burrows; Mollusks, phytosaurs, and possible theropod and ornithischian fossils; fossilized remains; early tetrapod trackways, Paleozoic freshwater sharks, ray-finned fishes, lobe-finned fishes, giant primitive amphibians, and multiple unique taxa of mammal-like reptiles; plant macrofossils; and fossil evidence; dry shelters for storage; Ancestral Pueblo great houses; rock art; ancient cliff dwellings; ceremonial sites; countless other artifacts; baskets; pottery; weapons; remains of single family dwellings; remains of granaries; remains of kivas; remains of towers; remains of villages and roads; petroglyphs; pictographs; remnants of Native American sheep-herding and farming; pottery; hogans; Cabins; corrals; trails; carved inscriptions in the rock; sharp pinnacles; broad mesas; labyrinthine canyons; solitary hoodoos; verdant hanging gardens; bare stone arches; natural bridges; colorful rock layers; fossil evidence; ray-finned fish fossils; late Paleozoic Era fossils, including giant amphibians, synapsid reptiles, and important plant fossils; Fossilized traces of marine and aquatic creatures; dinosaur fossils; mass graves of lumbering sauropods; metoposaurus, crocodiles, and other dinosaur fossils; Fossilized trackways of early tetrapods; fossilized ferns, horsetails, and cycads; continuous rock records of the Triassic-Jurassic transition; and traces of mammoths, short-faced bears, ground sloths, primates, evidence of maize- and bean-based agriculture, along with pottery, bows and arrows; pit houses; kivas; storage rooms; numerous fossils from the Permian and Upper Permian eras; shelter-cliff dwellings; dispersed villages; pit houses; storage pits; lithic scatters; campsites; rock shelters; pictographs; Prehistoric roads, structures, shrines, ceremonial sites, graves, pots, baskets, tools… and items of clothing; archosauromorph *Crosbysaurus harrisae*; manos and metates for grinding corn; remains of single family homes; large and inaccessible granaries; ancient cliff dwellings; large villages; granaries; kivas; towers; ceremonial sites; prehistoric steps cut into cliff faces; a prehistoric road system; petroglyphs; pictographs; recent rock writings; freestanding Pueblo masonry structures and towers; large, mesa-top Pueblo structures; Ancestral Pueblo sites; intact cultural landscapes; Pueblo I to early Pueblo II village sites; Chacoan roads; shallow pithouses and camps; Tool- and arrowhead-making sites; historic cattle-ranching cabins; archaeological remains; cliff dwellings; phytosaur and dinosaur fossils; wheel ruts and other traces of pioneer life.

308.    These items are listed as categories, such as "potential fossil yield," rather than as specific objects, such as "Butler Wash Village." The generic archaeological, historical, and paleontological items relied on in the proclamation are not qualifying landmarks, structures, or objects

under the Act for the simple reason that they are only listed generically or categorically. A generic description does not impart sufficient information from which to discern the area to be reserved or the smallest area compatible with the item's protection. Some generic archaeological, historical, and paleontological items are also nondescript, inconspicuous, or were listed with no indication of their past specific significance.

309.    In the Grand Staircase-Escalante Proclamation, generic archaeological, historical, and paleontological items relied on but ineligible for declaration as monuments include:

> pithouses; villages; storage cysts; sites attributed to many prehistoric cultures; petroglyph panels; pictograph panels; mass mortality sites; masonry structures; historic cabins; stock trails; rock writings; fossils of turtle shells, dinosaurs, and crocodile teeth; unique deposit of fossil oyster beds; marine mollusk shells rock shelters; cliffside storage structures; pithouses; rock writings; projectile points; hunter-gatherer residential pit structures; Ancestral Pueblo cultural sites; the most continuous record of Late Cretaceous life; marble-like iron oxide concretions; paleontological sites; fossils; evidence in our hemisphere of mammals from the Cenomanian through Santonian ages; fossil resources containing evidence of primitive mammals, as well as straight cone cephalopods, ammonites, gastropods, pelecypods, and Cretaceous shark teeth; a diverse assemblage of Campanian fauna; diverse and unique fossil evidence of ancient fauna and flora; Cretaceous rocks; fossilized fish, dinosaurs, and early reptiles, as well as multiple tracksites; and a diversity of fossils; and fences.

310.    As with the items defectively listed in the Bears Ears Proclamation, these generic archaeological, historical, and paleontological items do not impart sufficient information from which to discern the area to be reserved or the smallest area compatible with the item's protection. Some generic archaeological, historical, and paleontological items are also nondescript, inconspicuous, or were listed with no indication of their past specific significance.

311.    Sixth, specific archaeological and paleontological items relied on in the proclamation are not qualifying landmarks, structures, or objects under the Act because they are nondescript, inconspicuous, or were listed with no indication of their past specific significance.

312.    In the Bears Ears Proclamation, specific archaeological, historical, and paleontological items relied on but ineligible for declaration as monuments include but are not limited to:

yucca fiber sandal; Scorup Cabin; Upper Triassic and Lower Jurassic Glen Canyon Sandstone; Arch Canyon Great House; Mule Canyon Village; Monarch Cave; The Procession Panel, Wolfman Panel, and Lower Butler Wash Panel; a cave with more than 200 handprints in a variety of colors; Outlaw Trail; Comb Ridge fossil site; House on Fire; River House; Grand Gulch; Sand Island Petroglyph Panel; Salvation Knoll; Citadel cliff dwelling; a thousand-year-old ornamental sash found in the area made from azure and scarlet macaw feathers; a larger central village surrounded by smaller family-sized dwellings; Perfect Kiva; Ancient living quarters and a partially restored kiva; Multi-room, multi-story great house; Lime Ridge Clovis site; a collapsed two-story block masonry structure that appears to be an early version of a great house; Ancestral Pueblo village with structures and pottery; Turkey Pen site; Junction Village; Split Level Village; Bannister House; tattoo needle; site containing a multichromatic pictograph of a mask; archaeological inscriptions from the Wetherill expedition; Upper Triassic microvertebrate site; giant arthropod trackway; and a petroglyph featuring a macaw-like bird figure.

313.     In the Grand Staircase-Escalante Proclamation, specific archaeological, historical, and paleontological items relied on but ineligible for declaration as monuments include but are not limited to:

panel containing polychromatic depictions of long, linear figures that may date back to the Archaic period; Boulder Mail Trail; taxa that are entirely new to science; a new species of *Gryposaurus* possessing a more robust skull, a new raptor, and the tyrannosaurid Teratophoneus; Fremont sites; Uncle Charley's Bonebed; Virgin Branch of Ancestral Pueblo sites; Watson Cabin; Paria ghost town; nearly complete articulated skeleton of Poposaurus; Flag Point tracksite; and one of the world's best and most continuous records of Late Cretaceous terrestrial life.

314.     These long lists of individual items therefore may not be declared national monuments. Except for the nine items described below, none of the items listed by President Biden qualifies for monument designation under the Act.

315.     Because President Biden declared the entire landscape, rather than these individual items, to be the "monument," the eligibility of these items for monument protection is not properly presented in any event.

316.     Nor can the President stitch this long list of individual items together to achieve a landscape-scale national monument. The Act does not authorize the President to reverse engineer a national monument by drawing boundaries and then listing hundreds of items and features within those boundaries.

317.     On information and belief, the President believes that other nondisclosed items, not appearing in the proclamations, justify the reservation of millions of acres of land. The President is wrong because any such items have not been declared by "public proclamation" and therefore cannot form the basis for a reservation under the Act. 54 U.S.C. §320301(a).

318.     Neither the entire landscape nor this long list of individual items nor nondisclosed items justify President Biden's proclamations, declaring more than three million acres as national monuments.

319.     President Biden's proclamations do not accurately or fairly characterize the land or the items within the land as qualifying for monument protection. All regions of Utah include beautiful geological formations, and other archaeological, historical, or paleontological sites. Taking the proclamations on their own broad and generic terms, all 63 percent of federal land in Utah ought to be designated as a monument.

**B. President Biden's proclamations exceed his authority by reserving more land than is necessary to the proper care and management of any qualifying landmarks, structures, or objects.**

320.     That is not to say that nothing within the 3.23 million acres reserved by President Biden could qualify for declaration as a national monument under the Antiquities Act if properly identified.

321.     Within each reservation, a small number of identified items may likely qualify.

322.     In the Bears Ears Proclamation, likely qualifying items include Bears Ears Buttes, Butler Wash Village, Doll House, Moon House, Newspaper Rock, and San Juan Hill.

323.     In the Grand Staircase-Escalante Proclamation, likely qualifying items include Dance Hall Rock, Twentymile Wash Dinosaur Megatrackway, and Grosvenor Arch.

324.     For a variety of reasons, these nine items may satisfy the demanding terms of the Act in ways that other listed items do not.

325.     But the Act's Reservation Provision makes clear that a reservation "shall" be confined to the "smallest area compatible with the proper care and management" of any qualifying national monument. 54 U.S.C. §320301(b).

326.     This Reservation Provision imposes a "unique constraint." *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 980 (statement of Roberts, C.J.).

327.     And of course, the Reservation Provision's use of the term "shall" in reference to the "smallest area compatible" limitation means that the President has no discretion to disregard this constraint. "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020).

328.     The "smallest area compatible" for the proper care and management of any of the named qualifying items within the reservation ranges from a few acres to a few thousand acres. For the sorts of qualifying items that might be found within the reservations, the primary threat comes from direct human contact, which cannot be accomplished from more than a few feet away. If the federal government were to take steps to physically protect any qualifying item of the sort that might be found within the reservation, little more than a small enclosure or fences, together with appropriate public facilities, would be necessary. In more extreme circumstances, the creation of paved walkways, parking lots, and restrooms would probably be appropriate. But even in those cases, fifty acres of reserved land would typically be more than enough. And occasionally but rarely, a qualifying item of the sort that might be found within the reservations is big enough that a larger reservation of a few thousand acres may be necessary to encompass it.

329.     Activities that occur more than a few hundred yards away from any qualifying item are extremely unlikely to harm that item. Nor has the President provided any explanation of why or how activities occurring that far away from a qualifying item would pose any harm to it. A reservation

extending beyond those bounds would not be the smallest area compatible with the proper care and management of the qualifying item.

330.     The activities allowed in these areas before they became reservations were very unlikely to result in adverse effects to qualifying landmarks, structures, or objects because of the nature of those activities and because of preexisting regulatory requirements. Activities such as cattle grazing, firewood collection, and search-and-rescue efforts that are restricted by the reservations do not generate any more detrimental effects on any qualifying items than the flow of traffic and tourists. And the impacts of activities such as active management and resource extraction are avoided or mitigated through enforcement of existing regulatory requirements. They usually have no effects on landmarks, structures, or objects at all.

331.     When a traditional steward of the land turns soil or clears brush a few miles away from a historic landmark, it does not affect that landmark. When a search-and-rescue team uses its equipment to save a life in a field that is a mile from a unique formation of petroglyphs, it does not affect that formation. And when a cattle grazer fixes a fence half a mile away from a special ancient building, it does not affect that building.

332.     The federal government has recognized the harmless nature of these activities in other contexts. *See, e.g.*, 36 C.F.R. §800 Subpart C – Program Alternatives; "Appendix H: Undertakings Exempt from SHPO Consultation" in State Protocol Agreement between the Bureau of Land Mgmt. and the Utah State Historic Preservation Office (Jan. 2, 2020), bit.ly/3RaOVet.

333.     Existing legal protections also ensure that activities not adversely affect any qualifying landmarks, structures, or objects.

334.     Furthermore, many archaeological and paleontological resources are challenging for people to reach and can go untouched for centuries—at least until they are declared national monuments.

335. The President's reservation boundaries therefore must hew closely to any qualifying items within the reservations.

336. When other Presidents have declared monuments similar to those that arguably qualify within these areas, they have more closely adhered to the "smallest area compatible" limitation. For example, the areas reserved for several archaeological sites in the Southwest were as follows:

- For Navajo National Monument, which encompasses ancient cliff dwellings, 360 acres. *Navajo Nat'l Monument*, USGS, on.doi.gov/3ccrHF2.

- For Aztec Ruins National Monument, which encompasses Puebloan structures, 318 acres. *Aztec Ruins Nat'l Monument, New Mexico*, NPS, bit.ly/3PEInCK.

- For Montezuma Castle National Monument, which encompasses a five-story pre-Columbian structure, 859 acres. *Montezuma Castle*, NPS, bit.ly/3AzT5WW.

- For Hovenweep National Monument, which encompasses six groups of Ancestral Puebloan villages, 784 acres. *Hovenweep*, NPS, bit.ly/3AD1SaE.

337. Reservations of this size are more than sufficient to protect most potentially qualifying items. They allow for fences or enclosures around the items to prevent direct human contact as well as parking lots, paved walkways, and restrooms if appropriate.

338. Although these past reservations were generously proportioned and may not fully adhere to the terms of the Act, they represent a model that President Biden could have followed here. But each of President Bidens' reservations is more than *1,000* times larger than even the largest of these reservations.

339. President Biden's reservations are not confined to the smallest area compatible for the proper care and management of likely qualifying items within them.

340. Under an appropriate analysis, almost all of the land encompassed by President Biden's vast landscape reservations does not fit within the terms of the Act.

80

341.    Specifically, in the Bears Ears area, a reservation of approximately 40 acres would be more than sufficient for Newspaper Rock and San Juan Hill because that would allow for an enclosure that protected against threats to those items and would allow for a small parking lot, paved walkway, and restrooms if appropriate. Activity beyond that area would not harm those items. Similarly, a reservation of approximately 160 acres would be more than sufficient for Doll House and Moon House because that would allow for an enclosure that protected against threats to those items and would allow for a small parking lot, paved walkway, and restrooms if appropriate. Activity beyond that area would not harm those items.

342.    Meanwhile, a reservation of approximately 2,000 acres would be more than sufficient for the Bears Ears Buttes because that would allow for measures preventing activities that might affect the Buttes themselves. Similarly, a reservation of approximately 2,000 acres would be more than sufficient for the Butler Wash Village because that would allow for an enclosure that protected against threats to it and would allow for a small parking lot, paved walkway, and restrooms if appropriate. Activity beyond those areas would not harm those items.

343.    In the Grand Staircase-Escalante area, a reservation of 40 acres would be more than sufficient for Dance Hall Rock and Grosvenor Arch because that would allow for an enclosure that protected against threats to those items and would allow for a small parking lot, paved walkway, and restrooms if appropriate. Activity beyond that area would not harm those items. Meanwhile, a reservation of approximately 2,000 acres would be more than sufficient for the Twentymile Wash Dinosaur Megatrackway because that would allow for an enclosure that protected against threats to it and would allow for a small parking lot, paved walkway, and restrooms if appropriate. Activity beyond that area would not harm it.

344.     The maps below demonstrate how those reservations, tethered to the specific items that may likely qualify for protection under the Act, compare to the vast extent of President Biden's reservations.

345.     They represent reservation sizes estimated approximately in accordance with the principles for proper care and management described above.

346.     The maps show that the area eligible for reservation under the Act takes up less than 1% of the total area reserved by President Biden. In fact, these maps' representations of lawful reservations are slightly larger than scale because accurate representations of lawful reservations would be practically invisible when compared to the current reservations.

347.     The maps demonstrate that vast expanses of terrain are not justified by any likely qualifying items or by their proper care and management. Because the President's reservations cover these enormous areas without legal authority, they are not authorized by the Act and are unlawful.





348.     To the extent that other qualifying landmarks, structures, or objects, if any, are found to exist within the reservation boundaries, President Biden's reservations also go well beyond the "smallest area compatible" with their proper care and management.

349.     Importantly, the President has failed to show that qualifying items exist within vast and extensive portions of the current reservations. In fact, the federal government does not know what potentially designable items are within about 90 percent of the reservations. Any comprehensive science-based approach to modeling the cultural and historical resources throughout the monuments is in an embryonic stage. Vast areas within the monuments have never been inspected by on-the-ground resources inventories. As of March 2022, less than 10% of the area within the reservations had been physically inventoried by archaeologists. The areas not inventoried within the reservations constitute 2,972,551 acres, or 15 percent more than the land areas of Delaware and Rhode Island combined. As a result, little is known about the distribution, densities, and types of items within them. Any scientific modeling using current data would be speculative and subject to inaccuracies. The data sets derived from previous resources inventories within the monument boundaries are small, biased, project-based, and in many cases inadequate.

350.     The federal government cannot care for or manage what it does not understand and has not located, and the President cannot claim that parcels of land the size of small nations are necessary to the protection of monuments based on sheer speculation.

351.     In any event, if additional qualifying items do exist within the reservations, the current boundaries are not necessary for their proper care and management. For the reasons described above, activities in these areas are compatible with whatever few additional qualifying items might be found to exist within them, and any boundaries around those items would need to hew closely to the size of the items themselves, which would usually mean individual reservations of 160 acres or less.

352. Finally, any such qualifying landmarks, structures, or objects were less vulnerable to damage, theft or desecration *before* the reservations than after their public declarations as national monuments.

353. The reservations bring greater visitation and potential damage to every item enumerated in the proclamations because they turn a previously remote, quiet, and unvisited region into a tourist magnet, where visitors trample on or corrode or vandalize these items, litterers harm them, and federal agents prevent traditional stewards from taking care of them. For example, introducing thousands of unsupervised visitors into an area containing archaeological resources, both inventoried and not inventoried, that are incapable of being physically protected, will result in large amounts of irreparable resource damage and desecration.

354. The vast scale of the enlarged reservation boundaries itself renders the proper care and management of any plausibly qualifying landmarks, structures, or objects infeasible. The vast scale makes the reservations impossible for local rangers to patrol or protect. The oversized reservations are therefore antithetical to the proper care and management of any qualifying items.

355. A 1987 GAO Report analyzed the problems associated with protecting archaeological sites in the area and recognizes that it is virtually impossible to provide any type of physical protection to the cultural sites. GAO, Problems Protecting and Preserving Federal Archeological Resources, GAO/RCED-88-3 (Dec. 1987), bit.ly/3AbRt4i. The report concluded that the main obstacle to better protection was not a lack of legal restrictions, but a lack of funding and a lack of enforcement of existing laws. *Id.* at 37.

356. And the federal government is not providing any care or management in any event. The proclamations instead draw attention and visitors to archaeological and paleontological sites without providing for physical protection. The notion that the reservation is necessary for the proper care and management of any qualifying landmarks, structures, or objects is belied by the federal

government's own actions and inactions, and by the visible harm done to sites within the reservations as a result of the proclamations and the resultant notoriety.

357.    To the extent that the reservations rely on the validity of President Trump's, Obama's, or Clinton's descriptions of items within them, or on their descriptions of the care and management required to protect those items, they fail as to those items for substantially the same reasons. Every President's proclamations must comply with the Act. All acres encompassed by the current reservation boundaries are unlawfully designated regardless of whether those lands were covered by any pre-2021 reservations.

## C. Other legal considerations undermine President Biden's view that the Act provides unlimited power to designate monuments and reserve land.

358.    A broader reading of the Antiquities Act would implicate the non-delegation doctrine.

359.    It would convey to the President the power to displace the multiple-use principle established by Congress on practically all public land. All public land has notable features, natural beauty, wildlife and habitat, or historical significance.

360.    The non-delegation doctrine has particular force here, where the Property Clause specifically assigns power over federal lands to Congress. *See* Art. IV, §3 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). A broad reading of the Act such as that employed by President Biden would unlawfully transfer Congress's power to make *all* needful rules and regulations concerning federal property to the President.

361.    Constitutional avoidance therefore counsels a narrower interpretation.

362.    Past Antiquities Act cases are inapposite.

363.    *Utah Association of Counties v. Bush* and similar cases deferred to the President's discretion in reviewing Monument proclamations. 316 F. Supp. 2d 1172, 1186 (D. Utah 2004). That

is legal error. The Act does not confer unfettered discretion on the President, but instead "places discernible limits on the President's discretion." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). It includes specific statutory conditions and strict limitations that restrict the President's authority under the Act. As Chief Justice Roberts recently confirmed, courts must independently interpret the Act to decide (1) "[t]he scope of the objects that can be designated under the Act" and (2) "how to measure the area necessary for their proper care and management." *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (statement of Roberts, C.J.). In short, merely proclaiming—as President Biden has—that an area satisfies the statutory conditions does not make it true.

364. Two Supreme Court cases touching on the Act have involved more reasonable reservations, arose in different contexts, and have not committed to an open-ended approach that would allow landscape-scale reservations.

365. *Cameron v. United States* barely addressed the issue of the limits of the President's power under the Act. 252 U.S. 450, 455-56 (1920). It arose in the era when it was of little consequence whether a President could withdraw land under the Act because a parallel doctrine, articulated by the Supreme Court in 1915, authorized Presidents to withdraw lands generally for the public interest without statutory authorization. *Midwest Oil Co.*, 236 U.S. 459. Congress invalidated that doctrine when it enacted FLPMA. *Federal Land Policy and Management Act of 1976*, §704(a), 90 Stat. 2792 (1976) ("the implied authority of the President to make withdrawals and reservations resulting from the acquiescence of Congress (*U.S. v. Midwest Oil Co.*, 236 U.S. 459) [is] repealed"). But while it remained in effect, this doctrine made litigation over the scope of the Act practically a moot question in every case. If any litigant were ever successful in establishing that a reservation was beyond the scope of the Act, then the President could simply justify the same reservation under the *Midwest Oil* doctrine. That may explain why the parties hardly addressed the Act in their briefing in *Cameron*. Getches, *supra*, at

303. *Cameron* nonetheless required natural objects to be preeminent and unique to qualify for declarations under the Act. 252 U.S. at 455-56.

366.     Congress's repudiation of the *Midwest Oil* doctrine is significant for another reason. In repealing the *Midwest Oil* doctrine, Congress rejected the notion that the President has a general withdrawal authority and instead reemphasized the specific textual limits on a President's authority to reserve federal land. An expansive interpretation of the Antiquities Act that essentially allows the President a generalized and unlimited authority to reserve vast swaths of land so long as something located upon those lands is deemed to be of historic or scientific import essentially restores a power that Congress expressly removed from the President.

367.     Second, *Cappaert v. United States* briefly underscored the importance of the smallest-area-compatible provision. 426 U.S. 128, 141-42 (1976). It focused on the Act's employment for the protection of a pool containing the desert hole pup fish, which were endemic to a single cave in the desert and considered to be the rarest fish in the world—in contrast to common species such as skunks, porcupine, elk, and deer not within the contemplation of the Act. And it emphasized that the Act authorized protection only "to the extent necessary to preserve its scientific interest," which meant a small area surrounding the pool that contained the pup fish. *Id.* at 141. The Court confirmed in a later case that the district court in *Cappaert* acted appropriately in "tailor[ing] its injunction" protecting the monument to the "minimal" scope required. *United States v. New Mexico*, 438 U.S. 696, 700 n.4 (1978).

368.     Scholars have concluded that the Antiquities Act "has never been subjected to a thoughtful test of the limits of the authority it delegates to the President." Pendley, *Grand Staircase-Escalante National Monument: Protection of Antiquities or Preservationist Assault?*, 10 Utah B.J. 8, 15 (1997).

369.     That helps to explain why Chief Justice Roberts has now called for careful judicial attention to that question. *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (statement of Roberts, C.J.).

## CLAIMS FOR RELIEF

### Count I
### Lack of Statutory Authority Under Antiquities Act
### (Bears Ears)

370.    Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations.

371.    *Ultra vires* review is available to Plaintiffs contending that the President has exceeded his authority under the Antiquities Act so as "to ensure" that "the President has not exceeded his statutory authority." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

372.    A declaration made under the Act must be confined to "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and a reservation of land must be limited to those "parcels of land" that are "confined to the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. §320301(a)-(b).

373.    President Biden's proclamation establishing Bears Ears National Monument exceeds his authority under the Act because it is not confined to qualifying historic landmarks, historic and prehistoric structures, or other objects of historic or scientific interest.

374.    President Biden's reservation of land for Bears Ears National Monument exceeds his authority under the Act because it is not confined to the smallest area compatible with the proper care and management of the objects to be protected.

375.    To the extent that the reservation relies on the validity of President Obama's or Trump's descriptions of items within it, or on their descriptions of the care and management required to protect those items, it fails as to those items for substantially the same reasons. Every President's proclamations must comply with the Act. All acres encompassed by the current monument boundaries are unlawfully designated regardless of whether those lands were covered by any pre-2021 reservations.

376.     The President lacks the power to declare a reservation that covers the affected area. The President's discretion to designate objects and reserve parcels of land that qualify under the Act gives him no authority to designate objects and reserve parcels of land that do not qualify.

**Count II**
**Lack of Statutory Authority Under Antiquities Act**
**(Grand Staircase-Escalante)**

377.     Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations.

378.     *Ultra vires* review is available to Plaintiffs contending that the President has exceeded his authority under the Antiquities Act so as "to ensure" that "the President has not exceeded his statutory authority." *Mountain States Legal Found.*, 306 F.3d at 1136.

379.     A reservation made under the Act must be confined to "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and a reservation of land must be limited to those "parcels of land" that are "confined to the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. §320301(a)-(b).

380.     President Biden's proclamation designating Grand Staircase-Escalante National Monument exceeds his authority under the Act because it is not confined to qualifying historic landmarks, historic and prehistoric structures, or other objects of historic or scientific interest.

381.     President Biden's reservation of land for Grand Staircase-Escalante National Monument exceeds his authority under the Act because it is not confined to the smallest area compatible with the proper care and management of the objects to be protected.

382.     To the extent that the reservation relies on the validity of President Clinton's or Trump's descriptions of items within it, or on their descriptions of the care and management required to protect those items, it fails as to those items for substantially the same reasons. Every President's proclamations must comply with the Act. All acres encompassed by the current monument boundaries

are unlawfully designated regardless of whether those lands were covered by any pre-2021 reservations.

383.    The President lacks the power to declare a reservation that covers the affected area. The President's discretion to designate objects and reserve parcels of land that qualify under the Act gives him no authority to designate objects and reserve parcels of land that do not qualify.

**Count III**
**Violation of the Administrative Procedure Act, 5 U.S.C. §701 et seq.**
**by Agency Defendants**
**(Bears Ears)**

384.    Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations.

385.    The Bears Ears proclamation purports to delegate authority to the Agency Defendants, including the Department of Interior, the Department of Agriculture, the U.S. Forest Service, and the Bureau of Land Management and agency leaders, to make policy for the monument reservation, including policy prohibiting or impeding certain uses of those lands by Plaintiffs.

386.    Pursuant to the proclamations, the Bureau of Land Management, in conjunction with other agencies, issued an interim management plan in December 2021. That December 2021 management plan is final agency action, determining rights and obligations and from which legal consequences will flow regarding Plaintiffs' restricted use the reserved lands.

387.    For example, the December 2021 management plan decides that "no new mining claims may be located, and no new mineral leases may be issued, on lands within the monument." *See Interim Management of the Bears Ears National Monument* 2, Dep't of Int. (Dec. 16, 2021), perma.cc/8WU9-MMH9.

388.    Plaintiffs have been harmed by these agency actions. They restrain Plaintiffs' use of the land, cut off potential revenue, and impede other projects.

389.     This dispute about the lawfulness of the agency action is ripe. Whether the Agency Defendants may claim any authority under the proclamation is fit for judicial decision, and Plaintiffs will suffer hardship without this Court's decision on that question.

390.     The Antiquities Act does not permit the Bears Ears proclamation. But, pointing to that proclamation's delegation of authority, the Agency Defendants have taken actions to carry out the proclamations. Because the proclamations are themselves contrary to law, these agency actions of the Agency Defendants are likewise contrary to law and in excess of the agency's statutory authority. 5 U.S.C. §706(2)(A), (C).

391.     Under the Administrative Procedure Act, the Court should set aside agency actions already undertaken as part of implementing the proclamations, and enjoin the Defendants from taking any further action to carry out these illegal decrees. 5 U.S.C. §706.

**Count IV**
**Violation of the Administrative Procedure Act, 5 U.S.C. §701 *et seq.*,**
**by Agency Defendants**
**(Grand Staircase-Escalante)**

392.     Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations.

393.     The Grand Staircase-Escalante proclamation purports to delegate authority to the Agency Defendants, including the Department of Interior, the Department of Agriculture, the U.S. Forest Service, and the Bureau of Land Management and agency leaders, to make policy for the monument reservation, including policy prohibiting or impeding certain uses of those lands by Plaintiffs.

394.     Pursuant to the proclamation, the Bureau of Land Management, in conjunction with other agencies, issued an interim management plan in December 2021. That December 2021 management plan is final agency action, determining rights and obligations and from which legal consequences will flow regarding Plaintiffs' restricted use the reserved monument lands.

395.    For example, the December 2021 management plan decides that "no new mining claims may be located, and no new mineral leases may be issued, on lands within the monument." *Interim Management of the Grand Staircase-Escalante National Monument*, Dep't of Int. (Dec. 16, 2021), bit.ly/3kKb9bg.

396.    Plaintiffs have been harmed by these agency actions. They restrain Plaintiffs' use of the land, cut off potential revenue, and impede other projects.

397.    This dispute about the lawfulness of the agency action is ripe. Whether the Agency Defendants may claim any authority under the proclamation is fit for judicial decision, and Plaintiffs will suffer hardship without this Court's decision on that question.

398.    The Antiquities Act does not permit the Grant Staircase-Escalante proclamation. But, pointing to that proclamation's delegation of authority, the Agency Defendants have taken actions to carry out the proclamation. Because the proclamation is itself contrary to law, these agency actions of the Agency Defendants are likewise contrary to law and in excess of the agency's statutory authority. 5 U.S.C. §706(2)(A), (C).

399.    Under the Administrative Procedure Act, the Court should set aside agency actions already undertaken as part of implementing the proclamations, and enjoin the Defendants from taking any further action to carry out these illegal decrees. 5 U.S.C. §706.

**PRAYER FOR RELIEF**

Plaintiffs respectfully ask the Court to:

1. Declare that President Biden's October 8, 2021 Proclamation on Grand Staircase-Escalante National Monument is unlawful, *ultra vires*, contrary to law, and exceeds the President's authority under the Antiquities Act in part or in full;

2. Declare that any agency action taken pursuant to President Biden's October 8, 2021 Proclamation on Grand Staircase-Escalante National Monument is contrary to law and in excess of the agency's statutory authority;

3. Issue injunctive relief restraining Defendants and their successors from implementing or enforcing President Biden's October 8, 2021 Proclamation on Grand Staircase-Escalante National Monument, and the December 2021 management plan implementing it, in part or in full;

4. Declare that President Biden's October 8, 2021 Proclamation on Bears Ears National Monument is unlawful, *ultra vires*, contrary to law, and exceeds the President's authority under the Antiquities Act in part or in full;

5. Declare that any agency action taken pursuant to President Biden's October 8, 2021 Proclamation on Bears Ears National Monument is contrary to law and in excess of the agency's statutory authority;

6. Issue injunctive relief restraining Defendants and their successors from implementing or enforcing President Biden's October 8, 2021 Proclamation on Bears Ears National Monument, and the December 2021 management plan implementing it, in part or in full;

7. Award Plaintiff fees and costs under 28 U.S.C. §2412; and

8. Grant such other relief as the Court deems just and proper.

Dated: January 26, 2023

Respectfully submitted,

/s/ *Tyler R. Green*

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Taylor A.R. Meehan*
Jeffrey S. Hetzel*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
703.243.9423
taylor@consovoymccarthy.com
jhetzel@consovoymccarthy.com

*Pro Hac Vice*

*Counsel for Plaintiffs*

/s/ *Melissa Holyoak*

SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK
  Utah Solicitor General
ANTHONY L. RAMPTON
  Assistant Utah Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2023, I caused the foregoing document to be filed with the

Clerk of the Court using the Court's CM/ECF system, and service was thereby effected electronically

to all counsel of record.

Dated: January 26, 2023

/s/*Melissa Holyoak*
SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK
  Utah Solicitor General
ANTHONY L. RAMPTON
  Assistant Utah Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*