Matthew Campbell*
Jason Searle*
Allison A. Neswood*
NATIVE AMERICAN RIGHTS FUND
1506 Broadway, Boulder CO 80302
Phone number (303) 447-8760
mcampbell@narf.org
searle@narf.org
neswood@narf.org
Counsel for Hopi Tribe, Pueblo
of Zuni, and Ute Mountain Ute Tribe

Paul Spruhan*
Sage Metoxen*
Louis Mallette*
Daniel Moquin UT No. 7585
NAVAJO NATION DEPARTMENT OF
JUSTICE
PO Box 2010, Window Rock AZ 86515
Phone number (928) 871-6210
paspruhan@nndoj.org
smetoxen@nndoj.org
lmallette@nndoj.org
dmoquin@nndoj.org
Counsel for Navajo Nation

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; and THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES;<br>Plaintiffs,<br><br>ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS;<br>Consolidated Pls.,<br>v.<br><br>JOSEPH R. BIDEN, JR. in his official Capacity as President of the United States; et al.:<br>Defendants,<br><br>HOPI TRIBE, NAVAJO NATION, PUEBLO OF ZUNI AND UTE MOUNTAIN UTE TRIBE;<br>Intervenor-Defs. | **HOPI TRIBE, NAVAJO NATION, PUEBLO OF ZUNI, AND UTE MOUNTAIN UTE TRIBE MOTION TO DISMISS**<br><br>Lead Case No. 4:22-cv-00059-DN-PK<br>Member Case No. 4:22-cv-00060-DN<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

# TABLE OF CONTENTS

I.      Introduction. ............................................................................................... 1

II.      Factual Background. .................................................................................... 2

     A.      Importance of Bears Ears to the Tribal Nations ................................... 2

     B.      History of Bears Ears National Monument. ....................................... 11

III.      Standard of Review .................................................................................. 13

IV.      Argument. ................................................................................................ 14

     A.      Review Under the Antiquities Act is Limited. .................................. 14

     B.      Plaintiffs fail to establish Article III standing to challenge the Biden Bears Ears Proclamation. ................................................................................... 15

         i.      Plaintiffs fail to establish injury to any legally-protected interest. .................. 16

             1.      County-Plaintiffs fail to establish injury, as Bears Ears falls beyond their jurisdictional boundaries. ....................................... 16

             2.      All Plaintiffs fail to establish injury to the extent they rely on alleged harms to others or general allegations that the proclamation is illegal. .... 18

         ii.      Plaintiffs fail to establish causation and redressability. .................................... 20

             1.      Plaintiffs fail to establish that the Biden Bears Ears Proclamation caused the alleged harms. ......................................... 20

             2.      Plaintiffs fail to establish redressability, as the prior proclamations maintain the legal status and alleged visitation threats. .............................. 21

     C.      The Court should dismiss Plaintiffs' APA claims pursuant to Fed. R. Civ. P. 12(b)(1), as Plaintiffs fail to identify final agency action. ..................................... 24

         i.      BLM's Interim Guidance does not mark the consummation of BLM's and USFS's decisionmaking process. ........................................... 24

         ii.      BLM's Interim Guidance does not create legal consequences. ......................... 27

     D.      The Plaintiffs have Failed to State a Claim. .............................................. 30

         i.      The President Did Not Abuse His Discretion. ..................................... 31

         ii.      The President Need Only "Declare" National Monuments. ............................... 32

         iii.      The President Properly Protected Historic Landmarks, Historic and Prehistoric Structures, and Other Objects of Historic or Scientific Interest. ... 34

i

1. The Plaintiffs' View of What the President Can Protect is Improperly Narrow..................................................................................... 34

2. The Bears Ears Landscape is an Appropriate Object Under the Antiquities Act. ........................................................................................................ 39

3. Dictionary Definitions of Historic in 1906 Were Broad............................... 40

4. The Definition of Landmark in 1906. .......................................................... 41

iv. Overlapping Statutory Protections Do Not Make the Monuments Invalid.... 42

v. The President Has Broad Discretion to Reserve Land..................................... 42

V.    Conclusion .......................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967) ..................................................................................... 27

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982) ..................................................................................... 19

*Anderson v. Suiters*,
   499 F.3d 1228 (10th Cir. 2007)..................................................................... 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................. 13, 14, 29, 34

*Barrick Goldstrike Mines Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) ....................................................................... 28

*Bd. of Cnty. Commisioners of Sweetwater Cnty. v. Geringer*,
   297 F.3d 1108 (10th Cir. 2002)..................................................................... 18

*Bear Lodge Multiple Use Ass'n v. Babbitt*,
   175 F.3d 814 (10th Cir. 1999)......................................................................... 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 15

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................................... 24

*Buhendwa v. Reg'l Transportation Dist.*,
   82 F. Supp. 3d 1259 (D. Colo. 2015) ............................................................. 4

*C.C. v. California  Physicians' Serv.*,
   No. 4:21-CV-00010-DN-PK, 2021 WL 3207853 (D. Utah July 29, 2021)............... 4

*Cameron v. United States*,
   252 U.S. 450 (1920) ..................................................................................... 35

*Cappaert v. United States,*
426 U.S. 128 (1976) ................................................................................................ 35, 36

*Carcieri v. Salazar,*
555 U.S. 379 (2009) ........................................................................................ 33, 40, 41

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ........................................................................................................ 17

*Colorado Farm Bureau Fed'n v. U.S. Forest Serv.,*
220 F.3d 1171 (10th Cir. 2000) .................................................................................. 24

*Colorado Outfitters Ass'n v. Hickenlooper,*
823 F.3d 537 (10th Cir. 2016) .................................................................................... 15

*Consolidation Coal Co. v. Dir., Off. of Workers' Comp. Programs,*
864 F.3d 1142 (10th Cir. 2017) ............................................................................ 32, 39

*Ctr. For Native Ecosystems v. Cables,*
509 F.3d 1310 (10th Cir. 2007) .................................................................................. 24

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008) .................................................................................................... 15

*Doe by & through Doe v. Hunter,*
796 F. App'x 532 (10th Cir. 2019) ............................................................................. 18

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ........................................................................................ 24, 25, 30

*Khalik v. United Air Lines,*
671 F.3d 1188 (10th Cir. 2012) ............................................................................ 30, 31

*Kleppe v. New Mexico,*
426 U.S. 529 (1976) .................................................................................................... 31

*Living Rivers v. Hoffman,*
544 F. Supp. 3d 1218 (D. Utah 2021) .................................................................. 13, 23

*Lorillard v. Pons,*
434 U.S. 575 (1978) ................................................................................................ 32, 39

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................................................. *passim*

*McGirt v. Oklahoma,*
140 S. Ct. 2452 (2020) ................................................................................................ 44

*Meyers By & Through Meyers v. Bd. of Educ. of San Juan Sch. Dist.,*
905 F. Supp._1544 (D. Utah 1995) ............................................................................... 7

*Moses-El v. City & Cnty. of Denver,*
No. 20-1102, 2022 WL 1741944 (10th Cir. May 31, 2022) ..................................... 29

*Mountain States Legal Found. v. Bush,*
306 F.3d 1132 (D.C. Cir. 2002) ............................................................. 14, 15, 31, 35

*Muscogee (Creek) Nation v. Oklahoma Tax Comm'n,*
611 F.3d 1222 (10th Cir. 2010) .................................................................................. 15

*Nat. Arch & Bridge Soc'y v. Alston,*
209 F. Supp. 2d 1207 (D. Utah 2002) .......................................................................... 5

*Navajo Nation v. U.S. Forest Serv.,*
408 F. Supp. 2d 866 (D. Ariz. 2006) ............................................................................ 5

*Navajo Nation v. U.S. Forest Serv.,*
   479 F.3d 1024 (9th Cir. 2007)................................................................................. 5
*S. Utah Wilderness All. v. Palma,*
   707 F.3d 1143 (10th Cir. 2013)............................................................................. 27
*S. Utah Wilderness All. v. U.S. Dep't of the Interior,*
   No. 2:19-CV-00297-DBB, 2021 WL 1222158 (D. Utah Mar. 31, 2021).............................. 24
*Sierra Club v. Morton,*
   405 U.S. 727 (1972)............................................................................................. 19
*Smith v. LifeVantage Corp.,*
   429 F. Supp. 3d 1275 (D. Utah 2019) ............................................................... 13, 17
*State ex rel. Sullivan v. Lujan,*
   969 F.2d 877 (10th Cir. 1992)............................................................................... 19
*State of Utah v. Babbitt,*
   137 F.3d 1193 (10th Cir. 1998)........................................................................ 15, 16
*State of Wyoming v. Franke,*
   58 F. Supp. 890 (D. Wyo. 1945) .................................................................. 35, 36, 43
*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ........................................................................................ 18
*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ............................................................................ 14, 33, 44
*Tulare Cnty. v. Bush,*
   306 F.3d 1138 (D.C. Cir. 2002) ..................................................................... *passim*
*United States v. Mobley,*
   971 F.3d 1187 (10th Cir. 2020) .................................................................. 33, 40, 41
*United States v. West,*
   671 F.3d 1195 (10th Cir. 2012) ............................................................................ 36
*Utah Ass'n of Cntys. v. Bush,*
   316 F. Supp. 2d 1172 (D. Utah 2004) ............................................................. *passim*
*Wildearth Guardians v. Pub. Serv. Co. of Colorado,*
   698 F. Supp. 2d 1259 (D. Colo. 2010) .................................................................... 14
*Zuni Tribe of New Mexico v. U.S.,*
   12 Cl. Ct. 607 (1987)........................................................................................ 5, 6

**Statutes**

5 U.S.C. 704...................................................................................................... 24
5 U.S.C.A. § 553 (West) S 5.................................................................................. 27
54 U.S.C. §  320301(b)........................................................................................ 43
54 U.S.C. § 320301(a) ............................................................................... 32, 36, 38
54 U.S.C. § 320301(d) .................................................................................... 32, 39
54 U.S.C.A. § 320301........................................................................................... 14
54 U.S.C.A. §§ 320301(a), (b), (c) (West) ............................................................... 15

**Rules**

iv

Fed. R. Civ. P. 12(b)(1)............................................................................................. 13, 24
Fed. R. of Civ. P. 12(b)........................................................................................................ 1
Fed. R. of Civ. P. 12(b)(6) ................................................................................................ 13, 14

**Other Authorities**

Proclamation No. 9558, (Dec. 28, 2016)……………………………………………… *passim*
Proclamation No. 10285,  (Oct. 8 2021)…....………………………………………… *passim*

**Motion**

The Hopi Tribe, Navajo Nation, Pueblo of Zuni, and Ute Mountain Ute Tribe ("Tribal Nations") respectfully move the Court to dismiss these consolidated cases pursuant to Federal Rules of Civil Procedure 12(b).

**Memorandum in Support**

## I.    Introduction.

Ever since the Congress that enacted the Antiquities Act documented the need to protect the Bears Ears region more than a century ago, there have been efforts to do so. It was not until five Tribal Nations came together in 2010 to advocate for its protection that the Bears Ears National Monument became a reality. Each of the Tribal Nations have cultural, religious, and historic connections to the Bears Ears region. Whether those ties are to the sacred towering spires in the Valley of the Gods, the ancient migration routes throughout the region, the ceremonial sites that are still utilized to this day, or the many historic and cultural items that have been left behind by their ancestors, Bears Ears is a traditional and historic homeland for each of the Tribal Nations. As documented extensively in President Biden's Bears Ears Proclamation, the Tribal Nations' historic and cultural connections run throughout Bears Ears, necessitating the protection of the entire region.

In an attempt to shift the pleading burden onto the President, the Plaintiffs seek to sidestep longstanding Supreme Court case law upholding the President's broad

1

discretion to create national monuments. Many of Plaintiffs' arguments have been previously rejected by this and other courts, and Plaintiffs' challenges fare no better here. Moreover, Plaintiffs lack standing such that this court need not reach the merits of many of their claims. Even were the court to reach the merits, the Plaintiffs' claims fail.

Binding precedent has held for decades that the Antiquities Act grants broad discretion to the President to protect objects of historic *or* scientific interest. Plaintiffs' allegations that President Biden's Proclamations are faulty are therefore without merit. And Plaintiffs' attempt to implant new statutory requirements onto the Antiquities Act should also be rejected. President Biden's Proclamations establishing Bears Ears and Grand Staircase Escalante National Monuments may be the most detailed proclamations by any president. The Proclamations comport with the statutory text, and Plaintiffs' searching inquiry would be inconsistent with the broad deference accorded to the President by Congress.

President Biden's Bears Ears Proclamation is consistent with the Antiquities Act, and the original Congress' understanding of the Antiquities Act. Therefore, the Tribal Nations respectfully request that the Court dismiss the Plaintiffs' claims.

## II.   Factual Background.

### A.  Importance of Bears Ears to the Tribal Nations.

The importance of the Bears Ears region to the Tribal Nations and their members cannot be overstated. The opening sentences of President Obama's

Proclamation first establishing the Bears Ears National Monument ("Bears Ears")

describe a landscape that is so ancient and unique it has no parallel:

> Rising from the center of the southeastern Utah landscape and visible
> from every direction are twin buttes so distinctive that in each of the
> native languages of the region their name is the same: Hoon'Naqvut,
> Shash Jáa, Kwiyagatu Nukavachi, Ansh An Lashokdiwe, or "Bears Ears."[1]

Bears Ears has been the Tribal Nations' homeland since time immemorial and continues

to be sacred land.[2] The Tribal Nations' connection to the Bears Ears region is described

in great detail in both the Biden and Obama Proclamations.

Within Bears Ears as established by President Biden, there is a "unique density of

significant cultural, historical, and archaeological artifacts spanning thousands of

years[.]"[3] This includes "ancient cliff dwellings, large villages, granaries, kivas, towers,

ceremonial sites, [and] prehistoric steps cut into cliff faces[.]"[4] For example, Grand

Gulch, which the Plaintiffs maintain is a place not worthy of protection,[5] is "replete

with thousands of cliff dwellings and rock writing sites," and it "likely contains the

highest concentration of Ancestral Pueblo sites on the Colorado Plateau."[6] Grand Gulch

---

[1] Proclamation No. 9558, (Dec. 28, 2016) Establishment of the Bears Ears National Monument, 82 FR 1139 ("Obama Proclamation").

[2] Proclamation No. 10285,  (Oct. 8 2021) Bears Ears National Monument, 86 FR 57321 ("Biden Bears Ears Proclamation").

[3] *Id.*

[4] *Id.*

[5] Pls. Am. Compl. at 77, ECF No. 91 (identifying locations eligible for protection according to Plaintiffs).

[6] Biden Bears Ears Proclamation at 57329.

is so important that the Grand Gulch Archaeological District "was placed on the

National Register of Historic Places in 1982."[7]

The Biden Proclamation identifies many kivas throughout Bears Ears.[8] For

example, within Kane Gulch, a tributary to Grand Gulch, there is "a well preserved

Perfect Kiva."[9]  While the kivas identified in the proclamation are historic, kivas are also

important religious structures used for religious ceremonies still conducted today by

the Hopi and Zuni.[10] Kivas are "entered by a ladder from the roof down to the center of

the kiva floor. During ceremonies today, the ritual emergence of participants from the

kiva into the plaza above represents the original emergence by Puebloan groups from

the underworld into the current world."[11] As one court noted, the "kivas are the focal

---

[7] Grand Gulch Instant Study Area Complex, Bureau of Land Management, https://www.blm.gov/site-page/programs-national-conservation-lands-utah-grand-gultch-isa-complex; *Buhendwa v. Reg'l Transportation Dist.*, 82 F. Supp. 3d 1259, 1262, n.1 (D. Colo. 2015) (court may take judicial notice of contents on agency's website); *C.C. v. California Physicians' Serv.*, No. 4:21-CV-00010-DN-PK, 2021 WL 3207853, at *2 (D. Utah July 29, 2021) (taking judicial notice of agency website).

[8] *See generally* Biden Bears Ears Proclamation.

[9] Biden Bears Ears at 57329; *see also* Grand Gulch Map, Bureau of Land Management, https://www.blm.gov/sites/blm.gov/files/uploads/BLMUtahGrandGulch.pdf (map of Grand Gulch, with Perfect Kiva identified).

[10] NPS Museum Collections of Chaco Culture, National Park Service, https://www.nps.gov/museum/exhibits/chcu/slideshow/kivas/kivasintro.html (noting "Kiva" is a Hopi word).

[11] *Id*; *See also* Artifact Gallery - Kiva, National Park Service, https://www.nps.gov/meve/learn/education/artifactgallery_kiva.htm. ("Much like the biblical story of Noah's Ark, Hopis believe that the world before this one was destroyed, but a few chosen people were saved. Climbing a ladder up out of the smoky kiva and through the roof into the courtyard after ceremonies may have served as a powerful reminder of their movement from the world before.").

point of all religious activity in the Hopi Villages[.]"[12] Kivas are therefore immensely

important for religious, cultural, and historic purposes.

President Biden also identified "a prehistoric road system that connected the

people of Bears Ears to each other and possibly beyond."[13] The "Chacoan roads as well

as the handholds and steps carved into cliff faces" within Bears Ears were part of the

region's "migration system and are integral to the story of the Bears Ears landscape."[14]

The sites in the region may also provide "evidence of some of the furthest north

migration of Pueblo in the Mesa Verde region."[15]  These roads link together "remains of

single family dwellings, granaries, kivas, towers, and large villages" and reveal "a

complex cultural history."[16] Specifically, the ancient roads are tied to the Hopi and

Zuni, who are well known for their migration throughout the Bears Ears region.[17] The

Hopi and Zuni maintain traditional and historic stories about their migration that are

integrally related to their culture and religion, passed down from clan to clan.[18] These

---

[12] *Navajo Nation v. U.S. Forest Serv.*, 408 F. Supp. 2d 866, 894 (D. Ariz. 2006), *aff'd in part*, *rev'd in part and remanded*, 479 F.3d 1024 (9th Cir. 2007), *on reh'g en banc,* 535 F.3d 1058 (9th Cir. 2008), and *aff'd,* 535 F.3d 1058 (9th Cir. 2008).
[13] Biden Bears Ears Proclamation at 57321.
[14] *Id*. at 57327.
[15] *Id*. at 57324.
[16] Obama Proclamation at 1139.
[17] *Nat. Arch & Bridge Soc'y v. Alston*, 209 F. Supp. 2d 1207, 1211 (D. Utah 2002) (discussing Hopi migration through San Juan County); *see Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1041 (9th Cir. 2007), *on reh'g en banc, 535 F.3d 1058 (9th Cir. 2008)* (discussing the migrations).
[18] *Zuni Tribe of New Mexico v. U.S.*, 12 Cl. Ct. 607, 616 (1987) ("The ancient ties of Zuni people to their land is presently manifest in the tribal oral tradition about Zuni origin and migration and in the physical artifacts representing the archaeological history of Zuni culture."); Canyon Farmers, NPS History eLibrary,

migrations show how the entire landscape of Bears Ears is integrally related to the history of the Hopi and Zuni. President Biden properly recognized the importance of this region for the Hopi and Zuni and their history.

The Ute Mountain Ute also have profound historical connections to Bears Ears. The White Mesa community, just south of Blanding, Utah, is partially within and on the border of the Bears Ears National Monument.[19] "According to Ute tradition, the people of White Mesa came to the Four Corners area after the creation of the world."[20] The "people of White Mesa descend from a band of Southern Utes, the Weenuche."[21] Oral history from the Ute "describe[s] the historic presence of bison, antelope, and abundant bighorn sheep, which are also depicted in ancient rock art"[22] that was "left by the Ute[.]"[23]   The Obama Proclamation, which was referenced heavily and incorporated by the Biden Proclamation,[24] documented the many "ceremonial sites" within Bears Ears, and the Bear Dance remains among them.[25] The Bear Dance, one of the "most ancient and important Ute ceremonies,"[26] was historically conducted within the Bears Ears

---

http://npshistory.com/publications/nava/index.htm (describing the sacred migration paths of Hopi clans).

[19] Ute Mountain Ute, Utah Division of Indian Affairs, https://indian.utah.gov/ute-mountain-ute/.

[20] *Id.*

[21] *Id.*

[22] Obama Proclamation at 1142.

[23] *Id.* at 1139.

[24] *See generally* Biden Bears Ears Proclamation.

[25] Obama Proclamation, at 1139.

[26]  Lynda D. McNeil, *Ute Indian Bear Dance: Related Myths and Bear Glyphs*, 25 Am. Indian Rock Art Ass'n (AIRA) 133, 134 (1999).

region, and continues there to this day.[27] Reflecting "restoration," the Bear Dance usually takes place in the spring and is led by females choosing their dance partners.[28]

From the sacred towering spires in the Valley of the Gods, revered as ancient Navajo warriors frozen in stone, to the historic White Canyon region, known as "*Nahoniti'ino*" (hiding place), the lands protected by the Monument also hold special cultural and historic significance for the Navajo people.[29] The historic *Nahoniti'ino* was a place of refuge in the summer of 1864, where many Navajos escaped forced removal to Bosque Redondo and the harrowing Long Walk by hiding in what is now Bears Ears.[30] Bears Ears is also home to important figures in Navajo history, including Headman *K'aayélii* (who was born near the Bears Ears buttes), whose band eluded capture from the U.S. army by hiding in the canyons of the Monument, and Navajo Chief Manuelito (born in the Headwaters Region of Bears Ears), a key figure in the resistance against the Long Walk and signatory to the Treaty of 1868.[31] Until recently, the Navajo people continued to reside within the Monument's boundaries in traditional hogans. Now,

---

[27] *Photos: Utah Lt. Gov. Henderson Visits Towaoc Before Bear Dance*, The Journal (Sep. 2, 2022, 8:58pm), https://www.the-journal.com/articles/photos-utah-lt-gov-visits-towaoc-before-bear-dance/; *Ute Mountain Ute Tribe Visit and White Mesa Bear Dance*, September 2, 2022, Office of the Lieutenant Governor, https://officeofthelieutenantgovernor.pic-time.com/-utemountainutevisitandwhitemesabeardance9222/gallery.

[28] McNiel, *supra* note 26, at 135.

[29] Obama Proclamation at 1140.

[30] *Id*.; *see Meyers By & Through Meyers v. Bd. of Educ. of San Juan Sch. Dist.*, 905 F. Supp. 1544, 1551 n.1 (D. Utah 1995) (describing how many of the Navajo people were able to avoid the infamous "Long Walk" by hiding in mountains and canyons of San Juan County).

[31] *Id*.

Navajo people make extensive use of the Monument lands, where they camp, hunt for wild game, and forage for native plants as they have done since time immemorial. Navajo medicine people continue to harvest soils and medicinal plants within Bears Ears, exemplifying the Monument's inextricable ties to Navajo ceremonial practices, including songs, prayers, and healing ceremonies.

As can be seen, the cultural and historical importance of Bears Ears to the Tribal Nations "continues to this day."[32] The Tribal Nations' members still "come here for ceremonies and to visit sacred sites."[33] Many places within Bears Ears are tied to traditional and historic "stories of creation, danger, protection, and healing."[34] And members still hunt, fish, gather, cut wood, and collect medicinal and ceremonial plants, herbs, and materials within Bears Ears.[35]

In recognition of the historical and traditional "knowledge of Tribal Nations about these lands and objects,"[36] President Obama created a Bears Ears Commission consisting of elected representatives from each of the Tribal Nations to provide guidance and recommendations in the management of Bears Ears.[37] President Biden's Proclamation reestablished the Commission, recognizing that it would ensure management decisions affecting the monument reflect the

---

[32] Obama Proclamation at 1140.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] Biden Bears Ears Proclamation at 573332.
[37] Obama Proclamation at 1144.

essential knowledge of Tribal Nations.[38] By incorporating the Commission provisions under the Obama Proclamation,[39] the Biden Proclamation ensures that traditional knowledge and expertise will be centered in management and that the Tribal Nations will have a key role developing management plans.[40]

While there are many historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are identified in the Biden Bears Ears Proclamation, it is inappropriate to specifically identify many sacred places. Given the history of Native people being criminally punished for practicing their religions, they are particularly sensitive about providing such information to outsiders.[41] President Biden recognized as much, noting that many of the objects are "sacred to Tribal Nations, are sensitive, rare, or vulnerable to vandalism and theft, or are dangerous to visit and, therefore, revealing their specific names and locations could pose a danger to the objects or the public."[42]

Still, within each of the regions of Bears Ears, President Biden identified important objects of great historic and cultural significance to the Tribal Nations. Whether it is the Bears Ears Buttes, Indian Creek, Beef Basin, Blue Mountains,

---

[38] Biden Bears Ears Proclamation at 573332.

[39] *Id*.

[40] Obama Proclamation at 1144.

[41] *Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 817 (10th Cir. 1999) ("In 1892, Congress outlawed the practice of traditional Indian religious rituals on reservation land.").

[42] Biden Bears Ears Proclamation at 57322.

Cottonwood Canyon, Elk Ridge, Cedar Mesa, or Grand Gulch region, President Biden noted objects of historic and scientific interest to the Tribal Nations.[43] These places "facilitate the practice of traditions, and serve as a mnemonic device that elders use to teach younger generations where they came from, who they are, and how to live."[44]

Bears Ears and the resources found throughout it continue to serve integral roles in the development and practice of indigenous ceremonial and cultural lifeways. From dances and ceremonies held on these sacred lands, to the gathering of traditional foods and medicines, Bears Ears remains an essential landscape that members of Tribal Nations regularly visit to practice their spirituality, and connect with their history.[45] Given this history, detailed extensively in both the Biden and Obama Proclamations, the ancient sites within Bears Ears are worthy of protection under the Antiquities Act.

For context and to show how the Tribal Nations are connected to this place, below is a representational map of the Bears Ears region to the Native eye.[46]

---

[43] *Id*. at 57323-30 (identifying objects within each geographic subregion that hold cultural and historical significance to Tribal Nations).
[44] *Id*. at 57323.
[45] *Id*.
[46] The Region to the Native Eye, Bears Ears Coalition.
https://www.bearsearscoalition.org/the-region-to-the-native-eye/.



Map by Stephanie Smith

### B.  History of Bears Ears National Monument.

Efforts to protect Bears Ears span more than a century. In the House Report for the

Antiquities Act, Congress identified the Bluff District in Utah as containing "numerous

ruins[.]"[47] The "important relics of 'ancient basket makers'" were noted to be numerous

along "Montezuma Creek, Recapture Creek, Cottonwood Creek, Butler Wash, Comb

---

[47] H.R. Rep. No. 59-2224 at 5 (1906).

Wash, and Grand Gulch."[48] As early as 1904, advocates for protection of cultural landscapes "identified the Bears Ears region as one of seven areas in need of immediate protection."[49] Under the Plaintiffs' cramped view of the Antiquities Act, items and places specifically identified by the Congress that passed the Act would be ineligible for protection.[50] That construction of the Act cannot be reconciled with either the text of the Act or the legislative history demonstrating the intent behind it.

While there was a long history seeking to protect Bears Ears, the movement gained its full strength when the Tribal Nations came together in 2010. Though the Plaintiffs note that the Utah delegation worked to pass legislation through the Public Lands Initiative Act ("PLI") in 2016,[51] they fail to mention that the PLI would have unilaterally taken 100,000 acres of Uintah and Ouray reservation land from the Ute Indian Tribe and given it to the state of Utah.[52] As a result, the PLI never struck an appropriate balance. It was not until the Tribal Nations "united in a common vision to protect these sacred lands and requested permanent protection from President Obama that Bears Ears National Monument became a reality."[53]

---

[48] *Id*.

[49] Biden Bears Ears Proclamation at 57321.

[50] Pls. Am. Compl. at 77, ECF No. 91 (list of places to be protected, excluding Grand Gulch).

[51] Consol. Pls. Am. Compl. at 20, ECF No. 90.

[52] Utah Public Lands Initiative Act: Hearing on H.R. 5780 Before the Subcomm. on Fed. Lands of the Comm. On Nat. Res., 114th Congress 107 (2016) (statement of Ute Indian Tribe).

[53] Biden Bears Ears Proclamation at 57321.

### III.    Standard of Review.

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim if the court lacks subject matter jurisdiction.[54] The party invoking federal jurisdiction bears the burden to establish that the Court has jurisdiction,[55] including "that they have standing to sue."[56] Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."[57]

When a plaintiff seeks judicial review under the Administrative Procedure Act ("APA"), the plaintiff must also meet the standing requirements of the APA. "Plaintiffs must show there has been some 'final agency action' and must 'demonstrate that [their] claims fall within the zone of interests protected by the statute forming the basis of [their] claims.'"[58]

Under Rule 12(b)(6), courts must dismiss a complaint when it fails to state a claim upon which relief may be granted.[59] That is, "each cause of action must be supported by enough sufficient, well-pleaded facts to be plausible on its face."[60] While factual allegations are accepted as true, and reasonable inferences are drawn in a light most

---

[54] *Living Rivers v. Hoffman*, 544 F. Supp. 3d 1218, 1222-23 (D. Utah 2021).
[55] *Id*.
[56] *Id*.
[57] *Id*.
[58] *Id*.
[59] *Smith v. LifeVantage Corp.*, 429 F. Supp. 3d 1275, 1281-82 (D. Utah 2019) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009)).
[60] *Id*.

favorable to the plaintiff, "the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully."[61] Rather, the facts must "permit the court to infer more than the mere possibility of misconduct."[62]

Facts that are "subject to judicial notice," including facts that are a matter of public record, may be considered in a Rule 12(b)(6) motion without converting it into a motion for summary judgment.[63]

## IV.    Argument.

### A.  Review Under the Antiquities Act is Limited.

The Tribal Nations incorporate[64] the United States' arguments with regard to the reviewability of the creation[65] of national monuments under the Antiquities Act.[66] The proclamations here fall "well within" the statutory delegation to the President.[67] The language of the Antiquities Act "exudes deference"[68] to create monuments in nearly

---

[61] *Id*.

[62] *Id*.

[63] *Wildearth Guardians v. Pub. Serv. Co. of Colorado*, 698 F. Supp. 2d 1259, 1263 (D. Colo. 2010).

[64] While the Tribal Nations desired to utilize a staggered briefing schedule to reduce redundancy with the United States' brief, as has been done in other similar suits, the Plaintiffs were not willing to agree to such a schedule.

[65] That the Antiquities Act provides discretion to the President to *create* national monuments is clear. *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1140 (D.C. Cir. 2002); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002). The discretionary power to create that was delegated through the statute, however, does not include the power to revoke or reduce monuments. 54 U.S.C.A. § 320301.

[66] S*ee Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1185-86 (D. Utah 2004) ("*UAC*") (concluding the grant of discretion in the Antiquities Act limits review to whether the president acted pursuant to the Act).

[67] *Trump*, 138 S. Ct. at 2408.

[68] *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018).

every clause. The President "may," in the President's "discretion," declare national monuments; "may" reserve parcels of land; and the Secretary "may" accept the relinquishment of other parcels.[69] Because the President's discretion to create under the Act is so broad, review of such discretionary actions is very limited.[70] The president properly complied with the Antiquities Act.

### B. Plaintiffs fail to establish Article III standing to challenge the Biden Bears Ears Proclamation.

With respect to 12(b)(1), Tribal Nations bring facial challenges, whereby factual allegations in the complaint are accepted as true.[71] Plaintiffs bear the burden of establishing the three standing elements: injury, causation, and redressability.[72] Standing is not something dispensed in gross, but rather must be established with respect to each claim a plaintiff raises and for each form of relief requested.[73] Plaintiffs have failed to meet their burden here.

The Plaintiffs raise claims with regard to both the Bears Ears and Grand Staircase National Monuments.[74] Thus, to establish this Court's jurisdiction, Plaintiffs must allege

---

[69] 54 U.S.C.A. §§ 320301(a), (b), (c) (West).

[70] *UAC*, 316 F. Supp. 2d at 1185-86; *see Tulare Cnty.*, 306 F.3d at 1141; *Mountain States Legal Found.*, 306 F.3d at 1136.

[71] *Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 & n.1 (10th Cir. 2010); *Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560-63 (2007)).

[72] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *State of Utah v. Babbitt*, 137 F.3d 1193, 1201, 1202 (10th Cir. 1998); *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (It is the Plaintiffs' burden to establish standing).

[73] *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

[74] Pls. Am. Compl. at 2, ECF No. 91.

facts in their complaint as to both the Monument established by Biden Bears Ears Proclamation and the Monument established by Proclamation 10286 ("Biden Grand Staircase Proclamation") sufficient to satisfy each of the three standing elements for each of their claims.[75]

Moreover, "standing is not measured by the intensity of a party's commitment, fervor, or aggression in pursuit of its alleged right and remedy… Nor is the perceived importance of the asserted right a substitute for constitutional standing."[76] In their complaints, Plaintiffs raise many grievances about national monuments established pursuant to the Antiquities Act. They fall short, however, of establishing one or more of the three elements stated above, the "irreducible constitutional minimum of standing."[77]

### i. Plaintiffs fail to establish injury to any legally-protected interest.

To satisfy the first element of standing, injury in fact, a harm must be to a legally protected interest that is "concrete and particularized" and "actual or imminent."[78] All Plaintiffs fail to meet this standard. First, the County-Plaintiffs fail to establish injury to any legally-protected interests in Bears Ears, while all of the Plaintiffs fall short with general allegations of harm to others rather than themselves.

### 1. County-Plaintiffs fail to establish injury, as Bears Ears falls beyond their jurisdictional boundaries.

---

[75] The Tribal Nations focus on the claims specifically as to Bears Ears, although several of the arguments would apply equally with respect to Grand Staircase.

[76] *Utah*, 137 F.3d at 1202.

[77] *Id*. at 1204; *see Lujan*, 504 U.S. at 560.

[78] *Lujan*, 504 U.S. at 560.

Neither of the Counties claim injury as to Bears Ears; instead, they only identify the Biden Grand Staircase Monument as causing them harm. Bears Ears does not even border Garfield or Kane Counties,[79] and there are no allegations that Bears Ears lands fall within their jurisdictional boundaries. The Counties do not allege that the harm of the Monument extends to their jurisdictions, nor that such harm to the Counties is "imminent" as opposed to "hypothetical or conjectural."[80]  Moreover, any alleged harms would be suffered by others — namely San Juan County, within which Bears Ears is located.

The allegations of harms inflicted by careless tourists, of stymied local management, or of lost opportunities for economic exploitation all relate to impacts within the Bears Ears National Monument — impacts which are not theirs to claim. Where County-Plaintiffs do not allege harm specifically within the Monuments, they generally allege harm is being inflicted upon "Utah's small, dirt back roads"[81] and "State and local governments."[82] Such descriptions are insufficient to support standing.[83] In the summary of their injuries, County-Plaintiffs state that their territories include lands of the Biden Grand Staircase Monument but make no mention of the

---

[79] Bears Ears National Monument Management, Bureau of Land Management, https://www.blm.gov/programs/national-conservation-lands/utah/bears-ears-national-monument (noting monument is in San Juan County, Utah).
[80] *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).
[81] Pls. Am. Compl. at 52, ECF No. 91.
[82] *Id.*
[83] *Smith*, 429 F. Supp. 3d at 1281-82 ("the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully.").

Biden Bears Ears Monument.[84] Since the Kane and Garfield Counties cannot claim injury on behalf of San Juan County, or state or local governments generally, they fail to establish injury with respect to the Biden Bears Ears Monument.

The Counties may dislike Bears Ears, but that is not enough to establish injury under Article III, which requires harm to a "legally protected interest."[85] The Counties have no legally protected interest in lands of a National Monument completely beyond their jurisdictions.[86]

> **2. All Plaintiffs fail to establish injury to the extent they rely on alleged harms to others or general allegations that the proclamation is illegal.**

Plaintiffs' general claims that the Biden Proclamations are illegal do not suffice to establish injury. That is because "under Article III, an injury in law is not an injury in fact."[87] Neither do the allegations of harms to others suffice to establish injury, as such harms do not implicate Plaintiffs' legally-protected interests.

---

[84] Pls. Am. Compl. 4-5 ECF No. 91.

[85] *Lujan*, 504 U.S. at 560.

[86] *See Bd. of Cnty. Commisioners of Sweetwater Cnty. v. Geringer*, 297 F.3d 1108, 1114-15 (10th Cir. 2002) (Finding Plaintiff-County lacked standing to bring breach-of-trust claim against the State of Wyoming where the County was neither a trustee nor a beneficiary).

[87] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."); *see also Doe by & through Doe v. Hunter*, 796 F. App'x 532, 537 (10th Cir. 2019) ("Article III requires more than a desire to vindicate value interests. It requires an injury in fact that distinguishes a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.").

For example, Utah and the County-Plaintiffs allege that the Biden Monuments prohibit "Native Americans" from engaging in traditional cultural practices and infringe upon ranchers' grazing rights. [88] Even were this accurate, Utah and the County-Plaintiffs do not allege they as governmental bodies have suffered these injuries or otherwise assert they are suing *parens patriae*.[89] Dalton Plaintiffs err in the same way to the extent they rely on identifying harm to others, such as the Blue Ribbon Coalition identifying harms to local tribes and communities, other business, and industries in the area.[90] "'[T]he injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."[91] The same goes for allegations all Utah and County-Plaintiffs make suggesting harms to San Juan County.[92] Injury to San Juan County is San Juan County's to claim. Likewise, Utah and County-Plaintiffs claim no legally protected interests in many of the monument objects

---

[88] Pls. Am. Compl. at 58, ECF No. 91. While they repeatedly purport to claim injury to Native Americans from national monuments, Plaintiffs make just one single reference to one tribal member. *Id*. at 58.

[89] *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607 (1982) (describing *parens patriae*). Even if Plaintiffs were asserting *parens patriae* claims, they would fail. *State ex rel. Sullivan v. Lujan,* 969 F.2d 877, 883 (10th Cir. 1992) (states do not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government). Utah or County-Plaintiffs do not purport to bring their claims for "Native Americans" in any representational capacity, either. And as can be seen, the Tribal Nations have intervened in this matter to represent their interests and their members' interests.

[90] Pls. Am. Compl. at 26-30, ECF No. 90.

[91] *Sierra Club v. Morton*, 405 U.S. 727, 734-735 (1972).

[92] Pls. Am. Compl. at 37-38, ECF No. 91.

they alleged to be harmed.[93] Whereas Plaintiffs do not own or have any control over those objects or otherwise have a legally protected interest in them, they cannot rely upon them in order to establish injury.

### ii.   Plaintiffs fail to establish causation and redressability.

The Tribal Nations incorporate by reference the United States' arguments with respect causation and redressability to the extent they are consistent with Tribal Nations' arguments.[94] All Plaintiffs fail to establish causation and redressability. Simply put, the Biden Bears Ears Proclamation did not cause the harms Plaintiffs allege and the relief sought would fail to remedy those alleged harms. "[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly…trace[able] to the challenged action of the defendant, and not…th[e] result [of] the independent action of some third party not before the court.'"[95]

All Plaintiffs acknowledge that many of their alleged harms stem from the Obama and Trump Proclamations, not the Biden Bears Ears Proclamation. Thus, the harms are not "fairly traceable" to the Biden Proclamation, but are rather the result of independent third-party actions not before the Court.

### 1.   Plaintiffs fail to establish that the Biden Bears Ears Proclamation caused the alleged harms.

---

[93] Pls. Am. Compl. at 38-44, ECF No. 91 (bemoaning harms to eco-systems, but claiming no legally-protected interests in any of the objects or values therein. Plaintiffs cite no case to support for the suggestion that they can establish injury based on their self-described role as "traditional stewards" of the land).

[94] *See supra* note 64.

[95] *Lujan*, 504 U.S. at 560-61.

The harms Plaintiffs attribute to the Biden Bears Ears Proclamation would have already been caused by the previous Bears Ears Proclamations; Plaintiffs acknowledge as much.[96] The Obama Proclamation created the national monument protections, which existed even under the Trump Proclamation. The corresponding harms Plaintiffs allege — e.g., preemption of Utah's laws and policies, injury to wildlife, deprivation of economic opportunity and tax revenues, are not attributable to the Biden Bears Ears Proclamation. It vested no legal national monument protections or status that did not already exist since the Obama Proclamation.

The Biden Bears Ears Proclamation would have done nothing more than had already been done by the prior Proclamations, whether by way of prominence, legal protections, creating name-recognition, or visitation. Thus, all harms Plaintiffs allege would have originated from "third party actions"[97] well-before the Biden Bears Ears Monument. As a result, Plaintiffs cannot fairly trace their injuries to the Biden Bears Ears Monument for purposes of establishing causation.

> **2. Plaintiffs fail to establish redressability, as the prior proclamations maintain the legal status and alleged visitation threats.**

On the other side of the coin, the existence of the two prior Bears Ears Monuments also explains why Plaintiffs fail to establish redressability — Plaintiffs have requested declaratory and injunctive relief to invalidate only the Biden Bears Ears

---

[96] Consol. Pls. Am. Compl. at 20-23, 26, 29-30, 60-61, ECF No. 90; Pls. Am. Compl. at 23-26, ECF No. 91.
[97] *Lujan*, 504 U.S. at 560-61.

Monument, not the Obama and Trump Monuments. The fact that the Obama and Trump Monuments would persist means there is no possibility that invalidating the Biden Bears Ears Monument would provide Plaintiffs redress, as the previous Monuments would persist to create the national monument regulatory burdens and restrictions complained of. The Obama and Trump Monuments also drew attention to the region, and thus invalidating the Biden Monument would not remedy those alleged harms. Redressability requires that granting relief be "likely" as opposed to "speculative" that the injury will be redressed by a favorable decision.[98] Here, it isn't even a matter of weighing whether it is likely or merely speculative—the requested relief to invalidate the Biden Bears Ears Monument alone simply could not redress Plaintiffs' alleged injuries.

The complaints confirm as much. Utah and County-Plaintiffs postulate that the appropriate size of the Monument would be a few thousand acres.[99] They provide a list of Southwest Monuments they deem "were generously proportioned and may not fully have adhered to the terms of the Act," but were within the realm of propriety, ranging from 360 to 859 acres in size.[100] A monument within the range Plaintiffs suggest is nowhere close to the smallest of the two prior Bears Ears Monuments. Even the Trump Bears Ears Monument, which constituted just over 200,000 acres, is characterized by

---

[98] *Id.* at 561.
[99] Pls. Am. Compl. at 81-4, ECF No. 91.
[100] *Id.* at 80.

Plaintiffs as "extremely large."[101] Clearly, the nearly identical Obama Bears Ears Monument,[102] and Biden Bears Ears Monument,[103] are much larger than Utah and County-Plaintiffs suggest is appropriate. Thus, even with invalidation of the Biden Monument, Plaintiffs' alleged injuries would continue. For their part, Dalton Plaintiffs argue that the court is in no position to salvage the proclamations and therefore the proclamations must be set aside in full.[104] In that instance, invalidating the Biden Bears Ears Proclamation will fail to provide redress, as the regulatory burdens and restrictions would likewise continue under the previous proclamations.

Plaintiffs have challenged neither of the other Monuments. Rather, they have only requested declaratory and injunctive relief to invalidate the Biden Bears Ears Monument.[105] Thus, granting the relief requested of invalidating the Biden Bears Ears Monument would fail to redress their alleged injuries.

…

Plaintiffs have failed to establish standing and therefore Plaintiffs' case "must be dismissed for lack of standing."[106]

---

[101] *Id*. at 25-26.
[102] *Id*. at 24.
[103] *Id*. at 26.
[104] Consol. Pls. Am. Compl. at 62, ECF No. 90.
[105] Consol. Pls. Am. Compl. at 66, ECF No. 90; Pls. Am. Compl. at 95, ECF No. 91.
[106] *Living Rivers*, 544 F. Supp. 3d at 1224.

### C. The Court should dismiss Plaintiffs' APA claims pursuant to Fed. R. Civ. P. 12(b)(1), as Plaintiffs fail to identify final agency action.

The Court should dismiss Plaintiffs' APA claims pursuant to Fed. R. Civ. P. 12(b)(1), as Plaintiffs fail to identify final agency action necessary to establish the Court's jurisdiction.[107] Both sets of Plaintiffs primarily point to BLM's interim guidance as the final agency action sufficient to sustain their APA claims.[108] For the BLM guidance to constitute final agency action, it would need to mark the consummation of the agencies' decisionmaking process and produce legal consequences.[109] The interim guidance does neither.

#### i. BLM's Interim Guidance does not mark the consummation of BLM's and USFS's decisionmaking process.

An action does not mark the consummation of the decisionmaking process if it is merely tentative or interlocutory in nature.[110] Thus, actions of subordinate officials are not final agency actions, given they are typically non-dispositive.[111] Analogously,

---

[107] 5 U.S.C. 704; *Colorado Farm Bureau Fed'n v. U.S. Forest Serv.,* 220 F.3d 1171 (10th Cir. 2000) ("The plaintiffs must therefore satisfy the 'statutory standing' requirements of the APA.").

[108] Pls. Am. Compl. at 92, ECF No. 91; Consol. Pls. Am. Compl. at 64-65, ECF No. 90.

[109] *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) ("Under the Supreme Court's decision in *Bennett v. Spear*, agency action is final if it satisfies two requirements: First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.") (internal quotation marks omitted).

[110] *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992); *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:19-CV-00297-DBB, 2021 WL 1222158 (D. Utah Mar. 31, 2021), *aff'd sub nom. S. Utah Wilderness All. v. U.S. Dep't of Interior*, 44 F.4th 1264 (10th Cir. 2022).

[111] *Franklin*, 505 U.S. at 796-97.

agency action cannot possibly be final if an agency whose participation and approval is necessary for finality was not involved in the agency action.[112]

The BLM interim guidance — which was issued by the BLM Director to the subordinate BLM director for Utah — cannot mark the consummation of the decisionmaking process as to the entire monument, primarily because it was not issued in conjunction with the other essential managing agency, the United States Forest Service ("USFS").[113] The Biden Proclamation directs BLM and USFS to "jointly" prepare the final management plan and lays out a robust process that the agencies must first follow in order to finalize the plan, including "consultation with federally recognized Tribes and State and local governments."[114]

Relatedly, as a prerequisite to finalize the management plan, the Proclamation directs the agencies to collaborate with the Bears Ears Commission, which the Biden Proclamation reestablished according to the terms and conditions provided by the Obama Proclamation.[115] The Commission — a body composed of five Tribal Nations who have relied upon and held Bears Ears sacred from time immemorial, including the four to this lawsuit — is recognized by the Biden and Obama Bears Ears Proclamations as possessing tribal expertise and traditional and historical knowledge necessary to

---

[112] *Cf. id.*
[113] Interim Management of the Bears Ears National Monument, Bureau of Land Management, https://www.blm.gov/sites/default/files/docs/2021-12/BENM%20Interim%20Guidance%2012-16-21_Final508.pdf.
[114] Biden Bears Ears Proclamation at 57332.
[115] *Id.*

create a management plan that will adequately protect monument objects and values.[116] The Commission has an indispensable role in providing guidance and recommendations before the management plan can be finalized. This is reflected in the term providing that if the agencies choose not to incorporate specific recommendations of the Commission, they must furnish the Commission with a written explanation of their reasoning.[117] Following the issuance of BLM's interim guidance, the Commission entered into a collaborative management agreement with BLM and USFS to frame their relationship as they work toward a final management plan.[118] The participation of the USFS and the Commission since BLM's interim guidance was issued will result in a management plan significantly more developed and with different terms than BLM's interim guidance.

Dalton Plaintiffs acknowledge that BLM's interim guidance is merely a precursor to the final management plan, which may not issue until early 2024 or later. They further acknowledge that agency action can only be final if it is the "settled" position of the regulating agencies.[119] This precursor is not the settled position and cannot be the consummation of the agencies' decisionmaking process, as the policies and regulations regarding permitted activities and uses they claim will cause them harm are still in

---

[116] *Id.*
[117] Obama Proclamation at 1144.
[118] Inter-Governmental Cooperative Agreement, Bureau of Land Management, https://www.blm.gov/sites/default/files/docs/20206/BearsEarsNationalMonumentInter-GovernmentalAgreement2022.pdf
[119] Consol. Pls. Am. Compl. at 23, ECF No. 90.

development. Harm that rests upon contingent future events that may not occur at all, when an agency has not finally determined a party's rights, steer in favor of finding no final agency action.[120] As finalizing the management plan still requires the participation and input of USFS, and other governmental and private stakeholders, BLM's interim management guidance memo is a textbook example of an interlocutory measure that does not mark the consummation of the decisionmaking process to establish final agency action.

### ii.   BLM's Interim Guidance does not create legal consequences.

To satisfy the second final agency action requirement, an agency action must itself create final legal consequences.[121] Agency actions reviewable under the APA fall within the categories of formal or informal rulemaking or adjudication.[122] BLM's interim guidance isn't a rule or adjudication binding on Plaintiffs or any other private or public actors, but is rather guidance to a subordinate BLM official about how to proceed in creating rules and regulations in the form of the final management plan.

Dalton Plaintiffs, in relying solely on *Barrick Goldstrike Mines Inc. v. Browner* in support of their APA claim, appear to acknowledge as much and suggest instead that agency guidance can still deliver legal consequences and constitute final agency action. *Barrick* concerned EPA's issue of what it purported to be guidance, but the effect of which was regulatory, requiring mining operations to report use of certain toxic

---

[120] *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1160 (10th Cir. 2013).
[121] *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 151 (1967).
[122] 5 U.S.C.A. §§ 553, 554, 556, and 557 (West).

chemicals.[123] In finding that the regulatory guidance constituted final agency action, the court in *Barrick* focused on how the agency action subjected mining operators to new legal consequences in the form of enforcement actions and fines, thus binding them under a regulation by which they previously had not been bound.[124] Put another way, the guidance was rulemaking in disguise. By contrast, BLM's interim guidance does not authorize or threaten enforcement actions, fines, or any other adverse measures. Rather, it merely guides the Utah BLM Director while the agencies develop a final management plan and directs the Utah BLM Director to begin working with USFS to prepare the management plan with a goal to finalize by March 1, 2024.[125]

Dalton Plaintiffs also make the conclusory allegation that they have faced "other final agency actions," vaguely referring to new "rules, regulations, restrictions, and standards" that allegedly have come into effect pursuant to the interim guidance and that have resulted in federal permit denials.[126] Dalton Plaintiffs' claim does not furnish any more detail about these alleged rules, regulations, etc., whether with respect to how the interim guidance brought them into being or about any specific permit denials made pursuant to them.[127] Rather, the allegations are more akin to "unadorned, the-

---

[123] *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 47 (D.C. Cir. 2000).
[124] *Barrick*, 215 F.3d at 47-48.
[125] Interim Management of the Bears Ears National Monument, Bureau of Land Management, at 1, https://www.blm.gov/sites/default/files/docs/2021-12/BENM%20Interim%20Guidance%2012-16-21_Final508.pdf.
[126] Consol Pls. Am. Compl. 64, 65, ECF No. 90.
[127] *Id*.

defendant-unlawfully-harmed-me accusation[s]."[128] To meet the sufficient pleading standard, a court must find that the factual allegations, if true, would establish a plausible claim.[129] As Plaintiffs provide no facts about these alleged rules, regulations, etc. or explanation of how they stem from the interim guidance, it is impossible for the Court to evaluate whether they would fulfill consummation of the agencies' decisionmaking or legal consequences requirements necessary to establish final agency action. A plain reading of the guidance shows no new rules, regulations, etc., nor the incorporation of any such rules or regulations from elsewhere. Rather, it is explanatory.[130]

For the same reasons, Utah and County-Plaintiffs fare no better. Utah and the County-Plaintiffs provide nothing beyond the conclusory assertion that the guidance "is final agency action, determining rights and obligations and from which legal consequences will flow[.]" Their one purported "example" in stating that the memo "decides" that "no new mining claims may be located, and no new mineral leases may be issued, on lands within the monument,"[131] is misleading. The wording of the guidance that Plaintiffs quote is actually a quote of the Biden Proclamation. Thus, the memo does not "decide" anything with that language, but simply observes it as being

---

[128] *Iqbal*, 556 U.S. at 678.
[129] *Moses-El v. City & Cnty. of Denver,* No. 20-1102, 2022 WL 1741944, at 8 (10th Cir. May 31, 2022).
[130] Interim Management of the Bears Ears National Monument, Bureau of Land Management, https://www.blm.gov/sites/default/files/docs/2021-12/BENM%20Interim%20Guidance%2012-16-21_Final508.pdf.
[131] Pls. Am. Compl. at 92, ECF No. 91.

provided in the Proclamation. Since Plaintiffs do not (and cannot) challenge the Biden Proclamation as final agency action,[132] this line cannot serve as the basis for finding consummation of agency decisionmaking or legal consequences necessary to establish the final agency action.

…

BLM's interim guidance is but a precursor to the final management plan to be jointly issued by BLM and USFS, which will have its own terms. The Proclamation emphasizes the importance of maximizing public involvement and consultation with Tribes and State and local governments, and that in creating the Plan, the agencies, "shall maximize opportunities…for shared resources, operational efficiency, and cooperation."[133] Plaintiffs cannot show that BLM's interim guidance is the agencies' final determination of their legal rights.

### D. The Plaintiffs have Failed to State a Claim.

To state a claim to relief, Plaintiffs complaint "must contain enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"[134] A plaintiff must "nudge [his] claims across the line from conceivable to plausible" in order to survive a motion to dismiss."[135] The complaints here contain many legal conclusions throughout. Mere "labels and conclusions" and "a formulaic recitation of the elements

---

[132] The President is not an "agency" that can be challenged under the APA. *Franklin*, 505 U.S. at 800-01.

[133] Biden Bears Ears Proclamation at 57332.

[134] *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012).

[135] *Id.*

of a cause of action" will not suffice, however, as the Court is not required to accept as true such conclusions.[136]

In conclusory fashion, the Plaintiffs maintain that the Antiquities Act does not permit the President to declare for protection objects of historic or scientific interest they disagree with, and that it does not allow the President to reserve an area they deem too large or too small. But, Plaintiffs' arguments contradict over 100 years of case law demonstrating the opposite. The broad discretion that the Antiquities Act provides the President  is clear on its face and allows for protection of the entire area President Biden protected. Plaintiffs' complaints fail as a matter of law and are not plausible.

### i.  The President Did Not Abuse His Discretion.

Courts are "sensitive to pleading requirements" where they are asked to "review the President's actions under a statute that confers very broad discretion on the President and separation of powers concerns are presented."[137] To be sure, Congress is the body that has "complete power" over public lands, and can "regulate and protect" that land.[138] It is "equally true that Congress may delegate this authority as it deems appropriate."[139] Plaintiffs' arguments that the President exceeded his delegated authority have been previously addressed and rejected. In fact, Plaintiffs attack over a century of established case law. Had Congress agreed with Plaintiffs' view, it certainly

---

[136] *Id.*
[137] *Tulare Cnty.*, 306 F.3d at 1141 (citing *Mountain States,* 306 F.3d at 1137).
[138] *Kleppe v. New Mexico,* 426 U.S. 529, 540-41 (1976) (internal quotation marks omitted).
[139] *Utah Ass'n of Ctys.*, 316 F. Supp. 2d at 1191.

could have amended the Antiquities Act in the last 100 years.[140] Congress has amended

the act at least once since 1906,[141] yet maintained the provisions broadly interpreted by

the Courts. The 13 and 14 page proclamations here are extensively detailed and comply

with the Act. As such, this Court should heed the precedent and dismiss Plaintiffs

claims.

### ii. The President Need Only "Declare" National Monuments.

In an attempt to shift the pleading burden on to the President, the Plaintiffs

maintain that the President did not "explain" or "specify" how the lands set aside are

the smallest area compatible.[142] But, the President is not required to "include a certain

level of detail in the Proclamation."[143] Rather, the Act only requires the President to, in

his discretion, "declare" national monuments.[144] "Declare" had a common definition in

---

[140] *Consolidation Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 864 F.3d 1142, 1148 (10th Cir. 2017) (Courts presume Congress is aware of judicial interpretations) *citing Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[141] *See* 54 U.S.C. § 320301(d); Grand Teton National Park Act, Pub. L. No. 81-787, 64 Stat. 849 (1950).

[142] Consol. Pls. Am. Compl. at 4, 18, ECF No.90; Pls. Am. Compl. at 3, ECF No. 91.

[143] *Tulare Cnty.*, 306 F.3d at 1141.

[144] 54 U.S.C. § 320301(a).

1906,[145] which was to "make known publicly, publish, proclaim[.]"[146] Contrary to Plaintiffs' argument, nothing in the plain language of "declaring," requires an explanation or justification.

The Supreme Court recently addressed a similar question in *Trump v. Hawaii*. There, the Court questioned whether a statutory delegation to the President to make a "finding" required the President to "explain that finding with sufficient detail to enable judicial review."[147] If it was questionable that the President was required to explain a "finding" — a much more expansive requirement — it is an even more dubious proposition that the President must explain a declaration. Here, the 13 and 14 page proclamations[148] — which thoroughly describe the objects to be protected and the land necessary to protect them — are more than sufficient.[149]

More fundamentally, any challenge to the lands included in the monument must "identify the improperly designated lands with sufficient particularity to state a claim."[150]  The Plaintiffs' attempt to shift this burden to the President is misguided and

---

[145] *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009) ("We begin with the ordinary meaning of the word 'now,' as understood when the IRA was enacted."); *United States v. Mobley*, 971 F.3d 1187, 1198 (10th Cir. 2020) (words generally should be interpreted as taking their ordinary, contemporary, common meaning "at the time Congress enacted the statute.").

[146] *Declare*. Webster's Practical Dictionary (1906); *see also* A Standard Dictionary of the English Language (1910) (defining "declare" to mean "to make known, manifest, or clear[.]"

[147] *Trump*, 138 S. Ct. at 2409.

[148] *See generally* Biden Bears Ears and Grand Staircase Proclamations.

[149] *Trump*, 138 S. Ct. at 2409 (concluding 12 page proclamation was sufficient).

[150] *Tulare Cnty*, 306 F.3d at 1142.

33

contrary to established pleading requirements.[151] The Utah and County-Plaintiffs have failed to meet their burden altogether, as they do not specify any such lands. Of the Dalton Plaintiffs, only Kyle Kimmerle and Zeb Dalton even attempt to identify improperly designated lands with particularity. Their allegations, however, do not state a claim for relief as they assert, based on their knowledge, that "objects of historic or scientific interest" are not on their lands.[152] They say nothing about whether "historic landmarks" or "historic and prehistoric structures" are on the lands they identify.[153] Because there is no allegation that those parts of the monument "lack" historic landmarks or historic or prehistoric structures, the Dalton Plaintiffs' claims are not plausible.[154]

The President was only required to declare a national monument, and the Plaintiffs have failed to carry their burden to show the President's proclamation is unlawful.

### iii. The President Properly Protected Historic Landmarks, Historic and Prehistoric Structures, and Other Objects of Historic or Scientific Interest.

#### 1. The Plaintiffs' View of What the President Can Protect is Improperly Narrow.

---

[151] *See, e.g. Iqbal*, 556 U.S. at 678 (a claim must be plausible).
[152] Consl. Pls. Compl. at 50, 57, ECF. No. 90
[153] *Id.*
[154] Even if these claims were plausible, which they are not as described herein, they would only be plausible as to the lands that were identified with particularity.

Plaintiffs contend the President designated nonqualifying objects for protection.[155] In Plaintiffs' view, the President can only protect "interesting relics of prehistoric times"[156] or "indigenous pottery."[157] But this argument is inconsistent with the plain language of the Act and has been soundly rejected. Courts have found that "ecosystems and scenic vistas" are protectable under the Act, as the authority is "not limited to protecting only archeological sites."[158] In fact, in a decision that is close in time to the passage of the Antiquities Act, the Supreme Court concluded with no hesitation that the "Grand Canyon . . . is an object of unusual scientific interest."[159] The Court noted that the Grand Canyon

> is the greatest eroded canyon in the United States, if not in the world, is over a mile in depth, has attracted wide attention among explorers and scientists, affords an unexampled field for geologic study, is regarded as one of the great natural wonders, and annually draws to its borders thousands of visitors.[160]

Thus, it is clear that land itself can be a protected "object" under the Act. In *Cappaert*, the Supreme Court concluded that a proclamation protecting a "peculiar race of desert fish .

---

[155] Consol. Pls. Am. Compl. at 2-4, 61, ECF No.90; Pls. Am. Compl. at 2-3, 61-77, 90-91, ECF No. 91.
[156] Pls. Am. Compl. 2  ECF No. 91.
[157] Consol. Pls. Am. Compl. at 14-15  ECF No.90.
[158] *Tulare Cnty.*, 306 F.3d at 1142 (citing *Cappaert v. United States*, 426 U.S. 128, 141-42 (1976)); *Mountain States Legal Found.*, 306 F.3d at 1137 (citing *Cameron v. United States*, 252 U.S. 450 (1920) ("That argument fails as a matter of law in light of Supreme Court precedent interpreting the Act to authorize the President to designate the Grand Canyon and similar sites as national monuments."); *State of Wyoming v. Franke*, 58 F. Supp. 890, 892, 895 (D. Wyo. 1945) (upholding proclamation over objection that it contains no objects of historic or scientific interest required by the Act).
[159] *Cameron*, 252 U.S. at 455–56.
[160] *Id.*

. . which is found nowhere else in the world" was well within the language of the Antiquities Act.[161] And in *Franke*, the District Court in Wyoming noted that the proclamation there was supported by evidence of:

> trails and historic spots in connection with the early trapping and hunting of animals formulating the early fur industry of the West, structures of glacial formation and peculiar mineral deposits and plant life indigenous to the particular area, a biological field for research of wild life in its particular habitat within the area, involving a study of the origin, life, habits and perpetuation of the different species of wild animals, all of which it is claimed constitute matters of scientific interest within the scope and contemplation of the Antiquities Act.[162]

The Biden Proclamations have detailed descriptions of protected objects that clearly fit within the authority of the Act. Contrary to Plaintiffs' arguments, the plain language of the Antiquities Act "is not so limited[.]"[163] Rather, the President has broad discretion to protect historic *or* scientific objects.[164]

Plaintiffs would have the Court apply statutory construction principles, such as *ejusdem generis* to interpret the act.[165] It is, however, inappropriate to apply such aids when the plain language is clear, particularly when its application would be inconsistent with the statutes' purpose.[166] Plaintiffs also argue the court should limit "historic or scientific" objects to historic landmarks or structures.[167] But this reading

---

[161] *Cappaert,* 426 U.S. at 141.
[162] *State of Wyoming,* 58 F. Supp. at 895.
[163] *Cappaert*, 426 U.S. at 141-42.
[164] 54 U.S.C.A. § 320301(a).
[165] Pls. Am. Compl. at 66, ECF No. 91.
[166] *United States v. West*, 671 F.3d 1195, 1200 (10th Cir. 2012). (concluding applying *ejusdem generis* is inappropriate).
[167] Pls. Am. Compl. at 65, 66, ECF No. 91.

would render "or" in the statute superfluous and be  contrary to a plain reading. The Supreme Court has long made clear there is no uncertainty in the Act's text.

The legislative history also bears this out. As federal officials debated how to protect antiquities, a number of failed proposals would have limited protection to human-made artifacts, with no protection for natural objects.[168] Some of those bills withheld authority to protect objects altogether.[169] While some advocates wanted to preserve only antiquities, "the United States Department of the Interior proposed adding the protection of scenic and scientific resources to the Act."[170] The General Land Office wanted to protect lands in the "interest of science and for the preservation of scenic beauties and natural wonders and curiosities[.]"[171] The Department of Interior initially supported a proposal that would have protected lands "which for their scenic beauty, natural wonders or curiosities, ancient ruins or relics, or other objects of scientific or historic interest, or springs of medicinal or other properties it is desirable to

---

[168] H.R. 8195, 56th Cong. (1900) (proposing protections only for "any aboriginal antiquity or prehistoric ruin on [] public lands"); H.R. 9245, 56th Cong. (1900) (proposing protections only for "ruins of temples, houses, or other structures built by the former inhabitants of the country"); H.R. 10451, 56th Cong. (1900) ("proposing protections only for "monuments, cliff dwellings, cemeteries, graves, mounds, forts, or any other work of prehistoric, primitive, or aboriginal man"); H.R. 13349, 58th Cong. (1904) (proposing protections only for "historic and prehistoric ruins, monuments, archaeological objects and other antiquities, and the work of American aborigines"); S. 5603, 58th Cong. (1904) (same); S. 4127, 58th Cong. (1904) (providing protections only for "aboriginal monuments, ruins, or other antiquities").

[169] H.R. 8195, 56th Cong. (1900); S. 5603, 58th Cong. (1904).

[170] *Utah Ass'n of Cntys.*, 316 F. Supp. 2d at 1178.

[171] Ronald F. Lee, *The Antiquities Act of 1906*, 52, (1970) at http://www.cr.nps.gov/aad/pubs, reprinted in Raymond Harris Thompson, An Old and Reliable Authority, 42 J. OF THE S.W. 198 (2000) (*citations omitted*).

protect and utilize in the interest of the public."[172] Ultimately, the legislation Congress

adopted did not limit its protections to human-made artifacts, but also included "other

objects of … scientific interest."[173] This was a result of government officials persuading

drafters to broaden the scope to protect items they found important. "This phrase

essentially allowed the Department of the Interior's proposal, which Congress had

previously rejected, to be included in the final bill."[174]

If there were any doubt about the courts' broad reading, Congress has also

affirmed its understanding of the broad scope of protection. When Congress amended

the Antiquities Act in 1950, it noted that there was a sense that the Act was designed to

protect "natural phenomena" as well as areas of "historic importance."[175] And in 1976

when Congress enacted the Federal Land Management and Policy Act ("FLPMA"), it

could have again taken that opportunity to amend the Act. But, Congress "did not

curtail or restrict the exercise of presidential authority."[176] Had Congress been

concerned about the Supreme Court's interpretation of the Antiquities Act in upholding

the monument designation of the Grand Canyon, or the District Court's decision

---

[172] *Id*. at 53 (*citations omitted*).
[173] 54 U.S.C. § 320301(a).
[174] *Utah Ass'n of Ctys.*, 316 F. Supp. 2d at 1178.
[175] S. Rep. No. 81-1938, at 2 (1950).
[176] *Anaconda Copper Co. v. Andrus*, No. A79-161, 1980 BL 175, *2-3 (D. Alaska, July 1, 1980).

upholding the Jackson Hole National Monument, it could have amended the Act

accordingly in 1950 or 1976 but chose not to.[177]

Congress knew how to limit what objects to protect. The final version of the Act,

however, was a compromise that authorized the President to broadly protect objects of

historic *or* scientific interest. Congress has affirmed that understanding.

### 2. The Bears Ears Landscape is an Appropriate Object Under the Antiquities Act.

While Plaintiffs contend the Bears Ears landscape is not a qualifying object, it has

such a unique "density of significant cultural, historical, and archaeological artifacts

spanning thousands of years" that the entire landscape is worthy of protection.[178] The

landscape includes "remains of single family homes, ancient cliff dwellings, large

villages, granaries, kivas, towers, ceremonial sites, prehistoric steps cut into cliff faces,

and a prehistoric road system that connected the people of Bears Ears to each other and

possibly beyond."[179] The distribution of the objects is "across the Bears Ears

Landscape[.]"[180] Indeed, Congress itself noted in 1906 that the Bears Ears region was

worthy of protection.[181] And as discussed above, these sites are integrally tied to the

history of the Tribal Nations. Whether it is the kivas, towers, cliff dwellings, or the road

---

[177] 54 U.S.C. § 320301(d); *Consolidation Coal Co.*, 864 F.3d at 1148. (Courts presume Congress is aware of judicial interpretations) *citing Lorillard*, 434 U.S. at 580 ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").
[178] Biden Bears Ears Proclamation at 57321.
[179] *Id*.
[180] *Id*. at 57331.
[181] H.R. Rep. No. 59-2224 at 5 (1906).

system, these sites and objects span the entire region and constitute a "singular and sacred landscape."[182] A region more worthy of protection under the Antiquities Act is difficult to imagine.

### 3. Dictionary Definitions of Historic in 1906 Were Broad.

When courts interpret statutes, they must begin with the ordinary meaning of the words as understood when "enacted."[183] Plaintiffs maintain that in order to be "historic" under the Antiquities Act, objects must be "momentous or had an assured place in history. Something with no known major influence on a society is not historic."[184] For support, Plaintiffs point to modern dictionaries, as well as dictionaries from 1913 and 1922.[185] Plaintiffs' definition, however, was not the definition "at the time Congress enacted the statute."[186] Rather, in 1906 the definition of historic was broad. It was defined as "pertaining to or connected with history."[187] Even as late as 1910, "historic" was equated with "historical" and meant "mentioned or celebrated in history."[188] This broader reading of "historic" comports with how the courts have

---

[182] Biden Bears Ears Proclamation at 57322.

[183] *Carcieri*, 555 U.S. at 388 ("We begin with the ordinary meaning of the word 'now,' as understood when the IRA was enacted."); *United States v. Mobley*, 971 F.3d  at 1198 (words generally should be interpreted as taking their ordinary, contemporary, common meaning "at the time Congress enacted the statute.").

[184] Pls. Am. Compl. at 63, ECF No. 91.

[185] *Id*.

[186] *Mobley*, 971 F.3d at 1198.

[187] *Historic*. Modern World Dictionary of English Language (1906). *See also* Webster's Practical Dictionary (1906) (defining Historic to mean containing, pert. to, contained or exhibited in, deduced from, or representing history).

[188] *Historic*. Funk Wagnall's Standard Dictionary of the English Language (1910).

interpreted the Antiquities Act over the years.[189] This Court should not depart from that broad understanding.

### 4. The Definition of Landmark in 1906.

Plaintiffs attempt to graft non-statutory requirements into the Act by pointing to the definition of "landmark" in 1913.[190] According to the Plaintiffs, a landmark must be specific, conspicuous, and used in surveying or navigation.[191] Based on their definition, Plaintiffs add new statutory requirements — objects of historic or scientific interest cannot be "generic," "ubiquitous," "nebulous," or "inconspicuous" items.[192] None of these adjectives appear in the Act. As with "historic," Plaintiffs are relying on improperly narrow definitions. The common definition of "landmark" when "enacted"[193] is much broader. Webster's defined landmark as "any fixed and known object or prominent feature of a locality."[194] The Modern World Dictionary of the English Language in 1906 had a similar definition —"any prominent natural objects or features by which a place is known or distinguished."[195] This broader definition is

---

[189] *Tulare Cnty.*, 306 F.3d at 1141 (concluding that many archaeological sites recording Native American occupation and historic remnants of early Euroamerican settlement qualified as historic).

[190] Pls. Am. Compl. at 62, ECF No. 91.

[191] *Id*.

[192] Pls. Am. Compl. at 62, 66, ECF No. 91.

[193] *Carcieri,* 555 U.S. at 388 ("We begin with the ordinary meaning of the word 'now,' as understood when the IRA was enacted."); *Mobley*, 971 F.3d at 1198 (words generally should be interpreted as taking their ordinary, contemporary, common meaning "at the time Congress enacted the statute.").

[194] *Landmark*. Websters Practical Dictionary (1906).

[195] *Landmark*. The Modern World Dictionary at 2843 (1906).

consistent with the courts' interpretation of the Act. The Court, therefore, should reject Plaintiffs' attempt to create their own unsupported requirements inconsistent with the Act's text.

### iv.   Overlapping Statutory Protections Do Not Make the Monuments Invalid.

The Plaintiffs also assert, contrary to the determination by Congress, that the monument designations increase risk of harm to objects that are protected by other statutes. This Court has similarly rejected this argument. While the Antiquities Act and other statutes may provide overlapping sources of protection, "such overlap is neither novel nor illegal, and in no way renders the President's actions invalid."[196] Numerous statutes "provide environmental protection to public land and it is not surprising that some of them overlap."[197] There is no plausible claim that President Biden's proclamations are invalid because the Antiquities Act provides overlapping protection with other federal laws.

### v.   The President Has Broad Discretion to Reserve Land.

Plaintiffs also complain that more federal land was included in the Proclamation than was legal.[198] In Plaintiffs' view, reservations of land cannot be "much too small or much too large" and must be commensurate with "landmarks" and "structures."[199] But

---

[196] *Utah Ass'n of Ctys.*, 316 F. Supp. 2d at 1184.
[197] *Id.* at 1192.
[198] Part of the Plaintiffs argument hinges on the incorrect definition of what objects can be protected, which was addressed above.
[199] Pls. Am. Compl. at 66, ECF No. 91.

again, in an effort to shift the pleading burden, Plaintiffs have failed to plausibly allege

a claim for relief as they have not identified any lands that lack identifiable objects.[200]

And in any event, the Antiquities Act places no acreage limits on the amount of federal

land that can be reserved, but rather gives the President broad discretion to reserve the

land that is necessary. Plaintiffs want the courts to second guess the President's

determination, but this is "a controversy between the Legislative and Executive

Branches of the Government in which, under the evidence presented here, the Court

cannot interfere."[201]

Congress contemplated creating such limits on the President, but in the end

chose against it. For example, in both H.R. 9245, 56th Cong. (1904) and H.R. 10451, 56th

Cong. (1900), Congress would have placed a cap on reservations at 320 acres. And in S.

5603, Rpt. No. 3704, 58th Cong. (1905), Congress capped reservations of land at 620

acres. The final version of the Antiquities Act, however, had no such limits.[202] Rather, it

allowed the President to determine, in the President's discretion, what lands were

necessary to reserve.

President Biden's proclamations are not unique in making large reservations.[203]

The difference is that the 13 and 14 page proclamations here may be the most detailed

---

[200] *Tulare Cnty*, 306 F.3d at 1142; *see supra* at 36-7, § IV(D)(ii).
[201] *State of Wyoming*, 58 F. Supp. at 896.
[202] 54 U.S.C. § 320301(b).
[203] Mark Squillace, et al., *Presidents Lack the Authority to Abolish or Diminish National Monuments*, 103 Va. L. Rev. Online 55, n. 58 (Grand Canyon National Monument was 808,120 acres).

to date,[204] and easily satisfy the statutory requirements. Plaintiffs are not without recourse, but that power "belongs to Congress alone."[205]

## V.   Conclusion

Congress has provided the President broad discretion to create national monuments, and that discretion has been upheld for over a century. In an effort to shift the burden on to the President, the Plaintiffs misconstrue established pleading principles. The case law shows that the proclamations here easily satisfy the statutory requirements. Indeed, the Proclamations document the immense amount of historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest all across the Bears Ears landscape. Many of these sites and objects are integrally tied to the history of the Tribal Nations, and therefore the entire United States. Indeed, it is hard to imagine a place more worthy of protection under the Antiquities Act. For the forgoing reasons, the Tribal Nations' respectfully request that the Court dismiss Plaintiffs' claims pursuant to Rule 12(b).

---

[204] *Trump*, 138 S. Ct. at 2409 (concluding 12 page proclamation sufficient when President given discretion).
[205] *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020).

Dated: March 2, 2023                         Respectfully submitted,


/s/ Matthew Campbell                         /s/ Paul Spruhan
Matthew Campbell*                            Paul Spruhan*
mcampbell@narf.org                           paspruhan@nndoj.org
Jason Searle*                                Sage Metoxen*
searle@narf.org                              smetoxen@nndoj.org
Allison A. Neswood*                          Louis Mallette*
neswood@narf.org                             lmallette@nndoj.org
NATIVE AMERICAN RIGHTS FUND                  Daniel Moquin
1506 Broadway                                UT Bar No. 7585
Boulder, CO 80302                            dmoquin@nndoj.org
Phone: (303) 447-8760                        NAVAJO NATION DEPARTMENT OF
*Counsel for Hopi Tribe, Pueblo of Zuni, and*  JUSTICE
*Ute Mountain Ute Tribe*                      PO Box 2010
                                             Window Rock AZ 86515
                                             Phone: (928) 871-6210
/s/ David Mielke                             *Counsel for Navajo Nation*
David Mielke*
dmielke@abqsonosky.com
SONOSKY, CHAMBERS, SACHSE,
MIELKE & BROWNELL, LLP                       /s/ K. Andrew Fitzgerald
500 Marquette Avenue, NW, Suite 660          K. Andrew Fitzgerald
Albuquerque, NM 87102                        UT Bar No. 8944
Phone: (505) 247-0147                        andrewmoablawyer@icloud.com
                                             FITZGERALD LAW OFFICE
                                             285 South 400 East, Suite 206
Whitney A. Leonard*                          Moab, UT 84532
whitney@sonosky.net                          Phone: (435) 260-8593
SONOSKY, CHAMBERS, SACHSE,
MILLER & MONKMAN, LLP
510 L Street, Suite 310
Anchorage, AK 99501
Phone: (907) 258-6377
*Counsel for Pueblo of Zuni*


* Pro Hac Vice