**ANDERSON & KARRENBERG, PC**
Stephen P. Horvat (#6249)
50 West Broadway, Suite 600
Salt Lake City, Utah 84101-2035
Telephone: (801) 534-1700
shorvat@aklawfirm.com

**NATIONAL WILDLIFE FEDERATION**
Bailey Brennan (WY 7-5552) (admitted *pro hac vice*)
1200 G Street NW, Suite 900
Washington, DC  20005
Telephone: (307) 709-5643
brennanb@nwf.org
**Attorneys for Proposed Amici Curiae**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GARFIELD COUNTY UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; and THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES, | Lead Case No. 4:22-cv-00059-DN |
| Plaintiffs, | Member Case No: 4:22-cv-00060-DN |
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS, | District Judge David Nuffer |
| Consolidated Plaintiffs, | Magistrate Judge Paul Kohler |
| vs. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; et al., | |
| Defendants, | |

| | |
|---|---|
| HOPI TRIBE, NAVAJO NATION, PUEBLO OF ZUNI, UTE MOUNTAIN UTE TRIBE,<br><br>Intervenor-Defendants. | |

BRIEF OF PROPOSED *AMICI CURIAE* NATIONAL WILDLIFE FEDERATION, UTAH WILDLIFE FEDERATION, NEW MEXICO WILDLIFE FEDERATION, ARIZONA WILDLIFE FEDERATION, AND COLORADO WILDLIFE FEDERATION IN SUPPORT OF INTERVENOR-DEFENDANTS' AND FEDERAL DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................................... ii

District of Utah Rule 7-6(d)(1)(c) Statement ........................................................... 1

Interest of the Amici Curiae ....................................................................................... 1

Summary of the Argument.......................................................................................... 5

Argument ...................................................................................................................... 6

      I.      Introduction.................................................................................................. 6

      II.     Pursuant to their authority under the Antiquities Act, presidents have long created national monuments to protect ecosystems, wildlife, wildlife habitat, and other features as objects of scientific interest. ....................... 7

             a.     The Antiquities Act grants the president broad authority to designate national monuments for the purpose of protecting ecosystems, wildlife, and wildlife habitat as objects of scientific interest. .................................... 8

             b.     Consistent with their statutory authority under the Antiquities Act, presidents regularly establish monuments to protect wildlife, wildlife habitat and other objects of scientific interest.......................................... 10

      III.    The Monuments are home to dynamic ecosystems, diverse wildlife, and important habitat properly protected as objects of scientific interest under the Antiquities Act..................................................................................................................... 16

Conclusion .................................................................................................................. 24

**TABLE OF AUTHORITIES**

**Federal Cases**

*Alaska v. United States*, 545 U.S. 75 (2005) ................................................................. 9

*Cameron v. United States*, 252 U.S. 450 (1920) ......................................................... 8, 9

*Cappaert v. United States*, 426 U.S. 128, 141-42 (1976) ...................................... passim

*Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019) ............................ 10

*Mass. Lobstermen's Assn. v. Ross*, 349 F. Supp. 3d 48, 57 (D.D.C. 2018), *aff'd as modified*, 945 F.3d 535 (D.C. Cir. 2019) ........................................................................................ 15

*Mtn. States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) ............................. 8, 9, 10, 19

*Tulare County v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002) ................................ 8, 10, 19, 20

*United States v. Midwest Oil Co.*, 236 U.S. 459, 481 (1915) ...................................... 15

*Wyoming v. Franke*, 58 F. Supp. 890 (D. Wyo. 1945) ................................................... 8

**State Cases**

16 U.S.C. § 3213(a) ..................................................................................................... 15

54 U.S.C. § 320301 (2012) ...................................................................................... 8, 15

National Park Service and Related Programs, Pub. L. No. 113-287, 128 Stat. 3259 .................. 15

**State Rules**

Proclamation No. 10285, 86 Fed. Reg. 57,321 (Oct. 15, 2021) ......................... 6, 22, 23

Proclamation No. 10286, 86 Fed. Reg. 57,335 (Oct. 15, 2021) ............................... 7, 23

Proclamation No. 1733, 43 Stat. 1988 (Feb. 26, 1925) ................................................ 12

Proclamation No. 2032, 47 Stat. 2557 (Mar. 1, 1933) ................................................. 12

Proclamation No. 2961, 17 Fed. Reg. 691 (Jan. 17, 1952) .......................................... 12

Proclamation No. 3443, 27 Fed. Reg. 31 (Dec. 28, 1962) ........................................... 12

Proclamation No. 4346, 40 Fed. Reg. 5127 (Feb. 1, 1975) ......................................... 13

ii

Proclamation No. 4359, 40 Fed. Reg. 14,565 (Mar. 28, 1975)...................................................... 13

Proclamation No. 4614, 43 Fed. Reg. 57,025 (Dec. 1, 1978)...................................................... 13

Proclamation No. 4615, 43 Fed. Reg. 57,031 (Dec. 1, 1978)...................................................... 13

Proclamation No. 4616, 43 Fed. Reg. 57,035 (Dec. 1, 1978)...................................................... 13

Proclamation No. 4617, 43 Fed. Reg. 57,043 (Dec. 1, 1978)...................................................... 13

Proclamation No. 4618, 43 Fed. Reg. 57,053 (Dec. 1, 1978)...................................................... 12

Proclamation No. 4621, 43 Fed. Reg. 57,073 (Dec. 1, 1973)...................................................... 13

Proclamation No. 658, 34 Stat. 3236 (Sep. 24, 1906) ...................................................... 8

Proclamation No. 7265, 65 Fed. Reg. 2825 (Jan. 11, 2000)...................................................... 14

Proclamation No. 7318, 65 Fed. Reg. 37,249 (June 9, 2000)...................................................... 14

Proclamation No. 7320, 65 Fed. Reg. 37,259 (June 9, 2000)...................................................... 14

Proclamation No. 7392, 66  Fed. Reg. 7335 (Jan. 17, 2001)...................................................... 12

Proclamation No. 7397, 66 Fed. Reg. 7354 (Jan. 17, 2001)...................................................... 14

Proclamation No. 7398, 66 Fed. Reg. 7359 (Jan. 17, 2001)...................................................... 14

Proclamation No. 793, 35 Stat. 2174 (Jan. 9, 1908) ...................................................... 11

Proclamation No. 8031, 71 Fed. Reg. 36,443 (June 26, 2006)...................................................... 14

Proclamation No. 869, 34 Stat. 3306 (Mar. 2, 1909)...................................................... 11

Proclamation No. 9556, 82 Fed. Reg. 1149 (Dec. 28, 2017)...................................................... 14

**Cases**

Donald J. Wright, *Review of the Eucosma pulveratana (Walsingham) Species Group, with Descriptions of Eight New Species (Tortricidae)*, THE JOURNAL OF LEPIDOPTERISTS' SOCIETY, Vol 65, No. 2 101-118, 111 (2011).......................................................... 23

Hellmut H. Doelling et al., *Geology of Grand Staircase-Escalante National Monument, Utah*, 2000 UTAH GEOLOGICAL PUBLICATION ASS'N 28, 4-5 (2000) .................................................... 16

Jerran T. Flinders et al., *Mammals of the Grand Staircase–Escalante National Monument: A Literature and Museum Survey*, MONOGRAPHS OF THE WESTERN NORTH AMERICAN NATURALIST, No. 1 at 57 (2002) ...................................................................... 17, 22

John C. Ruple, *The Trump Administration and Lessons Not Learned from Prior National Monument Modifications*, 43 HARV. ENVTL. L. REV. 1 (2019) ................................................ 11

John M. Fryxell, et al., *Why are migratory ungulates so abundant?*, THE AMERICAN NATURALIST June 1988) ....................................................................................................................... 20

Kevin L. Monteith, et al., *Timing of seasonal migration in mule deer: effects of climate, plant phenology, and life-history characteristics*, ECOSPHERE (Apr.27, 2011) ................................. 20

Loreen Allphin and Kimball T. Harper, *Demography and Life History Characteristics of the Rare Kachina Daisy (Erigeron kachinensis, Asteraceae)*, THE AMERICAN MIDLAND NATURALIST, Vol. 138, No. 1, 109-120, 109 (Jul. 1997) ......................................................... 22

Mark Hebblewhite & Evelyn H. Merrill, *Trade-offs between predation risk and forage differ between migrant strategies in a migratory ungulate*, ECOLOGY (Dec. 1, 2009) ..................... 20

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 502-03 (2003) .................................................................................................................... 13, 15

Matthew Kauffman, et al., *Migration Corridors of Mule Deer in the Paunsaugunt Plateau Herd in Utah*, UNGULATE MIGRATIONS OF THE WESTERN UNITED STATES, Vol. 1 (2020) .............. 19

Matthew Kauffman, et al., *Ungulate Migrations of the Western United States, Volume 3*, U.S. GEOLOGICAL SURVEY SCIENTIFIC INVESTIGATIONS REPORT 2022–5088, 2 (2022) ................. 20

Matthew Kauffman, et al., *Ungulate Migrations of the Western United States, Volume 3*, U.S. GEOLOGICAL SURVEY SCIENTIFIC INVESTIGATIONS REPORT 2022–5088, 62-63 (2022) ........... 19

Michael Margherita, *The Antiquities Act & National Monuments: Analysis of Geological, Ecological, & Archaeological Resources of the Colorado Plateau*, 30 TUL. ENVTL. L.J. 273, 275-276 (2017) .................................................................................................. 16, 17, 22, 23

Olivia Messinger Carril, et al., *Wild bees of Grand Staircase-Escalante National Monument: richness, abundance, and spatio-temporal beta-diversity*, PEERJ (Nov. 7, 2018) ................... 23

**Rules**

Beatriz Moisset & Stephen Buchmann, *Bee Basics: An Introduction to Our Native Bees*, A USDA FOREST SERVICE AND POLLINATOR PARTNERSHIP PUBLICATION, 2 (March 2011)........ 24

Brian Maffly, *Utah's famed bighorn sheep thriving in Zion National Park, so state plans to move some to Bears Ears*, THE SALT LAKE TRIBUNE, Nov. 28, 2017 ............................................... 18

Chamois Andersen, *Bears Ears National Monument: Of Spirit and Nature*, NATIONAL WILDLIFE FEDERATION (Oct. 15, 2021) ............................................................................................. 2

Colorado Wildlife Federation, *Camp Hale-Continental Divide Designated as a National Monument* (Mar. 7, 2023) ................................................................................................... 3

Laura Tangley, *Being There for Bees: Native bees face many threats, but gardeners can help these indispensable pollinators*, NATIONAL WILDLIFE MAGAZINE (Mar. 30, 2016) ............... 24

Marine Access and State Transparency, H.R. 629, 117th Congress (2021) ................................. 15

Mary Jo Brooks, *Fighting to Preserve Bears Ears: The Bears Ears Inter-Tribal Coalition*, NATIONAL WILDLIFE FEDERATION (May 21, 2019) ................................................................. 2

Mary Jo Brooks, *Final Plans Will Decimate Land, Water, Wildlife in Bears Ears and Grand Staircase-Escalante* (Feb. 6, 2020) ........................................................................................ 2

Mike Saccone, *Bears Ears Plan 'Salt in the Open Wounds' of Tribes, Risks Irrevocable Harm to the Land, History, Wildlife*, NATIONAL WILDLIFE FEDERATION (July 26, 2019) ..................... 2

New Mexico Wildlife Federation, *Bears Ears National Monuments Attendees and Statement of Purpose* (Nov. 20, 2017) ......................................................................................................... 4

Paul Tolmé, *More Than Majesty: From sea to shining sea—and beyond—the United States' 157 national monuments are havens for wildlife conservation, outdoor recreation and preservation of indigenous cultures*, NATIONAL WILDLIFE MAGAZINE (Jun. 1, 2018) .................................. 2

Protect Utah's Rural Economy Act, S. 31, 117th Cong. (2021) .................................................. 15

TJ Brown, *National Wildlife Federation Members, Supporters Share Experiences, Speak Out for National Monuments*, NATIONAL WILDLIFE FEDERATION (May 9, 2019) .................................. 1

U.S. Fish and Wildlife Service, Mexican spotted owl (Strix occidentalis lucida) 5-Year Review Short Form Summary (Aug. 2013) ........................................................................................ 21

Utah Department of Natural Resources, *Mapping migration Corridors*, available at https://wildlifemigration.utah.gov/land-animals/corridors/ ...................................................... 19

Utah Division of Wildlife Resources, *Bighorn Sheep Unit Management Plan Kaiparowits WMU #26* (Aug. 2019) ..................................................................................................................... 18

Utah Division of Wildlife Resources, *Bighorn Sheep Unit Management Plan San Juan WMU #14* (Aug. 2019) ..................................................................................................................... 18

## DISTRICT OF UTAH RULE 7-6(D)(1)(C) STATEMENT

No person or entity, other than counsel for the proposed amici curiae, authored or contributed funds intended for the preparation or submission of this brief.

## INTEREST OF THE AMICI CURIAE

Established in 1936, the National Wildlife Federation (NWF) is the largest non-profit conservation organization in the United States. Working in seven regions across the country, NWF collaborates with 52 state and territory affiliates to increase America's fish and wildlife populations and enhance their capacity to thrive in a rapidly changing world. NWF works to protect critical wildlife habitat by gathering and developing the best available science on wildlife, engaging other stakeholders, advocating for important conservation policy, and coordinating conservation planning efforts.

NWF and its more than 7 million members and supporters have a strong interest in ensuring that the Bears Ears National Monument and Grand Staircase-Escalante National Monument (the "Monuments"), and the wildlife and habitat these monuments contain, remain protected consistent with the Antiquities Act. In 2021 and 2022, NWF members submitted a total of 21,006 comments to the Department of the Interior, U.S. Forest Service, and the White House to encourage greater protections for the Monuments. NWF also recently submitted formal comments on the proposal to prepare or revise management plans for the Monuments. Further, NWF members frequently visit the Monuments to hunt, fish, hike, backpack, observe wildlife, and explore the unique geology, ecology, and cultural history of these areas. *See* TJ Brown, *National Wildlife Federation Members, Supporters Share Experiences, Speak Out for National Monuments*, NATIONAL WILDLIFE FEDERATION (May 9, 2019).

NWF and its members also value and appreciate the cultural and spiritual ties that many Indigenous Peoples in this region have to these landscapes and regularly advocate for Tribal coordination, consultation, and co-management of the Monuments. *See* Mary Jo Brooks, *Fighting to Preserve Bears Ears: The Bears Ears Inter-Tribal Coalition*, NATIONAL WILDLIFE FEDERATION (May 21, 2019); Mike Saccone, *Bears Ears Plan 'Salt in the Open Wounds' of Tribes, Risks Irrevocable Harm to the Land, History, Wildlife*, NATIONAL WILDLIFE FEDERATION (July 26, 2019).

In addition, NWF curates numerous blogs and circulates articles explaining the importance and value of protected lands, including the Monuments. *See e.g* Paul Tolmé, *More Than Majesty: From sea to shining sea—and beyond—the United States' 157 national monuments are havens for wildlife conservation, outdoor recreation and preservation of indigenous cultures*, NATIONAL WILDLIFE MAGAZINE (Jun. 1, 2018); Chamois Andersen, *Bears Ears National Monument: Of Spirit and Nature*, NATIONAL WILDLIFE FEDERATION (Oct. 15, 2021); Mary Jo Brooks, *Final Plans Will Decimate Land, Water, Wildlife in Bears Ears and Grand Staircase-Escalante* (Feb. 6, 2020).

The Utah Wildlife Federation (UWF) works to conserve wildlife and its habitats; protect public access to outdoor recreation, hunting, and angling; and promote education, and conservation opportunities on public lands and waters in Utah, now and for future generations. UWF's members visit and recreate at the Monuments and value the wildlife, habitats, cultural resources, and wild landscapes found there. UWF works with government officials and stakeholders to identify ways of protecting and restoring landscape connectivity across the state, including in and around the Monuments.

As Colorado's oldest and most effective wildlife conservation group, Colorado Wildlife Federation (CWF) works to safeguard the state's wildlife and habitats on public lands: their winter ranges, migration and movement corridors, reproduction areas, summer ranges, and waterways they depend upon to survive. CWF members regularly travel to both Monuments to hike, recreate, and view wildlife. Moreover, CWF supports the recent designation of the Camp Hale-Continental Divide National Monument, which may see legal challenges if Plaintiffs are successful in this case. Colorado Wildlife Federation, *Camp Hale-Continental Divide Designated as a National Monument* (Mar. 7, 2023), https://coloradowildlife.org/camp-hale-continental-divide-designated-as-a-national-monument/.

The Arizona Wildlife Federation's mission is "educating, inspiring, and assisting individuals and organizations to value, conserve, enhance, manage, and protect wildlife and wildlife habitat in Arizona." This includes the Paunsaugunt mule deer herd, whose members migrate through Grand Staircase-Escalante National Monument to move between summer range in Utah and winter habitat in northern Arizona. *See infra* p. 11-12. AWF and its members have an interest in safeguarding the migratory movements and overall health of the Paunsaugunt mule deer herd, which could be harmed if the Grand Staircase-Escalante National Monument was reduced or invalidated.

Since 1914, the New Mexico Wildlife Federation (NMWF) has been advocating for sound wildlife management, access to public lands, protection of our waters, and provided opportunities to pursue the outdoor traditions that helped make America what it is today. As part of these efforts, NMWF has also advocated for the protection of Bears Ears National Monument. Following a visit to the monument in 2017, NMWF recognized that "this area provides not only an amazing

opportunity for sportsmen and outdoor recreationalists, but is also sacred to many tribes throughout the area who deeply value the land, water and wildlife within the National Monument." New Mexico Wildlife Federation, *Bears Ears National Monuments Attendees and Statement of Purpose* (Nov. 20, 2017).

CFW, NMWF, and AWF have interests in the protection of wildlife and wildlife habitat across the region. Wildlife, especially migrating big game, do not recognize political boundaries and move long distances across the landscape to seasonal habitats and breeding grounds. As a result, impacts to wildlife and habitat within the Monuments may impact the ability of CWF, NMWF, and AWF members to hunt, view, and enjoy wildlife within their own states.

Further, Utah, Colorado, New Mexico, and Arizona contain numerous national monuments in which CWF, UWF, NMWF, AWF and their members have interests that may be subject to legal challenge if Plaintiffs are successful in this case. Moreover, the traditional and ancestral homelands of the Intervenor-Defendants span these four states. *See* Int.-Def.'s Mot. Dismiss at 11, ECF No. 114. These organizations support and advocate on behalf Tribes and Indigenous Peoples with spiritual and cultural ties to the Monuments and the region, and seek to continue these efforts with the filing of this brief.

This brief expands upon arguments made in Intervenor-Defendants' Motion to Dismiss, including Section IV.D.iii, and the Federal Defendants' Motion to Dismiss, including Section VI.B. It provides additional explanation of the broad authority presidents have to protect wildlife and their habitat as objects of scientific interest under the Antiquities Act and the longstanding and consistent presidential practice of doing so. Further, this brief illustrates the scientific interest and importance of many of the species found in the Monuments.

**SUMMARY OF THE ARGUMENT[1]**

President Biden's proclamations identify an array of cultural, historical, Indigenous, and scientific objects worthy of and eligible for protections under the Antiquities Act, which Intervenor-Defendants and Federal Defendants address in their Motions to Dismiss. Proposed amici curiae support these arguments. To avoid duplication, we elaborate on one issue identified in the Motions to Dismiss: the broad presidential authority to designate wildlife, wildlife habitat, and ecosystems as objects of scientific interest.

For over a century and in dozens of monument designations, presidents of both political parties have exercised their broad authority under the Antiquities Act to establish national monuments to protect ecosystems, wildlife, wildlife habitat, and other features as objects of scientific interest. These designations include numerous species and their habitat, such as Olympic elk, redwood forests, various species of cacti, desert fish, humpback whales, dolphins, musk-oxen, Chum salmon, Dall sheep, and more than 7,000 marine species.

The United States Supreme Court and other federal courts have repeatedly upheld the president's broad authority under the Antiquities Act to establish monuments for the protection of such objects. Moreover, this historical executive practice supports an interpretation of the Antiquities Act that such features qualify as objects of scientific interest. Consistent executive practice carried out in the absence of congressional action can imply congressional acquiescence and consent. Indeed, over the last one hundred years, Congress has confronted the question of presidential authority under the Antiquities Act as exercised. Amid introduction of bills that would

---

[1] This brief was written with the invaluable assistance of Adina Nadler and Shanthi Chackalackal, law students from the University of Michigan Law School's Environmental Law & Sustainability Clinic.

reduce such discretion and debates on the topic, Congress has declined to impose limitations. Consistent executive practice, long-standing Supreme Court precedent, and Congressional inaction all confirm the broad presidential discretion under the Antiquities Act to designate monuments for the protection of wildlife, wildlife habitat, and ecosystems.

Pursuant to this authority, in the Monument proclamations, President Biden properly identifies and protects the dynamic ecosystems, diverse wildlife, and important habitat within the Monuments as objects of scientific interest under the Antiquities Act. Such wildlife includes over 660 species of bees, flora and fauna endemic to the region, herds of mule deer who migrate more than fifty miles in and across the Monuments, and the threatened Mexican spotted owl. These, and many other species, are properly identified as objects of scientific interest under the Antiquities Act eligible for protections afforded by that statute.

ARGUMENT

## I.      Introduction

President Biden's proclamations for the Monuments identify an array of cultural, historical, Indigenous, and scientific objects worthy of and eligible for protection under the Antiquities Act. The Bears Ears National Monument proclamation describes the area as "one of the most extraordinary cultural landscapes in the United States" containing a "unique density of significant cultural, historical, and archaeological artifacts." Proclamation No. 10285, 86 Fed. Reg. 57,321, (Oct. 15, 2021). This region has "supported indigenous people of the Southwest from time immemorial and continues to be sacred land to the Hopi Tribe, Navajo Nation, Ute Indian Tribe of the Uintah and Ouray Reservation, Ute Mountain Ute Tribe, and Pueblo of Zuni." *Id.* The

landscape is also home to "unique geology, biology, ecology, paleontology, and topography" and numerous objects of scientific interest. *Id*.

The Grand Staircase-Escalante National Monument proclamation describes the area's "rich human history, spanning from the indigenous people and cultures who made this area home to Anglo-American explorers and early Latter-day Saint pioneers" as well as its "varied geology," "outstanding biological resources," and a landscape that "support[s] diverse, rare, and endemic populations of plants and a diversity of animals, as well as unusual and diverse soils." Proclamation No. 10286, 86 Fed. Reg. 57,335 (Oct. 15, 2021). Both proclamations discuss in detail many of the individual objects of scientific, cultural, and historical importance within the Monuments.

In their motions to dismiss, Intervenor-Defendants and Federal Defendants provide robust arguments as to why, pursuant to the Antiquities Act, President Biden properly protected these and other objects of scientific, cultural, and historical significance when establishing the Monuments. Int.-Def.'s Mot. Dismiss § D, ECF No. 114; Fed. Def. Mot. Dismiss § IV, ECF No. 113.  Proposed amici curiae support these arguments. To avoid duplication, we elaborate on one issue identified in the Motions to Dismiss: the broad presidential authority, confirmed by long-standing Supreme Court precedent, executive practice and Congressional acquiescence, to designate wildlife, wildlife habitat and ecosystems as objects of scientific interest.

## II.   Pursuant to their authority under the Antiquities Act, presidents have long created national monuments to protect ecosystems, wildlife, wildlife habitat, and other features as objects of scientific interest.

The President's establishment of the Monuments to protect ecosystems, wildlife, and wildlife habitat, among other purposes, is not new nor novel. For more than a century, presidents have created national monuments to protect important objects such as wildlife, plants, and habitat.

For nearly as long, courts have found that such protections are a proper exercise of presidential discretion under the Antiquities Act, and Congress has declined to restrict this discretion. Accordingly, President Biden acted consistent with judicial precedent and longstanding practice when establishing the Monuments.

      a.      <u>The Antiquities Act grants the president broad authority to designate national monuments for the purpose of protecting ecosystems, wildlife, and wildlife habitat as objects of scientific interest.</u>

The Antiquities Act delegates authority to the president to protect "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" on federal public lands. 54 U.S.C. § 320301(a) (2012). This includes the authority to "reserve parcels of land" surrounding the objects to the extent necessary for the "proper care and management" of the identified resources. *Id.* § 320301(b). Courts have consistently interpreted the statute's "scientific interest" provision broadly, affirming the Antiquities Act's protective scope over varied scientific resources on public lands, including wildlife, wildlife habitat, and ecosystems broadly. *Cappaert v. United States*, 426 U.S. 128, 141-42 (1976); *Cameron v. United States*, 252 U.S. 450, 455 (1920); *Mtn. States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002); *Tulare County v. Bush*, 306 F.3d 1138, 1142 (D.C. Cir. 2002); *Wyoming v. Franke*, 58 F. Supp. 890, 895 (D. Wyo. 1945); Proclamation No. 658, 34 Stat. 3236 (Sep. 24, 1906) (Devil's Tower National Monument); Proclamation No. 697, 34 Stat. 3266 (Dec. 8, 1906) (Petrified Forest National Monument).

The Supreme Court has affirmed the president's broad discretion under the Antiquities Act to protect large landscapes and ecosystems as objects of scientific interest. In *Cameron v. United States,* the Court recognized the Grand Canyon as an object of scientific interest properly protected under the Antiquities Act because it was the largest geological feature of its kind in the nation,

served as a subject of geological study, and drew thousands of visitors annually. 252 U.S. at 455-56.

The Supreme Court has also affirmed the president's authority to protect wildlife and wildlife habitat under the Antiquities Act. In *Cappaert v. United States,* the Court held that a spring-fed subterranean pool in Devil's Hole National Monument and the endangered pupfish inhabiting it were both objects of scientific interest within the meaning of the Antiquities Act. 426 U.S. at 141-42. Further, the Court acknowledged that the scope of the monument created to protect the pupfish depends upon the habitat necessary to meet the biological needs of the protected species itself. *Id.* at 141 (holding that "the level of the pool may be permitted to drop to the extent that the drop does not impair the scientific value of the pool as the natural habitat of the species sought to be preserved."). Most recently, in *Alaska v. United States*, the Supreme Court recognized that an "essential purpose of monuments created pursuant to the Antiquities Act . . . is to conserve the scenery and the natural and historic objects and the wild life therein[.]" 545 U.S. 75, 103 (2005) (citing 54 U.S.C. § 100101) (quotations omitted).

Other courts have also specifically addressed the question of whether ecosystems, wildlife, and wildlife habitat qualify for protection under the Antiquities Act. In *Mountain States Legal Foundation v. Bush*, plaintiffs challenged the validity of six monuments established by President Clinton on the basis that they included ineligible objects, like desert gardens, geological features, and desert landscapes. 306 F.3d at 1137. The court disagreed, holding that every challenged proclamation referred to objects of scientific interest within the meaning of the Antiquities Act. *Id.* at 1133-34. Specifically, the court recognized the "rugged landscapes" of the Canyons of the Ancients National Monument, the Cascade-Siskiyou National Monument's role "as a biological

crossroads" intersecting "ecoregions," the "habitat" of the "shrub-steppe ecosystem" in Hanford

Reach National Monument, and the array of biological and scientific resources in the Sonoran

Desert National Monument's "desert ecosystem" as eligible objects of scientific interest under the

Antiquities Act. *Id.*

Further, the court in *Tulare County v. Bush* held that giant sequoia trees and their

surrounding ecosystems qualify as scientific objects under the Antiquities Act. 306 F.3d at 1142.

(holding that "[i]nclusion of such items as ecosystems and scenic vistas in the Proclamation did

not contravene the terms of the statute by relying on nonqualifying features."). Most recently, in

*Massachusetts Lobstermen's Association v. Ross*, the court again affirmed the president's authority

under the Antiquities Act to protect ecosystems as objects of scientific interest. 945 F.3d 535, 544

(D.C. Cir. 2019).

These cases affirm the president's broad authority under the Antiquities Act to designate

national monuments to protect ecosystems, wildlife, and wildlife habitat as objects of scientific

interest.

> b.  Consistent with their statutory authority under the Antiquities Act,
> presidents regularly establish monuments to protect wildlife, wildlife
> habitat, and other objects of scientific interest.

Since Congress passed the Antiquities Act in 1906, presidents have regularly and

consistently used it to protect scientific and geologic objects found on federal lands. As detailed

below, such objects often include important wildlife and plant species, ecosystems, and

landscapes. The following discussion is not exhaustive. Many other monument designations

identify wildlife, habitat, ecosystems, and landscapes as objects of scientific interest properly

protected under the Antiquities Act.

Each of the monuments mentioned below has, where challenged, withstood judicial scrutiny as appropriate exercises of presidential authority under the Antiquities Act. John C. Ruple, *The Trump Administration and Lessons Not Learned from Prior National Monument Modifications*, 43 HARV. ENVTL. L. REV. 1, 9 (2019) (explaining that "no challenge to a national monument designation has ever prevailed in court"). Further, Congress has acquiesced to the broad use of presidential authority to designate national monuments. Despite occasional efforts to substantively limit the scope of the Antiquities Act over its 116-year history, Congress has declined to do so.

Despite their brevity and general nature, many early monument proclamations specifically identify wildlife, plant species, or wild places as objects of scientific interest warranting protection. President Theodore Roosevelt created the John Muir National Monument in 1908 to protect an "**extensive growth of redwood trees** . . . of extraordinary scientific interest and importance because of the primeval character of the forest in which it is located, and of the character, age and size of the trees." Proclamation No. 793, 35 Stat. 2174 (Jan. 9, 1908) (emphasis added) (subsequently expanded twice). In his 1909 proclamation of Mount Olympus National Monument, President Roosevelt protected **the summer range and breeding ground of the Olympic Elk**— "a species peculiar to these mountains and rapidly decreasing in numbers." Proclamation No. 869, 34 Stat. 3306 (Mar. 2, 1909) (emphasis added) (now Olympic National Park).

In 1925, President Calvin Coolidge created Glacier Bay National Monument to protect a "**great variety of forest covering consisting of mature areas, bodies of youthful trees** . . . which should be preserved in absolutely natural condition, and great stretches now bare that will become forested in the course of the next century" so that "resulting movements and development of **flora**

**and fauna**" could be studied. Proclamation No. 1733, 43 Stat. 1988 (Feb. 26, 1925) (emphasis added) (now Glacier Bay National Park and Preserve). President Jimmy Carter later expanded Glacier Bay National Monument to protect, among other things, the Alsek River corridor—used by **large mammals and bald eagles, the "oldest plant communities in southeast Alaska," and "mature aquatic vegetative communities of the pre-neoglacial lakes**." Proclamation No. 4618, 43 Fed. Reg. 57,053 (Dec. 1, 1978) (emphasis added).

In 1933, President Herbert Hoover created the Saguaro National Monument to protect the scientific interest in "**various species of cacti, including the so-called giant cactus**." Proclamation No. 2032, 47 Stat. 2557 (Mar. 1, 1933) (emphasis added) (expanded in 1961 and now Saguaro National Park). As discussed in Section I.a above, in 1952, President Harry Truman expanded the Death Valley National Monument to include a subterranean pool home to "**a peculiar race of desert fish . . . found nowhere else in the world**[.]" Proclamation No. 2961, 17 Fed. Reg. 691 (Jan. 17, 1952) (emphasis added); *Cappaert*, 426 U.S. at 141 ("The fish are one of the features of scientific interest.").

In 1961, President John Kennedy created the Buck Island Reef National Monument to protect "one of the **finest marine gardens in the Caribbean Sea**" and "**rare marine life**." Proclamation No. 3443, 27 Fed. Reg. 31 (Dec. 28, 1962) (emphasis added). President Bill Clinton subsequently expanded the monument to protect numerous **marine species and habitats, including humpback whales, pilot whales, dolphins, pelicans, and sea birds**. Proclamation No. 7392, 66 Fed. Reg. 7335 (Jan. 17, 2001); *see also* Proclamation No. 4346, 40 Fed. Reg. 5127 (Feb. 1, 1975) and Proclamation No. 4359, 40 Fed. Reg. 14,565 (Mar. 28, 1975) (both enlarging the monument).

President Carter, building on his predecessors' use of the Antiquities Act, protected nearly 56 million acres of large, intact ecosystems as monuments in Alaska in the 1970s. Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 502-03 (2003). These monuments protected, among other objects, the "**summering area for a number of Old World bird species**;" Proclamation No. 4614, 43 Fed. Reg. 57,025 (Dec. 1, 1978) (emphasis added); a "wide variety of plant and animal species, from the **marine life along the shoreline and its lagoons** to the inland populations such as **musk-oxen, Dall sheep, caribou and many smaller species**;" Proclamation No. 4615, 43 Fed. Reg. 57,031 (Dec. 1, 1978) (emphasis added); "significant habitat for the **McKinley caribou herd**," other "scientifically important mammals such as **grizzly bear, wolf and wolverine**," and a "late run of **Chum salmon**;" Proclamation No. 4616, 43 Fed. Reg. 57,035 (Dec. 1, 1978) (emphasis added); a "**progression of ecosystems representing a continuum of communities from the boreal spruce forest and riparian shrub thickets in the south to the arctic tussock tundra in the north**;" Proclamation No. 4617, 43 Fed. Reg. 57,043 (Dec. 1, 1978) (emphasis added); and a "rich variety of wildlife" including **caribou, Alaskan sheefish, "nesting waterfowl, moose, and muskrat," "grizzly and black bears, wolf, wolverine, fox, otter, and other northern furbearing mammals**." Proclamation No. 4621, 43 Fed. Reg. 57,073 (Dec. 1, 1978) (emphasis added).

President George W. Bush's 2006 proclamation creating the Papahanaumokuakea Marine National Monument included the purpose of protecting "**more than 7,000 marine species** . . . unique to the Hawaiian Island Chain." Proclamation No. 8031, 71 Fed. Reg. 36,443 (June 26, 2006) (emphasis added).

President Bill Clinton created numerous monuments to conserve ecosystems and wildlife, including the Grand Canyon-Parashant National Monument, which protects, among other things, **riparian corridors that allow for "wildlife movement and plant dispersal," a ponderosa pine ecosystem, the Giant Mojave Yucca cacti, mule deer, Kaibab squirrels, wild turkey, the Mexican spotted owl, the California condor and other diverse, rare, threatened, and endangered species**. Proclamation No. 7265, 65 Fed. Reg. 2825 (Jan. 11, 2000) (emphasis added); *see also* Proclamation No. 7320, 65 Fed. Reg. 37,259 (June 9, 2000) (Ironwood Forest National Monument); Proclamation No. 7397, 66 Fed. Reg. 7354 (Jan. 17, 2001) (Sonoran Desert National Monument); Proclamation No. 7318, 65 Fed. Reg. 37,249 (June 9, 2000) (Cascade-Siskiyou National Monument); Proclamation No. 7398, 66 Fed. Reg. 7359 (Jan. 17, 2001) (Upper Missouri River Breaks National Monument).

When he established Gold Butte National Monument in 2017, President Obama protected the "**mosaic of braided and shallow washes** that flow into the Virgin River to the north and directly into Lake Mead on the south and west . . . **provid[ing] important water sources for the plants and animals**." Proclamation No. 9556, 82 Fed. Reg. 1149 (Dec. 28, 2017) (emphasis added).

In other words, for over one hundred years and in dozens of monument designations, presidents have regularly identified wildlife, habitat, ecosystems, and other objects of scientific interest as eligible for protection under the Antiquities Act. This historical and consistent executive practice supports an interpretation of the Antiquities Act that such features can and do qualify as objects of scientific interest. *Mass. Lobstermen's Assn. v. Ross*, 349 F. Supp. 3d 48, 57 (D.D.C. 2018), *aff'd as modified*, 945 F.3d 535 (D.C. Cir. 2019) (relying, in part, on executive practice for

the holding that submerged lands can be monuments). Further, as the Supreme Court has held, consistent executive practice carried out in the absence of congressional action can imply congressional acquiescence and consent. *See e.g. id; United States v. Midwest Oil Co.*, 236 U.S. 459, 481 (1915).

Indeed, Congress has considered presidential authority under the Antiquities Act as exercised and, while it has modified where and how monuments may be designated geographically, it has declined to impose any other limitations. For example, in 1950, Congress amended the Antiquities Act to prohibit the creation of national monuments in Wyoming in response to a controversy surrounding the Jackson Hole National Monument, but changed nothing else in the statute. *See* 54 U.S.C. § 320301(d); Squillace, 37 Ga. L. Rev. at 498. In 1980, in response to President Carter's expansive Alaska monuments, Congress limited the president's authority to withdraw lands in Alaska, but left the Antiquities Act unchanged. 16 U.S.C. § 3213(a). In 2014, Congress recodified the Antiquities Act making only minor changes, none of which affected the statute's scope. National Park Service and Related Programs, Pub. L. No. 113-287, 128 Stat. 3259.

Finally, Congress has, after consideration, declined to curtail presidential discretion. Marine Access and State Transparency, H.R. 629, 117th Congress (2021) (requiring congressional approval for monument designation); *see also* Protect Utah's Rural Economy Act, S. 31, 117th Cong. (2021) (prohibiting extension or establishment of monuments in Utah). Congress has had ample opportunity to consider and limit presidential discretion under the Antiquities Act. However, by refusing to limit presidential discretion, despite more than one hundred years of consistent executive practice, Congress has acquiesced to such broad presidential discretion.

**III.    The Monuments are home to dynamic ecosystems, diverse wildlife, and important habitat properly protected as objects of scientific interest under the Antiquities Act.**

Like presidents before him, President Biden identified areas of public land in need of additional care and management because of their important historical, cultural, archeological, geological, scientific, and ecological resources. The Monuments' proclamations detail many legally proper reasons for protecting the numerous species, habitats, ecosystems, and other objects of scientific interest. This section includes a selection of the many plants and animals of the Monuments and their ecosystems to help further the understanding of these landscapes, and the scientific importance of these species. The list is not exhaustive. Rather, it provides a glimpse of these complex and dynamic systems and the scientific insight and understanding they have and will continue to provide.

As their proclamations describe, the Monuments are located within the Colorado Plateau, a region identified by its important geological history and features, including canyons, domes, hoodoos, and natural bridges. Hellmut H. Doelling et al., *Geology of Grand Staircase-Escalante National Monument, Utah*, 2000 UTAH GEOLOGICAL PUBLICATION ASS'N 28, 4-5 (2000); Michael Margherita, *The Antiquities Act & National Monuments: Analysis of Geological, Ecological, & Archaeological Resources of the Colorado Plateau*, 30 TUL. ENVTL. L.J. 273, 275-276 (2017). The Colorado Plateau's climate and geological formations help define its diverse ecosystems, which include grasslands, shrublands, pinyon-juniper woodlands, alpine forests, and springs and seeps. *Id.* "Such widely varying environmental conditions have required species to adapt and provided for the development of unique ecosystems." *Id.*; Jerran T. Flinders et al., *Mammals of the Grand*

-16-

*Staircase–Escalante National Monument: A Literature and Museum Survey*, MONOGRAPHS OF THE WESTERN NORTH AMERICAN NATURALIST, No. 1 at 57 (2002).

Both proclamations discuss how the Monuments provide important habitat for desert bighorn sheep, which are well-adapted to the arid climate and steep, rugged landscape of southern Utah. These sheep, which serve as indicator species for habitat health, have historically suffered from overhunting and disease contracted from domestic livestock, especially sheep and goats.



Desert bighorn sheep along the San Juan River in Bears Ears National Monument. Photograph credit: Aaron Kindle.

Flinders et al. at 56. In recent decades, careful management and successful wild sheep relocations have resulted in populations that are increasing, but still below management objective. Utah Division of Wildlife Resources, *Bighorn Sheep Unit Management Plan Kaiparowits WMU #26* Aug. 2019); Utah Division of Wildlife Resources, *Bighorn Sheep Unit Management Plan San Juan WMU #14* (Aug. 2019).

In the Bears Ears National Monument, wildlife managers successfully transplanted big horn sheep in recent years in an effort to improve the health of the San Juan North herd—one of the state's most imperiled. Brian Maffly, *Utah's famed bighorn sheep thriving in Zion National Park, so state plans to move some to Bears Ears*, THE SALT LAKE TRIBUNE, Nov. 28, 2017. State managers have relocated big horn sheep from Arizona, Nevada, and other parts Utah to Grand Staircase-Escalante in recent decades to expand the Kaiparowits herd.

As herd sizes and range increase, so does the likelihood of big horn sheep encountering domestic livestock and disease, which are significant threats to long term survival. *Id.* Large landscapes, such as the Monuments, provide important habitat for the health and perpetuation of these herds. They also provide a laboratory to study and better understand the animals, and in turn, other regional herds whose own health may rely on relocations. *Cappaert*, 426 U.S. at 141-42; *Mtn. States Legal Found.*, 306 F.3d 1132; *Tulare County,* 306 F.3d 1138.

Additionally, both Monuments contain migration corridors that mule deer use to access important forage and habitat, and move with the resources and conditions they need. The Paunsaugunt mule deer herd—which the Grand Staircase-Escalante proclamation identifies—migrates seasonally into and across the monument. This herd is made up of around 5,200 individuals who leave their summer range on the Paunsaugunt Plateau in October, traveling up to 78 miles across the monument and to the Buckskin Mountains along the Utah-Arizona border. Matthew Kauffman, et al., *Migration Corridors of Mule Deer in the Paunsaugunt Plateau Herd in Utah*, UNGULATE MIGRATIONS OF THE WESTERN UNITED STATES, Vol. 1 (2020). In April, the herd makes its way back across the monument, returning to its summer range. *Id.*

Similarly, the San Juan mule deer herd, made up of approximately 11,750 individuals, migrates up to 35 miles in and across the central and eastern parts of Bears Ears National Monument. Matthew Kauffman, et al., *Ungulate Migrations of the Western United States, Volume 3*, U.S. GEOLOGICAL SURVEY SCIENTIFIC INVESTIGATIONS REPORT 2022–5088, 62-63 (2022); Utah Department of Natural Resources, *Mapping migration Corridors*, available at https://wildlifemigration.utah.gov/land-animals/corridors/. The monument contains both winter ranges near Indian Creek and Beef Basin, and summer ranges on North Elk Ridge and the Abajo Mountains, as well as the migration corridors that connect these areas. *Id.*

While mule deer exist across the west, understanding the nature and importance of migration to these and other ungulates is ongoing. Studies in recent decades show that migration is a critical survival strategy for large ungulates in the mountain west and beyond, enabling species to escape harsh climates, access high-quality forage and avoid predation. *See* John M. Fryxell, et al., *Why are migratory ungulates so abundant?*, THE AMERICAN NATURALIST (June 1988); Kevin L. Monteith, et al., *Timing of seasonal migration in mule deer: effects of climate, plant phenology, and life-history characteristics*, ECOSPHERE (Apr. 27, 2011); Mark Hebblewhite & Evelyn H. Merrill, *Trade-offs between predation risk and forage differ between migrant strategies in a migratory ungulate*, ECOLOGY (Dec. 1, 2009). "[A]s the human footprint in the western United States continues to expand, the migratory journeys of ungulates are becoming increasingly difficult, threatening the long-term persistence of existing migrations." Matthew Kauffman, et al., *Ungulate Migrations of the Western United States, Volume 3*, U.S. GEOLOGICAL SURVEY SCIENTIFIC INVESTIGATIONS REPORT 2022–5088, 2 (2022). Because of their importance to the perpetuation of these species, and furthering our scientific understanding of migratory behavior,

protection of these herds and routes is appropriate under the Antiquities Act. *Tulare County*, 306 F.3d at 1142; *see also* Proclamation No. 869 (creating Mount Olympus National Monument to protect the range and breeding ground of the Olympic Elk).

The Monuments' proclamations also identify numerous bird species that reside in the Monuments, including the Mexican spotted owl. The U.S. Fish and Wildlife Service listed the



A pair of Mexican spotted owl fledglings. U.S. Fish and Wildlife Service, https://www.nps.gov/articles/mexican-spotted-owl.htm

Mexican spotted owl, one of the continent's largest owls, as threatened under the Endangered Species Act in 1993 and designated critical habitat for the bird in 2004, including areas in both Monuments. 58 Fed. Reg. 14,248 (Mar. 16, 1993); 69 Fed. Reg. 53,181 (Aug. 31, 2004). The Mexican spotted owl has experienced population declines in recent decades primarily from timber harvest and other forest management practices that resulted in even-aged forests and more frequent wildfire. U.S. Fish and Wildlife Service, Mexican spotted owl (Strix occidentalis lucida) 5-Year Review Short Form Summary (Aug. 2013). Monument designation, along with the additional

authority and management tools it affords, will allow federal land agencies to better manage these lands for the protection of this threatened species and its habitat. *Cappaert*, 426 U.S. at 141-42.

The gray fox, which lives in both Monuments, plays an important role in maintaining Utah juniper stands and the other species dependent on this ecosystem for survival. The opportunistic gray fox has a diverse diet, preying on small mammals, birds, carrion, and fruit, including the berries of the Utah juniper. Flinders et al. at 58. The fox consumes the berries and spreads their seeds through its scat across the landscape. "Thus, the gray fox serves an important role in the dispersal and regeneration of forests dominated by Utah juniper," a plant species that is important throughout this landscape. *Id*. The gray fox, like so many other species in the Monuments, plays an important role in maintaining biological diversity and the integrity of the Monuments' ecosystems.

In some circumstances, the Monuments' geological and climactic conditions have given rise to plants and animals endemic only to the Colorado Plateau. Margherita, 30 Tul. Envtl. at 307. For example, the Bears Ears proclamation identifies a genetically distinct population of the Kachina daisy (*Erigeron kachinensis*), a rare flower endemic to the Colorado Plateau. Proclamation No. 10285, 86 Fed. Reg. at 57,326, 57,330. This specific population grows only in the rock seeps and hanging gardens of canyon walls in the Bears Ears National Monument. Loreen Allphin & Kimball T. Harper, *Demography and Life History Characteristics of the Rare Kachina Daisy (Erigeron kachinensis, Asteraceae)*, THE AMERICAN MIDLAND NATURALIST, Vol. 138, No. 1, 109-120, 109 (Jul. 1997). The Kachina daisy is vulnerable to drought, mining, water projects, tourism, and recreation. *Id.* at 109, 118.

The Bears Ears proclamation also identifies *eucosma navajoensis* as a species of scientific interest. This rare moth has dusty beige-colored wings marked with dark brown spots, and is found only in the Bears Ears National Monument near the Valley of the Gods. Proclamation No. 10285, 86 Fed. Reg. at 57,328; Donald J. Wright, *Review of the Eucosma pulveratana (Walsingham) Species Group, with Descriptions of Eight New Species (Tortricidae)*, THE JOURNAL OF LEPIDOPTERISTS' SOCIETY, Vol 65, No. 2 101-118, 111 (2011). Because this moth is found nowhere else on earth, its protection is critical. Margherita, 30 TUL. ENVTL. L.J. at 309; *Cappaert*, 426 U.S. at 141-42.

The Grand Staircase-Escalante proclamation identifies "an astounding diversity of bees" that live in the monument "due, in large part, to the substantial elevational gradient, diversity of habitats, and abundance of flowering plants." Proclamation No. 10286, 86 Fed. Reg. at 57,337. A recent study revealed that at least 660 species of bees reside in Grand Staircase-Escalante National Monument. Olivia Messinger Carril, et al., *Wild bees of Grand Staircase-Escalante National Monument: richness, abundance, and spatio-temporal beta-diversity*, PEERJ (Nov. 7, 2018). These species include bees that are red, blue, green, and striped; bees that are acclimated to cold, arid desert environments; and *Diadasia* bees, which build nests in soil, topped—for yet unknown reasons—by clay chimneys. *Id.*; Proclamation No. 10286; 86 Fed. Reg. at 57,339. Several of these bee species are found only in or near the Grand Staircase-Escalante National Monument, and more than a third are considered specialists—they prefer pollen from one or only a few plant species. *Id.*



*Diadasia* bees and their clay-chimney-topped nests. Photograph credit: Joseph Wilson.

Bees are critical to maintaining biodiversity and feeding humans across the globe, so their health and survival is paramount. Bees pollinate more than 80 percent of all flowering plants, including about 75 percent of the fruits, nuts, and vegetables grown in the United States. Beatriz Moisset & Stephen Buchmann, *Bee Basics: An Introduction to Our Native Bees*, A USDA FOREST SERVICE AND POLLINATOR PARTNERSHIP PUBLICATION, 2 (March 2011). Unfortunately, some native bee populations are declining across the country as a result of disease, insufficient nutrition, stress, competition from honey bees, pesticides, and habitat loss and fragmentation. *Id.* at 30-3; *see also* Laura Tangley, *Being There for Bees: Native bees face many threats, but gardeners can help these indispensable pollinators*, NATIONAL WILDLIFE MAGAZINE (Mar. 30, 2016). Research suggests that the protection of large landscapes that contain a diversity of habitat, such as the

Monuments, are important for the care and management of these native bee populations. *Id.* Given the important role these pollinators play in maintaining biodiversity across the Monuments, and the role pollinators play in sustaining our food system, President Biden properly included them as objects of scientific interest in his Grand Staircase-Escalante's proclamation.

These are only a few of the wildlife and plant species, habitats, and ecosystems that reside in and make up the Monuments. Because of the scientific interest of these and other objects identified in the proclamations, they were properly included as reasons for the Monuments' establishment. President Biden acted within his discretion under the Antiquities Act, and in accordance with more than a century of presidential practice, judicial precedent, and congressional acquiescence, when he included them in the Monuments' proclamations.

### CONCLUSION

For the foregoing reasons, we respectfully ask the Court to find in favor of the Intervenor-Defendants and Federal Defendants motions to dismiss Plaintiffs' complaints.

Dated this 20th day of March, 2023.

Respectfully submitted,

**NATIONAL WILDLIFE FEDERATION**

*/s/ Bailey K. Brennan*
Bailey K. Brennan (admitted *pro hac vice*)
***Attorneys for Proposed Amici Curiae***

**ANDERSON & KARRENBERG, PC**

*/s/ Stephen P. Horvat*
Stephen P. Horvat

I, Bailey K. Brennan, certify that this Brief of Proposed *Amici Curiae* contains 6,195 words and complies with DUCivR 7-1(a)(4).