## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES;<br>    *Plaintiffs*,<br><br>ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS;<br>    *Consolidated Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; TOM VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; FOREST SERVICE,<br>    *Defendants*,<br><br>HOPI TRIBE; NAVAJO NATION; PUEBLO OF ZUNI; UTE MOUNTAIN UTE TRIBE;<br>    *Intervenor-Defendants*,<br><br>CENTER FOR BIOLOGICAL DIVERSITY; GRAND CANYON TRUST; GREAT OLD BROADS FOR WILDERNESS; NATIONAL PARKS CONSERVATION ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; SOUTHERN UTAH WILDERNESS ALLIANCE; WESTERN WATERSHEDS PROJECT; WILDEARTH GUARDIANS; and WILDERNESS SOCIETY;<br>    *Intervenor-Defendants*. | **INDIVIDUAL PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS**<br><br>Case No. 4:22-cv-00059-DN-PK (lead case)<br>Case No. 4:22-cv-00060-DN-PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    The Antiquities Act of 1906 ................................................................... 3

    B.    The Grand Staircase-Escalante and Bears Ears Monuments ................ 4

    C.    President Biden's Proclamations ............................................................ 5

    D.    This Lawsuit............................................................................................ 7

SUMMARY OF ARGUMENT .......................................................................................... 8

STANDARD OF REVIEW ................................................................................................ 9

ARGUMENT ...................................................................................................................... 9

I.     THE PROCLAMATIONS ARE REVIEWABLE ............................................................... 9

    A.    Sovereign Immunity Does Not Bar This Suit ...................................... 10

    B.    Antiquities Act Designations Are Not Committed to
           the President's Discretion ..................................................................... 13

II.    THE PLAINTIFFS HAVE STANDING ........................................................................ 16

    A.    Zeb Dalton ............................................................................................ 17

    B.    Kyle Kimmerle...................................................................................... 21

    C.    The BlueRibbon Coalition .................................................................... 24

          1.    BlueRibbon has associational standing.................................... 24

          2.    BlueRibbon has organizational standing .................................. 33

    D.    Suzette Morris ...................................................................................... 35

III.   THE PROCLAMATIONS CONTRAVENE THE ANTIQUITIES ACT ............................... 36

    A.    The Antiquities Act Confers a Limited Power ..................................... 37

    B.    The Proclamations Exceed the Antiquities Act's Limits..................... 44

    C.    The Proclamations Are Unlawful in Full............................................. 51

IV.   THE ANTIQUITIES ACT CLAIMS SHOULD NOT BE DISMISSED ............................... 54

    A.    The Government Cannot Defend the Proclamations ............................ 54

    B.    The Intervenors Cannot Defend the Proclamations............................. 60

V.    THE APA CLAIMS SHOULD NOT BE DISMISSED ................................................... 63

CONCLUSION.................................................................................................................. 66

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
   141 S. Ct. 2485 (2021)...................................................................................................50

*Alaska v. United States,*
   545 U.S. 75 (2005)........................................................................................................57

*Am. Farm Bureau Fed'n v. EPA,*
   792 F.3d 281 (3d Cir. 2015).........................................................................................19

*Am. Forest Res. Council v. Hammond,*
   422 F. Supp. 3d 184 (D.D.C. 2019)..............................................................................11

*AMG Cap. Mgmt., LLC v. FTC,*
   141 S. Ct. 1341 (2021)............................................................................................61, 62

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015)......................................................................................................23

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015)......................................................................................................13

*ASARCO Inc. v. Kadish,*
   490 U.S. 605 (1989)......................................................................................................23

*Backcountry Hunters & Anglers v. U.S. Forest Serv.,*
   612 F. App'x 934 (10th Cir. 2015)...............................................................................53

*Bennett v. Spear,*
   520 U.S. 154 (1997)................................................................................................64, 65

*Brnovich v. Biden,*
   562 F. Supp. 3d 123 (D. Ariz. 2022) ............................................................................12

*Burnett v. Mortg. Elec. Registration Sys., Inc.,*
   706 F.3d 1231 (10th Cir. 2013) .....................................................................................9

*Cameron v. United States,*
   252 U.S. 450 (1920)................................................................................................10, 56

*Cappaert v. United States,*
   426 U.S. 128 (1976).................................................................................10, 55, 56, 63

*Career Coll. Ass'n v. Riley,*
   74 F.3d 1265 (D.C. Cir. 1996)......................................................................................64

*Carney v. Adams,*
   141 S. Ct. 493 (2020)....................................................................................................29

*Cayuga Nation v. Tanner,*
   824 F.3d 321 (2d Cir. 2016)..........................................................................................31

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
  511 U.S. 164 (1994)................................................................................................63

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ...............................................................11, 12, 13, 14

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
  333 U.S. 103 (1948)................................................................................................14

*Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*,
  236 F.3d 1174 (10th Cir. 2000) ..............................................................................32

*Clinton v. Jones*,
  520 U.S. 681 (1997)................................................................................................13

*Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*,
  No. 22-cv-581, 2022 WL 1266612 (D. Colo. Apr. 28, 2022) ...........................33, 34

*Colo. Outfitters Ass'n v. Hickenlooper*,
  823 F.3d 537 (10th Cir. 2016) ...........................................................................29, 31

*Colo. Taxpayers Union, Inc. v. Romer*,
  963 F.2d 1394 (10th Cir. 1992) .........................................................................24, 33

*Consumer Data Indus. Ass'n v. King*,
  678 F.3d 898 (10th Cir. 2012) ................................................................................32

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
  779 F.3d 258 (5th Cir. 2015) ..................................................................................17

*Cook Cnty. v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) ..................................................................................34

*Cressman v. Thompson*,
  798 F.3d 938 (10th Cir. 2015) ................................................................................32

*Dakota Cent. Tel. Co. v. S.D. ex rel. Payne*,
  250 U.S. 163 (1919)................................................................................................14

*Dalton v. Specter*,
  511 U.S. 462 (1994).....................................................................................13, 14, 16

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981)................................................................................................13

*Doyle v. Jewell*,
  No. 13-cv-861, 2014 WL 2892828 (D. Utah June 26, 2014) ..................................20

*Dugan v. Rank*,
  372 U.S. 609 (1963)................................................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Equal Means Equal v. Ferriero*,
    478 F. Supp. 3d 105 (D. Mass. 2020) ....................................................................34

*Ezell v. City of Chi.*,
    651 F.3d 684 (7th Cir. 2011) ...............................................................................31

*Fields v. City of Tulsa*,
    753 F.3d 1000 (10th Cir. 2014) ..........................................................................31

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)....................................................................................16, 63

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010).............................................................................................53

*Grand Canyon Tr. v. Energy Fuels Res. (U.S.A.) Inc.*,
    269 F. Supp. 3d 1173 (D. Utah 2017)................................................................36

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
    988 F.3d 114 (2d Cir. 2021)..........................................................................17, 19

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) (en banc) ..........................................................22

*Hydro Res., Inc. v. EPA*,
    608 F.3d 1131 (10th Cir.) (en banc) .......................................................... *passim*

*Initiative & Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) ..........................................................................23

*Jett v. Dall. Indep. Sch. Dist.*,
    491 U.S. 701 (1989)............................................................................................48

*Jordan v. Maxim Healthcare Servs., Inc.*,
    950 F.3d 724 (10th Cir. 2020) ............................................................................45

*Knife Rts., Inc. v. Vance*,
    802 F.3d 377 (2d Cir. 2015).................................................................................31

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949)............................................................................................10

*Laufer v. Looper*,
    22 F.4th 871 (10th Cir. 2022) ...............................................................................9

*Mass. Lobstermen's Ass'n v. Raimondo*,
    141 S. Ct. 979 (2021) ....................................................................... *passim*

*Mass. Lobstermen's Ass'n v. Ross*,
    349 F. Supp. 3d 48 (D.D.C. 2018) ..........................................................10, 13, 58

iv

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mass. Lobstermen's Ass'n v. Ross,*
    945 F.3d 535 (D.C. Cir. 2019) ......................................................................... *passim*

*Medellín v. Texas,*
    552 U.S. 491 (2008)..........................................................................................63

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007)..........................................................................................31

*Mescalero Apache Tribe v. New Mexico,*
    630 F.2d 724 (10th Cir. 1980) ..........................................................................24

*Monson v. Drug Enf't Admin.,*
    589 F.3d 952 (8th Cir. 2009) ............................................................................31

*Mountain States Legal Found. v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002)........................................................................15

*Muscogee (Creek) Nation v. Okla. Tax Com'n,*
    611 F.3d 1222 (10th Cir. 2010) ..........................................................................9

*N.H. Hemp Council, Inc. v. Marshall,*
    203 F.3d 1 (1st Cir. 2000)................................................................................31

*N.M. ex rel. Richardson v. BLM,*
    565 F.3d 683 (10th Cir. 2009) ..........................................................................26

*Nat. Res. Def. Council v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020)......................................................................64, 65

*Nat'l Parks & Conservation Ass'n v. FAA,*
    998 F.2d 1523 (10th Cir. 1993) ........................................................................51

*Nat'l Rifle Ass'n of Am. v. Magaw,*
    132 F.3d 272 (6th Cir. 1997) ............................................................................31

*NCAA v. Califano,*
    622 F.2d 1382 (10th Cir. 1980) ..................................................................20, 26

*New Mexico v. Dep't of Interior,*
    854 F.3d 1207 (10th Cir. 2017) ........................................................................22

*NFIB v. OSHA,*
    142 S. Ct. 661 (2022)........................................................................................50

*Niz-Chavez v. Garland,*
    141 S. Ct. 1474 (2021)......................................................................................37

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)............................................................................................48

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Phillips v. DeWine*,
   841 F.3d 405 (6th Cir. 2016) ................................................................19

*POET Biorefining, LLC v. EPA*,
   970 F.3d 392 (D.C. Cir. 2020) ..............................................................66

*Pomeroy v. Utah State Bar*,
   598 F. Supp. 3d 1250 (D. Utah 2022) ....................................................9

*Producers of Renewables United for Integrity, Truth & Transparency v. EPA*,
   No. 19-9532, 2022 WL 538185 (10th Cir. Feb. 23, 2022) ...................24

*Rapanos v. United States*,
   547 U.S. 715 (2006)..............................................................................61

*Rivera v. IRS*,
   708 F. App'x 508 (10th Cir. 2017) .......................................................12

*Role Models Am., Inc. v. White*,
   317 F.3d 327 (D.C. Cir. 2003)..............................................................66

*S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*,
   620 F.3d 1227 (10th Cir. 2010) ............................................................26

*S. Utah Wilderness All. v. Palma*,
   707 F.3d 1143 (10th Cir. 2013) ............................................................26

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993)..............................................................................13

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012)..............................................................23

*Sierra Club v. U.S. Dep't of Energy*,
   287 F.3d 1256 (10th Cir. 2002) ............................................................26

*Simmat v. U.S. Bureau of Prisons*,
   413 F.3d 1225 (10th Cir. 2005) ..............................................10, 12, 13

*Slater v. A.G. Edwards & Sons, Inc.*,
   719 F.3d 1190 (10th Cir. 2013) ..............................................................9

*State Nat'l Bank of Big Spring v. Lew*,
   795 F.3d 48 (D.C. Cir. 2015) ....................................................... *passim*

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)................................................................................23

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)..............................................................................28

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sw. Airlines Co. v. Saxon*,
  142 S. Ct. 1783 (2022) ......................................................................................38

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ..........................................................................10

*SWANCC v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ..........................................................................................61

*Tanzin v. Tanvir*,
  141 S. Ct. 486 (2020) ........................................................................................38

*Taylor v. Roswell Indep. Sch. Dist.*,
  713 F.3d 25 (10th Cir. 2013) ............................................................................36

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ...........................................................23, 65, 66

*Thomas v. Kaven*,
  765 F.3d 1183 (10th Cir. 2014) ........................................................................17

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .................................................................................16, 30

*Tucson Herpetological Soc'y v. Salazar*,
  566 F.3d 870 (9th Cir. 2009) ............................................................................53

*Tulare Cnty. v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001) ....................................................................66

*Tulare Cnty. v. Bush*,
  306 F.3d 1138 (D.C. Cir. 2002) ........................................................................54

*United States v. California*,
  436 U.S. 32 (1978) ...........................................................10, 47, 55, 56

*United States v. George S. Bush & Co.*,
  310 U.S. 371 (1940) ....................................................................................14, 16

*United States v. Hayes*,
  555 U.S. 415 (2009) ..........................................................................................46

*United States v. Hendrickson*,
  949 F.3d 95 (3d Cir. 2020) ................................................................................38

*United States v. Murdock Mach. & Eng'g Co.*,
  81 F.3d 922 (10th Cir. 1996) ............................................................................12

*United States v. Stevens*,
  559 U.S. 460 (2010) ..........................................................................................32

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Sup. Ct. of N.M.*,
    839 F.3d 888 (10th Cir. 2016) ............................................................32

*United Tribe of Shawnee Indians v. United States*,
    253 F.3d 543 (10th Cir. 2001) ...........................................................11

*Utah Ass'n of Cntys. v. Bush*,
    316 F. Supp. 2d 1172 (D. Utah 2004) ......................................... *passim*

*Utah Ass'n of Cntys. v. Clinton*,
    Nos. 97-cv-479, 97-cv-492, 97-cv-863, 1999 U.S. Dist. LEXIS 15852
    (D. Utah Aug. 12, 1999) ...................................................43, 48, 63

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
    21 F.4th 1229 (10th Cir. 2021) ......................................................24, 25

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ....................................................................47

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ....................................................................51

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021) ..............................................................66

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .......................................................................23

*William Gas Processing-Gulf Coast Co., L.P. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) ........................................................51

*Wyoming v. Franke*,
    58 F. Supp. 890 (D. Wyo. 1945) .....................................................15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .......................................................................63

*Ysleta Del Sur Pueblo v. Texas*,
    142 S. Ct. 1929 (2022) ....................................................................39

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) ......................................................51

**STATUTES**

5 U.S.C. § 702 ......................................................................................12

5 U.S.C. § 706 ......................................................................................63

9 U.S.C. § 1 ..........................................................................................38

16 U.S.C. § 433 ....................................................................................40

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

16 U.S.C. § 470aa *et seq.* ................................................................................49

16 U.S.C. § 470aaa *et seq.* ..............................................................................49

16 U.S.C. § 668 *et seq.* ...................................................................................49

16 U.S.C. § 703 *et seq.* ...................................................................................49

16 U.S.C. § 1131 *et seq.* .................................................................................48

16 U.S.C. § 1271 *et seq.* .................................................................................49

16 U.S.C. § 1431 *et seq.* .................................................................................49

16 U.S.C. § 1531 *et seq.* .................................................................................49

16 U.S.C. § 1600 *et seq.* .................................................................................49

16 U.S.C. § 3213 ...............................................................................................62

16 U.S.C. § 4301 *et seq.* .................................................................................49

18 U.S.C. § 1866 ..............................................................................3, 28, 40

25 U.S.C. § 3001 *et seq.* .................................................................................49

43 U.S.C. § 1701 *et seq.* .................................................................................48

43 U.S.C. § 1702I ..............................................................................................18

43 U.S.C. § 1714 ...............................................................................................48

43 U.S.C. § 1732 .................................................................................................4

54 U.S.C. § 100101 *et seq.* .......................................................................48, 49

54 U.S.C. § 300101 *et seq.* .............................................................................49

54 U.S.C. § 320301 ....................................................................................*passim*

Pub. L. No. 59-209, 34 Stat. 225 (1906) ......................................................3, 39

Pub. L. No. 94-579, 90 Stat. 2743 (1976) ........................................................61

**OTHER AUTHORITIES**

Black's Law Dictionary (2d ed. 1910) ..............................................................39

BLM Manual 6220 (2012) ................................................................................18

Bureau of Land Management, *Bears Ears National Monument:*
   *Analysis of the Management Situation* (Sept. 2022) ......................................4

Bureau of Land Management, *Grand Staircase-Escalante National Monument:*
   *Analysis of the Management Situation* (Aug. 2022) .......................................4

43 C.F.R. § 2310.3-2 .........................................................................................48

43 C.F.R. § 3515 ...............................................................................................65

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

43 C.F.R. § 4120.3-1 ...............................................................................................18

43 C.F.R. § 4120.3-3 ...............................................................................................18

40 Cong. Rec. 7888 (1906) ......................................................................................43

Fed. R. Civ. P. 12 ......................................................................................................9

82 Fed. Reg. 1139 (Dec. 28, 2016) ....................................................................4, 28

82 Fed. Reg. 58081 (Dec. 4, 2017) .................................................5, 18, 26, 28

82 Fed. Reg. 58089 (Dec. 4, 2017) ..........................................................................5

86 Fed. Reg. 57321 (Oct. 8, 2021) ................................................................. *passim*

86 Fed. Reg. 57335 (Oct. 8, 2021) ................................................................. *passim*

Murray D. Feldman, *The New Public Land Exchanges: Trading Development
Rights in One Area for Public Resources in Another*,
43 Rocky Mtn. Min. L. Inst. 2-1 (1997) ..............................................................65

H.R. 11021, 56th Cong. (1900) ...............................................................................42

H.R. Rep. No. 113-44 (2013) ...................................................................................61

H.R. Rep. No. 58-3704 (1905) .................................................................................42

H.R. Rep. No. 59-2224 (1906) ........................................................................ *passim*

Benjamin Hayes, Cong. Rsch. Serv., R45718, *The Antiquities Act: History,
Current Litigation, and Considerations for the 116th Congress*
(May 15, 2019) ......................................................................................................41

Ronald F. Lee, *The Antiquities Act of 1906* (1970) ..........................................41, 42

Letter from Harold L. Ickes, Sec'y of the Interior, to Hon. Rene L. DeRoun,
Chairman, House Comm. on Pub. Lands (Apr. 12, 1938) ....................................39

*Little Desert Off-Highway Vehicle Open Area*, BLM (Aug. 18, 2022) ......................27

Memorandum from Director, BLM, to Utah State Director, BLM, *Interim
Management of the Bears Ears National Monument* (Dec. 16, 2021) ............ *passim*

Memorandum from Director, BLM, to Utah State Director, BLM, *Interim
Management of the Grand Staircase-Escalante National Monument*
(Dec. 16, 2021) .............................................................................................. *passim*

*National Monument Facts and Figures*, NPS ...........................................................62

Frank Norris, *The Antiquities Act and the Acreage Debate*,
23 George Wright Forum 6 (2006) ........................................................................45

10 Oxford English Dictionary (1909) .......................................................................37

Proclamation No. 1713, 43 Stat. 1968 (Oct. 15, 1924) ............................................40

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Proclamation No. 2961, 17 Fed. Reg. 691 (Jan. 23, 1952) ............................................................55

Justin J. Quigley, *Grand Staircase-Escalante National Monument:
  Preservation or Politics*, 19 J. Land Res. & Env't L. 55 (1999) ............................................43

James R. Rasband, *Stroke of the Pen, Law of the Land?*,
  63 Rocky Mtn. Min. L. Inst. 21-1 (2017) ...................................................................4

Report of the Committee on the Public Lands No. 2691 (June 10, 1938) .....................................39

S. Rep. No. 59-3798 (1906) ......................................................................................42

Charles Schwarz et al., USDA Forest Service,
  *Wildland Planning Glossary* (1976) .......................................................................47

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*,
  37 Ga. L. Rev. 473 (2003) .................................................................................4, 43

U.S. Fish & Wildlife Service, *Habitat Conservation Planning Handbook*
  (Dec. 21, 2016) .....................................................................................................47

*Utah Special Recreation Permits Program*, BLM...............................................................25, 26

Carol H. Vincent, Cong. Rsch. Serv., R41330, *National Monuments and the
  Antiquities Act* (Nov. 28, 2022) .............................................................................4

Webster's International Dictionary (1893) ..........................................................................38

Webster's International Dictionary of the English Language (1902) ............................................39

Webster's New International Dictionary (1909) .............................................................37, 39

Webster's New International Dictionary (1913) ...................................................................39

13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
  § 3531.4 (3d ed. Apr. 2022 update) ......................................................................19, 20

# INTRODUCTION

"The Antiquities Act originated as a response to widespread defacement of Pueblo ruins in the American Southwest."[1]  To that end, the Act gives the President the authority to designate as monuments "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on [federal] land," and to set aside those lands that constitute the "smallest area compatible" with their protection.[2]  In the words of the House Report ahead of the Act's passage:  "The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times."[3]

Invoking these powers, President Biden recently set aside a landmass nearly the size of Connecticut—over three *million* acres of land in Southeastern Utah—as part of two monuments: Grand Staircase-Escalante and Bears Ears.  He did so on the unprecedented rationale that entire landscapes—one 1.87 million acres (about the size of Delaware), the other 1.36 million acres (Rhode Island plus Guam)—constituted "objects of historic or scientific interest" under the Act.[4]  So too a wide selection of standalone "areas," ecosystems, habitats, and even species of animals.[5]

President Biden's Proclamations are unlawful.  Landscapes and segments of land are not "objects situated on land."  Nor is an ecosystem, habitat, or falcon.  If the President were free to deem these things "objects," the Act would be limitless, as there is not an inch of federal land that is not part of some landscape or area (or ecosystem or habitat).  On the President's view, all federal land is thus fodder for a monument designation; the only restraint would be the President's own

---

[1] *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J., statement respecting cert denial).

[2] 54 U.S.C. § 320301(a)–(b).

[3] H.R. Rep. No. 59-2224, at 1 (1906).

[4] 86 Fed. Reg. 57335, 57345 (Oct. 8, 2021); 86 Fed. Reg. 57321, 57332 (Oct. 8, 2021).

[5] *See, e.g.*, *id.* at 57338.

discretion, which is no restraint at all.  And a law carefully designed to grant the President a tailored power would be transformed into one "without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea."[6]

The Government barely disputes this.  It does not deny that President Biden's decision to deem a landscape an "object" is unprecedented.  Nor does it ground its defense of the Proclamations in the text, structure, or history of the Antiquities Act.  In fact, it hardly defends the Proclamations at all—dedicating about six pages of its overlength brief to the merits.

Rather, the Government's lead argument is not that the Proclamations are lawful, but that they operate in a law-free zone.  According to the Government, the President can set aside all federal land for whatever reason he wants—anything from an indeterminate landscape to a single chuckwalla—and the federal courts would be powerless to intercede.  That assertion of plenary, unreviewable power has no basis in law, and this Court should reject it.

The Government next contends that the Individual Plaintiffs lack standing to challenge the Proclamations—a claim that defies common sense and established law.  The Government touts the Proclamations as groundbreaking conservation efforts that will preserve these lands *precisely by* restricting certain activities—namely, ranching, mining, off-roading, and the removal of resources. But at the same time, the Government insists the Individual Plaintiffs—a rancher, a miner, an off-roading group, and a Native American who seeks to remove resources from monument lands— somehow lack standing.  That defies credulity.  The Plaintiffs are the *very people* whose lives and livelihoods the Proclamations are designed to restrict.  They have standing to challenge them.

---

[6] *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial).

The Chief Justice recently recognized the need for courts to begin policing presidential abuses of the Antiquities Act.[7]  This case typifies that abuse.  Indeed, the Proclamations rest on an unprecedented and extreme reading of the Act that would render it boundless.  This Court should reject that reading, enforce the Act's terms, and deny the Defendants' motions to dismiss.

## BACKGROUND

### A.    The Antiquities Act of 1906

The Antiquities Act was originally developed to address a gap in federal law:  At the turn of the twentieth century, hordes of Americans were pilfering the Southwest of its historical and cultural artifacts, but there was no federal statute on the books that could effectively stop them.[8]

To combat this, Congress passed the Antiquities Act.  The Act's text today is materially the same as it was when first passed.[9]  And now, as then, it has two main parts that work together:

> **(a) Presidential declaration.—**The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.

> **(b) Reservation of land.—**The President may reserve parcels of land as a part of the national monuments.  The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.[10]

The Antiquities Act has also always included its own punishment provision (now listed at 18 U.S.C. § 1866(b)) that criminalizes the unlawful alteration of any feature of a monument:

> **Appropriation of, injury to, or destruction of historic or prehistoric ruin or monument or object of antiquity.—**A person that appropriates, excavates, injures, or destroys any historic or prehistoric ruin or monument or any other object of antiquity that is situated on land owned or controlled by the Federal Government

---

[7] *Id.*

[8] *See also* Part III.A.3 *infra* (detailing history of the Act).

[9] *Compare* 54 U.S.C. § 320301, *with* Pub. L. No. 59-209, 34 Stat. 225 (1906).

[10] 54 U.S.C. § 320301(a)–(b).

> without the permission of the head of the Federal agency having
> jurisdiction over the land on which the object is situated, shall be
> imprisoned not more than 90 days, fined under this title, or both.

Monument designations are done by presidential proclamation alone.  No public process is required; no congressional approval is needed; and no internal procedural hurdles must be cleared.

The "creation of a national monument is of no small consequence."[11]   Monument designations trigger an onerous regime of federal regulation—restrictions that flow from the proclamations themselves as well as the implementing regulations that follow.[12]  Where, as here, the proclamation labels the monument the "dominant reservation" on the land, it displaces other policies—such as the flexible "multiple use" mandate that ordinarily applies to managing federal lands—and dictates how federal agencies manage monument lands on a day-to-day basis.[13]

## B.    The Grand Staircase-Escalante and Bears Ears Monuments

Grand Staircase-Escalante and Bears Ears together cover more than three million acres of land in Utah.  Each Monument is itself over one million acres.  And each has been deeply controversial—so much so that President Clinton announced Grand Staircase-Escalante from Arizona,[14] and President Obama announced Bears Ears only days before leaving office.[15]

In an effort to shore up support from out-of-state environmentalists ahead of a presidential

---

[11] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).

[12] *See, e.g.*, Carol H. Vincent, Cong. Rsch. Serv., R41330, *National Monuments and the Antiquities Act* 8–10 (Nov. 28, 2022) (describing effects on land use).

[13] *See, e.g.*, 43 U.S.C. § 1732(a) (providing BLM "shall manage the public lands under principles of multiple use and sustained yield ... except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law"); *see also* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 514–19 (2003) (describing regulatory effects); Bureau of Land Management, *Grand Staircase-Escalante National Monument: Analysis of the Management Situation* 3-1 (Aug. 2022) (explaining monument designation is the priority consideration); Bureau of Land Management, *Bears Ears National Monument: Analysis of the Management Situation* 3-3 (Sept. 2022) (same for Bears Ears).

[14] *See Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1181 (D. Utah 2004),

[15] *See* 82 Fed. Reg. 1139, 1143 (Dec. 28, 2016); *see also* James R. Rasband, *Stroke of the Pen, Law of the Land?*, 63 Rocky Mtn. Min. L. Inst. 21-1, 21-2–21-3 (2017) (noting backlash).

election, President Clinton created the Grand Staircase-Escalante Monument in September 1996.[16] The original monument stretched across 1.7 million acres in Kane and Garfield Counties. And with it came a legion of changes that would impact the region for decades.[17] The story of Bears Ears is similar. As with Grand Staircase-Escalante, the creation of Bears Ears pretermitted an ongoing and robust debate among members of Congress, state officeholders, and local stakeholders regarding how to best protect these lands.[18] And as with Grand Staircase-Escalante, the designation promised new restrictions that would upend traditions and existing ways of life.[19]

The opposition to Grand Staircase-Escalante endured, and the response to Bears Ears was severe. In response, President Trump reexamined the monuments at the start of his administration.

In December 2017, President Trump reduced the size of Grand Staircase-Escalante by 860,000 or so acres, and Bears Ears by about 1.2 million.[20] For both monuments, President Trump found that many of the "objects" identified in each proclamation did not merit protection under the Antiquities Act; that other federal laws were better suited to manage the lands at issue; and that the boundaries of the monuments were far larger than necessary.[21] Further, President Trump's proclamations modifying the monuments removed earlier restrictions that limited much land use.[22]

### C.       President Biden's Proclamations

In his first year in office, President Biden again reversed course, reinstating and expanding Grand Staircase-Escalante and Bears Ears.[23]   Under his proclamations (together, herein, the

---

[16] *See Utah Ass'n of Cntys*, 316 F. Supp. 2d at 1181–82 (discussing background and desire to shutter local coal mine); *see also* Am. Compl. ¶¶ 54–55 (ECF 90).

[17] *See, e.g.*, Am. Compl. ¶¶ 52–56 (ECF 90).

[18] *Id.* ¶¶ 65–68.

[19] *See, e.g., id.*

[20] 82 Fed. Reg. 58089, 58093 (Dec. 4, 2017); 82 Fed. Reg. 58081, 58085 (Dec. 4, 2017).

[21] *Id.* at 58090–91 (Grand Staircase); *id.* at 58081–82 (Bears Ears).

[22] *Id.* at 58093–94 (Grand Staircase); *id.* at 58085–86 (Bears Ears).

[23] 86 Fed. Reg. 57335; 86 Fed. Reg. 57321.

"Proclamations"), President Biden set aside 1.87 million acres for Grand Staircase-Escalante (an expanse larger than Delaware), and 1.36 million acres for Bears Ears (Rhode Island plus Guam).[24]

President Biden justified each Monument on the ground that the entire landscape was *itself* an "object of historic and scientific interest" under the Act.[25]  That is unprecedented.  No President has ever claimed that a landscape is an "object situated on land," let alone attempt to reserve millions of acres on that basis.  The Proclamations also list a range of constitutive "objects" that are scattered across each landscape.  Among them, both Proclamations state each landscape is broken into "distinct and unique areas, which are themselves objects qualifying for protection."[26]  The Proclamations also identify as "objects" an indeterminate number of "ecosystems" and "habitat[s]."[27]  So too a variety of animals—bees, owls, sheep, and more.[28]

Both Proclamations assert their respective landscape alone justifies each monument *in full*; and they also say that the individual "objects" scattered across each landscape justifies the same.[29]

Along with markedly expanding the range of "objects" to be protected, the Proclamations reinstate the Clinton- and Obama-era regulatory regimes for each Monument.[30]  And they also add some of their own.  For instance, both Proclamations direct agencies to retire livestock grazing permits and leases that are relinquished to the Government.[31]  Further, on top of the restrictions imposed by the Proclamations themselves, the BLM Director—at President Biden's direction—

---

[24] *Id.* at 57345; *id.* at 57332.
[25] *Id.* at 57336; *id.* at 57322.
[26] *Id.* at 57338 (Grand Staircase); *id.* at 57324 (Bears Ears).
[27] *See, e.g.*, *id.* at 57323 (collection of "intact ecosystems").
[28] *See, e.g.*, *id.* at 57337.
[29] *See id.* at 57345 (Grand Staircase); *id.* at 57331 (Bears Ears).
[30] *Id.* at 57344–46 (Grand Staircase); *id.* at 57331–33 (Bears Ears).
[31] *Id.* at 57346 (Grand Staircase); *id.* at 57332 (Bears Ears).

has issued an interim management plan for each Monument.[32]  The plans "provide[] specific direction" to the agency, and constitute binding directives until replaced by full plans in 2024.[33]

### D.    This Lawsuit

Plaintiffs represent a cross-section of Utah:  Ranchers, miners, outdoorsmen, and Native Americans.  Despite these different backgrounds, they face a shared threat from President Biden's Proclamations—for each, the Proclamations were designed to target their ways of life.

In an effort to salvage their businesses, pastimes, and traditions, the Individual Plaintiffs filed this lawsuit in August 2022.[34]  The Court consolidated this case with a similar suit filed by Utah, Kane County, and Garfield County.[35]  Afterwards, a number of parties moved to intervene on behalf of the Government.  Two have been successful, while the others were denied.[36]  The Government and Tribal-Intervenors moved to dismiss this action on March 2, 2023.[37]  The SUWA-Intervenors did so on March 30.[38]

---

[32] Memorandum from Director, BLM, to Utah State Director, BLM, *Interim Management of the Grand Staircase-Escalante National Monument* (Dec. 16, 2021) [hereinafter, "Grand Staircase Interim Plan"], https://www.blm.gov/sites/default/files/docs/2021-12/GSENM_Interim_ Guidance_12-16-21_Final508_0.pdf; Memorandum from Director, BLM, Utah State Director, BLM, *Interim Management of the Bears Ears National Monument* (Dec. 16, 2021) [hereinafter, "Bears Ears Interim Plan"], https://www.blm.gov/sites/default/files/docs/2021-12/BENM% 20Interim%20Guidance%2012-16-21_Final508.pdf.

[33] *See, e.g.*, Grand Staircase Interim Plan, *supra*, at 1–2.

[34] *See e.g.*, Griffin Decl. ¶ 15 (ECF 90-2) (Simone Griffin: "[T]he Monument risks destroying what it means to live here in Escalante."); Am. Compl. ¶ 147 (ECF 90) (Kyle Kimmerle: "If allowed to stand in its current form, I fear that the Monument will soon fundamentally destroy our region and its traditional way of life."); Dalton Decl. ¶ 18 (ECF 90-8) ("If allowed to stand, the Monument and its accompanying regulations pose an existential threat to our ranch and our livelihood."); Am. Compl. ¶ 173 (ECF 90) (Suzette Morris:  "Whatever the intent behind the Monument, it will be disastrous for our community if it's allowed to stand.").

[35] ECF 39.

[36] ECF 52 (Tribal Intervenors); ECF 122 (SUWA); *id.* (denying others).

[37] ECF 113 (Government) [hereinafter, "Gov't Br."]; ECF 114 (Tribes) [hereinafter, "Tribal Br."].

[38] ECF 141 [hereinafter, "SUWA Br."].

## SUMMARY OF ARGUMENT

Congress passed the Antiquities Act for a basic purpose:  To give the President the tailored ability "to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times."[39]  This case turns on whether Congress failed at that modest aim in spectacular fashion, and stumbled into vesting the President with plenary power to set aside any and all federal land as a national monument.  It did not.

The Antiquities Act imposes careful and deliberate limits on presidential power, consistent with its original focus.  President Biden's Proclamations are irreconcilable with those limits— indeed, with the notion of limits at all.  They purport to set aside over three million acres in Utah on the ground that landscapes, geographic areas, ecosystems, habitats, and animals (among other things) all constitute "objects of historic or scientific interest that are situated on [federal] land."[40]  If those justifications are allowed to stand, then the Antiquities Act will have no bound.  Every inch of federal land harbors such "objects."

The Proclamations are unlawful.  A landscape is not an "object situated on land."  Neither is an "area" or an "owl."  The Antiquities Act empowers the President to set aside federal land to protect certain enumerated items; he may not reserve whatever land he wants for whatever reason. Because the Proclamations contravene the Act, the Court should ultimately hold them unlawful and enjoin their implementation.  And because the Defendants offer no reason for the Court not to reach the merits—nor any legal basis to support the Proclamations on the merits—the Court should deny their motions to dismiss.

---

[39] H.R. Rep. No. 59-2224, at 1.
[40] 54 U.S.C. § 320301(a).

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, a complaint "must plead facts sufficient to state a claim to relief that is plausible on its face."[41]  That is, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42] "The court must accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff."[43]  For its part, a Rule 12(b)(1) motion "may take one of two forms."[44]  "A facial attack assumes the allegations in the complaint are true and argues they fail to establish [subject-matter] jurisdiction.  A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction."[45]  Nevertheless, "the requirements for an initial showing sufficient to support standing in a case of this nature are relatively lenient."[46]

## ARGUMENT

### I.    THE PROCLAMATIONS ARE REVIEWABLE.

The Government's lead argument is that presidential proclamations under the Antiquities Act are unreviewable.[47]  That is a radical proposition.  On the Government's view, the President may reserve any federal land for any reason so long as he cites the Act.  And regardless of how far a proclamation goes beyond the statute's bounds, the courts are powerless to intervene on behalf of injured parties.

---

[41] *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013).
[42] *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).
[43] *Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250, 1255 (D. Utah 2022).
[44] *Muscogee (Creek) Nation v. Okla. Tax Com'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).
[45] *Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022).
[46] *Utah Ass'n of Cntys.*, 316 F. Supp. 2d at 1185 n.6.
[47] Tribal Intervenors adopt the bulk of the Government's reviewability arguments—at least for the *creation* of monuments (but somehow not their modification).  Tribal Br. at 14.  SUWA Intervenors adopt the others' merits arguments, but not the reviewability ones.  SUWA Br. at 1–2.

The Government is wrong.  No court has ever held that an Antiquities Act suit is barred by sovereign immunity.  And the Government's other reviewability arguments are against "a raft of precedent holding otherwise."[48]  Indeed, three times the Supreme Court has reviewed the legality of a President's monument designation.[49]  And just a few Terms ago, the Chief Justice wrote separately to invite "opportunities" to assess the scope of the President's Antiquities Act powers.[50] The Proclamations are subject to review.

### A.      Sovereign Immunity Does Not Bar This Suit.

The Government first invokes sovereign immunity.[51]  That effort has never worked in an Antiquities Act case.  This case should not be first, for two distinct reasons.

*First*, sovereign immunity does not attach to this suit.  There is a "traditional exception to sovereign immunity" for "suits for prospective relief when government officials act beyond the limits of statutory authority."[52]  The Supreme Court has long relied on this exception to review allegedly unlawful executive action by federal officials.[53]  So too lower federal courts.[54]

This case fits well within that exception.  The essence of this suit is that President Biden has exceeded his authority under the Antiquities Act, because the Act does not authorize him to declare as "objects"—and thus protect as monuments—things like landscapes, areas, ecosystems, habitats, and animals.[55]  And since the Proclamations facially exceed the President's authority

---

[48] *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 54 (D.D.C. 2018).

[49] *United States v. California*, 436 U.S. 32, 36 (1978); *Cappaert v. United States*, 426 U.S. 128, 141–42 (1976); *Cameron v. United States*, 252 U.S. 450, 455–56 (1920).

[50] *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial).

[51] Gov't Br. at 12–14.

[52] *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232–33 (10th Cir. 2005).

[53] *Dugan v. Rank*, 372 U.S. 609, 621–23 (1963); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690 (1949).

[54] *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (applying the "*Larson-Dugan* exception" to sovereign immunity to allegedly unlawful presidential action).

[55] *See* Part III *infra*.

under the statute, "there is no sovereign immunity to waive—it never attached in the first place."[56] As noted, no court has ever held that an Antiquities Act challenge is barred by sovereign immunity. In fact, applying these principles, every court to address the argument has rejected it.[57]

In reply, the Government confuses the law.  The Government suggests that so long as an executive action is conceivably within the ambit of a statute, then it falls outside the *ultra vires* exception to sovereign immunity.[58]  That is wrong.  At bottom, the Government conflates an abuse of discretion with the absence of authority.

One of the main cases the Government invokes actually illustrates the point.  In *United Tribe of Shawnee Indians v. United States*, a tribe brought an action against the United States (and various agencies) arguing that it met the criteria for federal tribal recognition, and taking issue with the Government's failure to ascribe it that designation.[59]  There, nobody disputed that the Government had *the power* to recognize tribes who met specified criteria; the only issue was whether the Government *had erred* in exercising that power by not recognizing a specific tribe under those criteria.[60]  The Tenth Circuit held such a claim barred by sovereign immunity, because the *ultra vires* exception did not extend to a "claim of error in the *exercise* of [a statutory] power."[61]

This case is different in kind.  Plaintiffs' claims are not that the President exercised his power "erroneously or incorrectly," as the Government says—for instance, that the President wrongly prioritized one ruin over another.[62]  Their claims are instead that the President went

---

[56] *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).
[57] *See, e.g.*, *Am. Forest Res. Council v. Hammond*, 422 F. Supp. 3d 184, 192 n.8 (D.D.C. 2019) (holding sovereign immunity does not bar Antiquities Act suit).
[58] Gov't Br. at 13–14.
[59] 253 F.3d 543, 545 (10th Cir. 2001).
[60] *Id.* at 548.
[61] *Id.* at 548–49.
[62] Gov't Br. at 13.

*beyond the bounds* of his authority to wield a power he does not possess, and declare as "objects" things the Antiquities Act categorically does not reach.  Because this suit rests on the President's *lack* of authority to fashion these monuments, it falls within the heartland of the *ultra vires* exception to sovereign immunity.[63]

*Second*, the APA waives any sovereign immunity the Government would have.  Section 702 has been read to operate as a "general waiver" of federal sovereign immunity for all injunctive or declaratory relief.[64]  And that waiver "is not limited to suits under the Administrative Procedure Act."[65]  The fact that the APA's review provisions do not extend to the President does not mean that its waiver does not reach all presidential actions.  Rather, § 702 is implicated whenever a subordinate "officer or employee" of the United States takes unlawful "act[ion]," in the ordinary sense of the word—not just "final action," as understood by the APA.[66]  And since Antiquities Act proclamations are "not self-executing"—that is, since they necessarily must be implemented by executive branch subordinates—claims concerning such proclamations are inherently premised on stopping unlawful subordinate executive action, and thus fit within the APA's waiver of federal immunity.[67]  (At the very least, the APA's waiver applies to Individual Plaintiffs' APA claims.)

Once more, no court has ever held an Antiquities Act challenge is barred by sovereign immunity.  There is no sound reason for this Court to become the first.

---

[63] *See, e.g.*, *Reich*, 74 F.3d at 1329 ("[I]f the federal officer … allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit.").

[64] *United States v. Murdock Mach. & Eng'g Co.*, 81 F.3d 922, 929 n.8 (10th Cir. 1996).

[65] *Simmat*, 413 F.3d at 1233.

[66] 5 U.S.C. § 702; *Rivera v. IRS*, 708 F. App'x 508, 511 n.2 (10th Cir. 2017) (final agency action not required for § 702's wavier).

[67] *Brnovich v. Biden*, 562 F. Supp. 3d 123, 150 & n.16 (D. Ariz. 2022); *see also Reich*, 74 F.3d at 1329 (casting doubt on argument that § 702 does not reach presidential actions).

### B.    Antiquities Act Designations Are Not Committed to the President's Discretion.

The Government next says that nobody can challenge proclamations under the Antiquities Act because those decisions are committed to the President's unreviewable discretion.[68]  In a variant of the above, the Government contends that such challenges are essentially attacks on the President's "exercise[] [of his] discretionary authority conferred on him pursuant to the Antiquities Act."[69]   And judicial review of such "discretionary judgments" is broadly unavailable, the Government says, without a clear statement from Congress creating a specific cause of action.[70]

Here too, the Government finds itself against "a raft of precedent holding otherwise."[71] The federal courts have long recognized that "equity" provides a cause of action for individuals aggrieved by a legal violation to bring suit to enjoin "violations of federal law by federal officials."[72]  And that is true for the President as much as any other federal official.[73]

In arguing otherwise, the Government presses a reading of *Dalton v. Specter* (and its related cases) that courts have already rejected as "breathtakingly broad."[74]  The Government claims *Dalton* and its progeny mean that whenever a statute supplies the President—rather than one of his subordinates—with a discretionary power, any exercise of that power is unreviewable without further congressional action.[75]  That is as wrong as it sounds.  The *Dalton* line of cases arose in a

---

[68] Gov't Br. at 14–19.

[69] *Id.* at 15.

[70] *Id.* at 18.

[71] *Mass. Lobstermen's*, 349 F. Supp. 3d at 54.

[72] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *see also, e.g.*, *Simmat*, 413 F.3d at 1232 ("Equity thus provides … the cause of action … when government officials act beyond the limits of statutory authority").

[73] *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 703 (1997) ("[W]hen the President takes official action, the Court has the authority to determine whether he has acted within the law."); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 160 (1993); *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981); *see also Reich*, 74 F.3d at 1327–28.

[74] *Reich*, 74 F.3d at 1329.

[75] Gov't Br. at 15.

particular fact-pattern:  A statute charged the President with making a "discrete specific decision," but provided "no limitations on the President's exercise of that authority."[76]  Specifically, the decisions were whether to accept a base closure recommendation (*Dalton*); approve flight routes (*Waterman*); change rates if he deemed it was "necessary" (*Bush*); and take control of domestic phonelines in wartime if "necessary" (*Dakota*).[77]  In each, the Court withheld review, reasoning that without further congressional criteria, it could not evaluate the President's discretionary act.[78]

This case is very different.  To tweak the facts of *Dakota*, this case is not like an abuse-of-discretion suit challenging the President's decision to commandeer some particular phoneline; it is the President seizing a bakery by calling it a telephone.  As the *Dalton* Court itself stressed, there is a difference between cases where the statutes impose no limit "at all" on the President's discretion, and those that place discernible limits on the same.[79]  Only in the former is judicial review sometimes unavailable; and that is because there is simply no law to apply in evaluating "[h]ow the President chooses to exercise the discretion Congress has granted him."[80]

But the Antiquities Act is not one of those statutes.  Rather, the Act imposes concrete limits on the President's discretion.  The President may only declare monuments to protect a set of enumerated items.[81]  And any monument must be the "smallest area compatible" with the protection of its items.[82]  Accordingly, as the D.C. Circuit has explained, "review is available to

---

[76] *Reich*, 74 F.3d at 1331.

[77] *Dalton v. Specter*, 511 U.S. 462, 476 (1994); *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948); *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940); *Dakota Cent. Tel. Co. v. S.D. ex rel. Payne*, 250 U.S. 163, 181, 184 (1919).

[78] *Reich*, 74 F.3d at 1331.

[79] *Dalton*, 511 U.S. at 476.

[80] *Id.*; *see also id.* at 478 (Blackmun, J., concurring in part and concurring in the judgment) (joining on understanding that "*ultra vires*" review is unaffected).

[81] 54 U.S.C. § 320301(a).

[82] *Id.* § 320301(b).

ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority."[83]  Simply put, the Antiquities Act's limits matter.  When a President goes past them, he is not *abusing* the discretion available to him; he is *exceeding* the fixed legal limits on his power.

For these reasons, this Court should not follow the two district courts in this Circuit that have deemed Antiquities Act proclamations effectively unreviewable.  There, the courts held that because the Antiquities Act vests the President with a discretionary power, the President's use of that power is largely beyond judicial scrutiny.[84]  That is incorrect.  The Antiquities Act gives the President sole "discretion" over *whether* to declare a monument at all.[85]  It does not give him the unreviewable discretion to determine for himself *what* the Act authorizes.  The President can choose to use his powers under the Act whenever he wants; he cannot decide for himself what those powers actually entail.

In short, on the Government's view, the President has unreviewable power to set aside all federal land to protect its general landscape or even a single bee that floats above it.  Perhaps he can even set aside land that is not federal at all.  After all, the Government says the President is the "sole and exclusive judge as to the existence of facts satisfying [the Act's] standards."[86]  That is mistaken.  The Supreme Court has three times evaluated on the merits challenges to an Antiquities Act designation.[87]  Quite rightly, not once did it pause on the propriety of exercising review.[88]

---

[83] *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *see also Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 540 (D.C. Cir. 2019).
[84] *Utah Ass'n of Cntys.*, 316 F. Supp. 2d at 1186; *Wyoming v. Franke*, 58 F. Supp. 890, 896 (D. Wyo. 1945).
[85] 54 U.S.C. § 320301(a).
[86] Gov't Br. at 16.
[87] *Supra* note 49.
[88] The Government's choice to frame this issue as a lack of a "cause of action" is somewhat confused.  Plaintiffs of course have a cause of action—along with equity, the Declaratory

## II.   THE PLAINTIFFS HAVE STANDING.

The Government next contends that the Individual Plaintiffs all lack standing.[89]  Article III requires that a plaintiff have a "personal stake" in the case—*i.e.*, an answer to the question: "What's it to you?"[90]  To do so, a plaintiff must demonstrate "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."[91]

The Government's argument here is at war with itself.  In one breath, it hails the Proclamations as pathmarking conservation efforts, and urges the Court not to set aside the "monument protections" that it says are necessary to protect these lands from certain activities— namely, ranching, mining, and off-roading.[92]  Or as the SUWA-Intervenors have put it:  "If the Dalton Plaintiffs obtain the relief they seek … [t]he lands would once again be open to mineral extraction and a multiple-use management regime that increases the risk of native vegetation removal[ and] harmful off-road vehicle use."[93]  But at the same time, the Government insists that none of the Individual Plaintiffs—a rancher, a miner, an off-roading group, and a Native American

---

Judgment Act.  The point of the *Dalton* line of cases is that even where a cause of action may be available, judicial review may not be, because the underlying statute offers no limits on the President's discretion, and there is thus just no law to apply.  *George S. Bush*, 310 U.S. at 380.  In other words, in those circumstances, there is often no judicial review because judges have not been given the means for coherently reviewing the act at issue, and thus it is committed to the President's discretion.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).  But that is not this case.

[89] The SUWA Intervenors do not presently contest the Individual Plaintiffs' standing.  *See* SUWA Br. at 2.  The Tribal Intervenors mirror the Government's arguments.  Tribal Br. at 15–23.

[90] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

[91] *Id.*

[92] Gov't Br. at 1; *see also, e.g.*, ECF 40, at 8.

[93] ECF 40, at 8.

seeking to remove traditional resources from monument lands—have standing to challenge the Proclamations that were premised upon restricting their very lives and livelihoods.[94]

The Government is incorrect. As then-Judge Kavanaugh has explained, "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated."[95] There is no reason to depart from that "rule" here.[96] The Individual Plaintiffs are not "mere outsider[s] asserting a [general] objection to the [Monuments]."[97] They are the objects of the Proclamations; they have standing to challenge them.

### A.   Zeb Dalton

Zeb has dedicated his life to operating a ranch in southern Utah.[98] In so doing, he follows in the footsteps of his family, which has been ranching on these lands for generations.[99] Zeb wants nothing more than to pass his ranch down to his children—as his father did for him, and his father before that.[100] President Biden's Proclamation poses an existential threat to that effort.[101]

During the Trump Administration, less than 1% of Zeb's ranch was located in the Bears Ears National Monument.[102] Now, about three-quarters of it is within monuments bounds.[103] That has caused a groundswell change to life at TY Ranch.

---

[94] Of course, the Government's fact-bound standing arguments are inappropriate on a motion to dismiss posture like this one, where the Court takes as true the Complaint's allegations. *See, e.g.*, *Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014). But they do not matter in all events. As explained, Individual Plaintiffs plainly have standing based on undisputed points alone.
[95] *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015).
[96] *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015); *see also, e.g.*, *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021).
[97] *State Nat'l Bank*, 795 F.3d at 53.
[98] Dalton Decl. ¶¶ 2–3, 6 (ECF 90-8).
[99] *Id.* ¶ 2.
[100] *Id.* ¶ 19.
[101] *Id.*
[102] *Id.* ¶ 5.
[103] *Id.* That number will get closer to 100% after the upcoming land transfer. *Id.* ¶ 16.

In particular, as Zeb has explained—and the Government does not contest—in order to manage a ranch, one needs need to be able to fix, modify, and build range improvements (*e.g.*, fences, wells, pipelines).[104]  And when a ranch is on federal land, a rancher needs to get federal approval in to make these improvements.[105]

It is uncontested that President Biden's Proclamation has elevated the standard—and thus increased the regulatory burden—for getting range improvements approved.  During the Trump Administration, range improvement applications were evaluated under the BLM's flexible multiple-use and sustained yield mandates.[106]  But under the Proclamation, "typical multiple use management is superseded by the direction in Proclamation 10285 to protect monument objects."[107]  That is a new and higher standard, as even Acting Bears Ears National Monument Manager Lundell acknowledged:  "[B]ecause of Proclamation 10,285, the BLM must determine that a range improvement is consistent with the protection of monument objects."[108]

It is also undisputed that obtaining federal permission for range improvements—whether on monument land or not—involves time, resources, and compliance costs.[109]  Indeed, it is a very cumbersome process even outside monument lands.  As Mr. Lundell's declaration explains, these

---

[104] *Id.* ¶¶ 7–9.

[105] Dalton Supp. Decl. ¶ 4 (ECF 90-8); *see also* 43 C.F.R. § 4120.3-3 (detailing range improvement permits); Lundell Decl. ¶ 12 (ECF 113-10) (discussing process).

[106] 82 Fed. Reg. at 58086 (Trump Proclamation:  "Livestock grazing within the monument shall continue to be governed by laws and regulations other than this proclamation."); *see also, e.g.*, 43 U.S.C. § 1702I (defining "multiple use" mandate); 43 C.F.R. § 4120.3-1 (explaining range improvements must be done "in a manner consistent with multiple-use management"); Peterson Decl. ¶ 34 (ECF 27-9) (SUWA Intervenors:  Contrasting the "general 'multiple use' principle" with the "heightened protection that applies to national monuments").

[107] Bears Ears Interim Plan, *supra*, at 3; *see also, e.g.*, 86 Fed. Reg. at 57332 (Biden Proclamation:  "The Secretaries shall manage livestock grazing … consistent with the care and management of the [Monument's] objects"); BLM Manual 6220 § 1.6.I (2012) (similar); Bears Ears Interim Plan, *supra*, at 5 (similar).

[108] Lundell Decl. ¶ 13 (ECF 113-10).

[109] *See, e.g.*, Dalton Supp. Decl. ¶ 4 (ECF 90-8).

approvals take years, and involve extensive work on the part of the Government and applicant.[110] Just consider the 100-plus pages of (single-spaced) NEPA filings that have already been put together for Zeb's request to build some water wells and fences.[111]   And now, as Zeb has explained—and as the Government again does not dispute—the range improvement process is even *more* cumbersome and *more* costly given the added layer of monument-specific review.[112]

That is more than sufficient for standing, as then-Judge Gorsuch laid bare for the en banc Tenth Circuit.  "[T]he out-of-pocket cost to a business of obeying a new rule of government, whether or not there may be pecuniary loss associated with the new rule, suffices to establish an injury in fact."[113]   Indeed, it does not even matter whether a new regulatory regime is in fact "stricter" or more costly than the old one; all that matters is the party has incurred "administrative costs" as part of complying with the new one.[114]   And so long as an affected party has done so, it has standing to challenge the lawfulness of the new regulatory regime.[115]

The federal courts are "uniform" on this score.[116]   As the Sixth Circuit put it, the "question is whether the Plaintiffs are within the group of individuals whose conduct the statute regulates."[117] And as the Third Circuit has explained, "compliance costs" associated with obeying new regulations, however stringent, are "a classic injury-in-fact."[118]   Or in Wright & Miller's words: "[I]njury sufficient to support standing may be found in subjection to unwanted procedures."[119]

---

[110] Lundell Decl. ¶¶ 12–13 (ECF 113-10).

[111] *Id.* ¶ 12 (collecting links).

[112] *See, e.g.*, Dalton Supp. Decl. ¶ 4 (ECF 90-8).

[113] *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1144–45 (10th Cir.) (en banc).

[114] *Id.*

[115] *See also State Nat'l Bank*, 795 F.3d at 53 (Kavanaugh, J.).

[116] *Grand River*, 988 F.3d at 121 (collecting cases).

[117] *Phillips v. DeWine*, 841 F.3d 405, 414–15 (6th Cir. 2016).

[118] *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015).

[119] 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed. Apr. 2022 update).

Zeb's standing is thus straightforward.  Zeb currently has range improvement applications pending—and will need range improvements in the future—that are subject to this new regulatory regime.[120]  And Zeb must expend resources to comply.  That is enough.[121]  In fact, Zeb is not simply expending resources to comply with an unlawful regime—itself sufficient—he is expending *more* resources due to that regime's heightened burdens.[122]  That well clears any bar.[123]

The Government has no answer to this.  And the few points it does make are unpersuasive.

*First*, the Government emphasizes that BLM has not yet *denied* any of Zeb's pending applications.[124]  Likewise, Mr. Lundell underscores that the BLM is not "barred from authorizing range improvements" under the Proclamation.[125]  But that is beside the point.  Again, in *Hydro Resources*—which likewise involved a "permitting process"—Judge Gorsuch made clear that standing was not contingent on a permit being denied; rather, it turned on whether a party was *subject to* and thus had to *comply with* an unlawful process.[126]  Further, the Government's argument fails on its own terms.  In the actual life of a ranch, a permit delayed is a permit denied.[127]  Here, Zeb's permits have languished in the bureaucracy for years—a problem the Proclamation will necessarily to make worse by miring approvals in an additional layer of monument review.[128]

---

[120] *Id.*; *see also, e.g.*, Dalton Decl. ¶¶ 7, 18 (ECF 90-8).

[121] *Hydro Res.*, 608 F.3d at 1144; *see also, e.g.*, *NCAA v. Califano*, 622 F.2d 1382, 1389 (10th Cir. 1980) ("Compulsion by unwanted and unlawful government edict is injury *per se*.").

[122] Dalton Supp. Decl. ¶ 4 (ECF 90-8) ("[T]his higher standard has caused—and will cause—me to spend more time and resources to comply with federal regulations.").

[123] *State Nat'l Bank*, 795 F.3d at 53.

[124] Gov't Br. at 38.

[125] Lundell Decl. ¶ 13 (ECF 113-10).

[126] *Hydro Res.*, 608 F.3d at 1144.

[127] Dalton Decl. ¶ 17 (ECF 90-8) (noting lost profits and other harms due to delays); *see also, e.g.*, *Doyle v. Jewell*, No. 13-cv-861, 2014 WL 2892828, at *1 (D. Utah June 26, 2014) (finding that "delay alone [may constitute Article III] harm and … a redress[a]ble injury").

[128] *See, e.g.*, Dalton Supp. Decl. ¶¶ 4–5 (ECF 90-8).

*Second*, the Government objects to Zeb raising new problems regarding parts of his ranch outside the Monument.[129]  But that misses the point.  That Zeb has faced regulatory scrutiny regarding the rest of his ranch—such as inquiries from BLM about the hydrologic impact of his wells—only shows that the effects of the Monument extend beyond its borders, even picking up outside activities that have downstream effects on monument lands.

*Third*, the Government dismisses Zeb's concerns about the upcoming SITLA land transfer, because the Monument does not mandate any land exchange.[130]  But once again, the Government misses the point.  Once the SITLA land transfer goes through, Zeb's ranch will be almost entirely on federal land.[131]  This will only compound the regulatory problems detailed above.  As it stands now—and will be worse later—Zeb cannot avoid the new federal range improvement regime.

Zeb is not a "mere outsider."[132]  By intent and design, President Biden's Proclamation has affected—and will continue to affect—life at TY Ranch.  Indeed, preserving the Monument's limitations on grazing practices is one of the central reasons so many parties have tried to intervene in this case.[133]   Zeb has standing.

### B.    Kyle Kimmerle

Kyle has standing for similar reasons, as the Government barely disputes.  Kyle runs a mining company with his dad.[134]  As with Zeb, Kyle's family has been living on and working these lands for generations.[135]  And as with Zeb, the Monument threatens his way of life.

---

[129] Gov't Br. at 37.
[130] *Id.* at 38.
[131] Dalton Decl. ¶ 18 (ECF 90-8).
[132] *State Nat'l Bank*, 795 F.3d at 53.
[133] *See, e.g.*, Kent Decl. ¶ 14 (ECF 27-6) (SUWA Intervenors); Hadenfeldt Decl. ¶ 55 (ECF 33-2) (Cedar Mesa Intervenors); Burrillo Decl. ¶ 22 (ECF 34-2) (American Anthropological Association Intervenors).
[134] Kimmerle Decl. ¶ 3 (ECF 90-7).
[135] *Id.*

Among other things, Kyle and his mining company have a number of active mining claims within the Bears Ears National Monument.[136]  He would like to move forward on some of those claims—including his Geitus mining claims—but has not done so because of "validity exam[inations]" that the Monument requires.[137]  These exams are not only expensive—at least $300,000 on the latest estimate—but also risky, because they expose the claims to being declared invalid (and thus challenged by BLM).[138]  Indeed, BLM officials have already indicated to Kyle that if he tries to move forward with his claims, they would seek to invalidate them.[139]  As a result, Kyle has suffered $2–3 million in lost profits.[140]  Related, Kyle has a number of other valid and active claims in Bears Ears—distinct from Geitus—whose value has plummeted due to being within monument bounds.[141]

That is sufficient for standing.  Subjecting Kyle's mining claims to new and costly regulations satisfies Article III.[142]  Likewise, where a governmental policy directly causes a "decline in value" of one's property, that also "satisf[ies] Article III."[143]

The Government makes two contrary arguments.  Both fail.

*First*, the Government does not contest that Kyle is subject to burdensome new regulations as a result of the Monument, but instead argues that those injuries are not redressable, because Kyle's mining claims are on lands that would be part of any monument regardless due to the

---

[136] *Id.* ¶ 10.

[137] *Id.* ¶¶ 11–17.

[138] *Id.* ¶ 14.

[139] *Id.*

[140] *Id.* ¶ 16.

[141] Kimmerle Supp. Decl. ¶ 4 (ECF 90-7).

[142] *See, e.g.*, *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1218 (10th Cir. 2017).

[143] *See, e.g.* *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1154 (10th Cir. 2013) (en banc) (Gorsuch, J., concurring).

Proclamation's severability clause.[144]  But this point rests on a fundamental legal error:  It confuses jurisdiction with the merits.[145]  For jurisdictional purposes, courts assume plaintiffs' claims have merit, and assess whether jurisdiction exists on that understanding.[146]  And here, the Individual Plaintiffs' claims are that the Proclamations exceed the President's authority and must be set aside in full—regardless of any severability clause.[147]  On this view, the proper course is to restore the status quo *before* the Biden Proclamation.  And on this view, Kyle's injuries are clearly redressable because the Proclamation and its accompanying regulations would fall in their entirety.[148]

*Second*, the Government dismisses Kyle's assertion that some of his claims within Bears Ears have lost value because of the Proclamation.  The Government does not contest that a person losing value on their property due to a governmental policy would create standing—nor could it.  Rather, the Government says that attributing any decline to the Monument is speculative.[149]  But that ignores reality.  It does not even take "principles of elementary economics" to understand that a mining claim is less valuable once saddled with (among other things) a validity examination—a requirement that is not only expensive on its own, but that jeopardizes the validity of the claim

---

[144] Gov't Br. at 40.

[145] *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (courts must distinguish standing and merits); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (same); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989) (same).

[146] *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–93 (1998) (courts ordinarily assume the merits for assessing jurisdiction); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) ("For purposes of standing, we must assume the Plaintiffs' claim has legal validity."); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (same); *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (same).

[147] Part III.C *infra*.

[148] Regardless, as both the Individual and Garfield County Plaintiffs have alleged, land underlying Kyle's mining claims *would* fall outside any proper monument designation—a plausible allegation that the Court must accept as true on this posture.  *See* Kimmerle Supp. Decl. ¶ 5 (ECF 90-7); Garfield County Am. Compl. ¶at 83 (ECF 91) (providing map).

[149] Gov't Br. at 41.

itself.[150]  And the one case relied on by the Government does not suggest otherwise.  There, the plaintiffs (certain energy producers) were complaining about the attenuated, indirect effects of the EPA granting fuel credits to *other* producers.[151]  Here, by contrast, Kyle is complaining about the *direct* and *predicable* effects of a governmental mining policy on his specific mining claims.

As with Zeb, Kyle is not a "mere outsider."[152]  He has active mining claims in Bears Ears, and the Monument is harming those claims—precisely as intended.[153]  Kyle has standing.

### C.      The BlueRibbon Coalition

BlueRibbon is a non-profit group that works on expanding and maintaining recreational access to public lands.[154]  It has thousands of members—including individuals and businesses—joined by a shared appreciation of the outdoors and, in particular, using off-road vehicles to explore them.[155]  Preserving motorized access to public lands is a central aspect of BlueRibbon's mission, and essential to its members' recreational interests.[156]  BlueRibbon has standing to sue here both on behalf of its members as well as in its own right.[157]

### 1.      BlueRibbon has associational standing.

A membership organization has standing to sue "(1) when its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's

---

[150] *Mescalero Apache Tribe v. New Mexico*, 630 F.2d 724, 727 (10th Cir. 1980); Kimmerle Decl. ¶¶ 13–14 (ECF 90-7) (explaining costs and risks associated with validity exam).

[151] *Producers of Renewables United for Integrity, Truth & Transparency v. EPA*, No. 19-9532, 2022 WL 538185, at *5–9 (10th Cir. Feb. 23, 2022).

[152] *State Nat'l Bank*, 795 F.3d at 53.

[153] *See, e.g.*, Atencio Decl. ¶ 27 (ECF 27-1) (SUWA Intervenors); ECF 33, at 9–10 (Cedar Mesa Intervenors); Burrillo Decl. ¶ 23 (ECF 34-2) (American Anthropological Association Intervenors); Holland Decl. ¶ 7 (ECF 31-2) (Grand Staircase Escalante Partners Intervenors).

[154] Burr Decl. ¶ 8 (ECF 90-1).

[155] *Id.* ¶¶ 10–12.

[156] *Id.*; *see also, e.g.*, *id.* ¶ 32.

[157] *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021) (associational standing); *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1396 (10th Cir. 1992) (organizational standing).

purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[158]  For the points discussed below, the Government does not dispute the latter two prongs.  BlueRibbon's associational standing thus turns entirely on the first: Whether its members have standing.  They do, for three independent reasons.

*First*, the Monuments changed the regulatory regime for obtaining "special recreation permits."  BlueRibbon members have hosted—and wish to continue to host—large group-rides and other off-roading events on lands within Grand Staircase-Escalante and Bears Ears.[159]  To do so, they must obtain special recreation permits from BLM.[160]  And now, before granting any permit for activities on monument lands, BLM must first ensure that any "recreation use or activity" is "consisten[t] with the proclamation."[161]  This raises the regulatory standard and—in light of this new and higher standard—BLM has made a point of emphasizing that "this requirement applies to special recreation permits that may come up for renewal, notwithstanding whether an event or activity has been permitted in the past."[162]

That suffices for standing.  BlueRibbon members must pay "out-of-pocket cost[s]" as part of "obeying" this new scheme.[163]  Each time a person applies for a special recreation permit, he

---

[158] *Utah Physicians*, 21 F.4th at 1241 (alterations omitted).

[159] *See, e.g.*, Burr Supp. Decl. ¶¶ 6–8, 14 (ECF 90-1); Burr Decl. ¶¶ 28–30 (ECF 90-1); *see also* Wright Decl. ¶ 14 (ECF 90-3) (expressing desire to apply for permits and host events throughout Grand Staircase).

[160] Burr Supp. Decl. ¶ 6 (ECF 90-1); *see also, e.g.*, *Utah Special Recreation Permits Program*, BLM, https://www.blm.gov/programs/recreation/permits-and-passes/special-recreation-permits/utah#:~:text=Day%2Duse%20fees%20are%20%242,or%20the%20 Monticello%20Field%20Office (last visited Apr. 13, 2023).

[161] Grand Staircase Interim Plan, *supra*, at 5; Bears Ears Interim Plan, *supra*, at 5.

[162] Grand Staircase Interim Plan, *supra*, at 5; Bears Ears Interim Plan, *supra*, at 5.

[163] *Hydro Res.*, 608 F.3d at 1144.

must pay a fee.[164]  This "outlay of funds necessary to secure a … permit from [BLM]" is enough, because it is a concrete injury incurred to comply with an unlawful process.[165]

But there is more.  Some members of BlueRibbon have had permits denied under this heightened standard—including one permit that asked to use a trail the Grand Staircase-Escalante Interim Plan identified as meriting reexamination for "off-road vehicle use" in light of the Proclamation.[166]  Other BlueRibbon members have been deterred by the greater regulatory hassle the Proclamations impose.[167]  And that is understandable.  During the Trump Administration, off-road vehicle use was not heavily regulated.[168]  By contrast, the Biden Proclamations specifically stress that off-roading is not a protected activity.[169]  These regulatory changes directly interfere with the recreational interests of BlueRibbon's members and thus amply suffice for standing.[170]

*Second*, the Proclamations have caused the closures of existing areas, and further forbid creating new roads for future exploration.  Such limits on using lands for "recreational … purposes" also readily give rise to standing.[171]

---

[164] *See, e.g.*, *Utah Special Recreation Permits Program*, *supra*.

[165] *Hydro Res.*, 608 F.3d at 1144 (quotation marks omitted); *see also Califano*, 622 F.2d at 1389 ("[T]he cost of obeying the regulations constitutes injury.").

[166] Wright Decl. ¶¶ 12–14 (ECF 90-3) (describing permit denials for Inchworm Arch Road); Grand Staircase Interim Plan, *supra*, at 4 (citing "off-road vehicle use" on "Inchworm Arch Road" as something to be reassessed for consistency with monument).

[167] *See, e.g.*, Klein Supp. Decl. ¶ 4 (ECF 90-4) (explaining that "higher regulatory burden" from new Proclamations has deterred Trail Hero from even pursuing events on monument lands).

[168] *See, e.g.*, 82 Fed. Reg. at 58086 (clarifying that "motorized and non-mechanized vehicle use on roads and trails" within monument lands is "allow[ed]").

[169] Burr Decl. ¶ 28 (ECF 90-1) (collecting sources and quotes).

[170] *See, e.g.*, *S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1233–34 (10th Cir. 2010).

[171] *See, e.g.*, *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1156 (10th Cir. 2013); *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 697 (10th Cir. 2009); *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002).

Start with the closures of existing roads and areas.  The Complaint details, for instance, that the Little Desert OHV Area has been restricted as a result of President Biden's Proclamation. Under the Trump Proclamation, people like Simone Griffin and her family were able to ride freely in that area, because it was available for open-access and open-travel.[172]  But after President Biden's Proclamation, that Area has been restricted.[173]  It now has signs posted outside and within telling people to stay on existing routes to "protect important resources."[174]  And BLM's website carries the same message.[175]  In turn, Simone and her family have stopped riding here.[176]

More, these sorts of "formal closures and restrictions only provide part of the picture."[177] For example, in the area around Paria River, the on-the-ground rules were relaxed during the Trump Administration, and members of the public found themselves able to ride again along the Paria Canyon Road by way of a 90-foot corridor used as a right-of-way.[178]  But after President Biden's Proclamation, BlueRibbon members have been informed they can no longer ride there.[179]

Looking to the future, the Proclamations also stymie the ability of BlueRibbon members to ride on—or help construct—new trails that would enable them to explore other places in now-monument lands.   For instance, President Biden's Proclamation incorporates by reference President Obama's Bears Ears Proclamation, which forbids "[a]ny additional roads or trails designated for motorized vehicle use" except for "the purposes of public safety or protection of

---

[172] Burr Supp. Decl. ¶ 5 (ECF 90-1).

[173] *See* Grand Staircase Interim Plan, *supra*, at 4 (identifying "off-road vehicle use" in "the Little Desert OHV open area" as something to be reassessed for consistency with monument).

[174] Griffin Supp. Decl. at 3 (ECF 90-2) (providing photo).

[175] *Little Desert Off-Highway Vehicle Open Area*, BLM (Aug. 18, 2022), https://www.blm.gov/utah-paria-river-do/public-room/data/little-desert-highway-vehicle-ohv-open-area.

[176] Griffin Supp. Decl. ¶ 4 (ECF 90-2).

[177] Burr Supp. Decl. ¶ 6 (ECF 90-1).

[178] *Id.* ¶ 9.

[179] *Id.*; *see also, e.g.*, *id.* ¶ 10 (explaining how members like guided tour operators have been told that increasing number of roads and trails are now closed for riding).

[the Monument's] objects."[180]  That policy directly harms BlueRibbon members.  Indeed, a tenet of BlueRibbon—and a shared pursuit of its members—is to expand motorized access on public lands.[181]  As one example, Tony Wright's group—the Utah / Arizona ATV Club—has spent hundreds of hours building and maintaining a new trail connected to the Inchworm Arch Road.[182] But the Proclamation now forbids their activities.  That is sufficient for Article III.[183]

*Third*, the Proclamations subject BlueRibbon's members to new criminal liability.  The Antiquities Act includes an enforcement provision, which provides that any "person" who "appropriates, excavates, injures, or destroys" any part of a "monument" is subject to 90 days in prison, a fine, or both.[184]  President Biden Proclamations' invoked this prohibition, issuing a "[w]arning" to all "unauthorized persons not to appropriate, injure, destroy, or remove any feature of [either] monument."[185]

This explicit threat of prosecution has chilled BlueRibbon's members from taking certain activity—such as off-roading in certain areas—that they would otherwise do.[186]  After all, the Proclamations declare every inch of the Grand Staircase-Escalante and Bears Ears' *landscapes* to be protected "objects" and thus designate these lands as features of the Monuments—triggering the Act's criminal enforcement provision.[187]  It is "virtually impossible to ride a vehicle over a

---

[180] 82 Fed. Reg. at 1145; 86 Fed. Reg. at 57332 (incorporating this by reference); *compare* 82 Fed. Reg. at 58086 (revising this restriction to allow for "motorized and non-mechanized vehicle use on roads and trails" as before).

[181] Burr Decl. ¶¶ 8–10 (ECF 90-1).

[182] Wright Decl. ¶ 8 (ECF 90-3); *see also* Burr Decl. ¶ 10 (ECF 90-1) (explaining that BlueRibbon members "often serve as volunteers to maintain and build trails" on these lands).

[183] *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

[184] 18 U.S.C. § 1866(b).

[185] 86 Fed. Reg. at 57346 (Grand Staircase); *id.* at 57333 (Bears Ears).

[186] *See, e.g.*, Griffin Supp. Decl. ¶ 4 (ECF 90-2) (explaining Simone and her family have refrained from riding in parts of the Little Desert OHV Area because of possible criminal liability).

[187] 86 Fed. Reg. at 57336; *id.* at 57322.

stretch of land without altering that land in some way, however small," and members thus have no option but to stop riding.[188]

Regulated parties need not break the law in order to challenge it, so long as they have refrained from certain conduct due to a "credible threat" of prosecution.[189]  That is this case. BlueRibbon members' ATVs are collecting dust for fear of criminal sanctions for riding on the Monuments' "landscapes."  That too supplies standing.

The Government does not address all of this.  And where it does, its points are lacking.

*First*, the Government asserts that no member of BlueRibbon has had a special recreation permit *denied* because of the Proclamations.[190]  To start, that is wrong—Tony Wright's group was denied a permit to use a trail specifically identified by the Grand Staircase-Escalante Interim Plan as one where off-road vehicle use should be reevaluated.[191]  This point also ignores how some members of BlueRibbon—like Trail Hero—have been *deterred* from even applying due to the regulatory burdens of the new scheme.

More fundamental, this is all irrelevant.  What matters for standing purposes is whether members of BlueRibbon have spent funds—and will continue to spend funds—as part of obtaining permits under an unlawful scheme.[192]  And here, that is undisputed.

*Second*, the Government claims that it has not yet formally closed any roads or trails as a result of the Proclamations.[193]  This too is wrong.  As for the Little Desert OHV Area, the Government's claim relies on the fact that the signs around the Area telling people to stay on

---

[188] Burr Supp. Decl. ¶ 10 (ECF 90-1).
[189] *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 545 (10th Cir. 2016).
[190] Gov't Br. at 43–44.
[191] Wright Decl. ¶¶ 12–13 (ECF 90-3); Grand Staircase Interim Plan, *supra*, at 4.
[192] *Hydro Res.*, 608 F.3d at 1144; *cf. Carney v. Adams*, 141 S. Ct. 493, 502 (2020) (describing Court's "able and ready" precedents for standing).
[193] Gov't Br. at 44–45.

existing routes use the word "please," so the Area remains (technically speaking) fully open.[194] Article III is not so wooden.  The signs around the Area are indistinguishable from those that designate enforceable closures in other parts of federal land.[195]  And it is absurd to think that members of BlueRibbon—whose livelihoods and recreational pursuits depend on maintaining good relationships with their federal regulators—would (quite literally) blow past these signs because they use nominal precatory language.[196]  Standing is a commonsense inquiry that asks whether a policy has affected someone in the real world.[197]  BlueRibbon members have plainly been affected, because when BLM instructed them to stay off certain trails, they listened.[198]

*Third*, the Government says that members of BlueRibbon do not face a sufficiently credible threat of prosecution.[199]  Tellingly, the Government does not deny that the activities at issue—for instance, riding ATVs along the Grand Staircase-Escalante and Bears Ears landscapes—would fall within the plain terms of the Antiquities Act's enforcement provision.  And while the Government suggests that it has assured members of BlueRibbon they will never be prosecuted, that is just not true.[200]  At most, a District Manager for BLM has said the agency has not taken the added step of closing certain trails due to the Proclamations.[201]  But that is very different from the Department

---

[194] *See id.* at 45 & n.239.
[195] Burr Supp. Decl. ¶ 5 (ECF 90-1).
[196] *Id.* ¶ 6.
[197] *TransUnion*, 141 S. Ct. at 2203.
[198] Griffin Supp. Decl. ¶ 4 (ECF 90-2).  Moreover, in focusing only on *formal* trail and road closures, the Government ignores the practical reality that defines much of life within federally managed land.  As noted, because of on-the-ground discretionary decisions by BLM officials, off-roading within both Monuments is now, in real world terms, far more limited than it was before President Biden's Proclamations.  These practical effects too give rise to standing. *See, e.g.*, Burr Supp. Decl. ¶ 9 (ECF 90-1) (discussing Paria Canyon Road).
[199] Gov't Br. at 45.
[200] *Id.* at 47.
[201] Barber Decl. ¶¶ 9–11 (ECF 113-1).

of Justice formally pledging to not charge members of BlueRibbon for off-roading (among other things) on monument lands.  The Government has never said *that*.

The Government also says that members of BlueRibbon are not allowed to bring a pre-enforcement challenge to the Monuments because off-road recreation lacks any sort of constitutional interest.  The Government is once again wrong on both the law and the facts.

As for the law, the Supreme Court "has not limited standing to pursue pre-enforcement challenges only to plaintiffs intending conduct arguably affected with a constitutional interest."[202] For instance, in *MedImmune, Inc. v. Genentech, Inc.*, the Court held that a party had standing to bring a pre-enforcement challenge because it faced a credible threat of a future patent action for infringement.[203]  This makes sense.  So long as a given harm is an Article III injury—be it constitutional, monetary, recreational, etc.—it is enough to sustain a pre-enforcement challenge.[204]

In all events, the activities at issue here are affected with constitutional interests.  The First Amendment protects Americans' freedom to practice their religion, as well as "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."[205]  The Proclamations harm both interests.  Restricting off-road access impairs BlueRibbon members' ability to come together to explore, maintain, and appreciate public lands.  Especially so for those members who depend on motorized access as the only way to reach some of these

---

[202] *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 n.4 (2d Cir. 2015).

[203] 549 U.S. 118, 129–31 (2007).

[204] *See, e.g.*, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331–32 (2d Cir. 2016) (allowing pre-enforcement challenge for bingo ordinance); *Monson v. Drug Enf't Admin.*, 589 F.3d 952, 958 (8th Cir. 2009) (same for Controlled Substances Act); *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 5 (1st Cir. 2000) (similar); *see also Colo. Outfitters*, 823 F.3d at 545–46 (finding "compelling" argument that economic injury alone sufficient) (citing *Ezell v. City of Chi.*, 651 F.3d 684, 696 (7th Cir. 2011) (holding economic injury sufficient)); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 290 (6th Cir. 1997) (same)).

[205] *Fields v. City of Tulsa*, 753 F.3d 1000, 1009, 1012 (10th Cir. 2014).

lands at all.[206]  And this all has significant religious implications, because much of the land now within the Monuments has deep familial and spiritual significance for members of BlueRibbon.[207]

Final, the Government contends that BlueRibbon members do not face potential prosecution because past prosecutions have involved the appropriation of artifacts.[208]  But this is also mistaken.  The Government cannot avoid challenge to potential prosecution by, in litigation, "promis[ing] to use [the law] responsibly."[209]  And no court has held that a party must point to a prior, identical prosecution in order to press such a challenge—lest every unprecedented law (or proclamation) escape review.  Rather, a pre-enforcement challenge is available so long as the threat of enforcement is not "chimerical" and the desired activities fit within "the plain language of the statute."[210]  That is this case.  There is no doubt the Antiquities Act's enforcement provision covers the conduct at issue.  And rather than disclaim prosecution, the President has *specifically warned* against violations here.  Members of BlueRibbon are thus entitled to sue now.

An animating purpose behind the Proclamations was to limit off-roading on monument lands.[211]  It already has accomplished that goal.  BlueRibbon members have standing.

---

[206] *See, e.g.*, Burr Decl. ¶ 12 (ECF 90-1) (describing how members depend on motorized access); Klein Decl. ¶¶ 3–4, 7 (ECF 90-4) (veterans); Johansen Decl. ¶ 3 (ECF 90-5) (seniors).

[207] *See, e.g.*, Burr Decl. ¶ 4 (ECF 90-1); Griffin Decl. ¶ 12 (ECF 90-2); Wright Decl. ¶ 15 (ECF 90-3); Shumway Decl. ¶ 4 (ECF 90-6).

[208] Gov't at 46.

[209] *United States v. Stevens*, 559 U.S. 460, 480 (2010); *see also, e.g.*, *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1193 (10th Cir. 2000) (explaining that the Government's "representations in this litigation are not binding on this or future administrations").

[210] *Cressman v. Thompson*, 798 F.3d 938, 947 (10th Cir. 2015); *see also, e.g.*, *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 901 (10th Cir. 2016); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012); *Davidson*, 236 F.3d at 1193.

[211] *See, e.g.*, ECF 27, at 2 (SUWA Intervenors) (citing "off-road vehicle use" as first activity that prompted creation of Bears Ears); Maryboy Decl. ¶ 32 (ECF 33-1) (Cedar Mesa Intervenors' Motion); Ewing Decl. ¶ 27 (ECF 34-3) (American Anthropological Association Intervenors); Polly Decl. ¶ 24 (ECF 31-4) (Grand Staircase Escalante Partners Intervenors).

## 2.    BlueRibbon has organizational standing.

BlueRibbon also has standing to sue in its own right.[212]  Because of President Biden's Proclamations—in particular, because of President Biden's decisions to expand the size and scope of each Monument, as well as increase their regulatory burdens—BlueRibbon has had to divert resources from core programs toward new monument-prompted efforts.[213]  If the Proclamations did not exist, BlueRibbon would be spending its resources on things like facilitating greater access to public lands through new roads and trails; working on reducing undue federal regulations that impair such access; and developing educational programs to spread awareness about important recreation issues.[214]  But BlueRibbon has had to scrap these plans, and instead pivot—with tens of thousands of dollars—to counteracting the Proclamations, such as by resisting additional regulations (rather than working on reducing existing ones) and helping members navigate the now uncertain legal climate for off-roading (rather than work toward new and expanded ways to access these lands).[215]  Further, some of BlueRibbon's existing programs that depend on de-regulated access to public lands—like its Dispersed Camping Access Alliance—have also been harmed.[216]

That suffices for organizational standing.  "[F]or several decades it has been established that diversion of resources is a cognizable harm in the context of Article III standing analysis."[217]  As the Seventh Circuit has held:  When a new policy causes an organization to "divert resources

---

[212] *Colo. Taxpayers Union*, 963 F.2d at 1396 (entity's standing same test as individual's).
[213] Burr Supp. Decl. ¶¶ 11–13 (ECF 90-1); Burr Decl. ¶¶ 30–31 (ECF 90-1).
[214] *See, e.g.*, Burr Decl. ¶¶ 13–15 (ECF 90-1).
[215] *Id.* ¶ 31.
[216] *Id.* ¶ 30; *see also* Burr Supp. Decl. ¶¶ 11–12 (ECF 90-1).
[217] *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-581, 2022 WL 1266612, at *3 (D. Colo. Apr. 28, 2022) (collecting cases).

from its core programs to new efforts designed to educate [members] about the [policy's] effects and to mitigate [its harms]," that is enough for standing.[218]

The Government sees things differently, but offers little to support its position.

*First*, the Government claims in relative passing that BlueRibbon's allegations of resource diversion are not plausible because the Monuments have existed since 1996 and 2016, respectively.[219]  Not so.  BlueRibbon has had to divert material resources in recent years because the Biden Administration decided to markedly expand the Monuments in recent years.[220]

*Second*, the Government says that the above injuries are mere "self-inflicted budgetary choices" that cannot give rise to Article III standing.[221]  That misunderstands the law.  Courts have prevented organizations from throwing money at a problem to try to insert themselves in a case— otherwise, every public interest organization in the country could create standing to challenge virtually any policy by diverting a few dollars to that initiative.[222]  But that concern is not implicated where, as here, a policy directly affects the ongoing operations of an existing organization, and forces the organization to alter its conduct to accommodate its members and mission.  In those circumstances, the organization's injury is not "self-inflicted" in any genuine sense; it is the Government's doing.[223]

---

[218] *Cook Cnty. v. Wolf*, 962 F.3d 208, 219 (7th Cir. 2020).

[219] Gov't Br. at 48.

[220] Burr Supp. Decl. ¶ 13 (ECF 90-1).  The Tribal Intervenors make a variation of this argument.  Tribal Br. at 21–23.  But as with the Government, the Tribes fail to appreciate that President Biden's Proclamations have caused new and distinct injuries to Individual Plaintiffs; injuries that would be redressed if the Court returned the status quo to the prior legal regime.

[221] Gov't Br. at 48.

[222] *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 123 (D. Mass. 2020) (collecting cases where injuries were "not distinct from [their] mere interest in the problem").

[223] *NAACP*, 2022 WL 1266612, at *3 ("[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts, or when a defendant's conduct

Both on behalf of its members and in its own right as an organization, the BlueRibbon Coalition has standing to challenge President Biden's unlawful Proclamations.

### D.      Suzette Morris

Suzette is a member of the Ute Mountain Ute Tribe.[224]  To practice her religious and cultural traditions, Suzette and her family depend on "ready access" to sacred lands within the Bears Ears Monument, where they can remove certain resources (such as cedar post and medicinal herbs).[225]  But following President Biden's Proclamation, doing so necessarily involves altering the Monument, because it involves altering the Bears Ears landscape.  And given the potential legal liability that might now attach from (among other things) cutting down trees or removing plants, Suzette has refrained from practicing aspects of her heritage.[226]  So too others in her community.[227]  As above, this new prohibition and its accompanying threat suffice for standing.[228]

In response, the Government offers two points.  Neither work.

*First*, the Government says that Suzette lacks standing because nothing prevents her from "visiting" Bears Ears.[229]  But this careful wording concedes the point.  The issue is not that Suzette is barred from *visiting* Bears Ears.  It is that—by the plain letter of the Act's enforcement

---

makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals." (citation and quotation marks omitted)).

[224] Morris Decl. ¶ 1 (ECF 90-9).

[225] *Id.* ¶¶ 7–8.

[226] *Id.* ¶ 8; *see also* Morris Supp. Decl. ¶¶ 5–6 (ECF 90-9).

[227] Morris Supp. Decl. ¶ 7 (ECF 90-9).

[228] The Government does not dispute Suzette's deterred activities are affected with constitutional interests.  Gov't Br. at 40 n.210.  Moreover, for the same reasons members of BlueRibbon face a "credible threat" of prosecution, Suzette does as well.  Part II.C.1 *supra*.

[229] Gov't Br. at 39.

provision—she is prohibited from accessing these lands as she once did, and from freely *removing* certain resources from them.[230]

*Second*, the Government discounts Suzette's concerns about liability on the ground that the Biden Bears Ears Proclamation incorporates President Obama's, and the latter specifically protected Native American access to Bears Ears for traditional purposes.[231]  But that is not what the Biden Proclamation says.  The Biden Proclamation only incorporates President Obama's *to the extent* the latter is consistent with the former.[232]  And the *Biden Proclamation* expressly forbids "remov[ing]" any "feature" of the Bears Ears landscape (along with its areas, ecosystems, habitats, and other such "objects").[233]

\* \* \*

The Individual Plaintiffs have standing to challenge the Proclamations that were designed to limit their lives and livelihoods.  Of course, the Court need not reach everything above; only one plaintiff needs standing for each form of relief sought.[234]  But whatever the path, its end is apparent.  Article III poses no bar to this suit.

## III.  THE PROCLAMATIONS CONTRAVENE THE ANTIQUITIES ACT.

The Defendants next contend that the Individual Plaintiffs have failed to state a claim under the Antiquities Act.  Quite the opposite.  The Proclamations facially violate the Act, and should be

---

[230] *See, e.g.*, *Grand Canyon Tr. v. Energy Fuels Res. (U.S.A.) Inc.*, 269 F. Supp. 3d 1173, 1191 (D. Utah 2017) (finding standing where plaintiff wishes to return to "prior use" of land).
[231] *Id.*
[232] 86 Fed. Reg. at 57332.
[233] *Id.* at 57333.
[234] *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 29 n.1 (10th Cir. 2013); *see also, e.g.*, *Utah Ass'n of Cntys.*, 316 F. Supp. 2d at 1185 n.6 (applying this rule in monument case).

declared unlawful in full.  If these Proclamations do not exceed the Act's bounds, none do.[235]

### A.      The Antiquities Act Confers a Limited Power.

Once more, in relevant part, the Antiquities Act reads as follows:

> **Presidential declaration.—**The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.[236]

This case concerns only the third set of items above—neither landmarks nor structures, but "*other objects* of historic or scientific interest that are *situated on land* owned or controlled by the Federal Government."[237]  Both Proclamations are exclusively justified as necessary to protect "objects."

The Act supplies the President with an important but circumscribed power.  Text, structure, and history make plain that an "object[] of historic or scientific interest that [is] situated on [federal] land" is a discrete, material thing that can be visibly identified and is affixed to federal land.  It is not an open-ended concept whose content is decided by a President's say-so.

### 1.      **Text.**  Five parts of the Act's text support a confined reading of "object."

*First*, the word "object" itself imposes certain constraints.  The Act does not define "object," so the word has its ordinary meaning at the time of enactment.[238]  And contemporary dictionaries make clear that an "object" is a discrete, material thing.[239]

---

[235] Given the Court's decision to stay summary judgment briefing (ECF 149), the Individual Plaintiffs have included significant portions of their argument section here (ECF 117), such that the Court may have a full picture of the case's merits in assessing the motions to dismiss.

[236] 54 U.S.C. § 320301(a).

[237] *Id.* (emphasis added).

[238] *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021).

[239] *See, e.g.*, Webster's New International Dictionary, at 1482 (1909) ("That which is put, or which may be regarded as put, in the way of some of the senses; something visible or tangible"); 10 Oxford English Dictionary, at 14 (1909) ("Something placed before the eyes, or presented to the sight or other sense; an individual thing seen or perceived, or that may be seen or perceived; a

*Second*, the word "object" is delimited by the word "other."  The Act states the President may designate as monuments "historic landmarks, historic and prehistoric structures, and *other* objects of historic or scientific interest."[240]  In using the word "other," Congress made clear that "objects of historic or scientific interest" should be read in relation to "historic landmarks" and "historic and prehistoric structures."[241]  That is, the use of "other" means an "object of historic or scientific interest" must be akin to an "historic landmark" or "historic or prehistoric structure."[242]

This list also makes clear that, while an "object" must be *akin* to an historical landmark or structure, it should not *subsume* those items.  Here, the Supreme Court's approach to the Federal Arbitration Act—a different statute with a similar structure—is helpful.  The FAA does not apply to "contracts of employment of seamen, railroad employees, or any *other* class of workers engaged in foreign or interstate commerce."[243]  As the Court has explained, "the phrase 'class of workers engaged in … commerce' should be 'controlled and defined by reference' to the specific classes of 'seamen' and 'railroad employees' that precede it."[244]  The alternative—reading the third category as picking up *all* employment contracts—would write the first two terms out of the statute altogether.[245]  So too here.  If "object" reduces to whatever the President deems worthy of protection, then "landmark" and "structure" are pointless language—there is no landmark or structure that would not also be an "object" under this reading.  But courts should avoid "ascribing

---

material thing"); Webster's International Dictionary, at 990 (1893) (listing as examples: "he observed an *object* in the distance; all the *objects* in sight; he touched a strange *object* in the dark").

[240] 54 U.S.C. § 320301(a) (emphasis added).

[241] *See Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020).

[242] *See, e.g.*, *United States v. Hendrickson*, 949 F.3d 95, 99 n.5 (3d Cir. 2020) ("The word 'other' usually indicates that the term that follows it is 'of the same kind as the item or person already mentioned.'").

[243] 9 U.S.C. § 1 (emphasis added).

[244] *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1790 (2022).

[245] *Id.*

to one word a meaning so broad that it assumes the same meaning as another statutory term."[246]

*Third*, "object" is modified by the phrase "situated on land owned or controlled by the Federal Government."  As Secretary of the Interior Ickes once observed, the use of "situated" shows that the Act only covers those "objects which are immobile and permanently affixed to the land."[247]  And contemporary dictionaries confirm Secretary Ickes's understanding of the word's ordinary meaning—something "permanently fixed."[248]  An amorphous concept or a living creature is not *affixed* to anything; only a discrete, material, stationary thing can be "situated on" land.

*Fourth*, "object" is further modified by the word "monument."  The Act says the President may declare certain "objects … to be national monuments."[249]  A "monument," though, is a "building, pillar, stone, or the like, erected to preserve the remembrance of a person, event, action, etc." or "to indicate a limit or to mark a boundary."[250]  Something indeterminate or mobile cannot be a "monument"—only something discrete, material, and stationary could work.

*Fifth*, the Act's title corroborates a tailored reading of "object."  It is the *Antiquities* Act— or in its longer form:  "An Act For the preservation of American *antiquities*."[251]  And when the Act was passed, an "antiquity" was "defined as a 'relic or monument of ancient times.'"[252]

---

[246] *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (quotation marks omitted).

[247] Letter from Harold L. Ickes, Sec'y of the Interior, to Hon. Rene L. DeRoun, Chairman, House Comm. on Pub. Lands (Apr. 12, 1938), *reproduced in* Report of the Committee on the Public Lands No. 2691 (June 10, 1938).

[248] *See, e.g.*, Webster's New International Dictionary, *supra*, at 1965 ("permanently fixed; located; as, a town *situated* on a hill").

[249] 54 U.S.C. § 320301(a).

[250] Webster's New International Dictionary (1913); *see also* Black's Law Dictionary 791 (2d ed. 1910) (listing as examples "posts, pillars, stone markers, cairns" as well as "fixed natural objects, blazed trees, and even a watercourse").

[251] Pub. L. No. 59-209, 34 Stat. 225 (emphasis added).

[252] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial) (quoting Webster's International Dictionary of the English Language 66 (1902)); *see also* Webster's New International Dictionary (1913) (listing "coin" or "statue" as examples).

The phrase "object[] of historic or scientific interest that [is] situated on [federal] land" thus means something. That is, an "object" under the Act must (at minimum) be (i) a discrete, material thing, (ii) akin to an historic landmark or structure, that is (iii) affixed upon federal land.

2.      **Structure.**  The structure of the Act confirms this understanding of "object."

The Antiquities Act has two main parts that work together:  one that allows the President to designate monuments, and another that allows him to reserve federal lands for their protection. The latter is explicit that any reservation "shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."[253]  So when President Coolidge made a monument of Fort Wood, he set aside its nearby 2.5 acres for the structure's protection.[254]

This "smallest area compatible" requirement makes sense only if an "object" is a discrete, material, and stationary thing.  If the word "object" includes "an imprecisely demarcated concept [like] an ecosystem," then the "smallest area compatible" provision is practically meaningless.[255] If the contours of an "object" are not independently discernible, they will inevitably turn on whatever the President says; and the "smallest area compatible" for protecting that indeterminate "object" will necessarily *also* be whatever the President says.  This critical statutory limit would then be no limit at all.  But there is no reason to read the text in such a self-defeating way.

The Act's punishment provision points in the same direction.  Since its inception, the Act has included a criminal prohibition on appropriating, excavating, injuring, or destroying any aspect of a "monument" (including any "object of antiquity").[256]  People have fair notice about what this means only when the "objects" can be readily discerned and quantified.  They do not have fair

---

[253] 54 U.S.C. § 320301(b).
[254] *See* Proclamation No. 1713, 43 Stat. 1968 (Oct. 15, 1924).
[255] *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial).
[256] *See* 16 U.S.C. § 433 (original); 18 U.S.C. § 1866(b) (current).

notice when a "monument" is an open-ended concept or idea; for instance, a three-billion-plus-acre expanse drawn around a general ecosystem that runs all alongside the Atlantic Coast.[257]

    **3.**    **History.**  The Act's history reflects its narrow scope.  The Act "originated as a response to widespread defacement of Pueblo ruins in the American Southwest,"[258] and Congress passed a law consistent with that focus.[259]  The Act was not a blank check.

    In the late nineteenth century, Americans became increasingly interested in the ruins and archeological treasures that interspersed the Western United States.[260]  But with interest came exploitation:  With little regard for conservation, people tore through historic sites in hopes of finding objects of antiquity to flip for a profit.[261]  And at the time, federal law stood no barrier.[262]

    The Antiquities Act emerged from an effort by archeologists to fill that legal void.[263] Under banners like the Committee on the Protection and Preservation of Objects of Archeological Interest, the archeologists proposed draft legislation that (unsurprisingly) sought to protect and preserve objects of archeological interest.[264]  These proposals differed at the margins, but shared two common features:  One, a clear desire to specify the precise items that could be protected; and two, a commitment the Act could only be used to reserve strictly limited tracts of federal land.[265]

    These considerations are most clear in the proposals Congress unambiguously *rejected*. The Department of Interior had pushed bills that would give the President the unrestrained

---

[257] *See* Oral Argument at 21:22–22:42, *Mass. Lobstermen's*, 945 F.3d 535 (No. 18-5353).

[258] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).

[259] *Id.*

[260] *See, e.g.*, Ronald F. Lee, *The Antiquities Act of 1906* 21–28 (1970).

[261] *Id.* at 32.

[262] *See, e.g.*, Benjamin Hayes, Cong. Rsch. Serv., R45718, *The Antiquities Act: History, Current Litigation, and Considerations for the 116th Congress* 2–3 (May 15, 2019).

[263] *See* Am. Compl. ¶¶ 39–41 (ECF 90) (detailing background).

[264] Lee, *supra*, at 47.

[265] *See* Am. Compl. ¶ 42 nn.1–2 (ECF 90) (listing proposals and draft text).

authority to set aside whatever public land he wanted for virtually any reason.[266]  But Congress—led by members from Western States who wielded essential votes, and who would only support a law that narrowly limited any federal antiquity power—refused.[267]  Rather than pass an open-ended statute, Congress enacted a narrow one that carefully enumerated *what* items could be protected, coupled with a separate limit on *how* they could be protected.

Eventually, Dr. Edgar Lee Hewett took the lead on what became the Antiquities Act of 1906.[268]  Hewett was a logical choice.  He had personally taken Congressman John Lacey—influential Chairman of the House Public Lands Committee—around the Southwest to show him the "pueblos and cliff dwellings" that any "archaeological legislation" would cover.[269]  And he worked closely with Congress to prepare a memorandum cataloguing "the historic and prehistoric ruins of Arizona, New Mexico, Colorado, and Utah" that would fall within the ambit of any law.[270]

Near the end of 1905, Hewett submitted his draft legislation to Congress and Congress passed it without any material changes.  President Roosevelt signed Hewett's bill into law in 1906.

Everyone understood what Hewett's bill did.  As the House Report put it: "The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times."[271]  Or in the words of the Senate Report: The bill is "carefully drawn" to protect "the historic and prehistoric ruins and monuments on the public lands of the United States [that] are rapidly being destroyed."[272]  As

---

[266] *See, e.g.*, H.R. 11021, 56th Cong. (1900) (allowing President to set aside lands to protect "scenic beauty," "natural wonders," and other "curiosities").

[267] Lee, *supra*, at 53–55; *see also* Am. Compl. ¶ 43 (ECF 90) (collecting quotes).

[268] Am. Compl. ¶¶ 44–45 (ECF 90).

[269] Lee, *supra*, at 69.

[270] H.R. Rep. No. 58-3704, at 2 (1905).

[271] H.R. Rep. No. 59-2224, at 1.

[272] S. Rep. No. 59-3798, at 1 (1906).

Congressman Lacey himself reiterated: The Act "is meant to cover the cave dwellers and cliff dwellers" and its "object … is to preserve these old objects of special interest and the Indian remains in the pueblos in the Southwest, whilst [other legislation] reserves the forests and the water courses."[273]  The Act would not affect "very much [land]" because the "bill provides that it shall be the smallest area necessary for the care and maintenance of the objects to be preserved."[274]

There was no suggestion—*none*—from any legislator, scholar, or commentator that this Act empowered the President to declare millions of acres of federal land a national monument, let alone do so in the name of protecting general items like landscapes and ecosystems.  By contrast, there is a consensus across bench and academy that Congress's original intent was the opposite.[275]

* * *

Text, structure, and history all make plain that when Congress gave the President the power to declare "objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," it conferred upon him a limited grant of authority.[276]  An "object" is not in the eye of the beholder; it is not a boundless concept.  Rather, an "object" under the Antiquities Act is, at minimum, (i) a discrete, material thing, (ii) akin to an

---

[273] 40 Cong. Rec. 7888 (1906).

[274] *Id.*; *see also id.* (explaining Antiquities Act is different from national park legislation).

[275] *See, e.g.*, *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial) ("Because there was scarcely an ancient dwelling site in the area that had not been vandalized by pottery diggers for personal gain, the Act provided a mechanism for the preservation of prehistoric antiquities in the United States."); *Utah Ass'n of Cntys.*, 316 F. Supp. 2d at 1178 ("The original purpose of the proposed Act was to protect objects of antiquity."); *Utah Ass'n of Cntys. v. Clinton*, Nos. 97-cv-479, 97-cv-492, 97-cv-863, 1999 U.S. Dist. LEXIS 15852, at *10 (D. Utah Aug. 12, 1999) (Congress "intended to limit the creation of national monuments to small land areas surrounding specific objects."); Squillace, *supra*, at 477–78 ("There seems little doubt that the impetus for the law that would eventually become the Antiquities Act was the desire of archaeologists to protect aboriginal objects and artifacts."); Justin J. Quigley, *Grand Staircase-Escalante National Monument: Preservation or Politics*, 19 J. Land Res. & Env't L. 55, 77 (1999) (the Act was intended to cover "aboriginal antiquities situated on federal lands").

[276] 54 U.S.C. § 320301(a).

historic landmark or structure, that is ultimately (iii) affixed upon federal land.  And in turn, the Act prohibits a President from predicating a monument on any "object" that lacks these features.

### B.    The Proclamations Exceed the Antiquities Act's Limits.

The Proclamations are based—in whole and in part—on protecting things that are not "objects" at all: Among them, landscapes, areas, ecosystems, habitats, and animals.  As a matter of law, none of these items has the basic traits of an "object."  And if adopted, the Government's position would confer extraordinary power on the President and render the Act limitless.

1.    **Land.**  The Proclamations rest foremost on the idea that land may *itself* constitute an "object situated on land."  The Grand Staircase-Escalante Proclamation sets aside 1.87 million acres on the rationale its entire landscape is an "object."[277]  The Bears Ears Proclamation reserves 1.36 million acres on the same basis.[278]  Moreover, both Proclamations declare that each landscape is composed of constitutive "areas" (*i.e.*, smaller landscapes) that are themselves also "objects."[279]

This is unprecedented.  No President has ever declared a landscape itself an "object."  For good reason.  The "land as object" theory is irreconcilable with the Act's text, structure, and history.

*First*, the text.  An entire landscape—or the smaller "areas" within it—is not an "object" that is "situated on land."  It *is* the land.  An "object" placed *on* a shelf is not *the* shelf.  An "object" set *on* a table is not *the* table.  And an "object" situated *on* land is not *the* land.  That is no doubt why the Proclamations omit the Act's "situated on land" language when discussing these "objects."

Nor does a landscape have possess the other necessary traits to be an "object" under the Act.  A landscape is not a discrete, material thing.  And it is not akin to a landmark or structure.

---

[277] 86 Fed. Reg. at 57336, 57345.
[278] *Id.* at 57322, 57331.
[279] *Id.* at 57338 ("Within the whole are distinct and unique areas, which are themselves objects qualifying for protection."); *id.* at 57324 (same).

At the end of the day, the Government's "land as object" theory reduces the Act's text to this:

> **(a) Presidential declaration.—**The President may, in the President's discretion, declare by public proclamation ~~historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on~~ land owned or controlled by the Federal Government to be national monuments.

The Government's position does not merely render a stray word or two superfluous; it vitiates the heart of the provision.  It is in no way the best reading of the statute.[280]

*Second*, the structure.  The second half of the Act, as noted, mandates that any monument "shall be confined to the smallest area compatible" with the protection of its covered objects.[281]  But if the land itself can be the object, then this requirement is effectively meaningless.  If the area and the object are the same thing, then the area will *necessarily* be the "smallest area compatible" with protecting that object—even if it is ultimately the size of Connecticut (or Montana).

This Court should not adopt an interpretation of the Act that excises one of its two core provisions.  The "smallest area compatible" requirement was an indispensable piece of the original Antiquities Act; without it the Act would not have garnered enough Western votes to pass.[282]  And by design, the provision imposes a clear restraint on presidential power.[283]  But under the "land as object" theory, presidents can circumvent this requirement by just including the entire landmass of the desired monument within its list of "objects."  That cannot be right.

*Third*, the Act's history likewise militates against the notion that a landscape or "area" can constitute an "object."  As discussed further below, the practical consequence of the Proclamations

---

[280] *See, e.g.*, *Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 744 (10th Cir. 2020) (rejecting interpretation that would render "meaningless" critical statutory language).

[281] 54 U.S.C. § 320301(b).

[282] *See, e.g.*, Frank Norris, *The Antiquities Act and the Acreage Debate*, 23 George Wright Forum 6, 8 (2006).

[283] *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial).

is that any President has unfettered ability to set aside all federal land—every inch of which is part of a landscape or "area."  But that is the *opposite* of what Congress intended.  Again, as the House Report put it: "The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times."[284]

The point is not that the phrase "object of historic or scientific interest" *only* means archeological relics or some other term that is narrower than the plain words Congress used. Individual Plaintiffs are not arguing that.  Rather, the point is that for the Government to be right, Congress must have passed a law that brought about the *very thing* that it sought to avoid, and the *very thing* that it specifically rejected years prior.  That is not plausible.  Congress debated the Antiquities Act for half a decade, and took pains to draft a statute that would ensure the President's authority—while sufficient to achieve Congress's goals—would be carefully limited.  Yet on the Government's telling, Congress accidentally provided plenary power all the same.[285]

The Government's "land as object" theory thus cannot square with any feature of the Act. Each aspect confirms what common sense dictates: That land is not an "object situated on land."

**2.      Other "Objects."**  The other "objects" underlying the Proclamations fare no better. As a pure legal matter, none has the traits of an "object":  None is (i) a discrete, material thing, (ii) akin to an historic landmark or structure, that is (iii) affixed upon federal land.

<u>Ecosystems.</u>  Both Monuments identify sprawling "ecosystems" as "objects."[286]  But an ecosystem is by nature an "imprecisely demarcated concept."[287]  It is not a discrete, material thing; it is not akin to an historic landmark or structure; and it is not affixed to anything.  An ecosystem

---

[284] H.R. Rep. No. 59-2224, at 1.

[285] *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009) (rejecting reading that would "frustrate Congress' manifest purpose" in passing statute).

[286] *E.g.*, 86 Fed. Reg. at 57340–41 (Grand Staircase); *id.* at 57323 (Bears Ears).

[287] *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial).

also fits poorly with the Act's "smallest area" requirement because it has no discernible bounds—again, the Government has claimed elsewhere the President may reserve all *three billion acres* along the Atlantic Ocean as a monument if he discerns an "ecosystem."[288]  That is untenable.

Habitats.  Both Proclamations list multiple "habitats" as "objects."[289]  But a habitat is just "[t]he location where" an "animal lives and its surroundings."[290]  It is no different than the land and—no more than a landscape or area—is not an "object situated on land."  Moreover, as with ecosystems, habitats have no discernible bounds, and thus do not fit within the Act's design.

Animals.  Both Proclamations are replete with animal species listed as "objects."[291]  But an animal is not an "object situated on land"—most obviously because living creatures are not *affixed* to the land.  Likewise, while a living animal may be a discrete, material thing, it is nothing like the sorts of "historic landmarks" or "structures" that can be "declare[d] by public proclamation . . . to be national monuments."  It makes no sense to say that bees or falcons can be deemed "national monuments" akin to inanimate cave dwellings.  That is no doubt why even the Department of Justice itself used to maintain that animal species are not "objects" under the Act.[292]

**3.    Consequences.**    The practical "fallout" from the Government's position "underscores the implausibility of [its] interpretation."[293]  If the concepts and items underlying the Proclamations all constitute "objects," then the Act would empower the President to convert all federal land into a monument.  That is not plausible for at least three reasons.

---

[288] *See* Oral Argument at 21:22–22:42, *Mass. Lobstermen's*, 945 F.3d 535 (No. 18-5353).
[289] *See, e.g.*, 86 Fed. Reg. at 57341 (Grand Staircase); *id.* at 57323 (Bears Ears).
[290] U.S. Fish & Wildlife Service, *Habitat Conservation Planning Handbook* G-14 (Dec. 21, 2016); *see also, e.g.*, Charles Schwarz et al., USDA Forest Service, *Wildland Planning Glossary* 91 (1976) (defining "[h]abitat" as the "natural environment" or "locality" where animals live).
[291] *See, e.g.*, 86 Fed. Reg. at 57339 (chuckwalla), 57342 (bees), 57342 (falcons); 86 Fed. Reg. at 57324 (sheep), 57328 (moths).
[292] *See California*, 436 U.S. at 34 n.5.
[293] *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).

*First*, that boundless reading would effectively annul a multitude of other federal laws. Congress has enacted numerous detailed frameworks for how the President "may preserve portions of land and sea."[294]  But the Government's interpretation of the Antiquities Act would empower the President to sidestep those regimes via unilateral proclamation.  That violates one of the "rudimentary principles of construction that the specific governs the general, and that, where text permits, statutes dealing with similar subjects should be interpreted harmoniously."[295]

Consider just a handful of the laws that the Government seeks to circumvent:

- *Wilderness Act* (16 U.S.C. § 1131 *et seq.*).  "The Wilderness Act … was intended to preserve the undeveloped character of designated areas."[296]  The Act gives the Executive the authority to temporarily set aside lands as "Wilderness Study Areas" and, after detailed procedures, gives the President the ability to *recommend* to Congress whether those lands should be designated as wilderness (a label that triggers a host of land use restrictions).  Notably, the Act reserves for *Congress* the power to designate an area as "wilderness."  And *unlike* the Antiquities Act, the Wilderness Act is expressly designed to reach any "areas" that are over 5,000 acres and have "ecological, geological, or other features of scientific, educational, scenic, or historical value."[297]

- *Federal Land Policy and Management Act* (43 U.S.C. § 1701 *et seq.*).  The FLPMA "established a policy in favor of retaining public lands for multiple use management," which involves "striking a balance" among a number of interests (including recreation, timber, and mining).[298]  The FLPMA gives the Interior Secretary the power to "make, modify, extend, or revoke withdrawals but only in accordance with" the Act's extensive procedural requirements.[299]  For instance, withdrawals in excess of 5,000 acres may be made only for twenty years at a time.[300]  And FLPMA withdrawals are subject to, among other things, full compliance with the National Environmental Policy Act.[301]

- *National Park Service Act* (54 U.S.C. § 100101 *et seq.*).  The NPSA provides that while the Executive is responsible for *managing* National Parks, those parks "may be

---

[294] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).
[295] *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 738–39 (1989) (Scalia, J., concurring in part and concurring in the judgment).
[296] *Utah Ass'n of Cntys.*, 1999 U.S. Dist. LEXIS 15852, at *14.
[297] 16 U.S.C. § 1131(c).
[298] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004).
[299] 43 U.S.C. § 1714(a).
[300] *Id.* § 1714(c)(1).
[301] *See* 43 C.F.R. § 2310.3-2(b)(3).

established only by an Act of Congress."[302]  As with the Wilderness Act, Congress reserved for *itself* the decision-making role when it came to a conservation statute with the potential to cover wide swaths of federal land.  Moreover, the NPSA shows that when Congress wants to broadly protect "scenery, natural and historic objects, and wild life," it knows how to do so, and to do so with clear language.[303]

- *National Marine Sanctuaries Act* (16 U.S.C. § 1431 *et seq.*).  "Under the National Marine Sanctuaries Act … the Secretary of Commerce can designate an area of the marine environment as a marine sanctuary, but only after satisfying rigorous consultation requirements and issuing findings on 12 statutory criteria." [304] Nevertheless, over the last two decades, Presidents used the Antiquities Act to sidestep the Marine Sanctuaries Act's extensive procedural hurdles, and have created massive marine monuments by way of simple and unilateral proclamations.[305]

Other examples abound.[306]  Of course, the point is not that laws cannot overlap at all, or even overlap in significant ways.  The point is that the Government's capacious reading of the Antiquities Act renders a legion of other statutes *nonsensical*—a reality that strongly cuts against its construction.  It is not sensible to interpret the U.S. Code as containing detailed schemes that the President can avoid at will—particularly when the President's aim of protecting public lands or waters is the *same* basic purpose of those other schemes.  And it strains credulity to think Congress would deliberately keep for *itself* the power to create national parks in the National Park Services Act, while obliquely giving the President the ability to do the *same thing* on his own.  Giving the word "object" its ordinary meaning avoids these tensions.

*Second*, basic federalism principles require that Congress speak clearly if it wishes to give

---

[302] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).
[303] 54 U.S.C. § 100101(a).
[304] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).
[305] *Id.*
[306] *See, e.g.*, Archaeological Resources Protection Act of 1979, 16 U.S.C. § 470aa *et seq.*; National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*; Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 *et seq.*; Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.*; Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*; Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*; National Forest Management Act, 16 U.S.C. § 1600 *et seq.*; National Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.*; Native American Graves Protection and Repatriation Act of 1976, 25 U.S.C. § 3001 *et seq.*; Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*

the President unfettered authority to set aside much of a State as a national monument.  The Federal Government owns roughly half of the American West.  For States like Utah—where the Government owns over 60% of the land—issues involving federal land management are intertwined with the State's ability to function.  It is not surprising, then, that when Congress has addressed matters of federal land ownership in the West, it has spoken clearly by way of finely reticulated schemes like the Federal Land Policy and Management or National Park Service Acts.

According to the Government, however, the Antiquities Act's sparse text empowers the President to unilaterally designate most of Utah as a national monument.  In its view, so long as the President deems those "landscapes" or "areas" to be "objects" worthy of protection, he may convert all 33 million acres of federal land in the State into a monument—and courts would be powerless to stop him.  If nothing else, that is a remarkable ability to alter the balance of power between the federal government and Western States.  But Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property."[307]  The Act's sparse text does not clear that bar.

*Third*, separation of powers canons like the major questions and non-delegation doctrines similarly foreclose the Government's open-ended view of the Act.  The former is implicated when a governmental action resolves a matter of great "political significance,"[308] or upends the traditional "balance between federal and state power."[309]  The Government's sweeping interpretation of the Act—claiming the unilateral power to convert millions of acres of land into a monument and thus sharply curtail all productive uses of it—triggers that doctrine.

The President thus must point to "clear congressional authorization" for his authority to

---

[307] *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).
[308] *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022).
[309] *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

establish such large expanses as monuments.[310]  A "plausible textual basis" is not enough.[311]  Only

a *clear statement* will suffice.[312]  And whatever the Act provides, it surely does not provide *that*.

Relatedly, constitutional avoidance principles caution against an open-ended reading of the

Act because, if the Government is right, then the statute raises serious non-delegations concerns.[313]

If the phrase "object of historic or scientific interest" means essentially "whatever the President

proclaims," then the Act has no intelligible principle to shape the President's discretion.  A federal

law that read—"The President may set aside as a national monument any federal land he sees

fit"—would be unconstitutional.  But that is *exactly what* the Government interprets the Act to say.

### C.    The Proclamations Are Unlawful in Full.

The Proclamations thus rest on basic legal errors.  To be valid, a monument must be the

"smallest area compatible" for protecting its covered "objects."[314]  But here, both Proclamations

are expressly predicated on things—landscapes, areas, ecosystems, habitats, and animals—that are

not "objects" at all as a matter of law.  As a result, the Court should hold that both Proclamations

are unlawful in their entireties, and enjoin the Defendants from implementing any part of them.

When a federal action is premised on invalid grounds, the traditional remedy is for a court

to set that action aside.[315]  That remedy is appropriate here.  The legal deficiencies detailed above

pervade every inch of the Monuments, and there is no way for this Court to conclude that these

---

[310] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

[311] *Id.*

[312] *Id.*

[313] *See id.* at 2619 (Gorsuch, J., concurring).

[314] 54 U.S.C. § 320301(b).

[315] *See, e.g.*, *William Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 330 (D.C. Cir. 2006) ("When an agency relies on multiple grounds for its decision, some of which are invalid, we may only sustain the decision where one is valid and the agency would clearly have acted on that ground even if the other were unavailable." (quotation marks and alterations omitted)); *see also, e.g.*, *Zzyym v. Pompeo*, 958 F.3d 1014, 1033–35 (10th Cir. 2020); *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir. 1993).

fundamental errors were harmless to either designation.

The Proclamations offer two justifications for their expansive borders: First, each Monument is "independently" justified on the ground that its underlying "landscape" is itself an "object in need of protection"; second, the Proclamations state that the constitutive "objects" scattered across each landscape add up to three-million-plus-acres-worth of protection.[316] Both rationales depend on legally invalid "objects," and thus cannot sustain the Monuments.

The "landscapes alone" rationale fails because, as explained, a "landscape" cannot be an "object." Nor can the "constitutive objects" rationale justify the Monuments. For one thing, separate and apart from the landscapes, the Government relies on the same flawed "land as object" theory to support its second rationale. The Proclamations state that each landscape is a "nesting doll" of "distinct and unique areas, which are themselves objects qualifying for protection."[317] And those "areas" cover *all* of Grand Staircase-Escalante and Bears Ears. So whether by way of one big landscape or a collection of smaller ones (*i.e.*, areas), the "land as object" theory undergirds the entirety of both Monuments.

The other purported "objects" only worsen the problem. The Proclamations identify around 100 species that traverse monument lands.[318] Likewise, the Proclamations rely on approximately 20 distinct "habitats" and an indeterminate number of "ecosystems."[319] By their terms, the Proclamations rely heavily on these gap-filling "objects" to justify the Monuments' massive scope, and to capture the vast expanses between individual ruins, artifacts, and fossils.

The Proclamations' second rationale thus cannot save the Monuments. And because each

---

[316] *See* 86 Fed. Reg. at 57345 (Grand Staircase); *id.* at 57331 (Bears Ears).

[317] *Id.* at 57338 (Grand Staircase); *id.* at 57324 (Bears Ears).

[318] *See* ECF 91 ¶¶ 294–95 (Utah Am. Compl.) (collecting examples).

[319] *See, e.g.*, 86 Fed. Reg. at 57323 (range of "habitat[s]"); *id.* (set of "intact ecosystems").

proffered justification for the Monuments is corrupted by the same fundamental legal errors concerning what constitutes an "object," neither Proclamation may survive.

Nor is there any judicial mechanism to create smaller monuments that salvage some subset of the Proclamations.  The Proclamations do not specify what lands are set aside for what objects, instead setting aside three-million-plus acres to protect one undifferentiated mass.  There is thus no way for a court to divine the "smallest area compatible" with protecting whatever valid "objects" might exist.  The Court is without any judicial means—or legal basis—to "blue-pencil" the Proclamations and create hypothetical different ones.[320]

There is instead only one proper remedy:  Declare the Proclamations unlawful in full, and restore the status quo.[321]  Because the Proclamations state that their borders are the "smallest area compatible" with protecting an undifferentiated mass of improper and proper objects, it is impossible for this Court to independently deem the Monuments' borders the "smallest area compatible" with protecting whatever valid objects might exist.[322]  After all, the "smallest area" necessary to protect a *collection* of things is invariably bigger than the "smallest area" necessary to protect a *subset* of those things.  If a judge drew up the "smallest" budget needed to hire four law clerks, it would of course be more than what the judge would need to hire only two.

At bottom, because there is no way to conclude the Monuments comply with the Act's "smallest area compatible" requirement—and because there is no way to sever or salvage portions of the Monuments—the proper course is to reject both Proclamations in full.  To the extent any

---

[320] *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010).

[321] *See, e.g.*, *Backcountry Hunters & Anglers v. U.S. Forest Serv.*, 612 F. App'x 934, 935 (10th Cir. 2015) (Gorsuch, J.) ("[I]f we were to grant the group the relief it seeks and strike down the 2010 order, the last valid and relevant trail plan … would apply.").

[322] *See, e.g.*, *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 880 (9th Cir. 2009) (error harmless only when it "clearly had no bearing on … the substance of [the] decision reached").

"objects" exist within current monument lands—like Grosvenor Arch or Newspaper Rock—the Act requires the President designate new monuments that are tailored to protecting only those "objects."  But he must do in a way that respects, rather than vitiates, the Act's bounds.

## IV.    THE ANTIQUITIES ACT CLAIMS SHOULD NOT BE DISMISSED.

The Government does not engage with any of this.  Nor does it make any real effort to ground its defense of the Proclamations in the text, structure, or history of the Antiquities Act.  In fact, the Government does not make much of an effort at all to defend the Monuments; it expends nearly fifty pages before turning to the merits, and then devotes about six to the Proclamations themselves.  That is, no doubt, because the Proclamations are irredeemably flawed.

### A.    The Government Cannot Defend the Proclamations.

The Government makes five main arguments as to the merits.  Each one falters.

*First*, the Government defends the Proclamations by torching a strawman, maintaining that the Antiquities Act is not limited to archeological objects.[323]  As detailed above, that is not the argument.  The argument is, rather, that "object" has the meaning the Act's text, structure, and history give it.  And under that straightforward definition, the Proclamations are unlawful.

*Second*, the Government suggests that Supreme Court precedent has blessed its view of the Act—namely, that species, habitats, and ecosystems can be "objects situated on land."[324]  The Government is wrong.  As the Chief Justice recently observed, the Court has never addressed—let

---

[323] Gov't Br. at 54.

[324] The Government never actually explains how an ecosystem constitutes an "object situated on land"—instead tacking that word to the end of a list of terms in a concluding sentence. *Id.* at 56.  The Government also includes a stray citation to the D.C. Circuit's decision in *Tulare County v. Bush*, 306 F.3d 1138, 1142 (D.C. Cir. 2002).  But that non-binding decision does not offer much help.  There, the litigants did not press the text, structure, or history arguments made above, instead pressing a (foreclosed) argument that the Act is limited to archeological relics.  The Court should therefore assign limited value to *Tulare*'s sparse analysis on this subject.

alone endorsed—a million-plus-acre monument like Grand Staircase-Escalante or Bears Ears.[325]
Indeed, the Court has definitively addressed the term "object" just twice, yielding approximately
three lines of independent analysis.  Those lines cannot save the Proclamations.

The Government principally relies on *Cappaert v. United States*, but it misreads that
case.[326]  There, the only "object" at issue was a subterranean pool in Devil's Hole (within the Death
Valley National Monument).  President Truman identified this "pool" as the only item protected
by his proclamation.[327]  And in the *Cappaert* Court's words, the Antiquities Act question presented
was whether the Act "g[ave] the President authority to reserve a pool."[328]  The Court answered
yes, which is consistent with the text of the Antiquities Act.  After all, a natural pool—like a
backyard pool—can be a (i) discrete material thing, (ii) akin to a historical structure, that is (iii)
affixed to federal land.[329]  It can thus be an "object."

To be sure, President Truman's proclamation and *Cappeart* mention that the pool was
home to a natural habitat and an endemic species of fish.[330]  But those were reasons why *the pool*
was a worthy "object" under the Act; these attributes were not *themselves* "objects" eligible for
protection.  A local house may merit a historic designation because Johnny Cash once lived there;
but that does not turn him into a "structure."  Unsurprisingly, a couple years later, when the Court
made brief mention of species and the Antiquities Act, it did not reference *Cappaert*—only noting

---

[325] *See Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial) (stating Court has "never considered" monument of multi-million acre "proportions").

[326] 426 U.S. 128; Gov't Br. at 55–56.

[327] Proclamation No. 2961, 17 Fed. Reg. 691 (Jan. 23, 1952) ("*Whereas* the said pool is of such outstanding scientific importance that it should be given special protection, and such protection can be best afforded by making the said forty-acre tract containing the pool a part of the said monument").

[328] 426 U.S. at 141.

[329] The Supreme Court has held that "land[]" under the Act also includes submerged lands (*California*, 436 U.S. at 36)—a holding not at issue here.

[330] 426 U.S. at 132, 141–42.

that the Government used to take the position that the Act "did not permit establishment or enlargement of a national monument to protect plant and animal life."[331]  It was right then.[332]

Nor does the first (and only other) time the Court engaged with the meaning of "object" help the Government.[333]  In *Cameron*, a man challenged the Government's attempt to stop him from using a mining claim within the Grand Canyon National Monument.  As with *Cappaert*, the case primarily concerned issues unrelated to the Act.[334]  But Cameron also challenged President Roosevelt's authority to create the Monument.[335]  The Court quickly rejected that claim: "[The Grand Canyon] is the greatest eroded canyon in the United States, if not in the world, is over a mile in depth, has attracted wide attention among explorers and scientists, affords an unexampled field for geologic study, is regarded as one of the great natural wonders, and annually draws to its borders thousands of visitors."[336]

This makes sense.  The phrase "objects of historic or scientific interest that are situated on [federal] land" includes natural formations, as long as those formations are discrete and quantifiable, and akin to a historic structure or landmark.  Canyons—and especially the Grand Canyon—fall comfortably within that language regardless of their size.  *Cameron* simply confirms that the Act's reference to "objects" is not necessarily limited to archeological sites and historic

---

[331] *California*, 436 U.S. at 34 n.5.

[332] At the most, even if *Cappaert* can be read to hold that endemic species may be "objects", that still cannot save the Proclamations.  An endemic species is limited to the bounds of something else (like a natural pool); it thus cannot be used to *expand* the otherwise proper bounds of a monument.  But here, the Proclamations conscript roaming animals to do just that.

[333] *Cameron*, 252 U.S. 450.

[334] *Id.*

[335] *Id.* at 455.

[336] *Id.* at 455–56.

relics.  But that is a far cry from deeming the word "object" to have no limit at all, expandable beyond all meaning to cover amorphous concepts and indeterminate ideas.[337]

*Third*, the Government insists there is nothing wrong with "land" being an "object situated on land" under the Act.[338]  But the Government does cite a single case to support its "land as object" theory.  Nor does the Government deny that specifically declaring a landscape itself to be an "object situated on land" is without precedent.

The Government instead emphasizes that both landscapes are important to various constituencies.[339]  But the Antiquities Act does not empower the President to reserve land for whatever he deems valuable; to the contrary, the Act's history is peppered with examples of Congress *specifically rejecting* such proposals in favor of tailored legislation.[340]

The Government also suggests that the Act's legislative history supports its unbound view.[341]  But the historical record cuts entirely the other way.[342]  Again, in the words of the House Report the Government invokes, the Act empowers the President to "create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times."[343]  Whatever the Monuments are, they are not *that*.  Further,

---

[337] One other case bears mention.  In *Alaska v. United States*, 545 U.S. 75 (2005), the Court discussed the Antiquities Act in the context of a complex dispute involving title to submerged lands in Alaska.  In so doing, a portion of the Court's opinion "suggested that an 'ecosystem' … can, under some circumstances, be protected under the Act." *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting cert denial).  But this aside was pure dicta.  *Id.*  Alaska did not press an Antiquities Act argument before the Court.  *Alaska*, 545 U.S. at 103.  And the Court never said that an ecosystem *was* an "object"; only that it "might conceivably" be one, which, "[i]f true," would simply bolster one way of deciding the case.  *Id.* at 103.

[338] Gov't Br. at 56.

[339] *Id.* at 57.

[340] Part III.A.3 *supra*.

[341] Gov't Br. at 57.

[342] Part III.A.3 *supra*.

[343] H.R. Rep. No. 59-2224, at 1.

the Government is wrong to suggest the Report contemplates treating standalone land as an "object" under the Act. It says the opposite. The Report states that if the Government wants to protect a "region[]" or the like, then it would need to secure a "permanent national park[]."[344] The Antiquities Act, by contrast, is for protecting objects like "pueblo ruins" and "cliff houses."[345]

Last, the Government says there is nothing wrong with treating landscapes as "objects" because presidents create large monuments all the time.[346] But for present purposes, the problem is not the size of the Monument, but rather the size of the power claimed. As noted, if the President can declare a "landscape" to be an "object," then the Antiquities Act has no bound.

*Fourth*, the Government maintains that the Individual Plaintiffs' claims must be dismissed because the Complaint fails to adequately specify lands that should fall outside some hypothetical, valid designation.[347] Once again, the Government is wrong on the law and the facts.

Start with the law. The Government muddles what is required for different Antiquities Act claims. Indeed, the D.C. Circuit—the source for the Government's proposed requirement—makes this point clear. That court has drawn "a distinction between two types of claims: those justiciable on the face of the proclamation and those requiring factual development."[348] The former include "bad object" claims—those premised on a proclamation being based on things beyond the Act's ambit.[349] Such claims may be resolved "as a matter of law because they turn on questions of statutory interpretation."[350] By contrast, the latter claims—those premised on a monument being *too big* even if its covered "objects" are legitimate—may require something more. For the D.C.

---

[344] *Id.* at 3.
[345] *Id.*
[346] Gov't Br. at 58.
[347] Gov't Br. at 49–53.
[348] *Mass. Lobstermen's*, 945 F.3d at 540.
[349] *Mass. Lobstermen's*, 349 F. Supp. 3d at 54.
[350] *Mass. Lobstermen's*, 945 F.3d at 540.

Circuit, that added showing includes "at a minimum … plausible factual allegations identifying an aspect of [a monument] designation that exceeds the President's statutory authority."[351]

The Government seeks to collapse this distinction.  But doing so makes no sense—and neither the D.C. Circuit nor any other court has followed this course.  When a proclamation is premised on protecting items that are not "objects" under the Antiquities Act, the proclamation exceeds the President's statutory authority on its face.  That is a pure legal defect and it requires setting aside the presidential action in full so long as the errors are not harmless.[352]

By contrast, in a "smallest area" claim—a challenge to the *size* of a Monument with a concededly legitimate underlying basis—the facts necessary matter.  And on that score, both Plaintiffs have advanced more than adequate allegations.[353]  The *Garfield* Plaintiffs provided a detailed and careful account of what a proper monument might look like.  The Individual Plaintiffs incorporated that account, and added too that there is no reason why a monument must include Zeb's ranch or Kyle's mining claims.[354]  At this stage, nothing more is required—especially when the Government has invoked a secret list of "objects" supposedly supporting the Monuments.[355]

*Fifth*, the Government mischaracterizes the Individual Plaintiffs' position as endorsing a "one bad object" theory of judicial review, where any proclamation is invalid so long as a plaintiff can identify a single improper "object."[356]  But that, too, misstates the Individual Plaintiffs' position.  Using one bad "object" is not invariably fatal.  Rather, as explained above, courts need only apply traditional remedial principles, which call for an executive action to be set aside when

---

[351] *Id.*

[352] Part III.C *supra*.

[353] *Mass. Lobstermen's*, 945 F.3d at 540 (plaintiffs must identify an "aspect of the designation that exceeds the President's statutory authority").

[354] *See* Am. Compl. ¶¶ 148, 168, 186 (ECF 90).

[355] Gov't Br. at 5 (explaining objects exist beyond those disclosed in Proclamations).

[356] *See id.* at 52.

it is *premised* on impermissible considerations.[357]  And here—many times over—every acre of President Biden's Proclamations is premised a nesting doll of invalid "objects."

Related, and as discussed above, the Government's broader reliance on the Proclamations' severability clauses is misplaced.  When a proclamation provides courts with no judicially administrable means of salvaging a monument, the proclamation is nonseverable, regardless of whether it includes a boilerplate severability clause.  That is this case.  Should the President wish to try his hand with new-and-lawful monuments, he may do so.  But the Government cannot charge this Court with performing what is ultimately the President's responsibility.

### B.        The Intervenors Cannot Defend the Proclamations.

The Intervenors mostly repeat or adopt the Government's merits arguments.[358]  But Tribal Intervenors add two brief ones of their own that merit mention.  Neither supports the Monuments.

*First*, the Tribes insist that the President need only "declare" a monument, and that he is not required to show his work.[359]  That may well be right; but a Monument may also rise-or-fall based on that decision.  Where, as here, a president declares a country-sized, omnibus monument, but does not delineate what lands are set aside for what "objects," he leaves his designation open to serious legal attack if it harbors material defects.  For such giant monuments, it is no doubt easier for a president to avoid this showing, and opt for a lump sum designation instead.  But that leaves the designation far more vulnerable when a court must assess remedies, because such a proclamation leaves a court without any means to intelligently sever the undifferentiated mass.

---

[357] Part III.C *supra*.
[358] Tribal Br. at 30–44; SUWA Br. at 2.
[359] Tribal Br. at 32.

*Second*, the Tribes suggest Congress has acquiesced to its view of the Act.[360]  Not so. Implicit ratification requires "overwhelming evidence" of acquiescence—that is, direct "evidence that Congress considered … the '*precise* issue' presented before the Court."[361]  There is no such evidence here.

Congress has never specifically considered and endorsed the interpretation of the Act underlying the Proclamations.  For instance, in 2014, Congress recodified the Antiquities Act without any substantive modifications.  But Congress did so as part of a massive, non-substantive effort to recodify a number of conservation laws that were related to the National Park System.[362] That housekeeping does not represent Congress analyzing the "precise issue" here.[363]

Nor has Congress somehow ratified the Executive's sweeping view in its other interactions with the Antiquities Act.  In particular, Congress did not implicitly ratify a boundless reading of the Act when it passed the FLPMA.  There, Congress repealed a number of laws relating to federal public lands management, but left the Antiquities Act in place.[364]  But that comes well below the towering bar set by the Supreme Court's precedents.  Consider, for example, *AMG Capital Management, LLC v. FTC*.[365]  There, the Court unanimously held Congress did not implicitly ratify the consensus view of eight circuit courts when it amended a provision's venue, joinder, and service rules, because the words at issue ("permanent injunction") were part of a *different* section within the *same* provision.[366]  If that falls short of what is required for implicit ratification,

---

[360] *Id.* at 32, 38–39.
[361] *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality opinion).
[362] H.R. Rep. No. 113-44 (2013) (noting bill makes "no substantive changes to the law").
[363] *See SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001).
[364] *See* Pub. L. No. 94-579, 90 Stat. 2743, 2792 (1976).
[365] 141 S. Ct. 1341, 1351 (2021).
[366] *Id.*

Congress's decision to pass the FLPMA—a *different* statute that itself repealed or amended *other* laws—does as well.

Likewise, Congress did not acquiesce to an unlimited view of the Act when it rejected specific presidential actions taken under it—namely, overturning President Carter's monuments in Alaska (16 U.S.C. § 3213), and requiring congressional approval for monuments in Wyoming (54 U.S.C. § 320301(d)). Where "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments … [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a particular] statutory interpretation."[367] So much so here.

Moreover, previous presidential designations are nowhere near as boundless and inconsistent with the Act as the Proclamations here. About three-quarters of Monuments are under 100,000 acres; over half are under 10,000 acres; and a third under 1,000 acres.[368] Country-sized monuments are a mostly modern phenomenon—starting with President Carter in 1978 (two years after the FLPMA passed).[369] In fact, "[s]ince 2006, Presidents have established five marine monuments alone whose total area exceeds that of all other American monuments combined."[370]

Even among these abuses, President Biden's Proclamations still break new ground. Never before has a President deemed an *entire landscape* an "object"—to say nothing of setting aside over *three million acres* to protect it. And Congress obviously has not ratified something novel.

At a more specific level, Congress has not ratified the Grand Staircase-Escalante Monument. The Proclamation suggests Congress ratified President Biden's version of the

---

[367] *Id.*

[368] *National Monument Facts and Figures*, NPS, https://www.nps.gov/subjects/archeology/national-monument-facts-and-figures.htm (last visited Apr. 13, 2023).

[369] *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).

[370] *Id.*

Monument by passing three laws altering the borders of President Clinton's.[371]  This is wrong, for the same reasons Judge Benson gave when facing a materially identical argument from the Clinton Administration.[372]  None of these laws consider the validity of—much less codify—the Grand Staircase-Escalante Monument.  Rather, in each instance, "these boundary adjustments could just as logically be seen as an attempt to mitigate one of the many possible severe impacts of the Monument rather than to validate its creation."[373]  And because each law has a clear alternative explanation, none evinces the pellucid legislative intent required for ratification.

Arguments based in legislative inaction generally "deserve little weight in the interpretive process,"[374] and there is no reason to give them more weight here.  Congress's inability to muster the political support to countermand unlawful executive action does not somehow render that action lawful.  "[P]ast practice does not, by itself, create power."[375]  This case is no exception.

## V.   THE APA CLAIMS SHOULD NOT BE DISMISSED.

When a presidential directive is unlawful, the actions implementing that directive are also unlawful.[376]  Under the APA, the proper course is to "set aside" these "final" agency actions as "in excess of statutory … authority" and "not in accordance with law."[377]  Such an action is "final" if

---

[371] 86 Fed. Reg. at 57344 (citing 1998 Utah Schools and Lands Exchange Act; 1998 Automobile National Heritage Area Act; and 2009 Omnibus Public Land Management Act).

[372] *Utah Ass'n of Cntys.*, 1999 U.S. Dist. LEXIS 15852, at *46–67.

[373] *Id.* at *49 (quotation marks omitted).

[374] *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994).

[375] *Medellín v. Texas*, 552 U.S. 491, 532 (2008).  Writing as *amicus*, the National Wildlife Federation (and others) emphasize that a number of past proclamations have protected things similar to the Proclamations.  ECF 124, at 7–15.  But even on its own terms, the NWF's examples are overstated.  For one, many rest on specific natural formations—something different in kind from a landscape, area, ecosystem, habitat, or animal.  For another, a number discuss animals as reasons that something *else* is an "object" under the Act.  A prime example, as noted, is *Cappaert*.

[376] *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952); *Franklin*, 505 U.S. at 828–29 (Scalia, J., concurring in part and concurring in the judgment).

[377] 5 U.S.C. § 706(2)(A), (C).

it "mark[s] the consummation of the agency's decisionmaking process" and is something "by which rights or obligations have been determined, or from which legal consequences will flow."[378]

The Complaint identifies two specific sets of final agency actions:  The Interim Plans, and a discrete permit denial.  Because these agency actions derive from President Biden's unlawful Proclamations, and because they are "final" under the APA, they give rise to valid APA claims.

**Interim Plans.**  As noted, BLM has issued two interim management plans—one for Grand Staircase-Escalante, another for Bears Ears—that establish how bureaucrats will regulate activities on monument lands.[379]  They "provide[] specific direction" for administering the Proclamations, and govern monument management until final plans are approved in 2024.[380]

The Plans undoubtedly mark the consummation of BLM's decisionmaking process.  They are issued by the BLM Director and are "not … subject to further consideration by the agency."[381] The Plans' interim label "refers only to [their] intended duration—not [their] tentative nature."[382]

The Tribes see things differently, and say the Interim Plans cannot be the consummation of the agency's decisionmaking process because the Proclamations specify that final management plans can only be issued after BLM consults with other groups (which has not happened yet).[383] But this is mistaken.  Whether BLM has cleared the requisite hurdles to promulgate *final* management plans has no bearing on whether its has finished its internal processes for *interim* management plans—which are *themselves* discrete agency actions.   "[A]n interim agency

---

[378] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).
[379] *Supra* notes 107, 166.
[380] Grand Staircase Interim Plan, *supra*, at 1; Bears Ears Interim Plan, *supra*, at 2.
[381] *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).
[382] *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996).
[383] Tribal Br. at 25–26.

resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency."[384]

The Interim Plans also generate legal consequences. "Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*."[385] And here, the Plans bind BLM and its staff, as well as create obligations for officials on the ground.[386]

The Government contends the Interim Plans do not determine any rights or obligations (and may not be agency action at all) because they exclusively distill other legal sources and are "simply informational documents."[387] But that is wrong. For instance, the Proclamations preclude new mining and mineral leasing with respect to all federal lands and "interests in lands within the boundaries of the monument," but include a carveout for any "exchange that furthers the protective purposes of the monument."[388] Therefore, under both Proclamations, the Government may commence exchanges with existing leaseholders and issue new permits as to monument land.[389]

The Interim Plans extinguish this discretion. Both state that "no new mining claims may be located, and no new mineral leases may be issued, on lands within the monument."[390] The Plans thus carry "legal consequences because [they] withdraw[] some of the discretion the

---

[384] *Wheeler*, 955 F.3d at 103.

[385] *Texas*, 933 F.3d at 441.

[386] *See, e.g.*, Grand Staircase Interim Plan, *supra*, at 4 (directing BLM-UT to review specific trails not expressly identified in the Proclamation for propriety of off-road vehicle).

[387] Gov't Br. at 62.

[388] 86 Fed. Reg. at 57345; *id.* at 57331.

[389] *See, e.g.*, 43 C.F.R. § 3515 (detailing ordinary BLM procedures for mineral lease exchanges); *see also* Murray D. Feldman, *The New Public Land Exchanges: Trading Development Rights in One Area for Public Resources in Another*, 43 Rocky Mtn. Min. L. Inst. 2-1 § 2.01 (1997).

[390] Grand Staircase Interim Plan, *supra*, at 2; Bears Ears Interim Plan, *supra*, at 2.

[Proclamations] afforded [BLM] in evaluating [mining and mineral leasing]."[391]  For the same reasons, *Whitewater Draw* and *Tulare County*—the cases cited by the Government—are inapposite because the pertinent plans did not reduce any agency's discretion during the interim period, but rather just restated existing obligations.[392]

The Interim Plans currently govern how the Monuments are managed, and will do so for the foreseeable future.  They are "final" agency actions under the APA, and are thus reviewable.

**Permit Denial.**  The Individual Plaintiffs have also alleged that certain permits have been denied as a result of the Proclamations.[393]  The Government does not dispute that a permit denial is a final agency action.  Nor could it.[394]  Rather, the Government disputes *why* recent permits have been denied, maintaining that Tony Wright's group was rejected for independent reasons.[395]  But that is the sort of factual dispute that should not be resolved on this posture.  The Individual Plaintiffs identified a permit that was denied in the aftermath of the Proclamations, and one that asked to use a trail specifically flagged by one of the Interim Plans.[396]  It is clearly plausible that the permit was denied because due to the Proclamation.  That is all that is required at this stage.

## CONCLUSION

The Court should deny the Defendants' motions to dismiss the Complaint.

---

[391] *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 405 (D.C. Cir. 2020); *see also, e.g.*, *Texas*, 933 F.3d at 442 (making same point about actions limiting "agency's discretion").

[392] *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1009 (9th Cir. 2021) (emphasizing document at issue "does not augment or diminish" the agency's obligations); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 29 (D.D.C. 2001) (similar).

[393] *See, e.g.*, Am. Compl. ¶ 109 (ECF 90).

[394] *See, e.g.*, *Role Models Am., Inc. v. White*, 317 F.3d 327, 331–32 (D.C. Cir. 2003).

[395] Gov't Br. at 66.

[396] Wright Decl. ¶¶ 12–14 (ECF 90-3).

Dated: April 14, 2023                    Respectfully submitted,

*/s/ Brady Brammer*
Brady Brammer (SBN: 13411)
Matt Piccolo (SBN: 15707)
BRAMMER RANCK, LLP
1955 W. Grove Parkway, Suite 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
bbrammer@brfirm.com

James M. Burnham (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
jburnham@jonesday.com
hgraver@jonesday.com

*Counsel for Individual Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 14, 2023, the foregoing document was served upon all counsel of record through this Court's electronic filing system.

*/s/ Brady Brammer*
Brady Brammer

*Counsel for Individual Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with this Court's Order Granting Joint Motion to Approve Briefing Page Limits, ECF No. 111 (Mar. 2, 2023), as it contains 66 pages.

*/s/ Brady Brammer*
Brady Brammer

*Counsel for Individual Plaintiffs*